# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| In re:<br><br>**QHC FACILITIES, *et al*[1]**<br><br>Debtors and Debtors in Possession | ) Chapter 11<br>) Case No. 21-01643-als11<br>) Jointly Administered<br>)<br>) Hon. Anita L. Shodeen<br>)<br>) **DEBTORS' MOTION FOR ORDERS (I)(A)**<br>) **APPROVING BIDDING PROCEDURES; (B)**<br>) **SCHEDULING THE TIME, DATE, AND**<br>) **FORM OF NOTICE FOR THE AUCTION**<br>) **AND SALE HEARING; AND (C)**<br>) **APPROVING BREAK-UP FEE; AND (II)(A)**<br>) **APPROVING THE SALE FREE AND**<br>) **CLEAR OF LIENS, CLAIMS, INTERESTS,**<br>) **& ENCUMBRANCES; AND (B)**<br>) **AUTHORIZING ASSUMPTION AND**<br>) **ASSIGNMENT OR REJECTION OF**<br>) **LEASES AND EXECUTORY CONTRACTS**<br>)<br>) No Hearing Set. |

**COMES NOW**, QHC Facilities, LLC and its affiliates in the above referenced cases (the "Debtors" or "QHC"), Debtors and Debtors-in-Possession herein, by and through their duly-employed general reorganization counsel, Jeffrey D. Goetz, Esq. and Krystal R. Mikkilineni, Esq. of the law firm of Bradshaw, Fowler, Proctor & Fairgrave, P.C., and respectfully file this Motion for Orders (I)(A) Approving Bidding Procedures; (B) Scheduling the Time, Date, and Form of Notice for the Auction and Sale Hearing; and (C) Approving Break-Up Fee; and (II)(A) Authorizing Sale of Assets Free and Clear of Liens, Claims, Interests and Encumbrances; and

---

[1] The Jointly Administered Debtors in this proceeding are *In re QHC Management, LLC* (Case No. 21-01644-als11), *In re QHC Mitchellville, LLC* (Case No. 21-01645-als11), *In re QHC Winterset North, LLC* (Case No. 21-01646-als11), *In re QHC Madison Square, LLC* (Case No. 21-01647-als11), *In re QHC Fort Dodge Villa, LLC* (Case No. 21-01648-als11), *In re QHC Crestridge, LLC* (Case No. 21-01649-als11), *In re QHC Crestview Acres Inc.* (Case No. 21-01650-als11), *In re QHC Humboldt North, LLC* (Case No. 21-01651-als11), *In re QHC Humboldt South, LLC* (Case No. 21-01652-als11) and *In re QHC Villa Cottages, LLC* (Case No. 21-01653-als11).

(B) Authorizing Assumption and Assignment or Rejection of Leases and Executory Contracts, and would show this Honorable Court as follows:

1.      On December 29, 2021 (the "Petition Date"), Debtors filed their respective voluntary petitions under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") (Docket No. 1).

2.      The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

3.      No trustee or examiner has been appointed in this case.

4.      On January 17, 2022, the Office of the United States Trustee (the "UST") filed a Notice of Appointment of Committee of Unsecured Creditors (the "Committee") (Docket No. 55).

## JURISDICTION

5.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The statutory predicates for relief sought herein include Bankruptcy Code sections 105(a), 363, 365 and Rules 2002, 6004, 6006 and 9006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## BACKGROUND

6.      Debtors have made the business decision to pursue an orderly sale of substantially all of their assets as a going concern to maximize value for the estates and their creditors.

7.      Debtors believe an orderly sale process will position the Debtors for a seamless transition of their skilled nursing and assisted living facilities, while prioritizing the continued and uninterrupted care of their residents.

8.      By this Motion, Debtors seek authority to solicit bids and sell substantially all of their assets (the "Assets") at auction (the "Auction") without a stalking horse bidder at this time.

9.      On January 24, 2022, the Debtors filed an application to employ Newmark Real Estate of Dallas, LLC ("Newmark") as their investment banker (the "Investment Banker") (Docket No. 79) (the "Employment Application") to market the Assets and run an auction process to determine the highest and best bid for the Assets.

## RELIEF REQUESTED

10.      As stated above, Debtors intend to sell the Assets and believe an orderly sale of the Assets after a structured marketing period is the best way to maximize the value of the Assets for the benefit of creditors, the estates, and other parties in interest.

11.      By this Motion, pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, and 9006, the Debtors seek entry of:

(a) The "Bidding Procedures Order", substantially in the form attached hereto as "Exhibit A":
   i. Authorizing and approving the "Bidding Procedures," substantially in the form attached as "Exhibit 1" to the Bidding Procedures Order;
   ii. Authorizing the Break-Up Fee in the event of a Stalking Horse Bidder;
   iii. Authorizing and approving the procedures for the assumption and assignment of executory contracts and unexpired leases and the determination of cure costs (the "Assumption and Assignment Procedures");
   iv. Scheduling a hearing with respect to approval of the sale of the Acquired Assets (the "Sale Hearing") and notices related thereto within 21 days of entry of the Bidding Procedures Order (subject to the Court's availability); and
   v. Approving various deadlines in connection with the foregoing.

(b) The "Sale Order," which shall be filed with the Court at least five (5) days prior to the Sale Hearing and shall be in form and substance reasonably acceptable to the Debtor and the Successful Bidder, authorizing and approving:
   i. The sale of the Assets of the Debtors free and clear of any liens,

claims, interests, and encumbrances (the "Acquired Assets") to the
Successful Bidder (the "Sale Order");

ii. The assumption and assignment of certain executory contracts and
unexpired leases of the Debtors in connection therewith; and

iii. Granting related relief.

## I.    Need for Timely Sale Process

12.    The Debtors have been authorized to use interim cash collateral through the
Court's order (Docket Nos. 25 & 29).  The Debtors believe the most expeditious and value-
maximizing path to emergence is one that would result in the least amount of administrative
expense and deterioration in the value of their operations. Moreover, Debtors believe that a
successful sale of Debtors' operations would be the best outcome to ensure the health and safety
of the patients/residents. Thus, it is the correct time to pursue a sale of substantially all their
assets pursuant to section 363 of the Bankruptcy Code on the terms proposed herein.

## II. Marketing Efforts

13.    The Debtors, in consultation with their professional advisors, diligently evaluated
a number of options to address their liquidity concerns prior to the commencement of these
Bankruptcy Cases.  Based on the Debtors' evaluation, and in an exercise of the Debtors' business
judgment, the Debtors concluded that a sale of all or substantially all of their assets was the best
way to maximize value for their creditors and ensure the health, safety, and welfare of their
residents.  To that end, the Debtors and their professional advisors have commenced robust and
aggressive marketing initiatives that generated expressions of interest from various parties.

14.    Newmark has been involved in the marketing of QHC since November of 2021.
Over the past few months, Newmark has been engaged in a robust marketing process that will
garner interest in the Debtors' Assets and facilitate the Debtors receiving the highest and best
offer for their Assets. QHC's mission is the provision of patient care and health care services to

the communities it serves. The proposed marketing effort and orderly auction and sale process will allow for the continuation of patient care while preserving and producing value for the benefit of the estates and their creditors.

15. In order to do the most efficient job possible in marketing Debtors' Assets, creating a competitive auction environment, and testing the marketplace to ensure the Debtors and the estates are realizing maximum value for the sale of the Debtors' Assets, the Investment Banker is working with management to prepare an executive summary of the Assets and their investment highlights to be distributed to potential buyers, both strategic and financial, who will and are executing non-disclosure agreements. Further, the Investment Banker has populated a virtual data room (the "VDR") to facilitate interested parties' due diligence exercises. The Investment Banker is also working with interested parties to supplement diligence investigations and facility tours, as necessary.

### III. Bidding Procedures

16. The Bidding Procedures are designed to maximize value for the Debtors' estates and will enable the Debtors to review, analyze, and compare all bids received to determine which bid is the highest and best. The Bidding Procedures describe, among other things, procedures for parties to access due diligence, the manner in which bidders and bids become "qualified," the receipt and negotiation of bids received, the conduct of the Auction, if any[2], the selection and approval of the ultimately successful bidder, and the deadlines with respect to the foregoing Bidding Procedures. The Debtors submit that the Bidding Procedures afford them the opportunity to pursue a sale process that will maximize the value of their estates.

---

[2] Auction will only occur if there are other bidders besides the potential stalking horse bidder.

17.    The Bidding Procedures will provide detailed instructions, requirements and notice to all interested parties regarding access to diligence materials, the assets to be sold, the bidding process, key dates for potential preliminary bidders, the bid submission process, determination and announcement of baseline bids, and conduct of the Auction and bidding terms.

18.    The Bidding Procedures and Form APA also provide that upon termination of any Stalking Horse Bidder's APA, if applicable, the Bid Deposit submitted by such Stalking Horse Bidder will be returned to the Stalking Horse Bidder. The Form APA also provides that upon consummation of an alternative transaction that is not the Stalking Horse Bidder's sale transaction, the Debtors will pay the Stalking Horse Bidder a break-up fee (the "Break-up Fee"). The Break-up Fee of up to 1.8% of the purchase price would be payable within five (5) business days of the Closing Date of the Successful Bidder, and until paid will be allowed as an administrative claim pursuant to Bankruptcy Code section 501(b)(1)(A).

19.    The Bidding Procedures and Form APA further provide that any bid must include a commitment to enter into an Operations Transfer Agreement upon entry of the Sale Order.

## IV.    Assumption and Assignment of Executory Contracts and Unexpired Leases

20.    To facilitate the Sale, the Debtors seek authority to assume and assign to the Successful Bidder the Assumed Contracts in accordance with the following proposed Assumption and Assignment Procedures:

(a)    Within five (5) business days after the entry of the Bidding Procedures Order (the "Assumption Notice Deadline"), the Debtors shall file with the Bankruptcy Court and serve, by overnight delivery (and by e-mail in cases where e-mail service has been consented to and where e-mail addresses are known), on counsel to the Committee and each counterparty (each, a "Counterparty," and collectively, the "Counterparties") to an Assumed Executory Contract a Cure Notice.

(b)    The Cure Notice shall include, without limitation, the cure amount (each, a "Cure Cost"), if any, that the Debtors (after consultation with the Stalking Horse Bidder, if any) believe is required to be paid to the applicable Counterparty under section

365(b)(1)(A) and (B) of the Bankruptcy Code for each of the Assumed Executory Contracts and shall further include the Contract Objection Deadline.  If a Counterparty objects to the Cure Cost, the Counterparty must file with the Bankruptcy Court and serve on the Contract Objection Notice Parties a written objection (a "Contract Objection").

(c)     Any Contract Objection shall:  (i) be in writing; (ii) comply with the Federal Rules of Bankruptcy Procedure; (iii) be filed with the clerk of the Bankruptcy Court, 300 U.S. Courthouse Annex, 110 East Court Avenue, Suite 300, Des Moines, Iowa 50309, together with proof of service, by the Contract Objection Deadline; (iv) be served, so as to be actually received on or before the Contract Objection Deadline, upon the Contract Objection Notice Parties (as defined below); and (v) state with specificity the grounds for such objection, including, without limitation, the fully liquidated cure amount and the legal and factual bases for any unliquidated cure amount that the Counterparty believes is required to be paid under section 365(b)(1)(A) and (B) of the Bankruptcy Code, along with the specific nature and dates of any alleged defaults, the pecuniary losses, if any, resulting therefrom, and the conditions giving rise thereto.

(d)     The "Contract Objection Notice Parties" are as follows: (A) ) general reorganization counsel to the Debtors, attention Jeffrey Goetz (goetz.jeffrey@bradshawlaw.com) and Krystal Mikkilineni (mikkilineni.krystal@bradsahawlaw.com); (B) counsel to the Committee: attention Francis Lawall (Francis.Lawall@Troutman.com) and Deborah Kovsky-Apap (deborah.kovsky@troutman.com); and (C) counsel to Lincoln Savings Bank, attention Jeff Courter (jwc@nyemaster.com) and Roy Leaf (rleaf@nyemaster.com).

(e)     If, after the Assumption Notice Deadline, additional executory contracts or unexpired leases of the Debtors are determined to be Assumed Executory Contracts, as soon as practicable thereafter, the Debtors shall file with the Bankruptcy Court and serve, by overnight delivery (and by e-mail in cases where e-mail service has been consented to and where e-mail addresses are known), on counsel to the Committee and the Counterparties a Cure Notice, and such Counterparties shall file any Contract Objections not later than seven (7) days thereafter.  In the event that the Stalking Horse Bidder, if any, and the relevant Counterparty cannot resolve any such Contract Objection, then the Debtor shall promptly notice a hearing before the Bankruptcy Court to resolve such Contract Objection.

(f)     As soon as practicable thereafter and in no event later than one (1) business day after the date of the Auction, the Debtors shall file with the Bankruptcy Court and serve, by overnight delivery (and by e-mail in cases where e-mail service has been consented to and where e-mail addresses are known), on the Counterparties a notice identifying the Successful Bidder, and the Counterparties shall file any Contract Objections solely on the basis of adequate assurance of future

performance not later than two (2) hours prior to the commencement of the Sale Hearing.

(g)     At the Sale Hearing, the Debtors will seek Bankruptcy Court approval of their assumption and assignment to the Successful Bidder of those Assumed Contracts that have been selected by the Successful Bidder to be assumed and assigned (collectively, the "Selected Assumed Contracts").  The Debtors and their estates reserve any and all rights with respect to any Assumed Contracts that are not ultimately designated as Selected Assumed Contracts.

(h)     If no Contract Objection is timely received with respect to a Selected Assumed Contract:  (i) the Counterparty to such Selected Assumed Contract shall be deemed to have consented to the assumption by the Debtors and assignment to the Successful Bidder of the Selected Assumed Contract, and be forever barred from asserting any objection with regard to such assumption and assignment (including, without limitation, with respect to adequate assurance of future performance by the Successful Bidder); (ii) any and all defaults under the Selected Assumed Contract and any and all pecuniary losses related thereto shall be deemed cured and compensated pursuant to section 365(b)(1)(A) and (B) of the Bankruptcy Code; and (ii) the Cure Cost for such Selected Assumed Contract shall be controlling, notwithstanding anything to the contrary in such Selected Assumed Contract, or any other related document, and the Counterparty shall be deemed to have consented to the Cure Cost and shall be forever barred from asserting any other claims related to such Selected Assumed Contract against the Debtors and their estates or the Successful Bidder, or the property of any of them, that existed prior to the entry of the Sale Order.

(i)     To the extent that the parties are unable to consensually resolve any Contract Objection prior to the commencement of the Sale Hearing, including, without limitation, any dispute with respect to the cure amount required to be paid to the applicable Counterparty under section 365(b)(1)(A) and (B) of the Bankruptcy Code (any such dispute, a "Cure Dispute"), such Contract Objection will be adjudicated at the Sale Hearing or at such other date and time as may be fixed by the Bankruptcy Court; provided, however, that, if the Contract Objection relates solely to a Cure Dispute, the Selected Assumed Contract may be assumed by the Debtors and assigned to the Successful Bidder provided that the cure amount the Counterparty asserts is required to be paid under section 365(b)(1)(A) and (B) of the Bankruptcy Code (or such lower amount as agreed to by the Counterparty) is deposited in a segregated account by the Debtors pending the Bankruptcy Court's adjudication of the Cure Dispute or the consensual resolution of the Cure Dispute by the Successful Bidder, on the one hand, and the objecting Counterparty, on the other hand.

(a)     If no Contract Objection is timely received, the Debtors shall be authorized to assume and assign such Assumed Contracts to the Successful Bidder without further notice to creditors or other parties in interest and without the

need for further order of the Bankruptcy Court, and such assumption and assignment shall be subject to the terms of the Sale Order.

21.    The Cure Cost fixed by the Bankruptcy Court with respect to any Selected Assumed Contract shall be paid by the Successful Bidder directly to the counterparty to such contracts as promptly as practicable after approval of the assumption and assignment. Further, the Successful Bidder shall provide adequate assurance of future performance under the Selected Assumed Contracts, as same is required by the Bankruptcy Court. In either event, the order approving assumption and assignment shall provide that upon payment of the applicable Cure Cost, such counterparty shall not have any remaining claim against the Debtors or the Estates related to any default under any such Selected Assumed Contract.

## V.    The Proposed Transaction Is a Sound Exercise of Business Judgment and in the Best Interests of the Estates

22.    Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a Debtor "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." *See also* Bankruptcy Rule 6004(f)(1) ("All sales not in the ordinary course of business may be by private sale or by public auction"). This section generally permits a debtor to sell property of the estate outside of the ordinary course of its business where the proposed sale is a sound exercise of the debtor's business judgment and when such sale is proposed in good faith. *See In re Lionel Corp.*, 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Nicole Energy Services, Inc.*, 385 B.R. 201, 210 (S.D. Ohio 2008) ("Under the law of this [Sixth] Circuit, the Court may approve a sale of all of a debtor's assets under § 363(b) 'when a sound business purpose dictates such action.'") (quoting *Stephens Industries, Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986)).

23.    Bankruptcy Code section 363 governs the Debtors' ability to sell property of the estates outside of the ordinary course of business. Although this section does not set forth a standard for determining when it is appropriate to authorize such a sale, courts have uniformly held that such a sale should be approved when it is justified by a sound business purpose. *See In re Lionel Corp.*, 722 F.2d at 1070-71; *Chrysler Group LLC v. South Holland Dodge, Inc.*, 862 F. Supp. 2d 661, 668 (E.D. Michigan 2012); *In re Dewey & LeBoeuf LLP*, No. 12–12321 (MG), 2012 WL 5386276, at *5 (Bankr. S.D. N.Y. Nov. 1, 2012); *In re Nicole Energy Services, Inc.*, 385 B.R. at 230. The burden of establishing a rational business justification lies with the debtor. *Nicole Energy*, 385 B.R. at 230 (citing *Lionel*, 722 F.2d at 1070-71). However, once the debtor makes such a showing, a presumption will attach that the decision was made on an informed basis, in good faith, and in the honest belief that the action was in the best interest of the company. *See*, *e.g.*, *In re Brook Valley VII, Joint Venture*, 496 F.3d 892, 900 (8th Cir. 2007).

24.    In the instant case, the proposed sale of the Assets constitutes a sound exercise of the Debtors' business judgment and has been proposed in good faith. First, an expeditious sale of the Assets will aid in minimizing the administrative expenses of the Debtors' estates, resulting in greater distribution to creditors.  Second, such sale as a going concern will ensure nursing operations and patient care will not be interrupted, thus protecting the health, safety, and welfare of patients. Finally, the sale represents the best opportunity for the Debtors to realize the value of the Assets on a going-concern basis, considering the factors in this case.  Testimony from a representative of the Debtors and a representative of Gibbins Advisors will be elicited to prove the Debtors have good business reasons and that Debtors are exercising their business judgment. Finally, the sale represents the best opportunity for the Debtors to realize the value of the Assets on a going-concern basis, considering the factors in this case.   Furthermore, an absence of any

other feasible path forward in the meantime does nothing other than cause the estates to incur

additional administrative expenses.

25.      The Debtors believe this Motion and the transactions contemplated thereby are in

the best interests of the bankruptcy estates and in the best interests of all other interested parties

in this chapter 11 case. An orderly sale of the Assets is essential. The proceeds of the sale, to the

extent sold as a going concern, will be greater than if the same Assets are sold in a piecemeal

liquidation because the Debtors' ongoing operations will not be interrupted, and Debtors'

patients will be able to stay in their residences without facing the trauma of transferring facilities.

The sale will also aid in minimizing the administrative expenses of Debtors' estates. Therefore,

the Debtors believe this Motion and the transactions contemplated thereby are in the best

interests of the bankruptcy estates and in the best interests of all other interested parties in this

chapter 11 case.

26.      The Debtors submit that the factors described above and to be established by the

Debtors' witnesses and exhibits at the Bidding Procedures and sale hearings will support an

expeditious sale of the Assets and are consistent with the traditional rationale for authorizing a

sale outside of a chapter 11 plan. *See also In re Boston Generating, LLC,* 440 B.R. 302, 321

(S.D.N.Y. 2010); *Lionel*, 722 F.2d at 1070.

**VI.      Sale Free and Clear of Liens**

27.      Bankruptcy Code section 363(f) authorizes a Debtor to use, sell or lease property

of the estate outside of the ordinary course of business, free and clear of any interest in such

property. The Bidding Procedures provide for the sale of the Assets free and clear of all interests,

liens, claims and encumbrances, including existing or asserted rights of first refusal, contractual

restrictions on transferability or other similar protective rights. Any such interests, liens, claims

and encumbrance would attach to the proceeds of the sale of the Assets (the "Sale Proceeds") ultimately attributable to the property against or in which such interest, lien, claim or encumbrances is asserted.

28.     Under Bankruptcy Code section 363(f)(2), a sale free and clear of all interests, liens, claims and encumbrances is permissible if all parties asserting liens on or other interests in the assets consent.  The Debtors are providing proper notice of this Motion to the United States Trustee, senior and other secured creditors, the Official Committee of Unsecured Creditors, counter-parties to executory contracts and unexpired leases, appropriate governmental authorities, and all other parties who have filed requests for special notice, thereby giving them the opportunity to object to this Motion. Provided no secured creditors object to this Motion, section 363(f)(2) will be satisfied. *See, e.g.*, *In re Motors Liquidation Co.*, 430 B.R. 65, 72) (in a chapter 11 case, noting that "secured lenders" approved a transaction under section 363(b) of the Bankruptcy Code and related transactions).

29.     Under Bankruptcy Code section 363(f)(4), a sale free and clear of all interests, liens, claims and encumbrances is permissible if the interest of any entity is in *bona fide* dispute. Under Bankruptcy Code section 363(f)(5), a sale free and clear of all interests, liens, claims and encumbrances is permissible if any party asserting an interest in the assets could be compelled to accept money satisfaction of such interest in a legal or equitable proceeding.  Any sale proposed by the Debtors will satisfy both elements.

## VII.    The Sale of Substantially All of the Debtors' Assets Does Not Establish Any *Sub Rosa* Plan of Reorganization

30.     A sale of assets may not be approved where such sale, rather than merely changing the composition of the Debtors' assets, either restructures the right of creditors or predetermines the rights of creditors under any future plan of reorganization. *See In re Braniff*

*Airways, Inc.*, 700 F.2d 935, 939-40 (5th Cir. 1983); *In re Iridium Operating LLC*, 478 F.3d 452,

465-66 (2nd Cir. 2007); *In re Continental Air Lines, Inc.*, 780 F.2d 1223, 1227-28 (5th Cir.

1986).

31.    In *Braniff*, the Fifth Circuit held that an agreement between the Debtor and its

creditors established a *sub rosa* plan of reorganization because, among other things, the

agreement:

> (i)    required that any future plan of reorganization allocate certain assets
> only to employees, shareholders or unsecured creditors of the Debtor;
> (ii)    required the secured creditors to vote a portion of their deficiency
> claim in favor of any future plan of reorganization approved by a majority
> of the unsecured creditors' committee; and
> (iii)    provided for the release of claims by all parties against the Debtors,
> its secured creditors and its officers and directors.

700 F.2d at 939-40.

32.    Unlike *Braniff*, the transactions contemplated by the Bidding Procedures will not

restructure the rights of the Debtors' creditors or predetermine the rights of such creditors under

any future plan of reorganization.

33.    Furthermore, the Debtors have articulated sound business justifications for selling

the Assets now, rather than as part of a plan. A Bankruptcy Code section 363 sale motion should

be approved if it is based on good business reasoning. *In re Lionel Corp.*, 722 F.2d at 1070; *In re*

*Equity Mgmt. Sys.*, 149 B.R. 120 (Bankr. S.D. Iowa 1993) (Court considered some of the

following factors: whether all parties in interest received reasonable notice; whether the purchase

price is fair and reasonable; whether there is a sound business reason for the sale; and whether

the proposed sale unfairly benefits insiders or proprietary purchasers, or unfairly favors a creditor

or class). Here, all such factors have been met.

34.    The value of the Assets will be tested in the marketplace via the auction and

bidding process mandated by the Bidding Procedures. The likelihood that a plan of

reorganization will be confirmed very quickly is doubtful and the future value of these Assets are

subject to being diminished if the case does not progress promptly with a sale process. Moreover,

as stated, it is in the best interests of the patients for Debtors to promptly sell. The Debtors need a

plan to emerge from chapter 11 and believes this sale process is the correct path because there is

no other plan that is feasible before the Court at the moment or likely to be forthcoming.  This is

an exercise of the Debtors' business judgment, which is the correct legal standard to apply.

**VIII.**    **The Bidding Procedures Are Intended to Enhance Competitive Bidding**

35.    Applying Bankruptcy Code section 363, courts accord debtors substantial

deference in formulating procedures for selling assets. *See*, *e.g.*, *In re Boston Generating, LLC*,

440 B.R. 302, 329-330 (S.D. N.Y. 2010) (noting that the requirements for section 363 sales are

reviewed according to the deferential "business judgment" standard); *In re Adelphia Commc'ns*

*Corp.*, No. 02–41729 (REG), 2003 WL 22316543, at *30 (Bankr. S.D.N.Y. Mar. 4, 2003)

(applying the "business judgment" standard presumption of validity and noting that courts are

"loath to interfere with corporate decisions absent showings of bad faith, self-interest, or gross

negligence"). Indeed, courts recognize that "procedures intended to enhance competitive bidding

are consistent with the goal of maximizing the value received by the estate and are appropriate in

the context of bankruptcy sales."  *In re Dura Auto. Sys., Inc.*, No. 06–11202, 2007 WL 7728109,

at *90 (Bankr. Del. Aug. 15, 2007).

36.    Here, the Bidding Procedures are supported by ample business justification, as

provided herein and as will be established by the Debtors' witnesses and exhibits at the Bidding

Procedures Hearing, and are reasonable and appropriate under the circumstances of this case.

The proposed Bidding Procedures are designed to foster an open, competitive and fair sale

process, while maximizing the value the estate hopes to obtain for the Assets. The Bidding

Procedures proposed herein substantially conform with bidding procedures approved by this

Court within the past several years. *See* Cycle Force Group, LLC, No. 21-00571-als11 (Bankr.

S.D. Iowa); *Foods, Inc. dba Dahl's Foods*, No. 14-02689-11 (Bankr. S.D. Iowa); *Newton Mfg.

Co.*, No. 15-01128-11 (Bankr. S.D. Iowa); *Wellman Dynamics Corp.*, No. 16-01825-als11

(Bankr. S.D. Iowa); *Sivyer Steel Corp.*, No. 18-00507-als11 (Bankr S.D. Iowa). Accordingly,

Debtors request the Court approve the Bidding Procedures as fair and reasonable under the

circumstances and authorize and direct the Debtors to proceed in accordance with them.

### IX.    <u>The Potential Break-Up Fee Should be Approved</u>

37.    "It has become increasingly common in section 363 sales of significant

portions of an estate's assets for the prospective buyer to demand a breakup fee or other

protection in the event that the sale is not consummated." 3 COLLIER ON BANKRUPTCY §

363.03 [7] (15th rev. ed. 2002). Bankruptcy courts have identified at least two instances in which

bidding incentives and protections may benefit the estate. First, a break-up fee or expense

reimbursement may be necessary to preserve the value of the estate if assurance of the fee

"promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have

been made and without which bidding would have been limited." *AgriProcessors, Inc. v. Iowa

Quality Beef Supply Network, L.L.C.* (*In re Tama Beef Packing, Inc.*) 290 B.R. 90 (8th Cir. BAP

2003) (*Tama I*) (quoting *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl.

Energy, Inc.)*, 181 F.3d 527, 533 (3d Cir. 1999) (*O'Brien*). Second, if the availability of the

break-up fee and expense reimbursement were to induce a bidder to research the value of the

debtors and convert the value to a dollar figure on which other bidders can rely, the bidder may

have provided a benefit to the estate by increasing the likelihood that the price at which the

debtor is sold will reflect its true worth. *Id.*; *see also In re Reliant Energy Channel View LP*, 594 F.3d 200, 206-08 (3d Cir. 2010).

38.     Further in *Wintz Companies*, the United States Bankruptcy Appellate Panel of the Eighth Circuit held that when considering break-up fees, "the test is whether the bankruptcy court, in its discretion, properly determines that the proposed fee, and the transaction as a whole, make economic sense and are in the best interest of the bankruptcy estate and its creditors." *In re Wintz Companies*, 230 B.R. 840, 846–47 (B.A.P. 8th Cir. 1999), aff'd, 219 F.3d 807 (8th Cir. 2000); *see also In re SpecialtyChem Prods. Corp.*, 372 B.R. 434, 440 (E.D.Wis. 2007) (Break-up fees are allowed when it "(1) arises from transaction with debtor-in-possession; and (2) is beneficial to debtor-in-possession in operation of its business").

39.     The Eighth Circuit in *Reagan* also allowed for a $50,000 break-up fee when it considered situations in which break-up fees are useful during a sale. *In re Reagan*, 403 B.R. 614, 619 (B.A.P. 8th Cir. 2009), aff'd, 374 F. App'x 683 (8th Cir. 2010).  In *Reagan*, the Court stated, "[s]talking horse bids may generate interest in the assets and create a sense of confidence in the value of the assets among prospective buyers who might assume that a willing buyer has conducted due diligence. *Id.* In the event that the stalking horse bidder is outbid, courts often approve break-up fees to compensate the stalking horse for the 'cost' of showing its hand before the auction, conducting due diligence and otherwise facilitating the creation of a market. *Id*. (citations omitted).

40.     In *Tama* I, the United Stated Bankruptcy Appellate Court in the Eighth Circuit used the *O'Brien* analysis from the Third Circuit Court of Appeals. *Tama I.,* 290 B.R. at 96. The Court analyzed three established tests used to determine whether break-up fees are permitted: (1) the business judgment test; (2) the best interests of the estate test; and (3) the

administrative claim test. *Id.* at 97. The Court in *Tama I* agreed with the Third Circuit's rationale

that there is no justification for applying a break-up fee any different than an application for

administrative expenses. *Id.* Therefore, in *Tama I*, the Bankruptcy Appellate Court for the Eighth

Circuit reviewed the following nine factors set forth by the Third Circuit in *O'Brien* as relevant

in deciding whether to award a break-up fee:

> (a)    the presence of self-dealing or manipulation in negotiating the break-up fee;
> (b)    the reasonableness of the break-up fee relative to the purchase price;
> (c)    whether the unsuccessful bidder placed the estate property in a "sales configuration mode" to attract other bidders to the auction;
> (d)    the ability of the request for a break-up fee to serve to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders, or attract additional bidders;
> (e)    the correlation of the fee to a maximum of value of the debtor's estate;
> (f)    the support of the principal secured creditors and creditors' committees for the break-up fee;
> (g)    the benefits safeguard to the debtor's estate; and
> (h)    the substantial adverse impact of the break-up fee on unsecured creditors where such creditors oppose the break-up fee.

*See id.; see also O'Brien*, 181 F.3d at 536.

41.    The Break-up Fee falls squarely within the *O'Brien* factors. Further, the

Break-up Fee is reasonable in relation to the size of the proposed sale and under the facts and

uncertainties of this transaction.  Such Break-Up Fee is an amount similar to break-up fees or

expense reimbursements approved in other similar Chapter 11 cases. *See, e.g.*, *In re: Otter Tail*

*Ag Enters., LLC.*, 2011 WL 231274 (Bankr.D.Minn.) (court approved $1 million or 1.59% of the

stated purchase price); *In re President Casinos, Inc.*, 314 B.R. 786, 789 (Bankr. E.D. Mo. 2004)

("a break-up fee in the amount of $250,000.00 is allowed as part of the Purchase and Sale

Agreement); *In re ContinentalAFA Dispensing Co.*, 416 B.R. 661, 663 (Bankr. E.D. Mo. 2009)

(approving a breakup fee of 3.6% of the purchase price); *In re Foods, Inc.*, No. 14-02689-11,

(Bankr.S.D. Iowa Dec. 03, 2014) (order approving break up-fee of $315,000 as reasonable); *In re Things Remembered, Inc.,* Case No. 19-10234 (KJC) (Bankr. D. Del.) (approving breakup fee of $425,000 or 2.4% of the purchase price and expense reimbursement up to $350,000); *In re Bertucci's Holdings, Inc.,* Case No. 18-10894 (MFW) (Bankr. D. Del.) (approving break-up of $750,000 or 4.4% of the cash portion of the purchase price and expense reimbursement up to $245,000); *In re The Weinstein Co. Holdings LLC*, Case No. 18-10601 (MFW) (Bankr. D. Del.) (approving break-up fee of 3% of cash purchase price or $9.3 million and expense reimbursement of up to 1.5% of the cash purchase price ($4.650 million), with right to seek an amount up to 2% of the cash purchase price ($6.2 million) if the sale hearing is delayed); *In re Brookstone Holdings Corp.,* Case No. 18-11780 (BLS) (Bankr. D. Del.) (approving break-up fee of $900,000 or 1.4% of the cash purchase price and expense reimbursement of up to $300,000).

42.    Break-up fees usually range from one to four percent of the purchase price, and are a fair and reasonable percentage of the proposed purchase price. *In re Tama Beef Packing, Inc*., 321 B.R. 496, 497–98 (B.A.P. 8th Cir. 2005) (*Tama II*). In *Tama II*, the Court distinguished between break-up fees and simple administrative expenses by stating "Break-up fees often surface, i.e., in conjunction with a "stalking horse's" unsuccessful bid. *Id.* Depending on the circumstances and the terms of the transaction, an unsuccessful stalking horse bidder may seek reimbursement of its actual expenses or it may seek a break-up fee which is designed to compensate the unsuccessful bidder for the risk and costs incurred in advancing the competitive bidding process." *Id.*; *see also In re President Casinos, Inc*., 314 B.R. 786, 789 (Bankr. E.D. Mo. 2004) ("A break-up fee that is greater than the actual cost and expenses of the prospective purchaser should constitute a fair and reasonable percentage of the proposed purchase price, and should be reasonably related to the risk, effort, and expenses of the prospective purchaser.").

Here, the Break-up Fee is a fair and reasonable percentage of the proposed purchase price, and is reasonably related to the proposed purchaser's risks, efforts, and expenses. *See Tama I.*, 290 B.R. at 98-99. The presence of the Break-up Fee confers a benefit on these bankruptcy estates.

43.     Finally, the Break-up Fee does not hamper any other party's ability to offer a higher or better bid for the Assets. Given the size of the Break-up Fee relative to the anticipated total amount of consideration provided for the Assets, and relative to the "overbid" requirements set forth in the Bidding Procedures, the fee is not so large as to have a "chilling effect" on other prospective bidders' interest in the Assets. *See In re Wintz Companies,* 230 B.R. at 847; *In re President Casinos, Inc.,* 314 B.R. at 786*; Tama I.*, 290 B.R. at 96.

44.     Furthermore, because the timely sale of the Assets is required and the auction process is the most beneficial means to the Debtors' estates of maximizing the value of the Acquired Assets, the Break-up Fee constitutes actual and necessary costs and expenses of preserving the Debtors' estates. In addition, because a Stalking Horse Bidder APA, if any, will create a floor for any additional bids, the Stalking Horse Bidder will have provided significant value to the Debtors' estates. The Debtors submit that the Break-up Fee is appropriate.

## X.     <u>The Assumption and Assignment Procedures Should be Approved</u>

45.     Section 365(a) of the Bankruptcy Code provides that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Upon finding that a debtor has exercised its sound business judgment in determining to assume an executory contract or unexpired lease, courts will approve the assumption under section 365(a) of the Bankruptcy Code. *See Nostas Assocs. v. Costich* (*In re Klein Sleep Prods.*, *Inc.*), 78 F.3d 18, 25 (2d Cir. 1996); *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp*.), 4 F.3d 1095, 1099 (2d Cir. 1993).

46.     In connection with the sale transaction, the Debtors will assume and assign the Assumed Contracts (*i.e.*, the executory contracts or unexpired leases included in the Successful Bidder's APA).  In the Sale Transaction, the Debtors' assumption of the Assumed Contracts will be contingent upon payment of Cure Costs and effective only upon the Closing.  Further, section 365(k) of the Bankruptcy Code provides that assignment by the debtor to an entity of a contract or lease "relieves the trustee and the estate from any liability for any breach of such contract or lease occurring after such assignment."  11 U.S.C. § 365(k).  Pursuant to section 365(k), the Debtors will therefore be relieved from any liability for any breach of any Assumed Contract after an assignment to the Successful Bidder.  As such, the assumption of the Assumed Contracts constitutes an exercise of the Debtors' sound business judgment.

47.     Section 365(b)(1) of the Bankruptcy Code requires that any outstanding defaults under the Assumed Contracts must be cured or that adequate assurance be provided that such defaults will be promptly cured.  As set forth above, the Debtors propose to file with the Court, and serve on each non-Debtor party to an Assumed Contract, a Cure Notice indicating the Debtors' calculation of the Cure Costs for each such contract.  Non-Debtor parties to the Assumed Contracts shall have the opportunity to lodge any objections to the proposed assumption and assignment to the Successful Bidder and, if applicable, the proposed Cure Cost.

48.     Pursuant to section 365(f)(2) of the Bankruptcy Code, a debtor may assign an executory contract or unexpired lease of nonresidential real property if "adequate assurance of future performance by the assignee of such contract or lease is provided."  11 U.S.C. § 365(f)(2). The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction."  *See Carlisle Homes, Inc. v. Azzari* (*In re Carlisle Homes, Inc.*), 103 B.R. 524, 538 (Bankr. D.N.J. 1988)

(citation omitted); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985)

(adequate assurance of future performance does not mean absolute assurance that debtor will thrive

and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985)

("[a]lthough no single solution will satisfy every case, the required assurance will fall considerably

short of an absolute guarantee of performance").  Among other things, adequate assurance may be

given by demonstrating the assignee's financial health and experience in managing the type of

enterprise or property assigned.  *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y.

1986) (adequate assurance of future performance is present when prospective assignee of lease has

financial resources and expressed willingness to devote sufficient funding to business to give it

strong likelihood of succeeding; in the leasing context, chief determinant of adequate assurance is

whether rent will be paid).

49.     At the Sale Hearing, to the extent necessary, the Debtors will be prepared to proffer

testimony or present evidence to demonstrate the ability of the Successful Bidder to perform under

the Assumed Contracts.  The Sale Hearing, therefore, will provide the Court and other interested

parties with the opportunity to evaluate the ability of the Successful Bidder to provide adequate

assurance of future performance, as required by section 365(b)(1)(C) of the Bankruptcy Code.

Accordingly, it is requested that at the conclusion of the Sale Hearing, the proposed assumption

and assignment of the Assumed Contracts be approved.

50.     To facilitate the assumption and assignment of the Assumed Contracts, the

Debtors further request the Court find all anti-assignment provisions of the Assumed Contracts

to be unenforceable under section 365(f) of the Bankruptcy Code.[3]

---

[3] Section 365(f)(1) provides in part that, "notwithstanding a provision in an executory contract or unexpired lease of
the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the
trustee may assign such contract or lease…"  11 U.S.C. § 365(f)(1).  Section 365(f)(3) further provides that
"Notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that

## REDUCTION OR ELIMINATION OF 14-DAY STAY

51.     Time is of the essence in approving and closing the sale, and any unnecessary delay in closing the sale could result in the collapse of the sale.  Accordingly, this Court should waive the 14-day period staying any order to sell or assign property of the estates imposed by Bankruptcy Rules 6004(h) and 6006(d).

## CONCLUSION

52.     Based upon the authorities and facts detailed above, the Debtors request the Court approve the Bidding Procedures and at a Sale Hearing to be held promptly after the Auction,  or if there are no other bidders besides the potential stalking horse bidder, and thus no Auction is held, within seven (7) days after the Preliminary Bidding Deadline, subject to the terms of the Bidding Procedures, the Court should approve the sale of the Assets to the purchaser or such other successful bidder at the Auction. Such relief is warranted because Debtors have shown and will further establish by testimonial and documentary evidence at the hearing, that the sale of the Assets is in the best interests of Debtors, their estates, patients, and creditors, and because the decision to sell the Assets was reached in the exercise of the Debtors' sound business judgment, after careful deliberation of their consequences and possible alternatives.

**WHEREFORE,** the Debtors respectfully request the Court hear this Motion and

(I)     enter the Bidding Procedures Order:

   a.  including a finding that due and adequate notice and an opportunity to be heard in accordance with all applicable law were given to all creditors and interested parties in the chapter 11 case, and any and all other affected or interested parties;

---

terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee."  11 U.S.C. § 365(f)(3).

b.  approving the Bidding Procedures;

c.  Approving the Break-Up Fee in the event of a Stalking Horse Bidder;

d.  Authorizing and approving the Assumption and Assignment Procedures; and

e.  Setting a Sale Hearing, subject to the Bidding Procedures;

and

(II)    enter the Sale Order:

a.  authorizing the sale of the Assets free and clear of all liens, encumbrances, claims and interests, including but not limited to personal property liens, mechanics' liens, judgment liens, rights of first refusal and all other claims;

b.  finding that the sale be effective immediately and that the stay provisions of Bankruptcy Rules 6004(h) and 6006(d) do not apply; and

c.  providing such other relief as is just and proper under the circumstances.

Date:  January 28, 2022                      Respectfully submitted,

/s/ *Krystal R. Mikkilineni*
Jeffrey D. Goetz, Esq., AT0002832
Krystal R. Mikkilineni, Esq., AT0011814
Bradshaw Fowler Proctor & Fairgrave, P.C.
801 Grand Avenue, Suite 3700
Des Moines, IA 50309-8004
515/246-5880
515/246-5808 FAX
goetz.jeffrey@bradshawlaw.com
mikkilineni.krystal@bradshawlaw.com

General Reorganization Counsel for
Debtors and Debtors-in-Possession.

CERTIFICATE OF SERVICE

This document was served electronically on parties who receive electronic notice through CM/ECF as listed on CM/ECF's notice of electronic filing.

/s/      *Barbara Warner*

EXHIBIT A


# UNITED STATES BANKRUPTCY COURT

# SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) Case No. 21-01643-als11 |
| **QHC FACILITIES, *et al*[1]** | ) Jointly Administered |
| | ) |
| Debtors and Debtors in Possession | ) Hon. Anita L. Shodeen |
| | ) |
| | ) **ORDER (A) APPROVING THE** |
| | ) **BIDDING PROCEDURES IN** |
| | ) **CONNECTION WITH THE AUCTION** |
| | ) **AND SALE OF ASSETS AND** |
| | ) **SCHEDULING AN AUCTION AND** |
| | ) **SALE HEARING; (B) APPROVING** |
| | ) **ASSUMPTION AND ASSIGNMENT** |
| | ) **PROCEDURES; (C) APPROVING** |
| | ) **THE BREAK-UP FEE; AND (D)** |
| | ) **GRANTING OTHER RELATED** |
| | ) **RELIEF** |
| | ) |
| | ) Entered on Docket: _____ |

THIS MATTER having come before the Court[2] on the motion (the "Motion") [Docket

No. ____] dated _____, of the Debtors for entry of an order (this "Order")

approving, among other things: (a) the Bidding Procedures (substantially in the form attached

hereto as **Exhibit 1**) and scheduling an Auction and the Sale Hearing for the sale of substantially

all the Debtors' assets; (b) the Assumption and Assignment Procedures; and (c) the Break-Up Fee

in the event of a Stalking Horse Bidder.  After due deliberation, and having reviewed the Motion,

---

[1] The Jointly Administered Debtors in this proceeding are *In re QHC Management, LLC* (Case No. 21-01644-als11), *In re QHC Mitchellville, LLC* (Case No. 21-01645-als11), *In re QHC Winterset North, LLC* (Case No. 21-01646-als11), *In re QHC Madison Square, LLC* (Case No. 21-01647-als11), *In re QHC Fort Dodge Villa, LLC* (Case No. 21-01648-als11), *In re QHC Crestridge, LLC* (Case No. 21-01649-als11), *In re QHC Crestview Acres Inc.* (Case No. 21-01650-als11), *In re QHC Humboldt North, LLC* (Case No. 21-01651-als11), *In re QHC Humboldt South, LLC* (Case No. 21-01652-als11) and *In re QHC Villa Cottages, LLC* (Case No. 21-01653-als11).

[2] Unless otherwise stated, capitalized terms not defined herein shall have the meanings set forth in the Bidding Procedures or the Motion.

any objections thereto, and materials submitted by the parties, and having considered the statements of counsel on the record, and the evidence adduced with respect to the Motion at a hearing to consider same, and having considered the agreements announced by the parties, and having determined that the relief requested in the Motion is in the best interests of the Debtors and their estates, in light of the circumstances described by counsel and reflected in the evidence,

**THE COURT HEREBY FINDS:**[3]

A.       This Court has jurisdiction over the Motion pursuant to 28 U.S.C. § 1334.  This proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O).  Venue is proper in this district and in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.       The statutory predicates for the relief requested herein are sections 105(a), 363(b) and (f), and 365 of title 11 of the United States Code (the "Bankruptcy Code") and Federal Rules of Bankruptcy Procedure 2002(a)(2), 6004(a), (b), (c), (e) and (f), 6006(a) and (c), 9006, 9007, and 9014.

C.       Notice of the Motion having been given to the Notice Parties (as defined below) is sufficient in light of the circumstances and the nature of the relief requested in the Motion.

D.       The Debtors have articulated good and sufficient reasons for this Court to grant the relief requested in the Motion regarding the sale process, which is reasonable and appropriate and represents the best method for ensuring patient welfare and maximizing value for the benefit of the Debtors' estates, including, without limitation: (i) approval of the Bidding Procedures; (ii) approval of the Assumption and Assignment Procedures; and (iii) approval of the Break-Up Fee in the event of a Stalking Horse Bidder.

---

[3] The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

E.      The Bidding Procedures were negotiated in good faith and at arms' length and are reasonably designed to promote participation and active bidding and ensure that the highest or best value is generated for the Acquired Assets.  Accordingly, the Bidding Procedures are reasonable and appropriate and represent the best method for maximizing value for the benefit of the Debtors' estates.

F.      In the event of a Stalking Horse Bidder, the Break-up Fee is reasonable and appropriate given, among other things, the size and nature of the Sale and the efforts that will be expended by a proposed purchaser, and is a material inducement for, and a condition of, a proposed purchaser's entry into an APA.  The Break-up Fee constitutes actual and necessary costs and expenses of preserving the Debtors' estates. In addition, because the Stalking Horse Bidder APA, if any, will create a floor for any additional bids, the Stalking Horse Bidder will have provided significant value to the Debtors' estates.

G.      Except for the Stalking Horse Bidder (if any), no other party submitting an offer or bid or a Qualified Bid shall be entitled to any expense reimbursement or breakup, termination, or similar fee, or post-petition claim, including any administrative expense claim or substantial contribution claim under section 503 of the Bankruptcy Code or otherwise, and by submitting a bid, a Bidder (other than the Stalking Horse Bidder, if any) shall be deemed to waive any right with respect thereto.

H.      The Assumption and Assignment Procedures, including notice of proposed Cure Costs, are reasonable and appropriate and consistent with section 365 of the Bankruptcy Code and Bankruptcy Rule 6006.  The Assumption and Assignment Procedures have been tailored to provide an adequate opportunity for all non-Debtor parties to the Assumed Contracts to raise any objections to the proposed assumption and assignment or to the Cure Costs.

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED EFFECTIVE IMMEDIATELY THAT:**

1.      The Motion is granted to the extent set forth herein.

2.      The Bidding Procedures are hereby approved in their entirety.  The Debtors are authorized to take any and all actions necessary or appropriate to implement the Bidding Procedures.

3.      All objections to the relief requested in the Motion that have not been withdrawn, waived, or settled (and all reservations of rights included therein) as announced to the Court at the hearing on the Motion or by stipulation filed with the Court, are overruled on the merits except as otherwise set forth herein.

4.      All bidders submitting a Qualified Bid are deemed to have submitted to the exclusive jurisdiction of this Court with respect to all matters related to the Auction and the terms and conditions of the sale or transfer of the Acquired Assets.

5.      The proposed Break-Up Fee, in the event there is a Stalking Horse Bidder, is reasonable and appropriate under the circumstances and is approved in its entirety.

6.      The Assumption and Assignment Procedures are reasonable and appropriate under the circumstances, fair to all non-Debtor parties, comply with the Bankruptcy Code, and are approved in their entirety.

7.      All Cure Objections must: (i) be in writing; (ii) comply with the Bankruptcy Rules; (iii) state with specificity what Cure Costs the objecting party believes are required; and (iv) be filed with this Court and served on the Debtors.

8.    If a timely Cure Objection is received and such objection cannot otherwise be resolved by the parties, such objection shall be heard at the Sale Hearing or such other date as the Court may determine.

9.    Within two (2) business days of entry of this Order, the Debtors (or their agent) shall serve by first class mail, postage prepaid, copies of: (i) this Order and (ii) the Bidding Procedures upon the following entities (collectively, the "<u>Notice Parties</u>"):[4]

(a)    the United States Trustee;

(b)    counsel to the Committee;

(c)    counsel to Lincoln Savings Bank;

(d)    the Internal Revenue Service and the Iowa Department of Revenue;

(e)    the United States Department of Justice;

(f)    state, county, and municipal governments having jurisdiction over any of the Acquired Assets;

(g)    all parties that have requested special notice pursuant to Bankruptcy Rule 2002;

(h)    all persons or entities known to the Debtors that have or have asserted a lien on, or security interest in, all or any portion of the Acquired Assets;

(i)    all governmental regulatory authorities asserting an interest in these Bankruptcy Cases;

(j)    all Assumed Contract parties;

(k)    all potential bidders previously identified by or otherwise known to the Debtors;

(l)    all patients and residents of the Facilities; and

(m)    all of the Debtors' employees.

---

[4] The Bidding Procedures will direct parties to contact Newmark Real Estate of Dallas, LLC ("Newmark") Investment Banker for the Debtor, for more information and will provide that any party that wishes to obtain a copy of any related document (subject to any necessary confidentiality agreement) may make such a request in writing to Newmark, attention Ross Sanders, 2515 McKinney Ave, Suite 1300, Dallas, TX 75201, ross.sanders@nmrk.com.

10.     As further described in the Bidding Procedures, the Sale Hearing will commence on _____ at _____ **prevailing Central time** or at such other hour on that date as the Court shall announce.  The Sale Hearing may be adjourned by the Bankruptcy Court from time to time without further notice to creditors or parties-in-interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing.

11.     Objections, if any, to the remainder of the relief requested in the Motion must: (a) be in writing and filed with this court **no later than** _____ **at** _____ **prevailing Central time** (the "Objection Deadline"); (b) comply with the Federal Rules of Bankruptcy Procedure; and (c) be served upon the Debtors, counsel for the Committee, and counsel for Lincoln Savings Bank so as to be **actually received** on or before the Objection Deadline.

12.     The Auction to conduct bidding with respect to the sale of the Acquired Assets, if necessary, shall have commenced by no later than February 21, 2022.

13.     All persons or entities (whether or not Qualified Bidders) that participate in the bidding process shall be deemed to have knowingly and voluntarily (i) consented to the entry of a final order by this Court in connection with the Motion to the extent that it is later determined that this Court, absent consent of the parties, cannot enter final orders or judgment in connection herewith consistent with Article III of the United States Constitution and (ii) waived any right to jury trial in connection with any disputes relating to any of the foregoing matters.

14.     Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 7062, 9014, or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

15.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

16.     The Debtors are authorized and empowered to take all actions necessary to implement the relief granted herein.

17.     To the extent that this Order is inconsistent with any prior order or pleading with respect to the Motion, the terms of this Order shall govern.

18.     This Court shall retain jurisdiction to resolve any dispute relating to the interpretation of the terms and conditions of this Order.

IT IS SO ORDERED.

_____

United States Bankruptcy Judge

Submitted by:


Respectfully submitted,

/s/ *Krystal R. Mikkilineni*
Jeffrey D. Goetz, Esq., AT0002832
Krystal R. Mikkilineni, Esq., AT0011814
Bradshaw Fowler Proctor & Fairgrave, P.C.
801 Grand Avenue, Suite 3700
Des Moines, IA 50309-8004
515/246-5880
515/246-5808 FAX
goetz.jeffrey@bradshawlaw.com
mikkilineni.krystal@bradshawlaw.com

*General Reorganization Counsel for*
*Debtors and Debtors-in-Possession.*

## **EXHIBIT 1**

**BIDDING PROCEDURES**

# EXHIBIT 1

## BIDDING PROCEDURES

On December 29, 2021, QHC Facilities, an Iowa limited liability company and its affiliates, QHC Management, LLC, QHC Madison Square, LLC, QHC Fort Dodge Villa, LLC, QHC Villa Cottages, LLC, QHC Mitchellville, LLC, QHC Humboldt North, LLC, QHC Humboldt South, LLC, QHC Winterset North, LLC, Crestview Acres, Inc., Crestridge, Inc. (the "Debtors"), as Debtors and debtors in possession, filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Iowa (the "Bankruptcy Court").

The Debtors are seeking to sell all or substantially all of their assets for the highest or best offer. On [___], 2021, the Bankruptcy Court entered an order [Docket No. [__]] (the "Bidding Procedures Order"), which, among other things, authorized the Debtors to solicit bids and approved these bidding procedures (the "Bidding Procedures") for the consideration of the highest or otherwise best price for all or substantially all of the Debtors' assets, on the terms and conditions set forth herein.

These Bidding Procedures describe, among other things: (i) the procedures for bidders to submit bids for substantially all of the assets of the Debtors (the "Acquired Assets"); (ii) the manner in which bidders and bids become Qualified Bidders and Qualified Bids, respectively (each as defined below); (iii) the negotiation of bids received; (iv) the conduct of the auction with respect to the Acquired Assets; and (v) the ultimate selection of the Accepted Bid (as defined below).

At the time of filing the Sale Motion, the Debtors had not secured a stalking horse bidder (the "Stalking Horse Bidder").  There may, however, be a Stalking Horse Bidder prior to the Auction, in which case, the Bid submitted by the Stalking Horse Bidder (the "Stalking Horse Bid") will be subject to higher or better offers submitted in accordance with these Bidding Procedures.

## Access to Diligence Materials

To participate in the bidding process and to receive access to due diligence (the "Diligence Materials"), a party must submit to the Debtors an executed confidentiality agreement ("Confidentiality Agreement") in form and substance reasonably satisfactory to the Debtors, as determined by the Debtors in consultation with its professionals.

The Diligence Materials shall be made available to interested bidders in a "Data Room" created and administered by the Debtors' investment banker, Newmark Real Estate of Dallas, LLC ("Newmark" or the "Investment Banker").  Parties interested in receiving access to the Data Room and Diligence Materials may contact Ross Sanders, ross.sanders@nmrk.com, (314) 221-8543, and will be provided with a form of the Confidentiality Agreement.

A party who qualifies for access to Diligence Materials shall be a "Preliminary Bidder". The Debtors will afford any Preliminary Bidder the time and opportunity to conduct reasonable due diligence under the time constraints provided herein; provided, however, that the Debtors shall not be obligated to furnish any due diligence information after the Preliminary Bid

Deadline. The Debtors reserve the right to withhold any Diligence Materials that it, in consultation with its professionals and the Consultation Parties (as defined below), determines are business-sensitive or otherwise not appropriate for disclosure to a Preliminary Bidder. Neither the Debtors nor their representatives shall be obligated to furnish information of any kind whatsoever to any person that is not determined to be a Preliminary Bidder.

Each Preliminary Bidder shall comply with all reasonable requests made by the Debtors and their advisors regarding such Preliminary Bidder.

The Debtors shall keep the Consultation Parties (as defined below) reasonably informed of all interested parties that become Preliminary Bidders and the status of their due diligence at all times.

## Assets to Be Sold

The Debtors are offering for sale all of the Acquired Assets as set forth in the form asset purchase agreement to be provided to each Preliminary Bidder (the "Form APA").  The Debtors will consider offers for the Acquired Assets either in whole or in lots by Facility (as defined in the Form APA); *provided, however*, that any offer for two or more Facilities shall specify the portion of the purchase price to be allocated to each Facility.

Except as otherwise provided for in these Bidding Procedures, and in the asset purchase agreement submitted by a Preliminary Bidder setting forth its Preliminary Bid (a "Bid APA"), all of the Debtors' rights, title and interest in and to the Acquired Assets shall be sold free and clear of any pledges, liens, security interests, encumbrances, claims, charges, options and interests thereon (collectively, the "Encumbrances") to the maximum extent permitted by the order approving the sale (the "Sale Order") and the Bankruptcy Code, with such Encumbrances to attach to the net proceeds of the sale of the Acquired Assets under the terms and provisions of the Sale Order.

## Bidding Process

The term "Consultation Parties" shall mean (i) the Official Committee of Unsecured Creditors (the "Committee"), and (ii) Lincoln Savings Bank.

The Debtors and their advisors, in consultation with the Consultation Parties, shall (i) determine whether any person is a Qualified Bidder as set forth herein; (ii) coordinate the efforts of Preliminary Bidders in conducting their due diligence investigations; (iii) receive offers from Preliminary Bidders, (iv) negotiate any offers made to purchase the Acquired Assets; (v) conduct an Auction of the Acquired Assets; (vi) select the Accepted Bid and a Backup Bid (if any); (vii) seek approval by the Bankruptcy Court of the Accepted Bid and Backup Bid (if any) at the hearing (the "Sale Hearing") set for approval of a sale or sales of the Debtors' assets (collectively, a "Sale Transaction"); and (viii) consummate the Sale Transaction at a closing (the "Closing") thereon as set forth herein and in the asset purchase agreement governing the Accepted Bid (the "Accepted Bid APA").

## Key Dates For Potential Preliminary Bidders

**Preliminary Bid Deadline:**                    [February 16, 2022]

**Qualified Bid Announcement Deadline:**         [February 18, 2022]

**Auction:**                                     [February 21, 2022]

**Sale Hearing:**                                [February __, 2022]


## Preliminary Bid Deadline

Preliminary Bids shall include an offer price for the Acquired Assets (including non-cash or other value) on a Facility-by-Facility basis as required herein.  Each Preliminary Bidder must provide to the Debtors and the Consultation Parties, by the Preliminary Bid Deadline: (1) a redline of its Bid APA to the Form APA, or in the event of a Stalking Horse Bidder has been approved, a redline to the Stalking Horse Bidder's asset purchase agreement (the "Stalking Horse APA"); (2) a clean, signed Bid APA; (3) its Bid Deposit; and (4) acceptable Proof of Performance as set forth herein.

Prior to the Preliminary Bid Deadline (defined below), the Debtors, in consultation with the Consultation Parties, may enter into verbal discussions with any or all of the Preliminary Bidders to determine clarifications of the Preliminary Bids and submitted Bid APAs and to negotiate terms of sale.  The Debtors may offer pricing guidance to the Preliminary Bidders if they determine, in consultation with the Consultation Parties, that such guidance is in the best interests of the Debtors' estates (the "Estates").  Such pricing guidance and other discussions, if undertaken, shall not create an enforceable agreement or be binding on the Debtors or their Estates.

The Debtors shall accept Preliminary Bids until **February 16, 2022 at 5 p.m. (Central Time)**, which shall be the "Preliminary Bid Deadline".  Except as determined by the Debtors, in consultation with the Consultation Parties, any party that does not submit a Bid by the Preliminary Bid Deadline may not (i) submit any offer after the Preliminary Bid Deadline or (ii) participate in the Auction.

## Determination of Qualified Bid(s) and Baseline Bid(s)

The Debtors shall evaluate and select by **February 18, 2022 at 5 p.m. (Central Time)** (the "Qualified Bid Announcement Deadline"), those Preliminary Bids which, in their discretion, after consultation with their professionals and the Consultation Parties, are deemed qualified bids entitled to bid at the Auction (the "Qualified Bids").  The Stalking Horse Bid, if any, shall automatically be deemed to be a Qualified Bid.

The Debtors shall determine, in consultation with the Consultation Parties, the highest and best Qualified Bid(s) submitted by the Preliminary Bid Deadline (the "Baseline Bid(s)").  This determination may take into account any factors the Debtors and Consultation Parties

reasonably deem relevant to the value of the Qualified Bids received by the Estates. On or before **February 20, 2022 (Central Time)** (the "<u>Designation Deadline</u>"), the Debtors shall file a notice designating the Baseline Bid and publish such notice in the Data Room and/or distribute the same at the Auction. The Debtors shall also provide copies of such Baseline Bid to all of the Qualified Bidders, including the Stalking Horse Bidder, if any, and to each of the Consultation Parties.

## **The Auction**

If the Debtors receive more than one Qualified Bid (including the Stalking Horse Bid, if any), the Debtors will conduct a live virtual Auction on February 21, 2022, **beginning at 10:00 a.m. (Central Time)**. If only one Qualified Bid (including a Stalking Horse Bid) is received by the Qualified Bid Deadline for a particular Facility or Facilities, such Qualified Bid shall be deemed the Accepted Bid for such Facility or Facilities and no Auction shall be conducted with respect to such Facility or Facilities.

Only a Qualified Bidder will be eligible to participate at the Auction, subject to such limitations as the Debtors may impose in good faith, in consultation with the Consultation Parties, as set forth herein. In addition, professionals and/or other representatives of (i) the Debtors, (ii) the Committee; and (iii) Lincoln Savings Bank will be permitted to attend and observe the Auction.

At the Auction, Qualified Bidders will be permitted to increase their bids in successive rounds of bidding. Bidding will start at the purchase price and terms proposed in the Baseline Bid, and will proceed thereafter in minimum increments of at least $100,000 (a "<u>Minimum Overbid Amount</u>") and all subsequent overbids shall be by $100,000. For the avoidance of doubt, in the event there is a Stalking Horse Bidder, the initial Minimum Overbid Amount shall be $100,000.00 plus the Break-Up Fee. The Debtors reserve the right to and may, after consultation with the Consultation Parties, increase or decrease the Minimum Overbid Amount at any time during the Auction. The Debtors, in consultation with their advisors and the Consultation Parties, shall determine, in their sole discretion, whether a Qualified Bid by a Qualified Bidder at the Auction matches or is higher and better than the prior Qualified Bid.

For the avoidance of doubt, the Stalking Horse Bidder, if any, shall be permitted to include the full amount of the Break-Up Fee in each bid by the Stalking Horse Bidder for the purposes of comparison to any overbid in connection with each round of bidding in the Auction.

The Debtors may adopt rules for the Auction at any time that the Debtors, in consultation with the Consultation Parties, reasonably determine to be appropriate to promote a spirited and robust auction, whether to adjourn the Auction at any time and from time to time, the conducting of multiple rounds of open or sealed bidding with notice only to the parties entitled to attend the Auction, and to declare that the Auction has ended when no further Bids are timely made or otherwise. At the start of the Auction, the Debtors shall describe the terms of the Baseline Bid. Each Qualified Bidder will be permitted what the Debtors, in consultation with the Consultation Parties, reasonably determine to be an appropriate amount of time to respond to the previous Bid at the Auction. The Auction will be conducted openly and shall be transcribed or recorded, and the Qualifying Bidders will be informed of the material terms of the previous bid.

In evaluating a Qualified Bid submitted at the Auction, the Debtors, in consultation with the Consultation Parties, may consider, among other things and without limitation, the amount of cash to be paid or delivered, the speed and certainty of consummating a transaction, and any other relevant factor.

## The Successful Bidder

Prior to ending the Auction, the Debtors, after consultation with the Consultation Parties, shall announce on the record that they have determined in their business judgment that they have received the highest or otherwise best Qualified Bid in the Accepted Bid, and the Qualified Bidder that had submitted such Qualified Bid shall be declared the winning bidder (the "Successful Bidder").  The Debtors, after consultation with the Consultation Parties, shall also identify the Qualified Bidder that submitted the next highest or otherwise best Qualified Bid as a Backup Bid and shall be declared the backup bidder (the "Backup Bidder").

The Debtors shall seek Bankruptcy Court approval of the Accepted Bid(s) and Backup Bid(s) (if any) at the Sale Hearing scheduled for **February __, 2022.**

## The Backup Bidder

The Backup Bidder shall be required to keep its Backup Bid open and irrevocable until the earlier of (i) the Closing of the Sale Transaction on the Accepted Bid; or (ii) thirty (30) days after the Sale Hearing.  Promptly following the Debtor's selection of the Accepted Bid, it shall file with the Bankruptcy Court notice of the Accepted Bid and Backup Bid, if any (the "Auction Report"), accompanied by such Successful Bidder's and Backup Bidder's Bid APA.

Following the Sale Hearing, if the Successful Bidder fails to consummate its purchase of the Acquired Assets by the Sale Closing date, the Debtor may deem the Backup Bidder to have the new prevailing bid, and the Debtor will be authorized, without further order of the Bankruptcy Court, to consummate the Sale Transaction with the Backup Bidder.  In such case of a failure to consummate the purchase of the Acquired Assets on the part of the Successful Bidder, the defaulting Successful Bidder's Bid Deposit shall be forfeited to the Debtors for the benefit of the Estates.  In addition, the Debtors, on behalf of the Estates, specifically reserve the right to seek all available damages, including specific performance, from any defaulting Successful Bidder (including any Backup Bidder designated as the new Successful Bidder).

## Bid Submission Process

A bid is a signed document from a Preliminary Bidder received by the Preliminary Bid Deadline that identifies the purchaser by its legal name (including any equity holders or other financial backers, if the Preliminary Bidder is an entity formed for the purpose of submitting bids or consummating a Sale Transaction), and any other party that will be participating in connection with the bid or the Sale Transaction, and includes, at a minimum, the following (a "Bid").  To be eligible to be considered by the Debtors as a Qualified Bidder, each Preliminary Bidder must satisfy, to the satisfaction of the Debtors and the Consultation Parties, the following conditions:

 (a)  Good Faith Deposit:  Each Preliminary Bidder must submit to the Debtors, by the Preliminary Bid Deadline, a good faith deposit (a "Bid Deposit") equal to

$250,000.00, which Bid Deposit shall be held by the Debtors in an escrow account (without interest) to be maintained by the Debtors until they determine whether or not such Preliminary Bid is a Qualified Bid.  The Bid Deposit shall be refunded, or applied to the Purchase Price, as set forth herein.  Any party that has not submitted its Bid Deposit may not be a Qualified Bidder, may not attend the Auction, and the Debtor may not negotiate the terms of a Bid with such party.

(b)  Redline APA:  Each Preliminary Bid must be submitted with a redline of the Form APA or the Stalking Horse APA, if applicable, (the "Redline APA") setting forth all proposed revisions by the Preliminary Bidder to the terms of the Form APA or Stalking Horse APA, if applicable.

(c)  Signed Bid APA: Each Preliminary Bid must be submitted with a clean version of the Bid APA, incorporating any proposed revisions, and signed by an authorized representative of the Preliminary Bidder.

(d)  Same or Better Terms:  If applicable, a statement that the Preliminary Bidder offers to purchase the Acquired Assets, pursuant to a Sale Transaction that is no less favorable to the Estates than the Sale Transaction contemplated in the Stalking Horse APA, if any.

(e)  Backup Bidder:  Each Bid submitted must provide that the (i) Qualified Bidder's Bid shall remain open and irrevocable until the earlier of (a) the Closing of the Sale Transaction on the Accepted Bid; or (b) thirty (30) days after the Outside Closing Date (defined below), and the (ii) Qualified Bidder is obligated to perform as a Backup Bidder (as defined below) in the event such Qualified Bidder is not the Successful Bidder.

(f)  Purchase Price; Minimum Bid:  If applicable, each Bid submitted must exceed the Stalking Horse Purchase Price, *plus* the Break-Up Fee, *plus* the Minimum Overbid Amount (the "Initial Minimum Bid Amount"). To the extent that multiple Bids are received for fewer than all of the Facilities, such Bids in the aggregate must exceed the Minimum Bid Amount. For the avoidance of doubt, there shall be no Initial Minimum Bid Amount in the absence of a Stalking Horse Bid.

(g)  Designation of Assigned Contracts and Leases:  A Preliminary Bid must identify with particularity each and every executory contract and lease with respect to which the Preliminary Bidder seeks assignment from the Debtors.

(h)  Excluded Assets: A Preliminary Bid must identify with particularity each of the Acquired Assets which the Preliminary Bidder does not wish to include in its offer.

(i)  Corporate Authority: A Preliminary Bid must include written evidence reasonably acceptable to the Debtors and the Consultation Parties demonstrating appropriate corporate authorization of the Preliminary Bidder to consummate the proposed Sale Transaction; provided that, if the Preliminary Bidder is an entity specially

6

formed for the purpose of effectuating the Sale Transaction, then the Preliminary Bidder must furnish written evidence reasonably acceptable to the Debtors and the Consultation Parties of the approval of the Sale Transaction by the equity holder(s) of such Preliminary Bidder.

(j)      <u>Disclosure of Identity of Preliminary Bidder</u>:  A Preliminary Bid must fully disclose the identity of each entity that will be bidding for or purchasing the Acquired Assets, including any equity holders, in the case of a Preliminary Bidder which is an entity specially formed for the purpose of effectuating the contemplated transaction, or otherwise participating in connection with such Preliminary Bid.  A Preliminary Bid must also fully disclose any connections or agreements with the Debtor, or any other known, potential or prospective Preliminary Bidder, and/or any officer, director or equity holder of the Debtors.

(k)      <u>Proof of Financial Ability to Perform</u>:  A Preliminary Bid must include written evidence that the Debtor may conclude, in consultation with its advisors, and the Consultation Parties, demonstrates that the Preliminary Bidder has the necessary financial ability to close the Sale Transaction and comply with section 365 of the Bankruptcy Code, including providing adequate assurance of future performance under all contracts and/or leases to be assumed and assigned in such Sale Transaction (collectively, such written evidence, the "<u>Proof of Performance</u>").

(l)      <u>Contact Information and Affiliates</u>:   The Preliminary Bid must provide the identity and contact information for the Preliminary Bidder.

(m)      <u>Contingencies</u>:   Each Preliminary Bid **<u>shall not</u>** be conditioned on obtaining financing, any internal approvals or credit committee approvals, or on the outcome or review of unperformed due diligence.

(n)      <u>Due Diligence</u>:  Each Preliminary Bid must expressly acknowledge and represent that the Preliminary Bidder: (a) has had an opportunity to conduct any and all due diligence regarding the Acquired Assets and the proposed transaction prior to making its Bid, (b) has relied solely upon its own independent review, investigation and/or inspection of any documents and the Acquired Assets in making its Bid or that of any of its legal, financial or other advisors, and (c) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the business of the Debtors or the Acquired Assets or the proposed transaction, or the completeness or accuracy of any information provided in connection therewith, except as expressly stated in the representations and warranties contained in the asset purchase agreement ultimately accepted and executed by the Debtors.

(o)      <u>Irrevocable</u>:  Each Preliminary Bid must be irrevocable in accordance with the Bidding Procedures until five (5) business days after the Sale Hearing, <u>provided</u> that if such Preliminary Bid is determined by the Debtors to be the Accepted Bid

or the Backup Bid, such Preliminary Bid shall continue to remain irrevocable, subject to the terms and conditions of these Bidding Procedures.

(p)    <u>Compliance with Diligence Requests</u>:  A Preliminary Bidder must have complied with reasonable requests for additional information and due diligence access from the Debtors to their satisfaction.

(q)    <u>Covenant to Cooperate</u>: Each Preliminary Bid must include a covenant to cooperate with the Debtors to provide pertinent factual information regarding the Preliminary Bidder's operations reasonably required to analyze issues arising with respect to any applicable anti-trust laws and other applicable regulatory requirements.

(r)    <u>Confidentiality Agreement</u>:  To the extent not already executed, the Preliminary Bid must include an executed Confidentiality Agreement in form and substance reasonably satisfactory to the Debtors.

(s)    <u>Environmental Requirements</u>:  Each Preliminary Bid must contain an acknowledgment of the following statement: "Nothing in these Bidding Procedures releases, nullifies, precludes, or enjoins the enforcement of any police or regulatory to a governmental unit that any entity would be subject to as the owner or operator of property after the date of entry of an order approving these Bidding Procedures. Nothing in these Bidding Procedures authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements under police or regulatory law. Nothing in these Bidding Procedures divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret these Bidding Procedures, or to adjudicate any defense asserted under the order approving these Bidding Procedures."

(t)    <u>Closing Date</u>:  A Preliminary Bid must include a commitment to enter into an Operations Transfer Agreement upon entry of the Sale Order and close and fully consummate the transactions contemplated by the Bid APA within 120 days of the Sale Order, subject to change of ownership approval by the regulatory agencies (the "Outside Closing Date").

(u)    <u>Bid Deadline</u>:  The following parties must receive a Preliminary Bid in writing (in both PDF and Word format), on or before the Preliminary Bid Deadline: (i) the Debtors' Investment Banker, attention Ross Sanders (ross.sanders@nmrk.com); (ii) general reorganization counsel to the Debtors, attention Jeffrey Goetz (goetz.jeffrey@bradshawlaw.com) and Krystal Mikkilineni (mikkilineni.krystal@bradsahawlaw.com); (iii) counsel to the Committee: attention Francis Lawall (Francis.Lawall@Troutman.com) and Deborah Kovsky-Apap (deborah.kovsky@troutman.com); and (iv) counsel to Lincoln Savings Bank, attention Jeff Courter (jwc@nyemaster.com) and Roy Leaf (rleaf@nyemaster.com).

8

A Preliminary Bid received from a Preliminary Bidder, on or before the Preliminary Bid Deadline, that meets the above requirements, shall constitute a "Qualified Bid", and such Preliminary Bidder shall constitute a "Qualified Bidder".  If the Debtors receive a Preliminary Bid prior to the Bid Deadline that is not determined by the Debtors, in accordance with these Bidding Procedures and in consultation with the Consultation Parties, to constitute a Qualified Bid, the Debtors may provide the Preliminary Bidder with the opportunity to remedy any deficiencies prior to the Preliminary Bid Deadline (or, as it deems appropriate, after the Preliminary Bid Deadline); provided, further, that, for the avoidance of doubt, if any Qualified Bidder fails to comply with reasonable requests for additional information and due diligence access from the Debtors to their satisfaction, the Debtors may, after consulting with their professionals and the Consultation Parties, disqualify any Qualified Bidder and reject a Qualified Bid.

### Sale Is As Is/Where Is

The sale of the Acquired Assets shall be on an "as is, where is" basis and without any additional representations or warranties of any kind, nature or description by the Debtors, their agents or the Estates, other than those set forth in the Form APA or Stalking Horse APA.  By submitting a bid, each Preliminary and Qualified Bidder shall be deemed to acknowledge and represent that it has had an opportunity to conduct any and all due diligence regarding the Acquired Assets prior to making its offer, that it has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Acquired Assets in making its bid, and that it did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Acquired Assets, or the completeness of any information provided in connection therewith or with the Auction, except as expressly stated in these Bidding Procedures.

### Sale Hearing

The Accepted Bid and the Backup Bid will be subject to approval by the Bankruptcy Court at the Sale Hearing on the date set forth above, or such other date as the Court may set. The Sale Hearing may be adjourned by the Debtors from time to time without further notice to creditors or other parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing, or by filing a notice on the docket of the Debtors' chapter 11 cases.

### Return of Deposits

The Bid Deposits of all Preliminary Bidders whose Preliminary Bid is not deemed by the Debtors as a Qualified Bid shall be returned to such Preliminary Bidder, without interest, within three (3) business days of such determination.  The Bid Deposit of any Qualified Bidder that is neither the Successful Bidder nor the Backup Bidder shall be returned to such Qualified Bidder not later than five (5) business days after the Sale Hearing.  The Bid Deposit of the Backup Bidder, if any, shall be returned to the Backup Bidder within three (3) business days after the Closing of the Sale Transaction with the Successful Bidder.  If the Successful Bidder timely and fully closes the Sale Transaction, its Bid Deposit shall be credited towards the Purchase Price.

9

## Closing of the Sale Transaction

The Successful Bidder shall fully consummate the Sale Transaction at a Closing to be scheduled and conducted by the Debtors and their professionals by no later than 120 days after entry of the Sale Order, subject to change of ownership approval by the regulatory agencies. No later than the Sale Closing date, the Successful Bidder shall be required to pay to the Debtors the balance of the Purchase Price in immediately available funds as set forth in the Successful Bidder's asset purchase agreement; execute such documents as the Debtors deem reasonably necessary to consummate the Sale Transaction; and otherwise fully consummate the Sale Transaction in accordance with the terms of the Accepted Bid APA as approved by the Bankruptcy Court. The Debtors may elect to conduct and consummate the Closing electronically and shall not be required to close the Sale Transaction in person if they deem it advisable.

## Modifications

The Debtors, in their sole discretion, but in consultation with their advisors and the Consultation Parties, may adopt, implement, and/or waive such other, additional or existing procedures or requirements that serves to further an orderly Auction and bidding process, including, but not limited to, the imposition of a requirement that all Qualified Bidders submit sealed Qualified Bids during the Auction, all without further notice except to those parties that would be entitled to attend at an Auction or participate in the Auction, as appropriate.

The Debtors, in their sole discretion, but in consultation with their advisors and Consultation Parties, may (a) determine which Qualified Bid, if any, is the Prevailing Bid, and (b) reject at any time before entry of an order approving the Accepted Bid, any Bid that, in the discretion of the Debtors, in consultation with their advisors and the Consultation Parties is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code or the Bidding Procedures, or (iii) contrary to the best interests of the Debtors' estates and their creditors. At or before the conclusion of the Auction, the Debtors, in their sole discretion, but in consultation with their advisors and Consultation Parties, may impose such other terms and conditions upon Qualified Bidders as the Debtors determine to be in the best interests of the Debtors' estates.

## Consultation Parties

The Debtors shall use their best effort to consult and confer with the Consultation Parties in respect of all material aspects of the bidding and Auction process in order to maximize value for all parties in interest. For the avoidance of doubt, however, the consultation rights provided to the Consultation Parties by these Bidding Procedures shall not limit the Debtors' discretion in any way and shall not include the right to veto any decision made by the Debtors in the exercise of their business judgment. Nothing in these Bidding Procedures shall limit, impair, or otherwise prejudice the ability of the Consultation Parties to object in connection with the Sale contemplated by these Bidding Procedures.

The Debtors may not modify the consultation or consent rights of any of the Consultation Parties set forth herein without the consent of such affected party; provided, however, that the Debtors may, in the exercise of their business judgment, take such steps as are necessary to

10

ensure a competitive and transparent bidding and Auction process, including, but not limited to, limiting (but not eliminating) the consultation rights of a Consultation Party that is or becomes a Qualified Bidder.

## Reservation of Rights of the Debtors

Except as otherwise provided in the Bidding Procedures or the Bidding Procedures Order, the Debtors, in consultation with the Consultation Parties, further reserve the right as they may reasonably determine to be in the best interest of the Estates and consistent with their fiduciary duties, to: (a) determine which Preliminary Bidders are Qualified Bidders; (b) determine which Preliminary Bids are Qualified Bids; (c) determine which Qualified Bid is the Accepted Bid or Backup Bid; (d) reject any Preliminary Bid that is (1) inadequate or insufficient, (2) not in conformity with the requirements of the Bidding Procedures or the requirements of the Bankruptcy Code, or (3) contrary to the best interests of the Debtors and their Estates; (e) waive non-compliance with any of the terms and conditions set forth herein as the Debtors determine to be in the best interests of the Estates, their creditors, and other parties in interest; (f) impose additional terms and conditions with respect to all potential bidders; (g) extend the deadlines set forth herein; (h) continue or cancel the Sale Hearing in open court, or by filing a notice on the docket of the Debtors' chapter 11 cases, without further notice to creditors or other parties in interest; and (i) modify the Bidding Procedures and implement additional procedural rules that the Debtors determine, in their business judgment, will better promote the goals of the bidding process and discharge its duties; provided, however, that any modification or additions to the Bidding Procedures shall not be materially inconsistent with the Bidding Procedures Order, Sale Order, any order approving any agreement for post-petition financing, or any other order of the Court.

## Break-Up Fee and Expense Reimbursement

Pursuant to the Bidding Procedures Order, the Stalking Horse Bidder, if any, is entitled to the Break-Up Fee in accordance with the terms of the Stalking Horse APA, the Sale Motion, and the Bidding Procedures Order.

Pursuant to the Bidding Procedures Order, except for the Stalking Horse Bidder, if any, no other party submitting an offer or bid or a Qualified Bid shall be entitled to any expense reimbursement or breakup, termination, or similar fee, or post-petition claim, including any administrative expense claim or substantial contribution claim under section 503 of the Bankruptcy Code or otherwise, and by submitting a bid, a Bidder (other than the Stalking Horse Bidder, if any) shall be deemed to waive any right with respect thereto.

## Consent to Jurisdiction and Authority as Condition to Bidding

All bidders that participate in the bidding process shall be deemed to have (i) consented to the core jurisdiction of the Bankruptcy Court to enter any order or orders, which shall be binding in all respects, in any way related to these Bidding Procedures, the bidding process, the Auction, or the construction and enforcement of any agreement or any other document relating to the Sale Transaction, (ii) waived any right to a jury trial in connection with any disputes relating to these Bidding Procedures, the bidding process, the Auction, or the construction and

11

enforcement of any agreement or any other document relating to the Sale Transaction, and (iii) consented to the entry of a final order or judgment in any way related to these Bidding Procedures, the bidding process, the Auction, or the construction and enforcement of any agreement or any other document relating to the Sale Transaction if it is determined that the Bankruptcy Court would lack Article III jurisdiction to enter such a final order or judgment absent the consent of the parties.