# UNITED STATES BANKRUPTCY COURT

## SOUTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| **QHC Facilities, LLC et al.,**[1] | ) | Case No. 21-01643-als11 |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | **CONSENT ORDER (I) AUTHORIZING** |
| | ) | **DEBTORS TO OBTAIN DEBTORS IN** |
| | ) | **POSSESSION FINANCING, AND (II)** |
| | ) | **PROVIDING ADEQUATE** |
| | ) | **PROTECTION, SUPERPRIORITY** |
| | ) | **CLAIMS** |
| | ) | [Bankruptcy Code Sections 105, 362, 363, |
| | ) | and 364, Bankruptcy Rule 4001] |
| | ) | |
| | ) | Date: Wednesday, February 2, 2022 |
| | ) | Time: 9:00 a.m. |
| _____ | ) | Courtroom 1 |

Upon the motion dated January 28, 2022 (the "Motion") (Docket No. 120) of the above-captioned Debtors and Debtors-in-possession (the "Debtors") for entry of an order (the "Order"), seeking (a) authority for the Debtors to borrow money (the "DIP Loan") from the DIP Lender[2] pursuant to the terms of the Debtors-in-Possession Credit Agreement (the "DIP Credit Agreement"), (attached hereto as **Exhibit A**), and use such funds strictly in accordance with the budget (attached hereto as **Exhibit B**) (the "Budget") to finance the operations of the Debtors' businesses.

---

[1] The Jointly Administered Debtors in this proceeding are *In re QHC Management, LLC* (Case No. 21-01644-als11), *In re QHC Mitchellville, LLC* (Case No. 21-01645-als11), *In re QHC Winterset North, LLC* (Case No. 21-01646-als11), *In re QHC Madison Square, LLC* (Case No. 21-01647-als11), *In re QHC Fort Dodge Villa, LLC* (Case No. 21-01648-als11), *In re Crestridge, Inc.* (Case No. 21-01649-als11), *In re Crestview Acres, Inc.* (Case No. 21-01650-als11), *In re QHC Humboldt North, LLC* (Case No. 21-01651-als11), *In re QHC Humboldt South, LLC* (Case No. 21-01652-als11) and *In re QHC Villa Cottages, LLC* (Case No. 21-01653-als11).

[2] All capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion unless otherwise expressly set forth herein.

This Court held a hearing on February 2, 2022 (the "Hearing"), and upon the record made by the Debtors at the Hearing, the testimony presented or proffered at the Hearing, and the other evidence submitted or adduced and the arguments of counsel made at the Hearing; and all objections to the entry of this Order having been overruled, withdrawn, or resolved pursuant to the terms of this Order. After the Hearing, on February 2, 2022, the Court entered a minute order granting DIP Funding (as defined below), on an interim basis subject to a final order; and after due deliberation and consideration and sufficient cause appearing therefor:

**IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:**

1.    *Motion Granted*.  The relief requested in the Motion is granted, as set forth in this Order. Except as otherwise expressly provided in this Order, any objection to the entry of this Order that has not been withdrawn, waived, resolved, or settled, is hereby denied and overruled on the merits.  This Order shall become effective immediately upon its entry.  To the extent that the terms of any of the Loan Documents[3] differ from the terms of this Order, this Order shall control.

2.    *Jurisdiction*.  This Court has jurisdiction over this chapter 11 case and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  The basis for the relief sought in the Motion and granted in this Order are sections 105, 361, 362, 363, 364 and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004 and 9014.

3.    *Approval of Loan Documents*.  The Court hereby approves the Loan Documents, as set forth in the Motion, and authorizes the Debtors and to execute, deliver, and perform their respective obligations under the Loan Documents. The Debtors are authorized to borrow and be

---

[3]    As defined in the DIP Credit Agreement.

obligated under the Loan Documents in an aggregate principal amount not to exceed Two Million

Dollars ($2,000,000) (the "DIP Funding") for operational and working capital purposes of the

Debtors, interest and fees under the Loan Documents, and the allowed costs and expenses of these

Chapter 11 Cases (including the Carve Out), in each case (other than the fees and expenses of the

DIP Lender reimbursable pursuant to the terms of the Loan Documents) in substantial compliance

with the Budget.  The DIP Funding is hereby approved and shall be made available to the Debtors

subject to the terms of the DIP Credit Agreement upon entry of this Order and otherwise in

accordance with the Budget without further request from the Debtors; *provided* that such DIP

Funding shall be made in substantial compliance with the Budget.  In furtherance of the foregoing

and without further approval of this Court on the Motion, the Debtors are authorized and directed

to perform all acts (and to the extent such acts have already occurred, such acts are hereby ratified),

including, without limitation:

    (a)    the execution, delivery and performance of the Loan Documents;

    (b)    the performance of all other acts required under or in connection with this

        Order on the Motion and the Loan Documents.

    4.    Subject and subordinate to the Carve-Out (as defined below),  the DIP Obligations,

pursuant to sections 364(c)(1) and 364(c)(2) of the Bankruptcy Code: (i) shall constitute (without

the need to file a proof of claim) joint and several superpriority claims against each Debtor, with

priority over any and all administrative expenses of the Debtors, whether now existing or hereafter

arising or incurred, of any kind whatsoever, including any and all administrative expenses or other

claims of the kind specified in or arising under sections 105, 326, 328, 330, 331, 364, 365, 503(b),

506(c), 507, 546(c), 552(b), 726, 1113, 1114, or any other provision of the Bankruptcy Code,

whether or not such expenses or claims may become secured by a judgment lien or other

nonconsensual lien, levy or attachment, whether now in existence or hereafter incurred by the

Debtors, and shall at all times be senior to the rights of any Debtor, any Debtors' estate, and any

successor trustee, estate representative, or any creditor, in any of the Chapter 11 Cases or any

successor case; and (ii) shall be secured by valid, enforceable, non-avoidable, and fully perfected

first priority security interests in and liens and mortgages upon (in favor of the DIP Lender) all

DIP Collateral.

      5.    *Granting of DIP Liens and Superpriority Claims*.  Effective immediately upon the

entry of this Order, and subject to the Carve-Out, as set forth more fully in this Order, the DIP

Obligations shall be:

      (a)    entitled to super-priority administrative expense claims pursuant to

Bankruptcy Code section 364(c)(1) (the "Superpriority Claim"); and

      (b)    a first priority "priming lien" on all assets of the Debtors pursuant to

Bankruptcy Code section 364(c)(2) and 364(d)(1); (collectively, the "DIP Protections").

      6.    *Automatic Perfection*. This Order shall be sufficient and conclusive evidence of the

validity, perfection, and priority of all liens and claims herein, including the DIP Protections and

Superpriority Claim, without the necessity of filing or recording financing statements, intellectual

property filings, mortgages, notices of lien or similar instruments in any jurisdiction, taking

possession of or control over cash, deposit accounts, securities, or other assets, or the taking of any

other action (including, for the avoidance of doubt, entering into any deposit account control

agreement, customs broker agreement or freight forwarding agreement) to validate or perfect (in

accordance with applicable non-bankruptcy law) the DIP Protections, or to entitle the DIP Lender

to the priorities granted herein.

7.    *Proof of Claim*. Any order entered by the Court establishing a bar date for any claims (including, without limitation, administrative claims) in any of the Chapter 11 Cases or any successor case shall not apply to the DIP Lender, in its capacity as the DIP Lender. The DIP Lender shall not be required to file proofs of claim or requests for approval of administrative expenses authorized by this Order in any of the Chapter 11 Cases or any successor case, and the provisions of this Order relating to the amount of the DIP Funding, DIP Protections, and Superpriority Claims shall constitute a sufficient and timely filed proof of claim and/or administrative expense request in respect of such obligations and such secured status.

8.    *Use of Proceeds.*  Notwithstanding anything contained herein to the contrary, the DIP Funding shall be used by the Debtors solely to (i) fund (x) the Debtors' post-petition operating expenses and general corporate and working capital requirements, and (y) the expenses of the Chapter 11 Cases, (ii) make any prepetition payments expressly permitted hereby and permitted by orders of this Court, (iii) pay costs, expenses, interest, and other obligations owing to the DIP Lender under the DIP Facility, and (iv) pursue, negotiate, document, and implement a sale process, to be completed pursuant to section 363 of the Bankruptcy Code, and/or a plan of reorganization or liquidation as applicable (the "Restructuring"), each of the above in accordance with and to the extent provided for in the Budget. The Debtors may, after consultation with the Official Committee of Unsecured Creditors (the "Committee") and the Webb Family Trust (the "Webb Trust") request changes to the then-approved Budget, which changes shall be subject to the DIP Lender's approval in its sole and absolute discretion. Debtors shall adhere to the Budget, subject to Permitted Variances. "Permitted Variances" means (i) all favorable variances, (ii) an unfavorable variance of no more than 15% for (A) total disbursements paid by the Debtors, and (B) total receipts of the Debtors, in each case from the amounts set forth in the applicable Budget

on a biweekly and cumulative basis (each such period, a "Testing Period" and all such periods,
"Testing Periods"). The Borrowers shall deliver to the DIP Lender, any Committee, and the
Webb Family Trust (the "Webb Trust") on or before Wednesday of each week commencing with
the week of February 16, 2022, the Budget Variance Report covering the applicable Testing
Period. Nothing in this Order shall prejudice or impair the rights of the Committee, Webb Trust,
or any other party-in-interest to object to any such change or modification.

9.    *Subsequent Financing*. If any of the Debtors, any trustee, any examiner with
enlarged powers, any responsible officer or any other estate representative subsequently appointed
in the Chapter 11 Cases or any successor case, shall obtain credit or incur debt in breach of the
Loan Documents at any time prior to the repayment in full in cash of the DIP Loan and all other
obligations under the DIP Credit Agreement, including subsequent to the confirmation of any plan
of reorganization or liquidation with respect to the Debtors and the Debtors' estates, then all cash
proceeds derived from such credit or debt shall immediately be turned over to the DIP Lender to
be applied in accordance with this Order and the Loan Documents.

10.    The Debtors shall deliver to the DIP Lender, the Committee and the Webb Trust
the following:

(a)    all monthly financial reporting given to the U.S. Trustee and all of the
financial reporting set forth in the DIP Credit Agreement;

(b)    all variance reports showing actual receipts and disbursements from
operations on a biweekly basis and comparing actual results (including estimated accrued but not
yet billed fees and expenses for all professionals in these Chapter 11 Cases) compared to the line
items in the most recently-delivered Budget for all prior periods in form and substance satisfactory
to the DIP Lender;

6

(c)      as soon as practicable, but in any event within one (1) Business Day after the Debtor becomes aware of the existence of any Event of Default,[4] written notice specifying the nature of such Event of Default, including the anticipated effect thereof; and

(d)      all pleadings, motions, applications, financial information and other papers and documents filed by a Debtor with the Bankruptcy Court;

11.    *Rights of Access and Information*. Without limiting the rights of access and information afforded the DIP Lender under the Loan Documents, the Debtors shall be, and hereby are, required to afford representatives, agents and/or employees of the DIP Lender reasonable access to: (a) the Debtors' premises, (b) knowledgeable officers and representatives of the Debtors, (c) the Debtors' books and records, and (d) the Debtors' properties and other DIP Collateral[5] of any Debtor, and the Debtors shall reasonably cooperate, consult with, and provide to such persons all such information as may be reasonably requested. Without limiting any other rights or remedies of the DIP Lender available at law or in equity, and subject to the terms of the DIP Documents, upon five (5) business day's written notice to counsel to the Debtors and any landlord, lienholder, licensor, or other third-party owner of any leased or licensed premises or intellectual property, that an Event of Default has occurred and is continuing, the DIP Lender, (i) may, unless otherwise expressly provided in any separate agreement by and between the applicable landlord or licensor and the DIP Lender (the terms of which shall be reasonably acceptable to the parties thereto), enter upon any leased or licensed premises of the Debtors for the purpose of exercising any remedy with respect to DIP Collateral located thereon, and (ii) shall be entitled to all of the Debtors' rights and privileges as lessee or licensee under the applicable license and to use any and all trademarks, trade names, copyrights, licenses, patents, or any other similar assets of the Debtors, which are owned

---

[4]    As defined in the DIP Credit Agreement.
[5]    As defined in the DIP Credit Agreement.

by or subject to a lien of any third party and which are used by Debtors in their businesses, in either

the case of (i) or (ii), without interference from lienholders or licensors thereunder; provided,

however, that the DIP Lender shall pay only rent and additional rent, fees, royalties, or other

monetary obligations of the Debtors that accrue during the period of such occupancy or actual use

by DIP Lender calculated on a per diem basis. Nothing herein shall require the Debtors or the DIP

Lender to assume any lease or license under Bankruptcy Code section 365(a) as a precondition to

the rights afforded to the DIP Lender herein.

12.    *Good Faith*. The DIP Lender has acted in good faith in connection with the DIP

Loan and the Loan Documents, including this Order, and the DIP Lender's reliance on this Order

is in good faith. Based on the findings set forth in this Order and the record made during the

Hearing, and in accordance with section 364(e) of the Bankruptcy Code, in the event any or all of

the provisions of this Order are reversed or modified by a subsequent order of the Court, or any

other court, the DIP Lender is entitled to the rights, remedies, privileges, benefits and protections

provided in section 364(e) of the Bankruptcy Code. Any such modification or reversal shall not

affect the validity of any lien or claim (including the DIP Protections and Superpriority Claims)

authorized or created hereby or by any other Loan Document. Any liens or claims granted to the

DIP Lender hereunder or under any other Loan Document arising prior to the effective date of any

such modification or reversal of this Order shall be governed in all respects by the original

provisions of this Order, including entitlement to all rights, remedies, privileges and benefits

granted herein.

13.    *DIP Lender's Release*. The Debtors, on behalf of themselves and their estates

(including any successor trustee or other estate representative in these Chapter 11 Cases or any

successor case) and any party acting by, through, or under any of the Debtors or any of their estates,

hereby stipulate and agree that they forever and irrevocably (a) release, discharge, waive, and acquit the DIP Lender and each of its affiliates, and each of their respective former, current, or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, successors, assigns and predecessors in interest, from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened, including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description, including, without limitation, (i) any so-called "lender liability" or equitable subordination claims or defenses, (ii) any and all claims and causes of action arising under the Bankruptcy Code, and (iii) any and all claims and causes of action regarding the validity, priority, perfection, or avoidability of the liens or secured claims of the DIP Lenders, in each case arising out of or in any way related to the DIP Loan, the Loan Documents, the extension of credit by the DIP Lender to the Debtors, or the Debtors' use of any of the proceeds of the DIP Funding; and (b) waive any and all defenses (including, without limitation, offsets and counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability, and nonavoidability of the obligations under the DIP Credit Agreement, the DIP Protections, and the Superpriority Claims. For the avoidance of doubt, the foregoing release shall not constitute a release of any rights arising under the Loan Documents.

14.    *DIP Lender's Liability and Indemnification*. The DIP Lender shall have no liability to any third party and shall not be deemed to be in control of the operations of Debtors, to owe any

fiduciary duty to the Debtors, their respective creditors, shareholders, or estates or to be acting as a "responsible person" or managing agent with respect to the operation or management of Debtors by virtue of the DIP Lender's entry into the Loan Documents and funding the DIP Loan. Debtors shall indemnify and hold harmless the DIP Lender and its affiliates and officers, directors, employees, agents and advisors (in such capacity) from and against all losses, liabilities, claims, damages or other expenses arising out of or relating to the Loan Documents and Debtors' use of the financing provided thereunder, except for losses, liabilities, claims, damages or other expenses that are finally determined by a non-appealable order of this Court to be caused by the gross negligence or willful misconduct of the DIP Lender or its applicable affiliates and officers, directors, employees, agents and advisors. This indemnification shall survive and continue for the benefit of all such persons or entities.

15.    *Discharge Waiver*. The Debtors expressly stipulate, and the Court finds and adjudicates that, none of the obligations related to the DIP Loan, the Superpriority Claims, or the DIP Protections shall be discharged by the entry of an order confirming any plan of reorganization, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless such obligations have been indefeasibly paid in full in cash on or before the effective date of a confirmed plan of reorganization. Except as otherwise agreed to by the DIP Lender, the Debtors shall not propose or support any plan or sale of all or substantially all of the Debtors' assets or entry of any confirmation order or sale order that is not conditioned upon the payment in full, in cash, of all obligations pursuant to the DIP Credit Agreement and this Final Order.

16.    *No Marshalling.* Absent a Court Order to the contrary the DIP Lender shall not be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral and DIP Obligations and all proceeds thereof shall be received and applied in accordance

with the DIP Credit Agreement and Loan Documents, as applicable, and nothing in this section shall limit or impair the rights of the DIP Lender to credit bid in accordance with the DIP Credit Agreement.

17.     *Section 506(c) Waiver.* No costs or expenses of administration which have been or may be incurred in these Chapter 11 Cases at any time shall be charged against the DIP Lender, in its capacity as DIP Lender, or the DIP Obligations pursuant to sections 105 or 506(c) of the Bankruptcy Code or otherwise without the express written consent of the DIP Lender in its sole discretion, and no such consent shall be implied, directly or indirectly, from any other action, inaction or acquiescence by any such agents or creditors (including, without limitation, consent to the Carve Out or the approval of the Budget hereunder).

18.     *Section 552(b) Waiver.* The DIP Lender, in its capacity as DIP Lender, shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and, further, the "equities of the case" exception under section 552(b) shall not apply to any of the DIP Lender or any of the obligations under the DIP Credit Agreement or this Order.

19.     *Limited Lien on Avoidance Actions and Proceeds of Avoidance Actions*.  For the avoidance of doubt, the DIP Collateral, DIP Liens, and DIP Superpriority Claims shall include a limited lien in favor of DIP Lender on all products, offspring, profits, and proceeds of any Avoidance Actions arising under chapter 5 of the United States Bankruptcy Code (the "Limited Avoidance Action Lien").  The DIP Lender may not take any action to enforce, collect or monetize the Limited Avoidance Action unless and until the DIP Lender has exhausted all remedies and recoveries available to the DIP Lender in connection all other DIP Collateral (*i.e* the real property and personal property components of the DIP Collateral, excluding any Avoidance Actions).

11

20.     *Carve Out.* Subject to the terms and conditions set forth in the Loan Documents, a carve out from the DIP Liens, DIP Superpriority claims, and DIP Protections for the payment of (i) fees payable to the United States Trustee pursuant to 28 U.S.C. 1930 and (ii) the allowed professional fees and expenses of the Debtors' estate professionals in an amount not to exceed (a) the amounts set forth in the Budget and paid into the applicable professional fee escrow (the "Professional Fee Escrow") to be used to pay fees earned and expenses incurred prior to the occurrence of a an Event of Default, plus (b) an aggregate amount not to exceed $90,000 for Debtors' professionals, $25,000 for the Patient Care Ombudsman, and $30,000 for Committee professionals to be used to pay fees earned and expenses incurred subsequent to the occurrence of a an Event of Default, which payments are approved on a final basis by this Court (collectively, the "Carve-Out"). In no event shall the amounts set forth in (ii)(a) - (b) exceed $755,000 without further Order of the Bankruptcy Court. In the event the funds in the Professional Fee Escrow are expended pursuant to an order from this Court approving interim fees, but not approved by this Court on a final basis, such fees will be returned to the DIP Loan balance or the prepetition Lincoln Savings Bank Note Balance. Nothing in this Agreement, shall alter, impair or prejudice the Debtors, Committee, DIP Lender, and Webb Trust or any other party-in-interest's right to review, and if appropriate, object, to the fees and expenses of any estate professional.

21.     *DIP Fees.* The Debtors are authorized and directed to pay all other fees, expenses and other amounts payable under the Loan Documents, including, without limitation, the Commitment Fee and fees and expenses of the DIP Lenders' bankruptcy counsel (the foregoing, the "DIP Lenders' Fees"). The DIP Lenders' bankruptcy counsel shall provide counsel for the Debtors and Committee and Office of the United States Trustee copies of all fees and expenses of such counsel incurred through the date of entry of this Order, and thereafter, monthly. The

Debtors, Committee, Webb Trust, or United States Trustee may object to the DIP Lenders'

bankruptcy counsel's fees and expenses within fourteen days of such statements. Any objection

to the payment of such fees and expenses shall be made only on the basis of "reasonableness," and

shall specify in writing the amount of the contested fees and expenses and detailed basis for such

objection. If any such objection to payment of an invoice (or any portion thereof) is not otherwise

resolved between the objector and the issuer of the invoice, either party may submit such dispute

to the Bankruptcy Court for a determination as to the reasonableness of the relevant disputed fees

and expenses set forth in the invoice. The Bankruptcy Court shall resolve any dispute as to the

reasonableness of any fees and expenses. None of the DIP Lenders' fees shall be subject to

Bankruptcy Court approval or U.S. Trustee guidelines, and no recipient of any such payment shall

be required to file with respect thereto any interim or final fee application with the Bankruptcy

Court.

22.    *Termination Right.* Notwithstanding Court Order, if there is no finalized Stalking

Horse Agreement by February 18, 2022, DIP Lender has a right to terminate the DIP Funding and

declare an Event of Default pursuant to the terms of the DIP Credit Agreement.

23.    *Milestones.* The Debtors are each required to comply with the milestones set forth

in Section 9(h) of the DIP Credit Agreement.

24.    *DIP Lender's Reservation of Rights.* Other than as expressly set forth in this Final

Order, any other rights, claims or privileges (whether legal, equitable or otherwise) of the DIP

Lender, in its capacity as DIP Lender, are preserved.

25.    *Government Recoupment/Setoff Rights.* For the avoidance of doubt, nothing in this

Order shall affect, modify or impair, any governmental unit's recoupment or setoff rights, claims,

or defenses, and/or the priority of such recoupment and setoff rights, claims and defenses. Nothing

contained in this Order should be construed to relieve the Debtors of any legal duties or obligations to any governmental unit under applicable non-bankruptcy laws and regulations. Nothing contained in this Order should be construed to affect the exclusive jurisdiction of the U.S. Department of Health & Human Services ("HHS") to adjudicate and pay Medicare claims in the ordinary course, provided however that the Debtors reserve the right to contest HHS' exclusive jurisdiction at a later date. Nothing in this Order waives the United States' right to assert an entitlement to adequate protection under § 363(e) of the Bankruptcy Code, to the extent such an entitlement exists.

26.    *Binding Order.*  The findings contained in the recital paragraphs of this Order shall be binding upon all parties in interest, including, without limitation, to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that no Debtor may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the DIP Lender. Any permitted assignee of the DIP Lender shall, upon the effectiveness of such assignment, agree to by bound by the provisions of the Loan Documents applicable to it as a DIP Lender and to perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as DIP Lender.

27.    *No Third-Party Beneficiaries.* Except as explicitly provided for herein, this Final Order creates any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.

28.    *No Waiver by Failure to Seek Relief.* The failure or delay of the DIP Lender to seek relief or otherwise exercise their respective rights and remedies under this Order or the other Loan Documents, or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the DIP Lender.

29.     *All Loan Documents Authorized*. Except as set forth in paragraph 27 herein, this Order constitutes this Court's approval of any and all terms and the DIP Credit Agreement, regardless of whether any specific term of condition is specifically contained in this Order. The fact that certain terms of the Loan Documents are specifically contained in this Order shall not impact the validity and enforceability of any provision of any Loan Document not specifically contained herein. This Order constitutes this Court's authorization for the DIP Lender and the Debtors to enter into any other Loan Documents consistent with the terms hereof and the DIP Credit Agreement.

30.     *Cash Collateral*. The *Amended Order on Motion to Use Cash Collateral* [Docket No. 111] shall continue to remain in force and effect until this Court holds a hearing to consider entry of the cash collateral stipulation between the Debtors and the DIP Lender on a final basis. For the avoidance of doubt, such stipulation is a Loan Document and part of the consideration for the DIP Loan.

31.     *Retention of Jurisdiction*.  The Bankruptcy Court shall retain jurisdiction over all matters pertaining to the implementation, interpretation and enforcement of this Order, the DIP Orders, Loan Documents, and the DIP Funding as set forth more fully in the Loan Documents.

32.     *Notice of the Financing Order*.  The Debtors shall promptly mail or fax copies of this Order to all parties entitled to notice within three (3) business days of the date hereof.

33.     This Order shall be deemed interim, however, unless an objection is filed by 10:00 a.m., February 10, 2022, this Order will become final. In the event an objection is filed, a hearing shall be held on February 11, 2022.

_____
Judge, U.S. Bankruptcy Court

Submitted by:

15

*/s/ Jeffrey D. Goetz*
Jeffrey D. Goetz, Esq., AT0002832
Krystal R. Mikkilineni, Esq., AT0011814
Bradshaw Fowler Proctor & Fairgrave P.C.
801 Grand Avenue, Suite 3700
Des Moines, IA  50309-8004
515/246-5817
515/246-5808 FAX
goetz.jeffrey@bradshawlaw.com
mikkilineni.krystal@bradshawlaw.com


General Reorganization Counsel for
Debtors and Debtors-In-Possession


*/s/   Francis J. Lawall*
Francis J. Lawall, Esq. (admitted pro hac vice)
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103-2799
Tel: (215) 981-44-81
Fax: (215) 689-4693
Francis.lawall@troutman.com

Proposed Counsel for the Committee of Unsecured Creditors


*/s/ Jeffrey W. Courter*
Jeffrey W. Courter, Esq.
700 Walnut Street, Suite 1600
Des Moines, IA 50309
Tel: (515) 283-8048
Fax: (515) 283-8045
jwc@nyemaster.com

Counsel for Lincoln Savings Bank


*/s/   Terry L. Gibson*
Terry L. Gibson, Esq., AT0002903
WANDRO & ASSOCIATES, P.C.
2501 Grand Avenue

Des Moines, IA 50309
Tel: (515)-281-1475
Fax: (515)-281-1474
tgibson@2501grand.com

Counsel for Webb Family Trust

**Exhibit A**

## SENIOR SECURED, SUPER-PRIORITY
## DEBTOR-IN-POSSESSION CREDIT AND SECURITY AGREEMENT

THIS SENIOR SECURED, SUPER-PRIORITY DEBTOR-IN-POSSESSION CREDIT AND SECURITY AGREEMENT (the "Agreement") is made and entered into as of February 3, 2022, by and between QHC Facilities, LLC, as Borrowers, and its affiliated debtor entities identified as "Borrowers" on Annex A. (collectively the "Borrowers" or "Debtors"), and Lincoln Savings Bank as lender (the "DIP Lender" or "LSB"). Each of the Borrowers and the DIP Lender is a "Party" and, collectively, they are the "Parties" to this Agreement. Certain terms used herein are defined in Annex A.

## RECITALS

**WHEREAS**, on the Petition Date, the Borrowers commenced voluntary cases (the "Chapter 11 Cases") under chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Iowa (the "Bankruptcy Court");

**WHEREAS**, as of the Petition Date, [QHC Madison Square, LLC, QHC Humboldt North, LLC, QHC Humboldt South, LLC, and Crestridge, Inc.] (collectively, the "Prepetition Notes Debtors") and LSB are parties to: (i) [•] (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Prepetition Notes"), pursuant to which LSB provided financing to the Prepetition Notes Debtors and the obligations under which were allegedly secured by security interests in and Liens on the Prepetition Collateral[1];;

**WHEREAS**, since the Petition Date, the Borrowers have continued, and intend to continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code;

**WHEREAS**, the Borrowers need additional financing in order to fund their business operations during the course of the Chapter 11 Cases and have asked the DIP Lender to make loans and advances to the Borrowers in a principal amount not to exceed $2,000,000.00 in the aggregate pursuant to sections 364(c) and 364(d) of the Bankruptcy Code (the "DIP Funding"), which shall be made in multiple Advances (as defined below) in accordance with the Budget;

**WHEREAS**, the DIP Lender is willing to extend credit to the Borrowers, subject to the terms and conditions set forth herein, in the other Loan Documents, and the DIP Order, including, but not limited to, that all of the Obligations (i) are secured by Liens on the DIP Collateral granted

---

[1]  The Debtors, Official Committee of Unsecured Creditors, and the Webb Family Trust appointed in the Chapter 11 Cases are reviewing the nature, extent, validity and priority of LSB's alleged security interest in, and Liens on, the Prepetition Collateral.  Nothing in this Agreement shall be deemed an admission of the nature, extent, validity, priority or enforceability of such security interests in, or Liens on, the Prepetition Collateral.  The Debtors, Committee and LSB will meet and confer to establish a timeline as to which any challenge to such security interests and Liens on the Prepetition Collateral may be brought for a determination before the Bankruptcy Court.

by the Borrowers, subject in priority only to the Carve-Out, as set forth herein and in the DIP Order, and (ii) constitute allowed, superpriority administrative expense claims pursuant to sections 364(c) and 364(d)(1) of the Bankruptcy Code, subject in priority only to the Carve-Out, as set forth herein and in the DIP Order; and

**WHEREAS**, the Borrowers have agreed to provide such Liens and collateral security (including, but not limited to, the DIP Collateral), superpriority claims and adequate protection, subject to the approval of the Bankruptcy Court.

**NOW THEREFORE**, in consideration of the premises, the mutual benefits to be derived from this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.    <u>Advances</u>. The DIP Lender agrees, subject to the terms and conditions of this Agreement and upon authorization by the Bankruptcy Court under the DIP Order, to make advances (each an "<u>Advance</u>," and collectively, the "<u>Advances</u>") to the Borrowers as follows, in each case provided that all applicable conditions set forth in Sections 15 and 17 hereof are satisfied:

(a)    upon entry of the DIP Order, the DIP Lender shall make one or more initial Advances to Borrowers in an aggregate amount not to exceed $<u>[480,500]</u> (each an "<u>Initial Advance</u>," and collectively, the ("<u>Initial Advances</u>"); and

(b)    from the entry of the DIP Order to and until (but not including) the Maturity Date, the DIP Lender shall, unless an Event of Default has occurred, make subsequent Advances to Borrowers (each a "<u>Subsequent Advance</u>," and collectively, the "<u>Subsequent Advances</u>"); <u>provided</u>, <u>however</u>, that the aggregate amount of all Advances to be made by the DIP Lender hereunder shall not exceed $2,000,000.00 (the "<u>Maximum DIP Principal Amount</u>") at any time. Advances shall only be used by the Borrowers to make disbursements in accordance with Section 9(d) hereof. Advances shall be made upon delivery of a Notice of Borrowing by the Borrowers in accordance with Section 2 hereof.  Each Advance, or any portion thereof, once repaid, may not be reborrowed.

2.    <u>Notice and Manner of Borrowing</u>.

(a)    Whenever the Borrowers desire to obtain an Advance hereunder, the Borrowers shall give written notice to the DIP Lender in the form of <u>Annex C</u> hereto (each a "<u>Notice of Borrowing</u>") not later than two (2) Business Days before the day on which the requested Advance is to be made. Each Notice of Borrowing shall specify (i) the requested date of such borrowing (which shall be a Business Day), (ii) the principal amount of the Advance to be borrowed, and (iii) the applicable wire instructions for the account to which the proceeds are to be disbursed.

(b)    Following receipt of a Notice of Borrowing, the DIP Lender shall make all such requested funds available to the Borrowers by wire transfer in accordance with instructions of the Borrowers provided to the DIP Lender. All Advances shall be secured by the DIP Collateral in accordance with the terms and conditions set forth in this Agreement and the DIP Orders.

(c)      Advances shall reduce the principal amount available for future Advances. The DIP Loan is not a revolving loan and Borrowers shall not have the right to reborrow any principal amount of the Advances credited or repaid.

(d)      The Advances made by the DIP Lender, the accrued and unpaid interest and all other Obligations shall be evidenced by one or more accounts or records maintained by the DIP Lender in the ordinary course of business.  The accounts or records maintained by the DIP Lender shall be conclusive absent manifest error of the amount of the Advances, accrued and unpaid interest, any other Obligations and payments made by Borrowers with respect to any of the foregoing.  Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of Borrowers hereunder to pay any amount owing with respect to the Obligations.

3.      <u>Payments of Principal</u>. Subject to the acceleration provisions of Section 8 hereof, all unpaid principal, fees and accrued and unpaid interest, and the Commitment Fee shall be due and payable in full in cash (or in another manner agreed to by the DIP Lender in writing) on the Maturity Date.

4.      <u>Interest</u>. Unless otherwise set forth in this Agreement, the unpaid principal amount of the Advances shall accrue interest at a rate equal to 10% per annum (the "<u>Stated Interest Rate</u>"). Interest shall be calculated on the basis of a 360-day year comprised of twelve (12) 30-day months for the actual number of days elapsed during the period for which interest is calculated.  All payments of interest under this Agreement shall be payable-in-kind at Maturity.

5.      <u>Prepayments; Payment Terms</u>. The Borrowers may at any time and from time to time prepay any principal amount of the Advances made under this Agreement in whole or in part without premium or penalty. All payments of principal of, and interest upon, the outstanding Advances shall be made by the Borrowers to the DIP Lender in cash in immediately available funds in lawful money of the United States of America, by wire transfer to the bank account designated by the DIP Lender in writing from time to time. All payments under this Agreement shall be made to the DIP Lender without withholding, defense, set-off, counterclaim, or deduction. Payments and prepayments made to the DIP Lender by the Borrowers hereunder shall be applied first to expenses recoverable under Section 12, then accrued interest and then to principal. If the due date of any payment under this Agreement would otherwise fall on a day that is not a Business Day, such due date shall be extended to the next succeeding Business Day, and interest shall be payable on any principal so extended for the period of such extension.

6.      <u>Security and Administrative Priority</u>.

(a)      <u>Collateral; Grant of Lien and Security Interest</u>.

(i)      As security for the full and timely payment and performance of all of the Obligations, upon authorization by the Bankruptcy Court under any of the DIP Orders, the Borrowers hereby assign, pledge, provides for and grant to the DIP Lender, a superpriority security interest in and Lien (subject only to the Carve-Out) on the DIP Collateral.

(ii)      The security interests and Liens in favor of the DIP Lender in the DIP Collateral shall be effective immediately upon the entry of the DIP Order and have the

3

priority set forth in Sections 9(c)(ii) – (v). Such Liens and security interests and their priority shall remain in effect until the Commitment shall have been terminated and all Obligations shall have been paid in full.

(iii)     Notwithstanding anything herein to the contrary (A) all proceeds received by the DIP Lender from the DIP Collateral subject to the Liens granted in Section 6(a)(i) and in each other Loan Document shall be, upon the occurrence and during the continuation of an Event of Default or a default under any DIP Order, subject and subordinate to the prior payment of the Carve-Out and (B) no Person entitled to the Carve-Out shall be entitled to sell or otherwise dispose of any DIP Collateral, and without limiting such Person's right to receive proceeds of a sale of the DIP Collateral up to the amount of the Carve-Out owed to such Person, such Person shall not seek or object to the sale or other disposition of any DIP Collateral. Notwithstanding the foregoing, the DIP Lender may, but shall not be obligated to, make additional Advances to pay all or any portion of the Carve-Out and add the amount of such additional Advances to the outstanding principal amount of the DIP Loan, which shall accrue interest at the Stated Interest Rate or, in applicable at the time, the Default Rate from the date of such additional Advances until the amount of such additional Advances, together with accrued interest thereon, are repaid to the DIP Lender in full.

(iv)     Notwithstanding anything to the contrary in the Loan Documents or DIP Order, in no event shall the DIP Collateral include, or the Liens attach to, any lease, license, contract or agreement or other property right to which any Debtor is a party, or any such relevant Debtor's rights or interests thereunder, if and for so long as the grant of such security interests and Liens would constitute or result in: (A) the abandonment, invalidation, unenforceability or other impairment of any right, title or interest of any Debtor therein or (B) in a breach or termination pursuant to the terms of, or a default under, any such lease, license, contract or agreement or other property right pursuant to any provision thereof, unless, in the case of either of clauses (A) and (B), the applicable provision is ineffective under applicable non-bankruptcy law or rendered ineffective by operation of the Bankruptcy Code (such leases, licenses, contracts or agreements or other property rights are collectively referred to as the "Excluded Assets"); provided, that the security interests and Liens shall in all events attach to or have recourse against all proceeds, products, offspring or profits from any and all Excluded Assets (including from the sale, transfer, disposition or monetization thereof).

(v)     The DIP Liens and DIP Superpriority Claims do not extend to any pre-petition credit facilities or Prepetition Notes the DIP Lender or any of its affiliates may have or hold with the Debtors.

(b)     Administrative Priority. Borrowers agrees that the Obligations shall constitute allowed superpriority administrative expenses in the Chapter 11 Case, having priority over all administrative expenses and claims, and over all unsecured and other claims against Borrowers now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expenses of the kind specified in, or arising or ordered under, sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726 and 1114 of the Bankruptcy Code or any other provision of the Bankruptcy Code or otherwise, and shall at all times be senior to the rights of the Borrowers, the estate of the Borrowers or estate representative

in the Chapter 11 Case or any subsequent proceeding, subject only to the Carve-Out and the terms and conditions of the DIP Order.

(c)    Grants, Rights and Remedies. The Liens and security interests granted pursuant to clause (a)(i) of this Section and the administrative priority granted pursuant to clause (b) of this Section may be granted independently by the Loan Documents and by other Loan Documents hereafter entered into. This Agreement, the DIP Order and such other Loan Documents supplement each other, and the grants, priorities, rights and remedies of the DIP Lender hereunder and thereunder are cumulative.

(d)    No Filings Required. The Liens and security interests referred to herein shall be deemed valid and perfected by entry of the DIP Order, as the case may be, and entry of the DIP Order shall be deemed to have occurred on or before the date of any Initial Advance. The DIP Lender shall not be required to file any financing statements, mortgages, notices of Lien or similar instruments in any jurisdiction or filing office, take possession or control of any DIP Collateral, or take any other action in order to validate or perfect the Lien and security interest granted by or pursuant to this Agreement, the DIP Order, as the case may be, or any other Loan Document.

(e)    Survival. The Liens, Lien priority, administrative priorities and other rights and remedies granted to the DIP Lender pursuant to this Agreement, the DIP Order and the other Loan Documents (specifically including, but not limited to, the existence, perfection and priority of the Liens and security interests provided herein and therein, and the administrative priority provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of Indebtedness by the Borrowers (pursuant to section 364 of the Bankruptcy Code or otherwise), or by any dismissal or conversion of the Chapter 11 Cases, or by any other act or omission whatsoever. Without limitation, notwithstanding any such order, financing, extension, incurrence, dismissal, conversion, act or omission:

(i)    except to the extent of the Carve-Out, no fees, charges, disbursements, costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases or any conversion of the same or in any other proceedings related thereto, and no priority claims, are or will be prior to or on parity with any claim of the DIP Lender against the Borrowers in respect of any Obligation;

(ii)    the Liens in favor of the DIP Lender set forth in clause (a)(i) of this Section shall constitute valid and perfected Liens and security interests having the priority set forth in Sections 9(c)(ii) – (v), and shall be prior to all other Liens and security interests, now existing or hereafter arising, in favor of any other creditor or any other Person whatsoever; and

(iii)    the Liens in favor of the DIP Lender set forth herein and in the other Loan Documents shall continue to be valid and perfected without the necessity that the DIP Lender file financing statements or mortgages, take possession or control of any DIP Collateral, or otherwise perfect its Lien under applicable non-bankruptcy law.

7.    Events of Default. Unless otherwise waived in writing by the DIP Lender, an "Event of Default" shall exist hereunder if any one or more of the following events shall occur:

(a)     the Borrowers shall fail (i) to pay any principal or any portion thereof when due, or (ii) to pay any interest or any portion thereof or any other amount hereunder or under any other Loan Document after the same becomes due; or

(b)     The DIP Order shall not be entered by the Bankruptcy Court in form and substance acceptable to the DIP Lender in its sole and absolute discretion by no later than 30 days after the filing of the motion seeking approval of this Agreement; or

(c)     Failure by the Debtors to comply with the terms and conditions of the Loan Documents (including the affirmative covenants, negative covenants, and other covenants and agreements contained herein); or

(d)     Cessation of the full force and effect of the Loan Documents; or

(e)     The granting or incurrence of any claim that is senior in priority to the claims of the DIP Lender pursuant to this Agreement, the DIP Order, and the other Loan Documents; or

(f)     The incurrence of any debt obligations by the Debtors, except as provided in the Budget and approved by the applicable orders of the Bankruptcy Court; or

(g)     The granting or incurrence of any Lien that is senior in priority to the Liens granted herein, except as expressly permitted herein; or

(h)     Entry of an order modifying or lifting the automatic stay seeking to recover from the assets of the Debtors an amount in excess of $100,000 (or multiple such orders which, in the aggregate, seek to recover an amount in excess of $100,000); or

(i)     Entry of an unstayed judgment over $250,000 or a nonmonetary judgment that would have a material and adverse impact on the Debtors, the Debtors' business, or the Debtors' ability to pursue and implement a Restructuring; or

(j)     Borrowers shall fail to perform or observe any term, covenant or agreement to be performed or observed by it contained in Section 10; or

(k)     Borrowers shall fail to perform or observe any other material covenant or agreement to be performed or observed by it contained herein; or

(l)     any Budget Event occurs; or

(m)     a Material Adverse Effect occurs; or

(n)     any representation or warranty of Borrowers made herein or in any other Loan Document proves to have been materially incorrect when made or reaffirmed; or

(o)     Borrowers shall contest the validity or enforceability of any part of this Agreement or any other Loan Document; or

(p)      any of the Milestones shall not be met (provided, that any such Milestones may be extended upon prior written consent of the DIP Lender in its sole and absolute discretion); or

(q)      a Change of Control shall occur; or

(r)      any of the Chapter 11 Cases are dismissed (or the Bankruptcy Court makes a ruling requiring the dismissal of any of the Chapter 11 Cases), or any of the Chapter 11 Cases are converted to a case under chapter 7 of the Bankruptcy Code; or

(s)      (i) entry of a judgment or order by the Bankruptcy Court or any other court modifying, limiting, subordinating, re-characterizing, or avoiding the validity, enforceability, perfection, or priority (as set forth in this Agreement) of any of the Obligations or the Liens securing the Obligations (or any invalidation or impairment of such Liens and/or superpriority claims of the DIP Lender shall otherwise occur); (ii) subject to entry of a Final Order, any imposition, surcharge or assessment against the DIP Lender's interest in the DIP Collateral, any costs or expenses, whether pursuant to sections 506(c) or 552 of the Bankruptcy Code; or (iii) any material provision of any Loan Document shall cease to be effective; or

(t)      any of the DIP Orders (i) shall be amended, supplemented, stayed, reversed, appealed, vacated or otherwise modified (or Borrowers shall apply for authority to do so) without the written consent of the DIP Lender (or Borrowers shall file, or otherwise support, any pleading seeking such relief described in this subparagraph), or (ii) shall cease to be in full force and effect; or

(u)      the Bankruptcy Court shall enter an order appointing a trustee under chapter 7 or chapter 11 of the Bankruptcy Code, or a responsible officer or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in subclauses (3) and (4) of clause (a) of section 1106 of the Bankruptcy Code) under clause (b) of section 1106 of the Bankruptcy Code in the Chapter 11 Case (or Borrowers shall file, or otherwise support, any pleading seeking such relief described in this subparagraph); or

(v)      the filing of any disclosure statement in support of a plan of reorganization and/or liquidation that is not reasonably satisfactory to the DIP Lender; or

(w)      the Borrowers file a motion in the Chapter 11 Case to use DIP Collateral under section 363 of the Bankruptcy Code other than any application related to the DIP Orders, except (i) with the express written consent of the DIP Lender or (ii) to the extent any such financing shall provide for the payment in full of the Obligations; or

(x)      the appointment of a chief restructuring officer other than Ronald Winters of Gibbins Advisors, LLC or any equivalent officer that is not satisfactory to the DIP Lender.

8.      Remedies.

(a)      Upon the occurrence and during the continuance of any Event of Default:

7

(i)     the DIP Lender may provide written notice to the Borrowers and any Committee in accordance with the provisions of Section 12(c) of this Agreement, and if the Borrowers have not cured such Event of Default within five (5) business days from the date of such written notice, the DIP Lender may declare the principal amount of the Advances made under this Agreement, together with any interest thereon, to be due and payable, and the principal amount of the Advances made under this Agreement, together with any such interest and all other amounts and Obligations due and owing by Debtors under this Agreement and the Loan Documents, shall thereupon immediately become due and payable without presentment, further notice, protest or other requirements of any kind, all of which are hereby expressly waived by the Borrowers; and

(ii)    the DIP Lender may provide written notice to the Borrowers and any Committee in accordance with the provisions of Section 12(c) of this Agreement, and if the Borrowers have not cured such Event of Default within five (5) business days from the date of such written notice, (A) the DIP Lender may exercise any or all of its rights and remedies and (B) the DIP Lender may file a motion for relief from the automatic stay provided under section 362.

(b)     Without limiting the foregoing and unless otherwise ordered by the Bankruptcy Court, upon the occurrence and during the continuance of an Event of Default, upon five (5) Business Days' prior written notice to the Borrowers, any Committee, and Webb Trust in accordance with the provisions of Section 12(c) of this Agreement, the DIP Lender may protect and enforce its rights under this Agreement and the other Loan Documents by any appropriate proceedings, including proceedings for specific performance of any covenant or agreement contained in this Agreement or any other Loan Document, and the DIP Lender may enforce payment of any Obligations due and payable hereunder or enforce any other legal or equitable right and remedies which it may have under this Agreement, any other Loan Document, or under applicable law or in equity.

(d)     Upon the occurrence and during the continuation of any Event of Default, interest under this Agreement on all amounts due and outstanding under this Agreement and any other Loan Document shall accrue at a rate of 18% per annum ("Default Interest"). Accrued Default Interest shall be added to the outstanding principal amount of the Advances on the last Business Day of each month and, to the extent accrued on any principal amount being repaid or prepaid, on the date of such repayment or prepayment.

9.      Borrowers' Representations and Warranties. Each of the Borrowers represents and warrants to the DIP Lender that on and from the Closing Date, subject to the Bankruptcy Court's entry of the DIP Orders:

(a)     General Representations. It is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and has full power and authority to execute, deliver and perform its Obligations under this Agreement and the other Loan Documents. It has duly authorized and taken all other necessary corporate action for the execution, delivery and performance of this Agreement and any other document or instrument delivered pursuant hereto or in connection herewith and the consummation of the transactions provided for in this Agreement. It has duly executed and delivered each Loan Document and each Loan Document constitutes its legal,

8

valid and binding obligation, enforceable in accordance with its terms subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally and subject to general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity). The execution and delivery of the Loan Documents, the performance of the transactions contemplated thereby and the fulfillment of the terms thereof will not (i) conflict with or violate any of its organizational documents or its contractual obligations, (ii) conflict with or violate any order, judgment or decree of governmental authority binding on it, (iii) require any approval of its equity-holders or any approval or consent of any Person under any contractual obligation of Borrowers, except for such approvals or consents which will be obtained on or before the date hereof, (iv) conflict with or violate any applicable laws, or (v) result in or require the creation or imposition of any Lien upon any of its properties or assets (other than any Liens created hereunder). It is not an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940. No representation or warranty of Borrowers contained in any Loan Document or in any other documents, certificates or statements given to the DIP Lender for use in connection with the transactions contemplated hereby contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained herein or therein not misleading in light of the circumstances in which the same were made. There are no facts known to the Borrowers that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect and that the Borrowers have not disclosed herein or in such other documents, certificates and statements given to the DIP Lender for use in connection with the transactions contemplated hereby.  Each Borrower has determined and represents to DIP Lender that it is a legitimate business purpose and in its best interests to for DIP Lender to extend credit pursuant to this Agreement.  Each Borrower acknowledges and represents that its business is related to the business of every other Borrower hereunder, and all commitments, advances and other credit extensions under this Agreement will individually and collectively benefit each Borrower hereunder.

(b)    Collateral Representations. Each Borrower owns the DIP Collateral purported to be owned by it or otherwise has rights or the power to transfer rights in the DIP Collateral in which it purports to grant a security interest and Lien hereunder, and no Lien exists upon the DIP Collateral that will be senior to, or have priority over, the security interests and Liens created or provided for herein.

(c)    Bankruptcy Representations.

(i)    The Chapter 11 Cases were commenced on the Petition Date in accordance with applicable law and proper notice thereof and the proper notice for (x) the motions seeking approval of the Loan Documents and the DIP Order, and (y) the hearing for the approval of the DIP Order was given in each case. Borrowers shall give, on a timely basis as specified in the DIP Order, all notices required to be given to all parties specified in the DIP Order.

(ii)    Pursuant to section 364(c)(1) of the Bankruptcy Code and the DIP Order, all Obligations and all other obligations of the Borrowers under the Loan Documents at all times shall constitute allowed superpriority administrative expense claims in the Chapter 11 Cases having priority over all other costs and expenses of the kinds specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provision of the Bankruptcy Code or otherwise, and shall at all times be senior to the rights of

Borrowers, the estate of Borrowers, and any successor trustee or estate representative in the Chapter 11 Cases or any subsequent proceeding or case under the Bankruptcy Code, including without limitation any conversion thereof to another case under the Bankruptcy Code, subject only to the Carve-Out. The DIP Liens and DIP Superpriority Claims, however, do not extend to any pre-petition credit facilities or the Prepetition Notes the DIP Lender or any of its affiliates may have or hold with the Debtors

        (iii)    Pursuant to section 364(c)(2) of the Bankruptcy Code and the DIP Order, all Obligations are secured by a first priority perfected Lien on all assets of the Borrowers and all proceeds thereof that were not subject to a perfected, non-avoidable Lien as of the Petition Date, subject only to the Carve-Out.

        (iv)    The Budget was prepared in good faith by the management of the Borrowers based on assumptions believed by the management of the Borrowers to be reasonable at the time made and upon information believed by the management of the Borrowers to have been reasonably accurate based upon the information available to the management of Borrowers at the time such Budget was furnished.

        (d)    None of the Borrowers and none of their respective officers, managers, directors, brokers, or agents (i) has violated any Anti-Terrorism Laws; or (ii) has engaged in any transaction, investment, undertaking, or activity that conceals the identity, source, or destination of the proceeds from any category of prohibited offenses designated by the Organization for Economic Co-operation and Development's Financial Action Task Force on Money Laundering.

        (e)    None of the Borrowers and none of their respective officers, managers, directors, brokers, or agents or any Person  that is acting or benefiting in any capacity in connection with this Agreement (i) is a Blocked Person, (ii) conducts any business or engages in making or receiving any contribution of goods, services, or money to or for the benefit of any Blocked Person, (iii) conducts any business or engages in making or receiving any contribution of goods, services, or money to or for the benefit of any Blocked Person, or (iv) engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law.

        (f)    Each Borrower has established policies and procedures to prevent and detect money laundering, including processes to meet all applicable anti-money laundering requirements of the USA Patriot Act.

        (g)    <u>Purpose of DIP Loans</u>. The proceeds of the Advances shall at all times be used in accordance with the terms of the Budget (including any Permitted Variance), including, without limitation, to fund the (i) expenses of administration of the Chapter 11 Case, (ii) orderly (x) winding down of operations and/or liquidation of some or all assets of the Borrowers, including, but not limited to, a sale process pursuant to Section 363 of the Bankruptcy Code, in a manner and subject to terms acceptable to and approved by the DIP Lender and (y) reorganization of the Borrowers and its business as a going concern, pursuant to a plan of reorganization to which DIP Lender has consented, as the case may be, (iii) Borrowers' business in the ordinary course during the Chapter 11 Cases, (iv) payment of administrative expense claims (including, without limitation, professional fee claims and claims pursuant to section 503(b)(9) of

the Bankruptcy Code), (v) make any adequate protection payments for prepetition secured claims as approved by the DIP Order or subsequent Order, and (vi) pay costs, expenses, fees (including, but not limited to, reasonable attorney's fees and expenses) and other Obligations owed to the DIP Lender.

10.   Covenants. Each of the Borrowers hereby covenants and agrees as follows:

(a)   Liens. The Borrowers shall not create, incur, assume or permit to exist any Lien on any property or asset now owned or hereafter acquired by it, or assign or sell any income or revenues (including accounts receivable) or rights in respect of any thereof, except the Liens created hereby and the Prepetition Liens which shall be junior to, and not have priority over, the security interests and Liens created or provided for herein.

(b)   Fundamental Changes. Other than through a sale process under section 363 of the Bankruptcy Code, the Borrowers shall not merge into or consolidate with any other Person or permit any other Person to merge into or consolidate with it, or sell, transfer, lease or otherwise dispose of (in one transaction or in a series of transactions)  any assets except in the ordinary course of business or as otherwise ordered by the Bankruptcy Court, or any stock of any of its Subsidiaries (in each case, whether now owned or hereafter acquired), enter into any other agreement or transaction that would result in a Change in Control, liquidate or dissolve.

(c)   Investments, Loans, Advances, Guarantees and Acquisitions. The Borrowers shall not purchase, hold or acquire (including pursuant to any merger with any Person) any capital stock, evidences of Indebtedness or other securities (including any option, warrant or other right to acquire any of the foregoing) of, make or permit to exist any loans or advances to, guarantee any obligations of, or make or permit to exist any investment or any other interest in, any other Person, or purchase or otherwise acquire (in one transaction or a series of transactions) any assets of any other Person constituting a business unit, except Permitted Investments and investments by the Borrowers existing on the date hereof in the capital stock of its Subsidiaries.

(d)   Restricted Payments. The Borrowers shall not declare or make, or agree to pay or make, directly or indirectly, any payments unless expressly identified and provided for in the Budget (including any Permitted Variances) or as otherwise ordered by the Bankruptcy Court.

(e)   Transactions with Affiliates. The Borrowers shall not sell, lease or otherwise transfer any property or assets to, or purchase, lease or otherwise acquire any property or assets from, or otherwise engage in any other transactions with, any Affiliated Persons, except transactions expressly identified and provided for in the Budget (including any Permitted Variance).

(g)   Use of Proceeds/Collateral. No portion of any Cash Collateral (as defined in the DIP Order) or proceeds of the loans made pursuant to this Agreement shall be used in any manner that is not permitted by the DIP Order and expressly provided for or included in the Budget (including any Permitted Variance).

(h)   Milestones. The Borrowers shall ensure that the following actions are completed on a timely basis:

11

(i)    Not later than twenty-five (25) days after the Debtors file with the Court a sale motion and bid procedures motion, which shall be in form and substance reasonably acceptable to the DIP Lender and shall seek to approve such stalking horse agreements and arrangements as are acceptable to the Debtors and the DIP Lender (the "Bidding Procedures Motion"), a hearing to consider approval of the Bidding Procedures Motion shall be held in the Court and the Court shall have entered a final order, approving the bid procedures for a section 363 sale of the Debtors' assets, which order shall be in form and substance reasonably acceptable to the DIP Lender, and approving such stalking horse agreements and arrangements as are acceptable to the Debtors and the DIP Lender (the "Bidding Procedures Order")

(ii)    The deadline for bidding under the Bidding Procedures Order shall be a date not later than 45 days following the filing of the Bidding Procedures Motion;

(iii)    Any auction contemplated by the Bidding Procedures Order, if necessary, shall be conducted not later than 50 days following the filing of the Bidding Procedures Motion;

(iv)    Not later than 55 days following the filing of the Bidding Procedures Motion, a sale hearing shall be held in the Court and the Court shall enter a sale order in form and substance reasonably acceptable to the DIP Lender, subject to the Court's Schedule; and

(v)    The repayment in full of the DIP obligations shall occur on the Maturity Date.

(i)    Cash Management. The Borrowers shall at all times maintain a cash management system reasonably acceptable to the DIP Lender and in accordance with any applicable Chapter 11 Orders.

(j)    Variance Report. The Debtors agree to provide such additional budgeting and cash forecasting documents as the DIP Lender may reasonably request. Debtors shall adhere to the Budget, subject to Permitted Variances. "Permitted Variances" means (i) all favorable variances, (ii) an unfavorable variance of no more than 15% for (A) total disbursements paid by the Debtors, and (B) total receipts of the Debtors, in each case from the amounts set forth in the applicable Budget on a biweekly and cumulative basis (each such period, a "Testing Period" and all such periods, "Testing Periods").   The Borrowers shall deliver to the DIP Lender, any Committee, and the Webb Family Trust (the "Webb Trust") on or before Wednesday of each week commencing with the week of February 16, 2022, the Budget Variance Report covering the applicable Testing Period.

(k)    Chapter 11 Orders. The Debtors shall comply with each Chapter 11 Order in all material respects.

(l)    Further Assurances. Borrowers shall promptly from time to time, give, execute, deliver, file, record, authorize, obtain or endorse any and all financing statements, continuation statements, notices, instruments, documents, assignments, security agreements, consents and other agreements and writings as may be necessary, desirable or that the DIP Lender may at any time reasonably request in order to create, preserve, secure, protect, perfect, maintain

perfection, enforce or validate the security interest granted pursuant hereto or to enable DIP Lender to exercise and enforce its rights hereunder with respect to such security interest.

(m)   Inspection.  Borrowers shall provide the DIP Lender, any Committee, and the Webb Trust, with reasonable access to inspect the DIP Collateral and Borrowers shall keep and maintain proper and accurate books, records and accounts in which full, true, and correct entries in all material respects, and in any event in conformity with generally accepted accounting principles consistently applied and all requirements of applicable law, shall be made of all dealings and transactions and assets, including without limitation, all DIP Collateral, in relation to their respective business and activities.

(n)   Insurance. Borrowers shall pay, in accordance with the Budget, costs required to maintain insurance for the DIP Collateral and continue the utility services provided to the Debtors as of the date hereof.

(o)   Compliance. Borrowers shall comply with all applicable laws and regulations related to their businesses and their operations, including all Anti-Terrorism Laws.

(p)   Final Release of Claims Upon Payment of DIP Obligations. DIP Lender shall receive, in its capacity as the DIP Lender and upon the full and final payment of all DIP Obligations, a full and final release of any all claims or causes of action, including, but not limited to any direct, indirect or derivative claims, arising from, or related to, the DIP Loan, the DIP Facility the DIP Loan Documents or the DIP Orders.  The release provided to the DIP Lender may be included in any plan of liquidation or plan of reorganization filed with the Court.

(q)   Continuing Effect. Borrowers shall take such actions as the DIP Lender requests to ensure the validity and perfection of the Liens and claims granted to the DIP Lender pursuant to this Agreement, the other Loan Documents and the DIP Order.

(r)   Restructuring. Borrowers shall not pursue, negotiate, solicit interest in, or agree to any sale or liquidation of the Debtors' assets or any Restructuring, reorganization, refinancing, or other transaction other than on terms that are satisfactory to the DIP Lender; provided, that nothing in the Loan Documents shall require any officer, director, manager or member of the Debtors to take any action that such party determines, in good faith and after consultation with outside counsel, violates such party's fiduciary duties. In the event that any such party determines that pursuing, negotiating, soliciting interest in, or agreeing to sale or liquidation of the Debtors' assets or any Restructuring, reorganization, refinancing, or other transaction other than on terms that are satisfactory to the DIP Lender is necessary to comply with such party's fiduciary duties, the Debtors shall provide notice to the DIP Lender within 24 hours of such determination; provided, further, that such determination shall not impair the DIP Lender's right to declare an Event of Default as a result of the Debtors' pursuit, negotiation, solicitation of interest in, or agreement to any sale or liquidation of the Debtors' assets or any Restructuring, reorganization, refinancing, or other transaction other than on terms that are satisfactory to the DIP Lender.

(s)   Each Borrower agrees that it is jointly and severally and unconditionally liable to DIP Lender for, and will pay to DIP Lender when due, the full amount of all Obligations, and all modifications, extensions and renewals thereto or thereof.

13

11.    <u>Governing Law; Submission to Jurisdiction; Waiver of Jury Trial, Etc.</u> This Agreement shall be governed by, and construed in accordance with, the laws of the State of Iowa except as governed by the Bankruptcy Code. **ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT SHALL BE BROUGHT IN THE BANKRUPTCY COURT, OR IN THE EVENT THAT THE BANKRUPTCY COURT DOES NOT HAVE OR DOES NOT EXERCISE JURISDICTION, THEN IN ANY STATE OR FEDERAL COURT IN THE STATE OF IOWA AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE BORROWERS HEREBY IRREVOCABLY ACCEPTS AND CONSENTS TO, IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE BANKRUPTCY COURT. EACH OF THE BORROWERS HEREBY IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OUT OF THE BANKRUPTCY COURT AND IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO THE EACH OF THE BORROWERS AT ITS ADDRESS FOR NOTICES AS SET FORTH IN SECTION 12(C). EACH OF THE BORROWERS AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING HEREIN SHALL AFFECT THE RIGHT OF THE DIP LENDER TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST BORROWERS IN ANY OTHER JURISDICTION. EACH OF THE BORROWERS HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE JURISDICTION OR LAYING OF VENUE OF ANY SUCH LITIGATION BROUGHT IN SUCH COURT AND ANY CLAIM THAT ANY SUCH LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. TO THE EXTENT THAT ANY OF THE BORROWERS HAS OR HEREAFTER MAY ACQUIRE ANY IMMUNITY FROM JURISDICTION OF ANY COURT OR FROM ANY LEGAL PROCESS (WHETHER THROUGH SERVICE OR NOTICE, ATTACHMENT PRIOR TO JUDGMENT, ATTACHMENT IN AID OF EXECUTION OR OTHERWISE) WITH RESPECT TO ITSELF OR ITS PROPERTY, EACH SUCH BORROWER HEREBY IRREVOCABLY WAIVES SUCH IMMUNITY IN RESPECT OF ITS OBLIGATIONS UNDER THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS. BORROWERS AND THE DIP LENDER HEREBY WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM CONCERNING ANY RIGHTS UNDER THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS, OR UNDER ANY AMENDMENT, WAIVER, CONSENT, INSTRUMENT, DOCUMENT OR OTHER AGREEMENT DELIVERED OR WHICH IN THE FUTURE MAY BE DELIVERED IN CONNECTION THEREWITH, OR ARISING FROM ANY FINANCING RELATIONSHIP EXISTING IN CONNECTION WITH THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS, AND AGREES THAT ANY SUCH ACTION, PROCEEDINGS OR COUNTERCLAIM SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. EACH OF THE BORROWERS CERTIFIES THAT NO OFFICER, REPRESENTATIVE, AGENT OR ATTORNEY OF THE DIP LENDER HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT THE DIP LENDER WOULD NOT, IN THE EVENT OF ANY ACTION, PROCEEDING OR COUNTERCLAIM, SEEK**

14

**TO ENFORCE THE FOREGOING WAIVERS. EACH OF THE BORROWERS HEREBY ACKNOWLEDGES THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE DIP LENDER ENTERING INTO THIS AGREEMENT.**

12.    <u>Indemnification; Amendments; Notices</u>.

(a)    <u>Indemnification</u>. The Borrowers shall reimburse, hold harmless and indemnify the DIP Lender and its directors, officers, agents, attorneys and affiliates from any and all loss, liability or legal or other expense with respect to or resulting from the Loan Documents, limited to the "Principal Amount" of any accrued interest; <u>provided</u>, <u>however</u>, that Borrowers shall not be obligated to indemnify any such Person for any indemnified liability caused by the gross negligence or willful misconduct of such Person, as finally determined by a court of competent jurisdiction. The indemnification provided to Borrower does not apply to any prepetition credit facilities or Prepetition Notes made by LSB in its capacity as a prepetition secured lender. The amount of any such indemnification shall be limited to the DIP Obligations payable under this Agreement, the Loan Documents, and DIP Orders.

(b)    <u>Amendments</u>. This Agreement may only be amended, changed, modified or terminated orally in an agreement in writing signed by the Borrowers and the DIP Lender.

(c)    <u>Notices</u>. Any notice required or requested hereunder shall be given in writing by registered or certified mail, return receipt requested, hand delivery, overnight mail, facsimile transmission (confirmed by mail and only if a facsimile number is provided below for such notice recipient) or electronic mail. Notices and requests shall be, (a) in the case of those by hand delivery, deemed to have been given when delivered to any officer of the Party to whom it is addressed, (b) in the case of those by registered or certified mail or overnight courier, deemed to have been given three (3) Business Days after the date when deposited in the mail or one (1) Business Day after being deposited with the overnight mail carrier for next Business Day delivery, (c) in the case of a facsimile transmission, when confirmed and (d) in the case of electronic mail, upon the sender sending such electronic mail.

The addresses for such communications shall be:

IF TO **BORROWERS**:

Jeffrey D. Goetz, Esq.,
Krystal R. Mikkilineni, Esq.
Bradshaw Fowler Proctor & Fairgrave, P.C.
801 Grand Avenue, Suite 3700
Des Moines, IA 50309-8004
515/246-5817
goetz.jeffrey@bradshawlaw.com

with a copy to:


**IF TO DIP LENDER**:

Jeff W. Courter
Nyemaster Goode, P.C.
700 Walnut, Suite 1600
Des Moines, IA 50309-8004
515/283-8048
JWC@nyemaster.com

with a copy to:




Borrowers or DIP Lender shall provide notice to the other of any change in its address and all future notices shall be sent accordingly.

13.   Right of Setoff. Unless otherwise ordered by the Bankruptcy Court, if an Event of Default shall have occurred and be continuing, the DIP Lender is hereby authorized at any time and from time to time, to the fullest extent permitted by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by the DIP Lender to or for the credit or the account of the Borrowers against any and all of the Obligations of the Borrowers now or hereafter existing hereunder to the DIP Lender or, irrespective of whether or not the DIP Lender shall have made any demand hereunder and although such Obligations of the Borrowers may be contingent or unmatured or are owed to a branch office of the DIP Lender different from the branch office holding such deposit or obligated on such Indebtedness. The rights of the DIP Lender hereunder are in addition to all other rights and remedies (including other rights of setoff) that the DIP Lender may have.

14.   Assignments. None of the Borrowers may assign any of its rights or obligations under this Agreement or the other Loan Documents without the consent of the DIP Lender. The DIP Lender may at any time assign or sell a participation interest in all or a portion of its rights and obligations under this Agreement and the other Loan Documents without the prior written consent of the Borrowers. From and after the effective date specified in each assignment and assumption, the assignee thereunder, but not any Person purchasing a participation interest, shall be a party to this Agreement and the other Loan Documents, as applicable, and, to the extent of the interest assigned by such assignment and assumption, have the rights and obligations of the DIP Lender under such document or documents, and the DIP Lender shall, to the extent of the interest assigned by such assignment and assumption, be released from its obligations under such document or documents (and, in the case of an assignment and assumption covering all of the DIP

Lender's rights and obligations under this Agreement, the DIP Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Section 12(a) with respect to facts and circumstances occurring prior to the effective date of such assignment.

15.    Conditions Precedent to All Funding. The DIP Lender's obligation to make Advances hereunder shall be subject to each of the following conditions precedent (the making of any Initial Advance by the DIP Lender being conclusively deemed to be satisfaction or waiver of the conditions precedent contained in this Section 15, and the date on which such conditions are satisfied or waived being referred to herein as the "Closing Date"):

(a)    Loan Documents; Organizational Documents. The DIP Lender shall have received this Agreement executed and delivered by the Borrowers. The DIP Lender shall have received: (i) the organizational documents of Borrowers, and, to the extent applicable, certified as of the date hereof or a recent date prior thereto by the Secretary of State of the State of Iowa (ii) signature and incumbency certificates of the officers of Borrowers; (iii) resolutions of the board of directors or similar governing body of Borrowers approving and authorizing the execution, delivery and performance of this Agreement and the other Loan Documents, certified as of the date hereof by its secretary or an assistant secretary as being in full force and effect without modification or amendment; and (iv) a good standing certificate with respect to Borrowers, dated as of the date hereof or a recent date prior thereto.

(b)    Representations and Warranties. The representations and warranties contained in this Agreement and each other Loan Document shall be true and correct in all material respects (unless otherwise qualified by materiality in which case such representations and warranties shall be true and correct in all respects) on and as of the Closing Date (or in the case of the funding of the Subsequent Advances referred to below, as of the date of each Subsequent Advance) as though made on and as of such date, except to the extent that any such representation or warranty expressly relates to an earlier date (in which case such representation or warranty shall be true and correct in all material respects (unless otherwise qualified by materiality in which case such representations and warranties shall be true and correct in all respects) on and as of such earlier date).

(c)    Defaults. There shall be no default or Event of Default under the Loan Documents.

(d)    Material Adverse Effect. No event or circumstance or change shall have occurred that has or could be reasonably expected have a Material Adverse Effect.

(e)    Budget. The DIP Lender shall have received the Budget, which shall be in form and substance reasonably acceptable to the DIP Lender, and such other information (financial or otherwise) as the DIP Lender may reasonably request.

(f)    Collateral. The DIP Lender shall have been granted a perfected Lien on the DIP Collateral by the DIP Order.

(g)    DIP Lender shall have (i) received a completed Certification of Beneficial Owner from each of the Beneficial Owners of each Borrower, (ii) determined that no Beneficial Owner of any Borrower, no Borrower or any Person in which a Borrower owns 25% or more of the equity interests, [and no Guarantor or any Person in which a Guarantor owns 25% or more of

17

the equity interests] is a Blocked Person, and (iii) satisfied all Anti-Terrorism Law requirements applicable in respect of each Borrower and in respect of each of the Beneficial Owners of each of Borrower [and each Guarantor].

>   (h)   Bankruptcy Related Conditions.

>   >   (i)   The Chapter 11 Cases shall have commenced in the Bankruptcy Court and all of the "first day orders" and all related pleadings to be filed at the time of commencement of the Chapter 11 Cases or shortly thereafter shall be in form and substance reasonably acceptable to the DIP Lender, be in full force and effect, and shall not (in whole or in part) have been reversed, modified, amended, stayed or vacated absent prior written consent of the DIP Lender, which may be given or withheld in its reasonable discretion.

>   >   (ii)   The Borrowers shall comply in all material respects with each Chapter 11 Order.

16.   Waivers. Except for the notices expressly required by the terms of this Agreement (which rights to notice are not waived by Borrowers), each of the Borrowers, for itself and its successors and assigns, hereby forever waives presentment, protest and demand, notice of protest, demand, dishonor and non-payment of this Agreement and the Advances, and all other notices in connection with the delivery, acceptance, performance, default or enforcement of the payment of this Agreement, and waives and renounces (to the extent allowed by law) all rights to the benefits of any statute of limitations and any moratorium, appraisement, and exemption now allowed or which may hereafter be provided by any federal or state statute or decisions against the enforcement and collection of the Obligations evidenced by this Agreement and any and all amendments, substitutions, extensions, renewals, increases, and modifications hereof. Borrowers expressly agree that this Agreement may be extended or subordinated, by forbearance or otherwise, from time to time, without in any way affecting the liability of Borrowers. No consent or waiver by DIP Lender with respect to any action or failure to act, which without such consent or waiver would constitute a breach of any provision of this Agreement, shall be valid or binding unless in writing signed by DIP Lender and then only to the extent expressly specified therein. Any Committee and the Webb Trust reserve all rights to object to or challenge any amendments or modifications to the DIP Credit Agreement. Neither the failure nor any delay in exercising any right, power or privilege under this Agreement, at law or equity, or otherwise available agreement, will operate as a waiver of such right, power or privilege and no single or partial exercise of any such right, power or privilege by DIP Lender will preclude any other or further exercise of such right, power or privilege.

17.   Conditions Precedent to Funding of Subsequent Advances. The DIP Lender's obligation to make any Subsequent Advance hereunder shall be subject to the satisfaction of the conditions set forth in Section 15 hereof and each of the following conditions precedent (the making of any Advance by the DIP Lender being conclusively deemed to be satisfaction or waiver of the conditions precedent with respect to such Subsequent Advance):

>   (a)   Budget. The DIP Lender shall have received all periodic updates required hereunder with respect to the Budget and all Budget Variance Reports, each in form and substance satisfactory to the DIP Lender, and the Borrowers shall be in compliance with the Budget subject only to Permitted Variances.

(b)    Stalking Horse Agreement. The Stalking Horse Agreement shall remain in force and effect and shall not have been amended, supplemented or otherwise modified without the written consent of the DIP Lender; provided, however, that this subsection shall not apply in the event that the Debtors enter into agreement(s) other than the Stalking Horse Agreement that (i) provide for the sale of substantially of the Debtors' assets pursuant to section 363 of the Bankruptcy Code and which agreement(s) (individually or together) increase the value provided to the Debtors' estates and (ii) have been approved in writing by the DIP Lender, which approval shall not be unreasonably withheld.

18.    Credit Bid. In any sale or other disposition of any of the DIP Collateral, the DIP Lender shall be permitted, pursuant to section 363(k) of the Bankruptcy Code, to credit bid up to the full amount of the then outstanding Obligations in addition to any other secured amounts due and owing to the DIP Lender under any other applicable agreement. Nothing in this paragraph shall limit or preclude the Debtors, any Committee, Webb Trust, or other party in interest rights under Section 363(k) of the Bankruptcy Code from objecting to the DIP Lender credit bidding any other secured amounts due and owing to the DIP Lender under any other applicable agreement.

19.    Cooperation. The Debtors shall provide the DIP Lender, Committee, and Webb Trust with draft copies of all motions, applications, proposed orders and other materials or documents that any of Debtors intend to file in the Chapter 11 Cases at least two (2) Business Days prior to any such filing or, where it is not practically possible to do so within such time, as soon as possible and in any event not less than one (1) Business Day prior to such filing. The Debtors shall cooperate in good faith with the DIP Lender to address the DIP Lender's comments with respect to such filings. Any such motion, application, proposed order, or other materials shall be consistent with this Agreement and the Loan Documents, including, without limitation, the Budget.

20.    Termination Right. Notwithstanding Court Order, if there is no finalized Stalking Horse Agreement by February 18, 2022, DIP Lender has a right to terminate the DIP Funding and declare an Event of Default pursuant to the terms of this Agreement.

21.    Limited Lien on Avoidance Actions and Proceeds of Avoidance Actions. For the avoidance of doubt, the DIP Collateral, DIP Liens, and DIP Superiority Claims shall include a limited lien in favor of DIP Lender on all products, offspring, profits, and proceeds of any Avoidance Actions arising under chapter 5 of the United States Bankruptcy Code (the "Limited Avoidance Action Lien"). The DIP Lender may not take any action to enforce, collect or monetize the Limited Avoidance Action unless and until the DIP Lender has exhausted all remedies and recoveries available to the DIP Lender in connection all other DIP Collateral (i.e. the real property and personal property components of the DIP Collateral, excluding any Avoidance Actions).

22.    Terms Generally. The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any person

shall be construed to include such person's successors and permitted assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Sections shall be construed to refer to Sections of this Agreement and (e) any reference to any law or regulation herein shall, unless otherwise specified, refer to such law or regulation as amended, supplemented or otherwise modified from time to time. The rules of construction set forth in this Section 18 shall be applicable to the Loan Documents mutatis mutandis.

23.    Execution in Counterparts; Facsimile and PDF Execution. This Agreement and the other Loan Documents may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which counterparts, taken together, shall constitute but one and the same instrument. Delivery of an executed counterpart of this Agreement or any other Loan Document by facsimile or pdf shall be equally as effective as delivery of an original executed counterpart of this Agreement or such other Loan Document. Any party delivering an executed counterpart of this Agreement or any other Loan Document by facsimile or pdf also shall deliver an original executed counterpart of this Agreement or such other Loan Document but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement or such other Loan Document.

24.    Acknowledgment of Receipt of Executed Copies.  Each Borrower acknowledges receipt of a fully executed copy of this Agreement and each other Loan Document.

*[Signature pages follow]*

**IMPORTANT:  READ BEFORE SIGNING.  THE TERMS OF THIS AGREEMENT SHOULD BE READ CAREFULLY BECAUSE ONLY THOSE TERMS IN WRITING ARE ENFORCEABLE.  NO OTHER TERMS OR ORAL PROMISES NOT CONTAINED IN THIS WRITTEN CONTRACT MAY BE LEGALLY ENFORCED.  YOU MAY CHANGE THE TERMS OF THIS AGREEMENT ONLY BY ANOTHER WRITTEN AGREEMENT.**

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be executed and delivered by their duly authorized officers, as of the date and year and at a place first above written.

**BORROWERS:**

_____

By: _____

Its: _____

QHC FACILITIES, LLC

_____

By: _____

Its: _____

QHC MANAGEMENT, LLC

_____

By: _____

Its: _____

QHC MITCHELLVILLE, LLC

_____

By: _____

Its: _____

21

QHC WINTERSET NORTH, LLC

_____

By: _____

Its: _____


QHC MADISON SQUARE, LLC

_____

By: _____

Its: _____


QHC FORT DODGE VILLA, LLC

_____

By: _____

Its: _____

QHC HUMBOLDT NORTH, LLC

_____

By: _____

Its: _____

QHC HUMBOLDT SOUTH, LLC

_____

By: _____

Its: _____

QHC VILLA COTTAGES, LLC

_____

By: _____

Its: _____

CRESTRIDGE, INC.

_____

By: _____

Its: _____

CRESTVIEW ACRES, INC.

**DIP LENDER:**

_____

By: _____

Its: _____

LINCOLN SAVINGS BANK

23

## ANNEX A

Definitions. The following capitalized terms, when used in this Agreement, shall have the following meanings:

"Anti-Terrorism Law" means any law related to money laundering, terrorism, or financing terrorism, including without limitation, the USA PATRIOT Act, The Currency and Foreign Transactions Reporting Act (31 U.S.C. §§ 5311-5330 and 12 U.S.C. §§ 1818(s), 1820(b), and 1951-1959) (also known as the "Bank Secrecy Act"), the Trading With the Enemy Act (50 U.S.C. § 1 et seq.), and Executive Order 13224.

"Avoidance Actions" means all causes of action arising under sections 502(d), 542, 544, 545, 547, 548, 549, 550, 551, 553(b), 732(2) or 724(a) of the Bankruptcy Code.

"Blocked Person" means any Person (a) whose name appears on the most current list of "Specially Designated Nationals and Blocked Persons" published by the Office of Foreign Assets Control of the US Department of the Treasury ("OFAC"), (b) who resides, is organized or chartered, or has a place of business in a country or territory subject to OFAC sanctions or embargo programs, (c) who is identified as prohibited from doing business with the United States under the International Emergency Economic Powers Act, the Trading With the Enemy Act, or any other any law (including common law), statute, ordinance, treaty, rule, regulation, order, decree, judgment, writ, injunction, settlement agreement, requirement or determination of an arbitrator or a court or any other Requirement of Law, (d) who commits, threatens, or supports "terrorism," as defined in Executive Order 13224; (e) who violates laws and regulations related to terrorism or money laundering, including Executive Order 13224 and the USA Patriot Act; or (f) who affiliates with any entity or Person described above.

"Borrowers" means QHC Facilities, LLC, QHC Management, LLC, QHC Mitchellville, LLC, QHC Winterset North, LLC, QHC Madison Square, LLC, QHC Fort Dodge Villa, LLC, QHC Humboldt North, LLC, QHC Humboldt South, LLC, and QHC Villa Cottages, LLC, each an Iowa limited liability company, and Crestridge, Inc. and Crestview Acres, Inc., each an Iowa corporation.

"Business Day" means a day on which the Federal Reserve Bank of New York is open for business.

"Budget" means a 13-week rolling operating budget and cash flow forecast, in form and substance satisfactory to the DIP Lender, which shall reflect the Borrowers' good faith projection of all weekly cash receipts and disbursements in connection with the operation of the Borrowers during such 13-week period, as such budget and forecast may be updated from time to time.

"Budget Event" means the actual amount of aggregate cumulative operating disbursements and expenses during any Budget Testing Period shall exceed the projected cumulative operating disbursements (on a cumulative basis) in the Budget for such Budget Testing Period by more than 15% (the variance described in this definition, the "Permitted Variance," and such Permitted Variance subject to receipt by DIP Lender of the Budget Variance Report).

"Budget Testing Date" means every other Wednesday of each calendar week commencing on February 16, 2022.

"Budget Testing Period" means, with respect to the initial Budget Testing Date, the period beginning on the Petition Date and ending on the Sunday immediately preceding the initial Budget

Testing Date and for each Budget Testing Date thereafter, the two-week period ending on the Sunday immediately preceding the Budget Testing Date.

"Carve-Out" means an amount for the payment of (i) fees payable to the United States Trustee pursuant to 28 U.S.C. 1930 and (ii) the allowed professional fees and expenses of estate professionals in an amount not to exceed (a) the amounts set forth in the Budget and scheduled to paid into the applicable Professional Fee Escrow to be used to pay fees earned and expenses incurred prior to the occurrence of a Termination Event, plus (b) an aggregate amount not to exceed $90,000 for Debtor professionals, $25,000 for the Patient Care Ombudsman, and $30,000 for Committee professionals to be paid into the Professional Fee Escrow to be used to pay fees earned and expenses incurred subsequent to the occurrence of an Event of Default, which fees are approved on a final basis by the Bankruptcy Court. In no event shall the amounts set forth in (ii)(a) - (b) exceed $755,000 without further Order of the Bankruptcy Court.

"Cash" means money, currency or a credit balance in any demand or deposit account.

"Change of Control" means, with respect to a Borrower, that the Borrower shall, directly or indirectly, in one or more related transactions, (a) consolidate or merge with or into (whether or not the Borrower is the surviving corporation) another Person, or (b) sell, assign, license, lease, transfer, convey or otherwise dispose of all or substantially all of the properties or assets of the Borrower to another Person, or (c) consummate a stock purchase agreement or other business combination (including a reorganization, recapitalization, spin-off or scheme of arrangement) with another Person whereby after such transaction such other Person holds more than 50% of the voting power of all classes of equity interests of the Borrower.

"Chapter 11 Orders" means all orders entered by the Bankruptcy Court in the Bankruptcy Case.

"Claim" has the meaning assigned to such term in section 101(5) of the Bankruptcy Code.

"Commitment" means the commitment of the DIP Lender to make Advances hereunder.

"Commitment Fee" means the amount that is 3% of the sum of the Advances.

"Controlled Account" means a deposit account maintained by Borrowers at an approved depository for debtor in possession accounts that is also acceptable to the DIP Lender in its reasonable discretion and, if requested by the DIP Lender, that is subject to a deposit account control agreement in favor of the DIP Lender.

"DIP Collateral" means any and all of each Debtors' right, title and interest in all real and personal property of the Debtors and their estates existing as of the Petition Date or acquired after the Petition Date, including, without limitation, real or personal, tangible or intangible, now owned or hereafter acquired, whether arising before or after the Petition Date, including, without limitation, all permits, contracts, management agreements, general intangibles, permits, licenses, statutory entitlements, instruments, equipment, accounts, and documents, all goods, inventory and fixtures, all documents, cash, cash equivalents, chattel paper, letters of credit and letter of credit rights, investment property, claims (including commercial tort claims and any claims against affiliates of the Debtors), causes of action, money, insurance, receivables, receivables records, deposit accounts, contract rights, payment intangibles, collateral support, supporting obligations and instruments, all interests in leaseholds and real properties, all patents, copyrights, trademarks, tradenames and other intellectual property, all equity interests, all books and records relating to the

25

foregoing, all other personal and real property of the Debtors, and all other collateral pledged under the Loan Documents, and all proceeds, products, accessions, rents and profits of or in respect of any of the foregoing (in each case as the foregoing are defined in the Uniform Commercial Code as in effect from time to time in the State of Delaware (and, if defined in more than one Article of such Uniform Commercial Code, shall have the meaning given in Article 9 thereof)); provided, however, DIP Collateral shall not include (a) the Debtors' leasehold interests (but shall include any proceeds from the assumption and assignment of any leasehold interest), (b) the Debtors' interests in leased personal property, and (c) any interest of the Debtors in the Professional Fee Escrow Account and the Professional Fee Escrow funds therein (each as defined in the DIP Order) except as otherwise provided in the DIP Order. For the avoidance of doubt, the DIP Collateral shall not include Avoidance Actions.

"DIP Order" means an order from the Bankruptcy Court approving this Agreement and the other Loan Documents with respect to the Debtors on a final basis. The DIP Order shall be in form and substance satisfactory to the DIP Lender in its sole and absolute discretion.

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any such equity interest.

"Indebtedness" of any Person means, without duplication, (a) all obligations of such Person for borrowed money or with respect to deposits or advances of any kind, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person upon which interest charges are customarily paid, (d) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person, (e) all obligations of such Person in respect of the deferred purchase price of property or services (excluding current accounts payable incurred in the ordinary course of business), (f) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed, (g) all guarantees by such Person of Indebtedness of others, (h) all capital lease obligations of such Person, (i) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty and (j) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.

"Initial Budget" shall mean the Budget prepared by the Borrowers and furnished to and approved by the DIP Lender in the form of Annex B hereto.

"Lien" means (i) any lien, mortgage, pledge, assignment, security interest, charge or encumbrance of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, and any lease or license in the nature thereof) and any option, trust or other preferential arrangement having the practical effect of any of the foregoing and (ii) in the case of Equity Interests, any purchase option, call or similar right of a third party with respect to such Equity Interests.

"Loan Documents" means this Agreement, the Budget, the stipulation for use of Cash Collateral, and any other documents, instruments or agreements entered into or made by the DIP Lender and/or the Borrowers in connection with the foregoing, together with the DIP Orders. For the avoidance of doubt, the Loan Documents do not include the documents, instruments, or agreements entered into or made pursuant to the Prepetition Notes or pre-petition credit facilities.

"Material Adverse Effect" means a material adverse effect on and/or material adverse developments (except for the commencement of the Chapter 11 Case and the effects that customarily result therefrom) with respect to (i) the business, operations, properties, assets, or condition (financial or otherwise) of the Borrowers taken as a whole, (ii) the ability of Borrowers to fully and timely perform its Obligations, (iii) the legality, validity, binding effect or enforceability against Borrowers of any Loan Document, (iv) the termination of any material contract with any State or Federal governmental program, agency, or otherwise, and/or (v) rights, remedies and benefits available to, or conferred upon, the DIP Lender under this Agreement or any other Loan Document.

"Maturity Date" means the earliest of (a) 120 days from the entry of the DIP Order; (b) the effective date of a plan of reorganization or liquidation; (c) the consummation of a sale(s) of all or substantially all of the assets of the Debtors; (d) the occurrence of an Event of Default; (e) the entry of an order by the Bankruptcy Court approving or authorizing any alternative or additional debtor-in-possession financing; and (f) such later date as the DIP Lender may agree in its sole and absolute discretion in writing with the Borrowers.

"Obligations" means, collectively, all obligations of the Borrowers under this Agreement, the DIP Order, and the other Loan Documents due to the DIP Lender to pay principal, fees, interest (including default interest), expenses and other amounts whatsoever, whether direct or indirect, absolute or contingent, now or hereafter from time to time owing by the Borrowers to the DIP Lender, including, but not limited to the following: (a) the due and punctual payment by each Borrower of (i) the unpaid Advances and interest (including interest accruing after the Maturity Date) on the Advances, as and when due, whether at maturity, by acceleration, or otherwise, and (ii) all other monetary obligations, including advances, debts, liabilities, obligations, and fees, whether primary, secondary, direct, indirect, absolute or contingent, due or to become due, now existing or hereafter arising, fixed or otherwise, of any Borrower to the DIP Lender under this Agreement, the other Loan Documents, and the DIP Order; and (b) the due and punctual payment and performance of all covenants, duties, agreements, obligations, and liabilities of any Borrower to the DIP Lender under or pursuant to this Agreement, the other Loan Documents, and the DIP Order.

"Permitted Investments" means (a) direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States), in each case maturing within one year from the date of acquisition thereof, (b) investments in certificates of deposit, banker's acceptances and time deposits maturing within 180 days from the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, any domestic office of any commercial bank organized under the laws of the United States or any State thereof which has a combined capital and surplus and undivided profits of not less than $500,000,000 and (c) investments expressly contemplated by the Budget (including any Permitted Variances);

"Person" means and includes natural persons, corporations, limited partnerships, general partnerships, limited liability companies, limited liability partnerships, joint stock companies, joint

ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, and governmental authorities.

"Petition Date" means December 29, 2021.

"Prepetition Collateral" means the "Collateral" defined in the Prepetition Note.

"Prepetition Note Obligations" means collectively, all obligations of the Borrowers under the Prepetition Note or pre-petition credit facilities to pay principal, fees, interest (including default interest, if applicable). All documents, agreements that all relate to the Prepetition Notes.

"Professional Fee Escrow" means amounts set forth in the Budget for estate professionals for periods prior to the occurrence of a post-petition default, if any, shall be set aside weekly and held by the Debtors in a separate segregated account for the Debtors professionals and the Committee professionals.

"Restructuring" means a sale process, to be completed pursuant to section 363 of the Bankruptcy Code, and/or a plan of reorganization or liquidation, as applicable expenses and other amounts whatsoever, whether direct or indirect, absolute or contingent, now or hereafter from time to time owing by the Borrowers to the DIP Lender.

"Stalking Horse Agreement" means an asset purchase agreement executed by a stalking horse in connection with the marketing and sale process.

"Subsidiary" means, with respect to any Person, any corporation, partnership, limited liability company, association, joint venture or other business entity of which more than 50% of the total voting power of shares of stock or other ownership interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Person or Persons (whether directors, managers, trustees or other Persons performing similar functions) having the power to direct or cause the direction of the management and policies thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof.

"UCC" means the Uniform Commercial Code (or any similar or equivalent legislation) as in effect from time to time in any applicable jurisdiction.

[*Remainder of page intentionally left blank*]

**QHC Facilities, LLC, et al.**
**13-Week Cash Flow Forecast**

(Amounts in $000s)

| | | Actuals | Actuals | Actuals Week 1 & 2 | Forecast Week 3 | Forecast Week 4 | Forecast Week 5 | Forecast Week 6 | Forecast Week 7 | Forecast Week 8 | Forecast Week 9 | Forecast Week 10 | Forecast Week 11 | Forecast Week 12 | Forecast Week 13 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 29-Dec-21 31-Dec-21 | 1-Jan-22 14-Jan-22 | 15-Jan-22 28-Jan-22 | 29-Jan-22 4-Feb-22 | 5-Feb-22 11-Feb-22 | 12-Feb-22 18-Feb-22 | 19-Feb-22 25-Feb-22 | 26-Feb-22 4-Mar-22 | 5-Mar-22 11-Mar-22 | 12-Mar-22 18-Mar-22 | 19-Mar-22 25-Mar-22 | 26-Mar-22 1-Apr-22 | 2-Apr-22 8-Apr-22 | 9-Apr-22 15-Apr-22 | 29-Dec-21 15-Apr-22 |
| 1 | Cash Inflows | 28.4 | 1,109.1 | 283.6 | 205.0 | 260.0 | 405.0 | 405.0 | 205.0 | 260.0 | 405.0 | 405.0 | 205.0 | - | - | 4,176.1 |
| 2 | Employee Costs | 12.4 | 495.4 | 400.6 | 355.0 | 187.0 | 325.0 | 97.0 | 295.0 | 187.0 | 255.7 | 68.9 | 35.0 | - | 15.0 | 2,729.0 |
| 3 | Operating Cash Outflows: | | | | | | | | | | | | | | | |
| 4 | Rent | - | 5.6 | 6.7 | 25.0 | - | - | - | - | - | 25.0 | - | - | - | - | 62.3 |
| 5 | Food | - | 25.9 | 50.4 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | 25.0 | - | - | - | - | 226.3 |
| 6 | Agency | 48.0 | 414.4 | 398.5 | 210.0 | 210.0 | 210.0 | 210.0 | 210.0 | 210.0 | - | - | - | - | - | 2,120.9 |
| 7 | Quality Assurance Assessment Fee | - | - | - | - | - | - | - | - | - | - | - | - | - | 225.0 | 225.0 |
| 8 | Insurance | - | 84.7 | 0.2 | 75.0 | - | - | - | - | 8.0 | - | - | - | - | - | 167.9 |
| 9 | Supplies | - | - | 49.5 | - | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | - | - | - | - | - | 74.5 |
| 10 | Utilities | - | - | - | 27.5 | 27.5 | 27.5 | 27.5 | 27.5 | 27.5 | 27.5 | 27.5 | 27.5 | - | - | 247.5 |
| 11 | Other | 5.3 | 83.6 | 113.7 | 55.0 | 55.0 | 55.0 | 55.0 | 55.0 | 30.0 | 30.0 | 30.0 | 30.0 | - | - | 597.6 |
| 12 | Total Operating Cash Outflows | 53.3 | 614.2 | 619.0 | 417.5 | 322.5 | 322.5 | 322.5 | 322.5 | 330.5 | 57.5 | 57.5 | 57.5 | - | 225.0 | 3,722.0 |
| 13 | Construction/Renovation - Mitchellville | - | 44.6 | 13.8 | - | - | - | - | - | - | - | - | - | - | - | 58.4 |
| 14 | Property Taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 15 | Total Non Operating Cash Outflows | - | 44.6 | 13.8 | - | - | - | - | - | - | - | - | - | - | - | 58.4 |
| 16 | Total Cash Outflows before Restructuring Disbursements | 65.7 | 1,154.2 | 1,033.4 | 772.5 | 509.5 | 647.5 | 419.5 | 617.5 | 517.5 | 313.2 | 126.4 | 92.5 | - | 240.0 | 6,509.4 |
| 17 | Process and Restructuring Costs | | | | | | | | | | | | | | | |
| 18 | Debt Service / Adequate Protection (including DIP) | 3.3 | - | - | 34.0 | - | - | - | 30.7 | - | - | - | 34.0 | - | 16.5 | 118.5 |
| 19 | Legal | - | - | - | - | - | 50.0 | - | 50.0 | - | - | - | 50.0 | - | 25.0 | 175.0 |
| 20 | Financial Advisor / CRO | - | - | - | - | - | 117.0 | 21.0 | 21.0 | 21.0 | 21.0 | 21.0 | 21.0 | 21.0 | 21.0 | 285.0 |
| 21 | UCC Professional Fees | - | - | - | - | - | 100.0 | 20.0 | 20.0 | 20.0 | 20.0 | 20.0 | 20.0 | 20.0 | 20.0 | 260.0 |
| 22 | Patient Care Ombudsman | - | - | - | - | - | 35.0 | - | - | - | - | - | - | - | - | 35.0 |
| 23 | US Trustee | - | - | 2.8 | - | - | - | - | 17.0 | - | - | - | 18.0 | - | 18.0 | 55.8 |
| 24 | Total Process and Restructuring Costs | 3.3 | - | 2.8 | 34.0 | - | 302.0 | 41.0 | 138.7 | 41.0 | 41.0 | 41.0 | 143.0 | 41.0 | 100.5 | 929.3 |
| 25 | Total Cash Outflows after Restructuring Disbursements | 69.0 | 1,154.2 | 1,036.2 | 806.5 | 509.5 | 949.5 | 460.5 | 756.2 | 558.5 | 354.2 | 167.4 | 235.5 | 41.0 | 340.5 | 7,438.7 |
| 26 | Cash Generated / (Needed) | (40.6) | (45.1) | (752.6) | (601.5) | (249.5) | (544.5) | (55.5) | (551.2) | (298.5) | 50.8 | 237.6 | (30.5) | (41.0) | (340.5) | (3,262.6) |
| 27 | Beginning Book Cash Balance | 1,413.4 | 1,372.8 | 1,327.7 | 575.1 | 454.1 | 204.6 | 279.6 | 524.1 | 572.9 | 274.4 | 325.2 | 562.8 | 532.3 | 491.3 | 1,413.4 |
| 28 | Cash Generated / (Needed) | (40.6) | (45.1) | (752.6) | (601.5) | (249.5) | (544.5) | (55.5) | (551.2) | (298.5) | 50.8 | 237.6 | (30.5) | (41.0) | (340.5) | (3,262.6) |
| 29 | DIP Loan Drawdowns (Payments) | - | - | - | 480.5 | - | 619.5 | 300.0 | 600.0 | - | - | - | - | - | - | 2,000.0 |
| 30 | Ending Book Cash Balance | 1,372.8 | 1,327.7 | 575.1 | 454.1 | 204.6 | 279.6 | 524.1 | 572.9 | 274.4 | 325.2 | 562.8 | 532.3 | 491.3 | 150.8 | 150.8 |
| 31 | DIP Loan Facility Amount | | | | 2,000.0 | 2,000.0 | 2,000.0 | 2,000.0 | 2,000.0 | 2,000.0 | 2,000.0 | 2,000.0 | 2,000.0 | 2,000.0 | 2,000.0 | 2,000.0 |
| 32 | DIP Loan (Drawdowns) Payments | | | | (480.5) | (480.5) | (1,100.0) | (1,400.0) | (2,000.0) | (2,000.0) | (2,000.0) | (2,000.0) | (2,000.0) | (2,000.0) | (2,000.0) | (2,000.0) |
| 33 | DIP Loan Availability | | | | 1,519.5 | 1,519.5 | 900.0 | 600.0 | - | - | - | - | - | - | - | - |
| 34 | Total Liquidity | 1,372.8 | 1,327.7 | 575.1 | 1,973.6 | 1,724.1 | 1,179.6 | 1,124.1 | 572.9 | 274.4 | 325.2 | 562.8 | 532.3 | 491.3 | 150.8 | 150.8 |

**Exhibit B**