## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | Case No. 21-01643-als11 |
| **QHC FACILITIES,** *et al*[1] | ) | Jointly Administered |
| | ) | |
| Debtors and Debtors in Possession | ) | Hon. Anita L. Shodeen |
| | ) | |
| | ) | **PROPOSED ORDER (A) APPROVING** |
| | ) | **THE BIDDING PROCEDURES IN** |
| | ) | **CONNECTION WITH THE AUCTION** |
| | ) | **AND SALE OF ASSETS AND** |
| | ) | **SCHEDULING AN AUCTION AND** |
| | ) | **SALE HEARING; (B) APPROVING** |
| | ) | **ASSUMPTION AND ASSIGNMENT** |
| | ) | **PROCEDURES; (C) APPROVING** |
| | ) | **THE BREAK-UP FEE; AND (D)** |
| | ) | **GRANTING OTHER RELATED** |
| | ) | **RELIEF** |
| | ) | |
| _____ | ) | Entered on Docket: _____ |

THIS MATTER having come before the Court[2] on the motion (the "Motion") [Docket No. 117], dated January 28, 2022, of the Debtors for entry of an order (this "Order") approving, among other things: (a) the Bidding Procedures (substantially in the form attached hereto as **Exhibit 1**) and scheduling an Auction and the Sale Hearing for the sale of substantially all the Debtors' assets; (b) the Assumption and Assignment Procedures; and (c) the Break-Up Fee. After due deliberation, and having reviewed the Motion, any objections thereto, and materials submitted by the parties, and having considered the statements of counsel on the record, and the evidence

---

[1] The Jointly Administered Debtors in this proceeding are *In re QHC Management, LLC* (Case No. 21-01644-als11), *In re QHC Mitchellville, LLC* (Case No. 21-01645-als11), *In re QHC Winterset North, LLC* (Case No. 21-01646-als11), *In re QHC Madison Square, LLC* (Case No. 21-01647-als11), *In re QHC Fort Dodge Villa, LLC* (Case No. 21-01648-als11), *Crestridge, Inc.* (Case No. 21-01649-als11), *Crestview Acres, Inc.* (Case No. 21-01650-als11), *In re QHC Humboldt North, LLC* (Case No. 21-01651-als11), *In re QHC Humboldt South, LLC* (Case No. 21-01652-als11) and *In re QHC Villa Cottages, LLC* (Case No. 21-01653-als11).

[2] Unless otherwise stated, capitalized terms not defined herein shall have the meanings set forth in the Bidding Procedures or the Motion.

adduced with respect to the Motion at a hearing to consider same (the "Bidding Procedures Hearing"), and having considered the agreements announced by the parties.

**THE COURT HEREBY FINDS:**[3]

A.    This Court has jurisdiction over the Motion pursuant to 28 U.S.C. § 1334.  This proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O).  Venue is proper in this district and in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.    The statutory predicates for the relief requested herein are sections 105(a), 363(b) and (f), and 365 of title 11 of the United States Code (the "Bankruptcy Code") and Federal Rules of Bankruptcy Procedure 2002(a)(2), 6004(a), (b), (c), (e) and (f), 6006(a) and (c), 9006, 9007, and 9014.

C.    Notice of the Motion having been given to the Notice Parties (as defined below) is sufficient in light of the circumstances and the nature of the relief requested in the Motion.

D.    The Motion was modified on the record at the Bidding Procedures Hearing as follows: (1) the Break-Up Fee increased from 1.8% to 3% of the Purchase Price; (2)  the amount of the Bid Deposit was adjusted, as described in the Bidding Procedures; and (3) key dates were extended, as described in the Bidding Procedures.

E.    The Debtors have articulated good and sufficient reasons for this Court to grant the relief requested in the Motion, as modified on the record at the Bidding Procedures Hearing, regarding the sale process, which is reasonable and appropriate and represents the best method for ensuring patient welfare and maximizing value for the benefit of the Debtors' estates: (i) approval

---

[3] The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

of the Bidding Procedures; (ii) approval of the Assumption and Assignment Procedures; and (iii) approval of the Break-Up Fee.

F.      The Bidding Procedures were negotiated in good faith and at arms' length and are reasonably designed to promote participation and active bidding and ensure that the highest or best value is generated for the Acquired Assets.  Accordingly, the Bidding Procedures are reasonable and appropriate and represent the best method for maximizing value for the benefit of the Debtors' estates.

G.      The Break-up Fee is reasonable and appropriate given, among other things, the size and nature of the Sale and the efforts that will be expended by a proposed purchaser, and is a material inducement for, and a condition of, a proposed purchaser's entry into an APA.  The Break-up Fee constitutes actual and necessary costs and expenses of preserving the Debtors' estates. In addition, because the Stalking Horse Bidder APA will create a floor for any additional bids, the Stalking Horse Bidder will have provided significant value to the Debtors' estates.

H.      Except for the Stalking Horse Bidder, no other party submitting an offer or bid or a Qualified Bid shall be entitled to any expense reimbursement or breakup, termination, or similar fee, or post-petition claim, including any administrative expense claim or substantial contribution claim under section 503 of the Bankruptcy Code or otherwise, and by submitting a bid, a Bidder (other than the Stalking Horse Bidder) shall be deemed to waive any right with respect thereto.

I.      The Assumption and Assignment Procedures, including notice of proposed Cure Costs, are reasonable and appropriate and consistent with section 365 of the Bankruptcy Code and Bankruptcy Rule 6006.  The Assumption and Assignment Procedures have been tailored to provide an adequate opportunity for all non-Debtor parties to the Assumed Contracts to raise any objections to the proposed assumption and assignment or to the Cure Costs.

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED EFFECTIVE IMMEDIATELY THAT:**

1.      The Motion is granted to the extent set forth herein.

2.      The Bidding Procedures are hereby approved in their entirety.  The Debtors are authorized to take any and all actions necessary or appropriate to implement the Bidding Procedures.

3.      All objections to the relief requested in the Motion that have not been withdrawn, waived, or settled as announced to the Court at the hearing on the Motion or by stipulation filed with the Court, are overruled on the merits except as otherwise set forth herein. Notwithstanding, all rights to object to the sale contemplated in the Motion are preserved.

4.      All bidders submitting a Qualified Bid are deemed to have submitted to the exclusive jurisdiction of this Court with respect to all matters related to the Auction and the terms and conditions of the sale or transfer of the Acquired Assets.

5.      The Break-Up Fee of 3% of the proposed purchase price is reasonable and appropriate under the circumstances and is approved in its entirety.

6.      The Assumption and Assignment Procedures restated in this paragraph are reasonable and appropriate under the circumstances, fair to all non-Debtor parties, comply with the Bankruptcy Code, and are approved in their entirety.

(a)      Within five (5) business days after the entry of the Bidding Procedures Order (the "Assumption Notice Deadline"), the Debtors shall file with the Court and serve, by overnight delivery (and by e-mail in cases where e-mail service has been consented to and where e-mail addresses are known), on counsel to the Committee and each counterparty (each, a "Counterparty," and collectively, the "Counterparties") to an Assumed Executory Contract a Cure Notice. Notwithstanding any other provision of this Order, the Debtors may opt to file and serve a Cure Notice relating to the Medicare Provider Agreements on the United States while settlement discussions between the parties are proceeding, after entry of this Order and subject to the written approval of the United States.

(b)     The Cure Notice shall include, without limitation, the cure amount (each, a "Cure Cost"), if any, that the Debtors (after consultation with the Stalking Horse Bidder, if any) believe is required to be paid to the applicable Counterparty under section 365(b)(1)(A) and (B) of the Bankruptcy Code for each of the Assumed Executory Contracts and shall further include the Contract Objection Deadline.  If a Counterparty objects to the Cure Cost, the Counterparty must file with the Bankruptcy Court and serve on the Contract Objection Notice Parties a written objection (a "Contract Objection").

(c)     Any Contract Objection shall:  (i) be in writing; (ii) comply with the Federal Rules of Bankruptcy Procedure; (iii) be filed with the clerk of the Bankruptcy Court, 300 U.S. Courthouse Annex, 110 East Court Avenue, Suite 300, Des Moines, Iowa 50309, together with proof of service, by the Contract Objection Deadline; (iv) be served, so as to be actually received on or before the Contract Objection Deadline, upon the Contract Objection Notice Parties (as defined below); and (v) state with specificity the grounds for such objection, including, without limitation, the fully liquidated cure amount and the legal and factual bases for any unliquidated cure amount that the Counterparty believes is required to be paid under section 365(b)(1)(A) and (B) of the Bankruptcy Code, along with the specific nature and dates of any alleged defaults, the pecuniary losses, if any, resulting therefrom, and the conditions giving rise thereto.

(d)     The "Contract Objection Notice Parties" are as follows: (A)  general reorganization counsel to the Debtors, attention Jeffrey Goetz (goetz.jeffrey@bradshawlaw.com) and Krystal Mikkilineni (mikkilineni.krystal@bradsahawlaw.com); (B) counsel to the Committee: attention Francis Lawall (Francis.Lawall@Troutman.com) and Deborah Kovsky-Apap (deborah.kovsky@troutman.com); and (C) counsel to Lincoln Savings Bank, attention Jeff Courter (jwc@nyemaster.com) and Roy Leaf (rleaf@nyemaster.com).

(e)     If, after the Assumption Notice Deadline, additional executory contracts or unexpired leases of the Debtors are determined to be Assumed Executory Contracts, as soon as practicable thereafter, the Debtors shall file with the Bankruptcy Court and serve, by overnight delivery (and by e-mail in cases where e-mail service has been consented to and where e-mail addresses are known), on counsel to the Committee and the Counterparties a Cure Notice, and such Counterparties shall file any Contract Objections not later than seven (7) days thereafter.  In the event that the Successful Bidder and the relevant Counterparty cannot resolve any such Contract Objection, then the Debtor shall promptly notice a hearing before the Bankruptcy Court to resolve such Contract Objection. If the Debtors propose to assume and assign executory contracts of the United States, the parties will discuss deadlines for the United States to object subject to the approval of the Court.

(f)     As soon as practicable thereafter and in no event later than one (1) business day after the date of the Auction, the Debtors shall file with the Court and serve, by overnight delivery (and by e-mail in cases where e-mail service has been consented to and where e-mail addresses are known), on the Counterparties a notice identifying the Successful Bidder, and the Counterparties shall file any Contract Objections <u>solely</u> on the basis of adequate assurance of future performance not later than two (2) hours prior to the commencement of the Sale Hearing.

(g)     At the Sale Hearing, the Debtors will seek Court approval of their assumption and assignment to the Successful Bidder of those Assumed Contracts that have been selected by the Successful Bidder to be assumed and assigned (collectively, the "<u>Selected Assumed Contracts</u>").  The Debtors and their estates reserve any and all rights with respect to any Assumed Contracts that are not ultimately designated as Selected Assumed Contracts.

(h)     If no Contract Objection is timely received with respect to a Selected Assumed Contract:  (i) the Counterparty to such Selected Assumed Contract shall be deemed to have consented to the assumption by the Debtors and assignment to the Successful Bidder of the Selected Assumed Contract, and be forever barred from asserting any objection with regard to such assumption and assignment (including, without limitation, with respect to adequate assurance of future performance by the Successful Bidder); (ii) any and all defaults under the Selected Assumed Contract and any and all pecuniary losses related thereto shall be deemed cured and compensated pursuant to section 365(b)(1)(A) and (B) of the Bankruptcy Code; and (ii) the Cure Cost for such Selected Assumed Contract shall be controlling, notwithstanding anything to the contrary in such Selected Assumed Contract, or any other related document, and the Counterparty shall be deemed to have consented to the Cure Cost and shall be forever barred from asserting any other claims related to such Selected Assumed Contract against the Debtors and their estates or the Successful Bidder, or the property of any of them, that existed prior to the entry of the Sale Order.

(i)     To the extent that the parties are unable to consensually resolve any Contract Objection prior to the commencement of the Sale Hearing, including, without limitation, any dispute with respect to the cure amount required to be paid to the applicable Counterparty under section 365(b)(1)(A) and (B) of the Bankruptcy Code (any such dispute, a "<u>Cure Dispute</u>"), such Contract Objection will be adjudicated at the Sale Hearing or at such other date and time as may be fixed by the Court; <u>provided</u>, <u>however</u>, that, if the Contract Objection relates solely to a Cure Dispute, the Selected Assumed Contract may be assumed by the Debtors and assigned to the Successful Bidder provided that the cure amount the Counterparty asserts is required to be paid under section 365(b)(1)(A) and (B) of the Bankruptcy Code (or such lower amount as agreed to by the Counterparty) is deposited in a segregated account by the Debtors pending the Court's adjudication of the Cure Dispute or the consensual resolution of the Cure Dispute by the

Successful Bidder, on the one hand, and the objecting Counterparty, on the other hand. If no Contract Objection is timely received, the Debtors shall be authorized to assume and assign such Assumed Contracts to the Successful Bidder without further notice to creditors or other parties in interest and without the need for further order of this Court, and such assumption and assignment shall be subject to the terms of the Sale Order.

(j)    (j)    Notwithstanding the any other provision of this  Order, the United States' deadline to object to any issue related to assumption and assignment of its executory contracts (including, without limitation, cure and adequate assurance of future performance) will be at least 30 days after the United States' receipt of the Cure Notice by email to counsel for the United States: Seth Shapiro and Marissa Embola. Because the Debtors intend to request a debt compromise from the United States, the United States' deadline to object to any issue related to assumption and assignment of its executory contracts, including, without limitation, the Medicare Provider Agreements, will be at least 7 business days after settlement negotiations have unsuccessfully concluded upon written notice to the Debtors by the United States. If settlement negotiations result in a settlement recommendation by counsel for the United States, the United States shall not have to file any objection to the assumption and assignment of its executory contracts (including, without limitation, any Medicare Provider Agreements) until 7 days after the authorizing official within the Department of Justice denies approval of the recommended settlement.  Nothing in this Order shall impair the United States' rights under the Medicare statutes and regulations with respect to approving the Successful Bidder as the future owner and operator of the facilities pursuant to the Medicare statutes and regulations.

(k)    The Cure Cost fixed by the Court with respect to any Selected Assumed Contract shall be paid by the Successful Bidder directly to the counterparty to such contracts as promptly as practicable after approval of the assumption and assignment.  Further, the Successful Bidder shall provide adequate assurance of future performance under the Selected Assumed Contracts, as same is required by the Bankruptcy Court.  In either event, the order approving assumption and assignment shall provide that upon payment of the applicable Cure Cost, such counterparty shall not have any remaining claim against the Debtors or the Estates related to any default under any such Selected Assumed Contract.

7.    Within two (2) business days of entry of this Order, the Debtors (or their agent)

shall serve by email to counsel of record and first class mail, postage prepaid, copies of: (i) this

Order and (ii) the Bidding Procedures upon the following entities (collectively, the "Notice Parties"):[4]

     (a)    the United States Trustee;

     (b)    counsel to the Committee;

     (c)    counsel to Lincoln Savings Bank;

     (d)    counsel to the Webb Family Trust;

     (e)    the Internal Revenue Service and the Iowa Department of Revenue;

     (f)    the United States Department of Justice;

     (g)    state, county, and municipal governments having jurisdiction over any of the Acquired Assets;

     (h)    all parties that have requested special notice pursuant to Bankruptcy Rule 2002;

     (i)    all persons or entities known to the Debtors that have or have asserted a lien on, or security interest in, all or any portion of the Acquired Assets;

     (j)    all governmental regulatory authorities asserting an interest in these Bankruptcy Cases;

     (k)    all Assumed Contract Counterparties;

     (l)    all potential bidders previously identified by or otherwise known to the Debtors;

     (m)    all patients and residents of the Facilities; and

     (n)    all of the Debtors' employees.

8.    As further described in the Bidding Procedures, the Sale Hearing will commence on _____ at _____ **prevailing Central time** or at such other hour on that date as the Court shall announce.  The Sale Hearing may be adjourned by the Bankruptcy Court from

---

[4] The Bidding Procedures will direct parties to contact Newmark Real Estate of Dallas, LLC ("Newmark") Investment Banker for the Debtor, for more information and will provide that any party that wishes to obtain a copy of any related document (subject to any necessary confidentiality agreement) may make such a request in writing to Newmark, attention Ross Sanders, 2515 McKinney Ave, Suite 1300, Dallas, TX 75201, ross.sanders@nmrk.com.

time to time without further notice to creditors or parties-in-interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing.

9.    Objections, if any, to the sale must: (a) be in writing and filed with this court **no later than _____ at _____ prevailing Central time** (the "Objection Deadline"); (b) comply with the Federal Rules of Bankruptcy Procedure; and (c) be served upon the Debtors, counsel for the Committee, counsel for Lincoln Savings Bank, and counsel for the Webb Family Trust so as to be **actually received** on or before the Objection Deadline.

10.    The Auction to conduct bidding with respect to the sale of the Acquired Assets, if necessary, shall commence on March 4, 2022.

11.    All persons or entities (whether or not Qualified Bidders) that participate in the bidding process shall be deemed to have knowingly and voluntarily (i) consented to the entry of a final order by this Court in connection with the Motion to the extent that it is later determined that this Court, absent consent of the parties, cannot enter final orders or judgment in connection herewith consistent with Article III of the United States Constitution and (ii) waived any right to jury trial in connection with any disputes relating to any of the foregoing matters.

12.    Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 7062, 9014, or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

13.    All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

14.    The Debtors are authorized and empowered to take all actions necessary to implement the relief granted herein.

15.    To the extent that this Order is inconsistent with any prior order or pleading with respect to the Motion, the terms of this Order shall govern.

16.    This Court shall retain jurisdiction to resolve any dispute relating to the interpretation of the terms and conditions of this Order.

IT IS SO ORDERED.

_____

United States Bankruptcy Judge

Submitted by:


/s/ *Krystal R. Mikkilineni*
Jeffrey D. Goetz, Esq., AT0002832
Krystal R. Mikkilineni, Esq., AT0011814
Bradshaw Fowler Proctor & Fairgrave, P.C.
801 Grand Avenue, Suite 3700
Des Moines, IA 50309-8004
515/246-5880
515/246-5808 FAX
goetz.jeffrey@bradshawlaw.com
mikkilineni.krystal@bradshawlaw.com

*General Reorganization Counsel for*
*Debtors and Debtors-in-Possession.*


Approved as to Form and Content:

/s/ *Francis J. Lawall*
Francis J. Lawall, Esq. (admitted pro hac vice)
Donald J. Detweiler, Esq. (admitted pro hac vice)
Deborah Kovsky-Apap, Esq. (admitted pro hac vice)
Troutman Pepper Hamilton Sander LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103-2799
Tel: (215) 981-44-81
Fax: (215) 689-4693
francis.lawall@troutman.com
donald.detweiler@troutman.com
deborah.kovsky@troutman.com

Proposed Counsel for the Committee of Unsecured Creditors


/s/ *Jeffrey W. Courter*
Jeffrey W. Courter, Esq.
Nyemaster Goode, P.C.
700 Walnut Street, Suite 1600
Des Moines, IA 50309
Tel: (515) 283-8048
Fax: (515) 283-8045
jwc@nyemaster.com

Counsel for Lincoln Savings Bank

*/s/ Terry L. Gibson*
Terry L. Gibson, Esq., AT0002903
WANDRO & ASSOCIATES, P.C.
2501 Grand Avenue
Des Moines, IA 50309
Tel: (515)-281-1475
Fax: (515)-281-1474
tgibson@2501grand.com

Counsel for Webb Family Trust

*/s/ Ashley Wieck*
L. Ashley Wieck, Esq.
ID # IS9998256
Federal Building, Room 793
210 Walnut Street
Des Moines, Iowa 50309-2108
Tel: (515) 323-2269
Ashley.Wieck@usdoj.gov

No Objection:

*/s/ Seth B. Shapiro*
Ruth A. Harvey, Esq.
Rodney A. Morris, Esq.
Seth B. Shapiro, Esq.
(D.C. Bar No. 433988)
Marissa D. Embola
(MI Bar No. P82568)
United States Department of Justice
P.O. Box 875
Ben Franklin Station
Washington, D.C. 20044-0875
Tel:  (202) 616-2316
marissa.embola@usdoj.gov
seth.shapiro@usdoj.gov

Counsel for the United States on behalf of
the U.S. Department of Health and Human
Services

# EXHIBIT 1

## BIDDING PROCEDURES

## BIDDING PROCEDURES

On December 29, 2021, QHC Facilities, LLC an Iowa limited liability company and its affiliates, QHC Management, LLC, QHC Madison Square, LLC, QHC Fort Dodge Villa, LLC, QHC Villa Cottages, LLC, QHC Mitchellville, LLC, QHC Humboldt North, LLC, QHC Humboldt South, LLC, QHC Winterset North, LLC, Crestview Acres, Inc., Crestridge, Inc. (the "Debtors"), as Debtors and debtors in possession, filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Iowa (the "Bankruptcy Court").

The Debtors are seeking to sell all or substantially all of their assets for the highest or best offer. On [___], 2022, the Bankruptcy Court entered an order [Docket No. [__]] (the "Bidding Procedures Order"), which, among other things, authorized the Debtors to solicit bids and approved these bidding procedures (the "Bidding Procedures") for the consideration of the highest or otherwise best price for all or substantially all of the Debtors' assets, on the terms and conditions set forth herein.

Crestridge Holdco, LLC ("Crestridge Holdco") (the "Stalking Horse Bidder") submitted the Stalking Horse Bid (as defined below).  The Debtors and Crestridge Holdco have agreed upon a form asset purchase agreement (the "Stalking Horse APA")[1] annexed hereto as Exhibit A. The Stalking Horse APA provides, pursuant to the terms and subject to the conditions contained therein, the consideration for the sale and transfer of the Acquired Assets is (i) an amount in cash equal to $11,000,000.00, subject to adjustment as set forth in the Stalking Horse APA; and (ii) assumption of the Assumed Liabilities (clauses (i) and (ii) collectively the "Stalking Horse Bid").

The Stalking Horse Bid is subject to higher or better offers submitted in accordance with the terms and conditions of these Bidding Procedures.  These Bidding Procedures describe, among other things: (i) the procedures for bidders to submit bids for substantially all of the assets of the Debtors (the "Acquired Assets"); (ii) the manner in which bidders and bids become Qualified Bidders and Qualified Bids, respectively (each as defined below); (iii) the negotiation of bids received; (iv) the conduct of the auction with respect to the Acquired Assets; and (v) the ultimate selection of the Accepted Bid (as defined below).

---

[1] Capitalized terms used but not otherwise defined herein will have the meanings ascribed to them in the Stalking Horse APA.

## Access to Diligence Materials

To participate in the bidding process and to receive access to due diligence (the "Diligence Materials"), a party must submit to the Debtors an executed confidentiality agreement ("Confidentiality Agreement") in form and substance reasonably satisfactory to the Debtors, as determined by the Debtors in consultation with its professionals.

The Diligence Materials shall be made available to interested bidders in a "Data Room" created and administered by the Debtors' investment banker, Newmark Real Estate of Dallas, LLC ("Newmark" or the "Investment Banker"). Parties interested in receiving access to the Data Room and Diligence Materials may contact Ross Sanders, ross.sanders@nmrk.com, (314) 221-8543, and will be provided with a form of the Confidentiality Agreement.

A party who qualifies for access to Diligence Materials shall be a "Preliminary Bidder". The Debtors will afford any Preliminary Bidder the time and opportunity to conduct reasonable due diligence under the time constraints provided herein; provided, however, that the Debtors shall not be obligated to furnish any due diligence information after the Preliminary Bid Deadline. The Debtors reserve the right to withhold any Diligence Materials that it, in consultation with its professionals and the Consultation Parties (as defined below), determines are business-sensitive or otherwise not appropriate for disclosure to a Preliminary Bidder. Neither the Debtors nor their representatives shall be obligated to furnish information of any kind whatsoever to any person that is not determined to be a Preliminary Bidder.

Each Preliminary Bidder shall comply with all reasonable requests made by the Debtors and their advisors regarding such Preliminary Bidder.

The Debtors shall keep the Consultation Parties (as defined below) reasonably informed of all interested parties that become Preliminary Bidders and the status of their due diligence at all times.

## Assets to Be Sold

The Debtors are offering for sale all of the Acquired Assets as set forth in the Stalking Horse APA. The Debtors will consider offers for the Acquired Assets either in whole (the "Whole Portfolio") or in lots by Facility ("Lots"); provided, however, that any offer for two or more Facilities shall specify the portion of the purchase price to be allocated to each Facility. If the Mitchellville and/or Winterset Medicare Provider Agreements are terminated by HHS prior to the auction or sale closing, then those Medicare Provider Agreements will not be included in the auction and/or sale accordingly.

Except as otherwise provided for in these Bidding Procedures, and in the asset purchase agreement submitted by a Preliminary Bidder setting forth its Preliminary Bid (a "Bid APA"), all of the Debtors' rights, title and interest in and to the Acquired Assets shall be sold free and clear of any pledges, liens, security interests, encumbrances, claims, charges, options and interests thereon (collectively, the "Encumbrances") to the maximum extent permitted by the order approving the sale (the "Sale Order") and the Bankruptcy Code, with such Encumbrances to attach to the net proceeds of the sale of the Acquired Assets under the terms and provisions of

the Sale Order.

## Bidding Process

The term "Consultation Parties" shall mean (i) the Official Committee of Unsecured Creditors (the "Committee"), (ii) Lincoln Savings Bank; and (iii) the Webb Family Trust.

The Debtors and their advisors, in consultation with the Consultation Parties, shall (i) determine whether any person is a Qualified Bidder as set forth herein; (ii) coordinate the efforts of Preliminary Bidders in conducting their due diligence investigations; (iii) receive offers from Preliminary Bidders, (iv) negotiate any offers made to purchase the Acquired Assets; (v) conduct an Auction of the Acquired Assets; (vi) select the Accepted Bid and a Backup Bid (if any); (vii) seek approval by the Bankruptcy Court of the Accepted Bid and Backup Bid (if any) at the hearing (the "Sale Hearing") set for approval of a sale or sales of the Debtors' assets (collectively, a "Sale Transaction"); and (viii) consummate the Sale Transaction at a closing (the "Closing") thereon as set forth herein and in the asset purchase agreement governing the Accepted Bid (the "Accepted Bid APA").

## Key Dates For Potential Preliminary Bidders

| | |
|---|---|
| **Finalized OTA & Management Agreement[2]** | **February 22, 2022** |
| **Preliminary Bid Deadline:** | **March 1, 2022** |
| **Qualified Bid Announcement Deadline:** | **March 3, 2022** |
| **Auction:** | **March 4, 2022** |
| **Sale Hearing:** | **March ___, 2022** |

## Preliminary Bid Deadline

Preliminary Bids shall include an offer price for the Acquired Assets (including non-cash or other value) on a Facility-by-Facility basis as required herein. Each Preliminary Bidder must provide to the Debtors and the Consultation Parties, by the Preliminary Bid Deadline: (1) a redline of its Bid APA to the Stalking Horse APA; (2) a clean, signed Bid APA; (3) its Bid Deposit; and (4) acceptable Proof of Performance as set forth herein.

Prior to the Preliminary Bid Deadline (defined below), the Debtors, in consultation with the Consultation Parties, may enter into verbal discussions with any or all of the Preliminary

---

[2] The Operations Transfer Agreement (the "OTA") and Management Agreement described in the Stalking Horse APA shall be finalized and uploaded to the Data Room by February 22, 2022.

Bidders to determine clarifications of the Preliminary Bids and submitted Bid APAs and to negotiate terms of sale. The Debtors may offer pricing guidance to the Preliminary Bidders if they determine, in consultation with the Consultation Parties, that such guidance is in the best interests of the Debtors' estates (the "Estates"). Such pricing guidance and other discussions, if undertaken, shall not create an enforceable agreement or be binding on the Debtors or their Estates.

The Debtors shall accept Preliminary Bids until **March 1, 2022 at 5 p.m. (Central Time)**, which shall be the "Preliminary Bid Deadline". Except as determined by the Debtors, in consultation with the Consultation Parties, any party that does not submit a Bid by the Preliminary Bid Deadline may not (i) submit any offer after the Preliminary Bid Deadline or (ii) participate in the Auction.

## Determination of Qualified Bid(s) and Baseline Bid(s)

The Debtors shall evaluate and select by **March 3, 2022 at 5:00 p.m. (Central Time)** (the "Qualified Bid Announcement Deadline"), those Preliminary Bids which, in their discretion, after consultation with their professionals and the Consultation Parties, are deemed qualified bids entitled to bid at the Auction (the "Qualified Bids"). The Stalking Horse Bid shall automatically be deemed to be a Qualified Bid.

The Debtors shall determine, in consultation with the Consultation Parties, the highest and best Qualified Bid(s) submitted by the Preliminary Bid Deadline (the "Baseline Bid(s)"). This determination may take into account any factors the Debtors and Consultation Parties reasonably deem relevant to the value of the Qualified Bids received by the Estates. On or before **March 4, 2022 (Central Time) at 9:00 a.m. (Central Time)** (the "Designation Deadline"), the Debtors shall file a notice designating the Baseline Bid and publish such notice in the Data Room and/or distribute the same at the Auction. The Debtors shall also provide copies of such Baseline Bid to all of the Qualified Bidders, including the Stalking Horse Bidder, and to each of the Consultation Parties.

## The Auction

If the Debtors receive more than one Qualified Bid (including the Stalking Horse Bid), the Debtors will conduct a live virtual Auction on **March 4, 2022**, **beginning at 10:00 a.m. (Central Time)**. If only one Qualified Bid (including a Stalking Horse Bid) is received by the Qualified Bid Deadline for a particular Facility or Facilities, such Qualified Bid shall be deemed the Accepted Bid for such Facility or Facilities and no Auction shall be conducted with respect to such Facility or Facilities.

Only a Qualified Bidder will be eligible to participate at the Auction, subject to such limitations as the Debtors may impose in good faith, in consultation with the Consultation Parties, as set forth herein. In addition, professionals and/or other representatives of (i) the Debtors, (ii) the Committee; (iii) Lincoln Savings Bank; and (iv) the Webb Family Trust will be permitted to attend and observe the Auction.

At the Auction, Qualified Bidders will be permitted to increase their bids in successive rounds of bidding. Bidding will start at the purchase price and terms proposed in the Baseline

Bid, and will proceed thereafter in minimum increments of at least $100,000 (a "Minimum Overbid Amount") and all subsequent overbids shall be by $100,000; *provided, however,* that if the Baseline Bid is the Stalking Horse Bid, the initial Minimum Overbid Amount shall be $100,000.00 plus the Break-Up Fee. The Debtors reserve the right to and may, after consultation with the Consultation Parties, increase or decrease the Minimum Overbid Amount at any time during the Auction. The Debtors, in consultation with their advisors and the Consultation Parties, shall determine, in their sole discretion, whether a Qualified Bid by a Qualified Bidder at the Auction matches or is higher and better than the prior Qualified Bid.

For the avoidance of doubt, the Stalking Horse Bidder shall be permitted to include the full amount of the Break-Up Fee in each bid by the Stalking Horse Bidder for the purposes of comparison to any overbid in connection with each round of bidding in the Auction.

The Debtors may adopt rules for the Auction at any time that the Debtors, in consultation with the Consultation Parties, reasonably determine to be appropriate to promote a spirited and robust auction, whether to adjourn the Auction at any time and from time to time, the conducting of multiple rounds of open or sealed bidding with notice only to the parties entitled to attend the Auction, and to declare that the Auction has ended when no further Bids are timely made or otherwise. At the start of the Auction, the Debtors shall describe the terms of the Baseline Bid. Each Qualified Bidder will be permitted what the Debtors, in consultation with the Consultation Parties, reasonably determine to be an appropriate amount of time to respond to the previous Bid at the Auction. The Auction will be conducted openly and shall be transcribed or recorded, and the Qualifying Bidders will be informed of the material terms of the previous bid.

In evaluating a Qualified Bid submitted at the Auction, the Debtors, in consultation with the Consultation Parties, may consider, among other things and without limitation, the amount of cash to be paid or delivered, the speed and certainty of consummating a transaction, and any other relevant factor.

### The Successful Bidder

Prior to ending the Auction, the Debtors, after consultation with the Consultation Parties, shall announce on the record that they have determined in their business judgment that they have received the highest or otherwise best Qualified Bid (the "Accepted Bid"), and the Qualified Bidder that had submitted such Qualified Bid shall be declared the winning bidder (the "Successful Bidder"). The Debtors, after consultation with the Consultation Parties, shall also identify the Qualified Bidder that submitted the next highest or otherwise best Qualified Bid as a Backup Bid and shall be declared the backup bidder (the "Backup Bidder").

The Debtors shall seek Bankruptcy Court approval of the Accepted Bid(s) and Backup Bid(s) (if any) at the Sale Hearing scheduled for **March __, 2022.**

### The Backup Bidder

The Backup Bidder shall be required to keep its Backup Bid open and irrevocable until the earlier of (i) the Closing of the Sale Transaction on the Accepted Bid; or (ii) thirty (30) days after the Outside Closing Date (defined below). Promptly following the Debtor's selection of the Accepted Bid, , but no later than one (1) business day after the date of the Auction, it shall file

with the Bankruptcy Court notice of the Accepted Bid and Backup Bid, if any (the "Auction Report"), accompanied by such Successful Bidder's and Backup Bidder's Bid APA. Notwithstanding the foregoing, if the Successful Bidder is for less than the Whole Portfolio (less any reductions by the terms of the APA), the Stalking Horse Bidder shall not be required to be the Backup Bidder and its Deposit shall be released to the Stalking Horse Bidder within two (2) business days.

Following the Sale Hearing, if the Successful Bidder fails to consummate its purchase of the Acquired Assets by the Outside Closing Date (defined below), the Debtor may deem the Backup Bidder to have the new prevailing bid, and the Debtor will be authorized, upon prior written notice to the Bankruptcy Court, the Consultation Parties, and the United States, and without further order of the Bankruptcy Court, to consummate the Sale Transaction with the Backup Bidder. In such case of a failure to consummate the purchase of the Acquired Assets on the part of the Successful Bidder, the defaulting Successful Bidder's Bid Deposit shall be forfeited to the Debtors for the benefit of the Estates.

## Bid Submission Process

A bid is a signed document from a Preliminary Bidder received by the Preliminary Bid Deadline that identifies the purchaser by its legal name (including any equity holders or other financial backers, if the Preliminary Bidder is an entity formed for the purpose of submitting bids or consummating a Sale Transaction), and any other party that will be participating in connection with the bid or the Sale Transaction, and includes, at a minimum, the following (a "Bid"). To be eligible to be considered by the Debtors as a Qualified Bidder, each Preliminary Bidder must satisfy, to the satisfaction of the Debtors and the Consultation Parties, the following conditions:

(a)     Good Faith Deposit: Each Preliminary Bidder must submit to the Debtors, by the Preliminary Bid Deadline, a good faith deposit equal to 5% of the amount of the Preliminary Bidder's Bid. The Bid Deposit shall be held by the Debtors in an escrow account (without interest) to be maintained by the Debtors until they determine whether or not such Preliminary Bid is a Qualified Bid. The Bid Deposit shall be refunded, or applied to the Purchase Price, as set forth herein. Any party that has not submitted its Bid Deposit may not be a Qualified Bidder, may not attend the Auction, and the Debtors may not negotiate the terms of a Bid with such party.

(b)     Redline APA: Each Preliminary Bid must be submitted with a redline of the Stalking Horse APA (the "Redline APA") setting forth all proposed revisions by the Preliminary Bidder to the terms of the Stalking Horse APA.

(c)     Signed Bid APA: Each Preliminary Bid must be submitted with a clean version of the Bid APA, incorporating any proposed revisions, and signed by an authorized representative of the Preliminary Bidder.

(d)     Same or Better Terms: A statement that the Preliminary Bidder offers to purchase the Acquired Assets, pursuant to a Sale Transaction that is no less favorable to the Estates than the Sale Transaction contemplated in the Stalking Horse APA.

(e) <u>Backup Bidder</u>:  Each Bid submitted must provide that the (i) Qualified Bidder's Bid shall remain open and irrevocable until the earlier of (a) the Closing of the Sale Transaction on the Accepted Bid; or (b) thirty (30) days after the Outside Closing Date (defined below), and the (ii) Qualified Bidder is obligated to perform as a Backup Bidder (as defined below) in the event such Qualified Bidder is not the Successful Bidder.

(f) <u>Purchase Price; Minimum Bid</u>:  Each Bid for the Whole Portfolio must exceed the Stalking Horse Purchase Price, *plus* the Break-Up Fee, *plus* the Minimum Overbid Amount (the "<u>Whole Portfolio Initial Minimum Bid Amount</u>").  Each bid for Lots must exceed the amount allocated by the Stalking Horse Bid for such Facilities plus the Minimum Overbid Amount (the "<u>Lots Initial Minimum Bid Amount</u>").

(g) <u>Designation of Assigned Contracts and Leases</u>:  A Preliminary Bid must identify with particularity each and every executory contract and lease with respect to which the Preliminary Bidder seeks assignment from the Debtors.

(h) <u>Excluded Assets</u>: A Preliminary Bid must identify with particularity each of the Acquired Assets which the Preliminary Bidder does not wish to include in its offer.

(i) <u>Corporate Authority</u>: A Preliminary Bid must include written evidence reasonably acceptable to the Debtors and the Consultation Parties demonstrating appropriate corporate authorization of the Preliminary Bidder to consummate the proposed Sale Transaction; <u>provided</u> <u>that</u>, if the Preliminary Bidder is an entity specially formed for the purpose of effectuating the Sale Transaction, then the Preliminary Bidder must furnish written evidence reasonably acceptable to the Debtors and the Consultation Parties of the approval of the Sale Transaction by the equity holder(s) of such Preliminary Bidder.

(j) <u>Disclosure of Identity of Preliminary Bidder</u>:  A Preliminary Bid must fully disclose the identity of each entity that will be bidding for or purchasing the Acquired Assets, including any equity holders, in the case of a Preliminary Bidder which is an entity specially formed for the purpose of effectuating the contemplated transaction, or otherwise participating in connection with such Preliminary Bid.  A Preliminary Bid must also fully disclose any connections or agreements with the Debtor, or any other known, potential or prospective Preliminary Bidder, and/or any officer, director or equity holder of the Debtors.

(k) <u>Proof of Financial Ability to Perform</u>:  A Preliminary Bid must include written evidence that the Debtor may conclude, in consultation with its advisors, and the Consultation Parties, demonstrates that the Preliminary Bidder has the necessary financial ability to close the Sale Transaction and comply with section 365 of the Bankruptcy Code, including providing adequate assurance of future performance

7

under all contracts and/or leases to be assumed and assigned in such Sale Transaction (collectively, such written evidence, the "Proof of Performance").

(l)     Contact Information and Affiliates:  The Preliminary Bid must provide the identity and contact information for the Preliminary Bidder.

(m)     Contingencies:  Each Preliminary Bid **shall not** be conditioned on obtaining financing, any internal approvals or credit committee approvals, or on the outcome or review of unperformed due diligence.

(n)     Due Diligence:  Each Preliminary Bid must expressly acknowledge and represent that the Preliminary Bidder: (a) has had an opportunity to conduct any and all due diligence regarding the Acquired Assets and the proposed transaction prior to making its Bid, (b) has relied solely upon its own independent review, investigation and/or inspection of any documents and the Acquired Assets in making its Bid or that of any of its legal, financial or other advisors, and (c) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the business of the Debtors or the Acquired Assets or the proposed transaction, or the completeness or accuracy of any information provided in connection therewith, except as expressly stated in the representations and warranties contained in the asset purchase agreement ultimately accepted and executed by the Debtors.

(o)     Irrevocable:  Each Preliminary Bid must be irrevocable in accordance with the Bidding Procedures until five (5) business days after the Sale Hearing, provided that if such Preliminary Bid is determined by the Debtors to be the Accepted Bid or the Backup Bid, such Preliminary Bid shall continue to remain irrevocable, subject to the terms and conditions of these Bidding Procedures.

(p)     Compliance with Diligence Requests:  A Preliminary Bidder must have complied with reasonable requests for additional information and due diligence access from the Debtors to their satisfaction.

(q)     Covenant to Cooperate:  Each Preliminary Bid must include a covenant to cooperate with the Debtors to provide pertinent factual information regarding the Preliminary Bidder's operations reasonably required to analyze issues arising with respect to any applicable anti-trust laws and other applicable regulatory requirements.

(r)     Confidentiality Agreement:  To the extent not already executed, the Preliminary Bid must include an executed Confidentiality Agreement in form and substance reasonably satisfactory to the Debtors.

(s)     Environmental Requirements: Each Preliminary Bid must contain an acknowledgment of the following statement: "Nothing in these Bidding Procedures releases, nullifies, precludes, or enjoins the enforcement of any police

or regulatory to a governmental unit that any entity would be subject to as the owner or operator of property after the date of entry of an order approving these Bidding Procedures. Nothing in these Bidding Procedures authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements under police or regulatory law. Nothing in these Bidding Procedures divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret these Bidding Procedures, or to adjudicate any defense asserted under the order approving these Bidding Procedures."

(t)  <u>Closing Date</u>:  A Preliminary Bid must include a commitment to enter into an Operations Transfer Agreement upon entry of the Sale Order and close and fully consummate the transactions contemplated by the Bid APA within 120 days of the Sale Order, subject to change of ownership approval by the regulatory agencies (the "Outside Closing Date").

(u)  <u>Bid Deadline</u>:  The following parties must receive a Preliminary Bid in writing (in both PDF and Word format), on or before the Preliminary Bid Deadline: (i) the Debtors' Investment Banker, attention Ross Sanders (ross.sanders@nmrk.com); (ii) general reorganization counsel to the Debtors, attention Jeffrey Goetz (goetz.jeffrey@bradshawlaw.com) and Krystal Mikkilineni (mikkilineni.krystal@bradsahawlaw.com); (iii) counsel to the Committee: attention Francis Lawall (Francis.Lawall@Troutman.com) and Deborah Kovsky-Apap (deborah.kovsky@troutman.com); (iv) counsel to Lincoln Savings Bank, attention Jeff Courter (jwc@nyemaster.com) and Roy Leaf (rleaf@nyemaster.com); and counsel to the Webb Family Trust, attention Terry Gibson (TGibson@2501grand.com).

A Preliminary Bid received from a Preliminary Bidder, on or before the Preliminary Bid Deadline, that meets the above requirements, shall constitute a "<u>Qualified Bid</u>", and such Preliminary Bidder shall constitute a "<u>Qualified Bidder</u>".  If the Debtors receive a Preliminary Bid prior to the Bid Deadline that is not determined by the Debtors, in accordance with these Bidding Procedures and in consultation with the Consultation Parties, to constitute a Qualified Bid, the Debtors may provide the Preliminary Bidder with the opportunity to remedy any deficiencies prior to the Preliminary Bid Deadline (or, as it deems appropriate, after the Preliminary Bid Deadline); <u>provided</u>, <u>further</u>, that, for the avoidance of doubt, if any Qualified Bidder fails to comply with reasonable requests for additional information and due diligence access from the Debtors to their satisfaction, the Debtors may, after consulting with their professionals and the Consultation Parties, disqualify any Qualified Bidder and reject a Qualified Bid.

### <u>Sale Is As Is/Where Is</u>

The sale of the Acquired Assets shall be on an "as is, where is" basis and without any additional representations or warranties of any kind, nature or description by the Debtors, their agents or the Estates, other than those set forth in the Stalking Horse APA.  By submitting a bid,

each Preliminary and Qualified Bidder shall be deemed to acknowledge and represent that it has had an opportunity to conduct any and all due diligence regarding the Acquired Assets prior to making its offer, that it has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Acquired Assets in making its bid, and that it did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Acquired Assets, or the completeness of any information provided in connection therewith or with the Auction, except as expressly stated in these Bidding Procedures.

### Sale Hearing

The Accepted Bid and the Backup Bid will be subject to approval by the Bankruptcy Court at the Sale Hearing on the date set forth above, or such other date as the Court may set. The Sale Hearing may be adjourned by the Debtors from time to time, subject to Court approval, by filing a notice on the docket of the Debtors' chapter 11 cases.

### Return of Deposits

The Bid Deposits of all Preliminary Bidders whose Preliminary Bid is not deemed by the Debtors as a Qualified Bid shall be returned to such Preliminary Bidder, without interest, within three (3) business days of such determination. The Bid Deposit of any Qualified Bidder that is neither the Successful Bidder nor the Backup Bidder shall be returned to such Qualified Bidder not later than five (5) business days after the Sale Hearing. The Bid Deposit of the Backup Bidder, if any, shall be returned to the Backup Bidder within three (3) business days after the Closing of the Sale Transaction with the Successful Bidder. If the Successful Bidder timely and fully closes the Sale Transaction, its Bid Deposit shall be credited towards the Purchase Price. If the Backup Bid closes the Sale Transaction in accordance with these Bidding Procedures, its Bid Deposit shall be credited towards the Purchase Price.

### Closing of the Sale Transaction

The Successful Bidder shall fully consummate the Sale Transaction at a Closing to be scheduled and conducted by the Debtors and their professionals by no later than 120 days after entry of the Sale Order, subject to change of ownership approval by the regulatory agencies. No later than the Sale Closing date, the Successful Bidder shall be required to pay to the Debtors the balance of the Purchase Price in immediately available funds as set forth in the Successful Bidder's asset purchase agreement; execute such documents as the Debtors deem reasonably necessary to consummate the Sale Transaction; and otherwise fully consummate the Sale Transaction in accordance with the terms of the Accepted Bid APA as approved by the Bankruptcy Court. The Debtors may elect to conduct and consummate the Closing electronically and shall not be required to close the Sale Transaction in person if they deem it advisable.

### Modifications

The Debtors, in their sole discretion, but in consultation with their advisors and the Consultation Parties, may adopt, implement, and/or waive such other, additional or existing procedures or requirements that serves to further an orderly Auction and bidding process, including, but not limited to, the imposition of a requirement that all Qualified Bidders submit

10

sealed Qualified Bids during the Auction, all without further notice except to those parties that would be entitled to attend at an Auction or participate in the Auction, as appropriate.

The Debtors, in their sole discretion, but in consultation with their advisors and Consultation Parties, may (a) determine which Qualified Bid, if any, is the Accepted Bid, and (b) reject at any time before entry of an order approving the Accepted Bid, any Bid that, in the discretion of the Debtors, in consultation with their advisors and the Consultation Parties is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code or the Bidding Procedures, or (iii) contrary to the best interests of the Debtors' estates and their creditors. At or before the conclusion of the Auction, the Debtors, in their sole discretion, but in consultation with their advisors and Consultation Parties, may impose such other terms and conditions upon Qualified Bidders as the Debtors determine to be in the best interests of the Debtors' estates.

## Consultation Parties

The Debtors shall use their best effort to consult and confer with the Consultation Parties in respect of all material aspects of the bidding and Auction process in order to maximize value for all parties in interest.  For the avoidance of doubt, however, the consultation rights provided to the Consultation Parties by these Bidding Procedures shall not limit the Debtors' discretion in any way and shall not include the right to veto any decision made by the Debtors in the exercise of their business judgment. Nothing in these Bidding Procedures shall limit, impair, or otherwise prejudice the ability of the Consultation Parties to object in connection with the Sale contemplated by these Bidding Procedures.

The Debtors may not modify the consultation or consent rights of any of the Consultation Parties set forth herein without the consent of such affected party; provided, however, that the Debtors may, in the exercise of their business judgment, take such steps as are necessary to ensure a competitive and transparent bidding and Auction process, including, but not limited to, limiting (but not eliminating) the consultation rights of a Consultation Party that is or becomes a Qualified Bidder.

## Reservation of Rights of the Debtors

Except as otherwise provided in the Bidding Procedures or the Bidding Procedures Order, the Debtors, in consultation with the Consultation Parties, further reserve the right as they may reasonably determine to be in the best interest of the Estates and consistent with their fiduciary duties, to: (a) determine which Preliminary Bidders are Qualified Bidders; (b) determine which Preliminary Bids are Qualified Bids; (c) determine which Qualified Bid is the Accepted Bid or Backup Bid; (d) reject any Preliminary Bid that is (1) inadequate or insufficient, (2) not in conformity with the requirements of the Bidding Procedures or the requirements of the Bankruptcy Code, or (3) contrary to the best interests of the Debtors and their Estates; (e) waive non-compliance with any of the terms and conditions set forth herein as the Debtors determine to be in the best interests of the Estates, their creditors, and other parties in interest; (f) impose additional terms and conditions with respect to all potential bidders; (g) extend the deadlines set forth herein; (h) continue or cancel the Sale Hearing by filing a notice on the docket of the Debtors' chapter 11 cases, without further notice to creditors or other

parties in interest; and (i) modify the Bidding Procedures and implement additional procedural rules that the Debtors determine, in their business judgment, will better promote the goals of the bidding process and discharge its duties; <u>provided</u>, <u>however</u>, that any modification or additions to the Bidding Procedures shall not be materially inconsistent with the Bidding Procedures Order, Sale Order, any order approving any agreement for post-petition financing, or any other order of the Court.

### **<u>Break-Up Fee and Expense Reimbursement</u>**

Pursuant to the Bidding Procedures Order, the Stalking Horse Bidder is entitled to the Break-Up Fee in accordance with the terms of the Stalking Horse APA, the Sale Motion, and the Bidding Procedures Order.

Pursuant to the Bidding Procedures Order, except for the Stalking Horse Bidder, no other party submitting an offer or bid or a Qualified Bid shall be entitled to any expense reimbursement or breakup, termination, or similar fee, or post-petition claim, including any administrative expense claim or substantial contribution claim under section 503 of the Bankruptcy Code or otherwise, and by submitting a bid, a Bidder (other than the Stalking Horse Bidder) shall be deemed to waive any right with respect thereto.

### **<u>Consent to Jurisdiction and Authority as Condition to Bidding</u>**

All bidders that participate in the bidding process shall be deemed to have (i) consented to the core jurisdiction of the Bankruptcy Court to enter any order or orders, which shall be binding in all respects, in any way related to these Bidding Procedures, the bidding process, the Auction, or the construction and enforcement of any agreement or any other document relating to the Sale Transaction, (ii) waived any right to a jury trial in connection with any disputes relating to these Bidding Procedures, the bidding process, the Auction, or the construction and enforcement of any agreement or any other document relating to the Sale Transaction, and (iii) consented to the entry of a final order or judgment in any way related to these Bidding Procedures, the bidding process, the Auction, or the construction and enforcement of any agreement or any other document relating to the Sale Transaction if it is determined that the Bankruptcy Court would lack Article III jurisdiction to enter such a final order or judgment absent the consent of the parties.

# EXHIBIT A

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (the "Agreement") is made and entered into as of February 11, 2022 (the "Execution Date"), by and between QHC Facilities, LLC, QHC Management, LLC, QHC Mitchellville, LLC, QHC Winterset North, LLC, QHC Madison Square, LLC, QHC Fort Dodge Villa, LLC, QHC Humboldt North, LLC, QHC Humboldt South, LLC, and QHC Villa Cottages, LLC, each an Iowa limited liability company, and Crestridge, Inc. and Crestview Acres, Inc., each an Iowa corporation, ("Seller"), and Crestridge Holdco, LLC, a Delaware limited liability company ("Buyer").

### ARTICLE I
DEFINITIONS

1.01    Definitions.    The following terms have the meanings assigned below:

"*Acquired Assets*" has the meaning described in Section 2.01 of this Agreement.

"*Acquisition Transaction*" shall mean any sale, transfer or other disposition (not involving the Buyer or its Affiliates), in one transaction or a series of transactions, of all or any substantial portion of the Acquired Assets or the Business, whether proposed to be effected pursuant to a merger, consolidation, tender offer, exchange offer, share exchange, amalgamation, stock acquisition, asset acquisition, business combination, restructuring, recapitalization, liquidation, dissolution, joint venture or similar transaction, whether or not proposed or advanced by the Seller.

"*Action*" means any claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, citation, grievance, summons, pleading, motion, objection, subpoena or investigation of any nature, whether civil, criminal, administrative regulatory or otherwise and whether at Law or in equity.

"*Affiliate*" means any Person that directly, or indirectly, controls, is controlled by, or is under common control with, such a specified Person.

"*Ancillary Agreements*" means any bill of sale, warranty deed, or similar transaction agreements in form and substance acceptable to Seller and Buyer.

"*Ancillary Businesses*" means the ancillary healthcare and medical business, including physician services, that Seller conducts.

"*Assumed Executory Contracts*" means the executory contracts, including Leases, of Seller listed on Schedule 2.08(a), designated and agreed by Buyer, that have been assumed and assigned by the Seller to the Buyer.

"*Assumed Lease*" means any Lease that is an Assumed Executory Contract.

"*Assumed Liabilities*" has the meaning set forth in Section 2.08 of this Agreement.

"**Assisted Living Facilities**" means the facilities consisting of (1) Madison Square Assisted Living, located at 209 W Jefferson St., Winterset, IA 50273 and (2) Fort Dodge Villa Cottages, located at 925 Martin Luther King Drive, Fort Dodge, IA 50501.

"**Bankruptcy Code**" means Title 11 of the U.S. Code, as amended from time to time.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of Iowa.

"**Bill of Sale**" means a bill of sale in form and substance acceptable to Buyer and Seller.

"**Bidding Procedures Order**" means that certain Order (A) Approving Bidding Procedures in Connection with the Auction and Sale of Assets and Scheduling an Auction and Sale Hearing; (B) Approving Assumption and Assignment Procedures; (C) Approving the Break-Up Fee; and (D) Granting Other Related Relief, entered on _____, Docket No. _____ in the Bankruptcy Case.

"**Break-Up Fee**" means a break-up fee in an amount equal to 3% of the Purchase Price, payable in accordance with Section 7.03 hereof.

"**Business**" means Seller's business as operators of 8 Skilled Nursing Facilities and 2 Assisted Living Facilities across Iowa, and all Ancillary Businesses of Seller.

"**Business Day**" means any day other than a Saturday, a Sunday, or a day on which commercial banks are allowed or required to close in Iowa.

"**Chapter 11 Case**" means the following proceedings pending before the Bankruptcy Court in which Seller are the Debtors: *In re QHC Facilities, LLC*, Case No. 21-01643-als11, *In re QHC Management, LLC* (Case No. 21-01644-als11), *In re QHC Mitchellville, LLC* (Case No. 21-01645-als11), *In re QHC Winterset North, LLC* (Case No. 21-01646-als11), *In re QHC Madison Square, LLC* (Case No. 21-01647-als11), *In re QHC Fort Dodge Villa, LLC* (Case No. 21-01648-als11), *In re Crestridge, Inc.* (Case No. 21-01649-als11), *In re Crestview Acres, Inc.* (Case No. 21-01650-als11), *In re QHC Humboldt North, LLC* (Case No. 21-01651-als11), *In re QHC Humboldt South, LLC* (Case No. 21-01652-als11), and *In re QHC Villa Cottages, LLC* (Case No. 21-01653-als11). ,.

"**Claim**" means any action, assessment, loss or experience rating, cause of action, claim, damage, demand, proceeding, fine, injury (including death), investigation, judgment, lawsuit, liability, loss, penalty, settlement or expense of any nature, whether civil, criminal, administrative or otherwise, and includes any and all "claims" as defined in 11 U.S.C. Section 101(5), and all "interests" as used in 11 U.S.C. Section 363(f).

"**Closing**" has the meaning set forth in Section 6.01 of this Agreement.

"**Closing Date**" has the meaning set forth in Section 6.01 of this Agreement. .

2

"*Code*" means Title 26 of the U.S. Code, as amended from time to time.

"*Contracts*" means all contracts and other agreements incident to the Facilities and/or Business to which Seller is a party.

"*Cure Costs*" means the amount necessary to cure all defaults under the Assumed Executory Contracts (as of the Closing Date) to permit Seller to assume and assign the Assumed Executory Contracts pursuant to Bankruptcy Code section 365 and any order of the Bankruptcy Court.

"*Disclosure Schedules*" means the disclosure schedules delivered by Seller concurrently with the execution and delivery of this Agreement.  If any schedules are not completed or attached hereto as of the date of this Agreement, the parties hereto agree to attach such schedules as soon as reasonably practicable, but in any event, this Agreement is subject to Buyer approving (which approval will not unreasonably be withheld, delayed or conditioned) all schedules or subsequent updates thereto within seven (7) days of submission thereof to Buyer.  The parties hereto agree that the party charged with providing an exhibit or schedule to this Agreement shall, to the extent necessary after delivery thereof, amend or supplement all exhibits and schedules in order for the same to be current, true and correct in all material respects as of the Closing Date.

"*DOH*" means Iowa Department of Public Health and the Iowa Department of Inspections and Appeals and Iowa Department of Human Services, collectively.

"*Employee Plans*" means any pension, retirement, savings, disability, medical, dental, health, life, death benefit, group insurance, profit-sharing, deferred compensation, stock option, stock purchase, bonus, incentive, executive compensation, vacation pay, holiday pay, severance benefit plan, trust, arrangement, agreement, policy or commitment, whether or not any of the foregoing is funded or insured and whether written or oral, that is intended to provide or does provide benefits to any of Seller's employees, and (i) to which seller is a party or by which Seller (or any of Seller's rights, properties or assets) is bound; (ii) with respect to which Seller has made any payments, contributions, or commitments, or may otherwise have any liability (whether or not Seller still maintains such plan, trust, arrangement, contract, agreement, policy, or commitment); or (iii) under which any director, employee or agent of Seller is a beneficiary as a result of his or her employment or affiliation with Seller.

"*Encumbrances*" means and includes interests, contractual rights, security interests, mortgages, liens, licenses, pledges, guarantees, charges, easements, reservations, restrictions, clouds, equities, rights of way, options, rights of first refusal and all other encumbrances, whether or not relating to the extension of credit or the borrowing of money.

"*Equipment*" means all furniture, fixtures, equipment, machinery, vehicles, and other personalty now or hereafter attached to or appurtenant to the Land or used in connection with the Facilities or the Business.

3

"***ERISA***" means the United States Employee Retirement Income Security Act of 1974, as amended from time to time, and the rules and regulations promulgated thereunder.

"***Escrow Agent***" means Landmark Abstract Agency, 207 Rockaway Turnpike, Lawrence, NY 11559, attn: Jacob Rekant, Jrekant@laatitle.com.

"***Excluded Agreements***" means all contracts, leases, and agreements (other than those between Seller and Buyer) that are not Assumed Executory Contracts: (i) as to which Seller is a party; (ii) to which Seller or its property is subject; or (iii) by which Seller is otherwise bound, whether oral or written.

"***Excluded Assets***" means those items specifically described in Section 2.02.

"***Excluded Liabilities***" means any liabilities of, and Claims against, Seller or the Acquired Assets, together with all other liabilities and obligations of, and Claims against, Seller that are not Assumed Liabilities.

"***Facilities***" means Seller's interest in the 8 Skilled Nursing Facilities and 2 Assisted Living Facilities, Land, Improvements, Equipment, Intellectual Property, Contract Rights, Leases, Intangible Personal Property, Government Authorizations, Records and the other intangible and tangible assets, whether real or personal or mixed, that are located in, or associated with, the nursing and assisted living facilities, and/or on the Land. The Facilities are listed on Exhibit A.

"***FMLA***" means the United States Family and Medical Leave Act, as amended from time to time, and the rules and regulations promulgated thereunder.

"***GAAP***" means generally accepted accounting principles in the United States, consistently applied.

"***Governmental Authority***" means the government of the United States or any foreign country or any state or political subdivision thereof and any entity, body or authority exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, and other quasi-governmental entities established to perform such functions.

"***Government Authorizations***" means all licenses, permits, approvals, certificates of need and occupancy, facility certifications, consents and other authorizations from any Governmental Authority as are necessary to lawfully own and/or operate the Facilities or conduct the Business.

"***Hazardous Materials***" means any substance, material, or waste that is or becomes regulated by any Governmental Authority including: (i) petroleum, (ii) asbestos, (iii) polychlorinated biphenyls, (iv) those substances, materials or wastes designated as a "hazardous substance" pursuant to Section 311 of the Clean Water Act or listed pursuant to Section 307 of the Clean Water Act or any amendments or replacements to these statutes,

(v) those substances, materials or wastes defined as a "hazardous waste" pursuant to Section 1004 of the Resource Conservation and Recovery Act or any amendments or replacements to that statute, or (vi) those substances, materials or wastes defined as a "hazardous substance" pursuant to Section 101 of the Comprehensive Environmental Response, Compensation and Liability Act, or any amendments or replacements to that statute.

 "*IDHS*" means the Iowa Department of Human Services.

"*IDIA*" means the Iowa Department of Inspections and Appeals.

"*IDPH*" means the Iowa Department of Public Health.

 "*Improvements*" means the buildings and all other improvements, including site improvements, landscaping, fixtures, mechanical equipment, apparatus and appliances, now owned or leased or hereafter placed in the Facilities, and/or on the Land.

"*Intangible Personal Property*" means all engineering and architectural plans and specifications, drawings, studies and as-built surveys relating to the Facilities that are in Seller's possession, and any other intangible personal property Seller owns and uses in connection with the Facilities.

"*Intellectual Property*" means any or all of the following rights: (i) all U.S., international, and foreign patents and applications therefor and all reissues, divisions, renewals, extensions, provisionals, continuations and continuations-in-part thereof; (ii) all inventions (whether or not patentable), invention disclosures, improvements, trade secrets, proprietary information, know-how, technology, technical data and customer lists, and all documentation relating to any of the  foregoing throughout the world; (iv) all industrial designs and any registrations and applications therefor throughout the world; (v) all internet uniform resource locators, domain names, trade names, logos, slogans, designs, common law trademarks and service marks, trademark and service mark registrations and applications therefor throughout the world; (vi) all databases and data collections and all rights therein throughout the world; (vii) all moral and economic rights of authors and inventors, however denominated, throughout the work; and (viii) any similar or equivalent rights to any of the foregoing anywhere in the world.

"*Inventory*" has the meaning set forth in Section 2.01(a) of this Agreement.

"*Knowledge*" with respect to Seller means all facts that a responsible officer of Seller employed as of the Execution Date would know or would have reason to know following due inquiry and diligence with respect to the matters at hand.

"*Labor Laws and Employment Laws*" means all Laws and all contracts or collective bargaining agreements governing or concerning labor relations, collective bargaining, conditions of employment, employment discrimination or harassment, wages, hours, or

5

occupations safety and health. The term includes ERISA, the Immigration Reform and Control Act of 1986, the National Labor Relations Act, the Civil Rights Acts of 1866 and 1964, the Equal Pay Act, the Age Discrimination in Employment Act, the Americans With Disabilities Act, FMLA, WARN Act, OSHA, the Davis Bacon Act, the Walsh-Healy Act, the Service Contract Act, the Fair Labor Standards Act, the Rehabilitation Act of 1973, the Sarbanes-Oxley Act, any worker's compensation Law, and all rules and regulations promulgated under any of the foregoing Laws.

"*Laws*" means all statutes, rules, codes, regulations, restrictions, ordinances, orders, decrees, approvals, directives, decisions, judgments, injunctions, writs, executive orders, awards, and decrees of, or issued by, any Government Authority.

"*Land*" means the real estate described on Exhibit B, together with all easements, hereditaments, rights of way, privileges and rights benefiting the same and all strips and gores of land lying adjacent to such land that Seller owns.

"*Leases*" means all lease or rental agreements involving or pertaining to the Business, to which Seller is a party, if any.

"*Licenses*" means all notifications, licenses, permits (including environmental, construction, and operation permits), franchises, certificates, certificates of need, accreditations, approvals, exemptions, waivers, classifications, registrations and other similar documents and authorizations any Governmental Authorities have issued, as well as all applications for any of the foregoing; *provided, however,* that Licenses shall not include any notifications, licenses, permits (including environmental, construction, and operation permits), franchises, certificates, certificates of need, accreditations, approvals, exemptions, waivers, classifications, registrations and other similar documents and authorizations any Governmental Authorities have issued, as well as all applications for any of the foregoing, related to any Excluded Asset.

"*Lien*" means any lien (statutory or otherwise), encumbrance, Claim, indebtedness, obligation, right, demand, charge, right of setoff, mortgage, deed of trust, security interest, pledge, preference, option, lease, license, Tax, right of first refusal or similar interest, title defect, easements, rights of way, restrictive covenant, encroachment, judgment, conditional sale, title retention agreement or restriction on transfer, or any other interest, whether it is secured or unsecured, known or unknown, recorded or unrecorded, contingent or liquidated.

"*Material Adverse Effect*" means any adverse effect in the business, financial or physical condition, or results of operations of the Facilities, the Business, or Seller with respect to the Facilities, that is material when taken as a whole, provided, however, that a Material Adverse Effect shall not be deemed to include events, changes, effects, conditions, state of facts or occurrences arising out of, relating to, or resulting from: (i) changes in the United States or foreign economies or financial markets in general; (ii) general changes or developments in business, regulatory, or macroeconomic conditions or trends that affect

6

the industries and markets in which the Sellers operate; (iii) any global or national health concern, epidemic, disease outbreak, pandemic (whether or not declared as such by any Governmental Authority and including "coronavirus" or "COVID-19") or any Law issued by a Governmental Authority requiring business closures, quarantine, "sheltering-in-place" or similar restrictions that arise out of such health concern, epidemic, disease outbreak or pandemic or any change in such Law following the date of this Agreement; (iv) changes after the date of this Agreement in any Laws; (v) the announcement or anticipated consummation of the transactions this Agreement contemplates; (vi) the commencement or pendency of the Chapter 11 Case; (vii) any objections in the Bankruptcy Court to (A) this Agreement or any of the transactions contemplated hereby or thereby, (B) the Bidding Procedures Order, or (C) the assumption or rejection of any Contract or Lease pursuant to and in compliance with this Agreement

"*Medicare Advance Payments*" means unpaid or unreturned accelerated or advance Medicare payments received by the Facilities under the Coronavirus Aid Relief, and Economic Security Act amending the Accelerated Payments program, and any other unpaid or unreturned advance payments or stimulus funds received by the Facilities through any federal or state governmental agency providing reimbursement.

"*Operations Transfer Agreement*" has the meaning set forth in Section 2.12.

"*OSHA*" means the United States Occupational Safety and Health Administration.

"**Out of Compliance**" means any of the following (A) a finding by a Governmental Authority of one or more deficiencies at any Facility at a "level G" or above that has not been corrected and cleared by the applicable Governmental Authority; (B) a denial of any Facility's right to admit patients or to receive Medicare or Medicaid payments or reimbursements for existing patients or for new admissions at any Facility (C) any Facility loses its operating license or any material Permit; (D) any Facility has any Provider Agreement revoked or terminated; and (E) any Facility has its number of beds reduced; provided that the Facilities shall not be Out of Compliance if any of the conditions set forth in this definition exist at any Facility but are thereafter cured or rectified by the Seller within a reasonable period.

"*Person*" means any individual, corporation, partnership, joint venture, association, limited liability company, trust, unincorporated organization or Governmental Authority.

"*Permitted Encumbrances*" means any Encumbrances that remain attached to any Acquired Assets, from and after the Closing Date, with Buyer's consent.

"*Petition Date*" means December 29, 2021.

"*Purchase Price*" has the meaning set forth in Section 2.03.

"*Qualified Bid*" shall have the meaning set forth in the Bidding Procedures.

7

"***Records***" means all books and records Seller (or its Affiliates) maintain in connection with the Facilities or the Business, but excluding any records relating solely to Seller corporate entity as distinct from the Facilities or Business.

"***Sale Order***" means an Order of the Bankruptcy Court approving the sale to Buyer.

"***Skilled Nursing Facilities***" means the facilities consisting of (1) Crestridge, located at 1015 Wesley Drive, Maquoketa, IA 52060, (2) Winterset Care Center North, located at 411 East Lane St., Winterset, IA 50273, (3) Crestview Acres, located at 1485 Grand Avenue, Marion, IA 52303, (4) Humboldt Care Center North, located at 1111 11th Ave, North, Humboldt, IA 50548, (5) Humboldt Care Center South, located at 800 13th St., South, Humboldt, IA 50548, (6) Sunnycrest Nursing Center, located at 401 Crisman St., Dysart, IA 52224, (7) Mitchell Village Care Center, located at 114 Carter St. SW, Mitchellville, IA 50169, and (8) Fort Dodge Villa Care Center, located 2721 10th Ave North, Fort Dodge, IA 50501.

"***Stalking Horse Bidder***" means the bidder identified in accordance with the Bidding Procedures Order.

"***Tax Return***" means any report, return, declaration or other information required to be supplied to any Governmental Authority in connection with Taxes, including estimated returns and reports of every kind with respect to Taxes.

"***Taxes***" means all taxes, charges, fees, levies, duties, penalties, additions or assessments imposed by any Governmental Authority, including income, excise, property, sales, transfer, use, ad valorem, profits, occupancy, environmental, sewer, tap, severance, franchise, value added or other taxes, including any interest, penalties or additions attributable thereto.

"***Third Party***" means any Person other than Seller, Buyer or an Affiliate of either.

"***Transaction Documents***" means this Agreement and any other agreement, document or instrument executed and delivered pursuant to the terms of, or otherwise in connection with, this Agreement, including, for the avoidance of doubt, the Bidding Procedures, the Bidding Procedures Order and the Sale Order.

"***Treasury Regulations***" means the Income Tax Regulations, including Temporary Regulations, promulgated under the Code.

"***WARN Act***" means the United States Worker Adjustment and Retraining Notification Act, as amended from time to time, and the rules and regulations promulgated thereunder.

1.02    <u>General Construction</u>. Whenever the context requires in this Agreement, the singular includes the plural and masculine includes the feminine or the neuter. The word "including" means "including without limitation." Words such as "herein," "hereof,"

"hereby" and "hereunder" and words of similar import refer to this Agreement as a whole and not to any particular Article, Section or Subsection of this Agreement.

1.03    <u>Schedules and Exhibits</u>.  The schedules and exhibits referenced in this Agreement are incorporated herein. All items disclosed hereunder shall be deemed disclosed in connection with the specific representation to which they are explicitly referenced. If no disclosure schedule is attached with reference to a specific Section of this Agreement, then such missing schedule shall be deemed to state "None."

**ARTICLE II**
AGREEMENT AND CONSIDERATION

2.01    <u>Agreement to Sell and Purchase</u>.  In consideration of the mutual covenants and promises contained in this Agreement, Seller agrees to sell, assign, transfer and convey unto Buyer all of Seller's right, title and interest in and to the assets described in this Section 2.01 (but not any Excluded Assets) (collectively the "***Acquired Assets***"), and Buyer agrees to purchase all of Seller's right, title and interest in and to the Acquired Assets (but not any Excluded Assets), all upon the terms and conditions set forth herein. Except for any Excluded Assets, the Acquired Assets consist of the following assets, properties and rights of Seller as of the close of business on the Closing Date:

(a)    All inventory, including finished goods, raw materials, work in progress, packaging, supplies, parts and other inventories, but excluding the Excluded Assets (collectively, the "***Inventory***");

(b)    All Contracts set forth in <u>Section 2.08(a)</u> of the Disclosure Schedules (the "***Assumed Executory Contracts***");

(c)    All Intellectual Property;

(d)    All furniture, equipment, machinery, tools, vehicles, office equipment, supplies, computers, telephones and other tangible personal property;

(e)    All Land;

(f)    All Permits which are held by Seller and required for the conduct of the Business as currently conducted or for the ownership and use of the Acquired Assets;

(g)    All rights to any Actions of any nature available to or being pursued by Seller to the extent related to the Business, the Acquired Assets or the Assumed Liabilities, whether arising by way of counterclaim or otherwise, *provided, however,* that the rights to any Avoidance Action against any party to a Contract of Seller not listed on <u>Section 2.08(a)</u> of the Disclosure Schedules as of the Closing or any Action against any director, officer, equity-holder, or lender of any Seller are not a Purchased Asset;

9

(h)     All of Seller's rights under warranties, indemnities and all similar rights against third parties to the extent related to any of the Acquired Assets or Assumed Liabilities;

(i)     All employee benefit plans set forth in <u>Section 2.01(i)</u> of the Disclosure Schedules, solely to the extent designated and agreed by Buyer, including all related insurance policies, contracts, trusts and any other assets attributable thereto (the "***Assumed Benefit Plans***");

(j)     All insurance benefits, including rights and proceeds, arising from or relating to the Business, the Acquired Assets or the Assumed Liabilities

(k)     Originals, or where not available, correct and complete copies, of all books and records, including books of account, ledgers and general, financial and accounting records, customer lists, customer purchasing histories, price lists, distribution lists, supplier lists, production data, quality control records and procedures, customer complaints and inquiry files, research and development files, records and data (including all correspondence with any Governmental Authority), sales material and records (including pricing history, total sales, terms and conditions of sale, sales and pricing policies and practices), strategic plans, internal financial statements, marketing and promotional surveys, material and research and files relating to the Intellectual Property Assets ("***Books and  Records***"); and

(l)     All goodwill and the going concern value of the Business.

2.02   <u>Excluded Assets</u>.  The following assets are expressly excluded from the purchase (the "***Excluded Assets***"):

(a)     All Contracts that are not Assumed Executory Contracts (the "***Excluded Contracts***");

(b)     Cash and cash equivalents;

(c)     Accounts receivable;

(d)     The corporate seals, organizational documents, minute books, stock books, Tax Returns, books of account or other records having to do with the corporate organization of Seller;

(e)     All rights to any Avoidance Actions against any creditor of Seller not listed in <u>Section 2.08(a)</u> of the Disclosure Schedules as of the Closing or any party to a Contract of Seller not listed on <u>Section 2.08(a)</u> of the Disclosure Schedules as of the Closing, or any Action against any director, officer, equity-holder, or lender of any Seller;

(a)     Prepaid expenses, credits, advance payments, claims, security, refunds, rights of recovery, rights of set-off, rights of recoupment, deposits, charges, sums and fees

10

(including any such item relating to the payment of Taxes) related to prior to the Closing Date; and

(f)      The rights specifically accruing to Seller under the Transaction Documents.

2.03    <u>Consideration</u>.  Buyer agrees to pay to Seller the total of Eleven Million and 00/100 Dollars ($11,000,000) (the "<u>Purchase Price</u>") in consideration for the sale of the Acquired Assets, subject to the adjustments and credits described herein.

2.04    <u>Good Faith Deposit</u>.  Within two (2) business days of the Execution Date, Buyer shall provide a good faith deposit of $550,000 in cash to Escrow Agent to be held pending Closing.  In the event Buyer is not the Prevailing Bidder at auction, Seller shall return the good faith deposit to Buyer within three business days of entry of the order approving the sale.

2.05    <u>Method of Payment</u>.  Buyer will pay the Purchase Price at Closing, less the Medicare Advance Payments, in immediately available funds. The Good Faith Deposit shall be applied to the Purchase Price.

2.06    <u>Allocation of the Purchase Price</u>.  The Purchase Price will be allocated in the manner set forth on Exhibit C, said allocation being mutually agreed upon by the parties.

2.07    <u>Excluded Assets</u>.  Notwithstanding anything herein to the contrary, Buyer will not acquire any interest in the Excluded Assets as a result of this transaction.

2.08    <u>Assumed Liabilities</u>.  Buyer will not assume or in any way be responsible for any of the debts, liabilities, or obligations of any kind or nature of Seller, other than as specifically set forth herein related to Assumed Executory Contracts (collectively, the "***Assumed Liabilities***").

(a)      Except as set forth herein, Buyer shall assume and be responsible for all Liabilities of Seller under the Assumed Executory Contracts, including any costs to cure any ongoing default under any Assumed Executory Contract (the "Cure Costs") in accordance with the Bidding Procedures. <u>Section 2.08(a)</u> of the Disclosure Schedules sets forth a correct and complete list of all Assumed Executory Contracts as of the date hereof, including any Cure Costs associated therewith. Therefore, Buyer shall only be obligated to pay Liabilities under contracts which Buyer has explicitly assumed pursuant to section 2.08(a) of this Agreement, which will be designated by Buyer, and detailed in section 2.08(a) of the Disclosure Schedules. If the Buyer indicates in the Disclosure Schedules that Buyer does not wish to assume a Cure Cost, it shall be deemed that Buyer does not assume the corresponding contract.  Notwithstanding the foregoing, Buyer shall not assume any Cure Costs related to any provider agreement (i.e., Medicare, Medicaid or any HMOs), which amount shall either be satisfied by Seller simultaneously with the Closing or credited at Closing against the Purchase Price.

11

2.09    Without limiting the generality of the foregoing, Buyer will have no liability for any Excluded Liabilities or Excluded Assets. Other than the Assumed Liabilities, Buyer shall not assume from Seller any Liabilities whatsoever, all of which shall be retained by the Seller and considered Excluded Liabilities including without limitation:

(a)    malpractice, professional liability or other tort claims, statutory or regulatory claims, claims of local, state or federal agencies whether civil or criminal, fraud-based claims or claims for breach of contract to the extent any such claims are based on acts or omissions of Seller or events occurring at the Facilities before the Closing Date;

(b)    any accounts payable, taxes, or other obligation or Liabilities of Seller to pay money incurred by Seller for periods prior to the Closing Date;

(c)    any collective bargaining agreements or other agreements or understandings with any labor union or collective bargaining unit or any employment or consulting agreements of any kind and any Liabilities arising from any pension fund or benefits programs;

(d)    any administrative expense Claims accruing in the Chapter 11 Case;

(e)    Liabilities of Seller arising under or in connection with any Excluded Contract;

(f)    Liabilities of Seller arising under all employment and change of control contracts, severance obligations, equity option contracts and equity purchase contracts to which Seller is a party other than any Liability arising pursuant to any Assumed Contract;

(g)    Liabilities or obligations in connection with any indebtedness of Seller, except pursuant to any Assumed Contract or other Assumed Liability;

(h)    other than Cure Amounts related to the Assumed Contracts, all pre-petition and post-petition Claims as of the Closing Date, including, without limitation, all trade payables and general unsecured Claims;

(i)    any Liability arising out of, under or in connection with the Excluded Assets;

(j)    all Liabilities relating to (including amounts or notice due to) employees, former employees, consultants, former consultants or retirees of Seller based on the termination of such employment or engagement by the Seller, including any amounts due to such Persons prior to Closing;

(k)    any Liability that is not an Assumed Liability; and

(l)    other than Cure Amounts related to the Assumed Contracts, any other Liabilities arising in whole or in part from Seller's acts or omissions or in any way related to the operations of the Facility prior to the Effective Time.

12

2.10    <u>Inspection / Due Diligence Period.</u>  Buyer agrees that it has conducted sufficient due diligence to close the sale and purchase the Acquired Assets as is, where is, other than as otherwise agreed by Seller and Buyer.

2.11    <u>Revisions to List of Assumed Executory Contracts</u>. Subject to the terms of any controlling Bankruptcy Court order and the requirements of the Bankruptcy Code, Buyer may revise Schedule 2.08(a) at any time prior to the Bankruptcy Court's entry of the Sale Order, by giving notice to Seller; provided, however, that such revision shall not result in additional cost (including Cure Cost) to Seller., following entry by the Bankruptcy Court of the Sale Order. Immediately upon Buyer's delivery of such written notice to Seller, Schedule 2.08(a), so revised, will define the scope of the Assumed Executory Contracts in all respects pursuant to this Agreement, including the scope of Assumed Liabilities, Assumed Executory Contracts, Excluded Liabilities, and Excluded Agreements, and Cure Costs.

2.12    <u>Provider Agreements;</u>

   (a)    <u>Operations Transfer Agreement</u>: The Buyer and Seller shall enter into an ancillary agreement providing for the orderly transition of the operations of each Facility from the Seller to the Buyer (the "***Operations Transfer Agreement***"). The Operations Transfer Agreement shall specify the terms and conditions of the transition of operations of, and financial responsibility for, the Facilities from Seller to Buyer for the time period between the entry of the Sale Order and the Closing Date.

   (b)    <u>Management Agreement</u>. The Buyer and Sellers shall enter into an ancillary agreement within five (5) Business Days of entry of the Sale Order to transfer management and operation of the Facilities, subject to Applicable Law (the "***Management Agreement***"). Pursuant to the Management Agreement, all economic risk and reward in relation to the operation of the Facilities transfers to the Buyer on the effective date of the Management Agreement. The effective date of the Management Agreement shall be no later than two (2) weeks following the earlier of (i) the Auction, or (ii) if no other qualified bids are received and the Auction is cancelled, the Preliminary Bid Deadline; *provided, however*, that the parties shall use good faith efforts to cause the Management Agreement to become effective as soon as feasible after the earlier of (i) or (ii).

   (c)    <u>Interim Billing</u>. (a) As of the Closing Date and to the extent permitted by Applicable Law, Seller shall transfer and assign to Buyer all of Seller's rights and interests in and to Seller's Medicare and Medicaid provider numbers and Medicare and Medicaid provider reimbursement agreements. The Parties acknowledge and agree that Buyer is not expected to have received its "tie in" notice from Centers for Medicare and Medicaid Services ("CMS") with respect to Seller's Medicare or Medicaid provider agreements or any new Medicare or Medicaid provider agreements (collectively, the "Provider Agreements") as of the Closing Date. Prior to Buyer's receipt of its tie in notice and Provider Agreements, so long as Buyer is accepting assignment of the Provider Agreements and is utilizing commercially reasonable efforts to become the certified Medicare and/or Medicaid provider, as applicable, at the Facility, Seller agrees that Buyer may bill for services performed following the Closing under Seller's Medicare and/or Medicaid

13

provider number, as applicable, to the extent permitted by Applicable Law. (b) The Parties acknowledge and agree that Seller's managed care provider plans and agreements with other third-party payors are not expected to have been updated with Buyer's provider information as of the Closing Date. From and after the Closing Date until such managed care provider plans and agreements with other third-party payors are updated with Buyer's provider information, Seller agrees that Buyer may bill for services provided following the Closing under Seller's managed care provider plans and agreements with other third-party payors using Seller's provider information to the extent permitted by Applicable Law and the terms and conditions of the plans and agreements with the third party payors. (c) Any reimbursements from Medicare or Medicaid billed by Buyer for dates of service after the Closing Date which are paid into Seller's accounts shall be forwarded by Seller to Buyer.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES

3.01   <u>Seller's Representations and Warranties</u>.   Seller represents and warrants to Buyer as follows and agrees that each of the following will be true and correct on the Execution Date and the Closing Date.   This Section 3.01 contains the full and complete list of Seller's representations and warranties to Buyer.   Seller covenants as follows:

    (a)   <u>Organization of Seller</u>. Each Seller as listed in the preamble above is either a limited liability company or corporation duly organized and validly existing and in good standing under the laws of the State of Iowa.

    (b)   <u>Authority</u>.  The execution and delivery of this Agreement and the Ancillary Agreements to which it is a party, and the consummation of the transactions herein contemplated have been duly and validly authorized by all necessary action on the part of Seller.  Subject to the Bankruptcy Court's entry of the Sale Order, this Agreement has been, and any Ancillary Agreements will be as of the Closing Date, duly executed and delivered by Seller, and do or will (as the case may be) constitute Seller's valid, legal, and binding obligation according to their terms.

    (c)   <u>Consents and Authority</u>.  Except for the Bankruptcy Court's entry of the Sale Order, Seller has obtained all corporate approvals and membership consents necessary to consummate the transactions contemplated therein.

    (d)   <u>Title</u>.  Seller has delivered to or made available for Buyer's review true, correct, and complete copies of the title abstracts for all real estate in which Seller has an interest.

    (e)   <u>Litigation and Compliance with Laws</u>.  To Seller's Knowledge, Schedule 3.01(e) sets forth a complete and accurate description of any litigation, proceeding, claim or investigation threatened or pending before any court, arbitrator or administrative agency affecting or relating to Seller or Seller's operation of the Facilities.

(f)    Utilities.  To Seller's Knowledge, all water, gas, electricity, telephone, cable, drainage facilities, sewer and other utilities required for the operation of the Facilities either enter the Land through adjoining public streets or, if they pass through adjoining private land, they do so in accordance with recorded easements.

(g)    Tax Returns; Taxes.  Except as precluded by the Bankruptcy Code, Seller has filed all Tax Returns due as of the Execution Date of this Agreement and has or will pay all Taxes against the Facilities and/or Seller that relate to Seller's ownership and/or operation of the Facilities, or that could constitute an Encumbrance against the Facilities, if and when they are due and payable.

(h)    Non-Foreign Status.  Seller is not a foreign entity (as the term is defined in the Internal Revenue Code and Income Tax Regulations) and Seller agrees to execute a Certificate of Non-Foreign Status pursuant to Section 1445 of the Internal Revenue Code at Closing.

(i)    Broker's Fee.  Seller is solely responsible for satisfying any Claim relating to any broker or advisor with respect to the transactions this Agreement contemplates for a brokerage commission, consulting fee, finder's fee or similar payment.

(j)    Bulk Sales Law.  Seller has complied, or will comply, with any applicable bulk sales law requirements applicable to the sale of the Facilities, at its sole expense.

(k)    Environmental Matters. To Seller's Knowledge, except as set forth on Schedule 3.01(t), the Facilities are in compliance with all federal, state and local environmental, health and safety laws, statutes ordinances and regulations, including all laws relating to Hazardous Materials, and wetlands.

(l)    Employee Plans.  Except as otherwise may be prohibited by law, Seller has delivered to or made available for Buyer's review true, correct, and complete copies of Seller's Employee Plans.

(m)    Fraud and Abuse.  Except as set forth on Schedule 3.01(t), to Seller's Knowledge, Seller has not engaged in any activities that are prohibited under 42 U.S.C. §1320a-7b or 42 U.S.C. 1395, or the regulations promulgated thereunder, or any applicable related Law, or that are prohibited by rules of professional conduct, including the following:  (a) knowingly and willfully making or causing to be made a false statement or representation of a material fact in any application for any benefit or payment; (b) knowingly and willfully making or causing to be made any false statement or representation of a material fact for use in determining rights to any benefit or payment; (c) any failure by a claimant to disclose knowledge of the occurrence of any event affecting the initial or continued right to any benefit or payment on its own behalf or on behalf of another, with the intent to fraudulently secure such benefit or payment; and (d) knowingly and willfully soliciting or receiving any remuneration (including any kickback, bribe or rebate) directly or indirectly, overtly or covertly, in cash or in kind, or offering to pay or receive such remuneration (i) in return for referring an individual to a person for the furnishing or

15

arranging for the furnishing of any item or service for which payment may be made in whole or in part by Medicare or Medicaid, or (ii) in return for purchasing, leasing or ordering or arranging for, or recommending, purchasing, leasing or ordering any good, facility, service or item for which payment may be made in whole or in part by Medicare or Medicaid. Seller is not and at no time has been suspended or excluded from participation in any federally funded health care program, including Medicare or Medicaid.

(n)   Insurance Policies.  Seller has delivered to or made available for Buyer's review true, correct, and complete copies of Seller's policies of insurance applicable to Seller, and the Facilities, including medical malpractice insurance covering all physicians and other professional personnel Seller has engaged or employed, general liability insurance, property insurance, employer's liability and workers' compensation insurance.

(o)   Certificates of Need.  Seller has delivered to or made available for Buyer's review true, correct, and complete copies of Seller's certificates of need; (ii) letters of non-reviewability; or (iii) other exemptions from certificate of need review, that Seller holds or uses in the operation of the Business.  Schedule 3.01(o) sets forth a true, correct, and complete list of all such documents.

(p)   Medical Staff. Seller has delivered to or made available for Buyer's review true, correct, and complete copies of Seller's (i) medical staff privilege and membership application forms; (ii) delineation of privilege forms; current medical staff bylaws, rules and regulations, and amendments thereto; (iii) credentials and appeals procedures not incorporated in any of the foregoing; and (iv) contracts with physicians, physician groups, or other members of the medical staff of the Facilities.

(q)   Hill-Burton and Other Liens.  Seller has not received any loans, grants, or loan guaranties pursuant to the United States Hill-Burton Act (42 U.S.C. § 291a, *et seq*.) program, the Health Professions Educational Assistance Act, the Nurse Training Act, the National Health Pharmacy and Resources Development Act, or the Community Mental Health Centers Act.  To Seller's Knowledge, none of the Acquired Assets are subject to any liability in respect of amounts received by Seller or others for the purchase of the Acquired Assets (or any part thereof) under restricted or conditioned grants or donations, including monies received under the Public Health Services Act (42 U.S.C. § 291, *et seq*.).

(r)   Experimental Procedures. Neither Seller, nor any officers, employees or agents of Seller, have performed or permitted to be performed, nor do they have Knowledge of the performance of, any experimental procedures involving patients/residents in the Facilities.

(s)   Permits.  Except as set forth on Schedule 3.01(s), the Facilities are duly licensed in accordance with the Laws of the State of Iowa, DOH and all other ancillary departments or services located at or operated for the benefit of, the Facilities that are required to be

16

separately licensed are duly licensed by the appropriate Governmental Authority.  To the Knowledge of Seller, Seller has all Permits which are needed or required by Law to operate its business related to or affecting the Facilities or any ancillary services related thereto as currently conducted.  Schedule 3.01(s) is a true, complete and accurate list all material Permits owned or held by or issued to Seller relating to the ownership or operation of the Facilities or the Acquired Assets and such Permits constitute all material Permits necessary for the conduct of the Business and operation of the Facilities as currently conducted and for the ownership of the Facilities by Seller and operation and use of the Acquired Assets by Seller, all of which are in full force and effect.

(t)    Compliance.  Except as set forth on Schedule 3.01(t), or to the extent such failure would not constitute a Material Adverse Effect, to the Knowledge of Seller, Seller is complying in all material respects with all applicable statutes, rules, regulations, and requirements of each Governmental Authority having jurisdiction over the Seller, the operations of the Facilities and the Acquired Assets.

(u)    Licensed Beds and Current Rate Schedule.  Schedule 3.01(u) sets forth a true, correct and complete statement, as of three (3) Business Days prior to the Execution Date, of: (i) the number and type of licensed beds at the Facilities, and (ii) the number of beds then occupied in, and the occupancy percentages at, the Facilities.

(v)    Prohibited Practices.  Except as set forth on Schedule 3.01(t), during the eighteen (18) month period prior to the Execution Date, no officers or directors of Seller have, during their period of engagement with Seller, been charged with, convicted of or pleaded guilty to crimes of theft or dishonesty, financial misconduct, or offenses related to the delivery of health care services, nor, to Seller's Knowledge, have any of Seller's current officers or directors been excluded from participation in Medicare, Medicaid or any other state or federal government reimbursement program.  To Seller's Knowledge, during the eighteen (18) month period prior to the Execution Date, none of Seller's officers, directors or employees has engaged in any conduct that may result in sanctions to Seller under any federal or state laws.

(w)    Government Investigations.  Except as set forth on Schedule 3.01(t), other than for routine state and federal inspections or surveys performed by DOH, during the eighteen (18) month period prior to the Closing Date, Seller has received no written notice of the commencement of any investigation proceedings or any governmental investigation or action (including any civil investigative demand or subpoena) under Laws.

(x)    Cost Reports.  Seller has filed all cost reports required to be filed for the Facilities as of the Closing Date under Law.  Seller has furnished Buyer with copies of all cost reports filed by Seller with the appropriate State agency, the appropriate Medicare and Medicaid agencies and/or fiscal intermediaries in respect of the operation of the Facilities for the years ended December 31 2020 and 2019, and to Seller's Knowledge, such cost reports did not contain any material disallowable costs or expenses or any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements

17

contained therein not misleading, and, to Seller's Knowledge, such cost reports have been prepared in all material respects in accordance and compliance with all applicable government rules and regulations.

(y)   Financial Information.

(i)   Schedule 3.01(y) hereto contains the following financial statements and financial information (collectively, the "***Historical Financial Information***"):

unaudited financial statements consisting of the balance sheet of the Business as of December 31, 2021, and the related statements of income and net surplus/deficit, and cash flow for the 12-month period ended on December 31, 2020 (the "***Unaudited Financial Information***").

(ii)   The Unaudited Financial Information included in the Historical Financial Information has been prepared consistent with past practice and may not include required footnote disclosures or reflect normal year-end adjustments. Seller has not changed in any material respects any accounting policy or methodology in calculating reserves, including reserves for uncollected accounts receivable, throughout all periods presented in the Historical Financial Information.

(z)   Real Property.

(a)   Schedule 3.01(z) contains an accurate and complete legal description, street address and tax parcel identification number for the Land. Seller holds good and indefeasible fee simple title to all the Land and shall convey the Land in accordance with the Sale Order free and clear of all Liens (other than the Permitted Liens). Seller is not a lessee of any portion of the Land. Seller agrees that title to the Land shall not be altered between the Execution Date and Closing. Except as set forth on Schedule 3.01(z), other than the right of Buyer pursuant to this Agreement, there are no outstanding agreements, options, rights of first offer, rights of first refusal, or any other grant to third party to sell, purchase, lease, sublease, use, occupy, or enjoy the Land or any portion thereof or interest therein.

(b)   Except as set forth on Schedule 3.01(t), Seller has not received written notice from any Governmental Authority of (and otherwise has no Knowledge of): (i) any pending or threatened condemnation proceedings affecting the Land, or any part thereof; (ii) any written notice asserting or alleging any material violations or potential violations of any Laws (including zoning and land use ordinances, building codes and similar requirements) with respect to the Land, or any part thereof, which have not heretofore been cured; or (iii) any pending or threatened proceedings, nor any claims or actions against Seller or the Land, relating to the ownership, lease, use or occupancy of such Land or any portion thereof which is reasonably likely to result in a material change in the condition of the Land or the ownership or operation of the Land. Seller has not received any

18

written notice of any pending zoning or other land use change affecting the real property.

(c)     Neither Seller nor, to Seller's Knowledge, any other person is in violation of a condition or agreement contained in any easement, restrictive covenant or any similar instrument or agreement affecting any of the Land in any material respect.

(d)     To Seller's Knowledge, except as set forth on Schedule 3.01(z), the Land is zoned for its current use and there are no waivers or variances granted by any Governmental Authority which, as a result of the transactions contemplated in this Agreement, will be withdrawn or abrogated, including but not limited to life safety code waivers.

3.02    Buyer's Representations and Warranties. Buyer makes the following representations and warranties to Seller, which will be true and correct as of the date made and the Closing Date:

(a) Organization of Buyer. Buyer is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Delaware and licensed to do business in the State of Iowa.

(b) Authority.  The execution and delivery of this Agreement and the consummation of the transactions herein contemplated have been duly and validly authorized by all necessary corporate action on the part of Buyer, and this Agreement constitutes, and the documents contemplated hereby will be, Buyer's valid and legally binding obligations, enforceable according to their terms.

(c) Conflict or Default. Neither the execution nor delivery of this Agreement, nor the consummation of the transactions herein contemplated will conflict with, violate, result in a breach by, constitute a default under or accelerate the performance provided by the terms of any Law or agreement to which Buyer may be subject.

3.03    Full Disclosure.  To their Knowledge, no representation or warranty by Seller or Buyer, and no statement, document, financial statement, certificate or other instrument, schedule or exhibit furnished or to be furnished hereunder or in connection with the transactions contemplated hereby (including all exhibits and schedules hereto) contains or will contain any untrue or misleading statement of fact or omit to state or contain anything necessary to make such matter correct, complete and not misleading in all respects and to fairly present the information set forth in a manner that is not misleading.

19

## ARTICLE IV
TITLE AND SURVEY

4.01   <u>Title Report and Policy</u>.  Promptly after the Execution Date, Seller will use good faith efforts to deliver for Buyer's review true, correct, and complete copies of all abstracts of title to the Land.  If the abstracts are not available, Buyer shall promptly order, or shall order a title commitment from the Escrow Agent.  An abstract for any parcel of Land purchased will become the property of Buyer when Buyer pays the Purchase Price in full. Seller will pay the cost of any additional abstracting title work due to any act or omission of Seller.  Buyer may elect to obtain a title insurance policy in lieu of an attorney's opinion at Buyer's expense.  Any objections to the title commitment Buyer identifies will be treated in the same manner as title objections in the attorney's title opinion.  Buyer shall have the right to object to anything material shown in the abstract (or title commitment) and survey, other than matters set forth in (3) through (6) below, by written notice ("<u>Buyer Objection Letter</u>") to Seller with five (5) business days of receipt of both the abstract (or title) and survey (the "<u>Unpermitted Exceptions</u>"). Seller shall identify whether or not it is willing or capable of correcting within ten (10) business days of receipt of the objection letter.   If Seller determines not to remove or correct such Unpermitted Exceptions, then Buyer may elect upon written notice to Seller made within three (3) Business Days after Buyer's receipt of the Seller objection response: (i) to terminate this Agreement as to that specific Facility or Land by written notice to Seller, in which event the Deposit shall be refunded to Buyer and neither party shall have any further liability to any other party under Agreement, except as otherwise provided in this Agreement; or (ii) to take the Property subject to such Unpermitted Exceptions, without adjustment to the Purchase Price, in which case such Unpermitted Exceptions shall become Permitted Exceptions.   Any objection by the Buyer to something material in an abstract or survey shall only apply as a right to terminate the Agreement as to the Land subject to such abstract or survey and Buyer shall not have the right to terminate the entire Transaction. As used herein, "<u>Permitted Exceptions</u>" means: (1) all restrictions, reservations, covenants and easements of record, if any, to which Buyer fails to object in its Buyer Objection Letter; (2) all matters disclosed on the Survey to which Buyer fails to object in its Buyer Objection Letter; (3) all current period Taxes not yet due and payable; (4) any covenants, conditions, or restrictions, or applicable Laws or other governmental regulations, governing or limiting the use of the property, in each case that are not violated by the existing improvements or the current use thereof; (5) any utility or other easements that would qualify under the foregoing clause and which further do not underlay any of the existing improvements on the Property; and (6) liens created by, through, or under Buyer.

4.02   <u>Survey</u>.  Seller has delivered to or made available for Buyer's review any surveys of Land in its possession.  Prior to Closing, Buyer may at its expense obtain a survey of the Land, or update an existing survey at Buyer's expense.

# ARTICLE V
## CONDITIONS

5.01   Conditions to Buyer's Obligations.   Buyer's obligations under this Agreement are conditioned upon the following (which Buyer may waive, in whole or in part, in writing):

(a)   Performance of Covenants.   Seller has, in all material respects, timely performed all covenants and obligations, and timely complied with all conditions required of Seller by this Agreement.

(b)   Representations and Warranties.   All of Seller's representations and warranties are true, complete and correct, in all material respects, on the Execution Date and as of the Closing Date as if made at that time (other than the representations and warranties that by their terms address matters only as of another specified date, which shall be so true, complete and correct, in all material respects, only as of such other specified date), except where the failure of such representations and warranties to be true, complete and correct, in all material respects, had not had, and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(c)   Closing Documents.   At the Closing, Seller will deliver or cause to be delivered each of the items required of it as specified in Section 8.02 of this Agreement.

(d)   Litigation.   Following the Execution Date, no notice has been received as to litigation commenced or Claim made or threatened against any Person, by any other Person with regard to this Agreement, or the transactions provided for in this Agreement that, if successfully prosecuted, would have a Material Adverse Effect on Buyer.

(e)   Sale Approval Motion.   Seller shall have filed a motion with the Bankruptcy Court seeking entry of the Sale Order, in form and substance satisfactory to Buyer (the "Sale Approval Motion").

(f)   Bidding Procedures Order.   There shall have been entered prior to any Auction, an Order of the Bankruptcy Court in the Bankruptcy Case (the "**Bidding Procedures Order**") approving, among other things: (i) in the event of an accepted overbid from a third party for the Acquired Assets and the closing of a transaction with respect thereto with such third party (a "**Third Party Closing**"), the payment of the Break-Up Fee to Buyer; (ii) an initial minimum overbid for any Auction in the amount of $100,000 plus the Break-Up Fee and a $100,000 minimum for additional overbids thereafter; (iii) that the Break-Up Fee shall be paid to Buyer from (and at the time of) the proceeds of the Third Party Closing, and the claim of Buyer for the Break-Up Fee shall have administrative expense priority under section 503(b)(1)(a) of the Bankruptcy Code, in each case, in accordance with the terms and conditions of the Bidding Procedures Order; and (iv) that, during any Auction, the Buyer shall receive a credit in connection with each bid in an amount equal to the sum of the Break-Up Fee.

21

(g)    <u>Auction</u>.  If there have been any Qualified Bids (as defined in the Bidding Procedures Order), Seller shall have conducted an auction sale (the "***Auction***") of the Acquired Assets in accordance with the Bidding Procedures approved by the Bankruptcy Court in the Bidding Procedures Order no later than the Auction (or such later date for which notice is provided in the Bidding Procedures Order or as Seller and Buyer may otherwise mutually agree), and Buyer's offer shall have been accepted by Seller as the highest or best offer for the Acquired Assets at the conclusion of the Auction.

(h)    <u>Consent</u>.  All certifications, consents, waivers, approvals, authorizations, Government Authorizations and determinations from and by third parties necessary legally to consummate the transactions contemplated herein have been obtained.

(i)    <u>Title Policy</u>.  If applicable, any title insurance policy described in <u>Article IV</u> of this Agreement has been issued.

(j)    <u>Condition of Acquired Assets</u>.  Following the Execution Date, there has been no material adverse damage to the Facilities.

(k)    <u>Subsequent Events</u>.  Except as set forth on Schedule 3.01(t) and Schedule 3.01(e), no action, investigation, Claim or proceeding has been instituted or threatened, or other matters occurred, that involve the likelihood of a Material Adverse Effect on the Business or the Facilities, and no action, investigation or proceeding has been instituted or threatened before any court or Governmental Authority to restrain or prohibit, or to obtain substantial damages in respect of, this Agreement, or the consummation of the transactions herein contemplated.

(l)    <u>Other Deliveries</u>.  Seller has delivered other items and deliveries relating to the Facilities as Buyer reasonably requests.

(m)    <u>Licenses</u>.  The Sale Order shall include approval of the Operations Transfer Agreement to allow Buyer to operate the Facilities until it has obtained all of the licenses required to operate the Facilities from the DOH.

(n)    <u>Compliance</u>.  No Facility shall be Out of Compliance, except as set forth on Schedule 3.01(t).

(o)    <u>Material Adverse Effect</u>.  There will have occurred following the date hereof no events nor will there exist circumstances which singly or in the aggregate have resulted in a Material Adverse Effect, provided, however, closure of one facility, including, without limitation, loss of license or provider agreement, shall be considered a Material Adverse Effect only with respect to that one respective facility and shall not be deemed a Material Adverse Effect to the entire Transaction.  Such Material Adverse Effect involving a particular facility shall result in a corresponding Purchase Price adjustment in an amount equal to the corresponding amount on Schedule 5.01(o).

22

(p)    <u>Sale Order</u>. The Bankruptcy Court has entered the Sale Order and as of Closing, such Sale Order remains in full force and effect.

5.02    <u>Conditions to Seller's Obligations</u>.    Seller's obligations under this Agreement are conditioned upon the following (which Seller may waive, in whole or in part, in writing):

(a)    <u>Performance of Covenants</u>.  Buyer has timely performed all covenants and obligations, and timely complied with all conditions this Agreement require of Buyer in all material respects, including paying the Purchase Price to Seller.

(b)    <u>Representations and Warranties</u>.  All of Buyer's representations and warranties contained herein are true, complete and correct in all material respects on the Execution Date and as of the Closing Date, as if made at that time.

(c)    <u>Conveyances</u>. Buyer and Seller have received all third party certifications, covenants, waivers, approvals, authorizations, Government Authorizations and determinations necessary to legally consummate the transactions contemplated herein.

(d)    <u>Payment of Purchase Price</u>. Buyer has delivered the Purchase Price by wire transfer of immediately available funds.

(e)    <u>Other Deliveries</u>.  Buyer has delivered other items and deliveries relating to the Facility as Seller reasonably requests.

(f)    <u>Sale Order</u>. The Bankruptcy Court has entered the Sale Order and as of Closing, such Sale Order remains in full force and effect.

**ARTICLE VI**
TERMINATION

6.01    <u>Termination</u>.  This Agreement may be terminated as follows:

(a)    At any time by the mutual written agreement of the Seller and the Buyer;

(b)    Automatically, upon the consummation of any Acquisition Transaction between the Seller and a party other than the Buyer;

(c)    By the Buyer, at its sole election, in the event that the Closing shall not have occurred prior to 120 days from entry of the Sale Order, subject to change of ownership approval by the regulatory agencies (the "***Outside Date***"); provided that the Buyer shall not be entitled to terminate this Agreement pursuant to this <u>Section 6.01</u>  if the failure of the Closing to occur on or prior to such date results primarily from the Buyer itself materially breaching any representation, warranty or covenant contained in this Agreement;

(d)    By the Seller, at its sole election, in the event that the Closing shall not have occurred on or before the Outside Date; provided that the Seller shall not be entitled to

23

terminate this Agreement pursuant to this <u>Section 6.01(d)</u> if the failure of the Closing to occur on or prior to such date results primarily from the Seller materially breaching any representation, warranty or covenant contained in this Agreement;

(e)    By the Buyer, at its sole election, in the event of a material breach of this Agreement by the Seller that has not been cured within ten (10) Business Days after written notice to the Seller, or if any representation or warranty of the Seller shall have become untrue in any material respect, in either case such that such breach or untruth is incapable of being cured, by the Outside Date.  Buyer shall not have a right to terminate under this section if Buyer is in material breach or any of its representations and/or warranties are untrue such that satisfaction of conditions to close under section 5.01 would be prevented;

(f)    By the Seller, at its sole election, in the event of a material breach of this Agreement by the Buyer that has not been cured within ten (10) Business Days after written notice to the Buyer, or if any representation or warranty of the Buyer shall have become untrue in any material respect, in either case such that such breach or untruth is incapable of being cured, by the Outside Date.  Seller shall not have a right to terminate under this section if Seller is in material breach or any of its representations and/or warranties are untrue such that satisfaction of conditions to close under section 5.02 would be prevented;

(g)    By the Buyer, at its sole election, upon the granting of any motion for relief from the automatic stay which would have a Material Adverse Effect, the conversion of the Case to a case under Chapter 7 of the Bankruptcy Code, the dismissal of the Case, the filing of any plan of reorganization by any party in interest that does not incorporate this Agreement, the filing of any motion by a party in interest in the Case to liquidate the Acquired Assets or any similar commencement of liquidation proceedings relating to the Seller, other than as contemplated herein, which is not dismissed within thirty (30) days, or upon the commencement of any similar actions or proceedings in or by any foreign court with respect to the Seller, which are not dismissed within thirty (30) days;

(h)    By the Buyer, at its sole election, if any of the conditions set forth in <u>Section 5.01</u> shall not have been, or the facts and circumstances are such that any of such conditions cannot be, fulfilled by the Outside Date, unless such failure shall be primarily due to the failure of Buyer to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing;

(i)    By the Seller, at its sole election, if any of the conditions set forth in <u>Section 5.02</u> shall not have been, or the facts and circumstances are such that any of such conditions cannot be, fulfilled by the Outside Date, unless such failure shall be primarily due to the failure of Seller to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing;

(j)    By the Buyer, upon entry by the Bankruptcy Court of any Order, or any other Governmental Authority of any Governmental Order, that is inconsistent in any material respect with the proposed Sale Order or, upon entry, with the Sale Order;

24

(k)     By the Buyer, if there shall be any Law that makes consummation of the transactions contemplated by this Agreement or any other Transaction Document illegal or otherwise prohibited;

(l)     By the Seller, if there shall be any Law that makes consummation of the transactions contemplated by this Agreement or any other Transaction Document illegal or otherwise prohibited; or

(m)     By the Buyer, if any Governmental Authority shall have issued a Governmental Order restraining or enjoining the transactions contemplated by this Agreement or any other Transaction Document, and such Governmental Order shall have become final and non-appealable; or

(n)     By the Seller, if any Governmental Authority shall have issued a Governmental Order restraining or enjoining the transactions contemplated by this Agreement or any other Transaction Document, and such Governmental Order shall have become final and non-appealable.

6.02    Effect of Termination.

(a)     In the event of the termination of this Agreement in accordance with this Article VI, this Agreement shall immediately become void and there shall be no liability on the part of any party hereto except (a) confidentiality obligations; (b) as set forth in this Article VI, Section 6.02, Article XII, and Article XIII; (c) any obligations for material breach of this Agreement occurring prior to such termination; and (d) that nothing herein shall relieve any party hereto from liability for any willful breach of any provision hereof (which, for the avoidance of doubt, will be deemed to include any failure by Buyer to consummate the Closing if and when it is obligated to do so hereunder with no outstanding breach or unsatisfied closing condition by Seller).

(b)     Breach by Buyer. In the event of termination of this Agreement pursuant to Section 6.01(f) due to a breach by Buyer, Sellers shall be entitled to to retain the Deposit as liquidated damages.

(c)     Deposit.

(i)     In the event of a valid termination of this Agreement pursuant to Section 6.01(f) due to a breach by Buyer, Sellers shall be entitled to receive the Deposit. In the event of such termination, the Parties shall direct the Escrow Agent to pay the Deposit to Sellers. The Sellers' receipt of the Deposit pursuant to this Section 6.02(c) is the only remedy available and will be liquidated damages.

(b)     In the event of termination of this Agreement pursuant to Section 6.01 (except pursuant to Section 6.01(f)), the Parties shall direct the Escrow Agent to promptly return the Deposit to Buyer.

25

6.03    Procedure Upon Termination.  In the event of termination by Buyer or Seller, or both, pursuant to Section 6.01, notice thereof shall forthwith be given to the other party.  If this Agreement is terminated as provided herein, each party shall redeliver all documents, work papers and other material of any other party relating to the transactions contemplated by this Agreement, whether so obtained before or after the execution hereof, to the party furnishing the same as soon as reasonably practicable following termination.

## ARTICLE VII
### BANKRUPTCY COURT APPROVAL OF THE BUYER AS "STALKING HORSE" BIDDER

7.01    Motions and Notices Regarding Sale of Assets and Assumption and Assignment of Assumed Executory Contracts

    (a) Seller shall seek prompt entry of the Sale Order pursuant to the Sale Motion after sufficient notice has been given, which Sale Order shall include, among other things, findings of fact and conclusions of law that the Buyer is not a successor-in-interest to the Seller or any Affiliate of Seller and that the Buyer is a good faith purchaser pursuant to Bankruptcy Code section 363(m).

    (b) The Seller covenants that, to the extent that it has not done so prior to the date of this Agreement, they shall promptly serve the third parties who are parties to Assumed Executory Contracts (such third parties being "***Cure Obligees***") with written notice of proposed cures on the Assumed Executory Contracts (such notice being the "***Cure Notice***"), which Cure Notice shall be provided to the Buyer within the time periods provided by the Bidding Procedures Order. The Cure Notice shall, as set forth in the Bidding Procedures Order, establish a deadline reasonably in advance of the Closing Date by which Cure Obligees must object to respective proposed cures or be deemed to have waived any such objection.

7.02    Requests for Information.  From the date of the approval of the Bidding Procedures Order (a) if the Seller supplies any information regarding the Business to a potential bidder not heretofore given to the Buyer, the Seller shall further provide the Buyer with a copy of such information within 24 hours of providing that information to any other potential bidder; and (b) with respect to any bid, term sheet, or written expression of interest by any other party for any asset or assets of any Seller, or any other reorganization proposal, submitted prior to the bid deadline established in the Bidding Procedures Order, the Seller shall provide the Buyer with prompt notice of such proposal.

7.03    Break-Up Fee.  If this Agreement is terminated for any reason except pursuant to Section 6.01(a) or Section 6.01(f), then in consideration of the real and substantial benefits conferred by the Buyer upon the Seller's bankruptcy estate by providing a minimum floor bid upon which the Seller, its creditors and the other bidders were able to rely and in

consideration of the time, expense and risks associated with serving as the "Stalking Horse" Bidder, including legal fees and expenses, overhead costs, due diligence expenses and other similar expenses related to the negotiation and preparation of this Agreement and of all related transactional documentation, due diligence and representation, the Seller shall pay to the Buyer, at the time of the closing of the sale of the Acquired Assets to the successful bidder for the Acquired Assets, solely from the sale proceeds received by the Seller from the closing of the Acquisition Transaction, provided that the Buyer is not then in material default of its obligations under this Agreement, the Break-Up Fee. The Seller and Buyer agree and stipulate that the Buyer has provided a mutual benefit to the Seller's estate by increasing the likelihood that the best possible price for the Acquired Assets shall be received and that the Break-Up Fee is reasonable and appropriate in light of the size and nature of the proposed sale transactions and comparable transactions, the commitments that have been made and the efforts that have and shall be expended by the Buyer and were necessary to induce the Buyer to pursue the transactions contemplated hereby under the terms of this Agreement. The Break-Up Fee also shall serve as liquidated damages with respect to any claims the Buyer may have against the Seller in connection with the Seller's failure to close the sale of the Acquired Assets to the Buyer as contemplated by this Agreement and Buyer shall provide a release to the Seller of any and all such claims upon payment of the Break-Up Fee.

7.04    <u>Defense of Orders</u>.  The Seller, at its sole cost and expense, shall diligently defend the Bidding Procedures Order and the Sale Order in the event that any motion for reconsideration or appeal of such Orders is filed.

**ARTICLE VIII**
CLOSING

8.01    <u>Closing</u>.

(a) Subject to satisfaction of the terms and conditions of this Agreement, including those set forth in <u>Article V</u>, the consummation of the transactions this Agreement contemplate (the "***Closing***") will occur on a date (the "***Closing Date***") not later than the first day of the first month after not less than five (5) Business Days after the satisfaction or waiver of all conditions in <u>Article V</u>, or on such other date as Buyer and Seller mutually agree; provided, however, that the Closing Date shall not be required to occur prior to seventy-five (75) days after the entry of the Sale Order, but the Buyer may elect to the Closing at any point prior.

(b)    The Closing shall be held at a location and on a date and at a time mutually agreed upon by Seller and Buyer, but absent such agreement shall be held at a time and place in Des Moines, Iowa, designated by Buyer in writing to Seller, unless mutually agreed-upon that the closing shall occur by mail or electronic mail by delivery of the closing items. Notwithstanding the foregoing time and place of Closing, Seller and Buyer may deliver all of their respective closing documents required hereunder with respect to the Closing on or before the Closing Date (to hold in escrow in accordance with customary

27

conveyancing practices subject to the consummation of the Closing) by mail, electronic mail, or overnight courier.

8.02    <u>Seller's Closing Documents</u>.  Seller will deliver to Buyer the following documents at Closing in form and substance acceptable to Buyer:

    (a)    <u>Warranty Deed</u>.  A general warranty deed conveying to Buyer title to the purchased Land and Improvements in fee simple, free and clear of all Liens and Encumbrances, except Permitted Encumbrances.

    (b)    <u>Bills of Sale</u>.  One or more Bills of Sale containing general warranty of title conveying to Buyer the purchased Equipment, the Intangible Personal Property, the Records, and all components of the Facilities that constitute personalty, free and clear of all Liens and Encumbrances.

    (c)    <u>Records</u>.  Originals of all Records in the possession of Seller; *provided, however*, that Seller shall retain copies of such records as may be necessary to administer Excluded Assets and otherwise administer the bankruptcy estate until such time as it can be closed.

    (d)    <u>Title Policy</u>.  If applicable, the title policy described in <u>Section 4.01</u> of this Agreement.

    (e)    <u>Closing Certificate</u>. A Seller's closing certificate reaffirming Seller's representations and warranties hereunder.

    (f)    <u>Other Documents</u>. Other documents as Buyer reasonably requests to accomplish the transactions this Agreement contemplates, or to evidence Seller's compliance with its covenants and agreements in this Agreement.

8.03    <u>Closing Costs</u>.  Seller has or will pay (i) the cost of preparing the Warranty Deed, (ii) the cost of the title abstract or title insurance provided herein, and (iii) the fees of its counsel. Buyer will pay (x) the cost of the Survey, (ii) the cost of any environmental site assessment, (y) the per page recording costs associated with recording the warranty deed, and (z) the fees of its counsel.  All security deposits referenced in any Assumed Lease shall be credited to Buyer at Closing.  The rent payable under any Assumed Lease shall be prorated as of the Closing Date.

8.04    <u>Prorations</u>.  The parties agree to the following prorations:

    (a)    <u>Accounts Receivable</u>.  Except as otherwise set forth in this Agreement, Accounts Receivable generated by transactions or business operations occurring prior to the Closing Date (or such earlier date as Buyer may assume responsibility for operations and costs under a transition services agreement or operations lease) shall remain Seller's property. Buyer and Seller may arrange for Buyer to collect such Accounts Receivable pursuant to the terms of a mutually agreed-upon ancillary agreement

(b) <u>Accounts Payable</u>. Except as otherwise set forth in this Agreement (including within the definition of Assumed Liabilities), Seller will be solely responsible for all accounts payable resulting from the ownership and/or operation of the Facilities prior to Closing (or such earlier date as Buyer may assume responsibility for operations and costs under the Operations Transfer Agreement). Buyer will be solely responsible for all accounts payable resulting from the ownership and/or operation of the Facilities after Closing Date (or such earlier date under the Operations Transfer Agreement) or the assumption of the Assumed Liabilities.

8.05   <u>Adjustments to the Purchase Price</u>. The following adjustments will be made at Closing, as of 11:59 p.m. on the day preceding the Closing Date, and will be added to the Purchase Price or credited against the Buyer's payment obligations at Closing, as the case may be.

(a) <u>Taxes</u>. Real property Taxes, real and personal ad valorem Taxes, and similar charges will be prorated as of the Closing Date in the manner customary for real estate transaction in Iowa. Because real property Taxes are paid in arrears, the portion of the Taxes allocable to Seller will be credited to Buyer on the closing statement.

(b) <u>Special Assessments</u>. Seller will pay in full all improvement lien assessments, if any, whether or not due and payable as of the Closing Date. Special assessments, whether pending or to become a lien prior to Closing, or payable in installments, or for which a change of assessment may be levied on Buyer after Closing, will be credited to Buyer in full at Closing.

(c) All expenses arising from the conduct of the business of the Facility in the ordinary course, including, without limitation trade payables, telephone expenses and utility charges attributable to the Facility, including any such items held in escrow (all such income and expenses to be referred to herein as the "***Prorated Items***"), shall be apportioned between Seller and Buyer as of the Closing Date, it being the agreement of the Parties that Seller shall be entitled to and responsible for all expenses and similar obligations arising from the operation of the Facilities prior to the Closing Date and Buyer shall be entitled to and responsible for all expenses and similar obligations arising from the operation of the Facilities from and after the Closing Date, except, in each case, as otherwise expressly set forth herein. All such prorations shall be made based on actual days elapsed in the relevant accounting, billing or revenue period. Utility charges which are not metered and read for the Closing shall be estimated based on prior charges. Based on reasonable estimates, the Parties shall make all prorations at the Closing, and all such prorations shall be effectuated through adjustment of the Purchase Price at Closing.

(d) Seller shall provide Buyer, at least twenty (20) days prior to the Closing Date, a schedule setting forth, for each employee, the amount of accrued but unused paid time off (including any accrued sick time) for each employee as of the Closing Date (collectively, "***Accrued PTO***") and the aggregate value of the Accrued PTO. Seller shall provide Buyer on the Closing Date with an updated version of such schedule

29

reflecting Accrued PTO amounts (and the value of those amounts) as of the Closing Date and provide Buyer with a credit to the Purchase Price in an equal to the Accrued PTO. On the Closing Date, Buyer shall assume the Accrued PTO balances with respect to the Transferred Employees and Buyer will, thereafter, be responsible for paying the Accrued PTO to the Transferred Employees in accordance with the Buyer's applicable policies and procedures.

## ARTICLE IX
## CASUALTY; RISK OF LOSS

9.01    <u>Casualty</u>.    In the event of a casualty causing substantial damage to the Facilities before the date of possession, Buyer may (at its option) rescind this Agreement, or may proceed to Closing and receive any insurance proceeds associated with such casualty.

9.02    <u>Risk of Loss Generally</u>.  Except as otherwise specifically provided above or as otherwise agreed by Buyer and Seller in any Ancillary Agreement, risk of loss from the Facilities, including by operation of any law that would impose liability relating to ownership of the Facilities, will not pass to Buyer until acceptance of the deed.

## ARTICLE X
## ADDITIONAL COVENANTS

10.01    <u>Cost Reports</u>. Seller will file or cause to be filed all cost reports required to be filed with CMS prior to the Closing Date (or such earlier date as Buyer may assume responsibility for operations and costs under a transition services agreement or operations lease). Buyer will file or cause to be filed all cost reports required to be filed on or after the Closing Date (or such earlier date as Buyer may assume responsibility for operations and costs under a transition services agreement or operations lease).

10.02    <u>Conduct of Business</u>. From the Execution Date through the Closing Date (or such earlier date as Buyer may assume responsibility for operations and costs under a transition services agreement or operations lease), Seller will, except as expressly provided herein or as otherwise agreed by Buyer and Seller in an Ancillary Agreement, or as the Bankruptcy Code prohibits, maintain and conduct its business in the ordinary course of business.

10.03    <u>Employees</u>.  Buyer and Seller shall consult in good faith about the status of employment of Seller's employees following the Execution Date and prior to the Closing Date.  In the absence of any direction from Buyer, prior to or as of the Closing Date, Seller may terminate any of Seller's employees.  Seller assumes all obligations under the federal WARN Act and any analogous provision of applicable state law with regard to all terminated employees, to the extent the WARN Act or such state law applies. Buyer may offer employment to some or all of Seller's employees, but has no obligation to offer employment to any employee of Seller. Buyer has no obligation whatsoever to any person

30

whom Seller currently, or has previously, employed unless Buyer employs that person after the Closing Date.

10.04  COBRA Coverage. Seller will be responsible for offering and providing any COBRA Coverage with respect to any "qualified beneficiary" who is covered by an Employee Plan that is a "group health plan" and who experiences a "qualifying event" prior to the Closing Date.  Buyer will be responsible for offering and providing any COBRA Coverage required with respect to any Seller employee (or other qualified beneficiary) hired by Buyer who becomes covered by a group health plan sponsored or contributed to by Buyer, and who experiences a qualifying event after the Closing Date. For purposes of this Section 8.03(b), "qualified beneficiary," "group health plan," and "qualifying event" each have the meaning set forth in Section 4980B of the Code.

10.05  Employee Information. To the extent not prohibited by applicable law, Seller will provide Buyer all information relating to any employee that Buyer may, for potential employment purposes, reasonably request, including personnel files, initial employment dates, employee health files, licenses, professional certifications, Form I-9, termination dates, reemployment dates, hours of service, and compensation and tax withholding history.

10.06  Employee Plans. Seller shall be responsible for providing all information, forms, and other administrative assistance and materials required of a plan administrator with respect to all Employee Plans for its employees that are terminated in connection with the sale of the Acquired Assets.

10.07  Taxes; Expenses. Buyer will pay all Taxes (other than income Taxes) or recording fees payable as a result of the sale of the Acquired Assets pursuant to this Agreement or any other action contemplated hereby, including fees paid to the Iowa Attorney General, the U.S. Attorney General, and any other governmental agency. The parties will cooperate in preparing, executing, and filing all returns, questionnaires, applications, and other documents regarding Taxes and all transfer, recording, registration and other fees that become payable in connection with the transactions that this Agreement contemplates that are required or permitted to be filed at or prior to Closing.

10.08  Transfer of Resident Trust Funds and Deposits.

(a)  Within five (5) Business Days of the Closing Date, Seller shall deliver to Buyer a true, correct and complete schedule of all trust funds held by Seller as of the most recent date available prior to the Closing Date for any current resident of the Facilities (collectively, the "**_Resident Trust Funds_**") and deposits or prepayments paid by or for any resident of the Facilities (collectively, the "**_Resident Deposits_**").

(b)  At the Closing, Seller shall transfer the Resident Trust Funds and Resident Deposits to Buyer, and Buyer shall accept, the Resident Trust Funds and Resident Deposits in trust for the residents, in accordance with applicable statutory and regulatory requirements. Within ten (10) Business Days after the Closing Date, Seller and Buyer shall prepare a

31

final schedule of the Resident Trust Funds and Resident Deposits and thereafter reconcile the Resident Trust Funds and Resident Deposits transferred from Seller to Buyer.

## ARTICLE XI
## NO SURVIVAL; NO INDEMNIFICATION

The covenants, obligations, representations and warranties of Buyer and Seller contained in this Agreement, any exhibit or schedule hereto, or any certificate or document delivered pursuant hereto shall not survive beyond the Closing. Neither party shall have any liability to the other after Closing for any breach thereof. Buyer agrees that it is purchasing the Acquired Assets as is, where is. Notwithstanding this provision, the parties may agree to limited survival and related indemnification rights for obligations that remain uncompleted as of the Closing Date in an Ancillary Agreement.

## ARTICLE XII
## REMEDIES FOR FAILURE TO CLOSE

12.01  Attorneys' Fees. In the event either party brings a lawsuit or other proceeding against the other party to enforce any provisions of this Agreement or any instrument executed pursuant to this Agreement, the prevailing party will be paid all costs and reasonable attorney's fees by the other party, such costs and reasonable attorney's fees will be included in any such judgment. For purposes of this Section 10.02, "prevailing party" means, in the case of a Person asserting a claim, the Person is successful in obtaining substantially all of the relief sought, and in the case of a Person defending against or responding to a claim, the Person is successful in denying substantially all of the relief sought.

12.02  Waiver. No delay in exercising any right or remedy will constitute a waiver thereof, and no waiver by Seller or Buyer of the breach of any covenant of this Agreement shall be construed as a waiver of any preceding or succeeding breach of the same or any other covenant or condition of this Agreement.

## ARTICLE XIII
## MISCELLANEOUS

13.01  Assignability. Buyer may assign this Agreement in whole or in part and/or designate a nominee to take title to all or any part the Facilities or the operations thereof at Closing without the consent of Seller, provided that such assignment and/or designation shall only be to an Affiliate of Buyer, and provided that Buyer shall remain fully bound by the terms and conditions of this Agreement. Any assignment of this Agreement shall be binding upon and inure to the benefit of the successor or assignee of Buyer. In the event Buyer finds it necessary or is required to provide to a third party a collateral assignment of the Buyer's interest in this Agreement and/or any related documents, Seller shall cooperate with the Buyer and any third party requesting such assignment including but not limited to Seller signing a consent and acknowledgment of such assignment.

32

13.02   Entire Agreement.  This Agreement constitutes the entire contract between the parties, and may not be modified except by an instrument in writing that both of them sign.  All of the schedules and exhibits to this Agreement are incorporated by this reference.

13.03   Governing Law.  This Agreement will be interpreted, construed, and enforced pursuant to the laws of the State of Iowa without giving effect to the choice of law rules thereof.

13.04   Notice.  All notices and other communication allowed or required under this Agreement will be in writing, and delivered by either hand delivery, overnight courier, or Regular First Class U.S. Mail, postage prepaid, and addressed as follows:

| If to Seller: | If to Buyer: |
|---|---|
| QHC Facilities LLC<br>8350 Hickman Road, Suite 15<br>Clive, IA 50325<br>Attn:  Mark Hidlebaugh, Member | Crestridge Holdco, LLC<br>600 Broadway, Suite E<br>Lynbrook, NY 11563 |
| With a copy to: | With a copy to: |
| Jeffrey D. Goetz, Esq.<br>Bradshaw Fowler Proctor & Fairgrave, P.C.<br>801 Grand Avenue, Suite 3700<br>Des Moines, IA 50309-8004 | Gutnicki LLP<br>4711 Golf Road, Suite 200<br>Skokie, IL 60076<br>Attn: Stacy J. Flanigan, Esq. |

All notices provided in accordance with this Section delivered by hand or by overnight courier will be deemed delivered and received on the delivery date.  All notices delivered by First Class Mail will be deemed delivered and received four (4) Business Days after being placed for delivery with the U.S Postal Service.

13.05   Section Headings; Drafting Party.  The headings of this Agreement are for convenience of reference only, do not form a part of this Agreement, and do not in any way modify, interpret or construe the intentions of the parties. The provisions of this Agreement have been examined, negotiated, drafted and revised by counsel for each party, and no implication will be drawn against any party by virtue of the drafting of this Agreement.

13.06   Waivers.  Any waiver by any party of any violation of, breach of or default under any provision of this Agreement or any exhibit, schedule or other document referred to in this Agreement by any other party will not be construed as or constitute a waiver of any subsequent violation, breach of, or default under that provision or any other provision of this Agreement, or any Exhibit, Schedule or other document referred to in this Agreement.

13.07   Further Assurances.  Each of the parties will, at any time and from time to time after the Closing, execute and deliver, or cause to be executed and delivered, to the other party or

33

their designee, such further consents, approvals, conveyances, assignments and other documents and instruments as any party shall reasonably request in order to carry out any and all of the terms and provisions of this Agreement.

13.08   Counterparts.  This Agreement may be executed in several counterparts and by facsimile transmission or email scan, each of which when so executed and delivered will be deemed an original, but all of which together shall constitute one and the same instrument.

13.09   Binding Effect.  This Agreement will be binding upon and inure to the benefit of the parties to this Agreement and their respective successors, heirs, assigns and legal representatives Waiver of Jury Trial. BUYER AND SELLER WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM, OR COUNTERCLAIM, WHETHER IN CONTRACT OR TORT, AT LAW OR IN EQUITY, ARISING OUT OF OR IN ANY WAY RELATED TO THIS AGREEMENT, OR THE TRANSACTIONS THAT THIS AGREEMENT CONTEMPLATES

13.10   Jurisdiction; Venue; Service of Process. Any litigation arising out of or relating to this Agreement, or the transactions this Agreement contemplates, will be brought in the Bankruptcy Court or a court located in Polk County, Iowa. Seller and Buyer consent to the jurisdiction of any such court. **The parties each waive personal service of process in any litigation arising out of or relating to this Agreement or any transaction this Agreement contemplates, and agree that all such service of process may be made in the manner set forth for notices in Section 11.04 of this Agreement, and that service so made will be deemed completed one (1) day after delivered in compliance with Section 11.04 of this Agreement. The parties expressly waive any other requirements of notice or personal service that any applicable Law may require.**

13.11   Exhibits and Schedules.  If any exhibits or schedules are not attached hereto, the parties agree to attach such exhibits and schedules as soon as reasonably practicable but in any event prior to ten (10) days before the Closing Date.  The Parties agree that the Party charged with providing an exhibit or schedule to this Agreement shall, to the extent necessary after delivery thereof, amend or supplement all exhibits and schedules in order for the same to be current, true and correct as of the Closing Date.  The inclusion of any new schedule or exhibit, or supplement thereto, shall be subject to such party approving any new exhibits and schedules or supplements thereto within seven (7) days of submission thereof.

**ARTICLE XIV**
**BANKRUPTCY MATTERS**

14.01   Sale Order. The Sale Order will provide, *inter alia*, that pursuant to 11 U.S.C. Sections 105, 363, and 365: (i) this Agreement and the transactions contemplated hereby are approved; (ii) Buyer will have and acquire at the Closing good, valid, marketable title to the Acquired Assets free and clear of all interests, Claims, Encumbrances, or Liens (except for Permitted Encumbrances and Assumed Liabilities) to the maximum extend provided

34

under 11 U.S.C. Sections 105, 363, and 365; (iii) Seller will assume and assign to Buyer all of the Assumed Executory Contracts as of the Closing Date; (iv) the Assumed Executory Contracts will be in full force and effect from and after the Closing with non-debtor parties being barred and enjoined from asserting against Buyer, *inter alia*, defaults, breaches or claims of pecuniary losses existing as of the Closing or by reason of the Closing; (v) Buyer is acquiring the Acquired Assets free and clear of the Excluded Liabilities and providing for a full release of Buyer with respect to the Excluded Liabilities; (vi) the activities and results of the marketing and auction conducted in connection with the sale, if any, are approved; (vii) Buyer will be found to be a good faith purchaser within the meaning of 11 U.S.C. Section 363(m); and (viii) the Bankruptcy Court will waive any stay that would otherwise be applicable to the immediate effectiveness of the Sale Order pursuant to Fed. R. Bankr. P. 6004(h) and 6006(d).

[signatures on following page]

35

IN WITNESS WHEREOF, the parties have executed this Agreement effective as of the date and year first written.

CRESTRIDGE HOLDCO, LLC

_____

By: _____

Its: ____CEO_____

QHC FACILITIES, LLC

_____

By: _____

Its: _____

QHC MANAGEMENT, LLC

_____

By: _____

Its: _____

IN WITNESS WHEREOF, the parties have executed this Agreement effective as of the date and year first written.

QHC FACILITIES, LLC

By: Mark Hidlebaugh

Its: Managing Member

QHC MANAGEMENT, LLC

By: Mark Hidlebaugh

Its: Managing Member

QHC MITCHELLVILLE, LLC

By: Mark Hidlebaugh

Its: Managing Member

QHC WINTERSET NORTH, LLC

By: Mark Hidlebaugh

Its: Managing Member

QHC MADISON SQUARE, LLC

By: Mark Hidlebaugh

Its: Managing Member

QHC FORT DODGE VILLA, LLC

By: _Mark Hidlebaugh_

Its: _Managing Member_

QHC HUMBOLDT NORTH, LLC

By: _Mark Hidlebaugh_

Its: _Managing Member_

QHC HUMBOLDT SOUTH, LLC

By: _Mark Hidlebaugh_

Its: _Managing Member_

QHC VILLA COTTAGES, LLC

By: _Mark Hidlebaugh_

Its: _Managing Member_

CRESTRIDGE, INC.

By: _Mark Hidlebaugh_

Its: _Managing Member_

CRESTVIEW ACRES, INC.

By: _Mark Hidlebaugh_

Its: _Managing Member_

# EXHIBITS

Exhibit A:      Facilities

Exhibit B:      Land

Exhibit C:      Purchase Price Allocation

## SCHEDULES

| | |
|---|---|
| Schedule 2.01(i) | Assumed Benefit Plans |
| Schedule 2.08(a) | Assumed Executory Contracts |
| Schedule 2.08(b) | Accrued PTO |
| Schedule 3.01(e): | Litigation |
| Schedule 3.01(o) | Certificates of Need |
| Schedule 3.01(s) | Permits |
| Schedule 3.01(t) | Compliance |
| Schedule 3.01(u) | Licensed Beds and Current Rate |
| Schedule 3.01(y) | Financial Information |
| Schedule 3.01(z) | Real Property |