# UNITED STATES BANKRUPTCY COURT

## SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| **QHC Facilities, LLC et al.,**[1] | ) Case No. 21-01643-als11 |
| | ) Jointly Administered |
| Debtors. | ) |
| | ) Hon. Anita L. Shodeen |
| | ) |
| | ) Sale Hearing: March 11, 2022 |
| | ) Time: 9:30 a.m. CST |
| | ) |
| | ) |

## NOTICE OF SUCCESSFUL BIDDER

**PLEASE TAKE NOTICE** that on January 28, 2022, the above-captioned debtors and debtors-in-possession (the "Debtors") filed with the Bankruptcy Court for the Southern District of Iowa (the "Court") their Motion for Orders (I)(A) Approving Bidding Procedures; (B) Scheduling the Time, Date, and Form of Notice for the Auction and Sale Hearing; and (C) Approving Break-Up Fee; and (II)(A) Authorizing Sale of Assets Free and Clear of Liens, Claims, Interests and Encumbrances; and (B) Authorizing Assumption and Assignment or Rejection of Leases and Executory Contracts (Docket No. 117) (the "Sale Motion").

**PLEASE TAKE FURTHER NOTICE** that the Debtors have solicited offers for the sale of the Debtors' Assets[2] consistent with the bidding procedures (the "Bidding Procedures") approved by the Court by entry of an order on February 11, 2022 (Docket No. 164) (the "Bidding Procedures Order").

**PLEASE TAKE FURTHER NOTICE** that on March 4, 2022, pursuant to the Bidding Procedures Order, the Debtors conducted the Auction with respect to the Debtors' Assets.

**PLEASE TAKE FURTHER NOTICE** that the Debtors have determined that the highest and best Qualified Bid for the Assets at the Auction (the "Successful Bid") was made by Cedar Healthgroup, LLC ("Cedar Healthgroup" or the "Successful Bidder"). The Successful Bid was made for the cash amount of twelve million one hundred thousand dollars ($12,100,000.00). In addition to the cash amount, the Successful Bidder agreed to assume the Accrued PTO

---

[1] The Jointly Administered Debtors in this proceeding are *In re QHC Management, LLC* (Case No. 21-01644-als11), *In re QHC Mitchellville, LLC* (Case No. 21-01645-als11), *In re QHC Winterset North, LLC* (Case No. 21-01646-als11), *In re QHC Madison Square, LLC* (Case No. 21-01647-als11), *In re QHC Fort Dodge Villa, LLC* (Case No. 21-01648-als11), *In re Crestridge, Inc.* (Case No. 21-01649-als11), *In re Crestview Acres, Inc.* (Case No. 21-01650-als11), *In re QHC Humboldt North, LLC* (Case No. 21-01651-als11), *In re QHC Humboldt South, LLC* (Case No. 21-01652-als11) and *In re QHC Villa Cottages, LLC* (Case No. 21-01653-als11).

[2] Terms used but not defined herein shall have the meaning ascribed to them in the Sale Motion or Bidding Procedures Order.

amounts as stated in Section 2.08(b) of the Successful Bidder's Asset Purchase Agreement (the "Accepted Bid APA"). Attached as Exhibit A is the duly executed Accepted Bid APA between the Debtors and Cedar Healthgroup dated March 7, 2022.

**PLEASE TAKE FURTHER NOTICE** that the Debtors have determined the second highest and best Qualified Bid for the Assets at the Auction (the "Backup Bid") was made by Blue Diamond Equities LLC (the "Backup Bidder"). The Backup Bid was made in a cash amount of twelve million ($12,000,000). In addition, the Backup Bidder also agreed to assume the Accrued PTO amounts. Attached as Exhibit B is the Backup Bidder's Asset Purchase Agreement (the "Backup Bid APA") between the Debtors and Blue Diamond Equities LLC dated February 29, 2022.

**PLEASE TAKE FURTHER NOTICE** that objections relating to the selection of the Successful Bidder (other than the Purchaser), or the terms of the Accepted Bid (other than the Asset Purchase Agreement), must: be filed with the Court, with copies delivered to the Bankruptcy Court and received by the Chambers of the Honorable Anita L. Shodeen, United States Bankruptcy Judge, at the U.S. Courthouse Annex, 110 East Court Avenue, Des Moines, Iowa 50309; conform to the Bankruptcy Rules, set forth the name of the objecting party, the nature and amount of any claims or interests held or asserted against the Debtors' estates, the basis for the objection and the specific grounds therefor; and be served so as to be received no later than March 9, 2022 at 5:00 p.m. CST upon: A) general reorganization counsel to the Debtors: attention Jeffrey Goetz (goetz.jeffrey@bradshawlaw.com) and Krystal Mikkilineni (mikkilineni.krystal@bradshawlaw.com); (iii) counsel to the Committee: attention Francis Lawall (Francis.Lawall@Troutman.com) and Deborah Kovsky-Apap (deborah.kovsky@troutman.com); (iv) counsel to Lincoln Savings Bank, attention Jeff Courter (jwc@nyemaster.com) and Roy Leaf (rleaf@nyemaster.com); and counsel to the Webb Family Trust, attention Terry Gibson (TGibson@2501grand.com) (collectively, the "Notice Parties").

**PLEASE TAKE FURTHER NOTICE** that the Sale Hearing to consider approval of the sale of the Debtors' Assets to the Successful Bidder at the Auction, free and clear of liens, claims, interests, and encumbrances in accordance with Bankruptcy Code section 363(f), will be held before the Honorable Anita L. Shodeen on March 11, 2022, commencing at 9:30 a.m. CST.

**PLEASE TAKE FURTHER NOTICE,** that at the Sale Hearing, the Debtors will seek the Court's approval of the Accepted Bid. Unless the Court orders otherwise, the Sale Hearing shall be an evidentiary hearing on matters relating to the Sale Transaction.

**PLEASE TAKE FURTHER NOTICE** that this Notice of Successful Bidder is subject to the terms and conditions of the Bidding Procedures Order, with such Bidding Procedures Order controlling in the event of any conflict, and the Debtors encourage parties in interest to review such documents in their entirety. Parties interested in receiving more information regarding the sale of the Assets and/or copies of any related document, including the Bidding Procedures Motion or the Bidding Procedures Order, may make a written request to Debtors' Counsel.

Dated: _____3/7/2022_____

*/s/ Krystal R. Mikkilineni*
Jeffrey D. Goetz, Esq., AT0002832
Krystal R. Mikkilineni, Esq. AT0011814
Bradshaw Fowler Proctor & Fairgrave P.C.
801 Grand Avenue, Suite 3700
Des Moines, IA  50309-8004
515/246-5880
515/246-5808 FAX
goetz.jeffrey@bradshawlaw.com
mikkilineni.krystal@bradshawlaw.com
General Reorganization Counsel for the Debtors
and Debtors in Possession,

CERTIFICATE OF SERVICE:  This document was served electronically on parties who receive electronic notice through
CM/ECF as listed on CM/ECF's notice of electronic filing.

*/s/       Barbara Warner*

# EXHIBIT A

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (the "Agreement") is made and entered into as of March 7, 2022 (the "Execution Date"), by and between QHC Facilities, LLC, QHC Management, LLC, QHC Mitchellville, LLC, QHC Winterset North, LLC, QHC Madison Square, LLC, QHC Fort Dodge Villa, LLC, QHC Humboldt North, LLC, QHC Humboldt South, LLC, and QHC Villa Cottages, LLC, each an Iowa limited liability company, and Crestridge, Inc. and Crestview Acres, Inc., each an Iowa corporation, ("Seller"), and Cedar Healthgroup, LLC, a New Jersey limited liability company ("Buyer").

## ARTICLE I
### DEFINITIONS

1.01    Definitions.    The following terms have the meanings assigned below:

"*Acquired Assets*" has the meaning described in Section 2.01 of this Agreement.

"*Acquisition Transaction*" shall mean any sale, transfer or other disposition (not involving the Buyer or its Affiliates), in one transaction or a series of transactions, of all or any substantial portion of the Acquired Assets or the Business, whether proposed to be effected pursuant to a merger, consolidation, tender offer, exchange offer, share exchange, amalgamation, stock acquisition, asset acquisition, business combination, restructuring, recapitalization, liquidation, dissolution, joint venture or similar transaction, whether or not proposed or advanced by the Seller.

"*Action*" means any claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, citation, grievance, summons, pleading, motion, objection, subpoena or investigation of any nature, whether civil, criminal, administrative regulatory or otherwise and whether at Law or in equity.

"*Affiliate*" means any Person that directly, or indirectly, controls, is controlled by, or is under common control with, such a specified Person.

"*Ancillary Agreements*" means any bill of sale, warranty deed, or similar transaction agreements in form and substance acceptable to Seller and Buyer.

"*Ancillary Businesses*" means the ancillary healthcare and medical business, including physician services, that Seller conducts.

"*Assumed Executory Contracts*" means the executory contracts, including Leases, of Seller listed on Schedule 2.08(a), designated and agreed by Buyer, that have been assumed and assigned by the Seller to the Buyer.

"*Assumed Lease*" means any Lease that is an Assumed Executory Contract.

1

"*Assumed Liabilities*" has the meaning set forth in Section 2.08 of this Agreement.

"*Assisted Living Facilities*" means the facilities consisting of (1) Madison Square Assisted Living, located at 209 W Jefferson St., Winterset, IA 50273 and (2) Fort Dodge Villa Cottages, located at 925 Martin Luther King Drive, Fort Dodge, IA 50501.

"*Bankruptcy Code*" means Title 11 of the U.S. Code, as amended from time to time.

"*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Iowa.

"*Bill of Sale*" means a bill of sale in form and substance acceptable to Buyer and Seller.

"*Bidding Procedures Order*" means that certain Order (A) Approving Bidding Procedures in Connection with the Auction and Sale of Assets and Scheduling an Auction and Sale Hearing; (B) Approving Assumption and Assignment Procedures; (C) Approving the Break-Up Fee; and (D) Granting Other Related Relief, entered on February 11, 2022, Docket Nos. 164 and 165 in the Bankruptcy Case.

"*Business*" means Seller's business as operators of 8 Skilled Nursing Facilities and 2 Assisted Living Facilities across Iowa, and all Ancillary Businesses of Seller.

"*Business Day*" means any day other than a Saturday, a Sunday, or a day on which commercial banks are allowed or required to close in Iowa.

"*Chapter 11 Case*" means the following proceedings pending before the Bankruptcy Court in which Seller are the Debtors: *In re QHC Facilities, LLC*, Case No. 21-01643-als11, *In re QHC Management, LLC* (Case No. 21-01644-als11), *In re QHC Mitchellville, LLC* (Case No. 21-01645-als11), *In re QHC Winterset North, LLC* (Case No. 21-01646-als11), *In re QHC Madison Square, LLC* (Case No. 21-01647-als11), *In re QHC Fort Dodge Villa, LLC* (Case No. 21-01648-als11), *In re Crestridge, Inc.* (Case No. 21-01649-als11), *In re Crestview Acres, Inc.* (Case No. 21-01650-als11), *In re QHC Humboldt North, LLC* (Case No. 21-01651-als11), *In re QHC Humboldt South, LLC* (Case No. 21-01652-als11), and *In re QHC Villa Cottages, LLC* (Case No. 21-01653-als11).  ,.

"*Claim*" means any action, assessment, loss or experience rating, cause of action, claim, damage, demand, proceeding, fine, injury (including death), investigation, judgment, lawsuit, liability, loss, penalty, settlement or expense of any nature, whether civil, criminal, administrative or otherwise, and includes any and all "claims" as defined in 11 U.S.C. Section 101(5), and all "interests" as used in 11 U.S.C. Section 363(f).

"*Closing*" has the meaning set forth in Section 6.01 of this Agreement.

"*Closing Date*" has the meaning set forth in Section 6.01 of this Agreement. .

"*Code*" means Title 26 of the U.S. Code, as amended from time to time.

2

"*Contracts*" means all contracts and other agreements incident to the Facilities and/or Business to which Seller is a party.

"*Cure Costs*" means the amount necessary to cure all defaults under the Assumed Executory Contracts (as of the Closing Date) to permit Seller to assume and assign the Assumed Executory Contracts pursuant to Bankruptcy Code section 365 and any order of the Bankruptcy Court.

"*Disclosure Schedules*" means the disclosure schedules delivered by Seller concurrently with the execution and delivery of this Agreement.  If any schedules are not completed or attached hereto as of the date of this Agreement, the parties hereto agree to attach such schedules as soon as reasonably practicable, but in any event, this Agreement is subject to Buyer approving (which approval will not unreasonably be withheld, delayed or conditioned) all schedules or subsequent updates thereto within seven (7) days of submission thereof to Buyer.  The parties hereto agree that the party charged with providing an exhibit or schedule to this Agreement shall, to the extent necessary after delivery thereof, amend or supplement all exhibits and schedules in order for the same to be current, true and correct in all material respects as of the Closing Date.

"*DOH*" means Iowa Department of Public Health and the Iowa Department of Inspections and Appeals and Iowa Department of Human Services, collectively.

"*Employee Plans*" means any pension, retirement, savings, disability, medical, dental, health, life, death benefit, group insurance, profit-sharing, deferred compensation, stock option, stock purchase, bonus, incentive, executive compensation, vacation pay, holiday pay, severance benefit plan, trust, arrangement, agreement, policy or commitment, whether or not any of the foregoing is funded or insured and whether written or oral, that is intended to provide or does provide benefits to any of Seller's employees, and (i) to which seller is a party or by which Seller (or any of Seller's rights, properties or assets) is bound; (ii) with respect to which Seller has made any payments, contributions, or commitments, or may otherwise have any liability (whether or not Seller still maintains such plan, trust, arrangement, contract, agreement, policy, or commitment); or (iii) under which any director, employee or agent of Seller is a beneficiary as a result of his or her employment or affiliation with Seller.

"*Encumbrances*" means and includes interests, contractual rights, security interests, mortgages, liens, licenses, pledges, guarantees, charges, easements, reservations, restrictions, clouds, equities, rights of way, options, rights of first refusal and all other encumbrances, whether or not relating to the extension of credit or the borrowing of money.

"*Equipment*" means all furniture, fixtures, equipment, machinery, vehicles, and other personalty now or hereafter attached to or appurtenant to the Land or used in connection with the Facilities or the Business.

"*ERISA*" means the United States Employee Retirement Income Security Act of 1974, as amended from time to time, and the rules and regulations promulgated thereunder.

3

"***Escrow Agent***" means Bradshaw Fowler Proctor & Fairgrave, 801 Grand Avenue, Suite 3700, Des Moines, IA 50309, attn: Jeffrey Goetz , goetz.jeffrey@bradshawlaw.com.

"***Excluded Agreements***" means all contracts, leases, and agreements (other than those between Seller and Buyer) that are not Assumed Executory Contracts: (i) as to which Seller is a party; (ii) to which Seller or its property is subject; or (iii) by which Seller is otherwise bound, whether oral or written.

"***Excluded Assets***" means those items specifically described in Section 2.02.

"***Excluded Liabilities***" means any liabilities of, and Claims against, Seller or the Acquired Assets, together with all other liabilities and obligations of, and Claims against, Seller that are not Assumed Liabilities.

 "***Facilities***" means Seller's interest in the 8 Skilled Nursing Facilities and 2 Assisted Living Facilities, Land, Improvements, Equipment, Intellectual Property, Contract Rights, Leases, Intangible Personal Property, Government Authorizations, Records and the other intangible and tangible assets, whether real or personal or mixed, that are located in, or associated with, the nursing and assisted living facilities, and/or on the Land.  The Facilities are listed on Exhibit A.

"***FMLA***" means the United States Family and Medical Leave Act, as amended from time to time, and the rules and regulations promulgated thereunder.

"***GAAP***" means generally accepted accounting principles in the United States, consistently applied.

"***Governmental Authority***" means the government of the United States or any foreign country or any state or political subdivision thereof and any entity, body or authority exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, and other quasi-governmental entities established to perform such functions.

"***Government Authorizations***" means all licenses, permits, approvals, certificates of need and occupancy, facility certifications, consents and other authorizations from any Governmental Authority as are necessary to lawfully own and/or operate the Facilities or conduct the Business.

"***Hazardous Materials***" means any substance, material, or waste that is or becomes regulated by any Governmental Authority including: (i) petroleum, (ii) asbestos, (iii) polychlorinated biphenyls, (iv) those substances, materials or wastes designated as a "hazardous substance" pursuant to Section 311 of the Clean Water Act or listed pursuant to Section 307 of the Clean Water Act or any amendments or replacements to these statutes, (v) those substances, materials or wastes defined as a "hazardous waste" pursuant to Section 1004 of the Resource Conservation and Recovery Act or any amendments or replacements to that statute, or (vi) those substances, materials or wastes defined as a "hazardous substance" pursuant to Section 101 of the Comprehensive Environmental

4

Response, Compensation and Liability Act, or any amendments or replacements to that statute.

 "*IDHS*" means the Iowa Department of Human Services.

"*IDIA*" means the Iowa Department of Inspections and Appeals.

"*IDPH*" means the Iowa Department of Public Health.

 "*Improvements*" means the buildings and all other improvements, including site improvements, landscaping, fixtures, mechanical equipment, apparatus and appliances, now owned or leased or hereafter placed in the Facilities, and/or on the Land.

"*Intangible Personal Property*" means all engineering and architectural plans and specifications, drawings, studies and as-built surveys relating to the Facilities that are in Seller's possession, and any other intangible personal property Seller owns and uses in connection with the Facilities.

"*Intellectual Property*" means any or all of the following rights: (i) all U.S., international, and foreign patents and applications therefor and all reissues, divisions, renewals, extensions, provisionals, continuations and continuations-in-part thereof; (ii) all inventions (whether or not patentable), invention disclosures, improvements, trade secrets, proprietary information, know-how, technology, technical data and customer lists, and all documentation relating to any of the  foregoing throughout the world; (iv) all industrial designs and any registrations and applications therefor throughout the world; (v) all internet uniform resource locators, domain names, trade names, logos, slogans, designs, common law trademarks and service marks, trademark and service mark registrations and applications therefor throughout the world; (vi) all databases and data collections and all rights therein throughout the world; (vii) all moral and economic rights of authors and inventors, however denominated, throughout the work; and (viii) any similar or equivalent rights to any of the foregoing anywhere in the world.

"*Inventory*" has the meaning set forth in Section 2.01(a) of this Agreement.

"*Knowledge*" with respect to Seller means all facts that a responsible officer of Seller employed as of the Execution Date would know or would have reason to know following due inquiry and diligence with respect to the matters at hand.

"*Labor Laws and Employment Laws*" means all Laws and all contracts or collective bargaining agreements governing or concerning labor relations, collective bargaining, conditions of employment, employment discrimination or harassment, wages, hours, or occupations safety and health. The term includes ERISA, the Immigration Reform and Control Act of 1986, the National Labor Relations Act, the Civil Rights Acts of 1866 and 1964, the Equal Pay Act, the Age Discrimination in Employment Act, the Americans With Disabilities Act, FMLA, WARN Act, OSHA, the Davis Bacon Act, the Walsh-Healy Act, the Service Contract Act, the Fair Labor Standards Act, the Rehabilitation Act of 1973, the

5

Sarbanes-Oxley Act, any worker's compensation Law, and all rules and regulations promulgated under any of the foregoing Laws.

"***Laws***" means all statutes, rules, codes, regulations, restrictions, ordinances, orders, decrees, approvals, directives, decisions, judgments, injunctions, writs, executive orders, awards, and decrees of, or issued by, any Government Authority.

"***Land***" means the real estate described on Exhibit B, together with all easements, hereditaments, rights of way, privileges and rights benefiting the same and all strips and gores of land lying adjacent to such land that Seller owns.

"***Leases***" means all lease or rental agreements involving or pertaining to the Business, to which Seller is a party, if any.

"***Licenses***" means all notifications, licenses, permits (including environmental, construction, and operation permits), franchises, certificates, certificates of need, accreditations, approvals, exemptions, waivers, classifications, registrations and other similar documents and authorizations any Governmental Authorities have issued, as well as all applications for any of the foregoing; *provided, however,* that Licenses shall not include any notifications, licenses, permits (including environmental, construction, and operation permits), franchises, certificates, certificates of need, accreditations, approvals, exemptions, waivers, classifications, registrations and other similar documents and authorizations any Governmental Authorities have issued, as well as all applications for any of the foregoing, related to any Excluded Asset.

"***Lien***" means any lien (statutory or otherwise), encumbrance, Claim, indebtedness, obligation, right, demand, charge, right of setoff, mortgage, deed of trust, security interest, pledge, preference, option, lease, license, Tax, right of first refusal or similar interest, title defect, easements, rights of way, restrictive covenant, encroachment, judgment, conditional sale, title retention agreement or restriction on transfer, or any other interest, whether it is secured or unsecured, known or unknown, recorded or unrecorded, contingent or liquidated.

"***Management Agreement***" has the meaning set forth in Section 2.12.

"***Material Adverse Effect***" means any adverse effect in the business, financial or physical condition, or results of operations of the Facilities, the Business, or Seller with respect to the Facilities, that is material when taken as a whole, provided, however, that a Material Adverse Effect shall not be deemed to include events, changes, effects, conditions, state of facts or occurrences arising out of, relating to, or resulting from: (i) changes in the United States or foreign economies or financial markets in general; (ii) general changes or developments in business, regulatory, or macroeconomic conditions or trends that affect the industries and markets in which the Sellers operate; (iii) any global or national health concern, epidemic, disease outbreak, pandemic (whether or not declared as such by any Governmental Authority and including "coronavirus" or "COVID-19") or any Law issued by a Governmental Authority requiring business closures, quarantine, "sheltering-in-place" or similar restrictions that arise out of such health concern, epidemic, disease outbreak or

6

pandemic or any change in such Law following the date of this Agreement; (iv) changes after the date of this Agreement in any Laws; (v) the announcement or anticipated consummation of the transactions this Agreement contemplates; (vi) the commencement or pendency of the Chapter 11 Case; (vii) any objections in the Bankruptcy Court to (A) this Agreement or any of the transactions contemplated hereby or thereby, (B) the Bidding Procedures Order, or (C) the assumption or rejection of any Contract or Lease pursuant to and in compliance with this Agreement

"***Medicare Advance Payments***" means unpaid or unreturned accelerated or advance Medicare payments received by the Facilities under the Coronavirus Aid Relief, and Economic Security Act amending the Accelerated Payments program, and any other unpaid or unreturned advance payments or stimulus funds received by the Facilities through any federal or state governmental agency providing reimbursement.

"***OSHA***" means the United States Occupational Safety and Health Administration.

"**Out of Compliance**" means any of the following (A) a finding by a Governmental Authority of one or more deficiencies at any Facility at a "level G" or above that  has not been corrected and cleared by the applicable Governmental Authority; (B) a denial of any Facility's right to admit patients or to receive Medicare or Medicaid payments or reimbursements for existing patients or for new admissions at any Facility (C) any Facility loses its operating license or any material Permit; (D) any Facility has any Provider Agreement revoked or terminated; and (E) any Facility has its number of beds reduced; provided that the Facilities shall not be Out of Compliance if any of the conditions set forth in this definition exist at any Facility but are thereafter cured or rectified by the Seller within a reasonable period.

"***Person***" means any individual, corporation, partnership, joint venture, association, limited liability company, trust, unincorporated organization or Governmental Authority.

"***Permitted Encumbrances***" means any Encumbrances that remain attached to any Acquired Assets, from and after the Closing Date, with Buyer's consent.

"***Petition Date***" means December 29, 2021.

 "***Purchase Price***" has the meaning set forth in Section 2.03.

"***Records***" means all books and records Seller (or its Affiliates) maintain in connection with the Facilities or the Business, but excluding any records relating solely to Seller corporate entity as distinct from the Facilities or Business.

"***Sale Order***" means an Order of the Bankruptcy Court approving the sale to Buyer.

"***Skilled Nursing Facilities***" means the facilities consisting of (1) Crestridge, located at 1015 Wesley Drive, Maquoketa, IA 52060, (2) Winterset Care Center North, located at 411 East Lane St., Winterset, IA 50273, (3) Crestview Acres, located at 1485 Grand Avenue, Marion, IA 52303, (4) Humboldt Care Center North, located at 1111 11th Ave,

North, Humboldt, IA 50548, (5) Humboldt Care Center South, located at 800 13th St., South, Humboldt, IA 50548, (6) Sunnycrest Nursing Center, located at 401 Crisman St., Dysart, IA 52224, (7) Mitchell Village Care Center, located at 114 Carter St. SW, Mitchellville, IA 50169, and (8) Fort Dodge Villa Care Center, located 2721 10th Ave North, Fort Dodge, IA 50501.

"*Tax Return*" means any report, return, declaration or other information required to be supplied to any Governmental Authority in connection with Taxes, including estimated returns and reports of every kind with respect to Taxes.

"*Taxes*" means all taxes, charges, fees, levies, duties, penalties, additions or assessments imposed by any Governmental Authority, including income, excise, property, sales, transfer, use, ad valorem, profits, occupancy, environmental, sewer, tap, severance, franchise, value added or other taxes, including any interest, penalties or additions attributable thereto.

"*Third Party*" means any Person other than Seller, Buyer or an Affiliate of either.

"*Transaction Documents*" means this Agreement and any other agreement, document or instrument executed and delivered pursuant to the terms of, or otherwise in connection with, this Agreement, including, for the avoidance of doubt, the Bidding Procedures, the Bidding Procedures Order and the Sale Order.

"*Treasury Regulations*" means the Income Tax Regulations, including Temporary Regulations, promulgated under the Code.

"*WARN Act*" means the United States Worker Adjustment and Retraining Notification Act, as amended from time to time, and the rules and regulations promulgated thereunder.

1.02    General Construction. Whenever the context requires in this Agreement, the singular includes the plural and masculine includes the feminine or the neuter. The word "including" means "including without limitation." Words such as "herein," "hereof," "hereby" and "hereunder" and words of similar import refer to this Agreement as a whole and not to any particular Article, Section or Subsection of this Agreement.

1.03    Schedules and Exhibits. The schedules and exhibits referenced in this Agreement are incorporated herein. All items disclosed hereunder shall be deemed disclosed in connection with the specific representation to which they are explicitly referenced. If no disclosure schedule is attached with reference to a specific Section of this Agreement, then such missing schedule shall be deemed to state "None."

**ARTICLE II**
AGREEMENT AND CONSIDERATION

2.01    Agreement to Sell and Purchase. In consideration of the mutual covenants and promises contained in this Agreement, Seller agrees to sell, assign, transfer and convey unto Buyer all of Seller's right, title and interest in and to the assets described in this Section 2.01 (but

8

not any Excluded Assets) (collectively the "*Acquired Assets*"), and Buyer agrees to purchase all of Seller's right, title and interest in and to the Acquired Assets (but not any Excluded Assets), all upon the terms and conditions set forth herein. Except for any Excluded Assets, the Acquired Assets consist of the following assets, properties and rights of Seller as of the close of business on the Closing Date:

(a)     All inventory, including finished goods, raw materials, work in progress, packaging, supplies, parts and other inventories, but excluding the Excluded Assets (collectively, the "*Inventory*");

(b)     All Contracts set forth in <u>Section 2.08(a)</u> of the Disclosure Schedules (the "*Assumed Executory Contracts*");

(c)     All Intellectual Property;

(d)     All furniture, equipment, machinery, tools, vehicles, office equipment, supplies, computers, telephones and other tangible personal property;

(e)     All Land;

(f)     All Permits which are held by Seller and required for the conduct of the Business as currently conducted or for the ownership and use of the Acquired Assets;

(g)     All rights to any Actions of any nature available to or being pursued by Seller to the extent related to the Business, the Acquired Assets or the Assumed Liabilities, whether arising by way of counterclaim or otherwise, *provided, however,* that the rights to any Avoidance Action against any party to a Contract of Seller not listed on <u>Section 2.08(a)</u> of the Disclosure Schedules as of the Closing or any Action against any director, officer, equity-holder, or lender of any Seller are not a Purchased Asset;

(h)     All of Seller's rights under warranties, indemnities and all similar rights against third parties to the extent related to any of the Acquired Assets or Assumed Liabilities;

(i)     All employee benefit plans set forth in <u>Section 2.01(i)</u> of the Disclosure Schedules, solely to the extent designated and agreed by Buyer, including all related insurance policies, contracts, trusts and any other assets attributable thereto (the "*Assumed Benefit Plans*");

(j)     All insurance benefits, including rights and proceeds, arising from or relating to the Business, the Acquired Assets or the Assumed Liabilities

(k)     Originals, or where not available, correct and complete copies, of all books and records, including books of account, ledgers and general, financial and accounting records, customer lists, customer purchasing histories, price lists, distribution lists, supplier lists, production data, quality control records and procedures, customer complaints and inquiry files, research and development files, records and data (including all correspondence with any Governmental Authority), sales material and records

9

(including pricing history, total sales, terms and conditions of sale, sales and pricing policies and practices), strategic plans, internal financial statements, marketing and promotional surveys, material and research and files relating to the Intellectual Property Assets ("***Books and Records***"); and

(l)    All goodwill and the going concern value of the Business.

2.02    <u>Excluded Assets</u>.  The following assets are expressly excluded from the purchase (the "***Excluded Assets***"):

(a)    All Contracts that are not Assumed Executory Contracts (the "***Excluded Contracts***");

(b)    Cash and cash equivalents;

(c)    Accounts receivable;

(d)    The corporate seals, organizational documents, minute books, stock books, Tax Returns, books of account or other records having to do with the corporate organization of Seller;

(e)    All rights to any Avoidance Actions against any creditor of Seller not listed in <u>Section 2.08(a)</u> of the Disclosure Schedules as of the Closing or any party to a Contract of Seller not listed on <u>Section 2.08(a)</u> of the Disclosure Schedules as of the Closing, or any Action against any director, officer, equity-holder, or lender of any Seller;

(a)    Prepaid expenses, credits, advance payments, claims, security, refunds, rights of recovery, rights of set-off, rights of recoupment, deposits, charges, sums and fees (including any such item relating to the payment of Taxes) related to prior to the Closing Date; and

(f)    The rights specifically accruing to Seller under the Transaction Documents.

2.03    <u>Consideration</u>.  Buyer agrees to pay to Seller the total of Twelve Million One Hundred and 00/100 Dollars ($12,100,000) (the "<u>Purchase Price</u>") in consideration for the sale of the Acquired Assets, subject to the adjustments and credits described herein.

2.04    <u>Good Faith Deposit</u>.  Within two (2) business days of the Execution Date, Buyer shall provide a good faith deposit of $605,000 in cash to Escrow Agent to be held pending Closing.  In the event Buyer is not the Prevailing Bidder at the Auction, Seller shall return the good faith deposit to Buyer within three business days of entry of the order approving the sale.

2.05    <u>Method of Payment</u>.  Buyer will pay the Purchase Price at Closing, less the Medicare Advance Payments, in immediately available funds. The Good Faith Deposit shall be applied to the Purchase Price.

10

2.06    <u>Allocation of the Purchase Price</u>.  The Purchase Price will be allocated in the manner set forth on Exhibit C, said allocation being mutually agreed upon by the parties.

2.07    <u>Excluded Assets</u>.  Notwithstanding anything herein to the contrary, Buyer will not acquire any interest in the Excluded Assets as a result of this transaction.

2.08    <u>Assumed Liabilities</u>.   Buyer will not assume or in any way be responsible for any of the debts, liabilities, or obligations of any kind or nature of Seller, other than as specifically set forth below(collectively, the "***Assumed Liabilities***").

(a)    Except as set forth herein, Buyer shall assume and be responsible for all Liabilities of Seller under the Assumed Executory Contracts, including any costs to cure any ongoing default under any Assumed Executory Contract (the "Cure Costs") in accordance with the Bidding Procedures. <u>Section 2.08(a)</u> of the Disclosure Schedules sets forth a correct and complete list of all Assumed Executory Contracts as of the date hereof, including any Cure Costs associated therewith. Therefore, Buyer shall only be obligated to pay Liabilities under contracts which Buyer has explicitly assumed pursuant to section 2.08(a) of this Agreement, which will be designated by Buyer, and detailed in section 2.08(a) of the Disclosure Schedules. If the Buyer indicates in the Disclosure Schedules that Buyer does not wish to assume a Cure Cost, it shall be deemed that Buyer does not assume the corresponding contract.  Notwithstanding the foregoing, Buyer shall not assume any Cure Costs related to any provider agreement (i.e., Medicare, Medicaid or any HMOs), which amount shall either be satisfied by Seller simultaneously with the Closing or credited at Closing against the Purchase Price.

(b)    All Liabilities of Seller with respect to the amount of accrued but unused paid time of (including any accrued sick time) for each employee as of the Closing Date (collecting, the "***Accrued PTO***") and the aggregate value of the Accrued PTO, as set forth on Schedule 2.08(b).  Seller shall provide Buyer, at least ten (10) days prior to the Closing Date, an updated version of Schedule 2.08(b) reflecting Accrued PTO amounts (and the value of those amounts).  Seller shall provide Buyer on the Closing Date with an updated version of Schedule 2.08(b) reflecting Accrued PTO amounts (and the value of those amounts) as of the Closing Date.  On the Closing Date, Buyer shall assume the Accrued PTO balances with respect to the transferred Employees and Buyer will, thereafter, be responsible for paying the Accrued PTO to the transferred Employees in accordance with the Buyer's applicable policies and procedures.

2.09    Without limiting the generality of the foregoing, Buyer will have no liability for any Excluded Liabilities or Excluded Assets.  Other than the Assumed Liabilities, Buyer shall not assume from Seller any Liabilities whatsoever, all of which shall be retained by the Seller and considered Excluded Liabilities including without limitation:

(a)    malpractice, professional liability or other tort claims, statutory or regulatory claims, claims of local, state or federal agencies whether civil or criminal, fraud-based claims or claims for breach of contract to the extent any such claims are based on acts or omissions of Seller or events occurring at the Facilities before the Closing Date;

(b)      any accounts payable, Taxes, or other obligation or Liabilities of Seller to pay money incurred by Seller for periods prior to the Closing Date;

(c)      any collective bargaining agreements or other agreements or understandings with any labor union or collective bargaining unit or any employment or consulting agreements of any kind and any Liabilities arising from any pension fund or benefits programs;

(d)      any administrative expense Claims accruing in the Chapter 11 Case;

(e)      Liabilities of Seller arising under or in connection with any Excluded Contract;

(f)      Liabilities of Seller arising under all employment and change of control contracts, severance obligations, equity option contracts and equity purchase contracts to which Seller is a party other than any Liability arising pursuant to any Assumed Contract;

(g)      Liabilities or obligations in connection with any indebtedness of Seller, except pursuant to any Assumed Contract or other Assumed Liability;

(h)      other than Cure Amounts related to the Assumed Contracts, all pre-petition and post-petition Claims as of the Closing Date, including, without limitation, all trade payables and general unsecured Claims;

(i)      any Liability arising out of, under or in connection with the Excluded Assets;

(j)      all Liabilities relating to (including amounts or notice due to) employees, former employees, consultants, former consultants or retirees of Seller based on the termination of such employment or engagement by the Seller, including any amounts due to such Persons prior to Closing;

(k)      any Liability that is not an Assumed Liability; and

(l)      other than Cure Amounts related to the Assumed Contracts, any other Liabilities arising in whole or in part from Seller's acts or omissions or in any way related to the operations of the Facility prior to the Effective Time.

2.10    Inspection / Due Diligence Period.  Buyer agrees that it has conducted sufficient due diligence to close the sale and purchase the Acquired Assets as is, where is, other than as otherwise agreed by Seller and Buyer.

2.11    Revisions to List of Assumed Executory Contracts. Subject to the terms of any controlling Bankruptcy Court order and the requirements of the Bankruptcy Code, Buyer may revise Schedule 2.08(a) at any time prior to the Bankruptcy Court's entry of the Sale Order, by giving notice to Seller; provided, however, that such revision shall not result in additional cost (including Cure Cost) to Seller., following entry by the Bankruptcy Court of the Sale Order.  Immediately upon Buyer's delivery of such written notice to Seller, Schedule 2.08(a), so revised, will define the scope of the Assumed Executory Contracts in all respects pursuant to this Agreement, including the scope of Assumed Liabilities, Assumed Executory Contracts, Excluded Liabilities, and Excluded Agreements, and Cure Costs.

2.12    Provider Agreements;

    (a)    Management Agreement.  The Buyer and Sellers shall enter into an ancillary agreement within five (5) Business Days of entry of the Sale Order to transfer management and operation of the Facilities, subject to Applicable Law (the "***Management Agreement***").  Pursuant to the Management Agreement, all economic risk and reward in relation to the operation of the Facilities transfers to the Buyer on the effective date of the Management Agreement.    The effective date of the Management Agreement shall be no later than two (2) weeks following the the Auction; *provided, however*, that the parties shall use good faith efforts to cause the Management Agreement to become effective as soon as feasible after the Auction.

    (b)    Interim Billing. (a) As of the Closing Date and to the extent permitted by Applicable Law, Seller shall transfer and assign to Buyer all of Seller's rights and interests in and to Seller's Medicare and Medicaid provider numbers and Medicare and Medicaid provider reimbursement agreements. The Parties acknowledge and agree that Buyer is not expected to have received its "tie in" notice from Centers for Medicare and Medicaid Services ("CMS") with respect to Seller's Medicare or Medicaid provider agreements or any new Medicare or Medicaid provider agreements (collectively, the "Provider Agreements") as of the Closing Date. Prior to Buyer's receipt of its tie in notice and Provider Agreements, so long as Buyer is accepting assignment of the Provider Agreements and is utilizing commercially reasonable efforts to become the certified Medicare and/or Medicaid provider, as applicable, at the Facility, Seller agrees that Buyer may bill for services performed following the Closing under Seller's Medicare and/or Medicaid provider number, as applicable, to the extent permitted by Applicable Law. (b) The Parties acknowledge and agree that Seller's managed care provider plans and agreements with other third-party payors are not expected to have been updated with Buyer's provider information as of the Closing Date. From and after the Closing Date until such managed care provider plans and agreements with other third-party payors are updated with Buyer's provider information, Seller agrees that Buyer may bill for services provided following the Closing under Seller's managed care provider plans and agreements with other third-party payors using Seller's provider information to the extent permitted by Applicable Law and the terms and conditions of the plans and agreements with the third party payors. (c) Any reimbursements from Medicare or Medicaid billed by Buyer for dates of service after the Closing Date which are paid into Seller's accounts shall be forwarded by Seller to Buyer.

## ARTICLE III
### REPRESENTATIONS AND WARRANTIES

3.01    Seller's Representations and Warranties.  Seller represents and warrants to Buyer as follows and agrees that each of the following will be true and correct on the Execution Date and the Closing Date.  This Section 3.01 contains the full and complete list of Seller's representations and warranties to Buyer.  Seller covenants as follows:

    (a)    Organization of Seller. Each Seller as listed in the preamble above is either a limited liability company or corporation duly organized and validly existing and in good standing under the laws of the State of Iowa.

13

(b)   Authority.  The execution and delivery of this Agreement and the Ancillary Agreements to which it is a party, and the consummation of the transactions herein contemplated have been duly and validly authorized by all necessary action on the part of Seller.  Subject to the Bankruptcy Court's entry of the Sale Order, this Agreement has been, and any Ancillary Agreements will be as of the Closing Date, duly executed and delivered by Seller, and do or will (as the case may be) constitute Seller's valid, legal, and binding obligation according to their terms.

(c)   Consents and Authority.  Except for the Bankruptcy Court's entry of the Sale Order, Seller has obtained all corporate approvals and membership consents necessary to consummate the transactions contemplated therein.

(d)   Title.  Seller has delivered to or made available for Buyer's review true, correct, and complete copies of the title abstracts for all real estate in which Seller has an interest.

(e)   Litigation and Compliance with Laws.  To Seller's Knowledge, Schedule 3.01(e) sets forth a complete and accurate description of any litigation, proceeding, claim or investigation threatened or pending before any court, arbitrator or administrative agency affecting or relating to Seller or Seller's operation of the Facilities.

(f)   Utilities.  To Seller's Knowledge, all water, gas, electricity, telephone, cable, drainage facilities, sewer and other utilities required for the operation of the Facilities either enter the Land through adjoining public streets or, if they pass through adjoining private land, they do so in accordance with recorded easements.

(g)   Tax Returns; Taxes.  Except as precluded by the Bankruptcy Code, Seller has filed all Tax Returns due as of the Execution Date of this Agreement and has or will pay all Taxes against the Facilities and/or Seller that relate to Seller's ownership and/or operation of the Facilities, or that could constitute an Encumbrance against the Facilities, if and when they are due and payable.

(h)   Non-Foreign Status.  Seller is not a foreign entity (as the term is defined in the Internal Revenue Code and Income Tax Regulations) and Seller agrees to execute a Certificate of Non-Foreign Status pursuant to Section 1445 of the Internal Revenue Code at Closing.

(i)   Broker's Fee.  Seller is solely responsible for satisfying any Claim relating to any broker or advisor with respect to the transactions this Agreement contemplates for a brokerage commission, consulting fee, finder's fee or similar payment.

(j)   Bulk Sales Law.  Seller has complied, or will comply, with any applicable bulk sales law requirements applicable to the sale of the Facilities, at its sole expense.

(k)   Environmental Matters.  To Seller's Knowledge, except as set forth on Schedule 3.01(t), the Facilities are in compliance with all federal, state and local environmental, health and safety laws, statutes ordinances and regulations, including all laws relating to Hazardous Materials, and wetlands.

14

(l)     Employee Plans.  Except as otherwise may be prohibited by law, Seller has delivered to or made available for Buyer's review true, correct, and complete copies of Seller's Employee Plans.

(m)     Fraud and Abuse.  Except as set forth on Schedule 3.01(t), to Seller's Knowledge, Seller has not engaged in any activities that are prohibited under 42 U.S.C. §1320a-7b or 42 U.S.C. 1395, or the regulations promulgated thereunder, or any applicable related Law, or that are prohibited by rules of professional conduct, including the following:  (a) knowingly and willfully making or causing to be made a false statement or representation of a material fact in any application for any benefit or payment; (b) knowingly and willfully making or causing to be made any false statement or representation of a material fact for use in determining rights to any benefit or payment; (c) any failure by a claimant to disclose knowledge of the occurrence of any event affecting the initial or continued right to any benefit or payment on its own behalf or on behalf of another, with the intent to fraudulently secure such benefit or payment; and (d) knowingly and willfully soliciting or receiving any remuneration (including any kickback, bribe or rebate) directly or indirectly, overtly or covertly, in cash or in kind, or offering to pay or receive such remuneration (i) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part by Medicare or Medicaid, or (ii) in return for purchasing, leasing or ordering or arranging for, or recommending, purchasing, leasing or ordering any good, facility, service or item for which payment may be made in whole or in part by Medicare or Medicaid. Seller is not and at no time has been suspended or excluded from participation in any federally funded health care program, including Medicare or Medicaid.

(n)     Insurance Policies.  Seller has delivered to or made available for Buyer's review true, correct, and complete copies of Seller's policies of insurance applicable to Seller, and the Facilities, including medical malpractice insurance covering all physicians and other professional personnel Seller has engaged or employed, general liability insurance, property insurance, employer's liability and workers' compensation insurance.

(o)     Certificates of Need.  Seller has delivered to or made available for Buyer's review true, correct, and complete copies of Seller's certificates of need; (ii) letters of non-reviewability; or (iii) other exemptions from certificate of need review, that Seller holds or uses in the operation of the Business.  Schedule 3.01(o) sets forth a true, correct, and complete list of all such documents.

(p)     Medical Staff. Seller has delivered to or made available for Buyer's review true, and complete copies of Seller's (i) medical staff privilege and membership application forms; (ii) delineation of privilege forms; current medical staff bylaws, rules and regulations, and amendments thereto; (iii) credentials and appeals procedures not incorporated in any of the foregoing; and (iv) contracts with physicians, physician groups, or other members of the medical staff of the Facilities.

(q)     Hill-Burton and Other Liens.  Seller has not received any loans, grants, or loan guaranties pursuant to the United States Hill-Burton Act (42 U.S.C. § 291a, *et seq*.) program, the

15

Health Professions Educational Assistance Act, the Nurse Training Act, the National Health Pharmacy and Resources Development Act, or the Community Mental Health Centers Act. To Seller's Knowledge, none of the Acquired Assets are subject to any liability in respect of amounts received by Seller or others for the purchase of the Acquired Assets (or any part thereof) under restricted or conditioned grants or donations, including monies received under the Public Health Services Act (42 U.S.C. § 291, *et seq.*).

(r)   <u>Experimental Procedures</u>. Neither Seller, nor any officers, employees or agents of Seller, have performed or permitted to be performed, nor do they have Knowledge of the performance of, any experimental procedures involving patients/residents in the Facilities.

(s)   <u>Permits</u>. Except as set forth on Schedule 3.01(s), the Facilities are duly licensed in accordance with the Laws of the State of Iowa, DOH and all other ancillary departments or services located at or operated for the benefit of, the Facilities that are required to be separately licensed are duly licensed by the appropriate Governmental Authority. To the Knowledge of Seller, Seller has all Permits which are needed or required by Law to operate its business related to or affecting the Facilities or any ancillary services related thereto as currently conducted. <u>Schedule 3.01(s)</u> is a true, complete and accurate list all material Permits owned or held by or issued to Seller relating to the ownership or operation of the Facilities or the Acquired Assets and such Permits constitute all material Permits necessary for the conduct of the Business and operation of the Facilities as currently conducted and for the ownership of the Facilities by Seller and operation and use of the Acquired Assets by Seller, all of which are in full force and effect.

(t)   <u>Compliance</u>. Except as set forth on <u>Schedule 3.01(t)</u>, or to the extent such failure would not constitute a Material Adverse Effect, to the Knowledge of Seller, Seller is complying in all material respects with all applicable statutes, rules, regulations, and requirements of each Governmental Authority having jurisdiction over the Seller, the operations of the Facilities and the Acquired Assets.

(u)   <u>Licensed Beds and Current Rate Schedule</u>. <u>Schedule 3.01(u)</u> sets forth a true, correct and complete statement, as of three (3) Business Days prior to the Execution Date, of: (i) the number and type of licensed beds at the Facilities, and (ii) the number of beds then occupied in, and the occupancy percentages at, the Facilities.

(v)   <u>Prohibited Practices</u>. Except as set forth on Schedule 3.01(t), during the eighteen (18) month period prior to the Execution Date, no officers or directors of Seller have, during their period of engagement with Seller, been charged with, convicted of or pleaded guilty to crimes of theft or dishonesty, financial misconduct, or offenses related to the delivery of health care services, nor, to Seller's Knowledge, have any of Seller's current officers or directors been excluded from participation in Medicare, Medicaid or any other state or federal government reimbursement program. To Seller's Knowledge, during the eighteen (18) month period prior to the Execution Date, none of Seller's officers, directors or employees has engaged in any conduct that may result in sanctions to Seller under any federal or state laws.

16

(w)   <u>Government Investigations</u>.   Except as set forth on Schedule 3.01(t), other than for routine state and federal inspections or surveys performed by DOH, during the eighteen (18) month period prior to the Closing Date, Seller has received no written notice of the commencement of any investigation proceedings or any governmental investigation or action (including any civil investigative demand or subpoena) under Laws.

(x)   <u>Cost Reports.</u>   Seller has filed all cost reports required to be filed for the Facilities as of the Closing Date under Law.  Seller has furnished Buyer with copies of all cost reports filed by Seller with the appropriate State agency, the appropriate Medicare and Medicaid agencies and/or fiscal intermediaries in respect of the operation of the Facilities for the years ended December 31 2020 and 2019, and to Seller's Knowledge, such cost reports did not contain any material disallowable costs or expenses or any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not misleading, and, to Seller's Knowledge, such cost reports have been prepared in all material respects in accordance and compliance with all applicable government rules and regulations.

(y)   <u>Financial Information</u>.

(i)      Schedule 3.01(y) hereto contains the following financial statements and financial information (collectively, the "***Historical Financial Information***"):

unaudited financial statements consisting of the balance sheet of the Business as of December 31, 2021, and the related statements of income and net surplus/deficit, and cash flow for the 12-month period ended on December 31, 2020 (the "***Unaudited Financial Information***").

(ii)      The Unaudited Financial Information included in the Historical Financial Information has been prepared consistent with past practice and may not include required footnote disclosures or reflect normal year-end adjustments.  Seller has not changed in any material respects any accounting policy or methodology in calculating reserves, including reserves for uncollected accounts receivable, throughout all periods presented in the Historical Financial Information.

(z)   <u>Real Property</u>.

(a)      Schedule 3.01(z) contains an accurate and complete legal description, street address and tax parcel identification number for the Land.  Seller holds good and indefeasible fee simple title to all the Land and shall convey the Land in accordance with the Sale Order free and clear of all Liens (other than the Permitted Liens).  Seller is not a lessee of any portion of the Land.  Seller agrees that title to the Land shall not be altered between the Execution Date and Closing. Except as set forth on <u>Schedule 3.01(z)</u>, other than the right of Buyer pursuant to this Agreement, there are no outstanding agreements, options, rights of first offer, rights of first refusal, or any other grant to third party to sell, purchase, lease, sublease, use, occupy, or enjoy the Land or any portion thereof or interest therein.

17

(b)      Except as set forth on Schedule 3.01(t), Seller has not received written notice from any Governmental Authority of (and otherwise has no Knowledge of): (i) any pending or threatened condemnation proceedings affecting the Land, or any part thereof; (ii) any written notice asserting or alleging any material violations or potential violations of any Laws (including zoning and land use ordinances, building codes and similar requirements) with respect to the Land, or any part thereof, which have not heretofore been cured; or (iii) any pending or threatened proceedings, nor any claims or actions against Seller or the Land, relating to the ownership, lease, use or occupancy of such Land or any portion thereof which is reasonably likely to result in a material change in the condition of the Land or the ownership or operation of the Land.  Seller has not received any written notice of any pending zoning or other land use change affecting the real property.

(c)      Neither Seller nor, to Seller's Knowledge, any other person is in violation of a condition or agreement contained in any easement, restrictive covenant or any similar instrument or agreement affecting any of the Land in any material respect.

(d)      To Seller's Knowledge, except as set forth on Schedule 3.01(z), the Land is zoned for its current use and there are no waivers or variances granted by any Governmental Authority which, as a result of the transactions contemplated in this Agreement, will be withdrawn or abrogated, including but not limited to life safety code waivers.

3.02    Buyer's Representations and Warranties. Buyer makes the following representations and warranties to Seller, which will be true and correct as of the date made and the Closing Date:

(a) Organization of Buyer. Buyer is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of New Jersey and as of the Closing will be licensed to do business in the State of Iowa.

(b) Authority.  The execution and delivery of this Agreement and the consummation of the transactions herein contemplated have been duly and validly authorized by all necessary corporate action on the part of Buyer, and this Agreement constitutes, and the documents contemplated hereby will be, Buyer's valid and legally binding obligations, enforceable according to their terms.

(c) Conflict or Default. Neither the execution nor delivery of this Agreement, nor the consummation of the transactions herein contemplated will conflict with, violate, result in a breach by, constitute a default under or accelerate the performance provided by the terms of any Law or agreement to which Buyer may be subject.

3.03    Full Disclosure.  To their Knowledge, no representation or warranty by Seller or Buyer, and no statement, document, financial statement, certificate or other instrument, schedule or exhibit furnished or to be furnished hereunder or in connection with the transactions

18

contemplated hereby (including all exhibits and schedules hereto) contains or will contain any untrue or misleading statement of fact or omit to state or contain anything necessary to make such matter correct, complete and not misleading in all respects and to fairly present the information set forth in a manner that is not misleading.

## ARTICLE IV
### TITLE AND SURVEY

4.01    <u>Title Report and Policy</u>.  Promptly after the Execution Date, Seller will use good faith efforts to deliver for Buyer's review true, correct, and complete copies of all abstracts of title to the Land.  If the abstracts are not available, Buyer shall promptly order, or shall order a title commitment from the Escrow Agent.  An abstract for any parcel of Land purchased will become the property of Buyer when Buyer pays the Purchase Price in full. Seller will pay the cost of any additional abstracting title work due to any act or omission of Seller.  Buyer may elect to obtain a title insurance policy in lieu of an attorney's opinion at Buyer's expense.  Any objections to the title commitment Buyer identifies will be treated in the same manner as title objections in the attorney's title opinion.  Buyer shall have the right to object to anything material shown in the abstract (or title commitment) and survey, other than matters set forth in (3) through (6) below, by written notice ("<u>Buyer Objection Letter</u>") to Seller with five (5) business days of receipt of both the abstract (or title) and survey (the "<u>Unpermitted Exceptions</u>"). Seller shall identify whether or not it is willing or capable of correcting within ten (10) business days of receipt of the objection letter.  If Seller determines not to remove or correct such Unpermitted Exceptions, then Buyer may elect upon written notice to Seller made within three (3) Business Days after Buyer's receipt of the Seller objection response: (i) to terminate this Agreement as to that specific Facility or Land by written notice to Seller, in which event the Deposit shall be refunded to Buyer and neither party shall have any further liability to any other party under Agreement, except as otherwise provided in this Agreement; or (ii) to take the Property subject to such Unpermitted Exceptions, without adjustment to the Purchase Price, in which case such Unpermitted Exceptions shall become Permitted Exceptions.  Any objection by the Buyer to something material in an abstract or survey shall only apply as a right to terminate the Agreement as to the Land subject to such abstract or survey and Buyer shall not have the right to terminate the entire Transaction. As used herein, "<u>Permitted Exceptions</u>" means: (1) all restrictions, reservations, covenants and easements of record, if any, to which Buyer fails to object in its Buyer Objection Letter; (2) all matters disclosed on the Survey to which Buyer fails to object in its Buyer Objection Letter; (3) all current period Taxes not yet due and payable; (4) any covenants, conditions, or restrictions, or applicable Laws or other governmental regulations, governing or limiting the use of the property, in each case that are not violated by the existing improvements or the current use thereof; (5) any utility or other easements that would qualify under the foregoing clause and which further do not underlay any of the existing improvements on the Property; and (6) liens created by, through, or under Buyer.

4.02    <u>Survey</u>.  Seller has delivered to or made available for Buyer's review any surveys of Land in its possession.  Prior to Closing, Buyer may at its expense obtain a survey of the Land, or update an existing survey at Buyer's expense.

# ARTICLE V
## CONDITIONS

5.01   <u>Conditions to Buyer's Obligations</u>.   Buyer's obligations under this Agreement are conditioned upon the following (which Buyer may waive, in whole or in part, in writing):

(a)   <u>Performance of Covenants</u>.   Seller has, in all material respects, timely performed all covenants and obligations, and timely complied with all conditions required of Seller by this Agreement.

(b)   <u>Representations and Warranties</u>.   All of Seller's representations and warranties are true, complete and correct, in all material respects, on the Execution Date and as of the Closing Date as if made at that time (other than the representations and warranties that by their terms address matters only as of another specified date, which shall be so true, complete and correct, in all material respects, only as of such other specified date), except where the failure of such representations and warranties to be true, complete and correct, in all material respects, had not had, and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(c)   <u>Closing Documents</u>.   At the Closing, Seller will deliver or cause to be delivered each of the items required of it as specified in <u>Section 8.02</u> of this Agreement.

(d)   <u>Litigation</u>.   Following the Execution Date, no notice has been received as to litigation commenced or Claim made or threatened against any Person, by any other Person with regard to this Agreement, or the transactions provided for in this Agreement that, if successfully prosecuted, would have a Material Adverse Effect on Buyer.

(e)   <u>Sale Approval Motion</u>.   Seller shall have filed a motion with the Bankruptcy Court seeking entry of the Sale Order, in form and substance satisfactory to Buyer (the "<u>Sale Approval Motion</u>").

(f)   <u>Auction</u>.   Seller shall have conducted an auction sale (the "***Auction***") of the Acquired Assets in accordance with the Bidding Procedures approved by the Bankruptcy Court in the Bidding Procedures Order no later than the Auction (or such later date for which notice is provided in the Bidding Procedures Order or as Seller and Buyer may otherwise mutually agree), and Buyer's offer shall have been accepted by Seller as the highest or best offer for the Acquired Assets at the conclusion of the Auction.

(g)   <u>Consent</u>.   All certifications, consents, waivers, approvals, authorizations, Government Authorizations and determinations from and by third parties necessary legally to consummate the transactions contemplated herein have been obtained.

(h)   <u>Title Policy</u>.   If applicable, any title insurance policy described in <u>Article IV</u> of this Agreement has been issued.

(i)   <u>Condition of Acquired Assets</u>.   Following the Execution Date, there has been no material adverse damage to the Facilities.

20

(j)    <u>Subsequent Events</u>.  Except as set forth on Schedule 3.01(t) and Schedule 3.01(e), no action, investigation, Claim or proceeding has been instituted or threatened, or other matters occurred, that involve the likelihood of a Material Adverse Effect on the Business or the Facilities, and no action, investigation or proceeding has been instituted or threatened before any court or Governmental Authority to restrain or prohibit, or to obtain substantial damages in respect of, this Agreement, or the consummation of the transactions herein contemplated.

(k)    <u>Other Deliveries</u>.  Seller has delivered other items and deliveries relating to the Facilities as Buyer reasonably requests.

(l)    <u>Licenses</u>.  The Sale Order shall include approval of the Management Agreement to allow Buyer to operate the Facilities until it has obtained all of the licenses required to operate the Facilities from the DOH.

(m)    <u>Compliance</u>.  No Facility shall be Out of Compliance, except as set forth on Schedule 3.01(t).

(n)    <u>Material Adverse Effect</u>.  There will have occurred following the date hereof no events nor will there exist circumstances which singly or in the aggregate have resulted in a Material Adverse Effect, provided, however, closure of one facility, including, without limitation, loss of license or provider agreement, shall be considered a Material Adverse Effect only with respect to that one respective facility and shall not be deemed a Material Adverse Effect to the entire Transaction.  Such Material Adverse Effect involving a particular facility shall result in a corresponding Purchase Price adjustment in an amount equal to the corresponding amount on Schedule 5.01(o).

(o)    <u>Sale Order</u>. The Bankruptcy Court has entered the Sale Order and as of Closing, such Sale Order remains in full force and effect.

5.02    <u>Conditions to Seller's Obligations</u>.    Seller's obligations under this Agreement are conditioned upon the following (which Seller may waive, in whole or in part, in writing):

(a)    <u>Performance of Covenants</u>.  Buyer has timely performed all covenants and obligations, and timely complied with all conditions this Agreement require of Buyer in all material respects, including paying the Purchase Price to Seller.

(b)    <u>Representations and Warranties</u>.  All of Buyer's representations and warranties contained herein are true, complete and correct in all material respects on the Execution Date and as of the Closing Date, as if made at that time.

(c)    <u>Conveyances</u>. Buyer and Seller have received all third party certifications, covenants, waivers, approvals, authorizations, Government Authorizations and determinations necessary to legally consummate the transactions contemplated herein.

(d)    <u>Payment of Purchase Price</u>. Buyer has delivered the Purchase Price by wire transfer of immediately available funds.

21

(e) <u>Other Deliveries</u>.  Buyer has delivered other items and deliveries relating to the Facility as Seller reasonably requests.

(f) <u>Sale Order</u>. The Bankruptcy Court has entered the Sale Order and as of Closing, such Sale Order remains in full force and effect.

**ARTICLE VI**
TERMINATION

6.01    <u>Termination</u>.  This Agreement may be terminated as follows:

(a)    At any time by the mutual written agreement of the Seller and the Buyer;

(b)    Automatically, upon the consummation of any Acquisition Transaction between the Seller and a party other than the Buyer;

(c)    By the Buyer, at its sole election, in the event that the Closing shall not have occurred prior to 120 days from entry of the Sale Order, subject to change of ownership approval by the regulatory agencies (the "**_Outside Date_**"); provided that the Buyer shall not be entitled to terminate this Agreement pursuant to this <u>Section 6.01</u>  if the failure of the Closing to occur on or prior to such date results primarily from the Buyer itself materially breaching any representation, warranty or covenant contained in this Agreement;

(d)    By the Seller, at its sole election, in the event that the Closing shall not have occurred on or before the Outside Date; provided that the Seller shall not be entitled to terminate this Agreement pursuant to this <u>Section 6.01(d)</u> if the failure of the Closing to occur on or prior to such date results primarily from the Seller materially breaching any representation, warranty or covenant contained in this Agreement;

(e)    By the Buyer, at its sole election, in the event of a material breach of this Agreement by the Seller that has not been cured within ten (10) Business Days after written notice to the Seller, or if any representation or warranty of the Seller shall have become untrue in any material respect, in either case such that such breach or untruth is incapable of being cured, by the Outside Date.  Buyer shall not have a right to terminate under this section if Buyer is in material breach or any of its representations and/or warranties are untrue such that satisfaction of conditions to close under section 5.01 would be prevented;

(f)    By the Seller, at its sole election, in the event of a material breach of this Agreement by the Buyer that has not been cured within ten (10) Business Days after written notice to the Buyer, or if any representation or warranty of the Buyer shall have become untrue in any material respect, in either case such that such breach or untruth is incapable of being cured, by the Outside Date.  Seller shall not have a right to terminate under this section if Seller is in material breach or any of its representations and/or warranties are untrue such that satisfaction of conditions to close under section 5.02 would be prevented;

(g)    By the Buyer, at its sole election, upon the granting of any motion for relief from the automatic stay which would have a Material Adverse Effect, the conversion of the Case to a case under Chapter 7 of the Bankruptcy Code, the dismissal of the Case, the filing of any

22

plan of reorganization by any party in interest that does not incorporate this Agreement, the filing of any motion by a party in interest in the Case to liquidate the Acquired Assets or any similar commencement of liquidation proceedings relating to the Seller, other than as contemplated herein, which is not dismissed within thirty (30) days, or upon the commencement of any similar actions or proceedings in or by any foreign court with respect to the Seller, which are not dismissed within thirty (30) days;

(h)    By the Buyer, at its sole election, if any of the conditions set forth in Section 5.01 shall not have been, or the facts and circumstances are such that any of such conditions cannot be, fulfilled by the Outside Date, unless such failure shall be primarily due to the failure of Buyer to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing;

(i)    By the Seller, at its sole election, if any of the conditions set forth in Section 5.02 shall not have been, or the facts and circumstances are such that any of such conditions cannot be, fulfilled by the Outside Date, unless such failure shall be primarily due to the failure of Seller to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing;

(j)    By the Buyer, upon entry by the Bankruptcy Court of any Order, or any other Governmental Authority of any Governmental Order, that is inconsistent in any material respect with the proposed Sale Order or, upon entry, with the Sale Order;

(k)    By the Buyer, if there shall be any Law that makes consummation of the transactions contemplated by this Agreement or any other Transaction Document illegal or otherwise prohibited;

(l)    By the Seller, if there shall be any Law that makes consummation of the transactions contemplated by this Agreement or any other Transaction Document illegal or otherwise prohibited; or

(m)    By the Buyer, if any Governmental Authority shall have issued a Governmental Order restraining or enjoining the transactions contemplated by this Agreement or any other Transaction Document, and such Governmental Order shall have become final and non-appealable; or

(n)    By the Seller, if any Governmental Authority shall have issued a Governmental Order restraining or enjoining the transactions contemplated by this Agreement or any other Transaction Document, and such Governmental Order shall have become final and non-appealable.

6.02    Effect of Termination.

(a)    In the event of the termination of this Agreement in accordance with this Article VI, this Agreement shall immediately become void and there shall be no liability on the part of any party hereto except (a) confidentiality obligations; (b) as set forth in this Article VI, Section 6.02, Article XII, and Article XIII; (c) any obligations for material breach of this Agreement occurring prior to such termination; and (d) that nothing herein shall

23

relieve any party hereto from liability for any willful breach of any provision hereof (which, for the avoidance of doubt, will be deemed to include any failure by Buyer to consummate the Closing if and when it is obligated to do so hereunder with no outstanding breach or unsatisfied closing condition by Seller).

(b)    Breach by Buyer. In the event of termination of this Agreement pursuant to Section 6.01(f) due to a breach by Buyer, Sellers shall be entitled to retain the Deposit as liquidated damages.

(c)    Deposit.

(i)    In the event of a valid termination of this Agreement pursuant to Section 6.01(f) due to a breach by Buyer, Sellers shall be entitled to receive the Deposit. In the event of such termination, the Parties shall direct the Escrow Agent to pay the Deposit to Sellers. The Sellers' receipt of the Deposit pursuant to this Section 6.02(c) is the only remedy available and will be liquidated damages.

(b)    In the event of termination of this Agreement pursuant to Section 6.01 (except pursuant to Section 6.01(f)), the Parties shall direct the Escrow Agent to promptly return the Deposit to Buyer.

6.03    Procedure Upon Termination.  In the event of termination by Buyer or Seller, or both, pursuant to Section 6.01, notice thereof shall forthwith be given to the other party.  If this Agreement is terminated as provided herein, each party shall redeliver all documents, work papers and other material of any other party relating to the transactions contemplated by this Agreement, whether so obtained before or after the execution hereof, to the party furnishing the same as soon as reasonably practicable following termination.

## ARTICLE VII
## BANKRUPTCY COURT APPROVAL OF THE BUYER

7.01    Motions and Notices Regarding Sale of Assets and Assumption and Assignment of Assumed Executory Contracts

(a) Seller shall seek prompt entry of the Sale Order pursuant to the Sale Motion after sufficient notice has been given, which Sale Order shall include, among other things, findings of fact and conclusions of law that the Buyer is not a successor-in-interest to the Seller or any Affiliate of Seller and that the Buyer is a good faith purchaser pursuant to Bankruptcy Code section 363(m).

(b) The Seller covenants that, to the extent that it has not done so prior to the date of this Agreement, they shall promptly serve the third parties who are parties to Assumed Executory Contracts (such third parties being "*Cure Obligees*") with written notice of proposed cures on the Assumed Executory Contracts (such notice being the "*Cure Notice*"), which Cure Notice shall be provided to the Buyer within the time periods

provided by the Bidding Procedures Order. The Cure Notice shall, as set forth in the Bidding Procedures Order, establish a deadline reasonably in advance of the Closing Date by which Cure Obligees must object to respective proposed cures or be deemed to have waived any such objection.

7.02    Requests for Information.  From the date of the approval of the Bidding Procedures Order (a) if the Seller supplies any information regarding the Business to a potential bidder not heretofore given to the Buyer, the Seller shall further provide the Buyer with a copy of such information within 24 hours of providing that information to any other potential bidder; and (b) with respect to any bid, term sheet, or written expression of interest by any other party for any asset or assets of any Seller, or any other reorganization proposal, submitted prior to the bid deadline established in the Bidding Procedures Order, the Seller shall provide the Buyer with prompt notice of such proposal.

7.04    Defense of Orders.  The Seller, at its sole cost and expense, shall diligently defend the Bidding Procedures Order and the Sale Order in the event that any motion for reconsideration or appeal of such Orders is filed.

### ARTICLE VIII
CLOSING

8.01    Closing.

(a) Subject to satisfaction of the terms and conditions of this Agreement, including those set forth in Article V, the consummation of the transactions this Agreement contemplate (the "***Closing***") will occur on a date (the "***Closing Date***") not later than the first day of the first month after not less than five (5) Business Days after the satisfaction or waiver of all conditions in Article V, or on such other date as Buyer and Seller mutually agree; provided, however, that the Closing Date shall not be required to occur prior to seventy-five (75) days after the entry of the Sale Order, but the Buyer may elect to the Closing at any point prior.

(b)    The Closing shall be held at a location and on a date and at a time mutually agreed upon by Seller and Buyer, but absent such agreement shall be held at a time and place in Des Moines, Iowa, designated by Buyer in writing to Seller, unless mutually agreed-upon that the closing shall occur by mail or electronic mail by delivery of the closing items. Notwithstanding the foregoing time and place of Closing, Seller and Buyer may deliver all of their respective closing documents required hereunder with respect to the Closing on or before the Closing Date (to hold in escrow in accordance with customary conveyancing practices subject to the consummation of the Closing) by mail, electronic mail, or overnight courier.

8.02    Seller's Closing Documents.  Seller will deliver to Buyer the following documents at Closing in form and substance acceptable to Buyer:

(a) <u>Warranty Deed</u>.  A general warranty deed conveying to Buyer title to the purchased Land and Improvements in fee simple, free and clear of all Liens and Encumbrances, except Permitted Encumbrances.

(b) <u>Bills of Sale</u>.  One or more Bills of Sale containing general warranty of title conveying to Buyer the purchased Equipment, the Intangible Personal Property, the Records, and all components of the Facilities that constitute personalty, free and clear of all Liens and Encumbrances.

(c) <u>Records</u>.  Originals of all Records in the possession of Seller; *provided, however*, that Seller shall retain copies of such records as may be necessary to administer Excluded Assets and otherwise administer the bankruptcy estate until such time as it can be closed.

(d) <u>Title Policy</u>.  If applicable, the title policy described in <u>Section 4.01</u> of this Agreement.

(e) <u>Closing Certificate</u>. A Seller's closing certificate reaffirming Seller's representations and warranties hereunder.

(f) <u>Other Documents</u>. Other documents as Buyer reasonably requests to accomplish the transactions this Agreement contemplates, or to evidence Seller's compliance with its covenants and agreements in this Agreement.

8.03   <u>Closing Costs</u>.  Seller has or will pay (i) the cost of preparing the Warranty Deed,  (ii) the cost of the title abstract or title insurance provided herein, and (iii) the fees of its counsel. Buyer will pay (x) the cost of the Survey, (ii) the cost of any environmental site assessment, (y) the per page recording costs associated with recording the warranty deed, and (z) the fees of its counsel.  All security deposits referenced in any Assumed Lease shall be credited to Buyer at Closing.  The rent payable under any Assumed Lease shall be prorated as of the Closing Date.

8.04   <u>Prorations</u>.  The parties agree to the following prorations:

(a) <u>Accounts Receivable</u>.  Except as otherwise set forth in this Agreement, Accounts Receivable generated by transactions or business operations occurring prior to the Closing Date (or such earlier date as Buyer may assume responsibility for operations and costs under a transition services agreement or operations lease) shall remain Seller's property. Buyer and Seller may arrange for Buyer to collect such Accounts Receivable pursuant to the terms of a mutually agreed-upon ancillary agreement

(b) <u>Accounts Payable</u>.  Except as otherwise set forth in this Agreement (including within the definition of Assumed Liabilities), Seller will be solely responsible for all accounts payable resulting from the ownership and/or operation of the Facilities prior to Closing (or such earlier date as Buyer may assume responsibility for operations and costs under the Management Agreement). Buyer will be solely responsible for all accounts payable resulting from the ownership and/or operation of the Facilities after Closing Date (or such earlier date under the Management Agreement) or the assumption of the Assumed Liabilities.

26

8.05   <u>Adjustments to the Purchase Price</u>.  The following adjustments will be made at Closing, as of 11:59 p.m. on the day preceding the Closing Date, and will be added to the Purchase Price or credited against the Buyer's payment obligations at Closing, as the case may be.

(a)   <u>Taxes</u>.  Real property Taxes, real and personal ad valorem Taxes, and similar charges will be prorated as of the Closing Date in the manner customary for real estate transaction in Iowa.  Because real property Taxes are paid in arrears, the portion of the Taxes allocable to Seller will be credited to Buyer on the closing statement.

(b)   <u>Special Assessments</u>.  Seller will pay in full all improvement lien assessments, if any, whether or not due and payable as of the Closing Date. Special assessments, whether pending or to become a lien prior to Closing, or payable in installments, or for which a change of assessment may be levied on Buyer after Closing, will be credited to Buyer in full at Closing.

(c)   All expenses arising from the conduct of the business of the Facility in the ordinary course, including, without limitation trade payables, telephone expenses and utility charges attributable to the Facility, including any such items held in escrow (all such income and expenses to be referred to herein as the "***Prorated Items***"), shall be apportioned between Seller and Buyer as of the Closing Date, it being the agreement of the Parties that Seller shall be entitled to and responsible for all expenses and similar obligations arising from the operation of the Facilities prior to the Closing Date and Buyer shall be entitled to and responsible for all expenses and similar obligations arising from the operation of the Facilities from and after the Closing Date, except, in each case, as otherwise expressly set forth herein.  All such prorations shall be made based on actual days elapsed in the relevant accounting, billing or revenue period. Utility charges which are not metered and read for the Closing shall be estimated based on prior charges.  Based on reasonable estimates, the Parties shall make all prorations at the Closing, and all such prorations shall be effectuated through adjustment of the Purchase Price at Closing.

**ARTICLE IX**
CASUALTY; RISK OF LOSS


9.01   <u>Casualty</u>.    In the event of a casualty causing substantial damage to the Facilities before the date of possession, Buyer may (at its option) rescind this Agreement, or may proceed to Closing and receive any insurance proceeds associated with such casualty.

9.02   <u>Risk of Loss Generally</u>.  Except as otherwise specifically provided above or as otherwise agreed by Buyer and Seller in any Ancillary Agreement, risk of loss from the Facilities, including by operation of any law that would impose liability relating to ownership of the Facilities, will not pass to Buyer until acceptance of the deed.

**ARTICLE X**
ADDITIONAL COVENANTS

27

10.01   <u>Cost Reports</u>. Seller will file or cause to be filed all cost reports required to be filed with CMS prior to the Closing Date (or such earlier date as Buyer may assume responsibility for operations and costs under a transition services agreement or operations lease). Buyer will file or cause to be filed all cost reports required to be filed on or after the Closing Date (or such earlier date as Buyer may assume responsibility for operations and costs under a transition services agreement or operations lease).

10.02   <u>Conduct of Business</u>. From the Execution Date through the Closing Date (or such earlier date as Buyer may assume responsibility for operations and costs under a transition services agreement or operations lease), Seller will, except as expressly provided herein or as otherwise agreed by Buyer and Seller in an Ancillary Agreement, or as the Bankruptcy Code prohibits, maintain and conduct its business in the ordinary course of business.

10.03   <u>Employees</u>.  Buyer and Seller shall consult in good faith about the status of employment of Seller's employees following the Execution Date and prior to the Closing Date.  In the absence of any direction from Buyer, prior to or as of the Closing Date, Seller may terminate any of Seller's employees.  Seller assumes all obligations under the federal WARN Act and any analogous provision of applicable state law with regard to all terminated employees, to the extent the WARN Act or such state law applies. Buyer may offer employment to some or all of Seller's employees, but has no obligation to offer employment to any employee of Seller. Buyer has no obligation whatsoever to any person whom Seller currently, or has previously, employed unless Buyer employs that person after the Closing Date.

10.04   <u>COBRA Coverage</u>. Seller will be responsible for offering and providing any COBRA Coverage with respect to any "qualified beneficiary" who is covered by an Employee Plan that is a "group health plan" and who experiences a "qualifying event" prior to the Closing Date.  Buyer will be responsible for offering and providing any COBRA Coverage required with respect to any Seller employee (or other qualified beneficiary) hired by Buyer who becomes covered by a group health plan sponsored or contributed to by Buyer, and who experiences a qualifying event after the Closing Date. For purposes of this Section 8.03(b), "qualified beneficiary," "group health plan," and "qualifying event" each have the meaning set forth in Section 4980B of the Code.

10.05   <u>Employee Information</u>. To the extent not prohibited by applicable law, Seller will provide Buyer all information relating to any employee that Buyer may, for potential employment purposes, reasonably request, including personnel files, initial employment dates, employee health files, licenses, professional certifications, Form I-9, termination dates, reemployment dates, hours of service, and compensation and tax withholding history.

10.06   <u>Employee Plans</u>. Seller shall be responsible for providing all information, forms, and other administrative assistance and materials required of a plan administrator with respect to all Employee Plans for its employees that are terminated in connection with the sale of the Acquired Assets.

10.07   <u>Taxes; Expenses</u>. Buyer will pay all Taxes (other than income Taxes) or recording fees payable as a result of the sale of the Acquired Assets pursuant to this Agreement or any

28

other action contemplated hereby, including fees paid to the Iowa Attorney General, the U.S. Attorney General, and any other governmental agency. The parties will cooperate in preparing, executing, and filing all returns, questionnaires, applications, and other documents regarding Taxes and all transfer, recording, registration and other fees that become payable in connection with the transactions that this Agreement contemplates that are required or permitted to be filed at or prior to Closing.

10.08   Transfer of Resident Trust Funds and Deposits.

    (a)    Within five (5) Business Days of the Closing Date, Seller shall deliver to Buyer a true, correct and complete schedule of all trust funds held by Seller as of the most recent date available prior to the Closing Date for any current resident of the Facilities (collectively, the "***Resident Trust Funds***") and deposits or prepayments paid by or for any resident of the Facilities (collectively, the "***Resident Deposits***").

    (b)    At the Closing, Seller shall transfer the Resident Trust Funds and Resident Deposits to Buyer, and Buyer shall accept, the Resident Trust Funds and Resident Deposits in trust for the residents, in accordance with applicable statutory and regulatory requirements. Within ten (10) Business Days after the Closing Date, Seller and Buyer shall prepare a final schedule of the Resident Trust Funds and Resident Deposits and thereafter reconcile the Resident Trust Funds and Resident Deposits transferred from Seller to Buyer.

**ARTICLE XI**
**NO SURVIVAL; NO INDEMNIFICATION**

The covenants, obligations, representations and warranties of Buyer and Seller contained in this Agreement, any exhibit or schedule hereto, or any certificate or document delivered pursuant hereto shall not survive beyond the Closing. Neither party shall have any liability to the other after Closing for any breach thereof. Buyer agrees that it is purchasing the Acquired Assets as is, where is. Notwithstanding this provision, the parties may agree to limited survival and related indemnification rights for obligations that remain uncompleted as of the Closing Date in an Ancillary Agreement.

**ARTICLE XII**
**REMEDIES FOR FAILURE TO CLOSE**

12.01   Attorneys' Fees.  In the event either party brings a lawsuit or other proceeding against the other party to enforce any provisions of this Agreement or any instrument executed pursuant to this Agreement, the prevailing party will be paid all costs and reasonable attorney's fees by the other party, such costs and reasonable attorney's fees will be included in any such judgment.  For purposes of this Section 10.02, "prevailing party" means, in the case of a Person asserting a claim, the Person is successful in obtaining substantially all of the relief sought, and in the case of a Person defending against or responding to a claim, the Person is successful in denying substantially all of the relief sought.

12.02  <u>Waiver</u>.  No delay in exercising any right or remedy will constitute a waiver thereof, and no waiver by Seller or Buyer of the breach of any covenant of this Agreement shall be construed as a waiver of any preceding or succeeding breach of the same or any other covenant or condition of this Agreement.

## ARTICLE XIII
MISCELLANEOUS

13.01  <u>Assignability</u>.  Buyer may assign this Agreement in whole or in part and/or designate a nominee to take title to all or any part the Facilities or the operations thereof at Closing without the consent of Seller, provided that such assignment and/or designation shall only be to an Affiliate of Buyer, and provided that Buyer shall remain fully bound by the terms and conditions of this Agreement.   Any assignment of this Agreement shall be binding upon and inure to the benefit of the successor or assignee of Buyer.  In the event Buyer finds it necessary or is required to provide to a third party a collateral assignment of the Buyer's interest in this Agreement and/or any related documents, Seller shall cooperate with the Buyer and any third party requesting such assignment including but not limited to Seller signing a consent and acknowledgment of such assignment.

13.02  <u>Entire Agreement</u>.  This Agreement constitutes the entire contract between the parties, and may not be modified except by an instrument in writing that both of them sign.  All of the schedules and exhibits to this Agreement are incorporated by this reference.

13.03  <u>Governing Law</u>.  This Agreement will be interpreted, construed, and enforced pursuant to the laws of the State of Iowa without giving effect to the choice of law rules thereof.

13.04  <u>Notice</u>.  All notices and other communication allowed or required under this Agreement will be in writing, and delivered by either hand delivery, overnight courier, or Regular First Class U.S. Mail, postage prepaid, and addressed as follows:

| If to Seller: | If to Buyer: |
|---|---|
| QHC Facilities LLC<br>8350 Hickman Road, Suite 15<br>Clive, IA 50325<br>Attn:  Mark Hidlebaugh, Member | Cedar Healthgroup, LLC<br>150 Airport Road, Suite 900<br>Lakewood, NJ 08701 |
| With a copy to: | With a copy to: |
| Jeffrey D. Goetz, Esq.<br>Bradshaw Fowler Proctor & Fairgrave, P.C.<br>801 Grand Avenue, Suite 3700<br>Des Moines, IA 50309-8004 | Lorium Law<br>101 NE Third Avenue, Suite 1800<br>Fort Lauderdale, FL 33301<br>Attn: Chad P. Pugatch, Esq. and Michael D. Karsch, Esq. |

All notices provided in accordance with this Section delivered by hand or by overnight courier will be deemed delivered and received on the delivery date.  All notices delivered

30

by First Class Mail will be deemed delivered and received four (4) Business Days after being placed for delivery with the U.S Postal Service.

13.05   Section Headings; Drafting Party.  The headings of this Agreement are for convenience of reference only, do not form a part of this Agreement, and do not in any way modify, interpret or construe the intentions of the parties. The provisions of this Agreement have been examined, negotiated, drafted and revised by counsel for each party, and no implication will be drawn against any party by virtue of the drafting of this Agreement.

13.06   Waivers.  Any waiver by any party of any violation of, breach of or default under any provision of this Agreement or any exhibit, schedule or other document referred to in this Agreement by any other party will not be construed as or constitute a waiver of any subsequent violation, breach of, or default under that provision or any other provision of this Agreement, or any Exhibit, Schedule or other document referred to in this Agreement.

13.07   Further Assurances.  Each of the parties will, at any time and from time to time after the Closing, execute and deliver, or cause to be executed and delivered, to the other party or their designee, such further consents, approvals, conveyances, assignments and other documents and instruments as any party shall reasonably request in order to carry out any and all of the terms and provisions of this Agreement.

13.08   Counterparts.  This Agreement may be executed in several counterparts and by facsimile transmission or email scan, each of which when so executed and delivered will be deemed an original, but all of which together shall constitute one and the same instrument.

13.09   Binding Effect.  This Agreement will be binding upon and inure to the benefit of the parties to this Agreement and their respective successors, heirs, assigns and legal representatives Waiver of Jury Trial. BUYER AND SELLER WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM, OR COUNTERCLAIM, WHETHER IN CONTRACT OR TORT, AT LAW OR IN EQUITY, ARISING OUT OF OR IN ANY WAY RELATED TO THIS AGREEMENT, OR THE TRANSACTIONS THAT THIS AGREEMENT CONTEMPLATES

13.10   Jurisdiction; Venue; Service of Process. Any litigation arising out of or relating to this Agreement, or the transactions this Agreement contemplates, will be brought in the Bankruptcy Court or a court located in Polk County, Iowa. Seller and Buyer consent to the jurisdiction of any such court. **The parties each waive personal service of process in any litigation arising out of or relating to this Agreement or any transaction this Agreement contemplates, and agree that all such service of process may be made in the manner set forth for notices in Section 11.04 of this Agreement, and that service so made will be deemed completed one (1) day after delivered in compliance with Section 11.04 of this Agreement. The parties expressly waive any other requirements of notice or personal service that any applicable Law may require.**

13.11   Exhibits and Schedules.  If any exhibits or schedules are not attached hereto, the parties agree to attach such exhibits and schedules as soon as reasonably practicable but in any event prior to ten (10) days before the Closing Date.  The Parties agree that the Party

31

charged with providing an exhibit or schedule to this Agreement shall, to the extent necessary after delivery thereof, amend or supplement all exhibits and schedules in order for the same to be current, true and correct as of the Closing Date. The inclusion of any new schedule or exhibit, or supplement thereto, shall be subject to such party approving any new exhibits and schedules or supplements thereto within seven (7) days of submission thereof.

**ARTICLE XIV**
BANKRUPTCY MATTERS

14.01   <u>Sale Order</u>. The Sale Order will provide, *inter alia*, that pursuant to 11 U.S.C. Sections 105, 363, and 365: (i) this Agreement and the transactions contemplated hereby are approved; (ii) Buyer will have and acquire at the Closing good, valid, marketable title to the Acquired Assets free and clear of all interests, Claims, Encumbrances, or Liens (except for Permitted Encumbrances and Assumed Liabilities) to the maximum extend provided under 11 U.S.C. Sections 105, 363, and 365; (iii) Seller will assume and assign to Buyer all of the Assumed Executory Contracts as of the Closing Date; (iv) the Assumed Executory Contracts will be in full force and effect from and after the Closing with non-debtor parties being barred and enjoined from asserting against Buyer, *inter alia*, defaults, breaches or claims of pecuniary losses existing as of the Closing or by reason of the Closing; (v) Buyer is acquiring the Acquired Assets free and clear of the Excluded Liabilities and providing for a full release of Buyer with respect to the Excluded Liabilities; (vi) the activities and results of the marketing and auction conducted in connection with the sale, if any, are approved; (vii) Buyer will be found to be a good faith purchaser within the meaning of 11 U.S.C. Section 363(m); and (viii) the Bankruptcy Court will waive any stay that would otherwise be applicable to the immediate effectiveness of the Sale Order pursuant to Fed. R. Bankr. P. 6004(h) and 6006(d).

[signatures on following page]

IN WITNESS WHEREOF, the parties have executed this Agreement effective as of the date and year first written.

CEDAR HEALTHGROUP, LLC

By: Mark Tress

Its: Member


QHC FACILITIES, LLC

By: Mark Hidlebaugh

Its: Managing Member


QHC MANAGEMENT, LLC

By: Mark Hidlebaugh

Its: Managing Member

33

QHC MITCHELLVILLE, LLC

By: *Mark Hidlebaugh*

Its: *Managing Member*

QHC WINTERSET NORTH, LLC

By: *Mark Hidlebaugh*

Its: *Managing Member*

QHC MADISON SQUARE, LLC

By: *Mark Hidlebaugh*

Its: *Managing Member*

QHC FORT DODGE VILLA, LLC

34

By: _Mark Hidlebaugh_

Its: _Managing Member_

QHC HUMBOLDT NORTH, LLC

By: _Mark Hidlebaugh_

Its: _Managing Member_

QHC HUMBOLDT SOUTH, LLC

By: _Mark Hidlebaugh_

Its: _Managing Member_

QHC VILLA COTTAGES, LLC

35

By: _Mark Hidlebaugh_

Its: _Managing Member_


CRESTRIDGE, INC.

By: _Mark Hidlebauge_

Its: _Managing Member_


CRESTVIEW ACRES, INC.

By: _Mark Hidlebur_

Its: _Managing Member_

**EXHIBITS**

Exhibit A:      Facilities

Exhibit B:      Land

Exhibit C:      Purchase Price Allocation

## SCHEDULES

| | |
|---|---|
| Schedule 2.01(i) | Assumed Benefit Plans |
| Schedule 2.08(a) | Assumed Executory Contracts |
| Schedule 2.08(b) | Accrued PTO |
| Schedule 3.01(e): | Litigation |
| Schedule 3.01(o) | Certificates of Need |
| Schedule 3.01(s) | Permits |
| Schedule 3.01(t) | Compliance |
| Schedule 3.01(u) | Licensed Beds and Current Rate |
| Schedule 3.01(y) | Financial Information |
| Schedule 3.01(z) | Real Property |

## MANAGEMENT AGREEMENT

**THIS MANAGEMENT AGREEMENT** (this "*Agreement*") is made and entered into as of this [_____] day of [_____], 2022 (the "*Effective Date*") by and between [_____], an [_____] [_____] ("*Operator*"), and [_____], an [_____] [_____] ("*Manager*").

### RECITALS:

A.      Operator currently owns and operates a [___] bed skilled care nursing home facility located at [_____] and known as [_____] (the "*Facility*").

B.      Operator currently holds a license ("*License*") from the Iowa Department of Inspections and Appeals ("*IDIA*") to operate the Facility as a skilled care nursing facility.

C.      Operator is selling the Facility to [_____] (the "*Purchaser*"), an affiliate of Manager pursuant to the terms of that certain Asset Purchase Agreement dated as of February 11, 2022 by and between Operator, other owner parties thereto, and Purchaser (the "*APA*");

D.      During the interim period between the execution of the APA and the Closing of the APA (as defined in the APA), Operator desires to retain the services of Manager with respect to the operations of the Facility as further described herein, and Manager desires to be so retained.

**NOW, THEREFORE**, in consideration of the foregoing recitals, which are incorporated herein by this reference, the mutual covenants contained herein, and other good and valuable consideration, the receipt, adequacy, and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. **Engagement of Manager.**  During the Term (as herein defined), Operator hereby engages and appoints Manager as its sole and exclusive manager with respect to the operation and the maintenance of the Facility in accordance with the standards of conduct set forth in Section 3 hereof and the other terms and conditions hereinafter provided.  Manager hereby accepts such engagement and appointment and agrees to faithfully perform the duties and obligations set forth in this Agreement and to comply with all of the terms and conditions set forth herein.  Operator grants to Manager sole and exclusive authority to formulate and implement policies, programs, and operations with respect to the Facility, and shall refrain from interference with and from participation in any functions that are delegated to Manager under this Agreement.

2. **Specific Duties of Manager**.  In addition to all functions expressly or impliedly granted to Manager in Section 1 of this Agreement, and without limiting the generality thereof, Manager shall, at all times from the date of this Agreement forward, have the right to exercise the following powers and shall have the obligation to perform the following functions:

a.  To supervise the Facility staff in the purchase and management of food, beverages, operating supplies, equipment, and services reasonably necessary for the maintenance and operation of the Facility, and to contract for the same on behalf of Operator.

b.  To recruit, select, hire, employ, train, supervise, promote, direct, and terminate the employment of any and all professional and non-professional personnel necessary to the proper maintenance and operation of the Facility, including, without limitation, the Administrator.  The Manager shall have control over the appropriate compensation for services of Facility personnel, including, without limitation, salary, bonuses, employee benefits, employee taxes, and all other expenses relating to their employment.  Manager shall establish the compensation levels, job classifications, personnel policies, employee benefits, and employee performance standards for Facility personnel to ensure the efficient operation of all departments within and services offered by the Facility.

c.  To maintain and manage the accounts receivables, accounts payable, employee compensation, payroll tax requirements and benefit programs, cash and all other income, expenses, assets and liabilities in connection with the Facility accruing or arising during the Term; provided that Operator shall be solely responsible with respect to all items of such expenses and liabilities and entitled to any income and assets for any period prior to the Term, subject to the provisions of this paragraph.  Operator shall use its best efforts to ensure that Manager has access to the deposit accounts for QHC Home Office (as defined below)as of the Commencement Date.  If such access is not available, QHC Home Office shall cause any cash or deposits deposited into a different account which are attributable to the Facility to be transferred to the QHC Home Office deposit accounts within five (5) business days of receipt.   Manager and Operator recognize and agree that all accounts receivable and accounts payable for the period prior to the Term ("Pre-Term Period") will not have been collected or paid as of the Effective Date.  Therefore, the parties agree that such amounts shall be reconciled pursuant to Section 5(d) hereof.  Further, Manager is permitted to use all Pre-Term and Term accounts receivable collected during the Term, provided Manager pays Pre-Term accounts payable as they come due and applied to the oldest Pre-Term accounts payable first.  To the extent Pre-Term accounts receivable exceed Pre-Term accounts payable, all Pre-Term accounts payable shall be paid prior to Termination of this Agreement.

d.  To cause to be paid on a timely basis, all expenses, costs, taxes, utilities and other charges incurred by or on behalf of Operator in connection with the maintenance or operation of the Facility (the "Expenses") arising and related to periods after the Commencement Date and during the Term, and to the extent any Expenses arose from and relate to the Pre-Term Period and are due during the Term, Manager shall timely pay such Expenses from proceeds of accounts receivable attributed to the Pre-Term Period. To procure and provide for replacements, repairs, and additions to, and the personal property used in the operation of, the Facility.

e.  To maintain complete and separate books of account and other accounting records for the Facility and the operations thereof.

- 2 -

f. To perform, or engage others to perform, administrative services in connection with the operation of the Facility as Manager may deem necessary or desirable in furtherance of the maintenance or operation of the Facility.

g. To provide the necessary and proper dietary services and consultations.

h. To recommend to Operator to make repairs, replacements and/or capital improvements at the Facility that would cost in excess of Fifty Thousand and No/100 Dollars ($50,000.00).

i. To the extent the Facility receives notice from the IDIA or other governmental authority with respect to a condition at the Facility that requires correction, Manager shall submit a plan of correction on behalf of Operator and shall further have authority to challenge, negotiate and settle any fines issued by such governmental authority on behalf of Operator.

j. To render advice and consulting services to Operator to enable Operator to coordinate actions to maintain all licenses, permits and certificates required for the operation of the Facility and ensure that appropriate certifications and accreditations are obtained and maintained, including, without limitation, obtaining dual certification for beds at the Facility.

k. To perform such other acts and provide such other services as shall be, in Manager's discretion, necessary or proper in order to maintain and operate the Facility.

l. To negotiate and enter into agreements or contracts, which Purchaser agrees to assume and pay any cure costs associated with such new agreements or contracts, in connection with any of the foregoing.

m. Prior to the Effective Date of this Agreement, the Operator received administrative services from and for the benefit of group vendor payments made by QHC Facilities, LLC and/or QHC Management, LLC (collectively, the "QHC Home Office") in connection with the operation of the Facility. To the extent Manager utilizes the services or benefits from payments of Expenses paid by the QHC Home Office, which is a separate entity not a party to this Agreement, during the Term, Manager shall timely pay QHC Home Office for such services and payments. Services may include, but are not limited to, entering/paying accounts payable, billing/collecting accounts receivable, cash activities/banking, use of debit cards, administrative costs of providing such services, etc. Group vendor payments may include, but are not limited to insurance, food, supplies, staffing agencies, etc.

The Manager shall not be required to obtain the prior approval of the Operator prior to performing any of the functions set forth in this Agreement, unless in the Manager's sole discretion a function is outside the ordinary course of business; provided, however, if any particular act is required to either avoid a loss or potential loss of the IDIA license and or required to cure an immediate jeopardy violation at the Facility, such limitation shall not

apply. Furthermore, Manager shall not close a Facility without Operator's consent, which consent will not be unreasonably withheld.

3. **Standard of Conduct.** Manager covenants to perform all of its obligations and conduct all of its activities hereunder, in accordance with the standards heretofore established in the maintenance and operation of the Facility; shall exercise reasonable care and diligence in carrying out its responsibilities; shall at all times seek to comply with all applicable laws, regulations, and professional ethics and standards applicable to the maintenance and operation of the Facility; and shall otherwise perform its obligations hereunder with the standard of diligence and care normally employed by duly-qualified individuals in the performance of comparable work and in accordance with practices appropriate to the activities undertaken. Manager will operate all Facilities in a professional and commercially reasonable manner.

4. **Term.** The term of this Agreement (the "*Term*") shall commence and be effective as of 12:01 a.m. on [_____ __], 2022 (the "*Commencement Date*"), pursuant to and in conformity with the APA, and shall terminate pursuant the Closing provisions specified in the APA, or as otherwise provided herein.

5. **Compensation and Reimbursement.**

　　a.　During the Term, Manager shall retain the Net Income (as herein defined) generated at the Facility from and after the Commencement Date, as Manager's management fee and sole compensation for the services provided under this Agreement (the "*Management Fee*").　The term "*Net Income*" as used in this Agreement shall mean (a) the gross revenues generated through the operations of the Facility during the Term, (b) minus all expenses incurred as a result of such operations during the Term, including without limitation, expenses pertaining to payroll, supplies, inventory, taxes (including payroll taxes, real estate taxes and state bed taxes levied by the IDIA), insurance and utilities. For purposes of determining the Net Income, the parties hereto agree to utilize the accrual method of accounting in accordance with generally accepted accounting principles consistently applied.　In the event that the Net Income for any period during the Term shall be a loss, Manager shall bear such loss.　In the avoidance of doubt, the Manager shall continue performing the services provided within this Agreement even if a loss occurs and such loss is not a cause for termination of this Agreement.

　　b.　In determining Net Income, the parties hereto agree to prorate all items of revenues and expenses as of the Commencement Date.　Accordingly:

　　　　i.　Any revenue generated as a result of the operations of the Facility during the Term shall be counted towards Net Income in computing the Management Fee, and Manager shall be entitled to such revenue once collected;

　　　　ii.　Any expenses and capital expenditures incurred as a result of and in connection with the operations of the Facility during the Term shall be counted against Net Income in computing the Management Fee, and Manager shall bear any such expenses;

iii. Any revenue generated as a result of the operations of the Facility prior to the Term shall not be counted towards Net Income in computing the Management Fee.

iv. Any expenses incurred as a result of the operations of the Facility prior to the Term shall not be counted against Net Income in computing the Management Fee; and

c.  For the avoidance of doubt, any amounts paid pursuant to the APA for accrued PTO or accrued bed taxes shall not be deemed to be revenue for the purposes of this Agreement.

d.  Within thirty (30) days of the Termination of this Agreement pursuant to the provisions of Sections 4 or 25 hereof, Manager shall prepare and deliver to Operator a final accounting statement with respect to the Facility, along with a statement of any sums due from one party to the other pursuant hereto, dated as of the date of Termination. Such statement is subject to audit and approval by Operator and shall properly denote whether accounts receivable collected and accounts payable paid during the Term were related to the Pre-Term Period.  Within thirty (30) days after the receipt by Operator of such final accounting statement, the parties will reconcile any amounts in controversy and mutually agree to any cash adjustments that are necessary pursuant to such final statement.  The cost of preparing such final accounting statement and any mediation of amounts in controversy shall be borne by the parties who incur them, unless the Termination occurs as a result of a Default (as defined in the APA) under the APA and subsequent termination by either party, in which case the defaulting party shall pay such costs.  Manager and Operator acknowledge that there may be certain adjustments for which the information is not available at the time of the final accounting, and the parties agree to readjust such amounts and make the necessary cash adjustments when such information becomes available; provided, however, that (except for ongoing disputes of which each party has received notice, or legal claims for which the statute of limitations has not expired) all accounts shall be deemed final six (6) months after Termination

6.  **Insurance.**  During the Term, Manager agrees to carry and maintain all insurance policies which existed at the Commencement Date and Manager shall be listed as an additional insured, with respect to all professional and other liability policies, and Manager shall be listed as an alternate employer, under the worker's compensation policy; provided that the premiums payable with respect to such insurance policies shall be counted against Net Income in computing the Management Fee.  To the extent premiums accrued prior to the Term or otherwise become due for the period during the Term, Manager shall accept financial responsibility for payment of such premiums or reimbursement to the Operator.

7.  **Licenses.**  Manager shall have the right as of the Commencement Date to operate the Facility on behalf of Operator under all licenses issued by the State of Iowa or other authorities having jurisdiction over the Facility, including the rights to use the Medicare and Medicaid provider numbers issued to Operator to the extent permitted by law.  To the extent permitted by law, the governing body of Manager is hereby designated as the governing body of the Facility.  Notwithstanding anything in this Agreement to the contrary, Operator will maintain

- 5 -

the long-term care license, issued by IDIA, in its name and any actions taken by Manager will be taken in the name, and on behalf, of Operator. Manager shall be responsible for the Facility maintaining compliance with all applicable rules and regulations.

8. **Relationship of Parties**. Manager shall perform its obligations under this Agreement solely as an independent contractor. The parties hereto acknowledge and agree that Manager may be providing similar management services for other businesses or may be otherwise employed during the Term. Except as expressly provided in this Agreement, nothing shall deprive or otherwise affect the right of Manager to provide services to others, notwithstanding the fact that Manager's other clients may be engaged in businesses which are either directly or indirectly in competition with the Facility.

9. **Access to Records.** During the Term, Manager agrees to provide Operator with copies of all reports or other filings with, and communications from, any governmental authority or agency having jurisdiction over the Facility within twenty-four hours of receipt. During the Term, upon request by Operator, Manager agrees to give Operator and its representatives access at reasonable times to all patient, financing, and other operational records of the Facility, and agrees that copies of all such records pertaining to the Facility shall be kept at the Facility.

10. **Patient Trust Funds.** During the Term, Manager shall assume custody of the Facility Patient Trust Fund and deal with them in the fiduciary capacity required by law.

11. **Notices.** All notices given hereunder shall be in writing and shall be deemed to have been given when delivered personally, by overnight courier service or deposited in the United States mail, postage prepaid, certified or registered, return receipt requested, addressed as follows:

| | |
|---|---|
| If to Manager: | If to Operator: |
| [_____] | [_____] |
| | 8350 Hickman Road, Suite 15 |
| | Clive, IA 50325 |
| With a copy to: | Attn: Mark Hidlebaugh, Member |
| | |
| | With a copy to: |
| | |
| | Bradshaw Fowler Proctor & Fairgrave, P.C. |
| | 801 Grand Avenue, Suite 3700 |
| | Des Moines, IA 50309-8004 |
| | Attn: Jeffrey D. Goetz, Esq. |
| | Attn: Krystal R. Mikkilineni, Esq. |
| | Facsimile: (515) 246-5808 |
| | goetz.jeffrey@bradshawlaw.com |
| | mikkilineni.krystal@bradshawlaw.com |

or such other address that any party designates to the other by written notice given in the manner stated above. Any notice sent by facsimile machine shall be deemed delivered upon transmission, so long as said transmission is evidenced by proof of said transmittal.

12. **Jurisdiction; Venue; Service of Process**. Any litigation arising out of or relating to this Agreement, or the transactions this Agreement contemplates, will be brought in the U.S. Bankruptcy Court for the Southern District of Iowa. Seller and Buyer consent to the jurisdiction of any such court. **The parties each waive personal service of process in any litigation arising out of or relating to this Agreement or any transaction this Agreement contemplates, and agree that all such service of process may be made in the manner set forth for notices in Section 14 of this Agreement, and that service so made will be deemed completed one (1) day after delivered in compliance with Section 14 of this Agreement. The parties expressly waive any other requirements of notice or personal service that any applicable Law may require.**

13. **Binding Effect.** Each of the respective provisions of this Agreement shall be binding upon and shall inure to the benefit of each of the parties and their respective successors and permitted assigns.

14. **Attorneys' Fees.** If an action shall be brought to recover any compensation or reimbursement due under this Agreement, for or on account of any breach of this Agreement, or to enforce or interpret any of the terms, covenants, or conditions of this Agreement, the prevailing party shall be entitled to receive reasonable attorneys' fees from the other party.

15. **Waiver.** The waiver by Operator or Manager of any breach of any term, covenant, or condition of this Agreement shall not be deemed to be a waiver of any prior or subsequent breach of such term, covenant, or condition, or of any breach of any other term, covenant, or condition of this Agreement.

16. **Severability.** In the event that any court, administrative agency, or other governmental entity with jurisdiction and authority to interpret this Agreement or any portion hereof, or to otherwise control any performance hereunder, determines that any term or combination of terms is invalid or unenforceable, such term or terms shall be construed in such a way as to accomplish the apparent purpose of such term or terms and this Agreement to the greatest extent possible. If, notwithstanding the intentions and directions of the parties hereto which are set forth herein, any such court, administrative agency, or other governmental entity finds any term or combination of terms to be invalid or unenforceable under applicable law, such determination shall not affect, impair, or render invalid or unenforceable the remainder of this Agreement, nor any other clause, phrase, provision, or portion hereof.

17. **Governing Law.** This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Iowa.

18. **Entire Agreement.** This Agreement constitutes the entire agreement between the parties and may not be amended or modified, except by an instrument in writing signed by all of the parties to this Agreement.

19. **Counterparts/Facsimile Signatures.**  This Agreement may be executed in counterparts. Facsimile signatures shall be treated as original signatures for purposes of being the parties hereto.

20. **Pronouns and Headings.**  As used herein, all pronouns shall include the masculine, feminine, neuter, singular, and plural thereof, wherever the context and facts require such construction.  The headings, titles, and subtitles herein are inserted for convenience of reference only and are not to be construed as part of this Agreement, or as in anyway defining, limiting, or amplifying its provisions.

21. **Contract Modification.**  If any laws or regulations, now existing or promulgated hereafter, are interpreted by judicial decision, a regulatory agency or outside independent legal counsel in such a manner as to indicate that the structure of the transactions contemplated under this Agreement is or may be in violation of such laws or regulations, this Agreement shall automatically amended to the fullest extent necessary to remedy the applicable legal concerns while preserving the underlying economic and financial arrangements to the extent possible.

22. **Further Actions.**  The parties hereto agree to take such additional actions, and execute, file, or record any and all such additional documents or instruments, as may be necessary in order to carry out the intents and purposes of this Agreement.

23. **Termination.** This Agreement may be terminated by mutual agreement of Manager and Operator, or otherwise upon the written notice of the party terminating this Agreement to the other party, after the occurrence of any of the events described in Section 25(a), or in the event Manager endangers Facility licensure.

> (a)    Termination of APA. If the APA is terminated, then this Agreement shall be concurrently terminated.

> (b)    Effect of Termination:  In the event of the termination of this Agreement in accordance with this Section 25, this Agreement shall become void within thirty (30) days, upon a reasonable transition of the operations of the Facility back to Operator, and there shall be no liability on the part of any party hereto except for any provision of this Agreement which is expressly described as surviving any expiration or termination of this Agreement.

[SIGNATURE PAGE FOLLOWS]

        IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date
first above written.

**MANAGER**:                                          **OPERATOR**:

[_____]                                         [_____]
an [_____] [_____]                         an [_____] [_____]


By: _____                       By: _____
Name: [_____]                                   Name: [_____]
Its:    Manager                                       Its:    Manager


                                                      **SOLELY FOR THE PURPOSE OF
                                                      CONSENTING TO SECTION 2(c)**

                                                      **QHC Facilities, LLC**
                                                      an [_____] [_____]


                                                      By: _____
                                                      Name: [_____]
                                                      Its:    Manager


                                                      **QHC Management, LLC**
                                                      an [_____] [_____]


                                                      By: _____
                                                      Name: [_____]
                                                      Its:    Manager

# EXHIBIT B

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (the "Agreement") is made and entered into as of February 29, 2022 (the "Execution Date"), by and between QHC Facilities, LLC, QHC Management, LLC, QHC Mitchellville, LLC, QHC Winterset North, LLC, QHC Madison Square, LLC, QHC Fort Dodge Villa, LLC, QHC Humboldt North, LLC, QHC Humboldt South, LLC, and QHC Villa Cottages, LLC, each an Iowa limited liability company, and Crestridge, Inc. and Crestview Acres, Inc., each an Iowa corporation, ("Seller"), and Blue Diamond Equities LLC, a New Jersey limited liability company ("Buyer").

### ARTICLE I
DEFINITIONS

1.01    Definitions.    The following terms have the meanings assigned below:

"*Acquired Assets*" has the meaning described in Section 2.01 of this Agreement.

"*Acquisition Transaction*" shall mean any sale, transfer or other disposition (not involving the Buyer or its Affiliates), in one transaction or a series of transactions, of all or any substantial portion of the Acquired Assets or the Business, whether proposed to be effected pursuant to a merger, consolidation, tender offer, exchange offer, share exchange, amalgamation, stock acquisition, asset acquisition, business combination, restructuring, recapitalization, liquidation, dissolution, joint venture or similar transaction, whether or not proposed or advanced by the Seller.

"*Action*" means any claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, citation, grievance, summons, pleading, motion, objection, subpoena or investigation of any nature, whether civil, criminal, administrative regulatory or otherwise and whether at Law or in equity.

"*Affiliate*" means any Person that directly, or indirectly, controls, is controlled by, or is under common control with, such a specified Person.

"*Ancillary Agreements*" means any bill of sale, warranty deed, or similar transaction agreements in form and substance acceptable to Seller and Buyer.

"*Ancillary Businesses*" means the ancillary healthcare and medical business, including physician services, that Seller conducts.

"*Assumed Executory Contracts*" means the executory contracts, including Leases, of Seller listed on Schedule 2.08(a), designated and agreed by Buyer, that have been assumed and assigned by the Seller to the Buyer.

"*Assumed Lease*" means any Lease that is an Assumed Executory Contract.

"*Assumed Liabilities*" has the meaning set forth in Section 2.08 of this Agreement.

"***Assisted Living Facilities***" means the facilities consisting of (1) Madison Square Assisted Living, located at 209 W Jefferson St., Winterset, IA 50273 and (2) Fort Dodge Villa Cottages, located at 925 Martin Luther King Drive, Fort Dodge, IA 50501.

"***Bankruptcy Code***" means Title 11 of the U.S. Code, as amended from time to time.

"***Bankruptcy Court***" means the United States Bankruptcy Court for the Southern District of Iowa.

"***Bill of Sale***" means a bill of sale in form and substance acceptable to Buyer and Seller.

"***Bidding Procedures Order***" means that certain Order (A) Approving Bidding Procedures in Connection with the Auction and Sale of Assets and Scheduling an Auction and Sale Hearing; (B) Approving Assumption and Assignment Procedures; (C) Approving the Break-Up Fee; and (D) Granting Other Related Relief, entered on _____, Docket No. _____ in the Bankruptcy Case.

"***Break-Up Fee***" means a break-up fee in an amount equal to 3% of the Purchase Price, payable in accordance with Section 7.03 hereof.

"***Business***" means Seller's business as operators of 8 Skilled Nursing Facilities and 2 Assisted Living Facilities across Iowa, and all Ancillary Businesses of Seller.

"***Business Day***" means any day other than a Saturday, a Sunday, or a day on which commercial banks are allowed or required to close in Iowa.

"***Chapter 11 Case***" means the following proceedings pending before the Bankruptcy Court in which Seller are the Debtors: *In re QHC Facilities, LLC*, Case No. 21-01643-als11, *In re QHC Management, LLC* (Case No. 21-01644-als11), *In re QHC Mitchellville, LLC* (Case No. 21-01645-als11), *In re QHC Winterset North, LLC* (Case No. 21-01646-als11), *In re QHC Madison Square, LLC* (Case No. 21-01647-als11), *In re QHC Fort Dodge Villa, LLC* (Case No. 21-01648-als11), *In re Crestridge, Inc.* (Case No. 21-01649-als11), *In re Crestview Acres, Inc.* (Case No. 21-01650-als11), *In re QHC Humboldt North, LLC* (Case No. 21-01651-als11), *In re QHC Humboldt South, LLC* (Case No. 21-01652-als11), and *In re QHC Villa Cottages, LLC* (Case No. 21-01653-als11).  ,.

"***Claim***" means any action, assessment, loss or experience rating, cause of action, claim, damage, demand, proceeding, fine, injury (including death), investigation, judgment, lawsuit, liability, loss, penalty, settlement or expense of any nature, whether civil, criminal, administrative or otherwise, and includes any and all "claims" as defined in 11 U.S.C. Section 101(5), and all "interests" as used in 11 U.S.C. Section 363(f).

"***Closing***" has the meaning set forth in Section 6.01 of this Agreement.

"***Closing Date***" has the meaning set forth in Section 6.01 of this Agreement. .

2

"***Code***" means Title 26 of the U.S. Code, as amended from time to time.

"***Contracts***" means all contracts and other agreements incident to the Facilities and/or Business to which Seller is a party.

"***Cure Costs***" means the amount necessary to cure all defaults under the Assumed Executory Contracts (as of the Closing Date) to permit Seller to assume and assign the Assumed Executory Contracts pursuant to Bankruptcy Code section 365 and any order of the Bankruptcy Court.

"***Disclosure Schedules***" means the disclosure schedules delivered by Seller concurrently with the execution and delivery of this Agreement.  If any schedules are not completed or attached hereto as of the date of this Agreement, the parties hereto agree to attach such schedules as soon as reasonably practicable, but in any event, this Agreement is subject to Buyer approving (which approval will not unreasonably be withheld, delayed or conditioned) all schedules or subsequent updates thereto within seven (7) days of submission thereof to Buyer.  The parties hereto agree that the party charged with providing an exhibit or schedule to this Agreement shall, to the extent necessary after delivery thereof, amend or supplement all exhibits and schedules in order for the same to be current, true and correct in all material respects as of the Closing Date.

"***DOH***" means Iowa Department of Public Health and the Iowa Department of Inspections and Appeals and Iowa Department of Human Services, collectively.

"***Employee Plans***" means any pension, retirement, savings, disability, medical, dental, health, life, death benefit, group insurance, profit-sharing, deferred compensation, stock option, stock purchase, bonus, incentive, executive compensation, vacation pay, holiday pay, severance benefit plan, trust, arrangement, agreement, policy or commitment, whether or not any of the foregoing is funded or insured and whether written or oral, that is intended to provide or does provide benefits to any of Seller's employees, and (i) to which seller is a party or by which Seller (or any of Seller's rights, properties or assets) is bound; (ii) with respect to which Seller has made any payments, contributions, or commitments, or may otherwise have any liability (whether or not Seller still maintains such plan, trust, arrangement, contract, agreement, policy, or commitment); or (iii) under which any director, employee or agent of Seller is a beneficiary as a result of his or her employment or affiliation with Seller.

"***Encumbrances***" means and includes interests, contractual rights, security interests, mortgages, liens, licenses, pledges, guarantees, charges, easements, reservations, restrictions, clouds, equities, rights of way, options, rights of first refusal and all other encumbrances, whether or not relating to the extension of credit or the borrowing of money.

"***Equipment***" means all furniture, fixtures, equipment, machinery, vehicles, and other personalty now or hereafter attached to or appurtenant to the Land or used in connection with the Facilities or the Business.

3

"*ERISA*" means the United States Employee Retirement Income Security Act of 1974, as amended from time to time, and the rules and regulations promulgated thereunder.

"*Escrow Agent*" means Landmark Abstract Agency, 207 Rockaway Turnpike, Lawrence, NY 11559, attn: Jacob Rekant, Jrekant@laatitle.com.

"*Excluded Agreements*" means all contracts, leases, and agreements (other than those between Seller and Buyer) that are not Assumed Executory Contracts: (i) as to which Seller is a party; (ii) to which Seller or its property is subject; or (iii) by which Seller is otherwise bound, whether oral or written.

"*Excluded Assets*" means those items specifically described in Section 2.02.

"*Excluded Liabilities*" means any liabilities of, and Claims against, Seller or the Acquired Assets, together with all other liabilities and obligations of, and Claims against, Seller that are not Assumed Liabilities.

"*Facilities*" means Seller's interest in the 8 Skilled Nursing Facilities and 2 Assisted Living Facilities, Land, Improvements, Equipment, Intellectual Property, Contract Rights, Leases, Intangible Personal Property, Government Authorizations, Records and the other intangible and tangible assets, whether real or personal or mixed, that are located in, or associated with, the nursing and assisted living facilities, and/or on the Land. The Facilities are listed on Exhibit A.

"*FMLA*" means the United States Family and Medical Leave Act, as amended from time to time, and the rules and regulations promulgated thereunder.

"*GAAP*" means generally accepted accounting principles in the United States, consistently applied.

"*Governmental Authority*" means the government of the United States or any foreign country or any state or political subdivision thereof and any entity, body or authority exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, and other quasi-governmental entities established to perform such functions.

"*Government Authorizations*" means all licenses, permits, approvals, certificates of need and occupancy, facility certifications, consents and other authorizations from any Governmental Authority as are necessary to lawfully own and/or operate the Facilities or conduct the Business.

"*Hazardous Materials*" means any substance, material, or waste that is or becomes regulated by any Governmental Authority including: (i) petroleum, (ii) asbestos, (iii) polychlorinated biphenyls, (iv) those substances, materials or wastes designated as a "hazardous substance" pursuant to Section 311 of the Clean Water Act or listed pursuant to Section 307 of the Clean Water Act or any amendments or replacements to these statutes,

4

(v) those substances, materials or wastes defined as a "hazardous waste" pursuant to Section 1004 of the Resource Conservation and Recovery Act or any amendments or replacements to that statute, or (vi) those substances, materials or wastes defined as a "hazardous substance" pursuant to Section 101 of the Comprehensive Environmental Response, Compensation and Liability Act, or any amendments or replacements to that statute.

"*IDHS*" means the Iowa Department of Human Services.

"*IDIA*" means the Iowa Department of Inspections and Appeals.

"*IDPH*" means the Iowa Department of Public Health.

"*Improvements*" means the buildings and all other improvements, including site improvements, landscaping, fixtures, mechanical equipment, apparatus and appliances, now owned or leased or hereafter placed in the Facilities, and/or on the Land.

"*Intangible Personal Property*" means all engineering and architectural plans and specifications, drawings, studies and as-built surveys relating to the Facilities that are in Seller's possession, and any other intangible personal property Seller owns and uses in connection with the Facilities.

"*Intellectual Property*" means any or all of the following rights: (i) all U.S., international, and foreign patents and applications therefor and all reissues, divisions, renewals, extensions, provisionals, continuations and continuations-in-part thereof; (ii) all inventions (whether or not patentable), invention disclosures, improvements, trade secrets, proprietary information, know-how, technology, technical data and customer lists, and all documentation relating to any of the foregoing throughout the world; (iv) all industrial designs and any registrations and applications therefor throughout the world; (v) all internet uniform resource locators, domain names, trade names, logos, slogans, designs, common law trademarks and service marks, trademark and service mark registrations and applications therefor throughout the world; (vi) all databases and data collections and all rights therein throughout the world; (vii) all moral and economic rights of authors and inventors, however denominated, throughout the work; and (viii) any similar or equivalent rights to any of the foregoing anywhere in the world.

"*Inventory*" has the meaning set forth in Section 2.01(a) of this Agreement.

"*Knowledge*" with respect to Seller means all facts that a responsible officer of Seller employed as of the Execution Date would know or would have reason to know following due inquiry and diligence with respect to the matters at hand.

"*Labor Laws and Employment Laws*" means all Laws and all contracts or collective bargaining agreements governing or concerning labor relations, collective bargaining, conditions of employment, employment discrimination or harassment, wages, hours, or

occupations safety and health. The term includes ERISA, the Immigration Reform and Control Act of 1986, the National Labor Relations Act, the Civil Rights Acts of 1866 and 1964, the Equal Pay Act, the Age Discrimination in Employment Act, the Americans With Disabilities Act, FMLA, WARN Act, OSHA, the Davis Bacon Act, the Walsh-Healy Act, the Service Contract Act, the Fair Labor Standards Act, the Rehabilitation Act of 1973, the Sarbanes-Oxley Act, any worker's compensation Law, and all rules and regulations promulgated under any of the foregoing Laws.

"*Laws*" means all statutes, rules, codes, regulations, restrictions, ordinances, orders, decrees, approvals, directives, decisions, judgments, injunctions, writs, executive orders, awards, and decrees of, or issued by, any Government Authority.

"*Land*" means the real estate described on Exhibit B, together with all easements, hereditaments, rights of way, privileges and rights benefiting the same and all strips and gores of land lying adjacent to such land that Seller owns.

"*Leases*" means all lease or rental agreements involving or pertaining to the Business, to which Seller is a party, if any.

"*Licenses*" means all notifications, licenses, permits (including environmental, construction, and operation permits), franchises, certificates, certificates of need, accreditations, approvals, exemptions, waivers, classifications, registrations and other similar documents and authorizations any Governmental Authorities have issued, as well as all applications for any of the foregoing; *provided, however,* that Licenses shall not include any notifications, licenses, permits (including environmental, construction, and operation permits), franchises, certificates, certificates of need, accreditations, approvals, exemptions, waivers, classifications, registrations and other similar documents and authorizations any Governmental Authorities have issued, as well as all applications for any of the foregoing, related to any Excluded Asset.

"*Lien*" means any lien (statutory or otherwise), encumbrance, Claim, indebtedness, obligation, right, demand, charge, right of setoff, mortgage, deed of trust, security interest, pledge, preference, option, lease, license, Tax, right of first refusal or similar interest, title defect, easements, rights of way, restrictive covenant, encroachment, judgment, conditional sale, title retention agreement or restriction on transfer, or any other interest, whether it is secured or unsecured, known or unknown, recorded or unrecorded, contingent or liquidated.

"*Material Adverse Effect*" means any adverse effect in the business, financial or physical condition, or results of operations of the Facilities, the Business, or Seller with respect to the Facilities, that is material when taken as a whole, provided, however, that a Material Adverse Effect shall not be deemed to include events, changes, effects, conditions, state of facts or occurrences arising out of, relating to, or resulting from: (i) changes in the United States or foreign economies or financial markets in general; (ii) general changes or developments in business, regulatory, or macroeconomic conditions or trends that affect

6

the industries and markets in which the Sellers operate; (iii) any global or national health concern, epidemic, disease outbreak, pandemic (whether or not declared as such by any Governmental Authority and including "coronavirus" or "COVID-19") or any Law issued by a Governmental Authority requiring business closures, quarantine, "sheltering-in-place" or similar restrictions that arise out of such health concern, epidemic, disease outbreak or pandemic or any change in such Law following the date of this Agreement; (iv) changes after the date of this Agreement in any Laws; (v) the announcement or anticipated consummation of the transactions this Agreement contemplates; (vi) the commencement or pendency of the Chapter 11 Case; (vii) any objections in the Bankruptcy Court to (A) this Agreement or any of the transactions contemplated hereby or thereby, (B) the Bidding Procedures Order, or (C) the assumption or rejection of any Contract or Lease pursuant to and in compliance with this Agreement

"*Medicare Advance Payments*" means unpaid or unreturned accelerated or advance Medicare payments received by the Facilities under the Coronavirus Aid Relief, and Economic Security Act amending the Accelerated Payments program, and any other unpaid or unreturned advance payments or stimulus funds received by the Facilities through any federal or state governmental agency providing reimbursement.

"*Operations Transfer Agreement*" has the meaning set forth in Section 2.12.

 "*OSHA*" means the United States Occupational Safety and Health Administration.

"**Out of Compliance**" means any of the following (A) a finding by a Governmental Authority of one or more deficiencies at any Facility at a "level G" or above that  has not been corrected and cleared by the applicable Governmental Authority; (B) a denial of any Facility's right to admit patients or to receive Medicare or Medicaid payments or reimbursements for existing patients or for new admissions at any Facility (C) any Facility loses its operating license or any material Permit; (D) any Facility has any Provider Agreement revoked or terminated; and (E) any Facility has its number of beds reduced; provided that the Facilities shall not be Out of Compliance if any of the conditions set forth in this definition exist at any Facility but are thereafter cured or rectified by the Seller within a reasonable period.

"*Person*" means any individual, corporation, partnership, joint venture, association, limited liability company, trust, unincorporated organization or Governmental Authority.

"*Permitted Encumbrances*" means any Encumbrances that remain attached to any Acquired Assets, from and after the Closing Date, with Buyer's consent.

"*Petition Date*" means December 29, 2021.

 "*Purchase Price*" has the meaning set forth in Section 2.03.

"*Qualified Bid*" shall have the meaning set forth in the Bidding Procedures.

7

"***Records***" means all books and records Seller (or its Affiliates) maintain in connection with the Facilities or the Business, but excluding any records relating solely to Seller corporate entity as distinct from the Facilities or Business.

"***Sale Order***" means an Order of the Bankruptcy Court approving the sale to Buyer.

"***Skilled Nursing Facilities***" means the facilities consisting of (1) Crestridge, located at 1015 Wesley Drive, Maquoketa, IA 52060, (2) Winterset Care Center North, located at 411 East Lane St., Winterset, IA 50273, (3) Crestview Acres, located at 1485 Grand Avenue, Marion, IA 52303, (4) Humboldt Care Center North, located at 1111 11th Ave, North, Humboldt, IA 50548, (5) Humboldt Care Center South, located at 800 13th St., South, Humboldt, IA 50548, (6) Sunnycrest Nursing Center, located at 401 Crisman St., Dysart, IA 52224, (7) Mitchell Village Care Center, located at 114 Carter St. SW, Mitchellville, IA 50169, and (8) Fort Dodge Villa Care Center, located 2721 10th Ave North, Fort Dodge, IA 50501.

"***Stalking Horse Bidder***" means the bidder identified in accordance with the Bidding Procedures Order.

"***Tax Return***" means any report, return, declaration or other information required to be supplied to any Governmental Authority in connection with Taxes, including estimated returns and reports of every kind with respect to Taxes.

"***Taxes***" means all taxes, charges, fees, levies, duties, penalties, additions or assessments imposed by any Governmental Authority, including income, excise, property, sales, transfer, use, ad valorem, profits, occupancy, environmental, sewer, tap, severance, franchise, value added or other taxes, including any interest, penalties or additions attributable thereto.

"***Third Party***" means any Person other than Seller, Buyer or an Affiliate of either.

"***Transaction Documents***" means this Agreement and any other agreement, document or instrument executed and delivered pursuant to the terms of, or otherwise in connection with, this Agreement, including, for the avoidance of doubt, the Bidding Procedures, the Bidding Procedures Order and the Sale Order.

"***Treasury Regulations***" means the Income Tax Regulations, including Temporary Regulations, promulgated under the Code.

"***WARN Act***" means the United States Worker Adjustment and Retraining Notification Act, as amended from time to time, and the rules and regulations promulgated thereunder.

1.02    <u>General Construction</u>. Whenever the context requires in this Agreement, the singular includes the plural and masculine includes the feminine or the neuter. The word "including" means "including without limitation." Words such as "herein," "hereof,"

8

"hereby" and "hereunder" and words of similar import refer to this Agreement as a whole and not to any particular Article, Section or Subsection of this Agreement.

1.03    <u>Schedules and Exhibits</u>.  The schedules and exhibits referenced in this Agreement are incorporated herein. All items disclosed hereunder shall be deemed disclosed in connection with the specific representation to which they are explicitly referenced. If no disclosure schedule is attached with reference to a specific Section of this Agreement, then such missing schedule shall be deemed to state "None."

## ARTICLE II
### AGREEMENT AND CONSIDERATION

2.01    <u>Agreement to Sell and Purchase</u>.  In consideration of the mutual covenants and promises contained in this Agreement, Seller agrees to sell, assign, transfer and convey unto Buyer all of Seller's right, title and interest in and to the assets described in this Section 2.01 (but not any Excluded Assets) (collectively the "***Acquired Assets***"), and Buyer agrees to purchase all of Seller's right, title and interest in and to the Acquired Assets (but not any Excluded Assets), all upon the terms and conditions set forth herein. Except for any Excluded Assets, the Acquired Assets consist of the following assets, properties and rights of Seller as of the close of business on the Closing Date:

(a)    All inventory, including finished goods, raw materials, work in progress, packaging, supplies, parts and other inventories, but excluding the Excluded Assets (collectively, the "***Inventory***");

(b)    All Contracts set forth in <u>Section 2.08(a)</u> of the Disclosure Schedules (the "***Assumed Executory Contracts***");

(c)    All Intellectual Property;

(d)    All furniture, equipment, machinery, tools, vehicles, office equipment, supplies, computers, telephones and other tangible personal property;

(e)    All Land;

(f)    All Permits which are held by Seller and required for the conduct of the Business as currently conducted or for the ownership and use of the Acquired Assets;

(g)    All rights to any Actions of any nature available to or being pursued by Seller to the extent related to the Business, the Acquired Assets or the Assumed Liabilities, whether arising by way of counterclaim or otherwise, *provided, however,* that the rights to any Avoidance Action against any party to a Contract of Seller not listed on <u>Section 2.08(a)</u> of the Disclosure Schedules as of the Closing or any Action against any director, officer, equity-holder, or lender of any Seller are not a Purchased Asset;

9

(h)    All of Seller's rights under warranties, indemnities and all similar rights against third parties to the extent related to any of the Acquired Assets or Assumed Liabilities;

(i)    All employee benefit plans set forth in Section 2.01(i) of the Disclosure Schedules, solely to the extent designated and agreed by Buyer, including all related insurance policies, contracts, trusts and any other assets attributable thereto (the "***Assumed Benefit Plans***");

(j)    All insurance benefits, including rights and proceeds, arising from or relating to the Business, the Acquired Assets or the Assumed Liabilities

(k)    Originals, or where not available, correct and complete copies, of all books and records, including books of account, ledgers and general, financial and accounting records, customer lists, customer purchasing histories, price lists, distribution lists, supplier lists, production data, quality control records and procedures, customer complaints and inquiry files, research and development files, records and data (including all correspondence with any Governmental Authority), sales material and records (including pricing history, total sales, terms and conditions of sale, sales and pricing policies and practices), strategic plans, internal financial statements, marketing and promotional surveys, material and research and files relating to the Intellectual Property Assets ("***Books and Records***"); and

(l)    All goodwill and the going concern value of the Business.

2.02    <u>Excluded Assets</u>.  The following assets are expressly excluded from the purchase (the "***Excluded Assets***"):

(a)    All Contracts that are not Assumed Executory Contracts (the "***Excluded Contracts***");

(b)    Cash and cash equivalents;

(c)    Accounts receivable;

(d)    The corporate seals, organizational documents, minute books, stock books, Tax Returns, books of account or other records having to do with the corporate organization of Seller;

(e)    All rights to any Avoidance Actions against any creditor of Seller not listed in Section 2.08(a) of the Disclosure Schedules as of the Closing or any party to a Contract of Seller not listed on Section 2.08(a) of the Disclosure Schedules as of the Closing, or any Action against any director, officer, equity-holder, or lender of any Seller;

(a)    Prepaid expenses, credits, advance payments, claims, security, refunds, rights of recovery, rights of set-off, rights of recoupment, deposits, charges, sums and fees

10

(including any such item relating to the payment of Taxes) related to prior to the Closing Date; and

(f)     The rights specifically accruing to Seller under the Transaction Documents.

2.03    <u>Consideration</u>.  Buyer agrees to pay to Seller the total of Eleven Million Six Hundred Thousand and 00/100 Dollars ($11,600,000) (the "<u>Purchase Price</u>") in consideration for the sale of the Acquired Assets, subject to the adjustments and credits described herein.

2.04    <u>Good Faith Deposit</u>.  Within two (2) business days of the Execution Date, Buyer shall provide a good faith deposit of $580,000 in cash to Escrow Agent to be held pending Closing.  In the event Buyer is not the Prevailing Bidder at auction, Seller shall return the good faith deposit to Buyer within three business days of entry of the order approving the sale.

2.05    <u>Method of Payment</u>.  Buyer will pay the Purchase Price at Closing, less the Medicare Advance Payments, in immediately available funds. The Good Faith Deposit shall be applied to the Purchase Price.

2.06    <u>Allocation of the Purchase Price</u>.  The Purchase Price will be allocated in the manner set forth on Exhibit C, said allocation being mutually agreed upon by the parties.

2.07    <u>Excluded Assets</u>.  Notwithstanding anything herein to the contrary, Buyer will not acquire any interest in the Excluded Assets as a result of this transaction.

2.08    <u>Assumed Liabilities</u>.  Buyer will not assume or in any way be responsible for any of the debts, liabilities, or obligations of any kind or nature of Seller, other than as specifically set forth herein related to Assumed Executory Contracts (collectively, the "*Assumed Liabilities*").

(a)     Except as set forth herein, Buyer shall assume and be responsible for all Liabilities of Seller under the Assumed Executory Contracts, including any costs to cure any ongoing default under any Assumed Executory Contract (the "Cure Costs") in accordance with the Bidding Procedures. <u>Section 2.08(a)</u> of the Disclosure Schedules sets forth a correct and complete list of all Assumed Executory Contracts as of the date hereof, including any Cure Costs associated therewith. Therefore, Buyer shall only be obligated to pay Liabilities under contracts which Buyer has explicitly assumed pursuant to section 2.08(a) of this Agreement, which will be designated by Buyer, and detailed in section 2.08(a) of the Disclosure Schedules. If the Buyer indicates in the Disclosure Schedules that Buyer does not wish to assume a Cure Cost, it shall be deemed that Buyer does not assume the corresponding contract.  Notwithstanding the foregoing, Buyer shall not assume any Cure Costs related to any provider agreement (i.e., Medicare, Medicaid or any HMOs), which amount shall either be satisfied by Seller simultaneously with the Closing or credited at Closing against the Purchase Price.

11

2.09    Without limiting the generality of the foregoing, Buyer will have no liability for any Excluded Liabilities or Excluded Assets.  Other than the Assumed Liabilities, Buyer shall not assume from Seller any Liabilities whatsoever, all of which shall be retained by the Seller and considered Excluded Liabilities including without limitation:

(a)    malpractice, professional liability or other tort claims, statutory or regulatory claims, claims of local, state or federal agencies whether civil or criminal, fraud-based claims or claims for breach of contract to the extent any such claims are based on acts or omissions of Seller or events occurring at the Facilities before the Closing Date;

(b)    any accounts payable, taxes, or other obligation or Liabilities of Seller to pay money incurred by Seller for periods prior to the Closing Date;

(c)    any collective bargaining agreements or other agreements or understandings with any labor union or collective bargaining unit or any employment or consulting agreements of any kind and any Liabilities arising from any pension fund or benefits programs;

(d)    any administrative expense Claims accruing in the Chapter 11 Case;

(e)    Liabilities of Seller arising under or in connection with any Excluded Contract;

(f)    Liabilities of Seller arising under all employment and change of control contracts, severance obligations, equity option contracts and equity purchase contracts to which Seller is a party other than any Liability arising pursuant to any Assumed Contract;

(g)    Liabilities or obligations in connection with any indebtedness of Seller, except pursuant to any Assumed Contract or other Assumed Liability;

(h)    other than Cure Amounts related to the Assumed Contracts, all pre-petition and post-petition Claims as of the Closing Date, including, without limitation, all trade payables and general unsecured Claims;

(i)    any Liability arising out of, under or in connection with the Excluded Assets;

(j)    all Liabilities relating to (including amounts or notice due to) employees, former employees, consultants, former consultants or retirees of Seller based on the termination of such employment or engagement by the Seller, including any amounts due to such Persons prior to Closing;

(k)    any Liability that is not an Assumed Liability; and

(l)    other than Cure Amounts related to the Assumed Contracts, any other Liabilities arising in whole or in part from Seller's acts or omissions or in any way related to the operations of the Facility prior to the Effective Time.

12

2.10   Inspection / Due Diligence Period.   Buyer agrees that it has conducted sufficient due diligence to close the sale and purchase the Acquired Assets as is, where is, other than as otherwise agreed by Seller and Buyer.

2.11   Revisions to List of Assumed Executory Contracts. Subject to the terms of any controlling Bankruptcy Court order and the requirements of the Bankruptcy Code, Buyer may revise Schedule 2.08(a) at any time prior to the Bankruptcy Court's entry of the Sale Order, by giving notice to Seller; provided, however, that such revision shall not result in additional cost (including Cure Cost) to Seller., following entry by the Bankruptcy Court of the Sale Order.  Immediately upon Buyer's delivery of such written notice to Seller, Schedule 2.08(a), so revised, will define the scope of the Assumed Executory Contracts in all respects pursuant to this Agreement, including the scope of Assumed Liabilities, Assumed Executory Contracts, Excluded Liabilities, and Excluded Agreements, and Cure Costs.

2.12   Provider Agreements;

    (a)   Operations Transfer Agreement:  The Buyer and Seller shall enter into an ancillary agreement providing for the orderly transition of the operations of each Facility from the Seller to the Buyer (the "***Operations Transfer Agreement***").  The Operations Transfer Agreement shall specify the terms and conditions of the transition of operations of, and financial responsibility for, the Facilities from Seller to Buyer for the time period between the entry of the Sale Order and the Closing Date.

    (b)   Management Agreement.  The Buyer and Sellers shall enter into an ancillary agreement within five (5) Business Days of entry of the Sale Order to transfer management and operation of the Facilities, subject to Applicable Law (the "***Management Agreement***").  Pursuant to the Management Agreement, all economic risk and reward in relation to the operation of the Facilities transfers to the Buyer on the effective date of the Management Agreement.    The effective date of the Management Agreement shall be no later than two (2) weeks following the earlier of (i) the Auction, or (ii) if no other qualified bids are received and the Auction is cancelled, the Preliminary Bid Deadline; *provided, however*, that the parties shall use good faith efforts to cause the Management Agreement to become effective as soon as feasible after the earlier of (i) or (ii).

    (c)   Interim Billing. (a) As of the Closing Date and to the extent permitted by Applicable Law, Seller shall transfer and assign to Buyer all of Seller's rights and interests in and to Seller's Medicare and Medicaid provider numbers and Medicare and Medicaid provider reimbursement agreements. The Parties acknowledge and agree that Buyer is not expected to have received its "tie in" notice from Centers for Medicare and Medicaid Services ("CMS") with respect to Seller's Medicare or Medicaid provider agreements or any new Medicare or Medicaid provider agreements (collectively, the "Provider Agreements") as of the Closing Date. Prior to Buyer's receipt of its tie in notice and Provider Agreements, so long as Buyer is accepting assignment of the Provider Agreements and is utilizing commercially reasonable efforts to become the certified Medicare and/or Medicaid provider, as applicable, at the Facility, Seller agrees that Buyer may bill for services performed following the Closing under Seller's Medicare and/or Medicaid

13

provider number, as applicable, to the extent permitted by Applicable Law. (b) The Parties acknowledge and agree that Seller's managed care provider plans and agreements with other third-party payors are not expected to have been updated with Buyer's provider information as of the Closing Date. From and after the Closing Date until such managed care provider plans and agreements with other third-party payors are updated with Buyer's provider information, Seller agrees that Buyer may bill for services provided following the Closing under Seller's managed care provider plans and agreements with other third-party payors using Seller's provider information to the extent permitted by Applicable Law and the terms and conditions of the plans and agreements with the third party payors. (c) Any reimbursements from Medicare or Medicaid billed by Buyer for dates of service after the Closing Date which are paid into Seller's accounts shall be forwarded by Seller to Buyer.

## ARTICLE III
### REPRESENTATIONS AND WARRANTIES

3.01 <u>Seller's Representations and Warranties</u>.  Seller represents and warrants to Buyer as follows and agrees that each of the following will be true and correct on the Execution Date and the Closing Date.  This Section 3.01 contains the full and complete list of Seller's representations and warranties to Buyer.  Seller covenants as follows:

(a) <u>Organization of Seller</u>. Each Seller as listed in the preamble above is either a limited liability company or corporation duly organized and validly existing and in good standing under the laws of the State of Iowa.

(b) <u>Authority</u>.  The execution and delivery of this Agreement and the Ancillary Agreements to which it is a party, and the consummation of the transactions herein contemplated have been duly and validly authorized by all necessary action on the part of Seller.  Subject to the Bankruptcy Court's entry of the Sale Order, this Agreement has been, and any Ancillary Agreements will be as of the Closing Date, duly executed and delivered by Seller, and do or will (as the case may be) constitute Seller's valid, legal, and binding obligation according to their terms.

(c) <u>Consents and Authority</u>.  Except for the Bankruptcy Court's entry of the Sale Order, Seller has obtained all corporate approvals and membership consents necessary to consummate the transactions contemplated therein.

(d) <u>Title</u>.  Seller has delivered to or made available for Buyer's review true, correct, and complete copies of the title abstracts for all real estate in which Seller has an interest.

(e) <u>Litigation and Compliance with Laws</u>.  To Seller's Knowledge, Schedule 3.01(e) sets forth a complete and accurate description of any litigation, proceeding, claim or investigation threatened or pending before any court, arbitrator or administrative agency affecting or relating to Seller or Seller's operation of the Facilities.

14

(f)    <u>Utilities</u>.  To Seller's Knowledge, all water, gas, electricity, telephone, cable, drainage facilities, sewer and other utilities required for the operation of the Facilities either enter the Land through adjoining public streets or, if they pass through adjoining private land, they do so in accordance with recorded easements.

(g)    <u>Tax Returns; Taxes</u>.  Except as precluded by the Bankruptcy Code, Seller has filed all Tax Returns due as of the Execution Date of this Agreement and has or will pay all Taxes against the Facilities and/or Seller that relate to Seller's ownership and/or operation of the Facilities, or that could constitute an Encumbrance against the Facilities, if and when they are due and payable.

(h)    <u>Non-Foreign Status</u>.  Seller is not a foreign entity (as the term is defined in the Internal Revenue Code and Income Tax Regulations) and Seller agrees to execute a Certificate of Non-Foreign Status pursuant to Section 1445 of the Internal Revenue Code at Closing.

(i)    <u>Broker's Fee</u>.  Seller is solely responsible for satisfying any Claim relating to any broker or advisor with respect to the transactions this Agreement contemplates for a brokerage commission, consulting fee, finder's fee or similar payment.

(j)    <u>Bulk Sales Law</u>.  Seller has complied, or will comply, with any applicable bulk sales law requirements applicable to the sale of the Facilities, at its sole expense.

(k)    <u>Environmental Matters</u>. To Seller's Knowledge, except as set forth on Schedule 3.01(t), the Facilities are in compliance with all federal, state and local environmental, health and safety laws, statutes ordinances and regulations, including all laws relating to Hazardous Materials, and wetlands.

(l)    <u>Employee Plans</u>.  Except as otherwise may be prohibited by law, Seller has delivered to or made available for Buyer's review true, correct, and complete copies of Seller's Employee Plans.

(m)    <u>Fraud and Abuse</u>.  Except as set forth on Schedule 3.01(t), to Seller's Knowledge, Seller has not engaged in any activities that are prohibited under 42 U.S.C. §1320a-7b or 42 U.S.C. 1395, or the regulations promulgated thereunder, or any applicable related Law, or that are prohibited by rules of professional conduct, including the following:  (a) knowingly and willfully making or causing to be made a false statement or representation of a material fact in any application for any benefit or payment; (b) knowingly and willfully making or causing to be made any false statement or representation of a material fact for use in determining rights to any benefit or payment; (c) any failure by a claimant to disclose knowledge of the occurrence of any event affecting the initial or continued right to any benefit or payment on its own behalf or on behalf of another, with the intent to fraudulently secure such benefit or payment; and (d) knowingly and willfully soliciting or receiving any remuneration (including any kickback, bribe or rebate) directly or indirectly, overtly or covertly, in cash or in kind, or offering to pay or receive such remuneration (i) in return for referring an individual to a person for the furnishing or

15

arranging for the furnishing of any item or service for which payment may be made in whole or in part by Medicare or Medicaid, or (ii) in return for purchasing, leasing or ordering or arranging for, or recommending, purchasing, leasing or ordering any good, facility, service or item for which payment may be made in whole or in part by Medicare or Medicaid. Seller is not and at no time has been suspended or excluded from participation in any federally funded health care program, including Medicare or Medicaid.

(n)    <u>Insurance Policies</u>.  Seller has delivered to or made available for Buyer's review true, correct, and complete copies of Seller's policies of insurance applicable to Seller, and the Facilities, including medical malpractice insurance covering all physicians and other professional personnel Seller has engaged or employed, general liability insurance, property insurance, employer's liability and workers' compensation insurance.

(o)    <u>Certificates of Need</u>.  Seller has delivered to or made available for Buyer's review true, correct, and complete copies of Seller's certificates of need; (ii) letters of non-reviewability; or (iii) other exemptions from certificate of need review, that Seller holds or uses in the operation of the Business.  <u>Schedule 3.01(o)</u> sets forth a true, correct, and complete list of all such documents.

(p)    <u>Medical Staff</u>. Seller has delivered to or made available for Buyer's review true, correct, and complete copies of Seller's (i) medical staff privilege and membership application forms; (ii) delineation of privilege forms; current medical staff bylaws, rules and regulations, and amendments thereto; (iii) credentials and appeals procedures not incorporated in any of the foregoing; and (iv) contracts with physicians, physician groups, or other members of the medical staff of the Facilities.

(q)    <u>Hill-Burton and Other Liens</u>.  Seller has not received any loans, grants, or loan guaranties pursuant to the United States Hill-Burton Act (42 U.S.C. § 291a, *et seq*.) program, the Health Professions Educational Assistance Act, the Nurse Training Act, the National Health Pharmacy and Resources Development Act, or the Community Mental Health Centers Act.  To Seller's Knowledge, none of the Acquired Assets are subject to any liability in respect of amounts received by Seller or others for the purchase of the Acquired Assets (or any part thereof) under restricted or conditioned grants or donations, including monies received under the Public Health Services Act (42 U.S.C. § 291, *et seq*.).

(r)    <u>Experimental Procedures</u>. Neither Seller, nor any officers, employees or agents of Seller, have performed or permitted to be performed, nor do they have Knowledge of the performance of, any experimental procedures involving patients/residents in the Facilities.

(s)    <u>Permits</u>.  Except as set forth on Schedule 3.01(s), the Facilities are duly licensed in accordance with the Laws of the State of Iowa, DOH and all other ancillary departments or services located at or operated for the benefit of, the Facilities that are required to be

16

separately licensed are duly licensed by the appropriate Governmental Authority. To the Knowledge of Seller, Seller has all Permits which are needed or required by Law to operate its business related to or affecting the Facilities or any ancillary services related thereto as currently conducted. Schedule 3.01(s) is a true, complete and accurate list all material Permits owned or held by or issued to Seller relating to the ownership or operation of the Facilities or the Acquired Assets and such Permits constitute all material Permits necessary for the conduct of the Business and operation of the Facilities as currently conducted and for the ownership of the Facilities by Seller and operation and use of the Acquired Assets by Seller, all of which are in full force and effect.

(t)    Compliance. Except as set forth on Schedule 3.01(t), or to the extent such failure would not constitute a Material Adverse Effect, to the Knowledge of Seller, Seller is complying in all material respects with all applicable statutes, rules, regulations, and requirements of each Governmental Authority having jurisdiction over the Seller, the operations of the Facilities and the Acquired Assets.

(u)    Licensed Beds and Current Rate Schedule. Schedule 3.01(u) sets forth a true, correct and complete statement, as of three (3) Business Days prior to the Execution Date, of: (i) the number and type of licensed beds at the Facilities, and (ii) the number of beds then occupied in, and the occupancy percentages at, the Facilities.

(v)    Prohibited Practices. Except as set forth on Schedule 3.01(t), during the eighteen (18) month period prior to the Execution Date, no officers or directors of Seller have, during their period of engagement with Seller, been charged with, convicted of or pleaded guilty to crimes of theft or dishonesty, financial misconduct, or offenses related to the delivery of health care services, nor, to Seller's Knowledge, have any of Seller's current officers or directors been excluded from participation in Medicare, Medicaid or any other state or federal government reimbursement program. To Seller's Knowledge, during the eighteen (18) month period prior to the Execution Date, none of Seller's officers, directors or employees has engaged in any conduct that may result in sanctions to Seller under any federal or state laws.

(w)    Government Investigations. Except as set forth on Schedule 3.01(t), other than for routine state and federal inspections or surveys performed by DOH, during the eighteen (18) month period prior to the Closing Date, Seller has received no written notice of the commencement of any investigation proceedings or any governmental investigation or action (including any civil investigative demand or subpoena) under Laws.

(x)    Cost Reports. Seller has filed all cost reports required to be filed for the Facilities as of the Closing Date under Law. Seller has furnished Buyer with copies of all cost reports filed by Seller with the appropriate State agency, the appropriate Medicare and Medicaid agencies and/or fiscal intermediaries in respect of the operation of the Facilities for the years ended December 31 2020 and 2019, and to Seller's Knowledge, such cost reports did not contain any material disallowable costs or expenses or any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements

17

contained therein not misleading, and, to Seller's Knowledge, such cost reports have been prepared in all material respects in accordance and compliance with all applicable government rules and regulations.

(y) <u>Financial Information</u>.

(i) <u>Schedule 3.01(y)</u> hereto contains the following financial statements and financial information (collectively, the "***Historical Financial Information***"):

unaudited financial statements consisting of the balance sheet of the Business as of December 31, 2021, and the related statements of income and net surplus/deficit, and cash flow for the 12-month period ended on December 31, 2020 (the "***Unaudited Financial Information***").

(ii) The Unaudited Financial Information included in the Historical Financial Information has been prepared consistent with past practice and may not include required footnote disclosures or reflect normal year-end adjustments. Seller has not changed in any material respects any accounting policy or methodology in calculating reserves, including reserves for uncollected accounts receivable, throughout all periods presented in the Historical Financial Information.

(z) <u>Real Property</u>.

(a) <u>Schedule 3.01(z)</u> contains an accurate and complete legal description, street address and tax parcel identification number for the Land. Seller holds good and indefeasible fee simple title to all the Land and shall convey the Land in accordance with the Sale Order free and clear of all Liens (other than the Permitted Liens). Seller is not a lessee of any portion of the Land. Seller agrees that title to the Land shall not be altered between the Execution Date and Closing. Except as set forth on <u>Schedule 3.01(z)</u>, other than the right of Buyer pursuant to this Agreement, there are no outstanding agreements, options, rights of first offer, rights of first refusal, or any other grant to third party to sell, purchase, lease, sublease, use, occupy, or enjoy the Land or any portion thereof or interest therein.

(b) Except as set forth on Schedule 3.01(t), Seller has not received written notice from any Governmental Authority of (and otherwise has no Knowledge of): (i) any pending or threatened condemnation proceedings affecting the Land, or any part thereof; (ii) any written notice asserting or alleging any material violations or potential violations of any Laws (including zoning and land use ordinances, building codes and similar requirements) with respect to the Land, or any part thereof, which have not heretofore been cured; or (iii) any pending or threatened proceedings, nor any claims or actions against Seller or the Land, relating to the ownership, lease, use or occupancy of such Land or any portion thereof which is reasonably likely to result in a material change in the condition of the Land or the ownership or operation of the Land. Seller has not received any

18

written notice of any pending zoning or other land use change affecting the real property.

(c)     Neither Seller nor, to Seller's Knowledge, any other person is in violation of a condition or agreement contained in any easement, restrictive covenant or any similar instrument or agreement affecting any of the Land in any material respect.

(d)     To Seller's Knowledge, except as set forth on Schedule 3.01(z), the Land is zoned for its current use and there are no waivers or variances granted by any Governmental Authority which, as a result of the transactions contemplated in this Agreement, will be withdrawn or abrogated, including but not limited to life safety code waivers.

3.02    Buyer's Representations and Warranties. Buyer makes the following representations and warranties to Seller, which will be true and correct as of the date made and the Closing Date:

(a) Organization of Buyer. Buyer is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Delaware and licensed to do business in the State of Iowa.

(b) Authority. The execution and delivery of this Agreement and the consummation of the transactions herein contemplated have been duly and validly authorized by all necessary corporate action on the part of Buyer, and this Agreement constitutes, and the documents contemplated hereby will be, Buyer's valid and legally binding obligations, enforceable according to their terms.

(c) Conflict or Default. Neither the execution nor delivery of this Agreement, nor the consummation of the transactions herein contemplated will conflict with, violate, result in a breach by, constitute a default under or accelerate the performance provided by the terms of any Law or agreement to which Buyer may be subject.

3.03    Full Disclosure.  To their Knowledge, no representation or warranty by Seller or Buyer, and no statement, document, financial statement, certificate or other instrument, schedule or exhibit furnished or to be furnished hereunder or in connection with the transactions contemplated hereby (including all exhibits and schedules hereto) contains or will contain any untrue or misleading statement of fact or omit to state or contain anything necessary to make such matter correct, complete and not misleading in all respects and to fairly present the information set forth in a manner that is not misleading.

19

## ARTICLE IV
### TITLE AND SURVEY

4.01    Title Report and Policy.  Promptly after the Execution Date, Seller will use good faith efforts to deliver for Buyer's review true, correct, and complete copies of all abstracts of title to the Land.  If the abstracts are not available, Buyer shall promptly order, or shall order a title commitment from the Escrow Agent.  An abstract for any parcel of Land purchased will become the property of Buyer when Buyer pays the Purchase Price in full. Seller will pay the cost of any additional abstracting title work due to any act or omission of Seller.  Buyer may elect to obtain a title insurance policy in lieu of an attorney's opinion at Buyer's expense.  Any objections to the title commitment Buyer identifies will be treated in the same manner as title objections in the attorney's title opinion.  Buyer shall have the right to object to anything material shown in the abstract (or title commitment) and survey, other than matters set forth in (3) through (6) below, by written notice ("Buyer Objection Letter") to Seller with five (5) business days of receipt of both the abstract (or title) and survey (the "Unpermitted Exceptions"). Seller shall identify whether or not it is willing or capable of correcting within ten (10) business days of receipt of the objection letter.   If Seller determines not to remove or correct such Unpermitted Exceptions, then Buyer may elect upon written notice to Seller made within three (3) Business Days after Buyer's receipt of the Seller objection response: (i) to terminate this Agreement as to that specific Facility or Land by written notice to Seller, in which event the Deposit shall be refunded to Buyer and neither party shall have any further liability to any other party under Agreement, except as otherwise provided in this Agreement; or (ii) to take the Property subject to such Unpermitted Exceptions, without adjustment to the Purchase Price, in which case such Unpermitted Exceptions shall become Permitted Exceptions.   Any objection by the Buyer to something material in an abstract or survey shall only apply as a right to terminate the Agreement as to the Land subject to such abstract or survey and Buyer shall not have the right to terminate the entire Transaction. As used herein, "Permitted Exceptions" means: (1) all restrictions, reservations, covenants and easements of record, if any, to which Buyer fails to object in its Buyer Objection Letter; (2) all matters disclosed on the Survey to which Buyer fails to object in its Buyer Objection Letter; (3) all current period Taxes not yet due and payable; (4) any covenants, conditions, or restrictions, or applicable Laws or other governmental regulations, governing or limiting the use of the property, in each case that are not violated by the existing improvements or the current use thereof; (5) any utility or other easements that would qualify under the foregoing clause and which further do not underlay any of the existing improvements on the Property; and (6) liens created by, through, or under Buyer. Notwithstanding anything to the contrary, all monetary liens (other than those set forth in subsections ((3) and (6)) shall be Unpermitted Exceptions and shall be removed by Seller, at its sole cost and expense, prior to the Closing.

4.02    Survey.  Seller has delivered to or made available for Buyer's review any surveys of Land in its possession.  Prior to Closing, Buyer may at its expense obtain a survey of the Land, or update an existing survey at Buyer's expense.

20

## ARTICLE V
### CONDITIONS

5.01    <u>Conditions to Buyer's Obligations</u>.    Buyer's obligations under this Agreement are conditioned upon the following (which Buyer may waive, in whole or in part, in writing):

   (a)    <u>Performance of Covenants</u>.    Seller has, in all material respects, timely performed all covenants and obligations, and timely complied with all conditions required of Seller by this Agreement.

   (b)    <u>Representations and Warranties</u>.    All of Seller's representations and warranties are true, complete and correct, in all material respects, on the Execution Date and as of the Closing Date as if made at that time (other than the representations and warranties that by their terms address matters only as of another specified date, which shall be so true, complete and correct, in all material respects, only as of such other specified date), except where the failure of such representations and warranties to be true, complete and correct, in all material respects, had not had, and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

   (c)    <u>Closing Documents</u>.    At the Closing, Seller will deliver or cause to be delivered each of the items required of it as specified in <u>Section 8.02</u> of this Agreement.

   (d)    <u>Litigation</u>.    Following the Execution Date, no notice has been received as to litigation commenced or Claim made or threatened against any Person, by any other Person with regard to this Agreement, or the transactions provided for in this Agreement that, if successfully prosecuted, would have a Material Adverse Effect on Buyer.

   (e)    <u>Sale Approval Motion</u>.    Seller shall have filed a motion with the Bankruptcy Court seeking entry of the Sale Order, in form and substance satisfactory to Buyer (the "<u>Sale Approval Motion</u>").

   (f)    <u>Bidding Procedures Order</u>.    There shall have been entered prior to any Auction, an Order of the Bankruptcy Court in the Bankruptcy Case (the "***Bidding Procedures Order***") approving, among other things: (i) in the event of an accepted overbid from a third party for the Acquired Assets and the closing of a transaction with respect thereto with such third party (a "***Third Party Closing***"), the payment of the Break-Up Fee to Buyer; (ii) an initial minimum overbid for any Auction in the amount of $100,000 plus the Break-Up Fee and a $100,000 minimum for additional overbids thereafter; (iii) that the Break-Up Fee shall be paid to Buyer from (and at the time of) the proceeds of the Third Party Closing, and the claim of Buyer for the Break-Up Fee shall have administrative expense priority under section 503(b)(1)(a) of the Bankruptcy Code, in each case, in accordance with the terms and conditions of the Bidding Procedures Order; and (iv) that, during any

21

Auction, the Buyer shall receive a credit in connection with each bid in an amount equal to the sum of the Break-Up Fee.

(g)    Auction.  If there have been any Qualified Bids (as defined in the Bidding Procedures Order), Seller shall have conducted an auction sale (the "***Auction***") of the Acquired Assets in accordance with the Bidding Procedures approved by the Bankruptcy Court in the Bidding Procedures Order no later than the Auction (or such later date for which notice is provided in the Bidding Procedures Order or as Seller and Buyer may otherwise mutually agree), and Buyer's offer shall have been accepted by Seller as the highest or best offer for the Acquired Assets at the conclusion of the Auction.

(h)    Consent.  All certifications, consents, waivers, approvals, authorizations, Government Authorizations and determinations from and by third parties necessary legally to consummate the transactions contemplated herein have been obtained.

(i)    Title Policy.  If applicable, any title insurance policy described in Article IV of this Agreement has been issued.

(j)    Condition of Acquired Assets.  Following the Execution Date, there has been no material adverse damage to the Facilities.

(k)    Subsequent Events.  Except as set forth on Schedule 3.01(t) and Schedule 3.01(e), no action, investigation, Claim or proceeding has been instituted or threatened, or other matters occurred, that involve the likelihood of a Material Adverse Effect on the Business or the Facilities, and no action, investigation or proceeding has been instituted or threatened before any court or Governmental Authority to restrain or prohibit, or to obtain substantial damages in respect of, this Agreement, or the consummation of the transactions herein contemplated.

(l)    Other Deliveries.  Seller has delivered other items and deliveries relating to the Facilities as Buyer reasonably requests.

(m)    Licenses.  The Sale Order shall include approval of the Operations Transfer Agreement to allow Buyer to operate the Facilities until it has obtained all of the licenses required to operate the Facilities from the DOH.

(n)    Compliance.  No Facility shall be Out of Compliance, except as set forth on Schedule 3.01(t).

(o)    Material Adverse Effect.  There will have occurred following the date hereof no events nor will there exist circumstances which singly or in the aggregate have resulted in a Material Adverse Effect, provided, however, closure of one facility, including, without limitation, loss of license or provider agreement, shall be considered a Material Adverse Effect only with respect to that one respective facility and shall not be deemed a Material Adverse Effect to the entire Transaction.  Such Material Adverse Effect involving a

22

particular facility shall result in a corresponding Purchase Price adjustment in an amount equal to the corresponding amount on Schedule 5.01(o).

(p)   Sale Order. The Bankruptcy Court has entered the Sale Order and as of Closing, such Sale Order remains in full force and effect.

5.02   Conditions to Seller's Obligations.   Seller's obligations under this Agreement are conditioned upon the following (which Seller may waive, in whole or in part, in writing):

(a)   Performance of Covenants.  Buyer has timely performed all covenants and obligations, and timely complied with all conditions this Agreement require of Buyer in all material respects, including paying the Purchase Price to Seller.

(b)   Representations and Warranties.  All of Buyer's representations and warranties contained herein are true, complete and correct in all material respects on the Execution Date and as of the Closing Date, as if made at that time.

(c)   Conveyances. Buyer and Seller have received all third party certifications, covenants, waivers, approvals, authorizations, Government Authorizations and determinations necessary to legally consummate the transactions contemplated herein.

(d)   Payment of Purchase Price. Buyer has delivered the Purchase Price by wire transfer of immediately available funds.

(e)   Other Deliveries.  Buyer has delivered other items and deliveries relating to the Facility as Seller reasonably requests.

(f)   Sale Order. The Bankruptcy Court has entered the Sale Order and as of Closing, such Sale Order remains in full force and effect.

## ARTICLE VI
### TERMINATION

6.01   Termination.  This Agreement may be terminated as follows:

(a)   At any time by the mutual written agreement of the Seller and the Buyer;

(b)   Automatically, upon the consummation of any Acquisition Transaction between the Seller and a party other than the Buyer;

(c)   By the Buyer, at its sole election, in the event that the Closing shall not have occurred prior to 120 days from entry of the Sale Order, subject to change of ownership approval by the regulatory agencies (the "*Outside Date*"); provided that the Buyer shall not be entitled to terminate this Agreement pursuant to this Section 6.01  if the failure of the Closing to occur on or prior to such date results primarily from the Buyer itself materially breaching any representation, warranty or covenant contained in this Agreement;

23

(d)    By the Seller, at its sole election, in the event that the Closing shall not have occurred on or before the Outside Date; provided that the Seller shall not be entitled to terminate this Agreement pursuant to this Section 6.01(d) if the failure of the Closing to occur on or prior to such date results primarily from the Seller materially breaching any representation, warranty or covenant contained in this Agreement;

(e)    By the Buyer, at its sole election, in the event of a material breach of this Agreement by the Seller that has not been cured within ten (10) Business Days after written notice to the Seller, or if any representation or warranty of the Seller shall have become untrue in any material respect, in either case such that such breach or untruth is incapable of being cured, by the Outside Date.  Buyer shall not have a right to terminate under this section if Buyer is in material breach or any of its representations and/or warranties are untrue such that satisfaction of conditions to close under section 5.01 would be prevented;

(f)    By the Seller, at its sole election, in the event of a material breach of this Agreement by the Buyer that has not been cured within ten (10) Business Days after written notice to the Buyer, or if any representation or warranty of the Buyer shall have become untrue in any material respect, in either case such that such breach or untruth is incapable of being cured, by the Outside Date.  Seller shall not have a right to terminate under this section if Seller is in material breach or any of its representations and/or warranties are untrue such that satisfaction of conditions to close under section 5.02 would be prevented;

(g)    By the Buyer, at its sole election, upon the granting of any motion for relief from the automatic stay which would have a Material Adverse Effect, the conversion of the Case to a case under Chapter 7 of the Bankruptcy Code, the dismissal of the Case, the filing of any plan of reorganization by any party in interest that does not incorporate this Agreement, the filing of any motion by a party in interest in the Case to liquidate the Acquired Assets or any similar commencement of liquidation proceedings relating to the Seller, other than as contemplated herein, which is not dismissed within thirty (30) days, or upon the commencement of any similar actions or proceedings in or by any foreign court with respect to the Seller, which are not dismissed within thirty (30) days;

(h)    By the Buyer, at its sole election, if any of the conditions set forth in Section 5.01 shall not have been, or the facts and circumstances are such that any of such conditions cannot be, fulfilled by the Outside Date, unless such failure shall be primarily due to the failure of Buyer to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing;

(i)    By the Seller, at its sole election, if any of the conditions set forth in Section 5.02 shall not have been, or the facts and circumstances are such that any of such conditions cannot be, fulfilled by the Outside Date, unless such failure shall be primarily due to the failure of Seller to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing;

24

(j)      By the Buyer, upon entry by the Bankruptcy Court of any Order, or any other Governmental Authority of any Governmental Order, that is inconsistent in any material respect with the proposed Sale Order or, upon entry, with the Sale Order;

(k)      By the Buyer, if there shall be any Law that makes consummation of the transactions contemplated by this Agreement or any other Transaction Document illegal or otherwise prohibited;

(l)      By the Seller, if there shall be any Law that makes consummation of the transactions contemplated by this Agreement or any other Transaction Document illegal or otherwise prohibited; or

(m)      By the Buyer, if any Governmental Authority shall have issued a Governmental Order restraining or enjoining the transactions contemplated by this Agreement or any other Transaction Document, and such Governmental Order shall have become final and non-appealable; or

(n)      By the Seller, if any Governmental Authority shall have issued a Governmental Order restraining or enjoining the transactions contemplated by this Agreement or any other Transaction Document, and such Governmental Order shall have become final and non-appealable.

6.02   Effect of Termination.

(a)      In the event of the termination of this Agreement in accordance with this Article VI, this Agreement shall immediately become void and there shall be no liability on the part of any party hereto except (a) confidentiality obligations; (b) as set forth in this Article VI, Section 6.02, Article XII, and Article XIII; (c) any obligations for material breach of this Agreement occurring prior to such termination; and (d) that nothing herein shall relieve any party hereto from liability for any willful breach of any provision hereof (which, for the avoidance of doubt, will be deemed to include any failure by Buyer to consummate the Closing if and when it is obligated to do so hereunder with no outstanding breach or unsatisfied closing condition by Seller).

(b)      Breach by Buyer. In the event of termination of this Agreement pursuant to Section 6.01(f) due to a breach by Buyer, Sellers shall be entitled to to retain the Deposit as liquidated damages.

(c)      Deposit.

(i)      In the event of a valid termination of this Agreement pursuant to Section 6.01(f) due to a breach by Buyer, Sellers shall be entitled to receive the Deposit. In the event of such termination, the Parties shall direct the Escrow Agent to pay the Deposit to Sellers. The Sellers' receipt of the Deposit pursuant to this Section 6.02(c) is the only remedy available and will be liquidated damages.

25

(b)    In the event of termination of this Agreement pursuant to Section 6.01 (except pursuant to Section 6.01(f)), the Parties shall direct the Escrow Agent to promptly return the Deposit to Buyer.

6.03    Procedure Upon Termination.  In the event of termination by Buyer or Seller, or both, pursuant to Section 6.01, notice thereof shall forthwith be given to the other party.  If this Agreement is terminated as provided herein, each party shall redeliver all documents, work papers and other material of any other party relating to the transactions contemplated by this Agreement, whether so obtained before or after the execution hereof, to the party furnishing the same as soon as reasonably practicable following termination.

## ARTICLE VII
BANKRUPTCY COURT APPROVAL OF THE "STALKING HORSE" BIDDER

7.01    Motions and Notices Regarding Sale of Assets and Assumption and Assignment of Assumed Executory Contracts

(a) Seller shall seek prompt entry of the Sale Order pursuant to the Sale Motion after sufficient notice has been given, which Sale Order shall include, among other things, findings of fact and conclusions of law that the Buyer is not a successor-in-interest to the Seller or any Affiliate of Seller and that the Buyer is a good faith purchaser pursuant to Bankruptcy Code section 363(m).

(b) The Seller covenants that, to the extent that it has not done so prior to the date of this Agreement, they shall promptly serve the third parties who are parties to Assumed Executory Contracts (such third parties being "*Cure Obligees*") with written notice of proposed cures on the Assumed Executory Contracts (such notice being the "*Cure Notice*"), which Cure Notice shall be provided to the Buyer within the time periods provided by the Bidding Procedures Order. The Cure Notice shall, as set forth in the Bidding Procedures Order, establish a deadline reasonably in advance of the Closing Date by which Cure Obligees must object to respective proposed cures or be deemed to have waived any such objection.

7.02    Requests for Information.  From the date of the approval of the Bidding Procedures Order (a) if the Seller supplies any information regarding the Business to a potential bidder not heretofore given to the Buyer, the Seller shall further provide the Buyer with a copy of such information within 24 hours of providing that information to any other potential bidder; and (b) with respect to any bid, term sheet, or written expression of interest by any other party for any asset or assets of any Seller, or any other reorganization proposal, submitted prior to the bid deadline established in the Bidding Procedures Order, the Seller shall provide the Buyer with prompt notice of such proposal.

26

7.03    <u>Break-Up Fee</u>.  If this Agreement is terminated for any reason except pursuant to <u>Section 6.01(a)</u> or <u>Section 6.01(f),</u> then in consideration of the real and substantial benefits conferred by the Buyer upon the Seller's bankruptcy estate by providing a minimum floor bid upon which the Seller, its creditors and the other bidders were able to rely and in consideration of the time, expense and risks associated with serving as the "Stalking Horse" Bidder, including legal fees and expenses, overhead costs, due diligence expenses and other similar expenses related to the negotiation and preparation of this Agreement and of all related transactional documentation, due diligence and representation, the Seller shall pay to the Buyer, at the time of the closing of the sale of the Acquired Assets to the successful bidder for the Acquired Assets, solely from the sale proceeds received by the Seller from the closing of the Acquisition Transaction, provided that the Buyer is not then in material default of its obligations under this Agreement, the Break-Up Fee. The Seller and Buyer agree and stipulate that the Buyer has provided a mutual benefit to the Seller's estate by increasing the likelihood that the best possible price for the Acquired Assets shall be received and that the Break-Up Fee is reasonable and appropriate in light of the size and nature of the proposed sale transactions and comparable transactions, the commitments that have been made and the efforts that have and shall be expended by the Buyer and were necessary to induce the Buyer to pursue the transactions contemplated hereby under the terms of this Agreement. The Break-Up Fee also shall serve as liquidated damages with respect to any claims the Buyer may have against the Seller in connection with the Seller's failure to close the sale of the Acquired Assets to the Buyer as contemplated by this Agreement and Buyer shall provide a release to the Seller of any and all such claims upon payment of the Break-Up Fee.

7.04    <u>Defense of Orders</u>.  The Seller, at its sole cost and expense, shall diligently defend the Bidding Procedures Order and the Sale Order in the event that any motion for reconsideration or appeal of such Orders is filed.

**ARTICLE VIII**
CLOSING

8.01    <u>Closing</u>.

(a) Subject to satisfaction of the terms and conditions of this Agreement, including those set forth in <u>Article V</u>, the consummation of the transactions this Agreement contemplate (the "***Closing***") will occur on a date (the "***Closing Date***") not later than the first day of the first month after not less than five (5) Business Days after the satisfaction or waiver of all conditions in <u>Article V</u>, or on such other date as Buyer and Seller mutually agree; provided, however, that the Closing Date shall not be required to occur prior to seventy-five (75) days after the entry of the Sale Order, but the Buyer may elect to the Closing at any point prior.

(b)    The Closing shall be held at a location and on a date and at a time mutually agreed upon by Seller and Buyer, but absent such agreement shall be held at a time and place in Des Moines, Iowa, designated by Buyer in writing to Seller, unless mutually agreed-upon

27

that the closing shall occur by mail or electronic mail by delivery of the closing items. Notwithstanding the foregoing time and place of Closing, Seller and Buyer may deliver all of their respective closing documents required hereunder with respect to the Closing on or before the Closing Date (to hold in escrow in accordance with customary conveyancing practices subject to the consummation of the Closing) by mail, electronic mail, or overnight courier.

8.02    <u>Seller's Closing Documents</u>.  Seller will deliver to Buyer the following documents at Closing in form and substance acceptable to Buyer:

(a)    <u>Warranty Deed</u>.  A general warranty deed conveying to Buyer title to the purchased Land and Improvements in fee simple, free and clear of all Liens and Encumbrances, except Permitted Encumbrances.

(b)    <u>Bills of Sale</u>.  One or more Bills of Sale containing general warranty of title conveying to Buyer the purchased Equipment, the Intangible Personal Property, the Records, and all components of the Facilities that constitute personalty, free and clear of all Liens and Encumbrances.

(c)    <u>Records</u>.  Originals of all Records in the possession of Seller; *provided, however*, that Seller shall retain copies of such records as may be necessary to administer Excluded Assets and otherwise administer the bankruptcy estate until such time as it can be closed.

(d)    <u>Title Policy</u>.  If applicable, the title policy described in <u>Section 4.01</u> of this Agreement.

(e)    <u>Closing Certificate</u>. A Seller's closing certificate reaffirming Seller's representations and warranties hereunder.

(f)    <u>Other Documents</u>. Other documents as Buyer reasonably requests to accomplish the transactions this Agreement contemplates, or to evidence Seller's compliance with its covenants and agreements in this Agreement.

8.03    <u>Closing Costs</u>.  Seller has or will pay (i) the cost of preparing the Warranty Deed, (ii) the cost of the title abstract or title insurance provided herein, and (iii) the fees of its counsel. Buyer will pay (x) the cost of the Survey, (ii) the cost of any environmental site assessment, (y) the per page recording costs associated with recording the warranty deed, and (z) the fees of its counsel.  All security deposits referenced in any Assumed Lease shall be credited to Buyer at Closing.  The rent payable under any Assumed Lease shall be prorated as of the Closing Date.

8.04    <u>Prorations</u>.  The parties agree to the following prorations:

(a)    <u>Accounts Receivable</u>.  Except as otherwise set forth in this Agreement, Accounts Receivable generated by transactions or business operations occurring prior to the Closing Date (or such earlier date as Buyer may assume responsibility for operations and costs under a transition services agreement or operations lease) shall remain Seller's

28

property. Buyer and Seller may arrange for Buyer to collect such Accounts Receivable pursuant to the terms of a mutually agreed-upon ancillary agreement

(b)    <u>Accounts Payable</u>.  Except as otherwise set forth in this Agreement (including within the definition of Assumed Liabilities), Seller will be solely responsible for all accounts payable resulting from the ownership and/or operation of the Facilities prior to Closing (or such earlier date as Buyer may assume responsibility for operations and costs under the Operations Transfer Agreement). Buyer will be solely responsible for all accounts payable resulting from the ownership and/or operation of the Facilities after Closing Date (or such earlier date under the Operations Transfer Agreement) or the assumption of the Assumed Liabilities.

8.05    <u>Adjustments to the Purchase Price</u>.  The following adjustments will be made at Closing, as of 11:59 p.m. on the day preceding the Closing Date, and will be added to the Purchase Price or credited against the Buyer's payment obligations at Closing, as the case may be.

(a)    <u>Taxes</u>.  Real property Taxes, real and personal ad valorem Taxes, and similar charges will be prorated as of the Closing Date in the manner customary for real estate transaction in Iowa.  Because real property Taxes are paid in arrears, the portion of the Taxes allocable to Seller will be credited to Buyer on the closing statement.

(b)    <u>Special Assessments</u>.  Seller will pay in full all improvement lien assessments, if any, whether or not due and payable as of the Closing Date. Special assessments, whether pending or to become a lien prior to Closing, or payable in installments, or for which a change of assessment may be levied on Buyer after Closing, will be credited to Buyer in full at Closing.

(c)    All expenses arising from the conduct of the business of the Facility in the ordinary course, including, without limitation trade payables, telephone expenses and utility charges attributable to the Facility, including any such items held in escrow (all such income and expenses to be referred to herein as the "***Prorated Items***"), shall be apportioned between Seller and Buyer as of the Closing Date, it being the agreement of the Parties that Seller shall be entitled to and responsible for all expenses and similar obligations arising from the operation of the Facilities prior to the Closing Date and Buyer shall be entitled to and responsible for all expenses and similar obligations arising from the operation of the Facilities from and after the Closing Date, except, in each case, as otherwise expressly set forth herein.  All such prorations shall be made based on actual days elapsed in the relevant accounting, billing or revenue period. Utility charges which are not metered and read for the Closing shall be estimated based on prior charges.  Based on reasonable estimates, the Parties shall make all prorations at the Closing, and all such prorations shall be effectuated through adjustment of the Purchase Price at Closing.

(d)    Seller shall provide Buyer, at least twenty (20) days prior to the Closing Date, a schedule setting forth, for each employee, the amount of accrued but unused paid time

29

off (including any accrued sick time) for each employee as of the Closing Date (collectively, "*Accrued PTO*") and the aggregate value of the Accrued PTO. Seller shall provide Buyer on the Closing Date with an updated version of such schedule reflecting Accrued PTO amounts (and the value of those amounts) as of the Closing Date and provide Buyer with a credit to the Purchase Price in an equal to the Accrued PTO. On the Closing Date, Buyer shall assume the Accrued PTO balances with respect to the Transferred Employees and Buyer will, thereafter, be responsible for paying the Accrued PTO to the Transferred Employees in accordance with the Buyer's applicable policies and procedures.

## ARTICLE IX
### CASUALTY; RISK OF LOSS

9.01    <u>Casualty</u>.    In the event of a casualty causing substantial damage to the Facilities before the date of possession, Buyer may (at its option) rescind this Agreement, or may proceed to Closing and receive any insurance proceeds associated with such casualty.

9.02    <u>Risk of Loss Generally</u>.  Except as otherwise specifically provided above or as otherwise agreed by Buyer and Seller in any Ancillary Agreement, risk of loss from the Facilities, including by operation of any law that would impose liability relating to ownership of the Facilities, will not pass to Buyer until acceptance of the deed.

## ARTICLE X
### ADDITIONAL COVENANTS

10.01    <u>Cost Reports</u>. Seller will file or cause to be filed all cost reports required to be filed with CMS prior to the Closing Date (or such earlier date as Buyer may assume responsibility for operations and costs under a transition services agreement or operations lease). Buyer will file or cause to be filed all cost reports required to be filed on or after the Closing Date (or such earlier date as Buyer may assume responsibility for operations and costs under a transition services agreement or operations lease).

10.02    <u>Conduct of Business</u>. From the Execution Date through the Closing Date (or such earlier date as Buyer may assume responsibility for operations and costs under a transition services agreement or operations lease), Seller will, except as expressly provided herein or as otherwise agreed by Buyer and Seller in an Ancillary Agreement, or as the Bankruptcy Code prohibits, maintain and conduct its business in the ordinary course of business.

10.03    <u>Employees</u>.  Buyer and Seller shall consult in good faith about the status of employment of Seller's employees following the Execution Date and prior to the Closing Date.  In the absence of any direction from Buyer, prior to or as of the Closing Date, Seller may terminate any of Seller's employees.  Seller assumes all obligations under the federal WARN Act and any analogous provision of applicable state law with regard to all terminated employees, to the extent the WARN Act or such state law applies. Buyer may

30

offer employment to some or all of Seller's employees, but has no obligation to offer employment to any employee of Seller. Buyer has no obligation whatsoever to any person whom Seller currently, or has previously, employed unless Buyer employs that person after the Closing Date.

10.04    COBRA Coverage. Seller will be responsible for offering and providing any COBRA Coverage with respect to any "qualified beneficiary" who is covered by an Employee Plan that is a "group health plan" and who experiences a "qualifying event" prior to the Closing Date.  Buyer will be responsible for offering and providing any COBRA Coverage required with respect to any Seller employee (or other qualified beneficiary) hired by Buyer who becomes covered by a group health plan sponsored or contributed to by Buyer, and who experiences a qualifying event after the Closing Date. For purposes of this Section 8.03(b), "qualified beneficiary," "group health plan," and "qualifying event" each have the meaning set forth in Section 4980B of the Code.

10.05    Employee Information. To the extent not prohibited by applicable law, Seller will provide Buyer all information relating to any employee that Buyer may, for potential employment purposes, reasonably request, including personnel files, initial employment dates, employee health files, licenses, professional certifications, Form I-9, termination dates, reemployment dates, hours of service, and compensation and tax withholding history.

10.06    Employee Plans. Seller shall be responsible for providing all information, forms, and other administrative assistance and materials required of a plan administrator with respect to all Employee Plans for its employees that are terminated in connection with the sale of the Acquired Assets.

10.07    Taxes; Expenses. Buyer will pay all Taxes (other than income Taxes) or recording fees payable as a result of the sale of the Acquired Assets pursuant to this Agreement or any other action contemplated hereby, including fees paid to the Iowa Attorney General, the U.S. Attorney General, and any other governmental agency. The parties will cooperate in preparing, executing, and filing all returns, questionnaires, applications, and other documents regarding Taxes and all transfer, recording, registration and other fees that become payable in connection with the transactions that this Agreement contemplates that are required or permitted to be filed at or prior to Closing.

10.08    Transfer of Resident Trust Funds and Deposits.

(a)    Within five (5) Business Days of the Closing Date, Seller shall deliver to Buyer a true, correct and complete schedule of all trust funds held by Seller as of the most recent date available prior to the Closing Date for any current resident of the Facilities (collectively, the "*Resident Trust Funds*") and deposits or prepayments paid by or for any resident of the Facilities (collectively, the "*Resident Deposits*").

(b)    At the Closing, Seller shall transfer the Resident Trust Funds and Resident Deposits to Buyer, and Buyer shall accept, the Resident Trust Funds and Resident Deposits in trust

31

for the residents, in accordance with applicable statutory and regulatory requirements. Within ten (10) Business Days after the Closing Date, Seller and Buyer shall prepare a final schedule of the Resident Trust Funds and Resident Deposits and thereafter reconcile the Resident Trust Funds and Resident Deposits transferred from Seller to Buyer.

## ARTICLE XI
## NO SURVIVAL; NO INDEMNIFICATION

The covenants, obligations, representations and warranties of Buyer and Seller contained in this Agreement, any exhibit or schedule hereto, or any certificate or document delivered pursuant hereto shall not survive beyond the Closing.  Neither party shall have any liability to the other after Closing for any breach thereof.  Buyer agrees that it is purchasing the Acquired Assets as is, where is.  Notwithstanding this provision, the parties may agree to limited survival and related indemnification rights for obligations that remain uncompleted as of the Closing Date in an Ancillary Agreement.

## ARTICLE XII
## REMEDIES FOR FAILURE TO CLOSE

12.01   Attorneys' Fees.  In the event either party brings a lawsuit or other proceeding against the other party to enforce any provisions of this Agreement or any instrument executed pursuant to this Agreement, the prevailing party will be paid all costs and reasonable attorney's fees by the other party, such costs and reasonable attorney's fees will be included in any such judgment.  For purposes of this Section 10.02, "prevailing party" means, in the case of a Person asserting a claim, the Person is successful in obtaining substantially all of the relief sought, and in the case of a Person defending against or responding to a claim, the Person is successful in denying substantially all of the relief sought.

12.02   Waiver.  No delay in exercising any right or remedy will constitute a waiver thereof, and no waiver by Seller or Buyer of the breach of any covenant of this Agreement shall be construed as a waiver of any preceding or succeeding breach of the same or any other covenant or condition of this Agreement.

## ARTICLE XIII
## MISCELLANEOUS

13.01   Assignability.  Buyer may assign this Agreement in whole or in part and/or designate a nominee to take title to all or any part the Facilities or the operations thereof at Closing without the consent of Seller, provided that such assignment and/or designation shall only be to an Affiliate of Buyer, and provided that Buyer shall remain fully bound by the terms and conditions of this Agreement.   Any assignment of this Agreement shall be binding upon and inure to the benefit of the successor or assignee of Buyer.  In the event Buyer finds it necessary or is required to provide to a third party a collateral assignment of the Buyer's interest in this Agreement and/or any related documents, Seller shall cooperate

32

with the Buyer and any third party requesting such assignment including but not limited to Seller signing a consent and acknowledgment of such assignment.

13.02   Entire Agreement.  This Agreement constitutes the entire contract between the parties, and may not be modified except by an instrument in writing that both of them sign.  All of the schedules and exhibits to this Agreement are incorporated by this reference.

13.03   Governing Law.  This Agreement will be interpreted, construed, and enforced pursuant to the laws of the State of Iowa without giving effect to the choice of law rules thereof.

13.04   Notice.  All notices and other communication allowed or required under this Agreement will be in writing, and delivered by either hand delivery, overnight courier, or Regular First Class U.S. Mail, postage prepaid, and addressed as follows:

| If to Seller: | If to Buyer: |
|---|---|
| QHC Facilities LLC | Blue Diamond Equities LLC |
| 8350 Hickman Road, Suite 15 | PO Box 156 |
| Clive, IA 50325 | Lakewood, NJ 08701 |
| Attn:  Mark Hidlebaugh, Member | Attention: Sam Haikins |
| With a copy to: | |
| | With a copy to: |
| Jeffrey D. Goetz, Esq. | |
| Bradshaw Fowler Proctor & Fairgrave, P.C. | Law Office of Jacob Unger |
| | 5404 Whitsett Ave., Suite 182 |
| 801 Grand Avenue, Suite 3700 | Valley Village, CA 91607 |
| Des Moines, IA 50309-8004 | Attn: Jacob Unger |

All notices provided in accordance with this Section delivered by hand or by overnight courier will be deemed delivered and received on the delivery date.  All notices delivered by First Class Mail will be deemed delivered and received four (4) Business Days after being placed for delivery with the U.S Postal Service.

13.05   Section Headings; Drafting Party.  The headings of this Agreement are for convenience of reference only, do not form a part of this Agreement, and do not in any way modify, interpret or construe the intentions of the parties. The provisions of this Agreement have been examined, negotiated, drafted and revised by counsel for each party, and no implication will be drawn against any party by virtue of the drafting of this Agreement.

13.06   Waivers.  Any waiver by any party of any violation of, breach of or default under any provision of this Agreement or any exhibit, schedule or other document referred to in this Agreement by any other party will not be construed as or constitute a waiver of any subsequent violation, breach of, or default under that provision or any other provision of this Agreement, or any Exhibit, Schedule or other document referred to in this Agreement.

13.07   Further Assurances. Each of the parties will, at any time and from time to time after the Closing, execute and deliver, or cause to be executed and delivered, to the other party or their designee, such further consents, approvals, conveyances, assignments and other documents and instruments as any party shall reasonably request in order to carry out any and all of the terms and provisions of this Agreement.

13.08   Counterparts. This Agreement may be executed in several counterparts and by facsimile transmission or email scan, each of which when so executed and delivered will be deemed an original, but all of which together shall constitute one and the same instrument.

13.09   Binding Effect. This Agreement will be binding upon and inure to the benefit of the parties to this Agreement and their respective successors, heirs, assigns and legal representatives Waiver of Jury Trial. BUYER AND SELLER WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM, OR COUNTERCLAIM, WHETHER IN CONTRACT OR TORT, AT LAW OR IN EQUITY, ARISING OUT OF OR IN ANY WAY RELATED TO THIS AGREEMENT, OR THE TRANSACTIONS THAT THIS AGREEMENT CONTEMPLATES

13.10   Jurisdiction; Venue; Service of Process. Any litigation arising out of or relating to this Agreement, or the transactions this Agreement contemplates, will be brought in the Bankruptcy Court or a court located in Polk County, Iowa. Seller and Buyer consent to the jurisdiction of any such court. **The parties each waive personal service of process in any litigation arising out of or relating to this Agreement or any transaction this Agreement contemplates, and agree that all such service of process may be made in the manner set forth for notices in Section 11.04 of this Agreement, and that service so made will be deemed completed one (1) day after delivered in compliance with Section 11.04 of this Agreement. The parties expressly waive any other requirements of notice or personal service that any applicable Law may require.**

13.11   Exhibits and Schedules. If any exhibits or schedules are not attached hereto, the parties agree to attach such exhibits and schedules as soon as reasonably practicable but in any event prior to ten (10) days before the Closing Date. The Parties agree that the Party charged with providing an exhibit or schedule to this Agreement shall, to the extent necessary after delivery thereof, amend or supplement all exhibits and schedules in order for the same to be current, true and correct as of the Closing Date. The inclusion of any new schedule or exhibit, or supplement thereto, shall be subject to such party approving any new exhibits and schedules or supplements thereto within seven (7) days of submission thereof.

**ARTICLE XIV**
BANKRUPTCY MATTERS

14.01   Sale Order. The Sale Order will provide, *inter alia*, that pursuant to 11 U.S.C. Sections 105, 363, and 365: (i) this Agreement and the transactions contemplated hereby are approved; (ii) Buyer will have and acquire at the Closing good, valid, marketable title to

34

the Acquired Assets free and clear of all interests, Claims, Encumbrances, or Liens (except for Permitted Encumbrances and Assumed Liabilities) to the maximum extend provided under 11 U.S.C. Sections 105, 363, and 365; (iii) Seller will assume and assign to Buyer all of the Assumed Executory Contracts as of the Closing Date; (iv) the Assumed Executory Contracts will be in full force and effect from and after the Closing with non-debtor parties being barred and enjoined from asserting against Buyer, *inter alia*, defaults, breaches or claims of pecuniary losses existing as of the Closing or by reason of the Closing; (v) Buyer is acquiring the Acquired Assets free and clear of the Excluded Liabilities and providing for a full release of Buyer with respect to the Excluded Liabilities; (vi) the activities and results of the marketing and auction conducted in connection with the sale, if any, are approved; (vii) Buyer will be found to be a good faith purchaser within the meaning of 11 U.S.C. Section 363(m); and (viii) the Bankruptcy Court will waive any stay that would otherwise be applicable to the immediate effectiveness of the Sale Order pursuant to Fed. R. Bankr. P. 6004(h) and 6006(d).

[signatures on following page]

35

IN WITNESS WHEREOF, the parties have executed this Agreement effective as of the date and year first written.

BLUE DIAMOND EQUITIES LLC,
A NEW JERSEY LIMITED LIABILITY COMPANY

_____

By: Sam Haikins


Its: Manager


QHC FACILITIES, LLC


_____


By: _____


Its: _____


QHC MANAGEMENT, LLC


_____


By: _____


Its: _____

36

QHC MITCHELLVILLE, LLC

_____

By: _____

Its: _____

QHC WINTERSET NORTH, LLC

_____

By: _____

Its: _____

QHC MADISON SQUARE, LLC

_____

By: _____

Its: _____

37

QHC FORT DODGE VILLA, LLC

_____

By: _____

Its: _____

QHC HUMBOLDT NORTH, LLC

_____

By: _____

Its: _____

QHC HUMBOLDT SOUTH, LLC

_____

By: _____

Its: _____

38

QHC VILLA COTTAGES, LLC


_____


By: _____


Its: _____


CRESTRIDGE, INC.


_____


By: _____


Its: _____


CRESTVIEW ACRES, INC.


_____


By: _____


Its: _____

40

# EXHIBITS

Exhibit A:      Facilities

Exhibit B:      Land

Exhibit C:      Purchase Price Allocation

**SCHEDULES**

| | |
|---|---|
| Schedule 2.01(i) | Assumed Benefit Plans |
| Schedule 2.08(a) | Assumed Executory Contracts |
| Schedule 2.08(b) | Accrued PTO |
| Schedule 3.01(e): | Litigation |
| Schedule 3.01(o) | Certificates of Need |
| Schedule 3.01(s) | Permits |
| Schedule 3.01(t) | Compliance |
| Schedule 3.01(u) | Licensed Beds and Current Rate |
| Schedule 3.01(y) | Financial Information |
| Schedule 3.01(z) | Real Property |

# EXHIBITS TO APA

## EXHIBIT A

**FACILITIES**

**Skilled Nursing:**

Crestridge, Inc.
1015 Wesley Dr.
Maquoketa, IA 52060-2637

Crestview Acres, Inc.
1485 Grand Ave
Marion, Iowa 52302-5219

Sunnycrest Nursing Center
401 Crisman St.,
Dysart, IA  52224-9520

Fort Dodge Villa Care Center
2721 10th Ave. North,
Fort Dodge, IA  50501-2834

Humboldt Care Center North
1111 11th Ave N
Humboldt, IA 50548-1225

Humboldt Care Center South
800 13th St S
Humboldt, IA 50548

Mitchell Village Care Center
114 Carter St. SW
Mitchellville, IA 50169-5000

Winterset Care Center North
411 East Lane St.
Winterset, IA 50273-1217

**Assisted Living:**

Villa Cottages
925 Martin Luther King Dr.
Fort Dodge, IA 50501-2866

Madison Square Assisted Living
209 W Jefferson St.
Winterset, IA 50273-1676

# EXHIBIT B
# LAND

**Crestridge, Inc**

Property Address: 1015 Wesley Drive, Maquoketa, IA 52060

Legally described as follows:

The South fourth of the East fourth of the Northwest quarter (NW 1/4) of the
Southwest quarter (SW 1/4) of Section Twenty-Four (24), Township Eighty-Four
(84) North, Range Two (2) East of the 5th P.M., Jackson County, Iowa;
EXCEPTING THEREFROM the West twenty (20) feet thereof;

AND

Commencing twenty (20) rods West of the Southeast corner of the West half
(W1/2) of the Northeast quarter (NE1/4) of the Southwest quarter (SW 1/4) of
Section twenty-four (24), Township eighty-four (84) North, Range two (2) East of
the 5th P.M., Jackson County, Iowa; thence West twenty (20) rods to the
Southwest corner of the Northeast quarter (NE 1/4) of said Southwest quarter
(SW 1/4) of said Section twenty-four (24); thence North twenty (20) rods; thence
East twenty (20) rods more or less to West line of land heretofore conveyed to
Leonard Seaver to Williams P. Thomas; thence South twenty (20) rods to the
place of beginning; EXCEPTING THEREFROM Lots one (1), two (2), three (3),
and four (4) according to survey by J. G. Thorne dated July 23, 1966, and
recorded in Plat Book 1 Page 143, Office of the Recorder of Jackson County,
Iowa, together with any interest in the street along the East side thereof;

AND

Beginning on the West line of Western Avenue in the City of Maquoketa, Jackson
County, Iowa, nine hundred ninety (990) feet South of the point of intersection of
the centerline of West Platt Street and the West line of said Western Avenue;
thence West one hundred twenty (120) feet to the point of commencement; thence
West four hundred ninety (490) feet; thence North ten (10) feet; thence East four
hundred ninety (490) feet; thence South ten (10) feet to the point of
commencement, all in the North half (N1/2) of the Southwest quarter (SW 1/4) of
Section twenty-four (24), Township eighty-four (84) north, Range two (2) East of
the 5th P.M. in the City of Maquoketa, Jackson County, Iowa

## Crestview Acres, Inc.

Property Address: 1485 Grand Ave, Marion Iowa 52302-5219

Legally described as follows:

> South 417 feet of North 457 feet of West 417 feet of East 447 feet of Lot 1,
> "auditor's Plat No. 202, Linn County, Iowa.

## Crestview Acres, Inc. dba Sunnycrest Nursing Center

Property Address: 401 Crisman St., Dysart, IA  52224-9520

Legally described as follows:

> Lots Ten (10), Eleven (11) and Twelve (12), Block Seventeen (17) Dysart, Iowa.

## QHC Fort Dodge Villa LLC dba Fort Dodge Villa Care Center

Property Address: 2721 10th Ave. North, Fort Dodge, IA  50501-2834

Legally described as follows:

> A tract of land located in the NE ¼ of the NW ¼ of Section 21-89-28 West of the
> 5th P.M., City of Fort Dodge, Webster County, Iowa, more particularly described
> as follows: Commencing at the Northeast corner of the said NW ¼; thence
> N89°33'00"W 198 feet along the North line of the said NW ¼;  thence
> S00°00'00"W 33.00 feet to the South right of way line of 10th Avenue North, to
> the point of beginning; thence continuing S00°00'00"W 481.01 feet; thence
> N89°33'00"W 423.51 feet to a point on the East right of way line of North 27th
> Street; thence N00°02'00"E 481.00 feet along the said East right of way line to a
> point on the South right of way line of 10th Avenue North; thence S89°33'00"E
> 423.24 feet along the said South right of way line to the point of beginning,
> containing 4.67 acres.

## QHC Villa Cottages, LLC dba Villa Cottages

Property Address: 925 Martin Luther King Dr., Fort Dodge, IA 50501-2866

Legally described as follows:

> A tract of land located in the NE 1/4 of the NW 1/4 of Section 21-89-28 West of
> the 5th P.M., City of Fort Dodge, Webster County, Iowa, more particularly
> described as follows:  Commencing at the  Northeast corner of  the said NW 1/4;
> thence N89°33'00"W 198.00 feet along the North  line of the said  NW 1/4;
> thence S00°00'00"W 514.01 feet to the point of beginning; thence continuing

S00°00'00"W 46.85 feet to a point 116.00 feet normally distant northwesterly from the centerline of the Chicago & Northwestern Railway right of way; thence S50°27'00"W 549.54 feet along a line parallel with the said Railroad centerline to a point on the East right of way line of North 27th Street; thence N00°02'00"E 400.10 feet along the said East right of way line; thence S89°33'00"E 423.51 feet to the point of beginning, containing 2.17 acres,

AND

Part of the vacated North 24th Street located in the NE1/4 of the NW 1/4 of Section 21-89-28 West of the 5th P.M., City of Fort Dodge, Webster County, Iowa, more particularly described as follows: Commencing at the North Quarter corner of the said Section 21 (said North Quarter corner also being the Northeast corner of said NE 1/4 of the NW 1/4); thence S00°00'00"W 33.00 feet along the East line of the said NE 1/4 of the NW 1/4 to the South right of way line of 10th Avenue North; thence N89°33'00"W 198.00 feet along the South right of way line; thence S00°00'00"W 527.86 feet to a point on the Northerly right of way line of vacated 24th Avenue North being the point of beginning; thence S50°26'20"W 549.54 feet along the said northerly right of way line to a point on the East right of way line of North 27th Street; thence S00°02'00"W 85.66 feet along the said East right of way line of North 27th Street to a point on the northerly railroad right of way line; thence N50°26'20"E 549.61 feet along the said Northerly railroad right of way line; thence N00°00'00"E 85.61 feet to the point of beginning

## QHC Humboldt North, LLC dba Humboldt Care Center North

Property Address: 1111 11th Avenue North, Humboldt, IA 50548-1225

Legally described as follows:

Parcel One:

All of Lot One (1) and the East Seventeen and one-half (17 ½) feet of Lot Two (2) of Block Thirty-Seven (37), Second College Addition, City of Humboldt, Humboldt County, Iowa.

Parcel Two:

All of Block Thirty-Six (36) and all of Tilleston Street (vacated) (now Twelfth Street North) between Blocks 36 and 37, all being in Second College Addition to the Town, now City, of Humboldt, Humboldt County, Iowa. (Sec. 36-92-29)

## QHC Humboldt South, LLC dba Humboldt Care Center South

Property Address: 800 13th Street South, Humboldt, Iowa 50548-2439

Legally described as follows:

A tract of land in the Southeast one-quarter (SE ¼) of the Northeast One-Quarter
(NE ¼) of Section Eleven (11), Township Ninety-One (91) North, Range Twenty-
Nine (29), and more particularly described as follows:  Beginning at the Northeast
Corner of said Southeast One-Quarter (SE ¼) of the Northeast One-Quarter (NE
¼), said point being1300.17 feet South of the Northeast Corner of Section Eleven
(11), thence South 417.4 feet along East line of Section Eleven (11), thence South
88 degrees 40' 30" West 467.4 feet, thence North 417.4 feet to Point on the North
Line of said Southeast One-Quarter (SE ¼) of the Northeast One-Quarter (NE ¼);
thence North 88 degrees 40' 30" East 467.4 feet along said North line to Point of
Beginning, except the North Thirty-Three (33) feet of North Edge and except that
part conveyed to the State of Iowa by Warranty Deed recorded in Book 260, Page
276, and more particularly described as follows:  Commencing at the E ¼ corner
of said Sec. 11; thence N00°07'29"E, 883.35 ft. along the East line of the NE ¼
said Sec. 11 to the SE corner of said tract; thence continuing along said line
N00°07'29"E, 384.34 ft.; thence S88°48'50"W, 65.02 ft.; thence S00°07'29"W,
204.40 ft; thence S07°14'59"W, 120.93 ft.; thence S00°07'29"W, 60.30 ft. to a
point on the South line of said tract; thence N88°48'09"E, 80.02 ft. along said line
to the Point of Beginning; containing 0.61 acre, more or less, including 0.44 acre,
more or less, in existing right of way.

## QHC Madison Square, LLC dba Madison Square

Property Address: 209 W. Jefferson St., Winterset, IA  50273-1676

Legally described as follows:

Units #101, #102, #103, #104, #106, #107, #108, #201, #202, #203, #204, #205,
#206, #208, #301, #302, #303, #304, #305, #306, #307, and #308 of Jefferson
Place in the City of Winterset, Madison County, Iowa, and an undivided interest
in the common elements and areas of Jefferson Place, as shown in the Declaration
of Condominium of Jefferson Place filed for record on April 14, 1995 in Town
Lot Deed Record 60 at page 159 in the Madison County Recorder's Office (and
any supplements and amendments thereto).

AND

Unit #207 of Jefferson Place in the City of Winterset, Madison County, Iowa, and
an undivided interest in the common elements and areas of Jefferson Place as
shown in the Declaration of Condominium of Jefferson Place filed for record on
April 14, 1995 in Town Lot Deed Record 60 at page 159 in the Madison County
Recorder's Office (and any supplements and amendments thereto).

## QHC Mitchellville, LLC dba Mitchell Village Care Center

Property Address: 114 Carter St. SW, Mitchellville, IA  50169-5000

Legally described as follows:

> All of Block 6, (except the East 165 feet and except the South 140 feet and except the West 126.33 feet) in Sage's Addition to Mitchellville, Polk County, Iowa.

## QHC Winterset North, LLC dba Winterset Care Center North

Property Address: 411 East Lane St., Winterset, IA  50273-1217

Legally described as follows:

A tract of land located in the Northwest Fractional Quarter (1/4) of the Northwest Fractional Quarter (1/4) of Section Thirty-one (31) in Township Seventy-s9x (76) North, Range Twenty-seven (27) West of the 5th P.M., City of Winterset, Madison County, Iowa, more particularly described as follows, to-wit: Commencing at the Southwest corner of the Northwest Fractional Quarter (1/4) of the Northwest Fractional Quarter (1/4) of said Section Thirty-one (31), thence South 88°37' East, 935.1 feet along the South line of said Northwest Fractional Quarter (1/4) of the Northwest Fractional Quarter (1/4) to the point of beginning, thence continuing South 88°37' East, 347.2 feet, thence North 506.5 feet, thence North 88° 37' West, 347.2 feet, thence South 506.5 feet to the point of beginning, containing 4.0359 acres.

# EXHIBIT C

## PURCHASE PRICE ALLOCATION

| Asset | Beds | PPB | Allocated Price |
|---|---|---|---|
| Crestridge Care Center | 75 | $16,511.67 | $1,238,375.40 |
| Crestview Acres | 100 | $8,806.23 | $880,622.51 |
| Fort Dodge Villa Care Center | 107 | $15,410.89 | $1,648,965.65 |
| Humboldt Care Center North | 90 | $17,612.45 | $1,585,120.52 |
| Humboldt Care Center South | 40 | $11,007.78 | $440,311.26 |
| Madison Square | 42 | $44,031.13 | $1,849,307.27 |
| Mitchell Village Care Center | 65 | $15,410.89 | $1,001,708.10 |
| Sunnycrest Nursing Center | 50 | $16,511.67 | $825,583.61 |
| Winterset Care Center North | 75 | $18,713.23 | $1,403,492.12 |
| Villa Cottages | 20 | $36,325.68 | $726,513.56 |
| **Total** | **664** | | **$11,600,000.00** |

**Section 2.01(i)**

**Employment Benefit Plans**

1. QHC Salaried and Hourly Employees' Nationwide 401(k) Plan.

2. QHC Salaried and Hourly Employees Medical Plan, provided by Wellmark (Group #52500).

3. QHC Salaried and Hourly Employees Dental Plan, provided by Guardian Life Insurance CO. (Group #00379980).

4. QHC Salaried and Hourly Employees Vision Plan, provided by Guardian Life Insurance Co (Group #00379980).

5. QHC Salaried and Hourly Employees Basic Life and Accidental Death & Dismemberment Plan, provided by Guardian Life Insurance Co (Group #00379980).

6. QHC Salaried and Hourly Employees Short-Term and Long-Term Disability Plan, provided by Aflac, (only for employees who wish to purchase)

## Schedule 2.08(a)

### Executory Contracts

### QHC Facilities, LLC

| Contract | Cure Costs[1] |
|---|---|
| 1. Bancleo Equipment Finance Lease Agreement for Q Copiers | $0 |
| 2. Subscription Services Agreement with Wescom Solution Inc. dba Pointclickcare Technologies | $221.50 |
| 3. QHC Facilities, LLC 401K Plan | $0 |
| 4. QHC Salaried and Hourly Employees Medical Plan, provided by Wellmark (Group #52500). | $0 |
| 5. Contract with Aureon Technology | $18,574.32 |
| 6. Software Solutions Contract ABILITY NETWORK INC. | $3,644.67 |
| 7. Contract with Chrysler Capital | $1,196.01 |
| 8. Services Contract with WEBSPEC | $360.00 |

### QHC Management, LLC

| Contract | Cure Costs[2] |
|---|---|

---

[1] Amount reflects the value of each Cure Cost as of the Agreement Date. Such amounts are subject to change prior to Closing in accordance with Section 1.03(b) of the Agreement as a result of Buyer's ongoing negotiations with creditors of Seller. All Medicare Provider Agreement Cure Amounts are being negotiated with the government and the Debtors will be seeking waiver of penalties.

| | | |
|---|---|---|
| 1. | Contract with Aureon Technology for 5-Dell Latitude 5411 Laptop, 8-Dell OptiPlex 3080 Micro Form Factor Desktop, 8 VESA Mount with Adaptor Box | $529.40 |
| 2. | Agreement for Computer Equipment with Great America Financial Services | $1,110.84 |
| 3. | Lease Agreement for office space located at 8350 Hickman Rd, Clive, IA with Schoenauer Property | $281.32 |
| 4. | Rental Agreement for storage units A-42, 148, A-67 and 168 with TKG Iowa Storage | $729.99 |
| 5. | Salaried and Hourly Employees Dental Plan, provided by Guardian Life Insurance CO. (Group #00379980). | $0 |
| 6. | QHC Salaried and Hourly Employees Vision Plan, provided by Guardian Life Insurance Co (Group #00379980). | $0 |
| 7. | QHC Salaried and Hourly Employees Basic Life and Accidental Death & Dismemberment Plan, provided by Guardian Life Insurance Co (Group #00379980). | $0 |
| 8. | Technology Services Contract with Marco, Inc. (Marco Technologies) | $136.01 |
| 9. | Services Contract with Verizon Wireless | $80.32 |
| 10. | Services Contract with QUADIENT FINANCE USA INC | $0 |
| 11. | Services Contract with Mediacom | $0 |
| 12. | Software Services Contract with Sage Group PLC | $541.84 |
| 13. | All Resident Admission Agreements | $0 |
| 14. | Utilities Contract with Midamerican Energy | $282.55 |

**Crestridge, Inc**.

| | Contract | Cure Costs |
|---|---|---|
| 1. | Staffing Agreement for Nursing Facility Hospice and Respite Care Services with Amenity Healthcare | $0 |
| 2. | Agreement for Fire Protection Services and Products with Johnson Controls Fire Protection LP | $3,859.73 |
| 3. | Nursing Facility Hospice and Respite Care Services Agreement with Mercy Medical Center-Clinton | $1,055.57 |
| 4. | Lease Agreement for Sharp MX-3070V System and Sharp MX-B355W System with Midwest Business Products | $3,075.64 |
| 5. | Staffing Agreement with PRN Staffing, Inc. | $0 |
| 6. | Agreement with RHA Service, Inc. for Manitowoc CNF-2501A-161 Countertop Nugget Machine | $487.82 |
| 7. | Consulting Dietitian Agreement with Saundra Meanor, RD, LD | $0 |
| 8. | Subscription Service Agreement with Wescom Solutions, dba Pointclickcare Technologies, Inc. | $2,947.74 |
| 9. | Rehabilitation Services Agreement with Millennium Rehab & Consulting, Inc. | $136,785.98 |
| 10. | Lease Agreement with GREAT AMERICA FINANCIAL SERVICES | $624.71 |
| 11. | Staffing Agreement with Helping Hand Nursing Solutions Inc. | $0 |
| 12. | CENTURYLINK COMMUNICATIONS, LLC | $754.33 |
| 13. | Services Agreement with Mediacom | $0 |
| 14. | Contract with National Access Long Distance | $0 |

| 15. | Services Agreement with Windstream | $75.33 |
| 16. | Mobile Imaging Services Agreement with BTX Iowa | $386.48 |
| 17. | Contract with AUREON TECHNOLOGIY | $544.50 |
| 18. | Equipment Rental Agreement #21-00147 with the Dexter Company dba Century Laundry Distributing | $998.70 |
| 19. | Equipment Rental Agreement #21-00139 with the Dexter Company dba Century Laundry Distributing | |
| 20. | All Resident Admission Agreements | $0 |
| 21. | All Secure Standard Fire Alarm Inspection and Service Agreement | $0 |
| 22. | Shred-it Contract | $0 |
| 23. | Osterhaus Pharmacy Agreement | $0 |
| 24. | Contract with RNL Services LLC for Sprinkler Systems | $0 |
| 25. | Telligen Health Management Agreement | $0 |
| 26. | Hospice Agreement with Hospice of Jackson County | $0 |
| 27. | Hospice Agreement with Genesis Health System dba Genesis Hospice | $0 |
| 28. | Hospice Agreement with Above and Beyond Hospice Care | $0 |
| 29. | Under Arrangement Agreement with University of Iowa Hospitals and Clinics | $0 |

| 30. | Presto X Pest Management Agreement | $0 |
|---|---|---|
| 31. | Dental Services Agreement with Senior Dental Care | $0 |
| 32. | Dialysis Provider Agreement with FMC Maquoketa | $0 |
| 33. | Dietitian Agreement with Keri Schwenker, RD | $0 |
| 34. | Wound Care Concepts Inc, Business Associate Agreement | $0 |
| 35. | Utilities Contract with Black Hills Energy | $0 |
| 36. | Utilities Contract with the City of Maquoketa | $0 |
| 37. | Utilities Contract with Maquoketa Municipal Electric | $0 |
| 38. | Martin Bros Distributing Contract | $22,647.18 |
| 39. | Presto-X-Company Pest Management Agreement | $1,878.88 |
| 40. | Staffing Agreement with Medical Staffing Network | $14,660.89 |
| 41. | Medicaid Provider Agreement, #0806406 | $32,182.17 |

### FORT DODGE VILLA

| Contract | | Cure Costs |
|---|---|---|
| 1. | Staffing Agreement for Nursing Facility Hospice and Respite Care Services with Amenity Healthcare | $0 |

| | | |
|---|---|---|
| 2. | Staffing Agreement with Adventure Staffing & Prof Svcs. | $11,621.09 |
| 3. | Mobile Imaging Services Agreement with BTX Iowa | $392.58 |
| 4. | Staffing Agreement with CBS Staffing LLC | $2,024.96 |
| 5. | Staffing Agreement with Favorite Healthcare Staffing | $0 |
| 6. | Staffing Agreement with Healthcare Resolutions | $0 |
| 7. | Staffing Agreement with Helping Hands Nursing Solutions | $16,769.89 |
| 8. | Staffing Agreement with Nursepro Staffing Agency, Inc, (Aerofund Financial) | $215,697.26 |
| 10. | Staffing Agreement with Solidcare Staffing | $0 |
| 11. | Staffing Agreement with TNN Iowa Inc, | $0 |
| 12. | Staffing Agreement with Tri-State Nursing | $214,816.12 |
| 13. | Subscription Services Agreement with Wescom Solutions, Inc, dba Pointclickcare Technologies, Inc. | $4,205.46 |
| 14. | Rehabilitation Services Agreement with Millennium Rehab & Consulting, Inc. | $207,391.55 |
| 15. | Lease Agreement with GREAT AMERICA FINANCIAL SERVICES | $564.32 |
| 16. | Nutritional Consulting Services Contract with Kristi Zwiefel, RD, LD | $0 |

| | | |
|---|---|---|
| 17. | Serenity Aviary Service Agreement with Adams Specialty Products, LLC | $926.62 |
| 18. | Services Agreement with Mediacom | $1,521.67 |
| 19. | Equipment Lease Agreement with Access Systems | $1640.33 |
| 20. | Contract Agreement with Aureon Technology | $896.20 |
| 21.<br>22. | Equipment Rental Agreement #21-00153 with The Dexter Company dba Century Laundry Distributing<br>Equipment Rental Agreement #21-00181 with The Dexter Company dba Century Laundry Distributing | $959.90 |
| 23. | All Resident Admission Agreements | $0 |
| 24. | Medical Director Agreement with Iowa Physicians Clinic, dba Unity Point | $0 |
| 25. | Growmark FS Agreement for Propane | $0 |
| 26. | Pharmerica Consultant Agreement | $11,360.87 |
| 27. | Shred-it | $0 |
| 28. | Staffing Agreement with AbiraCare LLC | $0 |
| 29. | Physicians Agreement with Dr. Randall Minion, MD | $0 |
| 30. | Renal Center of Fort Dodge Transfer Agreement | $0 |
| 31. | Staffing Agreement with Signature Healthcare LLC | $527.00 |

| 32. | Agreement with Iowa Hospice, LLC dba Kindred Hospice | $0 |
| 33. | Ancillary Services Agreement with Mayo Clinic | $0 |
| 34. | Service Contract with Fort Dodge Water Dept. | $0 |
| 35. | Utilities Contract with Midamerican Energy | $5,463.18 |
| 36. | Ecolab Pest Elimination Division Pest Control Agreement | $1,279.26 |
| 37. | Martin Bros Distributing Contract | $36,144.66 |
| 38. | Staffing Agreement with Progress Healthcare Staffing | $0 |
| 39. | Medicare Provider Agreement #165265 | $689,916.00 |

## HUMBOLDT NORTH

| | Contract | Cure Costs |
|---|---|---|
| 1. | Staffing Agreement with Abiracare LLC | $38,853.10 |
| 2. | Firewall Management Service Agreement with Aureon Communications, LLC | $1,156.10 |
| 3. | Staffing Agreement with Aventure Staffing | $434.54 |
| 4. | Equipment Rental Agreement #21-00148 with The Dexter Company dba Century Laundry Distributing | $688.47 |

| | | |
|---|---|---|
| 5. | Nursing Home Medical Director Agreement with Dr. Sharmini Surlar | $0 |
| 6. | Staffing Agreement with TNN Iowa Inc, | $0 |
| 7. | Staffing Agreement with Accessible Medical | $0 |
| 8. | Staffing Agreement with Healthcare Resolutions | $0 |
| 9. | Staffing Agreement with Helping Hands Nursing Solutions | $92,465.54 |
| 10. | Nursing Home Medical Director Agreement with Iowa Physicians Clinic Medical Foundation dba Unity Point Clinic | $0 |
| 11. | Nursing Facility Hospice and Respite Care Services with Iowa Hospice dba Kindred Hospice | $0 |
| 12. | Lease Agreement with Marco Technologies for a Konica Bizhub | $0 |
| 13. | Rehabilitation Services Agreement with Millennium Rehab & Consulting, Inc. | $196,236.56 |
| 14. | Pharmerica Consultant Agreement | $22,554.09 |
| 15. | Nursing Facility Hospice and Respite Care Services with St. Croix Hospice LLC | $0 |
| 16. | Staffing Agreement with Tristate Nursing | $2,360.08 |
| 17. | Subscription Service Agreement with Wescom Solutions Inc. dba Pointclickcare Technologies | $3,537.32 |
| 18. | Consulting Dietitian Agreement with Saundra Meanor, RD, LD | $0 |

| | | |
|---|---|---|
| 19. | DE LAGE LANDEN FINANCIAL SERVICES Agreement | $1,670.50 |
| 20. | Lease Agreement with GREAT AMERICA FINANCIAL SERVICES | $352.84 |
| 21. | Staffing Agreement with Nursepro Staffing Agency, Inc (Aerofund Financial) | $83,162.16 |
| 22. | Service Agreement with CENTURYLINK COMMUNICATIONS, LLC | $531.45 |
| 23. | Internet Services Agreement with GOLDFIELD ACCESS NETWORK | $0 |
| 24. | Contract Agreement with Aureon Technology | $1,156.10 |
| 25. | Aviary Contract Agreement with Living Design | $376.30 |
| 26. | Staffing Agreement with Signature Healthcare LLC | $0 |
| 27. | Storage Agreement with Carlson Storage | $0 |
| 28. | All Resident Admission Agreements | $0 |
| 29. | Postage Meter Agreement with Copy Systems, Inc. | $0 |
| 30. | Pharmerica Consultant Agreement | $0 |
| 31. | Shred-it Contract | $0 |
| 32. | Hospice Care Agreement with Iowa Hospice dba Gentiva | $0 |

| 33. | Transportation Services with Midas Counsel of Governments | $0 |
|-----|-----|-----|
| 34. | Hospice Agreement with Unity Point At Home dba Unity Point Hospice | $0 |
| 35. | Telligen Health Management Agreement | $0 |
| 36. | Dental Services Agreement with Senior Dental Care | $0 |
| 37. | Dietitian Agreement with Sandra Meanor | $0 |
| 38. | Goldfield Communications Services Agreement for CTV Services | $0 |
| 39. | Rehabilitation Services Agreement Humboldt County Memorial Hospital | $0 |
| 40. | Martin Bros Distributing Contract | $15,942.94 |
| 41. | Contract with Pepsi Beverages Company | $0 |
| 42. | Contract with RNL Services LLC for Sprinkler Systems | $0 |
| 43. | Telligen Health Management Agreement | $0 |
| 44. | Work Agreement with West Fork Services Inc | $0 |
| 45. | Utilities Contract with Midamerican Energy | $6,218.83 |
| 46. | Utilities Contract with the City of Humboldt | $0 |

| 47. | Ecolab Pest Elimination Division Pest Control Agreement | $1,928.61 |
| 48. | Transfer Agreement with Trinity Regional Medical Center | $0 |
| 49. | Medicare Provider Agreement #165533 | $17,500.00 |

## HUMBOLDT SOUTH

| Contract | Cure Costs |
|---|---|
| 1. Staffing Agreement with Abiracare LLC | $0 |
| 2. Firewall Management Service Agreement with Aureon Communications, LLC | $563.20 |
| 3. Staffing Agreement with Aventure Staffing | $10,125.36 |
| 4. Staffing Agreement with Nursepro Staffing (Aerofund Financial) | $83,162.16 |
| 5. Staffing Agreement with Putman Inc dba A-1 Careers | $0 |
| 6. Staffing Agreement with Healthcare Resolutions | $0 |
| 7. Staffing Agreement with Helping Hands Nursing Solutions | $22,663.16 |
| 8. Nursing Home Medical Director Agreement with Iowa Physicians Clinic Medical Foundation dba Unity Point Clinic | $0 |
| 9. Nursing Facility Hospice and Respite Care Services with Iowa Hospice dba Kindred Hospice | $0 |
| 10. Lease Agreement with Marco Technologies for a Konica Bizhub | $1,468.68 |

| 11. | Rehabilitation Services Agreement with Millennium Rehab & Consulting, Inc. | $130,837.15 |
| 12. | Staffing Agreement with Progress Healthcare Staffing | $0 |
| 13. | Nursing Facility Hospice and Respite Care Services with St. Croix Hospice LLC | $0 |
| 14. | Staffing Agreement with Tristate Nursing | $0 |
| 15. | Subscription Service Agreement with Wescom Solutions Inc. dba Pointclickcare Technologies | $1,572.12 |
| 16. | Nursing Facility Hospice and Respite Care Services with Unity Point Hospice | $5,548.60 |
| 17. | Consulting Dietitian Agreement with Saundra Meanor, RD, LD | $0 |
| 18. | Lease Agreement with GREAT AMERICA FINANCIAL SERVICES | $238.69 |
| 19. | Services Agreement with CENTURYLINK COMMUNICATIONS, LLC | $534.30 |
| 20. | Services Agreement with Mediacom | $737.03 |
| 21. | Services Agreement with NATIONAL ACCESS LONG DISTANCE | $11.61 |
| 22. | Aviary Contract Agreement with Living Design | $358.68 |
| 23. | Pharmerica Consultant Agreement | $1,283.19 |
| 24. | Storage Agreement with Carlson Storage | $0 |

| 25. | Equipment Rental Agreement #21-00133 with The Dexter Company dba Century Laundry Distributing | $399.83 |
|-----|------------------------------------------------------------------------------------------------|---------|
| 26. | All Resident Admission Agreements | $0 |
| 27. | Pharmerica Consultant Agreement | $0 |
| 28. | Shred-it Contract | $0 |
| 29. | Transportation Services with Midas Counsel of Governments | $0 |
| 30. | Senior Dental Care of Iowa LLC Contract | $0 |
| 31. | Nursing Home Medical Director Agreement with Dr. Sharmini Surlar | $0 |
| 32. | Telligen Health Management | $0 |
| 33. | Hospice Contract with Heartland Healthcare, Inc dba Gateway Hospice | $0 |
| 34. | Staffing Agreement with SolidCare Staffing | $0 |
| 35. | In Patient Care and Hospice Services Agreement with Iowa Hospice, LLC dba Kindred Hospice | $0 |
| 36. | Transfer Agreement with Trinity Regional Medical Center | $0 |
| 37. | Transportation Services with Midas Counsel of Governments | $0 |
| 38. | Hospice Services Agreement with Iowa Hospice, LLC dba Gentiva | $0 |

| 39. | Martin Bros Distributing Contract | $9,969.00 |
| 40. | RNL Services Automatic Fire Systems Agreement | $0 |
| 41. | Telligen Health Management Agreement | $0 |
| 42. | Utilities Contract with Midamerican Energy | $3,300.46 |
| 43. | Utilities Contract with the City of Humboldt | $0 |
| 45. | Ecolab Pest Elimination Division Pest Control Agreement | $426.87 |
| 46. | Medicare Provider Agreement #165534 | $47,225.61 |

## CRESTVIEW ACRES

| | Contract | Cure Costs |
|---|---|---|
| 1. | Staffing Agreement for SunnyCrest Nursing Center with AbiraCare LLC | $0 |
| 2. | Staffing Agreement for Nursing Facility Hospice and Respite Care Services with Amenity Healthcare | $0 |
| 3. | Consulting Dietitian Agreement for Crestview Acres, Inc. and SunnyCrest Nursing Center with Sharon Broome | $2,444.00 |
| 4. | Pharmacy Services Agreement with Carepro Home Infusion | $567.60 |
| 5. | Comprehensive Care program, 3-Dexter C Series, Washer/Extractor and 4-Dexter Micro Dryer with Century Contract Services, Inc, | $392.24 |

| 6. | 1 Dexter C Series Washer/Extractor and 1 for T600 for Sunnycrest with Century Contract Services, Inc. | $0 |
|---|---|---|
| 7. | Nursing Facility Hospice and Respite Care Services with Essene of Life Hospice | $0 |
| 8. | Crestview Acres Rehabilitation Services Agreement with Millennium Rehab & Consulting, Inc. | $241.52 |
| 9. | Staffing Agreement for SunnyCrest Nursing Center with Healthcare Resolutions | $15,846.00 |
| 10. | Lease Agreement with GREAT AMERICA FINANCIAL SERVICES | $1,526.62 |
| 11. | Medical Director Agreement with MercyOne | $7,300.00 |
| 12. | Staffing Agreement with Putnam Inc, dba A-1 Careers | $0 |
| 13. | Unity Point Hospice Services Agreement | $0 |
| 14. | Wound Care Concepts Inc, Business Associate Agreement | $0 |
| 15. | Stericycle Biohazard Service Agreement | $0 |
| 16. | RCR Enterprises LLC, dba Right At Home Services Agreement | $0 |
| 17. | Consulting Dietitian Agreement with Donna Pietz | $0 |
| 18. | Consulting Dietitian Agreement with Brian Scheil | $0 |
| 19. | All Heart Inc, Staffing Agreement | $0 |

| 20. | CBS Staffing, LLC, Staffing Agreement | $0 |
| --- | --- | --- |
| 21. | BTX X-Ray Services Agreement | $0 |
| 22. | Senior Dental Care of Iowa LLC Contract | $0 |
| 23. | Consulting Dietitian Agreement with Joyce Sankey | $0 |
| 24. | Above and Beyond Hospice Care Services Agreement | $0 |
| 25. | Consulting Dietitian Agreement with Deborah Mckay | $0 |
| 26. | Hawkeye State Scale Services Agreement | $0 |
| 27. | Pharmacy Consultation Services with William Burke Limited, dba Main Health Care Extended Care Pharmacy | $0 |
| 28. | Mediacom Services Agreement | $0 |
| 29. | PRN Staffing Inc. Staffing Agreement | $0 |
| 30. | RNL Services, LLC Contract | $0 |
| 31. | University of Iowa Hospitals and Clinics Out-Patient Services Agreement | $0 |
| 32. | Contract with Aureon Technology | $1,182.20 |
| 33. | Subscription Services Agreement with Wescom Solutions, Inc, Pointclickcare Technologies | $5,895.52 |

| | | |
|---|---|---|
| 34. | Services Contract with Mediacom | $3,329.63 |
| 35. | Services Agreement with Linco Water Services | $267.50 |
| 36. | Services Agreement with Centurylink Communications, LLC | $1,247.79 |
| 37. | Mobile Imaging Services Agreement with BTX Iowa | $363.86 |
| 38. | Equipment Rental Agreement #21-00142 with Century Contract Services, Inc. | $830.82 |
| 39. | Equipment Rental Agreement #61-00058 with Century Contract Services, Inc. | |
| 40. | All Resident Admission Agreements | $0 |
| 41. | Staffing Agreement with Hospice of the Midwest for Respite Care | $0 |
| 42. | Staffing Agreement with Hospice of the Midwest for Hospice Nursing Facility Services | $0 |
| 44. | Agreement with Iowa Hospice | $0 |
| 45. | Medical Waste Disposal Agreement with GRP and Associates | $0 |
| 46. | Sunnycrest Registered Dietitian Agreement with Amy Mooney-Geels | $0 |
| 47. | Telligen Health Management Agreement with Sunnycrest | $0 |
| 48. | Sunnycrest Hospice Agreement with Care Initiatives | $0 |
| 49. | Sunnycrest Dental Services Contract with Senior Dental Care of Iowa | $0 |

| 50. | Sunnycrest Three Rivers Provider Network Agreement | $0 |
| 51. | Sunnycrest Unity Point Respite Care Agreement | $0 |
| 52. | Clinical Lab Services Agreement with Virginia Gay Hospital | $0 |
| 53. | Wheaton Franciscan Healthcare Contract for Ancillary Services | $0 |
| 54. | Pharmacy Services Agreement with Pharmacy Matters | $0 |
| 55. | Pharmerica Consultant Agreement | $0 |
| 56. | Shred-it Contract | $0 |
| 57. | Utilities Contract with Alliant Energy | $3,171.20 |
| 58. | Utilities Contract with the City of Dysart | $12,483.76 |
| 59. | Sunnycrest's Pest Control Agreement with Ecolab Pest Elimination Division | $747.02 |
| 60. | Sunnycrest Martin Bros Distributing Contract | $14,764.67 |
| 61. | Sunnycrest Bugsby Pest Agreement | $483.64 |
| 62. | Crestview Acres Contract with Lukehart Lawn Care for Mowing and Trimming | $880.00 |
| 63. | Elevator Maintenance Services Contract with Schumacher Elevator | $2,732.42 |

| | | |
|---|---|---|
| 64. | Staffing Agreement Accessible Staffing | $1,236.73 |
| 65. | Staffing Agreement with Helping Hand Nursing Solutions Inc. | $0 |
| 66. | Sunnycrest Rehabilitation Services Agreement with Millennium Rehab & Consulting, Inc. | $136,482.15 |
| 67. 68. | Crestview Acres Medicare Provider Agreement #165299 Sunnycrest Medicare Provider Agreement #165515 | $93,301.20 |

## MADISON SQUARE

| Contract | | Cure Costs |
|---|---|---|
| 1. | Staffing Agreement with A-1 Medical Staffing | $0 |
| 2. | Medical Participating Provider Agreement for Amerigroup Iowa, Inc. | $0 |
| 3. | Subscription Service Agreement with Wescom Solutions Inc. Pointclickcare Technologies | $781.42 |
| 4. | Lease Agreement with Great America Financial | $188.26 |
| 5. | Services Agreement with Centurylink Communications, LLC | $526.57 |
| 6. | Services Agreement with Mediacom | $1,225.83 |
| 7. | Contract with Aureon Technology | $483.85 |
| 8. | Contract with Banleaco, Inc. | $258.47 |
| 9. | Services Agreement with Mediacom | $1,218.33 |

| 10. | All Resident Occupancy Agreements | $0 |
| 11. | Shred-it Contract | $0 |
| 12. | Utilities Contract with Winterset Municipal Utilities | $0 |
| 13. | Utilities Contract with Midamerican Energy | $3,839.89 |

## **MITCHELLVILLE**

| | Contract | Cure Costs |
|---|---|---|
| 1. | Staffing Agreement with AbiraCare LLC | $36,175.15 |
| 2. | Agreement with Banleaco, Inc. for 1 Kyocera MFP | $270.44 |
| 3. | Agreement for 2 Dexter Washer/Extractor, 1 Dexter Reversing Dryer with Century Contract Services, Inc. | $581.22 |
| 4. | Nursing Home Medical Director Agreement with Dr. Dale M. Grunewald | $600.00 |
| 5. | Staffing Agreement with SolidCare Staffing | $0 |
| 6. | Weekly mowing service contract with Hawkeye I VanGinkel (HVG) Lawn & Snow | $1,424.50 |
| 7. | Non-emergency Transportation Services Agreement with Joy Ride Transport | $134.00 |
| 8. | Professional Services Agreement with KareFirst Management Corp | $0 |
| 9. | Staffing Agreement with Maxim Healthcare Servicers | $0 |

| 10. | Outpatient Dialysis Services Coordination Agreement with RCG Mercy Des Moines, LLC | $0 |
|---|---|---|
| 11. | Staffing Agreement with Solidcare Staffing | $62,398.70 |
| 12. | Subscription Service Agreement with Wescom Solutions, Inc. dba Pointclickcare Technologies | $2,554.68 |
| 13. | Lease Agreement with Great America Financial Services | $217.00 |
| 14. | Rehabilitation Services Agreement with Millennium Rehab & Consulting, Inc. | $143,581.27 |
| 15. | Contract with Aureon Technology | $1,528.40 |
| 16. | Mobile Imaging Services Agreement with BTX Iowa | $198.58 |
| 17. | Rental Agreement with UNITED RENTALS/PAC-VAN INC | $1,844.45 |
| 18. | Contract with Banleaco, Inc. | $270.44 |
| 19. | Services Agreement with Centurylink Communications, LLC | $606.00 |
| 20. | Equipment Rental Agreement #61-00065 with Century Contract Services, Inc. | $1,238.30 |
| 21. | All Resident Admission Agreements | $0 |
| 22. | Pharmerica Consultant Agreement | $4,701.84 |
| 23. | Shred-it Contract | $0 |

| 24. | Telligen Health Management Agreement | $0 |
|---|---|---|
| 25. | RNL Services Automatic Fire Systems Agreement | $0 |
| 26. | Dietitian Agreement with Elayne Eckel RD | $0 |
| 27. | Services Agreement with Stericycle for Biohazard Waste Disposal | $0 |
| 28. | Nursing Facility Hospice and Respite Care Services Contract with UnityPoint at Home dba UnityPoint Hospice | $0 |
| 29. | Agreement with Waste Management of Iowa Inc. | $0 |
| 30. | Hospice and Respite Care Agreement with St. Croix Hospice | $0 |
| 31. | Hospice and Respite Care Agreement with Hospice of the Midwest | $0 |
| 32. | Fraser Ambulance Transportation Agreement (Midwest Medical Transport Company of Nebraska) | $0 |
| 33. | Hospice and Respite Care Agreement with Hospice of Central Iowa | $0 |
| 34. | Dietitian Agreement with Jill Dolan RD | $0 |
| 35. | Staffing Agreement with Signature Healthcare LLC | $0 |
| 36. | Staffing Agreement with Nursefinder | $0 |
| 37. | Utilities Contract with the City of Mitchellville | $0 |

| | | |
|---|---|---|
| 38 | Utilities Contract with Midamerican Energy | $3,670.65 |
| 39. | Ecolab Pest Elimination Division Pest Control Agreement | $1,936.72 |
| 40. | Staffing Agreement with A-1 Careers | $0 |
| 41. | Staffing Agreement with Accessible Staffing | $38,147.06 |
| 42. | CBS Staffing, LLC, Staffing Agreement | $59,153.64 |
| 43. | Staffing Agreement with Favorite Healthcare Staffing | $18,664.00 |
| 44. | Staffing Agreement with Helping Hand Nursing Solutions Inc. | $7,308.96 |
| 45. | Medicare Provider Agreement #165264 | $253,516.90 |

## VILLA COTTAGES

| Contract | Cure Costs |
|---|---|
| 1. Subscription Services Agreement with Wescom Solutions Inc, dba Pointclickcare | $277.76 |
| 2. Contract with Aureon Technology | $2,102.80 |
| 3. Contract with Windstream | $69.09 |
| 4. Contract with Banleaco, Inc. | $602.05 |
| 5. Mobile Imaging Services Agreement with BTX Iowa | $232.47 |

| | | |
|---|---|---|
| 6. | Services Agreement with Mediacom | $0 |
| 7. | Services Agreement with Centurylink Communications, LLC | $529.40 |
| 8. | Storage Agreement with Carlson Storage | $110.00 |
| 9. | All Resident Occupancy Agreements | $0 |
| 10. | Shred-it Contract | $0 |
| 11. | Utilities Contract with Midamerican Energy | $1,778.73 |
| 12. | Utilities Contract with Fort Dodge Water Dept. | $0 |
| 13. | Ecolab Pest Elimination Division Pest Control Agreement | $598.02 |
| 14. | Martin Bros Distributing Contract | $83.46 |

## WINTERSET NORTH

| | Contract | Cure Costs |
|---|---|---|
| 1. | Staffing Agreement with AbiraCare LLC | $47,588.26 |
| 2. | Nursing Facility Hospice and Respite Care Services with Avalon Hospice Iowa | $0 |
| 3. | Nursing Facility Hospice and Respite Care Services with Hospice of Central Iowa dba EveryStep | $0 |
| 4. | Nursing Facility Hospice and Respite Care Services with Hospice of Central Iowa dba HCI Care Services | $0 |

| 5. | Nursing Facility Hospice and Respite Care Services with Hospice of the Midwest | $0 |
|---|---|---|
| 6. | Transfer Agreement with Madison County Memorial Hospital | $991.20 |
| 7. | Rehabilitation Services Agreement with Millennium Rehab & Consulting Group | $85,672.08 |
| 8. | Agreement for 50 PPM Paper Pass Unit, 3 hole punch, Sheet Tandem Paper Drawers, Fax Expansion Kit, Staple Finisher, Toner Supply, and Tone Colletion Bottle with MMIT Business Solutions Group | $602.05 |
| 9. | Contract with Montross Pharmacy Inc, for 2 medication carts | $5,598.70 |
| 10. | Staffing Agreement with Nursepro Staffing (Aerofund Financial) | $75,272.47 |
| 11. | Lawn fertilization and weed control contract with Pro-Turf Services | $0 |
| 12. | Rehabilitation Services Agreement with Rehab Visions | $216.66 |
| 13. | Staffing Agreement with Signature Healthcare LLC | $0 |
| 14. | Nursing Facility Hospice and Respite Care Services Contract with St. Croix Hospice | $0 |
| 15. | Nursing Facility Hospice and Respite Care Services Contract with Suncrest Hospice | $0 |
| 16. | Staffing Agreement with TNN Iowa Inc, | $0 |
| 17. | Nursing Facility Hospice and Respite Care Services Contract with UnityPoint at Home dba UnityPoint Hospice | $0 |

| 18. | Subscription Service Agreement with Wescom Solutions Inc. dba Pointclickcare Technologies | $4,716.44 |
| 19. | Lease Agreements with Great America Financial Services | $323.54 |
| 20. | Contract with Aureon Technology | $2,102.80 |
| 21. | Contract with Windstream | $69.09 |
| 22. | Contract with BANLEACO | $602.05 |
| 23. | Mobile Imaging Services Agreement with BTX Iowa | $232.47 |
| 24. | Services Agreement with Mediacom | $0 |
| 25. | Contract with Centurylink Communications, LLC | $1,615.60 |
| 26. | Storage Agreement with Carlson Storage | $110.00 |
| 27. | Equipment Rental Agreement #61-00056 with Century Contract Services, Inc. Equipment Rental Agreement #21-00182 with Century | $1,389.00 |
| 28. | Staffing Agreement with A-1 Careers | $0 |
| 29. | All Resident Admission Agreements | $0 |
| 30. | Utilities Contract with MidAmerican Energy Company | $5,279.34 |
| 31. | Staffing Agreement with SolidCare Staffing | $0 |

| 32. | Shred-it Contract | $0 |
|---|---|---|
| 33. | Nursing Facility Hospice and Respite Care Services with Suncrest Hospice LLC | $0 |
| 34. | Nursing Home Medical Director Agreement with Dr. Kevin    de Regnier | $0 |
| 35. | Nursing Facility Hospice Agreement with Genteva | $0 |
| 36. | Medical Director Agreement with Dr. Robert Connor | $0 |
| 37. | Services Agreement with Stericycle | $0 |
| 38. | Telligen Health Management Agreement | $0 |
| 39. | Utilities Contract with Midamerican Energy | $5,279.34 |
| 40. | Staffing Agreement with Helping Hand Nursing Solutions Inc. | $29,024.69 |
| 41. | Utilities Contract with Winterset Municipal Utilities | $0 |
| 42. | Ecolab Pest Elimination Division Pest Control Agreement | $1,182.23 |
| 43. | Martin Bros Distributing Contract | $19,183.95 |
| 44. | Staffing Agreement with Accessible Staffing | $27,720.97 |
| 45. | CBS Staffing, LLC, Staffing Agreement | $65,152.67 |

| 46. | Staffing Agreement with Favorite Healthcare Staffing | $3,040.18 |
|-----|------------------------------------------------------|-----------|
| 47. | Medicare Provider Agreement #165497                  | $128,600.06 |

**Schedule 3.01(e)**

**Litigation**

**Crestview Acres, Inc.**

Linn County Case No. LACV 057567
Plaintiff: Bill Evans, Estate of Becky Hewitt, Jeffrey Evans and Dakota Hewitt
Filed April 14, 2017

**Crestridge, Inc.**

Polk County Case No. LACL151779
Plaintiff: Millennium Rehab & Consulting Group, Inc.
Filed October 26, 2021

Polk County Case No. LACL150417
Plaintiff Camillus Staffing, LLC d/b/a Nextaff
Filed April 12, 2021

**QHC Management, LLC**

Linn County Case No. LACV 057567
Plaintiff: Bill Evans, Estate of Becky Hewitt, Jeffrey Evans and Dakota Hewitt
Filed April 14, 2017

Humboldt County Case No. LACV018706
Plaintiff: Gayle Lemmon, Estate of Ellen McCullough, Dennis McCullough
Filed November 26, 2018

Polk County Case No. LACL151779
Plaintiff: Millennium Rehab & Consulting Group, Inc.
Filed October 26, 2021

Polk County Case No. LACL150417
Plaintiff: Camillus Staffing, LLC d/b/a Nextaff
Filed April 12, 2021

Polk County Case No. LACL149989
Plaintiff: Nicole Bittle
Filed February 22, 2021

Polk County Case No. LACL151446

Plaintiff: Estate of Gladys Mae VanSickle, Tammy VanSickle, Sherrie VanSickle, Clarence E.
Van Sickle
Filed September 9, 2021

## QHC Humboldt South. LLC

Humboldt County Case No. LACV018706
Plaintiff: Gayle Lemmon, Estate of Ellen McCullough, Dennis McCullough
Filed November 26, 2018

Polk County Case No. LACL151779
Plaintiff: Millennium Rehab & Consulting Group, Inc.
Filed October 26, 2021

Polk County Case No. LACL150417
Plaintiff Camillus Staffing, LLC d/b/a Nextaff
Filed April 12, 2021

Dickinson County Case No. LACV030157
Plaintiff: Grapetree Medical Staffing, LLC
Filed: January 30, 2020
Consolidated into LACV030142 which was dismissed 12/31/20

## QHC Facilities, LLC

Polk County Case No. LACL151779
Plaintiff: Millennium Rehab & Consulting Group, Inc.
Filed October 26, 2021

Polk County Case No. LACL151446
Plaintiff: Estate of Gladys Mae VanSickle, Tammy VanSickle, Sherrie VanSickle, Clarence E.
Van Sickle
Filed September 9, 2021

## QHC Fort Dodge Villa, LLC

Polk County Case No. LACL151779
Plaintiff: Millennium Rehab & Consulting Group, Inc.
Filed October 26, 2021

Polk County Case No. LACL150417
Plaintiff Camillus Staffing, LLC d/b/a Nextaff
Filed April 12, 2021

Polk County Case No. LACL149989
Plaintiff: Nicole Bittle

Filed February 22, 2021

**QHC Humboldt North, LLC**

Polk County Case No. LACL151779
Plaintiff: Millennium Rehab & Consulting Group, Inc.
Filed October 26, 2021
**QHC Humboldt North, LLC (Continued)**


Polk County Case No. LACL150417
Plaintiff Camillus Staffing, LLC d/b/a Nextaff
Filed April 12, 2021

**QHC Mitchellville, LLC**

Polk County Case No. LACL151779
Plaintiff: Millennium Rehab & Consulting Group, Inc.
Filed October 26, 2021

Polk County Case No. LACL150417
Plaintiff Camillus Staffing, LLC d/b/a Nextaff
Filed April 12, 2021

**QHC Winterset North, LLC**

Polk County Case No. LACL151779
Plaintiff: Millennium Rehab & Consulting Group, Inc.
Filed October 26, 2021

Polk County Case No. LACL150417
Plaintiff Camillus Staffing, LLC d/b/a Nextaff
Filed April 12, 2021

Polk County Case No. LACL151446
Plaintiff: Estate of Gladys Mae VanSickle, Tammy VanSickle, Sherrie VanSickle, Clarence E.
Van Sickle
Filed September 9, 2021

## Schedule 3.01(o)

### Certificates of Need

**None.**

## Schedule 3.01(s)

### Permits

**See attached excel sheet.**

<u>**Schedule 3.01(t)**</u>[2]

**Compliance**

**Facility Surveys**

<u>**Sunnycrest**</u>

1. Department of Health and Human Services Centers for Medicare and Medicaid Survey dated January 13, 2022.
2. Department of Health and Human Services Centers for Medicare and Medicaid Survey dated June 8, 2021
3. Department of Health and Human Services Centers for Medicare and Medicaid Survey dated April 12, 2021.
4. Department of Health and Human Services Centers for Medicare and Medicaid Survey dated March 25, 2021.
5. Iowa Dept. of Inspections and Appeals Visit Data Sheet
6. Iowa Dept of Public Safety Letter dated 6/8/2021
7. Iowa Dept of Public Safety Letter dated 7/12/2021

<u>**QHC Fort Dodge Villa**</u>

1. Iowa Dept. of Inspections and Appeals Visit Data Sheet
2. Department of Health and Human Services Centers for Medicare and Medicaid Survey dated December 22, 2021.
3. Department of Health and Human Services Centers for Medicare and Medicaid Survey dated December 6, 2021.
4. Department of Health and Human Services Centers for Medicare and Medicaid Survey dated October 6, 2021.
5. Department of Health and Human Services Centers for Medicare and Medicaid Survey dated February 10, 2021.
6. Fire Marshall Survey dated 2/2/2021

<u>**QHC Humboldt South**</u>

1. Iowa Dept. of Inspections and Appeals Visit Data Sheet

---

[2] All surveys will be submitted into the Data Room

2. Department of Health and Human Services Centers for Medicare and Medicaid Survey dated January 11, 2022.
3. Department of Health and Human Services Centers for Medicare and Medicaid Survey dated July 7, 2021.
4. Department of Health and Human Services Centers for Medicare and Medicaid Survey dated June 7, 2021
5. CMS Letter dated February 15, 2022.

## QHC Humboldt North
1. Iowa Dept. of Inspections and Appeals Visit Data Sheet
2. Department of Health and Human Services Centers for Medicare and Medicaid Survey dated September 23, 2021.
3. Department of Health and Human Services Centers for Medicare and Medicaid Survey dated July 6, 2021.
4. Iowa Dept of Public Safety Letter dated 8/5/2021

## Crestridge

1. Department of Health and Human Services Centers for Medicare and Medicaid Survey dated January 11, 2022.
2. Department of Health and Human Services Centers for Medicare and Medicaid Survey dated March 3, 2021.
3. Department of Health and Human Services Centers for Medicare and Medicaid Survey dated January 6, 2021.
4. Iowa Dept. of Inspections and Appeals Visit Data Sheet
5. Fire Marshall Survey dated 2/12/2020

## QHC Winterset North

1. Iowa Dept. of Inspections and Appeals Visit Data Sheet
2. Department of Health and Human Services Centers for Medicare and Medicaid Survey dated January 4, 2022
3. Department of Health and Human Services Centers for Medicare and Medicaid Survey dated November 30, 2021
4. Department of Health and Human Services Centers for Medicare and Medicaid Survey dated September 15, 2021.
5. Department of Health and Human Services Centers for Medicare and Medicaid Survey dated April 8, 2021.
6. Department of Health and Human Services Centers for Medicare and Medicaid Survey dated February 25, 2021.
7. Iowa Dept of Public Safety Letter dated 12/22/2021
8. Iowa Dept of Public Safety Letter dated 2/10/2022

**QHC Mitchellville**

1.  Department of Health and Human Services Centers for Medicare and Medicaid Survey dated February 2, 2022.
2.  Department of Health and Human Services Centers for Medicare and Medicaid Survey dated December 6, 2021.
3.  Department of Health and Human Services Centers for Medicare and Medicaid Survey dated August 18, 2021.
4.  Iowa Department of Inspections and Appeals Health Facilities Division Citation dated September 1, 2021.
5.  IDIA Letter dated September 1, 2021.
6.  IDIA Letter dated December 15, 2021.
7.  IDIA Letter dated February 10, 2022.
8.  Iowa Dept. of Inspections and Appeals Visit Data Sheet
9.  Department of Health and Human Services Centers for Medicare and Medicaid Survey dated February 15, 2022.
10. OSHA—Iowa Workforce Development Letter dated February 18, 2022.

**QHC Villa Cottages**

1.  Iowa Dept. of Inspections and Appeals Visit Data Sheet
2.  Iowa Department of Inspections and Appeals Health Facilities Division Citation dated September 29, 2019.
3.  Fire Marshall Survey dated 6/4/2021

**QHC Madison Square**

1.  Iowa Dept. of Inspections and Appeals Visit Data Sheet
2.  Iowa Department of Inspections and Appeals Health Facilities Division Citation dated December 14, 2020.
3.  Fire Marshall Survey dated 11/5/2020

## Facility Listing with Current Administrators[3]

**CRESTRIDGE, INC. (CR)**

---

[3] Administrator licenses have been added to the data room.

1015 WESLEY DRIVE
MAQUOKETA, IA 52060-2637
AMANDA CARR, ADMINISTRATOR
EMILY CLARK, ADMIN. ASSISTANT
TELE: 563.652-4968/ FAX: 563.652-3150
COMPANY #11

**CRESTVIEW ACRES, INC. (CV)**
1485 GRAND AVENUE
MARION, IA 52302-5219
, ADMINISTRATOR
, ADMIN. ASSISTANT
TELE: 319.377-4823/ FAX: 319.377-4501
COMPANY # 12

**QHC FORT DODGE VILLA, LLC (FV)**
**FORT DODGE VILLA CARE CENTER**
2721 10TH AVENUE NORTH
FORT DODGE, IA 50501-2834
JESSICA BELLINGER, PROVISIONAL ADMINISTRATOR/ADMIN. ASSISTANT
JESSE GRAZIER, INTERIM ADMIN. ASSISTANT
TELE: 515.576-7525/ FAX: 515.955-7528
COMPANY #23

**QHC VILLA COTTAGES, LLC (VC)**
**VILLA COTTAGES**
925 MARTIN LUTHER KING DRIVE
FORT DODGE, IA 50501-2866
MEGAN KAHLER, MANAGER
TELE: 515.576-6525/ FAX: 515.573-3968
COMPANY # 78

**QHC HUMBOLDT NORTH, LLC (HN)**
**HUMBOLDT CARE CENTER NORTH**
1111 11TH AVENUE NORTH
HUMBOLDT, IA 50548-1225
STACY BENNA, ADMINISTRATOR
JESSICA HABHAB, INTERIM ADMIN. ASSISTANT
TELE: 515.332-2623/ FAX: 515.332-2653
COMPANY #30

**QHC HUMBOLDT SOUTH, LLC (HS)**
**HUMBOLDT CARE CENTER SOUTH**
800 13TH STREET SOUTH

HUMBOLDT, IA 50548-2439
STACY BENNA, ADMINISTRATOR
JESSICA HABHAB, INTERIM ADMIN. ASSISTANT
TELE: 515.332-4104/ FAX: 515.332-4526
COMPANY #31


**QHC MADISON SQUARE, LLC (MS)**
209 W JEFFERSON STREET
WINTERSET, IA 50273-1676
LOGAN KUNZMAN, MANAGER
DEBBIE SHAFER, ADMIN. ASSISTANT
TELE: 515.462-5087/ FAX: 515.462-9058
COMPANY #43

**QHC MITCHELLVILLE, LLC (MV)**
**MITCHELL VILLAGE CARE CENTER**
114 CARTER STREET SW
MITCHELLVILLE, IA 50169-5000
LESLIE WALSH, ADMINISTRATOR
DARCY HEEBNER, ADMIN. ASSISTANT
TELE: 515.967-3726/ FAX: 515.967-3728
COMPANY #47

**SUNNYCREST NURSING CENTER (SC)**
401 CRISMAN STREET
DYSART, IA 52224-9520
ASHLEY KERSTEN, PROVISIONAL ADMINISTRATOR/ADMIN. ASSISTANT
TELE: 319.476-2400/ FAX: 319.476-3622
COMPANY #69

**QHC WINTERSET NORTH, LLC (WN)**
**WINTERSET CARE CENTER NORTH**
411 EAST LANE STREET
WINTERSET, IA 50273-1217
LESLIE WALSH, PROVISIONAL ADMINISTRATOR
BARBARA PAINTER, ADMIN. ASSISTANT
TELE: 515.462-1571/ FAX: 515.462-1572
COMPANY #84
**Rae Tucker was the previous provisional administrator, however, her license expired in February 2022. Rae has submitted an application to the Iowa Nursing Home Admins Licensure Board. Once approved she will be taking the test for the license. In the interim, the IDIA has allowed Leslie Walsh to serve as a provisional administrator.


**QHC FACILITIES, LLC**

LANETT POWERS, NURSE CONSULTANT
TELE: 515.570-1533/ FAX: 515.276-4353

**QHC FACILITIES, LLC**
LESLIE WALSH, REGIONAL ADMINISTRATOR
TELE: 319-427-1136/ FAX: 515.276-4353

## Schedule 3.01(u)

## Licensed Beds and Current Rate[4]

| Debtor | Type | Facility Name | Location | Available Beds | Bed Occupancy | Occupancy % |
|---|---|---|---|---|---|---|
| QHC Facilities, LLC | Corporate | N/A | 8350 Hickman Rd., Ste. 15 Clive, Iowa 50325 | N/A | N/A | N/A |
| QHC Management, LLC | Corporate | N/A | 8350 Hickman Rd., Ste. 15 Clive, Iowa 50325 | N/A | N/A | N/A |
| Crestridge, Inc. | Skilled Nursing | Crestridge | 1015 Wesley Dr. Maquoketa, IA 52060 | 75 | 52 | 69.3 |
| Crestview Acres, Inc. | Skilled Nursing | Crestview Acres | 1485 Grand Ave. Marion, IA 52302 | 100 | N/A | N/A |
| | Skilled Nursing | Sunnycrest Nursing Center | 401 Crisman St. Dysart, IA 52224 | 50 | 24 | 48.0 |
| QHC Fort Dodge Villa, LLC | Skilled Nursing | Fort Dodge Villa Care Center | 2721 10th Ave. N. Fort Dodge, IA 50501 | 107 | 64 | 59.8 |
| QHC Humboldt North, LLC | Skilled Nursing | Humboldt Care Center North | 1111 11th Ave. N. Humboldt, IA 50548 | 90 | 36 | 40.0 |
| QHC Humboldt South, LLC | Skilled Nursing | Humboldt Care Center South | 800 13th St. S. Humboldt, IA 50548 | 40 | 17 | 42.5 |

---

[4]All Skilled Nursing Facilities are dually certified beds, and can accept Medicare, Medicaid, or private pay. Assisted Living Facilities are residential units.

| QHC Mitchellville, LLC | Skilled Nursing | Mitchell Village Care Center | 114 Carter St. SW Mitchellville, IA 50169 | 65 | 20 | 30.8 |
|---|---|---|---|---|---|---|
| QHC Winterset North, LLC | Skilled Nursing | Winterset Care Center North | 411 East Lane St. Winterset, IA 50273 | 120 | 42 | 35.0 |
| QHC Madison Square, LLC | Assisted Living | Madison Square | 209 W Jefferson St. Winterset, IA 50273 | 44 (Residential Units) | 39 (Residential Units) | 88.6 |
| QHC Villa Cottages, LLC | Assisted Living | Villa Cottages | 925 Martin Luther King Dr. Fort Dodge, IA 50501 | 20 (Residential Units) | 14 (Residential Units) | 70.0 |
| | | | **Total** | **711** | | |

## Schedule 3.01(y)

### Financial Information

| Debtor | Balance Sheets 12/31/19 & 12/31/20 | Balance Sheet 6/30/21 | Balance Sheet 10/31/21 | Monthly Income Statements 8/31/20 – 7/31/21 | Annual Income Statements 2019 and 2020 | Income Statement YTD 6/30/21 | Income Statement YTD 10/31/21 |
|---|---|---|---|---|---|---|---|
| Crestridge, Inc. | X | X | X | X | X | X | X |
| Crestview Acres, Inc. | X | | X | X | X | X | X |
| QHC Fort Dodge Villas, LLC | X | X | X | X | X | X | X |
| QHC Humboldt North, LLC | X | X | X | X | X | X | X |
| QHC Humboldt South, LLC | X | X | X | X | X | X | X |
| QHC Madison Square, LLC | X | X | X | X | X | X | X |
| QHC Mitchellville, LLC | X | X | X | X | X | X | X |
| QHC Villa Cottages, LLC | X | X | X | X | X | X | X |
| QHC Winterset North, LLC | X | X | X | X | X | X | X |

*\* The financials referenced above are unaudited*

**Schedule 3.01(z)**

**Real Property**

**Crestridge, Inc**

Property Address: 1015 Wesley Drive, Maquoketa, IA 52060

Legally described as follows:

> The South fourth of the East fourth of the Northwest quarter (NW 1/4) of the
> Southwest quarter (SW 1/4) of Section Twenty-Four (24), Township Eighty-Four
> (84) North, Range Two (2) East of the 5th P.M., Jackson County, Iowa;
> EXCEPTING THEREFROM the West twenty (20) feet thereof;

> AND

> Commencing twenty (20) rods West of the Southeast corner of the West half
> (W1/2) of the Northeast quarter (NE1/4) of the Southwest quarter (SW 1/4) of
> Section twenty-four (24), Township eighty-four (84) North, Range two (2) East of
> the 5th P.M., Jackson County, Iowa; thence West twenty (20) rods to the
> Southwest corner of the Northeast quarter (NE 1/4) of said Southwest quarter
> (SW 1/4) of said Section twenty-four (24); thence North twenty (20) rods; thence
> East twenty (20) rods more or less to West line of land heretofore conveyed to
> Leonard Seaver to Williams P. Thomas; thence South twenty (20) rods to the
> place of beginning; EXCEPTING THEREFROM Lots one (1), two (2), three (3),
> and four (4) according to survey by J. G. Thorne dated July 23, 1966, and
> recorded in Plat Book 1 Page 143, Office of the Recorder of Jackson County,
> Iowa, together with any interest in the street along the East side thereof;

> AND

> Beginning on the West line of Western Avenue in the City of Maquoketa, Jackson
> County, Iowa, nine hundred ninety (990) feet South of the point of intersection of
> the centerline of West Platt Street and the West line of said Western Avenue;
> thence West one hundred twenty (120) feet to the point of commencement; thence

West four hundred ninety (490) feet; thence North ten (10) feet; thence East four hundred ninety (490) feet; thence South ten (10) feet to the point of commencement, all in the North half (N1/2) of the Southwest quarter (SW 1/4) of Section twenty-four (24), Township eighty-four (84) north, Range two (2) East of the 5th P.M. in the City of Maquoketa, Jackson County, Iowa

## Crestview Acres, Inc.

Property Address: 1485 Grand Ave, Marion Iowa 52302-5219

Legally described as follows:

> South 417 feet of North 457 feet of West 417 feet of East 447 feet of Lot 1,
> "auditor's Plat No. 202, Linn County, Iowa.

## Crestview Acres, Inc. dba Sunnycrest Nursing Center

Property Address: 401 Crisman St., Dysart, IA  52224-9520

Legally described as follows:

> Lots Ten (10), Eleven (11) and Twelve (12), Block Seventeen (17) Dysart, Iowa.

## QHC Fort Dodge Villa LLC dba Fort Dodge Villa Care Center

Property Address: 2721 10th Ave. North, Fort Dodge, IA  50501-2834

Legally described as follows:

> A tract of land located in the NE ¼ of the NW ¼ of Section 21-89-28 West of the
> 5th P.M., City of Fort Dodge, Webster County, Iowa, more particularly described
> as follows: Commencing at the Northeast corner of the said NW ¼; thence
> N89°33'00"W 198 feet along the North line of the said NW ¼;  thence
> S00°00'00"W 33.00 feet to the South right of way line of 10th Avenue North, to
> the point of beginning; thence continuing S00°00'00"W 481.01 feet; thence
> N89°33'00"W 423.51 feet to a point on the East right of way line of North 27th
> Street; thence N00°02'00"E 481.00 feet along the said East right of way line to a
> point on the South right of way line of 10th Avenue North; thence S89°33'00"E
> 423.24 feet along the said South right of way line to the point of beginning,
> containing 4.67 acres.

## QHC Villa Cottages, LLC dba Villa Cottages

Property Address: 925 Martin Luther King Dr., Fort Dodge, IA 50501-2866

Legally described as follows:

> A tract of land located in the NE 1/4 of the NW 1/4 of Section 21-89-28 West of
> the 5th P.M., City of Fort Dodge, Webster County, Iowa, more particularly
> described as follows:  Commencing at the  Northeast corner of  the said NW 1/4;
> thence N89°33'00"W 198.00 feet along the North  line of the said  NW 1/4;
> thence S00°00'00"W 514.01 feet to the point of beginning; thence continuing

S00°00'00"W 46.85 feet to a point 116.00 feet normally distant northwesterly from the centerline of the Chicago & Northwestern Railway right of way; thence S50°27'00"W 549.54 feet along a line parallel with the said Railroad centerline to a point on the East right of way line of North 27th Street; thence N00°02'00"E 400.10 feet along the said East right of way line; thence S89°33'00"E 423.51 feet to the point of beginning, containing 2.17 acres,

AND

Part of the vacated North 24th Street located in the NE1/4 of the NW 1/4 of Section 21-89-28 West of the 5th P.M., City of Fort Dodge, Webster County, Iowa, more particularly described as follows: Commencing at the North Quarter corner of the said Section 21 (said North Quarter corner also being the Northeast corner of said NE 1/4 of the NW 1/4); thence S00°00'00"W 33.00 feet along the East line of the said NE 1/4 of the NW 1/4 to the South right of way line of 10th Avenue North; thence N89°33'00"W 198.00 feet along the South right of way line; thence S00°00'00"W 527.86 feet to a point on the Northerly right of way line of vacated 24th Avenue North being the point of beginning; thence S50°26'20"W 549.54 feet along the said northerly right of way line to a point on the East right of way line of North 27th Street; thence S00°02'00"W 85.66 feet along the said East right of way line of North 27th Street to a point on the northerly railroad right of way line; thence N50°26'20"E 549.61 feet along the said Northerly railroad right of way line; thence N00°00'00"E 85.61 feet to the point of beginning

## QHC Humboldt North, LLC dba Humboldt Care Center North

Property Address: 1111 11th Avenue North, Humboldt, IA 50548-1225

Legally described as follows:

Parcel One:

All of Lot One (1) and the East Seventeen and one-half (17 ½) feet of Lot Two (2) of Block Thirty-Seven (37), Second College Addition, City of Humboldt, Humboldt County, Iowa.

Parcel Two:

All of Block Thirty-Six (36) and all of Tilleston Street (vacated) (now Twelfth Street North) between Blocks 36 and 37, all being in Second College Addition to the Town, now City, of Humboldt, Humboldt County, Iowa. (Sec. 36-92-29)

## QHC Humboldt South, LLC dba Humboldt Care Center South

Property Address: 800 13th Street South, Humboldt, Iowa 50548-2439

Legally described as follows:

> A tract of land in the Southeast one-quarter (SE ¼) of the Northeast One-Quarter (NE ¼) of Section Eleven (11), Township Ninety-One (91) North, Range Twenty-Nine (29), and more particularly described as follows:  Beginning at the Northeast Corner of said Southeast One-Quarter (SE ¼) of the Northeast One-Quarter (NE ¼), said point being1300.17 feet South of the Northeast Corner of Section Eleven (11), thence South 417.4 feet along East line of Section Eleven (11), thence South 88 degrees 40' 30" West 467.4 feet, thence North 417.4 feet to Point on the North Line of said Southeast One-Quarter (SE ¼) of the Northeast One-Quarter (NE ¼); thence North 88 degrees 40' 30" East 467.4 feet along said North line to Point of Beginning, except the North Thirty-Three (33) feet of North Edge and except that part conveyed to the State of Iowa by Warranty Deed recorded in Book 260, Page 276, and more particularly described as follows:  Commencing at the E ¼ corner of said Sec. 11; thence N00°07'29"E, 883.35 ft. along the East line of the NE ¼ said Sec. 11 to the SE corner of said tract; thence continuing along said line N00°07'29"E, 384.34 ft.; thence S88°48'50"W, 65.02 ft.; thence S00°07'29"W, 204.40 ft; thence S07°14'59"W, 120.93 ft.; thence S00°07'29"W, 60.30 ft. to a point on the South line of said tract; thence N88°48'09"E, 80.02 ft. along said line to the Point of Beginning; containing 0.61 acre, more or less, including 0.44 acre, more or less, in existing right of way.

## QHC Madison Square, LLC dba Madison Square

Property Address: 209 W. Jefferson St., Winterset, IA  50273-1676

Legally described as follows:

> Units #101, #102, #103, #104, #106, #107, #108, #201, #202, #203, #204, #205, #206, #208, #301, #302, #303, #304, #305, #306, #307, and #308 of Jefferson Place in the City of Winterset, Madison County, Iowa, and an undivided interest in the common elements and areas of Jefferson Place, as shown in the Declaration of Condominium of Jefferson Place filed for record on April 14, 1995 in Town Lot Deed Record 60 at page 159 in the Madison County Recorder's Office (and any supplements and amendments thereto).
>
> AND
>
> Unit #207 of Jefferson Place in the City of Winterset, Madison County, Iowa, and an undivided interest in the common elements and areas of Jefferson Place as shown in the Declaration of Condominium of Jefferson Place filed for record on April 14, 1995 in Town Lot Deed Record 60 at page 159 in the Madison County Recorder's Office (and any supplements and amendments thereto).

## QHC Mitchellville, LLC dba Mitchell Village Care Center

Property Address: 114 Carter St. SW, Mitchellville, IA  50169-5000

Legally described as follows:

> All of Block 6, (except the East 165 feet and except the South 140 feet and except the West 126.33 feet) in Sage's Addition to Mitchellville, Polk County, Iowa.

## QHC Winterset North, LLC dba Winterset Care Center North

Property Address: 411 East Lane St., Winterset, IA  50273-1217

Legally described as follows:

A tract of land located in the Northwest Fractional Quarter (1/4) of the Northwest Fractional Quarter (1/4) of Section Thirty-one (31) in Township Seventy-s9x (76) North, Range Twenty-seven (27) West of the 5th P.M., City of Winterset, Madison County, Iowa, more particularly described as follows, to-wit: Commencing at the Southwest corner of the Northwest Fractional Quarter (1/4) of the Northwest Fractional Quarter (1/4) of said Section Thirty-one (31), thence South 88°37' East, 935.1 feet along the South line of said Northwest Fractional Quarter (1/4) of the Northwest Fractional Quarter (1/4) to the point of beginning, thence continuing South 88°37' East, 347.2 feet, thence North 506.5 feet, thence North 88° 37' West, 347.2 feet, thence South 506.5 feet to the point of beginning, containing 4.0359 acres.