# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| **QHC FACILITIES, et al.,**[1] | ) | Case No. 21-01643-als11 |
| Debtors. | ) | Jointly Administered |
| | ) | |

### UNITED STATES' LIMITED OBJECTION TO DEBTORS' MOTION TO SELL FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS & ENCUMBRANCES

The United States of America (the "United States") on behalf of the Department of Health and Human Services ("HHS"), acting through its designated components, the Centers for Medicare and Medicaid Services ("CMS") and the Health Resources and Services Administration ("HRSA"), hereby files this limited objection to Debtor, QHC Facilities, LLC, and Affiliate Debtors (collectively "Debtors"), *Debtors' Motion For Orders (I)(A) Approving Bidding Procedures; (B) Scheduling The Time, Date, And Form Of Notice For The Auction And Sale Hearing; And (C) Approving Break-Up Fee; And (II)(A) Approving The Sale Free And Clear Of Liens, Claims, Interests, & Encumbrances; And (B) Authorizing Assumption And Assignment Or Rejection Of Leases And Executory Contracts* (the "Sale Motion")[2]. (ECF No. 117). In support of its limited objection, the United States states as follows:

---

[1] The Jointly Administered Debtors in this proceeding are *In re QHC Management, LLC* (Case No. 21-01644-als11), *In re QHC Mitchellville, LLC* (Case No. 21-01645-als11), *In re QHC Winterset North, LLC* (Case No. 21-01646-als11), *In re QHC Madison Square, LLC* (Case No. 21-01647-als11), *In re QHC Fort Dodge Villa, LLC* (Case No. 21-01648-als11), *In re Crestridge, Inc.* (Case No. 21-01649-als11), *In re Crestview Acres Inc.* (Case No. 21-01650-als11), *In re QHC Humboldt North, LLC* (Case No. 21-01651-als11), *In re QHC Humboldt South, LLC* (Case No. 21-01652-als11) and *In re QHC Villa Cottages, LLC* (Case No. 21-01653-als11).

[2] The Debtors' outstanding request is for the Court to approve the sale free and clear under 11 U.S.C. § 363(f).

1

## INTRODUCTION

1. HHS objects to the Sale Motion to the extent that (i) the Debtors try to assume and assign (or reject) the Medicare Provider Agreements without complying with Medicare Law and 11 U.S.C. § 365, (ii) the Management Agreement and/or Asset Purchase Agreement ("APA") results in a change in ownership (or "CHOW") that does not comply with the Medicare statute and regulations, (iii) the Debtors seek to sell or transfer unused Provider Relief Funds and American Rescue Plan funds, and (iv) the Debtors seeks to waive the 14-day stay under Fed. R. Bankr. P. 6004(h).

## BACKGROUND

### A. Procedural Background

2. On December 29, 2021, the Debtors filed voluntary petitions under chapter 11 of title 11 of the United States Code. Subsequently, the Court ordered the Debtors' cases to be jointly administered. (ECF No. 66).

3. The Debtors are skilled nursing and assisted living facilities and affiliated management companies operating in the State of Iowa. (ECF No. 15).

4. On January 28, 2022, the Debtors filed the Sale Motion seeking court approval of bidding procedures; scheduling the auction and sale hearing; authorizing the assumption and assignment or rejection of executory contracts; authorizing the sale of substantially all of the Debtors' assets free and clear of liens, claims, interests, and encumbrances; and, approving the proposed break-up fee. On February 11, 2022, the Court issued an order approving the bidding procedures, approving the assumption and assignment procedures, allowing the Debtors to solicit bids and hold an auction, and notifying parties of the auction, sale hearing, and relevant dates. (ECF No. 164).

5. An auction took place on March 4, 2022. On March 7, 2022, the Debtors filed a Notice of Successful Bidder, including the Successful Bidder's Asset Purchase Agreement ("APA") and Management Agreement. (ECF No. 199).

6. Based on the Amended Cure Notice filed on March 1, 2022, and in line with the Court's order (ECF No. 164), the United States' deadline to raise cure, adequate protection, and regulatory objections to the assumption and assignment of the Medicare Provider Agreements is March 21, 2022. (ECF No. 189).

**B. Regulatory Background**

*1. Requirements to Become a Medicare Provider and Changes of Ownership*

7. As of the Petition Date, the skilled nursing facility Debtors ("SNF Debtors")[3] were parties to Medicare Provider Agreements with the Secretary of HHS, acting through CMS ("Secretary"), under which they receive payment for services provided to Medicare beneficiaries pursuant to Title XVIII of the Social Security Act. *See* 42 U.S.C. §§ 1395-1395lll and its implementing regulations ("Medicare Law").

8. To be reimbursed for services provided to Medicare beneficiaries under Part A of the Medicare program, a skilled nursing facility must enter into an agreement with the Secretary, called a Health Insurance Benefit Agreement (commonly known as a "Medicare Provider Agreement" or "Provider Agreement"). 42 U.S.C. § 1395cc; 42 C.F.R. § 400.202 (defining "provider"); *see also* 42 C.F.R. §§ 489.2, 489.3. A new provider must apply to HHS and be

---

[3] The SNF Debtors and their Medicare Provider Numbers are as follows: (1) Crestview Acres, Inc.: 16-5515 and 16-5299; (2) Crestridge, Inc.: 16-5516; (3) QHC Fort Dodge Villa, LLC: 16-5265; (4) QHC Humboldt North, LLC: 16-5533; (5) QHC Humboldt South, LLC: 16-5534; (6) QHC Mitchellville, LLC: 16-5264; and (7) QHC Winterset LLC: 16-5497.

3

certified before it obtains payment for providing services to Medicare beneficiaries. *See* 42 C.F.R. § 488.1, 488.3, 489.1, 489.2 and 489.10. The certification process enables HHS to determine, among others, that the provider is qualified to provide health care services. *See* 42 C.F.R. § 489.10-12 (requirements for obtaining Provider Agreement).

9. The transfer of a Medicare Provider Agreement is strictly limited and must be approved by CMS before the transfer is effective. Provider Agreements may only be assigned upon a valid "change of ownership" ("CHOW"). 42 C.F.R. §§ 489.18, 489.18(c); *see United States v. Vernon Home Health, Inc.*, 21 F.3d 693, 696 (5th Cir. 1994), *cert. denied,* 513 U.S. 1015 (1994). For the transfer of a provider agreement to be approved, the transferee must submit a CHOW Application to CMS. The CMS Regional Office has ultimate responsibility for ascertaining whether and on what date a CHOW occurred. *See* State Operations Manual, CMS Publication 100-07, § 3210.2 ("SOM").[4]

10. When CMS determines that a valid CHOW has occurred, the existing Provider Agreement is automatically assigned to the new owner. *See* 42 C.F.R. § 489.18(c); *Vernon*, 21 F.3d at 696. An assigned Provider Agreement is subject to all statutory and regulatory terms and conditions under which it originally was issued, including the provider's quality history, adjustment of payments to account for prior overpayments or underpayments, and civil monetary penalties. 42 C.F.R. 489.18(d); SOM § 3210; *Vernon*, 21 F.3d at 696 (*citing* 42 C.F.R. § 489.18(a), (d)); *Deerbrook Pavilion, LLC v. Shalala*, 235 F.3d 1100, 1103-04 (8th Cir. 2000) (holding that "an [assigned] provider agreement is taken subject to all the terms and conditions under which it was issued").

11. When CMS approves an assignment, the "new" provider does not have to meet the initial

---

[4] Available at http://www.cms.gov/manuals/downloads/som107c03.pdf.

Medicare survey and certification requirements because the "new" provider is merely stepping into the shoes of the "old" provider with the same Provider Agreement. Even though the new provider takes the existing Provider Agreement after a CHOW, CMS may need to carefully evaluate whether the new owner is eligible to participate in the Medicare program before recognizing the assignment of the Medicare Provider Agreement.

12. Importantly, although providers receive Medicare reimbursement for services during the CHOW processing period, subject to certain requirements, *see* CMS Publ. 100-08, Chapter 15, § 15.7.7.1.5, Medicare regulations specifically prohibit the sale or transfer of billing privileges or a Medicare billing number, except pursuant to a valid change of ownership, 42 C.F.R. § 424.550; *see also* 42 C.F.R. § 424.535(a)(7) (revocation of Medicare enrollment for knowingly selling or allowing another entity to use a Medicare billing number unless exception applies). The anti-assignment provisions of Medicare Law preclude redirecting Medicare reimbursement to third parties. 42 U.S.C. §§ 1395g(c); *see* 42 C.F.R. § 424.73(a). Therefore, "[m]edicare funds cannot be paid directly by the government to someone other than the provider . . . ." *DFS Healthcare Receivables Trust v. Caregivers Great Lakes, Inc.*, 384 F.3d 338, 350 (7th Cir. 2004).

13. . During the CHOW process, the new owner may either: 1) submit claims and make arrangements with the old owner to transfer any payments for post-transfer services to the new owner; or 2) delay submitting claims until the CHOW processing is complete. *See* CMS Publication 100-08, Chapter 10, § 5.5.2.5.

<u>2. Medicare Reimbursement</u>

14. The Secretary contracts with Medicare Administrative Contractors (generally referred to herein as "payment contractors"), typically private insurance companies, to administer payment to providers for Medicare covered services. Payment contractors make advance payments based

5

upon estimates to providers in accordance with the Medicare Statute and regulations and perform the day-to-day administration of Medicare, *e.g.* audit and reimbursement activities. 42 U.S.C. § 1395k; 42 C.F.R. §§ 421.400 -421.404.

15. Under the Medicare payment system, actual reimbursement cannot be determined until the end of a cost-reporting period. Within five months after the end of each fiscal year, the provider must submit a cost report verifying the actual amount of reimbursements owed to it for the past fiscal year. 42 C.F.R. §§ 413.1, 413.20, 413.24(f); *see also* 42 U.S.C. § 1395g and 1395hh (conferring authority upon the Secretary to require submission of cost reports). Once the provider submits the cost report, the payment contractor audits the cost report and determines the provider's actual, rather than estimated, reimbursement. 42 U.S.C. §§ 1395g; 1395x(v)(1)(A)(ii); 42 C.F.R. § 413.24. If a provider's cost report shows that Medicare overpaid the provider for the prior fiscal year, this cost report constitutes a final overpayment determination, and the provider must pay the overpayment to Medicare. 42 C.F.R. § 405.378(c)(iv). Conversely, if a provider's cost report shows that Medicare underpaid the provider for the prior fiscal year, the cost report constitutes an underpayment, and Medicare must pay the underpayment to the provider. Id. Under this prescribed payment mechanism, CMS cannot definitively determine whether a provider owes CMS for overpayments relating to a particular fiscal year until after the provider submits that year's cost report and CMS completes its audit.

16. After the finally determining the reimbursement amount, the payment contractor issues a Notice of Amount of Medicare Program Reimbursement ("NPR"), advising the provider whether it was overpaid or underpaid. 42 C.F.R. §§ 413.60, 405.1803. The NPR is final unless revised by the payment contractor or appealed to the Provider Reimbursement Review Board. 42 C.F.R. § 405.1807.

*3. HHS' Claims*

17. On February 3, 2022, CMS filed proofs of claim asserting claims for pre-petition Medicare overpayments, advanced payments, and civil monetary penalties totaling $1,262,241.94 against the SNF Debtors.[5] In addition, CMS has assessed a post-petition civil monetary penalty against QHC Humboldt South, LLC of $20,000 based on January 4, 2022 quality of care deficiency. CMS is compiling data to determine the amount of any other post-petition assessments.

18. HRSA intends to file contingent and unliquidated claims for provider relief funds[6] ("PRF") and American Rescue Plan funds[7] ("ARP") in an amount no greater than $5.2 million.

---

[5] *See* Claim No. 7 (*In re QHC Mitchellville, LLC*, Case No. 21-01645), Claim No. 8 (*In re Winterset North, LLC*, Case No. 21-01646), Claim No. 9 (*In re QHC Fort Dodge Villa, LLC*, 21-01648), Claim No. 7 (*In re Crestridge, Inc.*, Case No. 21-01649), Claim No. 10 (*In re Crestview Acres Inc.*, Case No. 21-01650), Claim No. 7 (*In re Humboldt North, LLC*, 21-01651), Claim No. 7 (*In re QHC Humboldt South, LLC*, 21-01652).

[6] HRSA distributes PRF funds to eligible healthcare providers to prevent, prepare, and respond to the spread of COVID-19. Recipients must repay PRF distributions if they fail to agree to certain associated Terms and Conditions or fail to use the funds for permitted COVID-19 related purposes. *See generally*, Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. 116-136, Div. B, Title VIII, 134 Stat. 281, 560-64 (Mar. 27, 2020); *see,* Paycheck Protection Program and Health Care Enhancement Act ("Paycheck Protection Act"), Pub. L. 116-139, Div. B., Title I, 134 Stat. 620, 622-28 (Apr. 24, 2020); *see also*, Coronavirus Response and Relief Supplemental Appropriations Act, 2021 ("CRRSA Act"), Pub. L. 116-260, Div. M, Title III, 134 Stat. 1182, 1920-21 (Dec, 27, 2020); American Rescue Plan Act of 2021, Pub. L. 117-2, 135 Stat. 4, Title X, Subtitle N, § 9911 (Mar. 11, 2021), codified as 42 U.S.C. § 1320b-26(e)(1).

[7] HRSA distributes ARP funds to eligible rural providers and suppliers who serve rural Medicaid, Children's Health Insurance Program (CHIP), or Medicare patients to help address the disproportionate impact that COVID-19 has had on rural communities and rural health care providers. Recipients of ARP funds do not need to repay the funds received if the recipients meet the terms and conditions for each payment, and all other applicable requirements, including, but not limited to, proper use and accounting for such payments. *See generally* American Rescue Plan Act of 2021 ("ARP") (P.L. 117-2).

## ARGUMENT

19. While HHS does not oppose a sale *per se*, it opposes any proposed sale to the extent that (i) the Debtors try to assume and assign (or reject) their Medicare Provider Agreements without complying with Medicare Law and 11 U.S.C. § 365, (ii) it effects a change in ownership without complying with Medicare Law, (iii) it seeks to sell or transfer unused PRF and ARP funds, and (iv) it seeks to waive the 14-day stay under Fed. R. Bankr. P. 6004(h).

### A. Assumption and Assignment of the Medicare Provider Agreements Must Comply with Medicare Law and 11 U.S.C. § 365

20. HHS objects to the sale to the extent that the Debtors try to assume and assign the Medicare Provider Agreements to the Successful Bidder[8] (or reject them) without complying with Medicare Law and 11 U.S.C. § 365.

21. Medicare Law governs assignment of Medicare Provider Agreements. 42 C.F.R. § 489.18. A Provider Agreement can only be transferred pursuant to a CHOW. As a consequence of the CHOW, Medicare Law requires the transferee to accept successor liability for any pre-CHOW services. 42 C.F.R. §§ 489.18; *Vernon*, 21 F.3d at 696; *Deerbrook*, 235 F.3d at 1103-05. Treating the Provider Agreements as executory contracts under 11 U.S.C. § 365 satisfies the Medicare requirements. [9] *Cf. In re Dewey Ranch Hockey, LLC*, 406 B.R. 30, 37 (Bankr. D. Ariz.

---

[8] Capitalized terms not otherwise defined herein shall have the same meaning ascribed to them in the Sale Motion and the Notice of Successful Bidder.

[9] Several courts have treated Medicare Provider Agreements as executory contracts in bankruptcy. *See, e.g.*, *University Med. Ctr. v. Sullivan (In re University Med. Ctr.)*, 973 F.2d 1065, 1075-79 (3d Cir. 1992); *In re Vitalsigns Homecare, Inc.*, 396 B.R. 232 (Bankr. D. Mass. 2008) (treating Medicare provider numbers as executory contracts); *United States v. Consumer Health Servs.*, 171 B.R. 917 (Bankr. D.C. 1994), *rev'd on other grounds*, 108 F.3d 390 (D.C. Cir. 1997); *In re Slater Health Center, Inc.*, 294 B.R. 423, 432 (Bankr. D.R.I. 2003); *In re St. Johns Home Health Agency, Inc.*, 173 B.R. 238, 242 n.1 (Bankr. S.D. Fla. 1994); *Matter of*

2009) ("It is basic bankruptcy law regarding the assumption and assignment of executory contracts that the assuming party can not assume only the benefits of a contract; rather assumption is the entire agreement, benefits and burdens.")(citing 3 Collier on Bankruptcy ¶ 365.03[1] at p. 365-24 (15th ed. rev. 2007)[10]). The Debtors have already agreed on the record to treat their Medicare Provider Agreements as executory contracts.

22. Because the Medicare program payment mechanism involves upfront payments subject to adjustment through cost report auditing before determining actual reimbursements, transfer of a Medicare Provider Agreement requires not just cure of overpayments determined as of the date of the assumption and assignment, but also adequate assurance of future performance, including assumption of liability for later determined overpayments, regardless of whether the overpayment relate to requested reimbursements for services provided before assignment. *See Deerbrook*, 235 F.3d at 1103-05 (holding that transfer of a Medicare Provider Agreement created successor liability for overpayments). Moreover, when the Debtors assign the Medicare Provider Agreements to the Successful Bidder, the entity receives the benefits of the agreements along with the burdens (including the old provider's quality of care history and successor liability). See paragraph 10 above.

23. To the extent that the Debtors and the Successful Bidder seek to transfer the Medicare Provider Agreements free and clear of successor liability, the request is inconsistent with Medicare Law. As noted above, to comply with Medicare Law, Medicare Provider Agreements can only be transferred via a CHOW and the transferee must take successor liability when it

---

*Visiting Nurse Ass'n, Inc.*, 121 B.R. 114, 119 (Bankr. M.D. Fla. 1990); *In re Tidewater Mem'l Hosp.*, 106 B.R. 876, 883 (Bankr. E.D. Va. 1989) (and cases cited therein).

[10] Currently available at 3 Collier on Bankruptcy P 365.03 (16th 2021).

accepts assignment of the Medicare Provider Agreements. *See* 42 C.F.R. § 489.18; *Vernon*, 21 F.3d at 694-96; *Deerbrook*, 235 F.3d at 1103-05; see paragraphs 9 and 10 above. While paragraphs 2(i) and 7 in the Management Agreement and paragraph 2.12(b) in the APA affecting the transfer and use of the Debtors' Medicare Provider Agreements imply a transfer through a CHOW, paragraphs 7 and 8 in the Management Agreement and paragraphs 2.09(h) and (l) in the APA appear to preclude successor liability. If a CHOW occurs, successor liability must follow. Id. The Debtors and Successful Bidder cannot contract around Medicare Law's requirements. Despite asking the Court to approve the sale of the facilities free and clear, the Debtors propose a transaction that results in successor liability for the Manager and/or the Successful Bidder under Medicare Law. The Management Agreement and APA should be modified to account for this legal requirement.

24. Even if the Management Agreement and/or APA terms do not constitute a CHOW, the agreements still violate Medicare Law. As discussed in paragraph 12 above, Medicare Law prohibits the sale or transfer of billing privileges or the Medicare billing number except as part of a valid CHOW. If there has not been a CHOW, the Management Agreement and APA violate Medicare Law by allowing the Manager and Successful Bidder to use the Debtors' Medicare provider numbers. *See* ECF No. 199 at 46-47, ¶ 7 (Management Agreement); at 16, ¶ 2.12(b) (APA).

25. In light of the foregoing, the Court should condition any sale on the United States receiving any outstanding cure amounts[11] and adequate assurance of future performance as

---

[11] Because Medicare Law incorporates 42 U.S.C. § 405(g), which prohibits judicial review of the Secretary's decisions (including determining the amount of its claims) until administrative remedies have been exhausted, this Court lacks jurisdiction to establish a cure amount for HHS's claims. *See Weinberger v. Salfi*, 422 U.S. 749, 758 (1975) (Section 405(h) is a "statutorily specified jurisdictional prerequisite" that cannot be dispensed with by a "judicial conclusion of

required by Medicare Law and 11 U.S.C. § 365. [12][13]

**B. The Management Agreement and APA Cannot Effect a Change of Ownership Without Complying With Medicare Law**

26. HHS objects to the sale to the extent that the Management Agreement and/or APA transfer the Provider Agreements in a manner inconsistent with Medicare Law.

27. The Debtors propose to enter into a Management Agreement per facility with a Manager (an affiliate of the purchaser) that will assume responsibility for operating the facility between the execution date of the Management Agreement and the closing of the sale. (ECF No. 199 at 42). Under the agreement, the Manager has the right to operate each facility on the Debtors' behalf, including the right to use the Debtors' Medicare provider numbers, the right to "challenge, negotiate and settle any fines" issued by CMS, and the obligation to submit any CMS-required plan of correction. Id. at 44 ¶ 2(i), 46-47 ¶ 7. The Manager is also responsible for each facility maintaining compliance with applicable rules and regulations. Id. at 46-47 ¶ 7. Through the Management Agreement, the Debtors "grant[] to Manager sole and exclusive

---

futility." ); *Heckler v. Ringer*, 466 U.S. 602, 605 (1984) (holding that section 405(h) required a plaintiff to obtain a final administrative decision on their claims, even if cast as "procedural," prior to seeking judicial review*); cf. Clarinda Home Health v. Shalala*, 100 F.3d 526, 529-31 (8th Cir. 1996) (Section 405(g) bars federal jurisdiction over Medicare claims absent administrative exhaustion and subject to limited exceptions).

[12] According to the APA, "Buyer shall not assume any Cure Costs related to any provider agreement (i.e., Medicare, Medicaid or any HMOs), which amount shall either be satisfied by Seller simultaneously with the Closing or credited at Closing against the Purchase Price." (ECF No. 199 at 14 ¶ 2.08(a)).

[13] The Debtors have just begun settlement discussions with the United States to compromise HHS's claims. Until the settlement negotiations have concluded the parties cannot say how much, if any, of the cure amount will be compromised. Additionally, the United States has not received confirmation that the Successful Bidder will assume the unassessed overpayments and accept successor liability on the Medicare Provider Agreements as adequate assurance of future performance.

11

authority to formulate and implement policies, programs, and operations with respect to [each] Facility," but "any actions taken by Manager will be taken in the name, and on behalf, of Operator [of the facility]." Id. at 42 ¶ 1, 46-47 ¶ 7. In exchange for managing each facility, the Manager receive as compensation the Net Income generated by that facility during the management term. Id. at 45-46 ¶ 5. The term Net Income could be read to include Medicare reimbursements.[14] Id.

28. Under the APA, the Debtors will transfer all rights and interests in the Medicare provider numbers and Medicare Provider Agreements to the Successful Bidder to the extent permitted by applicable law upon closing of the sale. Id. at 16 ¶ 2.12(b). Certain liabilities will not transfer to the Successful Bidder, including "all pre-petition and post-petition Claims as of the Closing Date, including, without limitation, all trade payables and general unsecured Claims [other than Cure Amounts related to the Assumed Contracts];" and "any other Liabilities arising in whole or in part from Seller's acts or omissions or in any way related to the operations of the Facility prior to the Effective Time [other than Cure Amounts related to the Assumed Contracts]." Id. at 15 ¶ 2.09(h), (l). Subject to certain conditions and to the extent permitted by applicable law, the APA permits the Successful Bidder to bill for services performed after the closing date under the Debtors' Medicare provider number. Id. at 16 ¶ 2.12(b).

29. The Management Agreement and the APA are inconsistent with Medicare Law in three

---

[14] The Management Agreement defines Net Income as "(a) the gross revenues generated through the operations of the Facility during the Term, (b) minus all expenses incurred as a result of such operations during the Term, including without limitation, expenses pertaining to payroll, supplies, inventory, taxes (including payroll taxes, real estate taxes and state bed taxes levied by the IDIA), insurance and utilities" and "[a]ny revenue generated as a result of the operations of the Facility during the Term shall be counted towards Net Income in computing the Management Fee, and Manager shall be entitled to such revenue once collected." Id. at 45 ¶ 5(a), (b)(i).

ways.[15] First, the Management Agreement's billing scheme violates Medicare Law to the extent it bestows the benefits of the Provider Agreements without its burdens, successor liability. The unlawful separation of ownership (CHOW) from successor liability would arguably impact CMS's ability to enforce the Medicare Law and protect the health and safety of Medicare residents if an incident occurred during the gap period. CMS regulates facilities like the Debtors through the Medicare program and Medicare Provider Agreements. *See, generally*, 42 C.F.R. Subpart A (including, among other things, the requirements to become a provider and to meet the conditions of participation in the Medicare program). To the extent that the Debtors and the Successful Bidder attempt to separate the operation of each facility from the legal liability to CMS held by the provider under the Medicare Provider Agreement, *see* ECF No. 199 at 42-42, ¶¶ 1, 2, 7, 8 (arguably transferring full management and operational responsibilities to the Manager with no input from the Debtors), CMS would no longer have enforcement authority over the party that is legally responsible for the residents care and safety.[16]

30. Second, an agreement between the parties cannot change CMS regulations or procedures. Purchasers and related entities cannot contract their way out of federal obligations and requirements. *See Vernon,* 21 F.3d at 696 (any state law "right to purchase only assets is preempted by the federal law mandating that all assignments of provider agreements be subject to federal terms and conditions."); *cf. United States v. East Ridge Assocs.*, 295 F. Supp. 2d. 101,

---

[15] The Debtors and the United States are engaged in discussions that may resolve the United States' objections.

[16] A similar issue might arise with respect to the transfer and billing terms in the APA. *See* ECF No. 199 at 15 ¶ 2.09(h), (l) (appearing to exclude successor liability on the Provider Agreements from transferring to the Successful Bidder) and 16 ¶ 2.12(b) (transferring the Provider Agreement and provider number to the Successful bidder and allowing billing under the provider number before CMS approval of the CHOW).

105 (D. Me. 2003) (Purchasers may not purport to receive property which is subject to federal law and regulations "as if the law or regulation does not exist."). Accordingly, because "federal law fixes the relationships and responsibilities of Medicare with beneficiaries and providers[,] these relationships and responsibilities are beyond the reach of private parties … to alter." *Mission Hosp. Reg'l Med. Ctr. v. Burwell*, 819 F.3d 1112, 1116 (9th Cir. 2016).

31. Third, to the extent that the Management Agreement usurps CMS's authority to assess the suitability of new providers for the Medicare program, even under a CHOW, they cannot. *See* 42 C.F.R. §§ 489.10, 489.11, 489.12; SOM 3210.1A. Under Medicare Law, CMS has authority to determine that a provider meets the standards of participation in the Medicare program (42 C.F.R. §§ 489.10, 489.11) and to deny an agreement on certain bases, including that a provider has been convicted of fraud or is unable to give satisfactory assurance of compliance with the requirements of Medicare Law. 42 C.F.R. § 489.12. Section 3210.A of CMS's State Operations Manual requires CHOW processing for providers with Medicare Provider Agreements to allow CMS to determine who the responsible party is under the agreement. *See* SOM 3210.1A.

## C. Unused Provider Relief Funds and American Rescue Plan Funds Must be Returned to HHS and Cannot be Transferred or Sold

32. HHS objects to the sale to the extent that the Debtors seek to sell or transfer unused PRF and ARP funds.[17] PRF Terms and Conditions permit only the PRF recipient to use the funds it receives,[18] and HRSA Guidance prohibits any assignment or transfer of PRF distributions made

---

[17] Debtors counsel has represented to counsel for the United States that the Debtors no longer hold any PRF or ARP funds and that all money was used for purposes allowed under the statutes and implementing rules and regulations. The Debtors' allegations about the proper use of the funds are subject to audit by the agency.

[18] *See, generally,* Department of Health and Human Services, *Terms and Conditions*, https://www.hrsa.gov/provider-relief/past-payments/terms-conditions.

14

to specific Debtors. Specifically, the HRSA Guidance expressly provides that "if the [sale] transaction is an asset purchase (whether for some or all of the Provider Relief Fund recipient's assets), then the original recipient [i.e. the seller] must use the funds for its eligible expenses and lost revenues and return any unused funds to HHS." [19] The purchaser "cannot accept [a PRF] payment directly from another entity nor attest to the Terms and Conditions on behalf of the seller/previous owner in order to retain the Provider Relief Fund payment . . . unless the seller's Medicare provider agreement and TIN was accepted by the purchaser in the transaction." If "a bankrupt recipient is liquidated, it must similarly use the funds for its eligible expenses and lost revenues and return any unused funds to HHS." Each recipient therefore must use PRF distributions itself or, if it has no COVID-related purposes for which to use the distributions, return them to HHS. ARP funds are similarly restricted under its implementing rules and also subject to audit. [20] Both PRF and ARP funds are subject to audit by the agency. [21]

33. HHS respectfully requests that the Court condition the sale on the buyer agreeing to properly spending, reporting, and complying with any other obligations that the Debtors

---

[19] HRSA, *Provider Relief Programs: Provider Relief Fund and ARP Rural Payments Frequently Asked Questions* (Last updated Jan. 27, 2022), https://www.hrsa.gov/sites/default/files/hrsa/provider-relief/provider-relief-fund-faq-complete.pdf (the "HRSA Guidance) (Where PRF recipient transfers facility and assets to new operator, "the original recipient must use the funds for its eligible expenses and lost revenues and return any unused funds to HHS.").

[20] *See generally,* Acceptance of Terms and Conditions – HRSA, https://www.hrsa.gov/sites/default/files/hrsa/provider-relief/terms-and-conditions-ARP-rural.pdf (last visited January 21, 2022).

[21] *See id.*, 45 C.F.R. Part 75, subpt. F (audit requirements for non-federal entities with total annual federal award expenditures in excess of $750,000); 45 C.F.R.§§ 75.216(d), 75.501(i), (k) (options for commercial organizations with annual total federal award expenditure in excess of $750,000).

15

undertook when they received PRFs and similar payments under similar programs from the Health Resource and Services Administration. Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. 116-136, Div. B, Title VIII, 134 Stat. 281, 560-64 (Mar. 27, 2020); *see* Paycheck Protection Program and Health Care Enhancement Act ("Paycheck Protection Act"), Pub. L. 116-139, Div. B., Title I, 134 Stat. 620, 622-28 (Apr. 24, 2020); *see also* Coronavirus Response and Relief Supplemental Appropriations Act, 2021 ("CRRSA Act"), Pub. L. 116-260, Div. M, Title III, 134 Stat. 1182, 1920-21 (Dec, 27, 2020); American Rescue Plan Act of 2021, Pub. L. 117-2, 135 Stat. 4, Title X, Subtitle N, § 9911 (Mar. 11, 2021), codified as 42 U.S.C. § 1320b-26(e)(1).

### D. HHS Opposes Waiver Of The 14-Day Stay Pursuant To Fed. R. Bankr. P. 6004(h)

34. Fed. R. Bankr. P. 6004(h) provides that an order authorizing the sale of property is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise. HHS objects to any request for a waiver of the 14-day stay. The stay provides sufficient time for a party to appeal before a sale order is implemented. *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d). The Debtors and Successful Bidder will suffer little harm from the 6004(h) stay because the conditions of sale closing will not be completed within 14 days. Because the Medicare Provider Agreements require the operators to comply with quality of care standards, and because of the potential loss of significant federal funds devoted to quality of care, HHS requests the full 14-day period to appeal an order, if necessary.

### CONCLUSION

35. For the foregoing reasons, HHS respectfully requests that the Court sustain HHS's limited objection to the Sale Motion and condition any sale order in accordance with these objections.

Dated: March 10, 2022

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

RICHARD D. WESTPHAL
United States Attorney
Southern District of Iowa

CRAIG P. GAUMER
Assistant United States Attorney


/s/ Marissa Embola
RUTH A. HARVEY
RODNEY A. MORRIS
SETH B. SHAPIRO
(D.C. Bar No. 433988)
MARISSA D. EMBOLA
(MI Bar No. P82568)
United States Department of Justice
P.O. BOX 875
Ben Franklin Station
Washington, D.C. 20044-0875
(202) 616-2316
marissa.embola@usdoj.gov


Attorneys for the United States on behalf of the U.S. Department of Health and Human Services

**CERTIFICATE OF SERVICE**

I certify that a copy of the foregoing document was served electronically on parties who receive electronic notice through CM/ECF's notice of electronic filing dated March 10, 2022.

Parties receiving emailed service in accordance with the Notice of Sale (ECF No. 171):

    Jeffrey Goetz on behalf of the Debtors at goetz.jeffrey@bradshawlaw.com,
    Krystal Mikkileneni on behalf of the Debtors at mikkilineni.krystal@bradsahawlaw.com,
    Francis Lawall on behalf of the Committee of Unsecured Creditors at
        Francis.Lawall@Troutman.com,
    Deborah Kovsky-Apap on behalf of the Committee of Unsecured Creditors at
        deborah.kovsky@troutman.com,
    Jeff Courter on behalf of Lincoln Savings Bank at jwc@nyemaster.com,
    Roy Leaf on behalf of Lincoln Savings Bank at rleaf@nyemaster.com,
    Terry Gibson on behalf of Webb Family Trust at TGibson@2501grand.com.

                      Dated March 10, 2022
                      By:/s/ Marissa Embola
                      **Marissa Embola**
                      Trial Attorney

                      Attorney for the United States on behalf of the U.S. Department of Health and Human Services