IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| IN RE:<br><br>QHC FACILITIES, LLC, *et al.*,<br><br>Debtors. | Chapter 11 Bankruptcy<br>Case No. 21-01643<br><br>**BRIEF** |

COMES NOW Cedar Healthgroup, LLC ("Cedar Health"), and hereby respectfully submits the following Brief in support of its Motion for Summary Judgment filed simultaneously herewith:

## I. SUMMARY OF ARGUMENTS

The Debtors seek forfeiture of a $605,000 deposit ("Deposit") tendered by Cedar Health to the Debtors pursuant to an Asset Purchase Agreement ("APA"). The singular provision in the APA that speaks to Deposit retention is APA §6.02(b), which states:

> *In the event of termination* of this Agreement *pursuant to Section 6.01(f)* due to a breach by Buyer, Sellers shall be entitled to retain the Deposit as liquidated damages.

APA §6.02(b) (emphasis added). Section 6.01(f) in turn provides the APA may be terminated:

> By the Seller, at its sole election, in the event of a material breach of this Agreement by the Buyer *that has not been cured within ten (10) Business Days after written notice to the Buyer, or if any representation or warranty of the Buyer shall have become untrue in any material respect, in either case such that such breach or untruth is incapable of being cured, by the Outside Date*. Seller shall not have a right to terminate under this section if Seller is in material breach or any of its representations and/or warranties are untrue such that satisfaction of conditions to close under section 5.02 would be prevented

*Id.* at §6.01(f) (emphasis added). The meaning is plain and the facts are not disputed. The Debtors gave no cure notice and identify no breach or representation that is "incapable of

1

being cured" by the "Outside Date," defined by the APA as 120 days from the March 17, 2022 Sale Order. Cedar Health accordingly submits there was <u>no</u> §6.01(f) termination, and so §6.02(b) is unavailable to the Debtors. As a matter of law the Debtors cannot retain Cedar Health's Deposit.[1]

## II. SUMMARY JUDGMENT STANDARD

Any party may move for summary judgment regarding all or any part of the claims asserted in a case. Fed. R. Civ. P. 56(a). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(a)).

The party moving for entry of summary judgment bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Celotex*, 477 U.S. at 323). Once the moving party has met this burden, the non-moving party must go beyond the pleadings and—by depositions, affidavits, or otherwise—identify specific facts showing that there is a genuine issue for trial. *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005). The non-movant must show an alleged issue of fact is genuine and material as it relates to the substantive law. If the non-movant fails to make that showing with respect to an essential element of a claim or defense on which it bears the burden of proof, then the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322.

---

[1] In the event Cedar Health's Motion for Summary Judgment is denied, Cedar Health does not waive and instead reserves all arguments for trial or otherwise.

2

### III. GENERAL GOVERNING LEGAL PRINCIPLES

Section 13.03 of the APA directs the Court to utilize Iowa law when deciding the merits of the Debtors' Motion. These governing principles are well known. "It is the cardinal principle of contract construction that the parties' intent controls; and except in cases of ambiguity, this is determined by what the contract itself says." *Iowa Fuel & Mins., Inc. v. Iowa State Bd. of Regents*, 471 N.W.2d 859, 862 (Iowa 1991). When the terms of the contract are unambiguous, giving effect to the contract means "enforc[ing] it as written." *Lange v. Lange*, 520 N.W.2d 113, 117 (Iowa 1994); *Clinton Physical Therapy Servs., P.C. v. John Deere Health Care, Inc.*, 714 N.W.2d 603, 615 (Iowa 2006) ("Generally, contracts are interpreted based on the language within the four corners of the document."). In contrast, where the language of the contract is objectively ambiguous, that is, where the text creates "genuine uncertainty" because it is "fairly susceptible to two interpretations," the court will peek behind the words of the agreement and admit extrinsic evidence to decide which interpretation to enforce. *A.Y. McDonald Indus. v. INA*, 475 N.W.2d 607, 618–19 (Iowa 1991); *cf. Lange*, 520 N.W.2d at 119 ("A court should not give a contract a meaning that the parties did not in fact intend.").

Resolving ambiguity and weighing extrinsic evidence presents a fact issue incapable of resolution on summary judgment. *Acciona Windpower N. Am., LLC v. City of W. Branch, Iowa*, 847 F.3d 963, 967 (8th Cir. 2017) (noting that contract interpretation in Iowa is a legal issue unless extrinsic evidence is necessary to resolve ambiguity). That is not an issue here, however, because the meaning of the applicable APA terms is plain. "Enforc[ing] [the APA] as written," *Lange*, 520 N.W.2d at 117, means denying the Debtors' Motion. *Kern v. Palmer Coll. of Chiropractic*, 757 N.W.2d 651, 667 (Iowa 2008) (Appel, J., specially concurring)

(courts "enforce contracts as written, plain and simple").

## IV. ARGUMENTS

There was no §6.01(f) termination of the APA, and as a result the Debtors cannot keep and cannot forfeit the Deposit via §6.02(b). The Deposit should be returned to Cedar Health. The following arguments support Cedar Health's posture:

### A. The Debtors failed to issue proper notice of default

Section 6.01(f) of the APA provides the Sellers (*i.e.* the Debtors) may terminate the APA as follows:

> By the Sellers, at its sole discretion, in the event of a material breach of this Agreement by the Buyer that has not been cured within ten (10) Business Days after written notice to the Buyer or if any representation or warranty of the Buyer shall have become untrue in any material respect, in either case such that such material breach or untruth is incapable of being cured by the Outside Date.

APA §6.01(f). At APA §13.04, "notice" to the Buyer is defined and required to mean the tender by "overnight courier" or "Regular First Class U.S. Mail" of written (paper) notice issued to Cedar Health at its New Jersey address. *Id.* at §13.04. To the extent the Debtors claim Cedar Health's failure to sign the Management Agreements by the March 22, 2022 deadline constituted a "material breach of this Agreement" within the meaning of APA §6.01(f), the Debtors are obligated by §6.01(f) to provide "written notice to the Buyer." Since notice is required to be issued in paper format via overnight courier or First Class Mail to Cedar Health's New Jersey address, and since the Debtors merely issued an e-mail dated March 23, 2022, the Debtors have failed to comply with §6.01(f)[2]. The Debtors conceded as much, *viz. o*n April 5, 2022 the Debtors issued via Federal Express a Notice. Ex. K. If the Debtors' March 23, 2022 email was sufficient, then the Debtors would not need to issue the

---

[2] The issue of §6.01(f) notice was raised by the United States Trustee during the March 24, 2022 phone hearing before this Court. *See* March 24, 2022 Hearing Transcript at pp. 15-16, attached as **Exhibit O**.

4

April 5, 2022 Notice. In any event, this Court must apply and enforce the notice provision in APA §13.04. To hold otherwise would render the §13.04 notice requirement superfluous – this Court may not do so. *Fashion Fabrics of Iowa, Inc. v. Retail Invs. Corp.*, 266 N.W.2d22, 26 (Iowa 1978) ("Courts must strive to give effect to all the language of a contract."). In sum, because the Debtors failed to tender the requisite notice, the APA could not have been and was not terminated, and the Deposit cannot be kept by or forfeited to the Debtors. The Deposit must be returned to Cedar Health.

### B. Cedar Health timely cured

Assuming (but not conceding) the Debtors' March 23, 2022 e-mail constituted sufficient written notice within the meaning of APA §§ 6.01(f) and 13.04, Cedar Health may cure the default within ten business days, as permitted in APA §6.01(f). To that end, Cedar Health signed and tendered all Management Agreements to the Debtors on April 1, 2022. *See* Ex. I. April 1, 2022 is well within ten business days of the Debtors' e-mail dated March 23, 2022. As such, Cedar Health timely cured. There was thusly no termination pursuant to §6.01(f). And even if somehow the "ten business days" cure period does not apply, APA §6.01(f) further states it can be terminated only if "such breach is incapable of being cured . . . by the Outside Date." *See* APA §6.01(f). The term "Outside Date" was defined to mean 120 days after the March 17, 2022 Sale Order, *i.e.* July 15, 2022. *See Id.* at §6.01(c). It is undisputed Cedar Health signed the Management Agreement on April 1, 2022. Cedar Health therefore *did* cure *long before* the July 15, 2022 "Outside Date," within the meaning of §§6.01(c) and (f). Because Cedar Health timely cured, the Deposit cannot be kept by or forfeited to the Debtors. Instead, the Deposit must be returned to Cedar Health. To hold otherwise would impermissibly, illegally, and improperly write the "ten business days" cure

5

period and the "incapable of being cured by the Outside Date" provision out of the APA. The Iowa Court of Appeals in *Dolly Investments, LLC v. MMG Sioux City*, LLC, No. 21-0014, 2021 WL 5919052, at *2-*3 (Iowa Ct. App. Dec. 15, 2021), teaches when a lease required 15-day cure notice, the cure period must be enforced, and the landlord's failure to issue the requisite 15-day cure notice resulted in landlord (not the tenant) breaching the lease. The Debtors' Motion seeking retention of the Deposit should be similarly denied and overruled.

### C. Cedar Health *did* conduct sufficient "due diligence" to enable closing

To the extent the Debtors urge termination pursuant to the "representation or warranty . . . shall have become untrue" prong of §6.01(f) of the APA, the Debtors' arguments are again without merit. First, the "representation and warranty" language in §6.01(f) refers to Article III of the APA. This is so because APA Article III specifically deals with "Representations and Warranties." Indeed, at APA §3.02, Cedar Health specifically "***makes the following representations*** and warranties to Seller." APA §3.02 (emphasis added). In sum, the only "representation and warranty" made by Cedar Health in the APA were those expressed in Article III. This conclusion is mandated by the rule that "the expression of one thing of a class implies the exclusion of others not expressed." *Alta Vista Properties, LLC v. Mauer Vision Center, PC*, 855 N.W.2d 722, 727 (Iowa 2014) (citation omitted). In that light, the Debtors cannot point to any "representations and warranties" made by Cedar Health in Article III that were, are, or will be "untrue." For example, the Debtors cannot prove (and indeed the Debtors have not alleged) Cedar Health was not duly organized, or Cedar Health's actions were not duly authorized, within the meaning of APA §§3.02(a) and (b). The bottom line is the "untrue representation" prong §6.01(f) does not apply. The APA was not terminated, and the Deposit cannot be kept by and cannot be forfeited to the

6

Debtors. The Deposit instead should be returned to Cedar Health.

Second, to the extent the Debtors point to APA §2.10 and urge §2.10 constituted a "representation and warranty" within the meaning of §6.01(f), the Debtors' argument is nonetheless misplaced. Specifically, APA §2.10 states:

> Buyer agrees that it has conducted sufficient due diligence to close the sale and purchase the Acquired Assets as is, where is . . . .

The term "due diligence" was not defined in the APA. *See* APA Article I (listing definitions). In a bankruptcy sale environment, the term "due diligence" is limited to purely *financial* matters. For example, in *In re National Association of Professional Martial Artists, Inc.*, 328 B.R. 853 (Bankr. N. D. Florida 2005), a stalking horse bidder sought a large "break-up fee" for due diligence expenses. The Bankruptcy Court limited the expenses only to those incurred for "review of the seller's books and records in order to evaluate the going concern value of the enterprise." *Id.* at 857. Similarly, in *In re Texas Rangers Baseball Partners*, 431 B.R. 706 (Bankr. N.D. Tex. 2010), the phrase "due diligence" points to the buyer's examination of the seller's "assets and liabilities" to assess whether the prospective deal was worth it or not. *Id.* at 713. The information sought via the March 22, 2022 e-mail from Cedar Health's Ohio counsel related <u>not</u> to financial issues, but instead focused on regulatory matters. *See* Ex. G, (March 22, 2022 e-mail from Cedar Health's Ohio attorney Alan Schabes). As such, regulatory information sought by Cedar Health was not the type of "due diligence" described in APA §2.10. There was therefore no violation of §§2.10 or 6.01(f). The APA thusly was not terminated, and the Deposit may not be kept by or forfeited to the Debtors. Instead the Deposit should be returned to Cedar Health.

Third, even if "due diligence" in APA §2.10 encompassed regulatory information and data, §2.10 must be read in its entirety, *viz.* §2.10 deals with "due diligence" that would

7

enable Cedar Health "to ***close the sale and purchase*** the Acquired Assets." The terms "Closing Date" and "Closing" were defined to be "the meaning set forth in Section 6.01." *See* APA p.2. In reality, though, nothing in §6.01 defined the term "Closing" or "Closing Date." Rather, the term "Closing Date" was defined in APA §8.01[3], *viz.* "consummation of the transactions . . . will occur on a date . . . not later than the first day of the first month after not less than five . . . Business Days after the satisfaction or waiver of all conditions in Article V . . . provided, however, that ***Closing Date shall not be required to occur prior to . . . 75 . . . days after the entry of the [March 17, 2022] Sale Order***." *See* APA §8.01. The earliest "Closing Date" therefore would be March 17 + 75 days = May 31, 2022. Requesting regulatory data and information on March 22, 2022 and consuming "seven to ten business days" to procure the regulatory information and data do *not* equate to an inability to close the sale and purchase the Assets by May 31, 2022. Indeed, the Debtors have not so argued, and the Debtors certainly cannot prove if Cedar Health did not have the requisite regulatory information as of March 22, 2022, then Cedar Health could not close and purchase by the May 31 earliest closing date. Indeed, the Debtors do not contest Cedar Health's Proof of Funds or Cedar Health's financial ability to close and purchase. Viewed in the light most favorable to the Debtors, the most that can be said is Cedar Health did not timely sign the Management Agreements by March 22 (and Cedar Health *did* sign all Management Agreements 9 days later, on April 1). As such, there was no violation of §2.10, and §6.01(f) is not applicable. The APA was not terminated, and the Deposit cannot be kept by or forfeited to the Debtors. Instead the Deposit should be returned to Cedar Health.

---

[3] In other words, at APA p.2, where the terms "Closing" and "Closing Date" were defined to refer to "Section 6.01," there was a typo – the correct citation should be "Closing" and "Closing Date" were defined to refer to "Section 8.01."

Fourth and additionally, the so-called "untrue representation" prong in §6.01(f) has a temporal dimension and an additional qualifier, *viz.* the "untrue representation" must be such that it "is incapable of being cured by the Outside Date." *See* APA §6.01(f). The term "Outside Date" is defined at APA §6.01(c) to be "120 days from entry of the [March 17, 2022] Sale Order," *i.e.* circa July 17, 2022. Even if (but of course not conceding) Cedar Health did not conduct "sufficient due diligence" as of the March 7, 2022 execution of the APA, the Debtors have not alleged (nor can they ever prove) that Cedar Health could not then complete the requisite due diligence by the July 17, 2022 "Outside Date." Indeed, the undisputed *fact* is Cedar Health then did complete the requisite due diligence to enable it to sign and tender to the Debtors all Management Agreements by April 1, 2022 – long before July 17, 2022. As such, there was no violation of §§6.01(f) or 2.10. The APA was not terminated, and the Deposit cannot be kept by or forfeited to the Debtors. Instead, the Deposit should be returned to Cedar Health.

Fifth, a detailed tracking of the different versions of the Management Agreement circulated from and by the Debtors reveals the Management Agreement format and substance morphed over time. Specifically, as of the March 4, 2022 auction date, Cedar Health was provided with a form Management Agreement that did *not* have ¶¶24, 25, or 26. *See* Ex. CA. After the March 4, 2022 auction, the Debtors via counsel circulated to Cedar Health various versions of the Management Agreement, and the Debtors *twice* transmitted to Cedar Health "finalized" versions of the Management Agreement, only to subsequently issue newer versions. *Compare* Ex. CE *with* Ex. CI (e-mails from Debtors' counsel dated and timed as of March 10, 2022, at 6:21pm and March 17, 2022, at 5:33pm). Admittedly, Cedar Health's Florida counsel did on March 15, 2022 agree to the format of the Management

9

Agreement. But the request by Cedar Health's Ohio counsel for further data and information concerning regulatory issues simply did <u>not</u> lead to the conclusion that Cedar Health could not close the sale by the "Outside Date" of July 17, 2022 as required by §2.10. There simply was no violation of either §2.10 or §6.01(f). The APA was not terminated, and the Deposit cannot be kept by or forfeited to the Debtors. Instead, the Deposit should be returned to Cedar Health.

Sixth, and last but not least, if the Debtors urge Cedar Health's March 10, 2022 Affidavit somehow constituted an "untruth" within the scope of APA §6.01(f), the argument too is without merit. First, the APA was signed on March 7, 2022. The Declaration was signed on March 10, 2022, *i.e.* **after** the March 7 execution of the APA. Ex. E at p. 2. Surely no one can credibly contend an Agreement signed on March *7* contained an "untruth" with respect to a Declaration signed on March *10*. Second, the relevant portions of the March 10, 2022 Declaration said:

> 2. I am *familiar with the transactions* that are the subject of the Sale Motion.
>
> 3. The specific *terms of the sale* of the Acquired Assets to Cedar are *fully and completely set forth in the APA*.
>
> 4. Cedar has *not engaged in any collusion* . . . .
>
> 5. Cedar is *fully qualified* to provide the consideration . . . .

Ex. E at ¶¶2-5. As a result of the Declaration, this Court considered "all . . . papers filed" and then "found and determined that" Cedar Health and the Debtors "have not engaged in any conduct that would cause or permit the Sale . . . to be avoided pursuant to section 363(n)." *See* Sale Order at pp. 1 & 6. The Declaration served the sole purpose of enabling this Court to make a §363(m) and §363(n) finding. Of critical importance is no one has

alleged (and no one can prove) that Cedar Health was not "familiar with the transactions that are the subject of the Sale Motion," or the "terms of the sale" were not fully and completely set forth in the APA, or Cedar Health and the Debtors had engaged in any "collusion," or Cedar Health is not "fully qualified." Viewed in the light most favorable to the Debtors, Cedar Health simply did not sign the Management Agreements by March 22, 2022. No one can credibly argue (and the Debtors have not argued) that the non-signing of the Management Agreements by March 22, 2022 contradicts any of the statements in Cedar Health's March 10, 2022 Declaration. The Declaration is not germane to any issue at bar. The Deposit should not be kept by or forfeited to the Debtors. Instead, the Deposit should be returned to Cedar Health.

### D. The Debtors are not entitled to retain the Deposit for alleged "untruth"

Presumably, the Debtors rest their claim for the Deposit on APA §6.02, which provides:

> In the event of termination of this Agreement pursuant to Section 6.01(f) due to a **_breach_** by Buyer, Seller's shall be entitled to retain the Deposit as liquidated damages

APA § 6.02 (emphasis added). Notably §6.02 uses singularly the word "breach," whereas §6.01(f) deals with an "event of a material **_breach_**" **_or_** a "**_representation_** or warranty of the Buyer shall have become untrue . . . ." *See* APA §6.01(f) (emphasis added). Most significantly, §6.02 does **_not_** refer to "representation." A plain reading of §6.02 is it applies *only* to a **_breach_** and not to any representation. To the extent the Debtors rely on the "untrue representation" prong of §6.01(f), the Debtors cannot use §6.02 to retain the Deposit, because the §6.02 Deposit retention applies only if there was a breach. In the case at bar, admittedly Cedar Health did not sign the Management Agreements by the initial March 22

11

deadline. But (a) that breach was not properly noticed to Cedar Health and (b) in any event Cedar Health was entitled to and did timely cure within the breach cure period. As such, there was no actionable breach. The APA was not terminated, and the Debtors may not keep the Deposit via §6.02. Instead, the Deposit should be returned to Cedar Health.

### E. The Debtors failed to mitigate

Assuming (but not conceding) somehow the Debtors can prove §6.01(f) and §2.10 violations, the Debtors nonetheless are legally obligated to mitigate. *E.g., Kuehl v. Freeman Bros. Agency*, 521 N.W.2d 714, 719 (Iowa 1994) (person asserting breach of contract owes a duty to mitigate damages). In that light, as evidenced by e-mail and text traffic circa March 21, 2022 through March 24, 2022, Ex. J, the Debtors were simply *seeking money* in exchange for the seven- to ten-day period during which Cedar Health's Ohio counsel needed to review regulatory data and information. Put another way, contrary to the Debtors' argument at the March 24, 2022 "emergency" hearing held before this Court, the focus was primarily on money. Even though the Debtors had *more than* $1,500,000 cash in their Bank accounts as of March 2022, the Debtors were not satisfied with $250,000 being offered by Cedar Health. The Debtors instead chose to proceed to the March 24, 2022 "emergency" hearing, and now seek forfeiture of a $605,000 Deposit. The Debtors could have and should have accepted Cedar Health's offer and the Debtors should have and could have avoided the March 24 "emergency" hearing or the June 1 trial. The Debtors' failure to mitigate leads to the conclusion that the Debtors should not be rewarded with forfeiture of the Deposit. Instead, the Deposit should be returned to Cedar Health.

### V. CONCLUSION

This Court observed at the April 6, 2022 hearing that "it appears to me that the

contract is clear." Cedar Health agrees. Thus, for any one or all of the foregoing reasons, the Deposit should be returned to Cedar Health, and the Debtor's Motion should be denied and overruled.

/s/ Abram V. Carls
Eric W. Lam, AT0004416
Abram V. Carls, AT0011818
SIMMONS PERRINE MOYER BERGMAN PLC
115 Third Street SE, Suite 1200
Cedar Rapids, IA 52401
Tel: 319-366-7641; Fax: 319-366-1917
elam@simmonsperrine.com
acarls@spmblaw.com
ATTORNEYS FOR CEDAR HEALTHGROUP, LLC

## Certificate of Service

The undersigned certifies, under penalty of perjury, that on this 26th day of May, 2022, the foregoing document was electronically filed with the Clerk of Court using the Southern District of Iowa CM/ECF and the document was served electronically through the CM/ECF system to the parties of this case.

/s/ Abram V. Carls

Cedar Health/Pldgs/BA 21-01643 – Drafts/M4SJBrief.051122.1030am.jjp