# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| **QHC Facilities, LLC et al.,**[1] | ) | Case No. 21-01643-als11 |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | Hon. Anita L. Shodeen |
| | ) | |
| | | *Date entered on docket: November 2, 2022* |

## ORDER AUTHORIZING: (I) THE SALE OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES; (II) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (III) APPROVING THE DEBTORS' SETTLEMENT AGREEMENT WITH THE UNITED STATES

1.      THIS MATTER came before the Court on the *Debtors' Motion for Order Approving the Sale Free and Clear of Liens, Claims Interests and Encumbrances* (Docket No. 434) (the "Sale Motion") filed by QHC Facilities, LLC, and the above referenced affiliates ("QHC" or the "Debtors"), and the *Amendment to the Debtors' Motion for Order Approving the Sale Free and Clear of Liens, Claims, Interests, & Encumbrances* (Docket No. 454) (the "Sale Motion Amendment")*,* seeking authority, among other things, to sell substantially all assets of the Debtors; Blue Care Homes, LLC ("Blue Care" or the "Buyer") having submitted the highest and best offer for the Acquired Assets (defined below) (the "Sale"); the Court having reviewed: (a) the Sale Motion and the Sale Motion Amendment, (b) the Asset Purchase Agreement dated as of March 25, 2022 ("APA"), the First Amendment to the APA dated September 9, 2022 ("First Amendment"), and the Second Amendment to the APA, dated October 7, 2022 ("Second

---

[1] The Jointly Administered Debtors in this proceeding are *In re QHC Management, LLC* (Case No. 21-01644-als11), *In re QHC Mitchellville, LLC* (Case No. 21-01645-als11), *In re QHC Winterset North, LLC* (Case No. 21-01646-als11), *In re QHC Madison Square, LLC* (Case No. 21-01647-als11), *In re QHC Fort Dodge Villa, LLC* (Case No. 21-01648-als11), *In re Crestridge, Inc.* (Case No. 21-01649-als11), *In re Crestview Acres, Inc.* (Case No. 21-01650-als11), *In re QHC Humboldt North, LLC* (Case No. 21-01651-als11), *In re QHC Humboldt South, LLC* (Case No. 21-01652-als11) and *In re QHC Villa Cottages, LLC* (Case No. 21-01653-als11).

Amendment," and with the First Amendment, the "Amendments") (the APA together with the First and Second Amendment and any and all schedules, exhibits, and ancillary documents related thereto, in each case, as may be amended, modified or supplemented from time to time in accordance with the terms thereof, shall be referred to herein collectively as the "Blue Care APA"), between the Debtors and Blue Care, copies of which are attached hereto as **Exhibit A**; (c) the *Declaration of Shmuel Haikins in Support of Motion for Order Authorizing Sale of Assets Free and Clear of Liens, Claims and Encumbrances* (Docket No. 478); (d) all other papers filed with the Court relating to the Blue Care APA, and (e) the objections to the sale and the cure objections of certain contract parties, if any (collectively, the "Objections") and; the Court having considered the statements of counsel with respect to the relief granted herein and the evidence adduced at a hearing conducted on October 28, 2022 (the "Sale Hearing"); and the Court having determined that the legal and factual bases set forth in the Sale Motion Amendment and the other papers filed by the Debtors and at the Sale Hearing establish just cause to grant the relief granted herein;[2]

NOW, THEREFORE, it is hereby found and determined that:

## Jurisdiction, Venue and Final Order

A.      This Court has jurisdiction and authority to hear and determine the request to approve the Sale and grant the other relief set forth herein pursuant to 28 U.S.C. § 1334.  Venue of these cases in this District is proper under 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O). The statutory predicates for the relief sought herein are sections 105, 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006, and all other applicable law.

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Sale Motion, Sale Motion Amendment, or the Blue Care APA, as applicable.

B.      This Sale Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a).

## **Acquired Assets**

C.      Blue Care has executed the Blue Care APA. The Blue Care APA provides for, among other things, Blue Care to purchase certain assets of the Debtors which are set forth in the Blue Care APA (the "Acquired Assets"). The closing date for the Blue Care APA is November 14, 2022 (the "Closing Date" or "Closing"), subject to change by written agreement of the Debtors and Blue Care.

## **Notice of Sale Hearing, Blue Care APA, and Cure Costs**

D.      As evidenced by the certificates of service filed with the Court, proper, timely, adequate and sufficient notice of the Sale Motion, the Sale Motion Amendment, the relief granted herein and the Sale Hearing has been provided in accordance with sections 102(1), 363(b) and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 9006, 9007, 9008 and 9014. Such notice was good and sufficient, and appropriate under the circumstances. No other or further notice of the Sale Motion, the Sale Motion Amendment, the relief granted herein, the Sale Hearing or the entry of this Sale Order is necessary or shall be required. To the extent that the amount of notice given to any party entitled to notice is less than the number of days required under the applicable rules, the notice actually given to any such party is hereby deemed to be sufficient and adequate by the Court, and the notice to any and all such parties is hereby ordered to be shortened to the notice actually given.

E.      The Debtors filed the notice of assumption and assignment with respect to the Sale as evidenced by the: (i) *Notice re: Cure Amounts to Assume and Assign Certain Executory Contracts and Unexpired Leases in Connection with Sale of Assets* (Docket No. 180); (ii)

*Amendment to Notice re: Cure Amounts to Assume and Assign Certain Executory Contracts and Unexpired Leases in Connection with Sale of Assets* (Docket No. 189); (iii) *Second Amendment to Notice re: Cure Amounts to Assume and Assign Certain Executory Contracts and Unexpired Leases in Connection with Sale of Assets* (Docket No. 206); and (iv) *Third Amendment to Notice re: Cure Amounts to Assume and Assign Certain Executory Contracts and Unexpired Leases in Connection with Sale of Assets* (Docket No. 387) (collectively, as amended or supplemented, the "Cure Notice") identifying (among other things) the costs required to cure defaults under the Assumed Contracts (as defined herein) pursuant to section 365 of the Bankruptcy Code (the "Cure Costs"). The Debtors served the Cure Notice, and each supplement thereto, on each of the non-Debtor counterparties to the Assumed Contracts as set forth in the filed certificates of service. The service of the Cure Notice was sufficient under the circumstances and no further notice needs to be provided in respect of the assumption and assignment of the Assumed Contracts or the proposed Cure Costs related thereto, if any. Non-Debtor counterparties to the Assumed Contracts have had an adequate opportunity to object to the assignment and assumption of the Assumed Contracts and the associated Cure Costs.

### Highest and Best Offer; Business Judgment

F.        The Debtors demonstrated a sufficient basis to enter into the Blue Care APA, sell the Acquired Assets on the terms outlined therein, and assume and assign the Assumed Contracts under sections 363 and 365 of the Bankruptcy Code, and all such actions are appropriate exercises of the Debtors' business judgment and in the best interests of the Debtors, their creditors and their estates.

G.        The Blue Care offer, upon the terms and conditions set forth in the Blue Care APA, and the various related agreements contemplated thereby necessary to effect the transfer of the Acquired Assets to Blue Care (collectively, the "Related Agreements"), including the form and

the total consideration to be realized by the Debtors pursuant to the Blue Care APA: (i) are the highest and best offer received by the Debtors; (ii) are fair and reasonable; (iii) are in the best interest of the Debtors, their creditors and their estates; and (iv) constitute full and adequate consideration and reasonably equivalent value for the Acquired Assets.

H.      The Debtors' determination that the Sale set forth in the Blue Care APA constitutes the highest and best offer for the Acquired Assets is a valid and sound exercise of their business judgment. The Debtors have determined that the sale of the Acquired Assets under the terms set forth in the Blue Care APA and the Related Agreements represent the best opportunity for the Debtors' estates to realize the greatest value for the Acquired Assets and will provide a greater recovery for the Debtors' creditors, including through a reduction of claims against the Debtors' estates, than would be provided by any other practical or available alternative.

## Good Faith, Arms' Length Sale

I.      Blue Care is a purchaser in good faith, as that term is used in the Bankruptcy Code, and is entitled to the protections of section 363(m) of the Bankruptcy Code with respect to the Acquired Assets. The Blue Care APA and the Related Agreements were negotiated and entered into in good faith, based upon arm's length negotiations and without collusion or fraud of any kind.

J.      Blue Care and its professionals, agents and other representatives have complied in all respects with the Bidding Procedures Order and all other applicable orders of this Court in negotiating and entering into the Blue Care APA and all other applicable orders of this Court.

K.      Blue Care is not considered an "insider" of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code. Insider transactions are subjected to higher scrutiny. Debtors met their burden of proof in demonstrating good faith and an inherent fairness in the selection of Blue Care as the Successful Bidder.

L.      Blue Care and the Debtors have not engaged in any conduct that would cause or permit the Sale, the Blue Care APA or any Related Agreements to be avoided pursuant to section 363(n) of the Bankruptcy Code.

M.      The Sale neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates the terms of a liquidating plan of reorganization of the Debtors. The Sale does not constitute a *sub rosa* plan.

### Corporate Authority

N.      The Debtors are not a "foreign corporation" as that term is defined in section 1445 of the Internal Revenue Code.

O.      The Acquired Assets are property of the Debtors' estates under section 541 of the Bankruptcy Code. The Sale of the Acquired Assets by the Debtors has been duly and validly authorized by all necessary action and, upon entry of this Sale Order, the Debtors will have full power and authority to execute the Blue Care APA, the Related Agreements and all other documents contemplated thereby. No consents or approvals other than those provided for in the Blue Care APA and the Related Agreements are required for the Debtors to consummate the Sale described in the Blue Care APA.

### Satisfaction of Section 363(f)

P.      The Debtors may sell the Acquired Assets free and clear of all interests, liens, claims and encumbrances of any kind or nature whatsoever (collectively, the "Liens and Claims")[3] except as otherwise provided in the Blue Care APA, because, in each case, one or

---

[3] For the avoidance of doubt, the term "Liens and Claims" as used herein includes, without limitation, any mortgage, lien (as such term is defined in 11 U.S.C. § 101(37), including any mechanic's, materialman's, statutory, cash collateral or carve out lien or any other consensual or non-consensual lien), security interest or similar interests, charge, hypothecation, deed of trust, pledge, right of use, first offer or refusal, easement, servitude, restrictive

more of the standards set forth sections 363(f)(1)-(5) of the Bankruptcy Code have been satisfied. Those non-Debtor parties with interests in the Debtors' assets who did not object, or who withdrew their objections, to the Sale Motion and Sale Motion Amendment with respect to the relief granted herein are deemed to have consented to the Sale free and clear of Liens and Claims pursuant to section 363(f)(2) of the Bankruptcy Code. Accordingly, except as expressly provided in the Blue Care APA with respect to the Assumed Liabilities (as defined in the Blue Care APA), all persons or entities having Liens or Claims against or in any of the Acquired Assets shall be forever barred, estopped and permanently enjoined from pursuing or asserting such Liens and Claims against the Acquired Assets, the Buyer, or any of their assets, property, successors or assigns.

Q.    The Buyer would not have entered into the Blue Care APA and Related Agreements and would not consummate the transactions contemplated thereby if the Sale of the Acquired Assets to the Buyer were not free and clear of any and all Liens and Claims, except as otherwise provided in the Blue Care APA, or if the Buyer would, or in the future could, be liable for any of such Liens and Claims.

---

covenant, lease, sublease, covenant, right of way, option, restriction (including any restriction on transfer or on the use, voting, receipt of income or other rights or exercise of any attributes of ownership), conditional sale or other title retention agreements, interest, encroachment, encumbrance of any kind, debt, liability, obligation or claim (as that term is defined in 11 U.S.C. § 101(5)), including all rights or causes of action or choses of action (whether in law or in equity), proceedings, warranties, guarantees, indemnities, rights of recovery, setoff, recoupment, indemnity or contribution, obligations, demands, restrictions, indemnification claims, or liabilities relating to any act or omission of the Debtors or any other person, consent rights, options, contract rights, covenants, claims for reimbursement, exoneration, products liability, environmental, or tax, decrees of any court or governmental entity, indentures, loan agreements, and interest of any kind of nature whatsoever, and including any claim against Buyer and/or any of the assets or properties of the Buyer (including the Acquired Assets) based on a theory of successor liability, alter-ego or any similar theory of liability, and all costs and expenses relating thereto. Further, without limiting the foregoing, the term "Liens and Claims" as used herein includes any debts, liabilities, obligations or claims whether they are direct or indirect, known or unknown, matured or unmatured, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, due or to become due, whether arising prior to or subsequent to the commencement of the Chapter 11 Cases, and whether imposed by agreement, understanding, law, equity or otherwise.

R.     A sale of the Acquired Assets other than one free and clear of all Liens and Claims would yield substantially less value for the Debtors' estates, with less certainty, than the Sale as contemplated.  Therefore, the Sale contemplated by the Blue Care APA maximizes the Debtors' recovery on the Acquired Assets and thus, is in the best interests of the Debtors and their estates, creditors, and all other parties in interest.

## No Successorship

S.     Blue Care is not a continuation of the Debtors. In particular:

    i.   Blue Care is not holding itself out to the public as a continuation of the Debtors.

    ii.  There is no substantial continuity between Blue Care and the Debtors, and there is no continuity of enterprise between Blue Care and the Debtors.

    iii. Blue Care: (i) is not, as a result of any action taken in connection with the purchase of the Acquired Assets or otherwise, successor to the Debtors; and (ii) has not, de facto or otherwise, merged or consolidated with or into the Debtors.

    iv.  The Sale does not amount to a consolidation, merger or de facto merger of Blue Care and the Debtors.

    v.   The Sale is not being entered into fraudulently.

    vi.  Blue Care is a bona fide purchaser in good faith of the Acquired Assets.

## Assumption and Assignment of the Assumed Contracts

T.     The agreements and leases identified in the Cure Notice (as modified by the Buyer pursuant to the terms of the Blue Care APA the "Assumed Contracts") are either: (i) executory contracts or unexpired leases subject to section 365 of the Bankruptcy Code or (ii)

non-executory contracts that may be assigned to the Buyer according to their terms and applicable law. Except where the facts or context require otherwise, the term Assumed Contracts herein refers to executory contracts or unexpired leases subject to section 365 of the Bankruptcy Code.

U. The Debtors may assume each of the Assumed Contracts, and assign each of them to Blue Care pursuant to sections 363 and 365 of the Bankruptcy Code and this Sale Order, notwithstanding any anti-assignment clause or other similar provision in any Assumed Contract, as provided by section 365(f) of the Bankruptcy Code. The assumption and assignment of the Assumed Contracts is in the best interest of the Debtors and their estates, creditors and other parties in interest, and represents the reasonable exercise of sound and prudent business judgment by the Debtors. Blue Care and the Debtors have provided good and sufficient evidence of adequate assurance of future performance by Blue Care under the Assumed Contracts consistent with sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code.

V. The Cure Costs, if any, set forth in Exhibit A to the Cure Notice, and any supplement thereto, with respect to each Assumed Contract are the sole amounts necessary under sections 365(b)(l)(A), 365(b)(l)(B) and 365(f)(2)(A) of the Bankruptcy Code to cure all defaults and pay all actual pecuniary losses under the Assumed Contracts.

W. Blue Care shall pay the Cure Cost for each of its respective Assumed Contracts in accordance with the Blue Care APA, however, all Cure Costs and associated with the Medicare provider agreements will be paid in accordance with the Settlement Agreement between and among the Debtors, Blue Care, four operating companies ("Assignees"), and the

United States, attached hereto as "**Exhibit B**" (the "<u>United States Settlement Agreement</u>")[4]. The terms of the United States Settlement Agreement are more favorable than those terms in the Sale Motion that was noticed out to all parties.

      X.      Pursuant to the Blue Care APA and Management Agreements[5], Blue Care is assuming and is obligated to timely pay all obligations required under the Blue Care APA and the Management Agreements which the Manager incurred and has not yet paid, and the Debtors are released from such obligations and all such creditors have no claims against the Debtors.

      Y.      All findings of fact and conclusions of law announced by the Court at the Sale Hearing are incorporated herein.

<b><u>Compelling Circumstances for an Immediate Sale</u></b>

      Z.      Good and sufficient reasons for approval of the Blue Care APA and the Related Agreements and the Sale have been articulated.  The relief requested in the Sale Motion and Sale Motion Amendment is in the best interests of the Debtors, their estates, their creditors and other parties in interest.  The Debtors have demonstrated both (a) good, sufficient, and sound business purposes and justifications for approving the Blue Care APA and the Related Agreements, and (b) compelling circumstances for the Sale outside the ordinary course of business, pursuant to section 363(b) of the Bankruptcy Code before, and outside of, a plan of reorganization, in that, among other things, the immediate consummation of the Sale with the buyer is necessary and appropriate to maximize the value of the Debtors' estates.

---

[4] To the extent that all or a portion of the estimated $80,000.00 is attributable to the events which occurred during the management period, then Blue Care will reimburse the estate for such amounts.

[5] Management Agreements refers to all of the Management Agreements entered into between Blue Care and the Debtors on March 28, 2022, including any and all amendments thereto.

**Time is of the Essence**

AA.    Time is of the essence in consummating the Sale. To maximize the value of the Acquired Assets and minimize the costs incurred by the Debtors' estates, it is essential that the sale occurs promptly, and within the time constraints set forth in the Blue Care APA. Accordingly, there is cause to lift the stay contemplated by Bankruptcy Rules 6004 and 6006.

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

**General Provisions**

1.    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to these chapter 11 cases pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

2.    The Sale Motion and Sale Motion Amendment are **GRANTED** with respect to the approval of the Sale, as further described herein.

3.    All objections to the relief granted herein, whether filed, stated on the record in Court or otherwise, are **OVERRULED** on the merits and with prejudice to the extent they have not been withdrawn, waived or resolved.

4.    All objections to the relief granted herein that were not timely filed are hereby forever **BARRED**.

5.    Notice of the Sale Motion, the Sale Motion Amendment, and the Sale Hearing were adequate, appropriate, fair and equitable under the circumstances and complied in all respects with section 102(1) of the Bankruptcy Code, Bankruptcy Rules 2002, 6004 and 6006, and the Bidding Procedures Order.

**Approval of the Blue Care APA**

6.      The Blue Care APA and the Related Agreements, and all of the terms and conditions thereof, are hereby approved in all respects.

7.      The sale of the Acquired Assets to Blue Care, as set forth in the Blue Care APA, is approved pursuant to sections 105, 363 and 365 of the Bankruptcy Code, and the Debtors and Blue Care, and their respective affiliates, officers, directors, employees, professionals, agents and other representatives are authorized to immediately take any and all such actions as are necessary or appropriate to consummate and implement the Blue Care APA and the Related Agreements.

8.      The Debtors and their agents and other representatives, as applicable, are authorized and directed to execute and deliver the Blue Care APA and the Related Agreements, together with all additional agreements, instruments and documents that may be reasonably necessary or desirable to implement the Blue Care APA and effectuate the provisions of this Sale Order and the transactions approved hereby, all without further order of the Court. Additionally, pursuant to section 363(b) of the Bankruptcy Code, the Debtors are hereby authorized and empowered to fully assume, perform under, consummate and implement the Blue Care APA and the Related Agreements, together with such additional agreements, instruments and documents that may be reasonably necessary or desirable to implement the Blue Care APA, and to take all further actions as may reasonably be requested by Blue Care for the purpose of selling, assigning, transferring, granting, conveying, conferring and delivering to Blue Care, or transferring to Blue Care's possession, any or all of the Acquired Assets, or as may be necessary or appropriate to the performance of the obligations, and make effective the transactions contemplated by, the Blue Care APA, all without further order of this Court.

9.      Blue Care and their agents and other representatives, as applicable, are directed to execute and deliver all additional agreements, instruments and documents that may be reasonably necessary or desirable to implement the sale to Blue Care and to carry out all of its obligations thereunder on a timely and complete basis.

10.     The terms and provisions of the Blue Care APA, together with the terms and provisions of this Sale Order, shall be binding in all respects upon, and shall inure to the benefit of, the Debtors, the Debtors' estates and the Debtors' creditors, Blue Care and its affiliates, successors and assigns and any affected third parties and persons or entities asserting a claim against or interest in or lien on the Debtors' estates or any of the Acquired Assets to be sold to Blue Care pursuant to the Blue Care APA.

11.     The Blue Care APA or the Related Agreements and any other related agreements, documents or other instruments may be modified, amended or supplemented by Blue Care and Debtors, following consultation with the Consultation Parties (as defined below), on a non-material basis in accordance with the terms thereof without further order of the Court.

12.     The failure specifically to reference any particular provision of the Blue Care APA in this Sale Order shall not diminish or impair the efficacy of such provision. In the event of a conflict between the term of this Sale Order and the Blue Care APA or any Related Agreement, this Sale Order shall govern.

13.     The Debtors and Blue Care are hereby authorized and directed to take all actions reasonably necessary to effectuate the terms of the Blue Care APA and the Related Agreements, the transactions contemplated thereunder and the provisions of this Sale Order, all without the necessity of any further order of the Bankruptcy Court.

13

## **Transfer of the Acquired Assets**

14.     Pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, the Debtors are authorized to transfer the Acquired Assets in accordance with the terms of the Blue Care APA, and, upon the Closing under the Blue Care APA, such transfers shall: (a) be valid, legal, binding and effective transfers; (b) vest Blue Care with all right, title and interest of the Debtors in and to the Acquired Assets; and (c) be free and clear of all Liens and Claims, whether arising prior to or subsequent to the commencement of the Debtors' chapter 11 cases, and whether imposed by agreement, law, equity or otherwise, with all such Liens and Claims attaching to the proceeds of the sale in the same validity, enforceability, priority, force and effect, if any, as they attached to Acquired Assets before the sale, subject to the rights, claims, defenses and objections (if any) of all interested parties with respect to such Liens and Claims, including the rights of the Debtors' estates under chapter 5 of the Bankruptcy Code.

## **Assumption and Assignment of the Assumed Contracts**

15.     Pursuant to sections 105(a) and 365 of the Bankruptcy Code, and subject to and conditioned upon the Closing of the Sale, the assumption and assignment to Blue Care of the Assumed Contracts is hereby approved, and the requirements of section 365(b)(1) of the Bankruptcy Code with respect thereto are hereby deemed satisfied. To the extent that any Assumed Contract is not an executory contract or unexpired lease subject to section 365 of the Bankruptcy Code, such Assumed Contract is hereby assigned to Blue Care at the Closing in accordance with their terms and applicable law.

16.     The Debtors are hereby authorized to execute and deliver to Blue Care such agreements, documents or other instruments as may facilitate or document the sale, assignment, transfer, conveyance and deliver the Assumed Contracts to it.

17.     Upon the Closing: (a) the Assumed Contracts shall be transferred to, and remain in full force and effect for the benefit of Blue Care, in accordance with their respective terms, notwithstanding any provision in any such Assumed Contract (including those of the type described in sections 365(b)(2) and 365(f) of the Bankruptcy Code) that prohibits, restricts or conditions such assignment or transfer; and (b) pursuant to section 365(k) of the Bankruptcy Code and other applicable law, the Debtors shall be relieved from any further liability with respect to the Assumed Contract after such assignment to and assumption by Blue Care. Notwithstanding any provision of this Sale Order, the change of ownership rules and procedures as established in Medicare Law remain in effect, including but not limited to, the change of ownership administrative process and the imposition of successor liability.

18.     All defaults or other obligations of the Debtors under any Assumed Contract arising or accruing prior to the date of this Sale Order (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall be deemed cured upon payment of the Cure Costs with respect to each Assumed Contract.

19.     Except for the right to enforce the obligation to pay the Cure Costs, each non-debtor party to an Assumed Contract hereby is forever barred, estopped and permanently enjoined from asserting against the Debtors, Blue Care, or the property of any of them, any default existing as of the date of the entry of this Sale Order, whether declared or undeclared or known or unknown; or, against Blue Care, any counterclaim, defense, setoff or any other claim asserted or assertible against the Debtors.

20.     The failure of the Debtors or Blue Care to enforce at any time one or more terms or conditions of any Assumed Contract shall not be a waiver of such terms or conditions, or of Blue Care's rights to enforce every term and condition of the Assumed Contract.

21.     The payment of the Cure Costs (if any) shall: (a) effect a cure of all defaults existing thereunder as of the Closing Date; (b) compensate for any actual pecuniary loss to such non-debtor party resulting from such defaults; (c) constitute a satisfaction in full of all amounts accrued as of the Closing Date; and (d) together with the assumption and purchase of the Assumed Contracts by Blue Care, constitute adequate assurance of future performance thereof. After the payment of the relevant Cure Costs, neither the Debtors nor Blue Care shall have any further obligations to the non-debtor parties to the Assumed Contracts other than the obligations of Blue Care that accrue under the Assumed Contracts on or after the Closing Date.

22.     Upon the Closing Date and the payment of the relevant Cure Costs, Blue Care shall be deemed to be substituted for the relevant Debtors as a party to the applicable Assumed Contracts, and the Debtors shall be relieved from all liability on such Assumed Contracts arising on or after the Closing Date.

23.     Blue Care has provided adequate assurance of future performance under each Assumed Contract within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code.

24.     The terms of the United States Settlement Agreement are fair and equitable, and fall within the required range of reasonableness. The approval of the United States Settlement Agreement in this Chapter 11 Case is in the best interests of the Debtors, their estates, creditors, and other parties in interest; and the Court having found that the legal and factual bases establish

16

just cause for relief granted herein; and after due deliberation, the terms of the United States Settlement Agreement are hereby approved.

25.     The United States Settlement Agreement, a copy of which is attached hereto as **Exhibit "C"** is approved in its entirety. Notwithstanding any other language in this Sale Order or the Blue Care APA, and/or to the extent any ambiguities or inconsistencies exist between the terms of this Sale Order, the Blue Care APA, and the terms of the United States' Settlement Agreement, the terms of the United States Settlement Agreement shall control.

26.     The Debtors are authorized and directed to take all actions necessary or appropriate to effectuate, or otherwise enforce the terms, conditions, and provisions of the United States Settlement Agreement.

### Good Faith, Arms' Length Sale

27.     The Blue Care APA has been negotiated and executed, and the transactions contemplated by the Blue Care APA are and have been undertaken, by Debtors, the Buyer, and other parties, and their respective representatives at arm's length, without collusion and in "good faith," as that term is defined in section 363(m) of the Bankruptcy Code. Accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale or any term of the Blue Care APA, and shall not permit the unwinding of the Sale. The Buyer is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code, and, as such, is entitled to the full protections of section 363(m) of the Bankruptcy Code.

28.     None of the Debtors or the Buyer has engaged in any conduct that would cause or permit the Blue Care APA or the Sale to be avoided, or damages or costs to be imposed, under section 363(n) of the Bankruptcy Code.

**Disposition of Sale Proceeds**

29.    At Closing, the proceeds from the Sale (the "Sale Proceeds") shall be first used to pay off the DIP in the amount of $2,259,134.86 as of November 14, 2022 (the "DIP Amount"). If the Closing does not occur on November 14, 2022, interest at the default rate of $1,000 per day shall continue to accrue on the DIP Amount until the date of Closing. Next, the Sale Proceeds shall be used to pay a portion of the settlement amount to the United States, in accordance with the terms of this Order and United States Settlement Agreement. Then, the next $500,000.00 of Sale Proceeds shall be placed in an interest bearing account at Axos, in accordance with terms of this Order.

30.    At Closing, from the Sale Proceeds, the sum of 3% of the Purchase Price (the "Break-up Fee") shall be placed in an interest-bearing account at Axos Bank, and shall only be disbursed pursuant to a further Bankruptcy Court Order which determines whether Crestridge Holdco LLC is entitled to a Break-up Fee under the terms of the Bidding Procedures Order entered at Docket No. 164.

31.    Finally, the balance of Sale Proceeds shall be placed in the Debtors' DIP account subject to the valid liens, if any, attaching to such proceeds. The Debtors and Committee of Unsecured Creditors (the "Committee") shall move forward with drafting and proposing confirmation of a Plan of Liquidation, which shall provide for the appointment of a liquidating trustee or a plan administrator.

**Release of Liens**

32.    If any person or entity that has filed financing statements, mortgages, liens, *lis pendens*, mechanics' or materialmen's liens, notices of levy or other documents evidencing Liens and Claims against the Acquired Assets (other than with respect to the Assumed

Liabilities, as defined in the Blue Care APA) shall not have delivered to the Debtors prior to the

Closing, in proper form for filing and executed by the appropriate parties, termination

statements, instruments of satisfaction, releases of all Liens and Claims that the person or entity

has with respect to such Acquired Assets, such Liens and Claims shall be deemed released by

this Sale Order, and the Debtors, or Blue Care after the Closing, are hereby authorized and

directed to execute and file such statements, instruments, releases, and other documents on

behalf of the person or entity with respect to such Acquired Assets. Without limiting the

foregoing, a certified copy of this Sale Order may be filed with the appropriate Clerk's office

and/or recorded with the applicable Recorder's office as evidence to cancel the Liens and Claims

of record, except the Assumed Liabilities, as defined in the Blue Care APA.

33.     All persons or entities that are presently, or on the Closing Date may be, in

possession of some or all of the Acquired Assets are hereby directed to surrender possession of

the Acquired Assets to Blue Care on the Closing Date.

## Modification of the Automatic Stay

34.     The automatic stay under section 362 of the Bankruptcy Code is vacated and

modified to the extent necessary to implement the terms and provisions of the Blue Care APA

and the Related Agreements and the provisions of this Sale Order.

35.     Nothing in this Sale Order or the Blue Care APA releases, nullifies, precludes or

enjoins the enforcement of any police or regulatory power or liability to a governmental unit that

any entity would be subject to as the owner or operator of property after the Closing.

## Prohibition of Actions Against the Buyer; No Interference

36.     Blue Care has given substantial consideration under the Blue Care APA, which

consideration shall constitute valid and valuable consideration for the releases of any potential

claims of successor liability against Blue Care. Upon consummation of the Sale, Blue Care shall

not be deemed to (a) be the successor to the Debtors, except as to any Medicare Provider

Agreements in compliance with Medicare Law, (b) have, de facto or otherwise, merged with or

into the Debtors, or (c) be a mere continuation, alter ego or substantial continuation of the

Debtors.

37.    Except to the extent Blue Care otherwise specifically agreed in the Blue Care

APA or as set forth in this Sale Order, Blue Care shall not have any liability, responsibility or

obligation for any claims, liabilities or other obligations of the Debtors or their estates, including

without limitation, any claims, liabilities or other obligations related to the Acquired Assets

prior to Closing Date.

38.    To the maximum extent permitted by applicable law, and in accordance with the

Blue Care APA, Blue Care shall be authorized, as of the Closing, to operate under any license,

permit, registration, and governmental authorization or approval, excluding any and all

Medicare Provider Agreements, (collectively, the "Licenses") of the Debtors with respect to the

Acquired Assets. To the extent Blue Care cannot operate under any Licenses in accordance with

the previous sentence, the Licenses shall be in effect to the maximum extent permitted by

applicable law while Blue Care, with assistance from the Debtors, works promptly and

diligently to apply for and secure all necessary government approvals for the new issuance of

Licenses to Blue Care. The Debtors shall maintain the Licenses in good standing to the fullest

extent allowed by applicable law for Blue Care's benefit until equivalent new Licenses are

issued to Blue Care.

39.    Notwithstanding anything in this Sale Order, subject to section 525(a) of the

Bankruptcy Code, no governmental unit (as defined in section 101(27) of the Bankruptcy Code)

or any representative thereof may deny, revoke, suspend, or refuse to renew, any right, permit, license, copyright, patent, trademark or other permission relating to the use of the Purchased Assets sold, transferred, or conveyed to the Buyer on account of the filing or pendency of these chapter 11 cases, nothing in this Sale Order shall alter or otherwise expand the scope of section 525(a) of the Bankruptcy Code. .

40.     All persons or entities holding Liens and Claims with respect to the Acquired Assets are hereby barred from asserting such Liens and Claims against Blue Care, its successors or assigns, or the Acquired Assets.

41.     All persons and entities are prohibited and enjoined from taking any action to adversely affect or interfere with the ability of the Debtors to transfer the Acquired Assets to Blue Care in accordance with this Sale Order and the terms of the Blue Care APA.

**Additional Provisions**

42.     The Debtors shall file all required monthly operating reports.

43.     From and after the Closing for a period of three (3) years following the Closing Date (or, if later, the closing of the Debtors' bankruptcy cases), Blue Care will provide the Debtors, their advisors, and representatives of the Debtors' estate with reasonable access, during normal business hours, upon reasonable advance notice, to the books and records related to the Debtors' operations, including work papers, schedules, memoranda, tax returns, tax schedules, tax rulings, and other documents (for the purpose of examining and copying) relating to the Acquired Assets or the Assumed Liabilities with respect to periods or occurrences prior to the Closing Date and reasonable access, during normal business hours, and upon reasonable advance notice, to employees, officers, advisors, accountants, offices and properties (including for the purpose of better understanding such books and records) of Blue Care, in each case, for purposes relating to

the Debtors' bankruptcy cases, the wind-down of the operations of Debtors and their estates, actions to which Debtors are a party, insurance claims, tax payments, returns or audits, the functions of any trusts established under any plans of liquidation or any other successors of the Debtors (including a plan administrator or a liquidating trustee, pursuant to any plans of liquidation). Unless otherwise consented to in writing by the Debtors following the Debtors' consultation with (i) Lincoln Savings Bank, (ii) the Webb Family Trust, and (iii) the Official Committee of Unsecured Creditors (collectively, the "Consultation Parties"), Blue Care will not, for a period of three (3) years following the Closing Date (or, if later, the closing of the Debtors' bankruptcy cases), destroy, alter or otherwise dispose of any of the material books and records relating to the Debtors' operations (other than additional copies thereof) without first offering to surrender to the Debtors such books and records or any portion thereof that Blue Care may intend to destroy, alter or dispose of. For purposes of clarification, the obligations regarding the records in this paragraph shall include records created or obtained during the during the Term of the Management Agreements (as Term is defined in section 4 therein). Blue Care will remove all records from the Clive corporate office within thirty (30) days after the Closing Date. Blue Care shall also remove all records from QHC Humboldt South, LLC, Crestview Acres, Inc., Crestview Acres, Inc. dba Sunnycrest Nursing Facility, and QHC Mitchellville, LLC within seven (7) business days after the Closing Date and preserve them in accordance of the terms of the Blue Care APA.   Blue Care is acquiring all medical records, including but not limited to the QHC Discontinued Properties, and will assume record custodian duties consist with 45 CFR Parts 160, 164, 171 and state law.

44.     After Closing, Blue Care will within three (3) business days of receipt, deliver all remittances or all assets which belong to the Debtors (including but not limited to IRS Form 941 checks) and correspondence which may be received.

45.     Blue Care is a party in interest and shall be entitled to be heard on all issues in this chapter 11 case related to Blue Care APA, the transactions contemplated thereby, and the implementation or enforcement of this Sale Order.

46.     Nothing contained in any plan of reorganization or liquidation, or order of any type or kind entered in this chapter 11 case, any subsequent chapter 7 or chapter 11 cases of the Debtors, or any related proceeding subsequent to entry of this Sale Order, shall conflict with or derogate from the terms of this Sale Order or the Blue Care APA.

47.     Each and every federal, state and local government agency or department and all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds and other similar persons are hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Blue Care APA the Related Agreements and this Sale Order.

48.     Nothing in this Order shall affect the Debtors' rights against Cedar Healthgroup, LLC.

49.     Bankruptcy Code section 525 shall apply to the full extent applicable.

50.     The provisions of this Sale Order and any actions taken pursuant hereto shall survive any order of this Court dismissing or converting these chapter 11 cases.  The provisions of this Sale Order are non-severable and mutually dependent.

51.     The provisions of Bankruptcy Rules 6004(h) and 6006(d) shall not apply to stay consummation of the sale of the Acquired Assets to Blue Care under the Blue Care APA, as

23

contemplated in the Sale Motion Amendment and approved by this Sale Order, and the Debtors and Blue Care are hereby authorized to consummate the transactions contemplated and approved herein immediately upon entry of this Sale Order.

52.     This Court retains exclusive jurisdiction to (a) enforce and implement the terms and provisions of the Blue Care APA, the Related Agreements, all amendments thereto, any waivers thereunder and any other agreements executed in connection therewith; (b) resolve any disputes arising under or related to the Blue Care APA and transactions contemplated thereby; and (c) interpret, implement and enforce the provisions of this Sale Order. Notwithstanding the foregoing, nothing in this Sale Order or the Blue Care APA divests any tribunal of any jurisdiction it may have under police or regulatory law, or divests the Secretary of HHS of jurisdiction with respect to claims arising under or intertwined with the Medicare Law. Finally, nothing in this Sale Order or the Blue Care APA divests any federal or state regulatory authority of its powers to approve or disapprove of the transactions contemplated by this Sale Order and the Blue Care APA, nor does it compel that such decisions be made within any required time frame.

**IT IS SO ORDERED.**

                                                                **/s/ Anita L. Shodeen**
                                                                Anita L. Shodeen
                                                                U.S. Bankruptcy Judge


APPROVED FOR ENTRY BY:


*/s/ Krystal R. Mikkilineni*
Krystal R. Mikkilineni, Esq., AT0011814
Dentons Davis Brown
The Davis Brown Tower
215 10th Street, Suite 1300
Des Moines, IA 50309

(515) 246-7943
krystal.mikkilineni@dentons.com

General Reorganization Co-Counsel for
Debtors and Debtors in Possession


/s/  Francis J. Lawall
Francis J. Lawall, Esq. (admitted pro hac vice)
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103-2799
Tel: (215) 981-44-81
Fax: (215) 689-4693
Francis.lawall@troutman.com

Counsel for the Committee of Unsecured Creditors


/s/  Bradley R. Kruse
Bradley R. Kruse, IS9999179
Dickinson, Mackaman, Tyler & Hagen, P.C.
699 Walnut St., Ste. 1600
Des Moines, IA 50309
Telephone: 515.246.4505
e-mail: bkruse@dickinsonlaw.com


-and-


/s/  Richard Kanowitz
Richard Kanowitz, Esq. (pro hac vice)
Gabriel Levinson (pro hac vice)
Haynes and Boone, LLP
30 Rockefeller Plaza, 26th Floor
New York, NY 10112
Telephone: 212.918.8971
e-mail: richard.kanowitz@haynesboone.com
e-mail: gabriel.levinson@haynesboone.com

Martha Wyrick (pro hac vice)
Haynes and Boone, LLP
2323 Victory Avenue, Suite 700
Dallas, TX 75219
Telephone: 713.547.2047

e-mail: martha.wyrick@haynesboone.com

Counsel to the Blue Care Homes, LLC


*/s/  Roy R. Leaf*
Jeffrey W. Courter, Esq., AT
Roy R. Leaf, Esq., AT
Nyemaster Goode, PC
700 Walnut, Suite 1600
Des Moines, IA  50309
(515) 283-8048
(515) 283-3108 FAX
jwc@nyemaster.com
rleaf@nyemaster.com

Counsel for Lincoln Savings Bank

*/s/  Terry L. Gibson*
Terry L. Gibson, Esq., AT0002903
WANDRO & ASSOCIATES, P.C.
2501 Grand Avenue
Des Moines, IA 50309
Tel: (515)-281-1475
Fax: (515)-281-1474
tgibson@2501grand.com

Counsel for Webb Family Trust


NO OBJECTION:

*/s/  L. Ashley Wieck*
L. Ashley Wieck, Esq.
ID # IS9998256
Federal Building, Room 793
210 Walnut Street
Des Moines, Iowa 50309-2108
Tel: (515) 323-2269
Ashley.Wieck@usdoj.gov

Counsel for the United States Trustee


*/s/ Tiffiney F. Carney*
Ruth A. Harvey, Esq.

Rodney A. Morris, Esq.
Seth B. Shapiro, Esq.
(D.C. Bar No. 433988)
Tiffiney F. Carney, Esq.
United States Department of Justice
P.O. Box 875
Ben Franklin Station
Washington, D.C. 20044-0875
Tel: (202) 616-2316
seth.shapiro@usdoj.gov
tiffiney.carney@usdoj.gov

Counsel for the United States on behalf of
the U.S. Department of Health and Human
Services


*/s/  Krissa Mason*
Krissa Mason, Esq., AT0011928
Assistant Attorney General
Office of the Attorney General of Iowa
1305 E. Walnut St.
Des Moines, IA 50319
(515) 721-3917
krissa.mason@ag.iowa.gov

Counsel for the Iowa Department of Human Services


*/s/ Anagha Dixit*
Anagha Dixit, Esq., AT0013042
Assistant Attorney General
Office of the Attorney General of Iowa
1305 E. Walnut St.
Des Moines, IA 50319
(515) 281-5478
anagha.dixit@ag.iowa.gov

Counsel for Iowa Department of Inspections and Appeals


*/s/ Susan Goodman*
Susan N. Goodman, RN JD
Pivot Health Law, LLC
P.O. Box 69734
Oro Valley, AZ 85737

(520) 744-7061
sgoodman@pivothealthaz.com

Patient Care Ombudsman

Parties receiving this Order from the Clerk of Court:
Everyone in this Chapter Case

# EXHIBIT A

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (the "Agreement") is made and entered into as of March 25, 2022 (the "Execution Date"), by and between QHC Facilities, LLC, QHC Management, LLC, QHC Mitchellville, LLC, QHC Winterset North, LLC, QHC Madison Square, LLC, QHC Fort Dodge Villa, LLC, QHC Humboldt North, LLC, QHC Humboldt South, LLC, and QHC Villa Cottages, LLC, each an Iowa limited liability company, and Crestridge, Inc. and Crestview Acres, Inc., each an Iowa corporation, ("Seller"), and Blue Care Homes, LLC, a New Jersey limited liability company ("Buyer").

## ARTICLE I
DEFINITIONS

1.01    Definitions.    The following terms have the meanings assigned below:

"*Acquired Assets*" has the meaning described in Section 2.01 of this Agreement.

"*Acquisition Transaction*" shall mean any sale, transfer or other disposition (not involving the Buyer or its Affiliates), in one transaction or a series of transactions, of all or any substantial portion of the Acquired Assets or the Business, whether proposed to be effected pursuant to a merger, consolidation, tender offer, exchange offer, share exchange, amalgamation, stock acquisition, asset acquisition, business combination, restructuring, recapitalization, liquidation, dissolution, joint venture or similar transaction, whether or not proposed or advanced by the Seller.

"*Action*" means any claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, citation, grievance, summons, pleading, motion, objection, subpoena or investigation of any nature, whether civil, criminal, administrative regulatory or otherwise and whether at Law or in equity.

"*Affiliate*" means any Person that directly, or indirectly, controls, is controlled by, or is under common control with, such a specified Person.

"*Ancillary Agreements*" means any bill of sale, warranty deed, or similar transaction agreements in form and substance acceptable to Seller and Buyer.

"*Ancillary Businesses*" means the ancillary healthcare and medical business, including physician services, that Seller conducts.

"*Assumed Executory Contracts*" means the executory contracts, including Leases, of Seller listed on Schedule 2.08(a), designated and agreed by Buyer, that have been assumed and assigned by the Seller to the Buyer.

"*Assumed Lease*" means any Lease that is an Assumed Executory Contract.

"*Assumed Liabilities*" has the meaning set forth in Section 2.08 of this Agreement.

"***Assisted Living Facilities***" means the facilities consisting of (1) Madison Square Assisted Living, located at 209 W Jefferson St., Winterset, IA 50273 and (2) Fort Dodge Villa Cottages, located at 925 Martin Luther King Drive, Fort Dodge, IA 50501.

"***Bankruptcy Code***" means Title 11 of the U.S. Code, as amended from time to time.

"***Bankruptcy Court***" means the United States Bankruptcy Court for the Southern District of Iowa.

"***Bill of Sale***" means a bill of sale in form and substance acceptable to Buyer and Seller.

"***Bidding Procedures Order***" means that certain Order (A) Approving Bidding Procedures in Connection with the Auction and Sale of Assets and Scheduling an Auction and Sale Hearing; (B) Approving Assumption and Assignment Procedures; (C) Approving the Break-Up Fee; and (D) Granting Other Related Relief, entered on February 11, 2022, Docket Nos. 164 and 165 in the Bankruptcy Case.

"***Break-Up Fee***" means a break-up fee in an amount equal to 3% of the Purchase Price, payable in accordance with Section 7.03 hereof.

"***Business***" means Seller's business as operators of 8 Skilled Nursing Facilities and 2 Assisted Living Facilities across Iowa, and all Ancillary Businesses of Seller.

"***Business Day***" means any day other than a Saturday, a Sunday, or a day on which commercial banks are allowed or required to close in Iowa.

"***Chapter 11 Case***" means the following proceedings pending before the Bankruptcy Court in which Seller are the Debtors: *In re QHC Facilities, LLC*, Case No. 21-01643-als11, *In re QHC Management, LLC* (Case No. 21-01644-als11), *In re QHC Mitchellville, LLC* (Case No. 21-01645-als11), *In re QHC Winterset North, LLC* (Case No. 21-01646-als11), *In re QHC Madison Square, LLC* (Case No. 21-01647-als11), *In re QHC Fort Dodge Villa, LLC* (Case No. 21-01648-als11), *In re Crestridge, Inc.* (Case No. 21-01649-als11), *In re Crestview Acres, Inc.* (Case No. 21-01650-als11), *In re QHC Humboldt North, LLC* (Case No. 21-01651-als11), *In re QHC Humboldt South, LLC* (Case No. 21-01652-als11), and *In re QHC Villa Cottages, LLC* (Case No. 21-01653-als11).  ,.

"***Claim***" means any action, assessment, loss or experience rating, cause of action, claim, damage, demand, proceeding, fine, injury (including death), investigation, judgment, lawsuit, liability, loss, penalty, settlement or expense of any nature, whether civil, criminal, administrative or otherwise, and includes any and all "claims" as defined in 11 U.S.C. Section 101(5), and all "interests" as used in 11 U.S.C. Section 363(f).

"***Closing***" has the meaning set forth in Section 6.01 of this Agreement.

"***Closing Date***" has the meaning set forth in Section 6.01 of this Agreement.

"***Code***" means Title 26 of the U.S. Code, as amended from time to time.

"***Contracts***" means all contracts and other agreements incident to the Facilities and/or Business to which Seller is a party.

"***Cure Costs***" means the amount necessary to cure all defaults under the Assumed Executory Contracts (as of the Closing Date) to permit Seller to assume and assign the Assumed Executory Contracts pursuant to Bankruptcy Code section 365 and any order of the Bankruptcy Court.

"***Disclosure Schedules***" means the disclosure schedules delivered by Seller concurrently with the execution and delivery of this Agreement.  If any schedules are not completed or attached hereto as of the date of this Agreement, the parties hereto agree to attach such schedules as soon as reasonably practicable, but in any event, this Agreement is subject to Buyer approving (which approval will not unreasonably be withheld, delayed or conditioned) all schedules or subsequent updates thereto within seven (7) days of submission thereof to Buyer.  The parties hereto agree that the party charged with providing an exhibit or schedule to this Agreement shall, to the extent necessary after delivery thereof, amend or supplement all exhibits and schedules in order for the same to be current, true and correct in all material respects as of the Closing Date.

"***DOH***" means Iowa Department of Public Health and the Iowa Department of Inspections and Appeals and Iowa Department of Human Services, collectively.

"***Employee Plans***" means any pension, retirement, savings, disability, medical, dental, health, life, death benefit, group insurance, profit-sharing, deferred compensation, stock option, stock purchase, bonus, incentive, executive compensation, vacation pay, holiday pay, severance benefit plan, trust, arrangement, agreement, policy or commitment, whether or not any of the foregoing is funded or insured and whether written or oral, that is intended to provide or does provide benefits to any of Seller's employees, and (i) to which seller is a party or by which Seller (or any of Seller's rights, properties or assets) is bound; (ii) with respect to which Seller has made any payments, contributions, or commitments, or may otherwise have any liability (whether or not Seller still maintains such plan, trust, arrangement, contract, agreement, policy, or commitment); or (iii) under which any director, employee or agent of Seller is a beneficiary as a result of his or her employment or affiliation with Seller.

"***Encumbrances***" means and includes interests, contractual rights, security interests, mortgages, liens, licenses, pledges, guarantees, charges, easements, reservations, restrictions, clouds, equities, rights of way, options, rights of first refusal and all other encumbrances, whether or not relating to the extension of credit or the borrowing of money.

"***Equipment***" means all furniture, fixtures, equipment, machinery, vehicles, and other personalty now or hereafter attached to or appurtenant to the Land or used in connection with the Facilities or the Business.

3

"*ERISA*" means the United States Employee Retirement Income Security Act of 1974, as amended from time to time, and the rules and regulations promulgated thereunder.

"*Escrow Agent*" means Bradshaw Fowler Proctor & Fairgrave, 801 Grand Avenue, Suite 3700, Des Moines, IA 50309, attn: Jeffrey Goetz , goetz.jeffrey@bradshawlaw.com.

"*Excluded Agreements*" means all contracts, leases, and agreements (other than those between Seller and Buyer) that are not Assumed Executory Contracts: (i) as to which Seller is a party; (ii) to which Seller or its property is subject; or (iii) by which Seller is otherwise bound, whether oral or written.

"*Excluded Assets*" means those items specifically described in Section 2.02.

"*Excluded Liabilities*" means any liabilities of, and Claims against, Seller or the Acquired Assets, together with all other liabilities and obligations of, and Claims against, Seller that are not Assumed Liabilities.

"*Facilities*" means Seller's interest in the 8 Skilled Nursing Facilities and 2 Assisted Living Facilities, Land, Improvements, Equipment, Intellectual Property, Contract Rights, Leases, Intangible Personal Property, Government Authorizations, Records and the other intangible and tangible assets, whether real or personal or mixed, that are located in, or associated with, the nursing and assisted living facilities, and/or on the Land.  The Facilities are listed on Exhibit A.

"*FMLA*" means the United States Family and Medical Leave Act, as amended from time to time, and the rules and regulations promulgated thereunder.

"*GAAP*" means generally accepted accounting principles in the United States, consistently applied.

"*Governmental Authority*" means the government of the United States or any foreign country or any state or political subdivision thereof and any entity, body or authority exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, and other quasi-governmental entities established to perform such functions.

"*Government Authorizations*" means all licenses, permits, approvals, certificates of need and occupancy, facility certifications, consents and other authorizations from any Governmental Authority as are necessary to lawfully own and/or operate the Facilities or conduct the Business.

"*Hazardous Materials*" means any substance, material, or waste that is or becomes regulated by any Governmental Authority including: (i) petroleum, (ii) asbestos, (iii) polychlorinated biphenyls, (iv) those substances, materials or wastes designated as a "hazardous substance" pursuant to Section 311 of the Clean Water Act or listed pursuant to Section 307 of the Clean Water Act or any amendments or replacements to these statutes,

4

(v) those substances, materials or wastes defined as a "hazardous waste" pursuant to Section 1004 of the Resource Conservation and Recovery Act or any amendments or replacements to that statute, or (vi) those substances, materials or wastes defined as a "hazardous substance" pursuant to Section 101 of the Comprehensive Environmental Response, Compensation and Liability Act, or any amendments or replacements to that statute.

"*IDHS*" means the Iowa Department of Human Services.

"*IDIA*" means the Iowa Department of Inspections and Appeals.

"*IDPH*" means the Iowa Department of Public Health.

"*Improvements*" means the buildings and all other improvements, including site improvements, landscaping, fixtures, mechanical equipment, apparatus and appliances, now owned or leased or hereafter placed in the Facilities, and/or on the Land.

"*Intangible Personal Property*" means all engineering and architectural plans and specifications, drawings, studies and as-built surveys relating to the Facilities that are in Seller's possession, and any other intangible personal property Seller owns and uses in connection with the Facilities.

"*Intellectual Property*" means any or all of the following rights: (i) all U.S., international, and foreign patents and applications therefor and all reissues, divisions, renewals, extensions, provisionals, continuations and continuations-in-part thereof; (ii) all inventions (whether or not patentable), invention disclosures, improvements, trade secrets, proprietary information, know-how, technology, technical data and customer lists, and all documentation relating to any of the foregoing throughout the world; (iv) all industrial designs and any registrations and applications therefor throughout the world; (v) all internet uniform resource locators, domain names, trade names, logos, slogans, designs, common law trademarks and service marks, trademark and service mark registrations and applications therefor throughout the world; (vi) all databases and data collections and all rights therein throughout the world; (vii) all moral and economic rights of authors and inventors, however denominated, throughout the work; and (viii) any similar or equivalent rights to any of the foregoing anywhere in the world.

"*Inventory*" has the meaning set forth in Section 2.01(a) of this Agreement.

"*Knowledge*" with respect to Seller means all facts that a responsible officer of Seller employed as of the Execution Date would know or would have reason to know following due inquiry and diligence with respect to the matters at hand.

"*Labor Laws and Employment Laws*" means all Laws and all contracts or collective bargaining agreements governing or concerning labor relations, collective bargaining, conditions of employment, employment discrimination or harassment, wages, hours, or

5

occupations safety and health. The term includes ERISA, the Immigration Reform and Control Act of 1986, the National Labor Relations Act, the Civil Rights Acts of 1866 and 1964, the Equal Pay Act, the Age Discrimination in Employment Act, the Americans With Disabilities Act, FMLA, WARN Act, OSHA, the Davis Bacon Act, the Walsh-Healy Act, the Service Contract Act, the Fair Labor Standards Act, the Rehabilitation Act of 1973, the Sarbanes-Oxley Act, any worker's compensation Law, and all rules and regulations promulgated under any of the foregoing Laws.

"*Laws*" means all statutes, rules, codes, regulations, restrictions, ordinances, orders, decrees, approvals, directives, decisions, judgments, injunctions, writs, executive orders, awards, and decrees of, or issued by, any Government Authority.

"*Land*" means the real estate described on Exhibit B, together with all easements, hereditaments, rights of way, privileges and rights benefiting the same and all strips and gores of land lying adjacent to such land that Seller owns.

"*Leases*" means all lease or rental agreements involving or pertaining to the Business, to which Seller is a party, if any.

"*Licenses*" means all notifications, licenses, permits (including environmental, construction, and operation permits), franchises, certificates, certificates of need, accreditations, approvals, exemptions, waivers, classifications, registrations and other similar documents and authorizations any Governmental Authorities have issued, as well as all applications for any of the foregoing; *provided, however,* that Licenses shall not include any notifications, licenses, permits (including environmental, construction, and operation permits), franchises, certificates, certificates of need, accreditations, approvals, exemptions, waivers, classifications, registrations and other similar documents and authorizations any Governmental Authorities have issued, as well as all applications for any of the foregoing, related to any Excluded Asset.

"*Lien*" means any lien (statutory or otherwise), encumbrance, Claim, indebtedness, obligation, right, demand, charge, right of setoff, mortgage, deed of trust, security interest, pledge, preference, option, lease, license, Tax, right of first refusal or similar interest, title defect, easements, rights of way, restrictive covenant, encroachment, judgment, conditional sale, title retention agreement or restriction on transfer, or any other interest, whether it is secured or unsecured, known or unknown, recorded or unrecorded, contingent or liquidated.

"*Management Agreement*" has the meaning set forth in Section 2.12.

"*Material Adverse Effect*" means any adverse effect in the business, financial or physical condition, or results of operations of the Facilities, the Business, or Seller with respect to the Facilities, that is material when taken as a whole, provided, however, that a Material Adverse Effect shall not be deemed to include events, changes, effects, conditions, state of facts or occurrences arising out of, relating to, or resulting from: (i) changes in the United

6

States or foreign economies or financial markets in general; (ii) general changes or developments in business, regulatory, or macroeconomic conditions or trends that affect the industries and markets in which the Sellers operate; (iii) any global or national health concern, epidemic, disease outbreak, pandemic (whether or not declared as such by any Governmental Authority and including "coronavirus" or "COVID-19") or any Law issued by a Governmental Authority requiring business closures, quarantine, "sheltering-in-place" or similar restrictions that arise out of such health concern, epidemic, disease outbreak or pandemic or any change in such Law following the date of this Agreement; (iv) changes after the date of this Agreement in any Laws; (v) the announcement or anticipated consummation of the transactions this Agreement contemplates; (vi) the commencement or pendency of the Chapter 11 Case; (vii) any objections in the Bankruptcy Court to (A) this Agreement or any of the transactions contemplated hereby or thereby, (B) the Bidding Procedures Order, or (C) the assumption or rejection of any Contract or Lease pursuant to and in compliance with this Agreement

"*Medicare Advance Payments*" means unpaid or unreturned accelerated or advance Medicare payments received by the Facilities under the Coronavirus Aid Relief, and Economic Security Act amending the Accelerated Payments program, and any other unpaid or unreturned advance payments or stimulus funds received by the Facilities through any federal or state governmental agency providing reimbursement.

"*OSHA*" means the United States Occupational Safety and Health Administration.

"**Out of Compliance**" means any of the following (A) a finding by a Governmental Authority of one or more deficiencies at any Facility at a "level G" or above that has not been corrected and cleared by the applicable Governmental Authority; (B) a denial of any Facility's right to admit patients or to receive Medicare or Medicaid payments or reimbursements for existing patients or for new admissions at any Facility (C) any Facility loses its operating license or any material Permit; (D) any Facility has any Provider Agreement revoked or terminated; and (E) any Facility has its number of beds reduced; provided that the Facilities shall not be Out of Compliance if any of the conditions set forth in this definition exist at any Facility but are thereafter cured or rectified by the Seller within a reasonable period.

"*Person*" means any individual, corporation, partnership, joint venture, association, limited liability company, trust, unincorporated organization or Governmental Authority.

"*Permitted Encumbrances*" means any Encumbrances that remain attached to any Acquired Assets, from and after the Closing Date, with Buyer's consent.

"*Petition Date*" means December 29, 2021.

 "*Purchase Price*" has the meaning set forth in Section 2.03.

"*Qualified Bid*" shall have the meaning set forth in the Bidding Procedures.

7

"***Records***" means all books and records Seller (or its Affiliates) maintain in connection with the Facilities or the Business, but excluding any records relating solely to Seller corporate entity as distinct from the Facilities or Business.

"***Sale Order***" means an Order of the Bankruptcy Court approving the sale to Buyer.

"***Skilled Nursing Facilities***" means the facilities consisting of (1) Crestridge, located at 1015 Wesley Drive, Maquoketa, IA 52060, (2) Winterset Care Center North, located at 411 East Lane St., Winterset, IA 50273, (3) Crestview Acres, located at 1485 Grand Avenue, Marion, IA 52303, (4) Humboldt Care Center North, located at 1111 11th Ave, North, Humboldt, IA 50548, (5) Humboldt Care Center South, located at 800 13th St., South, Humboldt, IA 50548, (6) Sunnycrest Nursing Center, located at 401 Crisman St., Dysart, IA 52224, (7) Mitchell Village Care Center, located at 114 Carter St. SW, Mitchellville, IA 50169, and (8) Fort Dodge Villa Care Center, located 2721 10th Ave North, Fort Dodge, IA 50501.

"***Stalking Horse Bidder***" means the bidder identified in accordance with the Bidding Procedures Order.

"***Tax Return***" means any report, return, declaration or other information required to be supplied to any Governmental Authority in connection with Taxes, including estimated returns and reports of every kind with respect to Taxes.

"***Taxes***" means all taxes, charges, fees, levies, duties, penalties, additions or assessments imposed by any Governmental Authority, including income, excise, property, sales, transfer, use, ad valorem, profits, occupancy, environmental, sewer, tap, severance, franchise, value added or other taxes, including any interest, penalties or additions attributable thereto.

"***Third Party***" means any Person other than Seller, Buyer or an Affiliate of either.

"***Transaction Documents***" means this Agreement and any other agreement, document or instrument executed and delivered pursuant to the terms of, or otherwise in connection with, this Agreement, including, for the avoidance of doubt, the Bidding Procedures, the Bidding Procedures Order and the Sale Order.

"***Treasury Regulations***" means the Income Tax Regulations, including Temporary Regulations, promulgated under the Code.

"***WARN Act***" means the United States Worker Adjustment and Retraining Notification Act, as amended from time to time, and the rules and regulations promulgated thereunder.

1.02   General Construction. Whenever the context requires in this Agreement, the singular includes the plural and masculine includes the feminine or the neuter. The word "including" means "including without limitation." Words such as "herein," "hereof,"

"hereby" and "hereunder" and words of similar import refer to this Agreement as a whole and not to any particular Article, Section or Subsection of this Agreement.

1.03    <u>Schedules and Exhibits</u>.  The schedules and exhibits referenced in this Agreement are incorporated herein. All items disclosed hereunder shall be deemed disclosed in connection with the specific representation to which they are explicitly referenced. If no disclosure schedule is attached with reference to a specific Section of this Agreement, then such missing schedule shall be deemed to state "None."

**ARTICLE II**
AGREEMENT AND CONSIDERATION

2.01    <u>Agreement to Sell and Purchase</u>.  In consideration of the mutual covenants and promises contained in this Agreement, Seller agrees to sell, assign, transfer and convey unto Buyer all of Seller's right, title and interest in and to the assets described in this Section 2.01 (but not any Excluded Assets) (collectively the "***Acquired Assets***"), and Buyer agrees to purchase all of Seller's right, title and interest in and to the Acquired Assets (but not any Excluded Assets), all upon the terms and conditions set forth herein. Except for any Excluded Assets, the Acquired Assets consist of the following assets, properties and rights of Seller as of the close of business on the Closing Date:

(a)    All inventory, including finished goods, raw materials, work in progress, packaging, supplies, parts and other inventories, but excluding the Excluded Assets (collectively, the "***Inventory***");

(b)    All Contracts set forth in <u>Section 2.08(a)</u> of the Disclosure Schedules (the "***Assumed Executory Contracts***");

(c)    All Intellectual Property;

(d)    All furniture, equipment, machinery, tools, vehicles, office equipment, supplies, computers, telephones and other tangible personal property;

(e)    All Land;

(f)    All Permits which are held by Seller and required for the conduct of the Business as currently conducted or for the ownership and use of the Acquired Assets;

(g)    All rights to any Actions of any nature available to or being pursued by Seller to the extent related to the Business, the Acquired Assets or the Assumed Liabilities, whether arising by way of counterclaim or otherwise, *provided, however,* that the rights to any Avoidance Action against any party to a Contract of Seller not listed on <u>Section 2.08(a)</u> of the Disclosure Schedules as of the Closing or any Action against any director, officer, equity-holder, or lender of any Seller are not a Purchased Asset;

9

(h)     All of Seller's rights under warranties, indemnities and all similar rights against third parties to the extent related to any of the Acquired Assets or Assumed Liabilities;

(i)     All employee benefit plans set forth in <u>Section 2.01(i)</u> of the Disclosure Schedules, solely to the extent designated and agreed by Buyer, including all related insurance policies, contracts, trusts and any other assets attributable thereto (the "***Assumed Benefit Plans***");

(j)     All insurance benefits, including rights and proceeds, arising from or relating to the Business, the Acquired Assets or the Assumed Liabilities

(k)     Originals, or where not available, correct and complete copies, of all books and records, including books of account, ledgers and general, financial and accounting records, customer lists, customer purchasing histories, price lists, distribution lists, supplier lists, production data, quality control records and procedures, customer complaints and inquiry files, research and development files, records and data (including all correspondence with any Governmental Authority), sales material and records (including pricing history, total sales, terms and conditions of sale, sales and pricing policies and practices), strategic plans, internal financial statements, marketing and promotional surveys, material and research and files relating to the Intellectual Property Assets ("***Books and  Records***"); and

(l)     All goodwill and the going concern value of the Business.

2.02    <u>Excluded Assets</u>.  The following assets are expressly excluded from the purchase (the "***Excluded Assets***"):

(a)     All Contracts that are not Assumed Executory Contracts (the "***Excluded Contracts***");

(b)     Cash and cash equivalents;

(c)     Accounts receivable;

(d)     The corporate seals, organizational documents, minute books, stock books, Tax Returns, books of account or other records having to do with the corporate organization of Seller;

(e)     All rights to any Avoidance Actions against any creditor of Seller not listed in <u>Section 2.08(a)</u> of the Disclosure Schedules as of the Closing or any party to a Contract of Seller not listed on <u>Section 2.08(a)</u> of the Disclosure Schedules as of the Closing, or any Action against any director, officer, equity-holder, or lender of any Seller;

(a)     Prepaid expenses, credits, advance payments, claims, security, refunds, rights of recovery, rights of set-off, rights of recoupment, deposits, charges, sums and fees

10

(including any such item relating to the payment of Taxes) related to prior to the Closing Date; and

(f)    The rights specifically accruing to Seller under the Transaction Documents.

2.03    <u>Consideration</u>.  Buyer agrees to pay to Seller the total of Twelve Million and 00/100 Dollars ($12,000,000) (the "<u>Purchase Price</u>") in consideration for the sale of the Acquired Assets, subject to the adjustments and credits described herein.

2.04    <u>Good Faith Deposit</u>.  Within two (2) business days of the Execution Date, Buyer shall provide a good faith deposit of $600,000 in cash to Escrow Agent to be held pending Closing.  In the event Buyer is not the Prevailing Bidder at auction, Seller shall return the good faith deposit to Buyer within three business days of entry of the order approving the sale.

2.05    <u>Method of Payment</u>.  Buyer will pay the Purchase Price at Closing, less the Medicare Advance Payments, in immediately available funds. The Good Faith Deposit shall be applied to the Purchase Price.

2.06    <u>Allocation of the Purchase Price</u>.  The Purchase Price will be allocated in the manner set forth on Exhibit C, said allocation being mutually agreed upon by the parties.

2.07    <u>Excluded Assets</u>.  Notwithstanding anything herein to the contrary, Buyer will not acquire any interest in the Excluded Assets as a result of this transaction.

2.08    <u>Assumed Liabilities</u>.  Buyer will not assume or in any way be responsible for any of the debts, liabilities, or obligations of any kind or nature of Seller, other than as specifically set forth below (collectively, the "***Assumed Liabilities***").

(a)    Except as set forth herein, Buyer shall assume and be responsible for all Liabilities of Seller under the Assumed Executory Contracts, including any costs to cure any ongoing default under any Assumed Executory Contract (the "Cure Costs") in accordance with the Bidding Procedures. <u>Section 2.08(a)</u> of the Disclosure Schedules sets forth a correct and complete list of all Assumed Executory Contracts as of the date hereof, including any Cure Costs associated therewith. Therefore, Buyer shall only be obligated to pay Liabilities under contracts which Buyer has explicitly assumed pursuant to section 2.08(a) of this Agreement, which will be designated by Buyer, and detailed in section 2.08(a) of the Disclosure Schedules. If the Buyer indicates in the Disclosure Schedules that Buyer does not wish to assume a Cure Cost, it shall be deemed that Buyer does not assume the corresponding contract.  Notwithstanding the foregoing, Buyer shall not assume any Cure Costs related to any provider agreement (i.e., Medicare, Medicaid or any HMOs), which amount shall either be satisfied by Seller simultaneously with the Closing or credited at Closing against the Purchase Price.

11

(b)  All Liabilities of Seller with respect to the amount of accrued but unused paid time of (including any accrued sick time) for each employee as of the Closing Date (collecting, the "**Accrued PTO**"), as set forth on Schedule 2.08(b).  Seller shall provide Buyer, at least ten (10) days prior to the Closing Date, an updated version of Schedule 2.08(b) reflecting Accrued PTO amounts (and the value of those amounts).  Seller shall provide Buyer on the Closing Date with an updated version of Schedule 2.08(b) reflecting Accrued PTO amounts (and the value of those amounts) as of the Closing Date.  On the Closing Date, Buyer shall assume the Accrued PTO balances with respect to the transferred Employees and Buyer will, thereafter, be responsible for paying the Accrued PTO to the transferred Employees in accordance with the Buyer's applicable policies and procedures.

2.09  Without limiting the generality of the foregoing, Buyer will have no liability for any Excluded Liabilities or Excluded Assets.  Other than the Assumed Liabilities, Buyer shall not assume from Seller any Liabilities whatsoever, all of which shall be retained by the Seller and considered Excluded Liabilities including without limitation:

(a)  malpractice, professional liability or other tort claims, statutory or regulatory claims, claims of local, state or federal agencies whether civil or criminal, fraud-based claims or claims for breach of contract to the extent any such claims are based on acts or omissions of Seller or events occurring at the Facilities before the Closing Date;

(b)  any accounts payable, taxes, or other obligation or Liabilities of Seller to pay money incurred by Seller for periods prior to the Closing Date;

(c)  any collective bargaining agreements or other agreements or understandings with any labor union or collective bargaining unit or any employment or consulting agreements of any kind and any Liabilities arising from any pension fund or benefits programs;

(d)  any administrative expense Claims accruing in the Chapter 11 Case;

(e)  Liabilities of Seller arising under or in connection with any Excluded Contract;

(f)  Liabilities of Seller arising under all employment and change of control contracts, severance obligations, equity option contracts and equity purchase contracts to which Seller is a party other than any Liability arising pursuant to any Assumed Contract;

(g)  Liabilities or obligations in connection with any indebtedness of Seller, except pursuant to any Assumed Contract or other Assumed Liability;

(h)  other than Cure Amounts related to the Assumed Contracts, all pre-petition and post-petition Claims as of the Closing Date, including, without limitation, all trade payables and general unsecured Claims;

(i)  any Liability arising out of, under or in connection with the Excluded Assets;

12

(j)      all Liabilities relating to (including amounts or notice due to) employees, former employees, consultants, former consultants or retirees of Seller based on the termination of such employment or engagement by the Seller, including any amounts due to such Persons prior to Closing;

(k)      any Liability that is not an Assumed Liability; and

(l)      other than Cure Amounts related to the Assumed Contracts, any other Liabilities arising in whole or in part from Seller's acts or omissions or in any way related to the operations of the Facility prior to the Effective Time.

2.10    <u>Inspection / Due Diligence Period.</u>  Buyer agrees that it has conducted sufficient due diligence to close the sale and purchase the Acquired Assets as is, where is, other than as otherwise agreed by Seller and Buyer.

2.11    <u>Revisions to List of Assumed Executory Contracts</u>. Subject to the terms of any controlling Bankruptcy Court order and the requirements of the Bankruptcy Code, Buyer may revise Schedule 2.08(a) at any time prior to the Bankruptcy Court's entry of the Sale Order, by giving notice to Seller; provided, however, that such revision shall not result in additional cost (including Cure Cost) to Seller., following entry by the Bankruptcy Court of the Sale Order.  Immediately upon Buyer's delivery of such written notice to Seller, Schedule 2.08(a), so revised, will define the scope of the Assumed Executory Contracts in all respects pursuant to this Agreement, including the scope of Assumed Liabilities, Assumed Executory Contracts, Excluded Liabilities, and Excluded Agreements, and Cure Costs.

2.12    <u>Provider Agreements;</u>

(a)      <u>Management Agreement</u>.  The Buyer and Sellers shall enter into an ancillary agreement within five (5) Business Days of entry of the Sale Order to transfer management and operation of the Facilities, subject to Applicable Law (the "***Management Agreement***").  Pursuant to the Management Agreement, all economic risk and reward in relation to the operation of the Facilities transfers to the Buyer on the effective date of the Management Agreement.    The effective date of the Management Agreement shall be no later than two (2) weeks following the earlier of (i) the Auction, or (ii) if no other qualified bids are received and the Auction is cancelled, the Preliminary Bid Deadline; *provided, however*, that the parties shall use good faith efforts to cause the Management Agreement to become effective as soon as feasible after the earlier of (i) or (ii).

(b)      <u>Interim Billing</u>. (a) As of the Closing Date and to the extent permitted by Applicable Law, Seller shall transfer and assign to Buyer all of Seller's rights and interests in and to Seller's Medicare and Medicaid provider numbers and Medicare and Medicaid provider reimbursement agreements. The Parties acknowledge and agree that Buyer is not expected to have received its "tie in" notice from Centers for Medicare and Medicaid Services ("CMS") with respect to Seller's

13

Medicare or Medicaid provider agreements or any new Medicare or Medicaid provider agreements (collectively, the "Provider Agreements") as of the Closing Date. Prior to Buyer's receipt of its tie in notice and Provider Agreements, so long as Buyer is accepting assignment of the Provider Agreements and is utilizing commercially reasonable efforts to become the certified Medicare and/or Medicaid provider, as applicable, at the Facility, Seller agrees that Buyer may bill for services performed following the Closing under Seller's Medicare and/or Medicaid provider number, as applicable, to the extent permitted by Applicable Law. (b) The Parties acknowledge and agree that Seller's managed care provider plans and agreements with other third-party payors are not expected to have been updated with Buyer's provider information as of the Closing Date. From and after the Closing Date until such managed care provider plans and agreements with other third-party payors are updated with Buyer's provider information, Seller agrees that Buyer may bill for services provided following the Closing under Seller's managed care provider plans and agreements with other third-party payors using Seller's provider information to the extent permitted by Applicable Law and the terms and conditions of the plans and agreements with the third party payors. (c) Any reimbursements from Medicare or Medicaid billed by Buyer for dates of service after the Closing Date which are paid into Seller's accounts shall be forwarded by Seller to Buyer.

## ARTICLE III
### REPRESENTATIONS AND WARRANTIES

3.01    <u>Seller's Representations and Warranties</u>.  Seller represents and warrants to Buyer as follows and agrees that each of the following will be true and correct on the Execution Date and the Closing Date.  This Section 3.01 contains the full and complete list of Seller's representations and warranties to Buyer.  Seller covenants as follows:

(a)    <u>Organization of Seller</u>. Each Seller as listed in the preamble above is either a limited liability company or corporation duly organized and validly existing and in good standing under the laws of the State of Iowa.

(b)    <u>Authority</u>.  The execution and delivery of this Agreement and the Ancillary Agreements to which it is a party, and the consummation of the transactions herein contemplated have been duly and validly authorized by all necessary action on the part of Seller.  Subject to the Bankruptcy Court's entry of the Sale Order, this Agreement has been, and any Ancillary Agreements will be as of the Closing Date, duly executed and delivered by Seller, and do or will (as the case may be) constitute Seller's valid, legal, and binding obligation according to their terms.

(c)    <u>Consents and Authority</u>.  Except for the Bankruptcy Court's entry of the Sale Order, Seller has obtained all corporate approvals and membership consents necessary to consummate the transactions contemplated therein.

(d)    <u>Title</u>.  Seller has delivered to or made available for Buyer's review true, correct, and complete copies of the title abstracts for all real estate in which Seller has an interest.

14

(e)  <u>Litigation and Compliance with Laws</u>.  To Seller's Knowledge, Schedule 3.01(e) sets forth a complete and accurate description of any litigation, proceeding, claim or investigation threatened or pending before any court, arbitrator or administrative agency affecting or relating to Seller or Seller's operation of the Facilities.

(f)  <u>Utilities</u>.  To Seller's Knowledge, all water, gas, electricity, telephone, cable, drainage facilities, sewer and other utilities required for the operation of the Facilities either enter the Land through adjoining public streets or, if they pass through adjoining private land, they do so in accordance with recorded easements.

(g)  <u>Tax Returns; Taxes</u>.  Except as precluded by the Bankruptcy Code, Seller has filed all Tax Returns due as of the Execution Date of this Agreement and has or will pay all Taxes against the Facilities and/or Seller that relate to Seller's ownership and/or operation of the Facilities, or that could constitute an Encumbrance against the Facilities, if and when they are due and payable.

(h)  <u>Non-Foreign Status</u>.  Seller is not a foreign entity (as the term is defined in the Internal Revenue Code and Income Tax Regulations) and Seller agrees to execute a Certificate of Non-Foreign Status pursuant to Section 1445 of the Internal Revenue Code at Closing.

(i)  <u>Broker's Fee</u>.  Seller is solely responsible for satisfying any Claim relating to any broker or advisor with respect to the transactions this Agreement contemplates for a brokerage commission, consulting fee, finder's fee or similar payment.

(j)  <u>Bulk Sales Law</u>.  Seller has complied, or will comply, with any applicable bulk sales law requirements applicable to the sale of the Facilities, at its sole expense.

(k)  <u>Environmental Matters</u>. To Seller's Knowledge, except as set forth on Schedule 3.01(t), the Facilities are in compliance with all federal, state and local environmental, health and safety laws, statutes ordinances and regulations, including all laws relating to Hazardous Materials, and wetlands.

(l)  <u>Employee Plans</u>.  Except as otherwise may be prohibited by law, Seller has delivered to or made available for Buyer's review true, correct, and complete copies of Seller's Employee Plans.

(m)  <u>Fraud and Abuse</u>.  Except as set forth on Schedule 3.01(t), to Seller's Knowledge, Seller has not engaged in any activities that are prohibited under 42 U.S.C. §1320a-7b or 42 U.S.C. 1395, or the regulations promulgated thereunder, or any applicable related Law, or that are prohibited by rules of professional conduct, including the following: (a) knowingly and willfully making or causing to be made a false statement or representation of a material fact in any application for any benefit or payment; (b) knowingly and willfully making or causing to be made any false statement or representation of a material fact for use in determining rights to any benefit or payment; (c) any failure by a claimant to disclose knowledge of the occurrence of any event affecting the initial or continued

15

right to any benefit or payment on its own behalf or on behalf of another, with the intent to fraudulently secure such benefit or payment; and (d) knowingly and willfully soliciting or receiving any remuneration (including any kickback, bribe or rebate) directly or indirectly, overtly or covertly, in cash or in kind, or offering to pay or receive such remuneration (i) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part by Medicare or Medicaid, or (ii) in return for purchasing, leasing or ordering or arranging for, or recommending, purchasing, leasing or ordering any good, facility, service or item for which payment may be made in whole or in part by Medicare or Medicaid. Seller is not and at no time has been suspended or excluded from participation in any federally funded health care program, including Medicare or Medicaid.

(n)   <u>Insurance Policies</u>.  Seller has delivered to or made available for Buyer's review true, correct, and complete copies of Seller's policies of insurance applicable to Seller, and the Facilities, including medical malpractice insurance covering all physicians and other professional personnel Seller has engaged or employed, general liability insurance, property insurance, employer's liability and workers' compensation insurance.

(o)   <u>Certificates of Need</u>.  Seller has delivered to or made available for Buyer's review true, correct, and complete copies of Seller's certificates of need; (ii) letters of non-reviewability; or (iii) other exemptions from certificate of need review, that Seller holds or uses in the operation of the Business.  <u>Schedule 3.01(o)</u> sets forth a true, correct, and complete list of all such documents.

(p)   <u>Medical Staff</u>. Seller has delivered to or made available for Buyer's review true, correct, and complete copies of Seller's (i) medical staff privilege and membership application forms; (ii) delineation of privilege forms; current medical staff bylaws, rules and regulations, and amendments thereto; (iii) credentials and appeals procedures not incorporated in any of the foregoing; and (iv) contracts with physicians, physician groups, or other members of the medical staff of the Facilities.

(q)   <u>Hill-Burton and Other Liens</u>.  Seller has not received any loans, grants, or loan guaranties pursuant to the United States Hill-Burton Act (42 U.S.C. § 291a, *et seq*.) program, the Health Professions Educational Assistance Act, the Nurse Training Act, the National Health Pharmacy and Resources Development Act, or the Community Mental Health Centers Act.  To Seller's Knowledge, none of the Acquired Assets are subject to any liability in respect of amounts received by Seller or others for the purchase of the Acquired Assets (or any part thereof) under restricted or conditioned grants or donations, including monies received under the Public Health Services Act (42 U.S.C. § 291, *et seq*.).

(r)   <u>Experimental Procedures</u>. Neither Seller, nor any officers, employees or agents of Seller, have performed or permitted to be performed, nor do they have Knowledge of the

16

performance of, any experimental procedures involving patients/residents in the Facilities.

(s)    Permits.  Except as set forth on Schedule 3.01(s), the Facilities are duly licensed in accordance with the Laws of the State of Iowa, DOH and all other ancillary departments or services located at or operated for the benefit of, the Facilities that are required to be separately licensed are duly licensed by the appropriate Governmental Authority.  To the Knowledge of Seller, Seller has all Permits which are needed or required by Law to operate its business related to or affecting the Facilities or any ancillary services related thereto as currently conducted.  Schedule 3.01(s) is a true, complete and accurate list all material Permits owned or held by or issued to Seller relating to the ownership or operation of the Facilities or the Acquired Assets and such Permits constitute all material Permits necessary for the conduct of the Business and operation of the Facilities as currently conducted and for the ownership of the Facilities by Seller and operation and use of the Acquired Assets by Seller, all of which are in full force and effect.

(t)    Compliance.  Except as set forth on Schedule 3.01(t), or to the extent such failure would not constitute a Material Adverse Effect, to the Knowledge of Seller, Seller is complying in all material respects with all applicable statutes, rules, regulations, and requirements of each Governmental Authority having jurisdiction over the Seller, the operations of the Facilities and the Acquired Assets.

(u)    Licensed Beds and Current Rate Schedule.  Schedule 3.01(u) sets forth a true, correct and complete statement, as of three (3) Business Days prior to the Execution Date, of: (i) the number and type of licensed beds at the Facilities, and (ii) the number of beds then occupied in, and the occupancy percentages at, the Facilities.

(v)    Prohibited Practices.  Except as set forth on Schedule 3.01(t), during the eighteen (18) month period prior to the Execution Date, no officers or directors of Seller have, during their period of engagement with Seller, been charged with, convicted of or pleaded guilty to crimes of theft or dishonesty, financial misconduct, or offenses related to the delivery of health care services, nor, to Seller's Knowledge, have any of Seller's current officers or directors been excluded from participation in Medicare, Medicaid or any other state or federal government reimbursement program.  To Seller's Knowledge, during the eighteen (18) month period prior to the Execution Date, none of Seller's officers, directors or employees has engaged in any conduct that may result in sanctions to Seller under any federal or state laws.

(w)    Government Investigations.  Except as set forth on Schedule 3.01(t), other than for routine state and federal inspections or surveys performed by DOH, during the eighteen (18) month period prior to the Closing Date, Seller has received no written notice of the commencement of any investigation proceedings or any governmental investigation or action (including any civil investigative demand or subpoena) under Laws.

17

(x)    Cost Reports. Seller has filed all cost reports required to be filed for the Facilities as of the Closing Date under Law. Seller has furnished Buyer with copies of all cost reports filed by Seller with the appropriate State agency, the appropriate Medicare and Medicaid agencies and/or fiscal intermediaries in respect of the operation of the Facilities for the years ended December 31 2020 and 2019, and to Seller's Knowledge, such cost reports did not contain any material disallowable costs or expenses or any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not misleading, and, to Seller's Knowledge, such cost reports have been prepared in all material respects in accordance and compliance with all applicable government rules and regulations.

(y)    Financial Information.

(i)    Schedule 3.01(y) hereto contains the following financial statements and financial information (collectively, the "*Historical Financial Information*"):

unaudited financial statements consisting of the balance sheet of the Business as of December 31, 2021, and the related statements of income and net surplus/deficit, and cash flow for the 12-month period ended on December 31, 2020 (the "*Unaudited Financial Information*").

(ii)    The Unaudited Financial Information included in the Historical Financial Information has been prepared consistent with past practice and may not include required footnote disclosures or reflect normal year-end adjustments. Seller has not changed in any material respects any accounting policy or methodology in calculating reserves, including reserves for uncollected accounts receivable, throughout all periods presented in the Historical Financial Information.

(z)    Real Property.

(a)    Schedule 3.01(z) contains an accurate and complete legal description, street address and tax parcel identification number for the Land. Seller holds good and indefeasible fee simple title to all the Land and shall convey the Land in accordance with the Sale Order free and clear of all Liens (other than the Permitted Liens). Seller is not a lessee of any portion of the Land. Seller agrees that title to the Land shall not be altered between the Execution Date and Closing. Except as set forth on Schedule 3.01(z), other than the right of Buyer pursuant to this Agreement, there are no outstanding agreements, options, rights of first offer, rights of first refusal, or any other grant to third party to sell, purchase, lease, sublease, use, occupy, or enjoy the Land or any portion thereof or interest therein.

(b)    Except as set forth on Schedule 3.01(t), Seller has not received written notice from any Governmental Authority of (and otherwise has no Knowledge of): (i) any pending or threatened condemnation proceedings affecting the Land, or any part thereof; (ii) any written notice asserting or alleging any material violations or potential violations of any Laws (including zoning and land

18

use ordinances, building codes and similar requirements) with respect to the Land, or any part thereof, which have not heretofore been cured; or (iii) any pending or threatened proceedings, nor any claims or actions against Seller or the Land, relating to the ownership, lease, use or occupancy of such Land or any portion thereof which is reasonably likely to result in a material change in the condition of the Land or the ownership or operation of the Land. Seller has not received any written notice of any pending zoning or other land use change affecting the real property.

(c)    Neither Seller nor, to Seller's Knowledge, any other person is in violation of a condition or agreement contained in any easement, restrictive covenant or any similar instrument or agreement affecting any of the Land in any material respect.

(d)    To Seller's Knowledge, except as set forth on <u>Schedule 3.01(z)</u>, the Land is zoned for its current use and there are no waivers or variances granted by any Governmental Authority which, as a result of the transactions contemplated in this Agreement, will be withdrawn or abrogated, including but not limited to life safety code waivers.

3.02   <u>Buyer's Representations and Warranties</u>. Buyer makes the following representations and warranties to Seller, which will be true and correct as of the date made and the Closing Date:

(a) <u>Organization of Buyer</u>. Buyer is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Delaware and licensed to do business in the State of Iowa.

(b) <u>Authority</u>. The execution and delivery of this Agreement and the consummation of the transactions herein contemplated have been duly and validly authorized by all necessary corporate action on the part of Buyer, and this Agreement constitutes, and the documents contemplated hereby will be, Buyer's valid and legally binding obligations, enforceable according to their terms.

(c) <u>Conflict or Default</u>. Neither the execution nor delivery of this Agreement, nor the consummation of the transactions herein contemplated will conflict with, violate, result in a breach by, constitute a default under or accelerate the performance provided by the terms of any Law or agreement to which Buyer may be subject.

3.03   <u>Full Disclosure</u>. To their Knowledge, no representation or warranty by Seller or Buyer, and no statement, document, financial statement, certificate or other instrument, schedule or exhibit furnished or to be furnished hereunder or in connection with the transactions contemplated hereby (including all exhibits and schedules hereto) contains or will contain any untrue or misleading statement of fact or omit to state or contain anything necessary to

19

make such matter correct, complete and not misleading in all respects and to fairly present the information set forth in a manner that is not misleading.

**ARTICLE IV**
TITLE AND SURVEY

4.01    <u>Title Report and Policy</u>.  Promptly after the Execution Date, Seller will use good faith efforts to deliver for Buyer's review true, correct, and complete copies of all abstracts of title to the Land.  If the abstracts are not available, Buyer shall promptly order, or shall order a title commitment from the Escrow Agent.  An abstract for any parcel of Land purchased will become the property of Buyer when Buyer pays the Purchase Price in full. Seller will pay the cost of any additional abstracting title work due to any act or omission of Seller.  Buyer may elect to obtain a title insurance policy in lieu of an attorney's opinion at Buyer's expense.  Any objections to the title commitment Buyer identifies will be treated in the same manner as title objections in the attorney's title opinion.  Buyer shall have the right to object to anything material shown in the abstract (or title commitment) and survey, other than matters set forth in (3) through (6) below, by written notice ("<u>Buyer Objection Letter</u>") to Seller with five (5) business days of receipt of both the abstract (or title) and survey (the "<u>Unpermitted Exceptions</u>"). Seller shall identify whether or not it is willing or capable of correcting within ten (10) business days of receipt of the objection letter.  If Seller determines not to remove or correct such Unpermitted Exceptions, then Buyer may elect upon written notice to Seller made within three (3) Business Days after Buyer's receipt of the Seller objection response: (i) to terminate this Agreement as to that specific Facility or Land by written notice to Seller, in which event the Deposit shall be refunded to Buyer and neither party shall have any further liability to any other party under Agreement, except as otherwise provided in this Agreement; or (ii) to take the Property subject to such Unpermitted Exceptions, without adjustment to the Purchase Price, in which case such Unpermitted Exceptions shall become Permitted Exceptions.  Any objection by the Buyer to something material in an abstract or survey shall only apply as a right to terminate the Agreement as to the Land subject to such abstract or survey and Buyer shall not have the right to terminate the entire Transaction. As used herein, "<u>Permitted Exceptions</u>" means: (1) all restrictions, reservations, covenants and easements of record, if any, to which Buyer fails to object in its Buyer Objection Letter; (2) all matters disclosed on the Survey to which Buyer fails to object in its Buyer Objection Letter; (3) all current period Taxes not yet due and payable; (4) any covenants, conditions, or restrictions, or applicable Laws or other governmental regulations, governing or limiting the use of the property, in each case that are not violated by the existing improvements or the current use thereof; (5) any utility or other easements that would qualify under the foregoing clause and which further do not underlay any of the existing improvements on the Property; and (6) liens created by, through, or under Buyer. Notwithstanding anything to the contrary, all monetary liens (other than those set forth in subsections ((3) and (6)) shall be Unpermitted Exceptions and shall be removed by Seller, at its sole cost and expense, prior to the Closing.

4.02   Survey.  Seller has delivered to or made available for Buyer's review any surveys of Land in its possession.  Prior to Closing, Buyer may at its expense obtain a survey of the Land, or update an existing survey at Buyer's expense.

**ARTICLE V**
CONDITIONS

5.01   Conditions to Buyer's Obligations.   Buyer's obligations under this Agreement are conditioned upon the following (which Buyer may waive, in whole or in part, in writing):

(a)   Performance of Covenants.  Seller has, in all material respects, timely performed all covenants and obligations, and timely complied with all conditions required of Seller by this Agreement.

(b)   Representations and Warranties.  All of Seller's representations and warranties are true, complete and correct, in all material respects, on the Execution Date and as of the Closing Date as if made at that time (other than the representations and warranties that by their terms address matters only as of another specified date, which shall be so true, complete and correct, in all material respects, only as of such other specified date), except where the failure of such representations and warranties to be true, complete and correct, in all material respects, had not had, and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(c)   Closing Documents.  At the Closing, Seller will deliver or cause to be delivered each of the items required of it as specified in Section 8.02 of this Agreement.

(d)   Litigation.  Following the Execution Date, no notice has been received as to litigation commenced or Claim made or threatened against any Person, by any other Person with regard to this Agreement, or the transactions provided for in this Agreement that, if successfully prosecuted, would have a Material Adverse Effect on Buyer.

(e)   Sale Approval Motion.  Seller shall have filed a motion with the Bankruptcy Court seeking entry of the Sale Order, in form and substance satisfactory to Buyer (the "Sale Approval Motion").

(f)   Bidding Procedures Order.  There shall have been entered prior to any Auction, an Order of the Bankruptcy Court in the Bankruptcy Case (the "***Bidding Procedures Order***") approving, among other things: (i) in the event of an accepted overbid from a third party for the Acquired Assets and the closing of a transaction with respect thereto with such third party (a "***Third Party Closing***"), the payment of the Break-Up Fee to Buyer; (ii) an initial minimum overbid for any Auction in the amount of $100,000 plus the Break-Up Fee and a $100,000 minimum for additional overbids thereafter; (iii) that the Break-Up

21

Fee shall be paid to Buyer from (and at the time of) the proceeds of the Third Party Closing, and the claim of Buyer for the Break-Up Fee shall have administrative expense priority under section 503(b)(1)(a) of the Bankruptcy Code, in each case, in accordance with the terms and conditions of the Bidding Procedures Order; and (iv) that, during any Auction, the Buyer shall receive a credit in connection with each bid in an amount equal to the sum of the Break-Up Fee.

(g)  Auction.  If there have been any Qualified Bids (as defined in the Bidding Procedures Order), Seller shall have conducted an auction sale (the "*Auction*") of the Acquired Assets in accordance with the Bidding Procedures approved by the Bankruptcy Court in the Bidding Procedures Order no later than the Auction (or such later date for which notice is provided in the Bidding Procedures Order or as Seller and Buyer may otherwise mutually agree), and Buyer's offer shall have been accepted by Seller as the highest or best offer for the Acquired Assets at the conclusion of the Auction.

(h)  Consent.  All certifications, consents, waivers, approvals, authorizations, Government Authorizations and determinations from and by third parties necessary legally to consummate the transactions contemplated herein have been obtained.

(i)  Title Policy.  If applicable, any title insurance policy described in Article IV of this Agreement has been issued.

(j)  Condition of Acquired Assets.  Following the Execution Date, there has been no material adverse damage to the Facilities.

(k)  Subsequent Events.  Except as set forth on Schedule 3.01(t) and Schedule 3.01(e), no action, investigation, Claim or proceeding has been instituted or threatened, or other matters occurred, that involve the likelihood of a Material Adverse Effect on the Business or the Facilities, and no action, investigation or proceeding has been instituted or threatened before any court or Governmental Authority to restrain or prohibit, or to obtain substantial damages in respect of, this Agreement, or the consummation of the transactions herein contemplated.

(l)  Other Deliveries.  Seller has delivered other items and deliveries relating to the Facilities as Buyer reasonably requests.

(m)  Licenses.  The Sale Order shall include approval of the Management Agreement to allow Buyer to operate the Facilities until it has obtained all of the licenses required to operate the Facilities from the DOH.

(n)  Compliance.  No Facility shall be Out of Compliance, except as set forth on Schedule 3.01(t).

(o)  Material Adverse Effect.  There will have occurred following the date hereof no events nor will there exist circumstances which singly or in the aggregate have resulted in a

22

Material Adverse Effect, provided, however, closure of one facility, including, without limitation, loss of license or provider agreement, shall be considered a Material Adverse Effect only with respect to that one respective facility and shall not be deemed a Material Adverse Effect to the entire Transaction.  Such Material Adverse Effect involving a particular facility shall result in a corresponding Purchase Price adjustment in an amount equal to the corresponding amount on Schedule 5.01(o).

(p)    Sale Order. The Bankruptcy Court has entered the Sale Order and as of Closing, such Sale Order remains in full force and effect.

5.02    Conditions to Seller's Obligations.    Seller's obligations under this Agreement are conditioned upon the following (which Seller may waive, in whole or in part, in writing):

(a)    Performance of Covenants.  Buyer has timely performed all covenants and obligations, and timely complied with all conditions this Agreement require of Buyer in all material respects, including paying the Purchase Price to Seller.

(b)    Representations and Warranties.  All of Buyer's representations and warranties contained herein are true, complete and correct in all material respects on the Execution Date and as of the Closing Date, as if made at that time.

(c)    Conveyances. Buyer and Seller have received all third party certifications, covenants, waivers, approvals, authorizations, Government Authorizations and determinations necessary to legally consummate the transactions contemplated herein.

(d)    Payment of Purchase Price. Buyer has delivered the Purchase Price by wire transfer of immediately available funds.

(e)    Other Deliveries.  Buyer has delivered other items and deliveries relating to the Facility as Seller reasonably requests.

(f)    Sale Order. The Bankruptcy Court has entered the Sale Order and as of Closing, such Sale Order remains in full force and effect.

**ARTICLE VI**
TERMINATION

6.01    Termination.  This Agreement may be terminated as follows:

(a)    At any time by the mutual written agreement of the Seller and the Buyer;

(b)    Automatically, upon the consummation of any Acquisition Transaction between the Seller and a party other than the Buyer;

(c)    By the Buyer, at its sole election, in the event that the Closing shall not have occurred prior to 120 days from entry of the Sale Order, subject to change of ownership

23

approval by the regulatory agencies (the "***Outside Date***"); provided that the Buyer shall not be entitled to terminate this Agreement pursuant to this Section 6.01 if the failure of the Closing to occur on or prior to such date results primarily from the Buyer itself materially breaching any representation, warranty or covenant contained in this Agreement;

(d)     By the Seller, at its sole election, in the event that the Closing shall not have occurred on or before the Outside Date; provided that the Seller shall not be entitled to terminate this Agreement pursuant to this Section 6.01(d) if the failure of the Closing to occur on or prior to such date results primarily from the Seller materially breaching any representation, warranty or covenant contained in this Agreement;

(e)     By the Buyer, at its sole election, in the event of a material breach of this Agreement by the Seller that has not been cured within ten (10) Business Days after written notice to the Seller, or if any representation or warranty of the Seller shall have become untrue in any material respect, in either case such that such breach or untruth is incapable of being cured, by the Outside Date.  Buyer shall not have a right to terminate under this section if Buyer is in material breach or any of its representations and/or warranties are untrue such that satisfaction of conditions to close under section 5.01 would be prevented;

(f)     By the Seller, at its sole election, in the event of a material breach of this Agreement by the Buyer that has not been cured within ten (10) Business Days after written notice to the Buyer, or if any representation or warranty of the Buyer shall have become untrue in any material respect, in either case such that such breach or untruth is incapable of being cured, by the Outside Date.  Seller shall not have a right to terminate under this section if Seller is in material breach or any of its representations and/or warranties are untrue such that satisfaction of conditions to close under section 5.02 would be prevented;

(g)     By the Buyer, at its sole election, upon the granting of any motion for relief from the automatic stay which would have a Material Adverse Effect, the conversion of the Case to a case under Chapter 7 of the Bankruptcy Code, the dismissal of the Case, the filing of any plan of reorganization by any party in interest that does not incorporate this Agreement, the filing of any motion by a party in interest in the Case to liquidate the Acquired Assets or any similar commencement of liquidation proceedings relating to the Seller, other than as contemplated herein, which is not dismissed within thirty (30) days, or upon the commencement of any similar actions or proceedings in or by any foreign court with respect to the Seller, which are not dismissed within thirty (30) days;

(h)     By the Buyer, at its sole election, if any of the conditions set forth in Section 5.01 shall not have been, or the facts and circumstances are such that any of such conditions cannot be, fulfilled by the Outside Date, unless such failure shall be primarily due to the failure of Buyer to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing;

(i)     By the Seller, at its sole election, if any of the conditions set forth in Section 5.02 shall not have been, or the facts and circumstances are such that any of such

24

conditions cannot be, fulfilled by the Outside Date, unless such failure shall be primarily due to the failure of Seller to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing;

(j)     By the Buyer, upon entry by the Bankruptcy Court of any Order, or any other Governmental Authority of any Governmental Order, that is inconsistent in any material respect with the proposed Sale Order or, upon entry, with the Sale Order;

(k)     By the Buyer, if there shall be any Law that makes consummation of the transactions contemplated by this Agreement or any other Transaction Document illegal or otherwise prohibited;

(l)     By the Seller, if there shall be any Law that makes consummation of the transactions contemplated by this Agreement or any other Transaction Document illegal or otherwise prohibited; or

(m)     By the Buyer, if any Governmental Authority shall have issued a Governmental Order restraining or enjoining the transactions contemplated by this Agreement or any other Transaction Document, and such Governmental Order shall have become final and non-appealable; or

(n)     By the Seller, if any Governmental Authority shall have issued a Governmental Order restraining or enjoining the transactions contemplated by this Agreement or any other Transaction Document, and such Governmental Order shall have become final and non-appealable.

6.02     Effect of Termination.

(a)     In the event of the termination of this Agreement in accordance with this Article VI, this Agreement shall immediately become void and there shall be no liability on the part of any party hereto except (a) confidentiality obligations; (b) as set forth in this Article VI, Section 6.02, Article XII, and Article XIII; (c) any obligations for material breach of this Agreement occurring prior to such termination; and (d) that nothing herein shall relieve any party hereto from liability for any willful breach of any provision hereof (which, for the avoidance of doubt, will be deemed to include any failure by Buyer to consummate the Closing if and when it is obligated to do so hereunder with no outstanding breach or unsatisfied closing condition by Seller).

(b)     Breach by Buyer. In the event of termination of this Agreement pursuant to Section 6.01(f) due to a breach by Buyer, Sellers shall be entitled to to retain the Deposit as liquidated damages.

(c)     Deposit.

25

      (i)     In the event of a valid termination of this Agreement pursuant to Section 6.01(f) due to a breach by Buyer, Sellers shall be entitled to receive the Deposit. In the event of such termination, the Parties shall direct the Escrow Agent to pay the Deposit to Sellers. The Sellers' receipt of the Deposit pursuant to this Section 6.02(c) is the only remedy available and will be liquidated damages.

      (b)     In the event of termination of this Agreement pursuant to Section 6.01 (except pursuant to Section 6.01(f)), the Parties shall direct the Escrow Agent to promptly return the Deposit to Buyer.

6.03   <u>Procedure Upon Termination</u>.  In the event of termination by Buyer or Seller, or both, pursuant to <u>Section 6.01</u>, notice thereof shall forthwith be given to the other party.  If this Agreement is terminated as provided herein, each party shall redeliver all documents, work papers and other material of any other party relating to the transactions contemplated by this Agreement, whether so obtained before or after the execution hereof, to the party furnishing the same as soon as reasonably practicable following termination.

## ARTICLE VII
### BANKRUPTCY COURT APPROVAL OF THE "STALKING HORSE" BIDDER

7.01   <u>Motions and Notices Regarding Sale of Assets and Assumption and Assignment of Assumed Executory Contracts</u>

   (a) Seller shall seek prompt entry of the Sale Order pursuant to the Sale Motion after sufficient notice has been given, which Sale Order shall include, among other things, findings of fact and conclusions of law that the Buyer is not a successor-in-interest to the Seller or any Affiliate of Seller and that the Buyer is a good faith purchaser pursuant to Bankruptcy Code section 363(m).

   (b) The Seller covenants that, to the extent that it has not done so prior to the date of this Agreement, they shall promptly serve the third parties who are parties to Assumed Executory Contracts (such third parties being "***Cure Obligees***") with written notice of proposed cures on the Assumed Executory Contracts (such notice being the "***Cure Notice***"), which Cure Notice shall be provided to the Buyer within the time periods provided by the Bidding Procedures Order. The Cure Notice shall, as set forth in the Bidding Procedures Order, establish a deadline reasonably in advance of the Closing Date by which Cure Obligees must object to respective proposed cures or be deemed to have waived any such objection.

7.02   <u>Requests for Information</u>.  From the date of the approval of the Bidding Procedures Order (a) if the Seller supplies any information regarding the Business to a potential bidder not heretofore given to the Buyer, the Seller shall further provide the Buyer with a copy of such information within 24 hours of providing that information to any other potential bidder; and

(b) with respect to any bid, term sheet, or written expression of interest by any other party for any asset or assets of any Seller, or any other reorganization proposal, submitted prior to the bid deadline established in the Bidding Procedures Order, the Seller shall provide the Buyer with prompt notice of such proposal.

7.03    <u>Break-Up Fee</u>.  If this Agreement is terminated for any reason except pursuant to <u>Section 6.01(a)</u> or <u>Section 6.01(f),</u> then in consideration of the real and substantial benefits conferred by the Buyer upon the Seller's bankruptcy estate by providing a minimum floor bid upon which the Seller, its creditors and the other bidders were able to rely and in consideration of the time, expense and risks associated with serving as the "Stalking Horse" Bidder, including legal fees and expenses, overhead costs, due diligence expenses and other similar expenses related to the negotiation and preparation of this Agreement and of all related transactional documentation, due diligence and representation, the Seller shall pay to the Buyer, at the time of the closing of the sale of the Acquired Assets to the successful bidder for the Acquired Assets, solely from the sale proceeds received by the Seller from the closing of the Acquisition Transaction, provided that the Buyer is not then in material default of its obligations under this Agreement, the Break-Up Fee. The Seller and Buyer agree and stipulate that the Buyer has provided a mutual benefit to the Seller's estate by increasing the likelihood that the best possible price for the Acquired Assets shall be received and that the Break-Up Fee is reasonable and appropriate in light of the size and nature of the proposed sale transactions and comparable transactions, the commitments that have been made and the efforts that have and shall be expended by the Buyer and were necessary to induce the Buyer to pursue the transactions contemplated hereby under the terms of this Agreement. The Break-Up Fee also shall serve as liquidated damages with respect to any claims the Buyer may have against the Seller in connection with the Seller's failure to close the sale of the Acquired Assets to the Buyer as contemplated by this Agreement and Buyer shall provide a release to the Seller of any and all such claims upon payment of the Break-Up Fee.

7.04    <u>Defense of Orders</u>.  The Seller, at its sole cost and expense, shall diligently defend the Bidding Procedures Order and the Sale Order in the event that any motion for reconsideration or appeal of such Orders is filed.

## ARTICLE VIII
CLOSING

8.01    <u>Closing</u>.

(a) Subject to satisfaction of the terms and conditions of this Agreement, including those set forth in <u>Article V</u>, the consummation of the transactions this Agreement contemplate (the "***Closing***") will occur on a date (the "***Closing Date***") not later than the first day of the first month after not less than five (5) Business Days after the satisfaction or waiver of all conditions in <u>Article V</u>, or on such other date as Buyer and Seller mutually agree; provided, however, that the Closing Date shall not be required to occur prior to seventy-

27

five (75) days after the entry of the Sale Order, but the Buyer may elect to the Closing at any point prior.

(b)    The Closing shall be held at a location and on a date and at a time mutually agreed upon by Seller and Buyer, but absent such agreement shall be held at a time and place in Des Moines, Iowa, designated by Buyer in writing to Seller, unless mutually agreed-upon that the closing shall occur by mail or electronic mail by delivery of the closing items. Notwithstanding the foregoing time and place of Closing, Seller and Buyer may deliver all of their respective closing documents required hereunder with respect to the Closing on or before the Closing Date (to hold in escrow in accordance with customary conveyancing practices subject to the consummation of the Closing) by mail, electronic mail, or overnight courier.

8.02    Seller's Closing Documents.  Seller will deliver to Buyer the following documents at Closing in form and substance acceptable to Buyer:

(a)    Warranty Deed.  A general warranty deed conveying to Buyer title to the purchased Land and Improvements in fee simple, free and clear of all Liens and Encumbrances, except Permitted Encumbrances.

(b)    Bills of Sale.  One or more Bills of Sale containing general warranty of title conveying to Buyer the purchased Equipment, the Intangible Personal Property, the Records, and all components of the Facilities that constitute personalty, free and clear of all Liens and Encumbrances.

(c)    Records.  Originals of all Records in the possession of Seller; *provided, however*, that Seller shall retain copies of such records as may be necessary to administer Excluded Assets and otherwise administer the bankruptcy estate until such time as it can be closed.

(d)    Title Policy.  If applicable, the title policy described in Section 4.01 of this Agreement.

(e)    Closing Certificate. A Seller's closing certificate reaffirming Seller's representations and warranties hereunder.

(f)    Other Documents. Other documents as Buyer reasonably requests to accomplish the transactions this Agreement contemplates, or to evidence Seller's compliance with its covenants and agreements in this Agreement.

8.03    Closing Costs.  Seller has or will pay (i) the cost of preparing the Warranty Deed,  (ii) the cost of the title abstract or title insurance provided herein, and (iii) the fees of its counsel. Buyer will pay (x) the cost of the Survey, (ii) the cost of any environmental site assessment, (y) the per page recording costs associated with recording the warranty deed, and (z) the fees of its counsel.  All security deposits referenced in any Assumed Lease shall be credited to Buyer at Closing.  The rent payable under any Assumed Lease shall be prorated as of the Closing Date.

28

8.04    Prorations.  The parties agree to the following prorations:

(a)    Accounts Receivable.  Except as otherwise set forth in this Agreement, Accounts Receivable generated by transactions or business operations occurring prior to the Closing Date (or such earlier date as Buyer may assume responsibility for operations and costs under a transition services agreement or operations lease) shall remain Seller's property. Buyer and Seller may arrange for Buyer to collect such Accounts Receivable pursuant to the terms of a mutually agreed-upon ancillary agreement

(b)    Accounts Payable.  Except as otherwise set forth in this Agreement (including within the definition of Assumed Liabilities), Seller will be solely responsible for all accounts payable resulting from the ownership and/or operation of the Facilities prior to Closing (or such earlier date as Buyer may assume responsibility for operations and costs under the Management Agreement). Buyer will be solely responsible for all accounts payable resulting from the ownership and/or operation of the Facilities after Closing Date (or such earlier date under the Management Agreement) or the assumption of the Assumed Liabilities.

8.05    Adjustments to the Purchase Price.  The following adjustments will be made at Closing, as of 11:59 p.m. on the day preceding the Closing Date, and will be added to the Purchase Price or credited against the Buyer's payment obligations at Closing, as the case may be.

(a)    Taxes.  Real property Taxes, real and personal ad valorem Taxes, and similar charges will be prorated as of the Closing Date in the manner customary for real estate transaction in Iowa.  Because real property Taxes are paid in arrears, the portion of the Taxes allocable to Seller will be credited to Buyer on the closing statement.

(b)    Special Assessments.  Seller will pay in full all improvement lien assessments, if any, whether or not due and payable as of the Closing Date. Special assessments, whether pending or to become a lien prior to Closing, or payable in installments, or for which a change of assessment may be levied on Buyer after Closing, will be credited to Buyer in full at Closing.

(c)    All expenses arising from the conduct of the business of the Facility in the ordinary course, including, without limitation trade payables, telephone expenses and utility charges attributable to the Facility, including any such items held in escrow (all such income and expenses to be referred to herein as the "***Prorated Items***"), shall be apportioned between Seller and Buyer as of the Closing Date, it being the agreement of the Parties that Seller shall be entitled to and responsible for all expenses and similar obligations arising from the operation of the Facilities prior to the Closing Date and Buyer shall be entitled to and responsible for all expenses and similar obligations arising from the operation of the Facilities from and after the Closing Date, except, in each case, as otherwise expressly set forth herein.  All such prorations shall be made based on actual days elapsed in the relevant accounting, billing or revenue period. Utility charges which are not metered and read for the Closing shall be estimated based

29

on prior charges.  Based on reasonable estimates, the Parties shall make all prorations at the Closing, and all such prorations shall be effectuated through adjustment of the Purchase Price at Closing.

## ARTICLE IX
### CASUALTY; RISK OF LOSS

9.01    <u>Casualty</u>.    In the event of a casualty causing substantial damage to the Facilities before the date of possession, Buyer may (at its option) rescind this Agreement, or may proceed to Closing and receive any insurance proceeds associated with such casualty.

9.02    <u>Risk of Loss Generally</u>.  Except as otherwise specifically provided above or as otherwise agreed by Buyer and Seller in any Ancillary Agreement, risk of loss from the Facilities, including by operation of any law that would impose liability relating to ownership of the Facilities, will not pass to Buyer until acceptance of the deed.

## ARTICLE X
### ADDITIONAL COVENANTS

10.01    <u>Cost Reports</u>. Seller will file or cause to be filed all cost reports required to be filed with CMS prior to the Closing Date (or such earlier date as Buyer may assume responsibility for operations and costs under a transition services agreement or operations lease). Buyer will file or cause to be filed all cost reports required to be filed on or after the Closing Date (or such earlier date as Buyer may assume responsibility for operations and costs under a transition services agreement or operations lease).

10.02    <u>Conduct of Business</u>. From the Execution Date through the Closing Date (or such earlier date as Buyer may assume responsibility for operations and costs under a transition services agreement or operations lease), Seller will, except as expressly provided herein or as otherwise agreed by Buyer and Seller in an Ancillary Agreement, or as the Bankruptcy Code prohibits, maintain and conduct its business in the ordinary course of business.

10.03    <u>Employees</u>.  Buyer and Seller shall consult in good faith about the status of employment of Seller's employees following the Execution Date and prior to the Closing Date.  In the absence of any direction from Buyer, prior to or as of the Closing Date, Seller may terminate any of Seller's employees.  Seller assumes all obligations under the federal WARN Act and any analogous provision of applicable state law with regard to all terminated employees, to the extent the WARN Act or such state law applies. Buyer may offer employment to some or all of Seller's employees, but has no obligation to offer employment to any employee of Seller. Buyer has no obligation whatsoever to any person whom Seller currently, or has previously, employed unless Buyer employs that person after the Closing Date.

30

10.04    <u>COBRA Coverage</u>. Seller will be responsible for offering and providing any COBRA Coverage with respect to any "qualified beneficiary" who is covered by an Employee Plan that is a "group health plan" and who experiences a "qualifying event" prior to the Closing Date. Buyer will be responsible for offering and providing any COBRA Coverage required with respect to any Seller employee (or other qualified beneficiary) hired by Buyer who becomes covered by a group health plan sponsored or contributed to by Buyer, and who experiences a qualifying event after the Closing Date. For purposes of this Section 8.03(b), "qualified beneficiary," "group health plan," and "qualifying event" each have the meaning set forth in Section 4980B of the Code.

10.05    <u>Employee Information</u>. To the extent not prohibited by applicable law, Seller will provide Buyer all information relating to any employee that Buyer may, for potential employment purposes, reasonably request, including personnel files, initial employment dates, employee health files, licenses, professional certifications, Form I-9, termination dates, reemployment dates, hours of service, and compensation and tax withholding history.

10.06    <u>Employee Plans</u>. Seller shall be responsible for providing all information, forms, and other administrative assistance and materials required of a plan administrator with respect to all Employee Plans for its employees that are terminated in connection with the sale of the Acquired Assets.

10.07    <u>Taxes; Expenses</u>. Buyer will pay all Taxes (other than income Taxes) or recording fees payable as a result of the sale of the Acquired Assets pursuant to this Agreement or any other action contemplated hereby, including fees paid to the Iowa Attorney General, the U.S. Attorney General, and any other governmental agency. The parties will cooperate in preparing, executing, and filing all returns, questionnaires, applications, and other documents regarding Taxes and all transfer, recording, registration and other fees that become payable in connection with the transactions that this Agreement contemplates that are required or permitted to be filed at or prior to Closing.

10.08    <u>Transfer of Resident Trust Funds and Deposits</u>.

     (a)    Within five (5) Business Days of the Closing Date, Seller shall deliver to Buyer a true, correct and complete schedule of all trust funds held by Seller as of the most recent date available prior to the Closing Date for any current resident of the Facilities (collectively, the "***Resident Trust Funds***") and deposits or prepayments paid by or for any resident of the Facilities (collectively, the "***Resident Deposits***").

     (b)    At the Closing, Seller shall transfer the Resident Trust Funds and Resident Deposits to Buyer, and Buyer shall accept, the Resident Trust Funds and Resident Deposits in trust for the residents, in accordance with applicable statutory and regulatory requirements. Within ten (10) Business Days after the Closing Date, Seller and Buyer shall prepare a final schedule of the Resident Trust Funds and Resident Deposits and thereafter reconcile the Resident Trust Funds and Resident Deposits transferred from Seller to Buyer.

31

## ARTICLE XI
## NO SURVIVAL; NO INDEMNIFICATION

The covenants, obligations, representations and warranties of Buyer and Seller contained in this Agreement, any exhibit or schedule hereto, or any certificate or document delivered pursuant hereto shall not survive beyond the Closing. Neither party shall have any liability to the other after Closing for any breach thereof. Buyer agrees that it is purchasing the Acquired Assets as is, where is. Notwithstanding this provision, the parties may agree to limited survival and related indemnification rights for obligations that remain uncompleted as of the Closing Date in an Ancillary Agreement.

## ARTICLE XII
## REMEDIES FOR FAILURE TO CLOSE

12.01   Attorneys' Fees.  In the event either party brings a lawsuit or other proceeding against the other party to enforce any provisions of this Agreement or any instrument executed pursuant to this Agreement, the prevailing party will be paid all costs and reasonable attorney's fees by the other party, such costs and reasonable attorney's fees will be included in any such judgment.  For purposes of this Section 10.02, "prevailing party" means, in the case of a Person asserting a claim, the Person is successful in obtaining substantially all of the relief sought, and in the case of a Person defending against or responding to a claim, the Person is successful in denying substantially all of the relief sought.

12.02   Waiver.  No delay in exercising any right or remedy will constitute a waiver thereof, and no waiver by Seller or Buyer of the breach of any covenant of this Agreement shall be construed as a waiver of any preceding or succeeding breach of the same or any other covenant or condition of this Agreement.

## ARTICLE XIII
## MISCELLANEOUS

13.01   Assignability.  Buyer may assign this Agreement in whole or in part and/or designate a nominee to take title to all or any part the Facilities or the operations thereof at Closing without the consent of Seller, provided that such assignment and/or designation shall only be to an Affiliate of Buyer, and provided that Buyer shall remain fully bound by the terms and conditions of this Agreement.  Any assignment of this Agreement shall be binding upon and inure to the benefit of the successor or assignee of Buyer.  In the event Buyer finds it necessary or is required to provide to a third party a collateral assignment of the Buyer's interest in this Agreement and/or any related documents, Seller shall cooperate with the Buyer and any third party requesting such assignment including but not limited to Seller signing a consent and acknowledgment of such assignment.

13.02   Entire Agreement.  This Agreement constitutes the entire contract between the parties, and may not be modified except by an instrument in writing that both of them sign.  All of the schedules and exhibits to this Agreement are incorporated by this reference.

32

13.03   <u>Governing Law</u>.  This Agreement will be interpreted, construed, and enforced pursuant to the laws of the State of Iowa without giving effect to the choice of law rules thereof.

13.04   <u>Notice</u>.  All notices and other communication allowed or required under this Agreement will be in writing, and delivered by either hand delivery, overnight courier, or Regular First Class U.S. Mail, postage prepaid, and addressed as follows:

| | |
|---|---|
| If to Seller: | If to Buyer: |
| QHC Facilities LLC<br>8350 Hickman Road, Suite 15<br>Clive, IA 50325<br>Attn: Mark Hidlebaugh, Member | Blue Care Homes, LLC<br>c/o Blue Diamond Equities LLC<br>PO Box 156<br>Lakewood, NJ 08701<br>Attn: Sam Haikins<br>Email: sam@bdequities.com |
| With a copy to: | |
| Jeffrey D. Goetz, Esq.<br>Bradshaw Fowler Proctor & Fairgrave,<br>P.C.<br>801 Grand Avenue, Suite 3700<br>Des Moines, IA 50309-8004 | With a copy to:<br><br>Law Office of Jacob Unger<br>5404 Whitsett Ave., Suite 182<br>Valley Village, CA 91607<br>Attn: Jacob Unger<br>Email: junger@jacobungerlaw.com |

All notices provided in accordance with this Section delivered by hand or by overnight courier will be deemed delivered and received on the delivery date.  All notices delivered by First Class Mail will be deemed delivered and received four (4) Business Days after being placed for delivery with the U.S Postal Service.

13.05   <u>Section Headings; Drafting Party</u>.  The headings of this Agreement are for convenience of reference only, do not form a part of this Agreement, and do not in any way modify, interpret or construe the intentions of the parties. The provisions of this Agreement have been examined, negotiated, drafted and revised by counsel for each party, and no implication will be drawn against any party by virtue of the drafting of this Agreement.

13.06   <u>Waivers</u>.  Any waiver by any party of any violation of, breach of or default under any provision of this Agreement or any exhibit, schedule or other document referred to in this Agreement by any other party will not be construed as or constitute a waiver of any subsequent violation, breach of, or default under that provision or any other provision of this Agreement, or any Exhibit, Schedule or other document referred to in this Agreement.

13.07   <u>Further Assurances</u>. Each of the parties will, at any time and from time to time after the Closing, execute and deliver, or cause to be executed and delivered, to the other party or

33

their designee, such further consents, approvals, conveyances, assignments and other documents and instruments as any party shall reasonably request in order to carry out any and all of the terms and provisions of this Agreement.

13.08   Counterparts.  This Agreement may be executed in several counterparts and by facsimile transmission or email scan, each of which when so executed and delivered will be deemed an original, but all of which together shall constitute one and the same instrument.

13.09   Binding Effect.  This Agreement will be binding upon and inure to the benefit of the parties to this Agreement and their respective successors, heirs, assigns and legal representatives Waiver of Jury Trial. BUYER AND SELLER WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM, OR COUNTERCLAIM, WHETHER IN CONTRACT OR TORT, AT LAW OR IN EQUITY, ARISING OUT OF OR IN ANY WAY RELATED TO THIS AGREEMENT, OR THE TRANSACTIONS THAT THIS AGREEMENT CONTEMPLATES

13.10   Jurisdiction; Venue; Service of Process. Any litigation arising out of or relating to this Agreement, or the transactions this Agreement contemplates, will be brought in the Bankruptcy Court or a court located in Polk County, Iowa. Seller and Buyer consent to the jurisdiction of any such court. **The parties each waive personal service of process in any litigation arising out of or relating to this Agreement or any transaction this Agreement contemplates, and agree that all such service of process may be made in the manner set forth for notices in Section 11.04 of this Agreement, and that service so made will be deemed completed one (1) day after delivered in compliance with Section 11.04 of this Agreement. The parties expressly waive any other requirements of notice or personal service that any applicable Law may require.**

13.11   Exhibits and Schedules.  If any exhibits or schedules are not attached hereto, the parties agree to attach such exhibits and schedules as soon as reasonably practicable but in any event prior to ten (10) days before the Closing Date.  The Parties agree that the Party charged with providing an exhibit or schedule to this Agreement shall, to the extent necessary after delivery thereof, amend or supplement all exhibits and schedules in order for the same to be current, true and correct as of the Closing Date.  The inclusion of any new schedule or exhibit, or supplement thereto, shall be subject to such party approving any new exhibits and schedules or supplements thereto within seven (7) days of submission thereof.

## ARTICLE XIV
## BANKRUPTCY MATTERS

14.01   Sale Order. The Sale Order will provide, *inter alia*, that pursuant to 11 U.S.C. Sections 105, 363, and 365: (i) this Agreement and the transactions contemplated hereby are approved; (ii) Buyer will have and acquire at the Closing good, valid, marketable title to the Acquired Assets free and clear of all interests, Claims, Encumbrances, or Liens (except for Permitted Encumbrances and Assumed Liabilities) to the maximum extend provided

under 11 U.S.C. Sections 105, 363, and 365; (iii) Seller will assume and assign to Buyer all of the Assumed Executory Contracts as of the Closing Date; (iv) the Assumed Executory Contracts will be in full force and effect from and after the Closing with non-debtor parties being barred and enjoined from asserting against Buyer, *inter alia*, defaults, breaches or claims of pecuniary losses existing as of the Closing or by reason of the Closing; (v) Buyer is acquiring the Acquired Assets free and clear of the Excluded Liabilities and providing for a full release of Buyer with respect to the Excluded Liabilities; (vi) the activities and results of the marketing and auction conducted in connection with the sale, if any, are approved; (vii) Buyer will be found to be a good faith purchaser within the meaning of 11 U.S.C. Section 363(m); and (viii) the Bankruptcy Court will waive any stay that would otherwise be applicable to the immediate effectiveness of the Sale Order pursuant to Fed. R. Bankr. P. 6004(h) and 6006(d).


[signatures on following page]

35

IN WITNESS WHEREOF, the parties have executed this Agreement effective as of the date and year first written.

BLUE CARE HOMES, LLC

a New Jersey limited liability company

By: _____

Name: Sam Haikins

Its:    Manager


QHC FACILITIES, LLC


By: _____

Its: Managing Member


QHC MANAGEMENT, LLC


By: _____

Its: Managing Member

DocuSign Envelope ID: 7BC844C1-9507-4E36-BCB5-[illegible]

QHC MITCHELLVILLE, LLC

_____

By: _____

Its: Managing Member

QHC WINTERSET NORTH, LLC

_____

By: _____

Its: Managing Member

QHC MADISON SQUARE, LLC

_____

By: _____

Its: Managing Member

37

QHC FORT DODGE VILLA, LLC

_____

By: _____

Its: _____

QHC HUMBOLDT NORTH, LLC

_____

By: _____

Its: _____

QHC HUMBOLDT SOUTH, LLC

_____

By: _____

Its: _____

38

QHC VILLA COTTAGES, LLC

By: _____

Its: Managing Member

CRESTRIDGE, INC.

By: _____

Its: Managing Member

CRESTVIEW ACRES, INC.

By: _____

Its: Managing Member

39

**EXHIBITS**

Exhibit A:      Facilities

Exhibit B:      Land

Exhibit C:      Purchase Price Allocation

## SCHEDULES

| | |
|---|---|
| Schedule 2.01(i) | Assumed Benefit Plans |
| Schedule 2.08(a) | Assumed Executory Contracts |
| Schedule 2.08(b) | Accrued PTO |
| Schedule 3.01(e): | Litigation |
| Schedule 3.01(o) | Certificates of Need |
| Schedule 3.01(s) | Permits |
| Schedule 3.01(t) | Compliance |
| Schedule 3.01(u) | Licensed Beds and Current Rate |
| Schedule 3.01(y) | Financial Information |
| Schedule 3.01(z) | Real Property |

# EXHIBITS TO APA

## EXHIBIT A

## FACILITIES

### Skilled Nursing:

Crestridge, Inc.
1015 Wesley Dr.
Maquoketa, IA 52060-2637

Crestview Acres, Inc.
1485 Grand Ave
Marion, Iowa 52302-5219

Sunnycrest Nursing Center
401 Crisman St.,
Dysart, IA  52224-9520

Fort Dodge Villa Care Center
2721 10th Ave. North,
Fort Dodge, IA  50501-2834

Humboldt Care Center North
1111 11th Ave N
Humboldt, IA 50548-1225

Humboldt Care Center South
800 13th St S
Humboldt, IA 50548

Mitchell Village Care Center
114 Carter St. SW
Mitchellville, IA 50169-5000

Winterset Care Center North
411 East Lane St.
Winterset, IA 50273-1217

### Assisted Living:

Villa Cottages
925 Martin Luther King Dr.
Fort Dodge, IA 50501-2866

Madison Square Assisted Living
209 W Jefferson St.
Winterset, IA 50273-1676

# EXHIBIT B
# LAND

## Crestridge, Inc

Property Address: 1015 Wesley Drive, Maquoketa, IA 52060

Legally described as follows:

The South fourth of the East fourth of the Northwest quarter (NW 1/4) of the Southwest quarter (SW 1/4) of Section Twenty-Four (24), Township Eighty-Four (84) North, Range Two (2) East of the 5th P.M., Jackson County, Iowa; EXCEPTING THEREFROM the West twenty (20) feet thereof;

AND

Commencing twenty (20) rods West of the Southeast corner of the West half (W1/2) of the Northeast quarter (NE1/4) of the Southwest quarter (SW 1/4) of Section twenty-four (24), Township eighty-four (84) North, Range two (2) East of the 5th P.M., Jackson County, Iowa; thence West twenty (20) rods to the Southwest corner of the Northeast quarter (NE 1/4) of said Southwest quarter (SW 1/4) of said Section twenty-four (24); thence North twenty (20) rods; thence East twenty (20) rods more or less to West line of land heretofore conveyed to Leonard Seaver to Williams P. Thomas; thence South twenty (20) rods to the place of beginning; EXCEPTING THEREFROM Lots one (1), two (2), three (3), and four (4) according to survey by J. G. Thorne dated July 23, 1966, and recorded in Plat Book 1 Page 143, Office of the Recorder of Jackson County, Iowa, together with any interest in the street along the East side thereof;

AND

Beginning on the West line of Western Avenue in the City of Maquoketa, Jackson County, Iowa, nine hundred ninety (990) feet South of the point of intersection of the centerline of West Platt Street and the West line of said Western Avenue; thence West one hundred twenty (120) feet to the point of commencement; thence West four hundred ninety (490) feet; thence North ten (10) feet; thence East four hundred ninety (490) feet; thence South ten (10) feet to the point of commencement, all in the North half (N1/2) of the Southwest quarter (SW 1/4) of Section twenty-four (24), Township eighty-four (84) north, Range two (2) East of the 5th P.M. in the City of Maquoketa, Jackson County, Iowa

## Crestview Acres, Inc.

Property Address: 1485 Grand Ave, Marion Iowa 52302-5219

Legally described as follows:

> South 417 feet of North 457 feet of West 417 feet of East 447 feet of Lot 1,
> "auditor's Plat No. 202, Linn County, Iowa.

## Crestview Acres, Inc. dba Sunnycrest Nursing Center

Property Address: 401 Crisman St., Dysart, IA  52224-9520

Legally described as follows:

> Lots Ten (10), Eleven (11) and Twelve (12), Block Seventeen (17) Dysart, Iowa.

## QHC Fort Dodge Villa LLC dba Fort Dodge Villa Care Center

Property Address: 2721 10th Ave. North, Fort Dodge, IA  50501-2834

Legally described as follows:

> A tract of land located in the NE ¼ of the NW ¼ of Section 21-89-28 West of the
> 5th P.M., City of Fort Dodge, Webster County, Iowa, more particularly described
> as follows: Commencing at the Northeast corner of the said NW ¼; thence
> N89°33'00"W 198 feet along the North line of the said NW ¼;  thence
> S00°00'00"W 33.00 feet to the South right of way line of 10th Avenue North, to
> the point of beginning; thence continuing S00°00'00"W 481.01 feet; thence
> N89°33'00"W 423.51 feet to a point on the East right of way line of North 27th
> Street; thence N00°02'00"E 481.00 feet along the said East right of way line to a
> point on the South right of way line of 10th Avenue North; thence S89°33'00"E
> 423.24 feet along the said South right of way line to the point of beginning,
> containing 4.67 acres.

## QHC Villa Cottages, LLC dba Villa Cottages

Property Address: 925 Martin Luther King Dr., Fort Dodge, IA 50501-2866

Legally described as follows:

> A tract of land located in the NE 1/4 of the NW 1/4 of Section 21-89-28 West of
> the 5th P.M., City of Fort Dodge, Webster County, Iowa, more particularly
> described as follows:  Commencing at the  Northeast corner of  the said NW 1/4;
> thence N89°33'00"W 198.00 feet along the North  line of the said  NW 1/4;
> thence S00°00'00"W 514.01 feet to the point of beginning; thence continuing

S00°00'00"W 46.85 feet to a point 116.00 feet normally distant northwesterly from the centerline of the Chicago & Northwestern Railway right of way; thence S50°27'00"W 549.54 feet along a line parallel with the said Railroad centerline to a point on the East right of way line of North 27th Street; thence N00°02'00"E 400.10 feet along the said East right of way line; thence S89°33'00"E 423.51 feet to the point of beginning, containing 2.17 acres,

AND

Part of the vacated North 24th Street located in the NE1/4 of the NW 1/4 of Section 21-89-28 West of the 5th P.M., City of Fort Dodge, Webster County, Iowa, more particularly described as follows: Commencing at the North Quarter corner of the said Section 21 (said North Quarter corner also being the Northeast corner of said NE 1/4 of the NW 1/4); thence S00°00'00"W 33.00 feet along the East line of the said NE 1/4 of the NW 1/4 to the South right of way line of 10th Avenue North; thence N89°33'00"W 198.00 feet along the South right of way line; thence S00°00'00"W 527.86 feet to a point on the Northerly right of way line of vacated 24th Avenue North being the point of beginning; thence S50°26'20"W 549.54 feet along the said northerly right of way line to a point on the East right of way line of North 27th Street; thence S00°02'00"W 85.66 feet along the said East right of way line of North 27th Street to a point on the northerly railroad right of way line; thence N50°26'20"E 549.61 feet along the said Northerly railroad right of way line; thence N00°00'00"E 85.61 feet to the point of beginning

## QHC Humboldt North, LLC dba Humboldt Care Center North

Property Address: 1111 11th Avenue North, Humboldt, IA 50548-1225

Legally described as follows:

Parcel One:

All of Lot One (1) and the East Seventeen and one-half (17 ½) feet of Lot Two (2) of Block Thirty-Seven (37), Second College Addition, City of Humboldt, Humboldt County, Iowa.

Parcel Two:

All of Block Thirty-Six (36) and all of Tilleston Street (vacated) (now Twelfth Street North) between Blocks 36 and 37, all being in Second College Addition to the Town, now City, of Humboldt, Humboldt County, Iowa. (Sec. 36-92-29)

## QHC Humboldt South, LLC dba Humboldt Care Center South

Property Address: 800 13th Street South, Humboldt, Iowa 50548-2439

Legally described as follows:

A tract of land in the Southeast one-quarter (SE ¼) of the Northeast One-Quarter (NE ¼) of Section Eleven (11), Township Ninety-One (91) North, Range Twenty-Nine (29), and more particularly described as follows:  Beginning at the Northeast Corner of said Southeast One-Quarter (SE ¼) of the Northeast One-Quarter (NE ¼), said point being1300.17 feet South of the Northeast Corner of Section Eleven (11), thence South 417.4 feet along East line of Section Eleven (11), thence South 88 degrees 40' 30" West 467.4 feet, thence North 417.4 feet to Point on the North Line of said Southeast One-Quarter (SE ¼) of the Northeast One-Quarter (NE ¼); thence North 88 degrees 40' 30" East 467.4 feet along said North line to Point of Beginning, except the North Thirty-Three (33) feet of North Edge and except that part conveyed to the State of Iowa by Warranty Deed recorded in Book 260, Page 276, and more particularly described as follows:  Commencing at the E ¼ corner of said Sec. 11; thence N00°07'29"E, 883.35 ft. along the East line of the NE ¼ said Sec. 11 to the SE corner of said tract; thence continuing along said line N00°07'29"E, 384.34 ft.; thence S88°48'50"W, 65.02 ft.; thence S00°07'29"W, 204.40 ft; thence S07°14'59"W, 120.93 ft.; thence S00°07'29"W, 60.30 ft. to a point on the South line of said tract; thence N88°48'09"E, 80.02 ft. along said line to the Point of Beginning; containing 0.61 acre, more or less, including 0.44 acre, more or less, in existing right of way.

## QHC Madison Square, LLC dba Madison Square

Property Address: 209 W. Jefferson St., Winterset, IA  50273-1676

Legally described as follows:

Units #101, #102, #103, #104, #106, #107, #108, #201, #202, #203, #204, #205, #206, #208, #301, #302, #303, #304, #305, #306, #307, and #308 of Jefferson Place in the City of Winterset, Madison County, Iowa, and an undivided interest in the common elements and areas of Jefferson Place, as shown in the Declaration of Condominium of Jefferson Place filed for record on April 14, 1995 in Town Lot Deed Record 60 at page 159 in the Madison County Recorder's Office (and any supplements and amendments thereto).

AND

Unit #207 of Jefferson Place in the City of Winterset, Madison County, Iowa, and an undivided interest in the common elements and areas of Jefferson Place as shown in the Declaration of Condominium of Jefferson Place filed for record on April 14, 1995 in Town Lot Deed Record 60 at page 159 in the Madison County Recorder's Office (and any supplements and amendments thereto).

## QHC Mitchellville, LLC dba Mitchell Village Care Center

Property Address: 114 Carter St. SW, Mitchellville, IA  50169-5000

Legally described as follows:

> All of Block 6, (except the East 165 feet and except the South 140 feet and except the West 126.33 feet) in Sage's Addition to Mitchellville, Polk County, Iowa.

## QHC Winterset North, LLC dba Winterset Care Center North

Property Address: 411 East Lane St., Winterset, IA  50273-1217

Legally described as follows:

A tract of land located in the Northwest Fractional Quarter (1/4) of the Northwest Fractional Quarter (1/4) of Section Thirty-one (31) in Township Seventy-s9x (76) North, Range Twenty-seven (27) West of the 5th P.M., City of Winterset, Madison County, Iowa, more particularly described as follows, to-wit: Commencing at the Southwest corner of the Northwest Fractional Quarter (1/4) of the Northwest Fractional Quarter (1/4) of said Section Thirty-one (31), thence South 88°37' East, 935.1 feet along the South line of said Northwest Fractional Quarter (1/4) of the Northwest Fractional Quarter (1/4) to the point of beginning, thence continuing South 88°37' East, 347.2 feet, thence North 506.5 feet, thence North 88° 37' West, 347.2 feet, thence South 506.5 feet to the point of beginning, containing 4.0359 acres.

# EXHIBIT C

## PURCHASE PRICE ALLOCATION

| Asset | Beds | PPB | Allocated Price |
|-------|------|-----|-----------------|
| Crestridge Care Center | 75 | $16,511.67 | $1,238,375.40 |
| Crestview Acres | 100 | $8,806.23 | $880,622.51 |
| Fort Dodge Villa Care Center | 107 | $15,410.89 | $1,648,965.65 |
| Humboldt Care Center North | 90 | $17,612.45 | $1,585,120.52 |
| Humboldt Care Center South | 40 | $11,007.78 | $440,311.26 |
| Madison Square | 42 | $44,031.13 | $1,849,307.27 |
| Mitchell Village Care Center | 65 | $15,410.89 | $1,001,708.10 |
| Sunnycrest Nursing Center | 50 | $16,511.67 | $825,583.61 |
| Winterset Care Center North | 75 | $18,713.23 | $1,403,492.12 |
| Villa Cottages | 20 | $36,325.68 | $726,513.56 |
| **Total** | **664** | | **$11,600,000.00** |

**Section 2.01(i)**

**Employment Benefit Plans**

1.  QHC Salaried and Hourly Employees' Nationwide 401(k) Plan.

2.  QHC Salaried and Hourly Employees Medical Plan, provided by Wellmark (Group #52500).

3.  QHC Salaried and Hourly Employees Dental Plan, provided by Guardian Life Insurance CO. (Group #00379980).

4.  QHC Salaried and Hourly Employees Vision Plan, provided by Guardian Life Insurance Co (Group #00379980).

5.  QHC Salaried and Hourly Employees Basic Life and Accidental Death & Dismemberment Plan, provided by Guardian Life Insurance Co (Group #00379980).

6.  QHC Salaried and Hourly Employees Short-Term and Long-Term Disability Plan, provided by Aflac, (only for employees who wish to purchase)

**Schedule 2.08(a)**

**Assumed Executory Contracts**

**QHC Facilities, LLC**

None

**QHC Management, LLC**

None

**Crestridge, Inc**.

| Contract | Cure Costs[1] |
|---|---|
| 1.  All Resident Admission Agreements | $0 |
| 2.  Medicare Provider Agreement, #0806406 | $32,182.17 |

**FORT DODGE VILLA**

| Contract | Cure Costs |
|---|---|
| 1.  All Resident Admission Agreements | $0 |
| 2.  Medicare Provider Agreement #165265 | $689,916.00 |

**HUMBOLDT NORTH**

| Contract | Cure Costs |
|---|---|

---

[1] Amount reflects the value of each Cure Cost as of the Agreement Date. Such amounts are subject to change prior to Closing in accordance with Section 1.03(b) of the Agreement as a result of Buyer's ongoing negotiations with creditors of Seller. All Medicare Provider Agreement Cure Amounts are being negotiated with the government and the Debtors will be seeking waiver of penalties.

| 1. | All Resident Admission Agreements | $0 |
|---|---|---|
| 2. | Medicare Provider Agreement #165533 | $17,500.00 |

## HUMBOLDT SOUTH

| Contract | | Cure Costs |
|---|---|---|
| 1. | All Resident Admission Agreements | $0 |
| 2. | Medicare Provider Agreement #165534 | $47,225.61 |

## CRESTVIEW ACRES

| Contract | | Cure Costs |
|---|---|---|
| 1. | All Resident Admission Agreements | $0 |
| 2. 3. | Crestview Acres Medicare Provider Agreement #165299 Sunnycrest Medicare Provider Agreement #165515 | $93,301.20 |

## MADISON SQUARE

| Contract | | Cure Costs |
|---|---|---|
| 1. | All Resident Occupancy Agreements | $0 |

## MITCHELLVILLE

| Contract | Cure Costs |
|---|---|

| | |
|---|---|
| 1.    All Resident Admission Agreements | $0 |
| 2.    Medicare Provider Agreement #165264 | $253,516.90 |

## VILLA COTTAGES

| Contract | Cure Costs |
|---|---|
| 1.    All Resident Occupancy Agreements | $0 |

## WINTERSET NORTH

| Contract | Cure Costs |
|---|---|
| 1.    All Resident Admission Agreements | $0 |
| 2.    Medicare Provider Agreement #165497 | $128,600.06 |

## Schedule 2.08(b)
### Accrued PTO

| Debtor Facility | Type(s) | Estimate |
|---|---|---|
| QHC Humboldt North LLC | PTO/Vacation | 36,942 |
| QHC Humboldt South LLC | PTO | 23,684 |
| Crestridge Inc. | PTO/Vacation | 68,773 |
| QHC Fort Dodge Villa LLC | PTO | 55,583 |
| QHC Mitchellville LLC | PTO/Vacation | 14,101 |
| Crestview Acres, Inc. (Sunnycrest) | PTO | 33,833 |
| QHC Winterset North LLC | PTO/Vacation | 51,476 |
| | | |
| Madison Square | PTO | 20,569 |
| Villa Cottages | PTO | 22,426 |
| **Value of Accrued PTO/Vacation** | | **327,387** |

\* Estimate as of Payroll Period Ended February 25, 2022 (paid March 4, 2022).

\*\* Calculated using average facility pay rate x total employee PTO/Vacation hours

**Schedule 3.01(e)**

**Litigation**

**Crestview Acres, Inc.**

Linn County Case No. LACV 057567
Plaintiff: Bill Evans, Estate of Becky Hewitt, Jeffrey Evans and Dakota Hewitt
Filed April 14, 2017

**Crestridge, Inc.**

Polk County Case No. LACL151779
Plaintiff: Millennium Rehab & Consulting Group, Inc.
Filed October 26, 2021

Polk County Case No. LACL150417
Plaintiff Camillus Staffing, LLC d/b/a Nextaff
Filed April 12, 2021

**QHC Management, LLC**

Linn County Case No. LACV 057567
Plaintiff: Bill Evans, Estate of Becky Hewitt, Jeffrey Evans and Dakota Hewitt
Filed April 14, 2017

Humboldt County Case No. LACV018706
Plaintiff: Gayle Lemmon, Estate of Ellen McCullough, Dennis McCullough
Filed November 26, 2018

Polk County Case No. LACL151779
Plaintiff: Millennium Rehab & Consulting Group, Inc.
Filed October 26, 2021

Polk County Case No. LACL150417
Plaintiff: Camillus Staffing, LLC d/b/a Nextaff
Filed April 12, 2021

Polk County Case No. LACL149989
Plaintiff: Nicole Bittle
Filed February 22, 2021

Polk County Case No. LACL151446
Plaintiff: Estate of Gladys Mae VanSickle, Tammy VanSickle, Sherrie VanSickle, Clarence E.
Van Sickle
Filed September 9, 2021

**QHC Humboldt South. LLC**

Humboldt County Case No. LACV018706
Plaintiff: Gayle Lemmon, Estate of Ellen McCullough, Dennis McCullough
Filed November 26, 2018

Polk County Case No. LACL151779
Plaintiff: Millennium Rehab & Consulting Group, Inc.
Filed October 26, 2021

Polk County Case No. LACL150417
Plaintiff Camillus Staffing, LLC d/b/a Nextaff
Filed April 12, 2021

Dickinson County Case No. LACV030157
Plaintiff: Grapetree Medical Staffing, LLC
Filed: January 30, 2020
Consolidated into LACV030142 which was dismissed 12/31/20

**QHC Facilities, LLC**

Polk County Case No. LACL151779
Plaintiff: Millennium Rehab & Consulting Group, Inc.
Filed October 26, 2021

Polk County Case No. LACL151446
Plaintiff: Estate of Gladys Mae VanSickle, Tammy VanSickle, Sherrie VanSickle, Clarence E.
Van Sickle
Filed September 9, 2021

**QHC Fort Dodge Villa, LLC**

Polk County Case No. LACL151779
Plaintiff: Millennium Rehab & Consulting Group, Inc.
Filed October 26, 2021

Polk County Case No. LACL150417
Plaintiff Camillus Staffing, LLC d/b/a Nextaff
Filed April 12, 2021

Polk County Case No. LACL149989
Plaintiff: Nicole Bittle
Filed February 22, 2021

**QHC Humboldt North, LLC**

Polk County Case No. LACL151779
Plaintiff: Millennium Rehab & Consulting Group, Inc.
Filed October 26, 2021
**QHC Humboldt North, LLC (Continued)**


Polk County Case No. LACL150417
Plaintiff Camillus Staffing, LLC d/b/a Nextaff
Filed April 12, 2021

**QHC Mitchellville, LLC**

Polk County Case No. LACL151779
Plaintiff: Millennium Rehab & Consulting Group, Inc.
Filed October 26, 2021

Polk County Case No. LACL150417
Plaintiff Camillus Staffing, LLC d/b/a Nextaff
Filed April 12, 2021

**QHC Winterset North, LLC**

Polk County Case No. LACL151779
Plaintiff: Millennium Rehab & Consulting Group, Inc.
Filed October 26, 2021

Polk County Case No. LACL150417
Plaintiff Camillus Staffing, LLC d/b/a Nextaff
Filed April 12, 2021

Polk County Case No. LACL151446
Plaintiff: Estate of Gladys Mae VanSickle, Tammy VanSickle, Sherrie VanSickle, Clarence E.
Van Sickle
Filed September 9, 2021




**Schedule 3.01(o)**

**Certificates of Need**

**None.**

## Schedule 3.01(s)

### Permits

**See attached excel sheet.**

## Schedule 3.01(t)[2]

### Compliance

**Facility Surveys**

**Sunnycrest**

1. Department of Health and Human Services Centers for Medicare and Medicaid Survey dated January 13, 2022.
2. Department of Health and Human Services Centers for Medicare and Medicaid Survey dated June 8, 2021
3. Department of Health and Human Services Centers for Medicare and Medicaid Survey dated April 12, 2021.
4. Department of Health and Human Services Centers for Medicare and Medicaid Survey dated March 25, 2021.
5. Iowa Dept. of Inspections and Appeals Visit Data Sheet
6. Iowa Dept of Public Safety Letter dated 6/8/2021
7. Iowa Dept of Public Safety Letter dated 7/12/2021

**QHC Fort Dodge Villa**

1. Iowa Dept. of Inspections and Appeals Visit Data Sheet
2. Department of Health and Human Services Centers for Medicare and Medicaid Survey dated December 22, 2021.
3. Department of Health and Human Services Centers for Medicare and Medicaid Survey dated December 6, 2021.
4. Department of Health and Human Services Centers for Medicare and Medicaid Survey dated October 6, 2021.
5. Department of Health and Human Services Centers for Medicare and Medicaid Survey dated February 10, 2021.
6. Fire Marshall Survey dated 2/2/2021

**QHC Humboldt South**

1. Iowa Dept. of Inspections and Appeals Visit Data Sheet
2. Department of Health and Human Services Centers for Medicare and Medicaid Survey dated January 11, 2022.

---

[2] All surveys will be submitted into the Data Room

3. Department of Health and Human Services Centers for Medicare and Medicaid Survey dated July 7, 2021.
4. Department of Health and Human Services Centers for Medicare and Medicaid Survey dated June 7, 2021
5. CMS Letter dated February 15, 2022.

**QHC Humboldt North**
1. Iowa Dept. of Inspections and Appeals Visit Data Sheet
2. Department of Health and Human Services Centers for Medicare and Medicaid Survey dated September 23, 2021.
3. Department of Health and Human Services Centers for Medicare and Medicaid Survey dated July 6, 2021.
4. Iowa Dept of Public Safety Letter dated 8/5/2021

**Crestridge**

1. Department of Health and Human Services Centers for Medicare and Medicaid Survey dated January 11, 2022.
2. Department of Health and Human Services Centers for Medicare and Medicaid Survey dated March 3, 2021.
3. Department of Health and Human Services Centers for Medicare and Medicaid Survey dated January 6, 2021.
4. Iowa Dept. of Inspections and Appeals Visit Data Sheet
5. Fire Marshall Survey dated 2/12/2020

**QHC Winterset North**

1. Iowa Dept. of Inspections and Appeals Visit Data Sheet
2. Department of Health and Human Services Centers for Medicare and Medicaid Survey dated January 4, 2022
3. Department of Health and Human Services Centers for Medicare and Medicaid Survey dated November 30, 2021
4. Department of Health and Human Services Centers for Medicare and Medicaid Survey dated September 15, 2021.
5. Department of Health and Human Services Centers for Medicare and Medicaid Survey dated April 8, 2021.
6. Department of Health and Human Services Centers for Medicare and Medicaid Survey dated February 25, 2021.
7. Iowa Dept of Public Safety Letter dated 12/22/2021
8. Iowa Dept of Public Safety Letter dated 2/10/2022

**QHC Mitchellville**

1. Department of Health and Human Services Centers for Medicare and Medicaid Survey dated February 2, 2022.
2. Department of Health and Human Services Centers for Medicare and Medicaid Survey dated December 6, 2021.
3. Department of Health and Human Services Centers for Medicare and Medicaid Survey dated August 18, 2021.
4. Iowa Department of Inspections and Appeals Health Facilities Division Citation dated September 1, 2021.
5. IDIA Letter dated September 1, 2021.
6. IDIA Letter dated December 15, 2021.
7. IDIA Letter dated February 10, 2022.
8. Iowa Dept. of Inspections and Appeals Visit Data Sheet
9. Department of Health and Human Services Centers for Medicare and Medicaid Survey dated February 15, 2022.
10. OSHA—Iowa Workforce Development Letter dated February 18, 2022.

**QHC Villa Cottages**

1. Iowa Dept. of Inspections and Appeals Visit Data Sheet
2. Iowa Department of Inspections and Appeals Health Facilities Division Citation dated September 29, 2019.
3. Fire Marshall Survey dated 6/4/2021

**QHC Madison Square**

1. Iowa Dept. of Inspections and Appeals Visit Data Sheet
2. Iowa Department of Inspections and Appeals Health Facilities Division Citation dated December 14, 2020.
3. Fire Marshall Survey dated 11/5/2020

# Facility Listing with Current Administrators[3]

**CRESTRIDGE, INC. (CR)**
1015 WESLEY DRIVE
MAQUOKETA, IA 52060-2637

---

[3] Administrator licenses have been added to the data room.

AMANDA CARR, ADMINISTRATOR
EMILY CLARK, ADMIN. ASSISTANT
TELE: 563.652-4968/ FAX: 563.652-3150
COMPANY #11

**CRESTVIEW ACRES, INC. (CV)**
1485 GRAND AVENUE
MARION, IA 52302-5219
, ADMINISTRATOR
, ADMIN. ASSISTANT
TELE: 319.377-4823/ FAX: 319.377-4501
COMPANY # 12

**QHC FORT DODGE VILLA, LLC (FV)**
**FORT DODGE VILLA CARE CENTER**
2721 10TH AVENUE NORTH
FORT DODGE, IA 50501-2834
JESSICA BELLINGER, PROVISIONAL ADMINISTRATOR/ADMIN. ASSISTANT
JESSE GRAZIER, INTERIM ADMIN. ASSISTANT
TELE: 515.576-7525/ FAX: 515.955-7528
COMPANY #23

**QHC VILLA COTTAGES, LLC (VC)**
**VILLA COTTAGES**
925 MARTIN LUTHER KING DRIVE
FORT DODGE, IA 50501-2866
MEGAN KAHLER, MANAGER
TELE: 515.576-6525/ FAX: 515.573-3968
COMPANY # 78

**QHC HUMBOLDT NORTH, LLC (HN)**
**HUMBOLDT CARE CENTER NORTH**
1111 11TH AVENUE NORTH
HUMBOLDT, IA 50548-1225
STACY BENNA, ADMINISTRATOR
JESSICA HABHAB, INTERIM ADMIN. ASSISTANT
TELE: 515.332-2623/ FAX: 515.332-2653
COMPANY #30

**QHC HUMBOLDT SOUTH, LLC (HS)**
**HUMBOLDT CARE CENTER SOUTH**
800 13TH STREET SOUTH
HUMBOLDT, IA 50548-2439
STACY BENNA, ADMINISTRATOR
JESSICA HABHAB, INTERIM ADMIN. ASSISTANT
TELE: 515.332-4104/ FAX: 515.332-4526

COMPANY #31

**QHC MADISON SQUARE, LLC (MS)**
209 W JEFFERSON STREET
WINTERSET, IA 50273-1676
LOGAN KUNZMAN, MANAGER
DEBBIE SHAFER, ADMIN. ASSISTANT
TELE: 515.462-5087/ FAX: 515.462-9058
COMPANY #43

**QHC MITCHELLVILLE, LLC (MV)**
**MITCHELL VILLAGE CARE CENTER**
114 CARTER STREET SW
MITCHELLVILLE, IA 50169-5000
LESLIE WALSH, ADMINISTRATOR
DARCY HEEBNER, ADMIN. ASSISTANT
TELE: 515.967-3726/ FAX: 515.967-3728
COMPANY #47

**SUNNYCREST NURSING CENTER (SC)**
401 CRISMAN STREET
DYSART, IA 52224-9520
ASHLEY KERSTEN, PROVISIONAL ADMINISTRATOR/ADMIN. ASSISTANT
TELE: 319.476-2400/ FAX: 319.476-3622
COMPANY #69

**QHC WINTERSET NORTH, LLC (WN)**
**WINTERSET CARE CENTER NORTH**
411 EAST LANE STREET
WINTERSET, IA 50273-1217
LESLIE WALSH, PROVISIONAL ADMINISTRATOR
BARBARA PAINTER, ADMIN. ASSISTANT
TELE: 515.462-1571/ FAX: 515.462-1572
COMPANY #84
**Rae Tucker was the previous provisional administrator, however, her license expired in
February 2022. Rae has submitted an application to the Iowa Nursing Home Admins Licensure
Board. Once approved she will be taking the test for the license. In the interim, the IDIA has
allowed Leslie Walsh to serve as a provisional administrator.

**QHC FACILITIES, LLC**
LANETT POWERS, NURSE CONSULTANT
TELE: 515.570-1533/ FAX: 515.276-4353

**QHC FACILITIES, LLC**

LESLIE WALSH, REGIONAL ADMINISTRATOR
TELE: 319-427-1136/ FAX: 515-276-4353

**<u>Schedule 3.01(u)</u>**

**Licensed Beds and Current Rate[4]**

| Debtor | Type | Facility Name | Location | Available Beds | Bed Occupancy | Occupancy % |
|---|---|---|---|---|---|---|
| QHC Facilities, LLC | Corporate | N/A | 8350 Hickman Rd., Ste. 15 Clive, Iowa 50325 | N/A | N/A | N/A |
| QHC Management, LLC | Corporate | N/A | 8350 Hickman Rd., Ste. 15 Clive, Iowa 50325 | N/A | N/A | N/A |
| Crestridge, Inc. | Skilled Nursing | Crestridge | 1015 Wesley Dr. Maquoketa, IA 52060 | 75 | 52 | 69.3 |
| Crestview Acres, Inc. | Skilled Nursing | Crestview Acres | 1485 Grand Ave. Marion, IA 52302 | 100 | N/A | N/A |
| | Skilled Nursing | Sunnycrest Nursing Center | 401 Crisman St. Dysart, IA 52224 | 50 | 24 | 48.0 |
| QHC Fort Dodge Villa, LLC | Skilled Nursing | Fort Dodge Villa Care Center | 2721 10th Ave. N. Fort Dodge, IA 50501 | 107 | 64 | 59.8 |
| QHC Humboldt North, LLC | Skilled Nursing | Humboldt Care Center North | 1111 11th Ave. N. Humboldt, IA 50548 | 90 | 36 | 40.0 |
| QHC Humboldt South, LLC | Skilled Nursing | Humboldt Care Center South | 800 13th St. S. Humboldt, IA 50548 | 40 | 17 | 42.5 |
| QHC Mitchellville, LLC | Skilled Nursing | Mitchell Village Care Center | 114 Carter St. SW Mitchellville, IA 50169 | 65 | 20 | 30.8 |
| QHC Winterset North, LLC | Skilled Nursing | Winterset Care Center North | 411 East Lane St. Winterset, IA 50273 | 120 | 42 | 35.0 |
| QHC Madison Square, LLC | Assisted Living | Madison Square | 209 W Jefferson St. Winterset, IA 50273 | 44 (Residential Units) | 39 (Residential Units) | 88.6 |

---

[4]All Skilled Nursing Facilities are dually certified beds, and can accept Medicare, Medicaid, or private pay. Assisted Living Facilities are residential units.

| QHC Villa Cottages, LLC | Assisted Living | Villa Cottages | 925 Martin Luther King Dr. Fort Dodge, IA 50501 | 20 (Residential Units) | 14 (Residential Units) | 70.0 |
|---|---|---|---|---|---|---|
| | | | **Total** | **711** | | |

## Schedule 3.01(y)

## Financial Information

| Debtor | Balance Sheets 12/31/19 & 12/31/20 | Balance Sheet 6/30/21 | Balance Sheet 10/31/21 | Monthly Income Statements 8/31/20 – 7/31/21 | Annual Income Statements 2019 and 2020 | Income Statement YTD 6/30/21 | Income Statement YTD 10/31/21 |
|---|---|---|---|---|---|---|---|
| Crestridge, Inc. | X | X | X | X | X | X | X |
| Crestview Acres, Inc. | X | | X | X | X | X | X |
| QHC Fort Dodge Villas, LLC | X | X | X | X | X | X | X |
| QHC Humboldt North, LLC | X | X | X | X | X | X | X |
| QHC Humboldt South, LLC | X | X | X | X | X | X | X |
| QHC Madison Square, LLC | X | X | X | X | X | X | X |
| QHC Mitchellville, LLC | X | X | X | X | X | X | X |
| QHC Villa Cottages, LLC | X | X | X | X | X | X | X |
| QHC Winterset North, LLC | X | X | X | X | X | X | X |

* *The financials referenced above are unaudited*

**Schedule 3.01(z)**

**Real Property**

**Crestridge, Inc**

Property Address: 1015 Wesley Drive, Maquoketa, IA 52060

Legally described as follows:

The South fourth of the East fourth of the Northwest quarter (NW 1/4) of the
Southwest quarter (SW 1/4) of Section Twenty-Four (24), Township Eighty-Four
(84) North, Range Two (2) East of the 5th P.M., Jackson County, Iowa;
EXCEPTING THEREFROM the West twenty (20) feet thereof;

AND

Commencing twenty (20) rods West of the Southeast corner of the West half
(W1/2) of the Northeast quarter (NE1/4) of the Southwest quarter (SW 1/4) of
Section twenty-four (24), Township eighty-four (84) North, Range two (2) East of
the 5th P.M., Jackson County, Iowa; thence West twenty (20) rods to the
Southwest corner of the Northeast quarter (NE 1/4) of said Southwest quarter
(SW 1/4) of said Section twenty-four (24); thence North twenty (20) rods; thence
East twenty (20) rods more or less to West line of land heretofore conveyed to
Leonard Seaver to Williams P. Thomas; thence South twenty (20) rods to the
place of beginning; EXCEPTING THEREFROM Lots one (1), two (2), three (3),
and four (4) according to survey by J. G. Thorne dated July 23, 1966, and
recorded in Plat Book 1 Page 143, Office of the Recorder of Jackson County,
Iowa, together with any interest in the street along the East side thereof;

AND

Beginning on the West line of Western Avenue in the City of Maquoketa, Jackson
County, Iowa, nine hundred ninety (990) feet South of the point of intersection of
the centerline of West Platt Street and the West line of said Western Avenue;
thence West one hundred twenty (120) feet to the point of commencement; thence
West four hundred ninety (490) feet; thence North ten (10) feet; thence East four
hundred ninety (490) feet; thence South ten (10) feet to the point of
commencement, all in the North half (N1/2) of the Southwest quarter (SW 1/4) of
Section twenty-four (24), Township eighty-four (84) north, Range two (2) East of
the 5th P.M. in the City of Maquoketa, Jackson County, Iowa

## Crestview Acres, Inc.

Property Address: 1485 Grand Ave, Marion Iowa 52302-5219

Legally described as follows:

> South 417 feet of North 457 feet of West 417 feet of East 447 feet of Lot 1, "auditor's Plat No. 202, Linn County, Iowa.

## Crestview Acres, Inc. dba Sunnycrest Nursing Center

Property Address: 401 Crisman St., Dysart, IA  52224-9520

Legally described as follows:

> Lots Ten (10), Eleven (11) and Twelve (12), Block Seventeen (17) Dysart, Iowa.

## QHC Fort Dodge Villa LLC dba Fort Dodge Villa Care Center

Property Address: 2721 10th Ave. North, Fort Dodge, IA  50501-2834

Legally described as follows:

> A tract of land located in the NE ¼ of the NW ¼ of Section 21-89-28 West of the 5th P.M., City of Fort Dodge, Webster County, Iowa, more particularly described as follows: Commencing at the Northeast corner of the said NW ¼; thence N89°33'00"W 198 feet along the North line of the said NW ¼;  thence S00°00'00"W 33.00 feet to the South right of way line of 10th Avenue North, to the point of beginning; thence continuing S00°00'00"W 481.01 feet; thence N89°33'00"W 423.51 feet to a point on the East right of way line of North 27th Street; thence N00°02'00"E 481.00 feet along the said East right of way line to a point on the South right of way line of 10th Avenue North; thence S89°33'00"E 423.24 feet along the said South right of way line to the point of beginning, containing 4.67 acres.

## QHC Villa Cottages, LLC dba Villa Cottages

Property Address: 925 Martin Luther King Dr., Fort Dodge, IA 50501-2866

Legally described as follows:

> A tract of land located in the NE 1/4 of the NW 1/4 of Section 21-89-28 West of the 5th P.M., City of Fort Dodge, Webster County, Iowa, more particularly described as follows:  Commencing at the  Northeast corner of  the said NW 1/4; thence N89°33'00"W 198.00 feet along the North  line of the said  NW 1/4; thence S00°00'00"W 514.01 feet to the point of beginning; thence continuing

S00°00'00"W 46.85 feet to a point 116.00 feet normally distant northwesterly from the centerline of the Chicago & Northwestern Railway right of way; thence S50°27'00"W 549.54 feet along a line parallel with the said Railroad centerline to a point on the East right of way line of North 27th Street; thence N00°02'00"E 400.10 feet along the said East right of way line; thence S89°33'00"E 423.51 feet to the point of beginning, containing 2.17 acres,

AND

Part of the vacated North 24th Street located in the NE1/4 of the NW 1/4 of Section 21-89-28 West of the 5th P.M., City of Fort Dodge, Webster County, Iowa, more particularly described as follows: Commencing at the North Quarter corner of the said Section 21 (said North Quarter corner also being the Northeast corner of said NE 1/4 of the NW 1/4); thence S00°00'00"W 33.00 feet along the East line of the said NE 1/4 of the NW 1/4 to the South right of way line of 10th Avenue North; thence N89°33'00"W 198.00 feet along the South right of way line; thence S00°00'00"W 527.86 feet to a point on the Northerly right of way line of vacated 24th Avenue North being the point of beginning; thence S50°26'20"W 549.54 feet along the said northerly right of way line to a point on the East right of way line of North 27th Street; thence S00°02'00"W 85.66 feet along the said East right of way line of North 27th Street to a point on the northerly railroad right of way line; thence N50°26'20"E 549.61 feet along the said Northerly railroad right of way line; thence N00°00'00"E 85.61 feet to the point of beginning

## QHC Humboldt North, LLC dba Humboldt Care Center North

Property Address: 1111 11th Avenue North, Humboldt, IA 50548-1225

Legally described as follows:

Parcel One:

All of Lot One (1) and the East Seventeen and one-half (17 ½) feet of Lot Two (2) of Block Thirty-Seven (37), Second College Addition, City of Humboldt, Humboldt County, Iowa.

Parcel Two:

All of Block Thirty-Six (36) and all of Tilleston Street (vacated) (now Twelfth Street North) between Blocks 36 and 37, all being in Second College Addition to the Town, now City, of Humboldt, Humboldt County, Iowa. (Sec. 36-92-29)

## QHC Humboldt South, LLC dba Humboldt Care Center South

Property Address: 800 13th Street South, Humboldt, Iowa 50548-2439

Legally described as follows:

A tract of land in the Southeast one-quarter (SE ¼) of the Northeast One-Quarter
(NE ¼) of Section Eleven (11), Township Ninety-One (91) North, Range Twenty-
Nine (29), and more particularly described as follows:  Beginning at the Northeast
Corner of said Southeast One-Quarter (SE ¼) of the Northeast One-Quarter (NE
¼), said point being1300.17 feet South of the Northeast Corner of Section Eleven
(11), thence South 417.4 feet along East line of Section Eleven (11), thence South
88 degrees 40' 30" West 467.4 feet, thence North 417.4 feet to Point on the North
Line of said Southeast One-Quarter (SE ¼) of the Northeast One-Quarter (NE ¼);
thence North 88 degrees 40' 30" East 467.4 feet along said North line to Point of
Beginning, except the North Thirty-Three (33) feet of North Edge and except that
part conveyed to the State of Iowa by Warranty Deed recorded in Book 260, Page
276, and more particularly described as follows:  Commencing at the E ¼ corner
of said Sec. 11; thence N00°07'29"E, 883.35 ft. along the East line of the NE ¼
said Sec. 11 to the SE corner of said tract; thence continuing along said line
N00°07'29"E, 384.34 ft.; thence S88°48'50"W, 65.02 ft.; thence S00°07'29"W,
204.40 ft; thence S07°14'59"W, 120.93 ft.; thence S00°07'29"W, 60.30 ft. to a
point on the South line of said tract; thence N88°48'09"E, 80.02 ft. along said line
to the Point of Beginning; containing 0.61 acre, more or less, including 0.44 acre,
more or less, in existing right of way.

## QHC Madison Square, LLC dba Madison Square

Property Address: 209 W. Jefferson St., Winterset, IA  50273-1676

Legally described as follows:

Units #101, #102, #103, #104, #106, #107, #108, #201, #202, #203, #204, #205,
#206, #208, #301, #302, #303, #304, #305, #306, #307, and #308 of Jefferson
Place in the City of Winterset, Madison County, Iowa, and an undivided interest
in the common elements and areas of Jefferson Place, as shown in the Declaration
of Condominium of Jefferson Place filed for record on April 14, 1995 in Town
Lot Deed Record 60 at page 159 in the Madison County Recorder's Office (and
any supplements and amendments thereto).

AND

Unit #207 of Jefferson Place in the City of Winterset, Madison County, Iowa, and
an undivided interest in the common elements and areas of Jefferson Place as
shown in the Declaration of Condominium of Jefferson Place filed for record on
April 14, 1995 in Town Lot Deed Record 60 at page 159 in the Madison County
Recorder's Office (and any supplements and amendments thereto).

## QHC Mitchellville, LLC dba Mitchell Village Care Center

Property Address: 114 Carter St. SW, Mitchellville, IA  50169-5000

Legally described as follows:

> All of Block 6, (except the East 165 feet and except the South 140 feet and except
> the West 126.33 feet) in Sage's Addition to Mitchellville, Polk County, Iowa.

## QHC Winterset North, LLC dba Winterset Care Center North

Property Address: 411 East Lane St., Winterset, IA  50273-1217

Legally described as follows:

A tract of land located in the Northwest Fractional Quarter (1/4) of the Northwest
Fractional Quarter (1/4) of Section Thirty-one (31) in Township Seventy-s9x (76) North,
Range Twenty-seven (27) West of the 5th P.M., City of Winterset, Madison County,
Iowa, more particularly described as follows, to-wit: Commencing at the Southwest
corner of the Northwest Fractional Quarter (1/4) of the Northwest Fractional Quarter
(1/4) of said Section Thirty-one (31), thence South 88°37' East, 935.1 feet along the
South line of said Northwest Fractional Quarter (1/4) of the Northwest Fractional Quarter
(1/4) to the point of beginning, thence continuing South 88°37' East, 347.2 feet, thence
North 506.5 feet, thence North 88° 37' West, 347.2 feet, thence South 506.5 feet to the
point of beginning, containing 4.0359 acres.

## FIRST AMENDMENT TO ASSET PURCHASE AGREEMENT AND MANAGEMENT AGREEMENTS

THIS FIRST AMENDMENT TO ASSET PURCHASE AGREEMENT AND MANAGEMENT AGREEMENTS (the "**Amendment**") is made and entered into as of September 9th, 2022 (the "**Effective Date**"), by and between Seller (as defined below) and Buyer (as defined below).  Reference is made to (i) that certain Asset Purchase Agreement (the "**Agreement**") dated as of March 25, 2022 (the "**Execution Date**"), by and between QHC Facilities, LLC, QHC Management, LLC, QHC Mitchellville, LLC, QHC Winterset North, LLC, QHC Madison Square, LLC, QHC Fort Dodge Villa, LLC, QHC Humboldt North, LLC, QHC Humboldt South, LLC, and QHC Villa Cottages, LLC, each an Iowa limited liability company, and Crestridge, Inc. and Crestview Acres, Inc., each an Iowa corporation, (individually and collectively, "**Seller**" or "**Operator**"), and Blue Care Homes, LLC, a New Jersey limited liability company ("**Buyer**" or "**Manager**") and (ii) those certain Management Agreements (the "**Management Agreements**") dated as of the Execution Date, by and between Operator and Manager.  Capitalized terms used but not defined in this Amendment shall have the meanings ascribed to such terms in the Agreement or Management Agreements.

1. Subject to the terms of this Amendment and in consideration of the mutual covenants herein contained, Buyer and Seller do hereby agree that the Agreement and Management Agreements shall be amended as follows:

    a. The Purchase Price shall be reduced from $12.0 million to $4.5 million.

    b. Prior to the Closing, Seller agrees to allow and Manager shall close and cease all operations, including but not limited to licensed nursing home operations, at each of the following Facilities: QHC Humboldt South, LLC dba Humboldt Care Center South, Crestview Acres, Inc. (Marion), Crestview Acres, Inc. dba Sunnycrest Nursing Center, and QHC Mitchellville, LLC dba Mitchell Village Care Center (collectively, the "**Discontinued QHC Properties**"). Notwithstanding anything in the Agreement or Management Agreements to the contrary, all direct costs related to the closing of the Discontinued QHC Properties shall be solely borne by Manager.  Manager shall maintain the utilities of each Discontinued QHC Property, oversee the security of each Discontinued QHC Property and, where necessary, coordinate the winterization of each Discontinued QHC Property provided that each of the foregoing Manager obligations shall cease for a particular Discontinued QHC Property upon the Closing of the sale pursuant to this Amendment.

    c. The Discontinued QHC Properties and all assets of such Discontinued QHC Properties other than as set forth in this Amendment shall be removed as an "Acquired Asset" and added as an "Excluded Asset" under the Agreement. Buyer and Manager shall have no obligations or liabilities for the Discontinued QHC Properties other than the obligations and liabilities set forth in this Amendment.

    d.  The Closing Date refenced in the APA shall be October 14, 2022 and the Outside Date shall be October 31, 2022.  Closing is subject to:

        i. Obtaining the Regulatory Approvals.  Buyer and Seller will use their best efforts to obtain the Regulatory Approvals.  For the purposes of this Amendment, "**Regulatory Approvals**" means any consent required by Section 5.01(h) of the Agreement, including but not limited to the approvals of the IDIA, IDHS, IDPH,

and the Iowa Medicaid Managed Care Organizations and any regulatory approvals required to reduce the beds of the facilities as set forth on Schedule 1(d)(i); Debtors shall move forward with submission to the applicable regulatory body of all required materials for the reduction of beds contemplated by this paragraph no later than two (2) Business Days after execution of this Amendment; and,

ii. Buyer shall pay for the monthly premium or financing related payment obligations of the policies detailed on Schedule 1(d)(ii) which are currently in place, for claims arising out of the operation of the Facilities during the period from the Petition Date through Closing, but which may be asserted during the 120-day period after Closing. Such insurance coverage shall not be canceled or modified for at least 120 days after Closing.

e. At the Closing, there will be no proration of Accounts Receivable as currently contemplated by Section 8.04(a) of the Agreement or as contemplated in Section 5(d) of the Management Agreements and instead Buyer and Seller agree that:

i. All amounts of Accounts Receivable of any facility collected by Buyer during or after the Term (as defined in the Management Agreement) shall be retained by Buyer, except as set forth below.

ii. All Pre-Term accounts receivable which has been paid toward Pre-Term accounts payable as of the effective date of this Amendment shall be retained by Seller as an Excluded Asset.

iii. All rights to COVID-19 provider relief funds from the U.S. Health Resources and Services Administration and/or the U.S. Department of Health and Human Services, COVID-19 related employer tax credits or any other federal, state or local program or tax refund ("COVID-19 Relief Funds"), derived from the operations of the facilities prior to Closing under this Amendment shall be retained by or paid to Seller as an Excluded Asset provided that any reports for COVID-19 provider relief funds from the U.S. Health Resources and Services Administration and/or the U.S. Department of Health and Human Services related to the Acquired Assets must be submitted to the applicable governmental authority within one year of Closing. The Seller shall cause such reports to be submitted timely and as soon as reporting is available for the applicable reporting period. Any applications for COVID-19 Relief Funds that have not been received by Closing must be submitted by Sellers to the applicable governmental authority within four months of the effective date of the Sellers' Plan. All insurance proceeds related to operations of the Facilities before the Term and all insurance proceeds related to any Discontinued Property shall also be retained by Seller as an Excluded Asset.

iv. Any accounts receivable or monies collected on or after the effective date of this Amendment related to services rendered at the Facilities prior to the Term ("Pre-Term A/R") will be split 80% to Seller and 20% to Buyer. Any accounts receivable collection related to services rendered during the Term ("Term A/R") will be retained by Buyer as an Acquired Asset.

v. Buyer and Seller may engage Jeff Steggerda and/or Brighton Consulting Group, as well as any additional professionals, to bill and collect any uncollected Pre-Term A/R, and any related cost of collection will be deducted from such collected

Pre-Term A/R according to the split between Buyer and Seller provided in section 1(e)(iv). For the avoidance of doubt, any initial set-up or administration costs related to the engagements with Jeff Steggerda and/or Brighton Consulting Group which are not funded through the collection of accounts receivable shall be obligations of the Manager and Buyer. Any liability of Seller for the collection work of Jeff Steggerda and/or Brighton Consulting Group shall be limited to the amounts actually collected for Seller's account. Buyer and Manager agree to direct Jeff Steggerda and/or Brighton Consulting Group to prioritize billing of Pre-Term A/R. The Buyer shall also have the ability to engage Jeff Steggerda and/or Brighton Consulting Group, as well as any additional professionals, to bill and collect any uncollected Term A/R and shall be solely responsible for any associated costs and expenses of such engagements.

vi.   Any and all rights, causes of action against Cedar Healthgroup, LLC arising prior to Closing and proceeds thereof (whether received before or after Closing), as well as any rights or other causes of action retained by Seller under the Agreement or Management Agreements, shall be Excluded Assets.

vii.  Section 5.01(o) is modified to provide that the closures of the Discontinued QHC Properties shall not be considered a Material Adverse Effect.

viii. Section 13.04 is modified to remove Jacob Unger as a notice party and replace him with the following:

Polsinelli PC
Attn: Gabriel Levinson
600 Third Avenue
42nd Floor
New York, NY 10016
glevinson@polsinelli.com

ix.   The Buyer's assumption of the Accrued PTO as an Assumed Liability in section 2.08(b) of the Agreement shall include the Accrued PTO of all Debtors, including but not limited to the Accrued PTO related to the Discontinued QHC Properties.

f.   Notwithstanding anything in the Agreement or Management Agreements to the contrary, from and after Closing, Buyer and Manager shall remain obligated and solely responsible to pay and satisfy the following items which shall be Assumed Liabilities under the Agreement and the Seller shall have no further responsibility for these items and/or obligations upon Closing:

i.   All obligations of Seller incurred or accrued during the Management Agreements Term for the operation of the facilities. For the avoidance of doubt, Manager shall not be responsible for professional fees incurred in connection with the Debtors' bankruptcy case, property taxes incurred or accrued prior to the Management Agreement Term, bed taxes (or any other similar tax) incurred or accrued prior to the Management Agreement Term or claims for recoupment of insurance proceeds, provider relief funds, or other funds that Seller is retaining pursuant to Section 1(e)(iii).

ii. The Cure amounts related to the Assumed Medicare Contracts and all other liabilities related to the Assumed Medicare Contracts, to be paid at Closing, provided, however, Buyer shall not be liable for any claims arising from HRSA funds or Care Act Funds paid to Seller.

iii. The cost of maintaining the insurance policies referenced in Section 1(d)(ii), which shall be timely paid by Buyer;

iv. The Accrued PTO contemplated by Section 1(e)(ix); and,

v. The obligations to close the Discontinued QHC Properties described in Section 1(b).

g. Buyer may engage Jeff Steggerda and/or Brighton Consulting Group promptly after the Effective Date for the purpose of producing financial projections and assistance with Medicaid reimbursement for the Facilities going forward and shall be solely responsible for any associated costs and expenses of such engagements.

h. Buyer agrees to reasonably cooperate with Seller and its Affiliates with respect to any post-Closing bankruptcy matters or other accounting and regulatory matters and, accordingly, shall provide reasonable access to such information and records to Seller and its Affiliates as such Persons may reasonably require to respond to any such bankruptcy matters or other accounting and regulatory matters.

i. Buyer shall retain Seller's and Discontinued QHC Properties' books and records, including any resident and patient medical records, as required by any and all applicable Laws and other requirements of any Governmental Authority.

j. Buyer shall assume the Medicare provider agreements associated with QHC Humboldt North, LLC dba Humboldt Care Center North, Crestridge, Inc. (Maquoketa) and QHC Fort Dodge Villa LLC dba Fort Dodge Villa Care Center (collectively, the "Assumed Medicare Contracts") and pay any cure costs incurred in connection therewith.

k. Buyer shall use Seller's current trade vendors post-Closing to the extent such goods and/or services are necessary for the operation of the Facilities and provided such goods and services are offered to be provided in a commercially reasonable manner and at a cost competitive with the current market.

l. Manager and Buyer shall pay the Sellers a Services Fee at the earlier of (x) the Closing or (y) November 15, 2022 for assistance that Sellers provide related to vendor disbursement and treasury activities performed from September 12, 2022 through the Closing. The fee for these services ("the Services Fee") shall be $45,000, plus $2,250 per Business Day after October 14, 2022. Sellers do not make any representation or warranty in regard to these services and Buyer and Manager shall hold the Sellers, their officers and directors, and professionals harmless from any liability associated with these services.

m. All real property including but not limited to all buildings and improvements related to the QHC Humboldt North, LLC dba Humboldt Care Center North, Crestridge, Inc. (Maquoketa), QHC Fort Dodge Villa LLC dba Fort Dodge Villa Care Center and QHC Winterset North, LLC dba Winterset Care Center North facilities and the Assisted Living Facilities (together, the "Acquired Facilities") (the "Real Property") shall be included as an Acquired Asset. In addition, all other assets, whether real, personal or mixed, tangible or intangible, utilized in the Business and at the location of the Acquired Facilities in the normal course of operations other than Excluded Assets shall be an Acquired Asset.

n. The parties agree that Blue Care Homes, LLC may assign its rights and interests in the Agreement with respect to the Acquired Facilities as set forth on Schedule 1(n) provided that Blue Care Homes, LLC shall remain obligated under the Agreement with respect to any obligations, covenants or liabilities thereunder.

o. Permit shall be defined to mean Licenses. The Buyer shall acquire only the Permits related to the Acquired Facilities.

2. <u>Representations</u>. In order to induce the other parties to execute and deliver this Amendment, each party hereby represents and warrants to the other parties that this Amendment is duly authorized, executed and delivered by it and assuming due authorization, execution and delivery by each other parties, constitutes the legally valid and binding obligation of it, enforceable against it in accordance with its terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting enforcement of creditors rights generally and equitable principles (whether considered in a proceeding at equity or at law).

3. <u>Counterparts</u>. This Amendment may be executed in any number of counterparts, and by the different parties on different counterpart signature pages, all of which taken together shall constitute one and the same agreement. Any of the parties hereto may execute this Amendment by signing any such counterpart and each of such counterparts shall for all purposes be deemed to be an original. Delivery of a counterpart hereof by e-mail transmission of an Adobe portable document format file (also known as a *"PDF"* file) shall be effective as delivery of a manually executed counterpart hereof.

4. <u>Full Force and Effect</u>.

a. Unless specifically modified by this Amendment, all other terms and conditions of the Agreement will remain in full force and effect, and the same are hereby ratified and confirmed. In the event of any conflict, inconsistency, or incongruity between the provisions of this Amendment and the Agreement the provisions of this Amendment will control.

b. Unless specifically modified by this Amendment, all other terms and conditions of the Management Agreements will remain in full force and effect, and the same are hereby ratified and confirmed. In the event of any conflict, inconsistency, or incongruity between the provisions of this Amendment and the Management Agreements the provisions of this Amendment will control.

c. If the Closing has not occurred by the Outside Date, all obligations under the Agreement and the Management Agreements and all of the rights of the parties thereunder shall remain fully enforceable as originally set forth and approved by the Bankruptcy Court, and this Amendment shall terminate and have no further force or effect.

d. This Amendment and the obligations herein described are subject to and conditioned upon entry by the Bankruptcy Court of an order approving the Amendment.

5. <u>Governing Law</u>. This Amendment will be interpreted, construed, and enforced pursuant to the laws of the State of Iowa without giving effect to the choice of law rules thereof.

6.   <u>Severability</u>.  If any provision of this Amendment is held invalid, illegal or unenforceable in any jurisdiction, the remainder of this Amendment, or application of that provision to any Persons or circumstances, or in any jurisdiction, other than those as to which it is held unenforceable, will not be affected by that unenforceability and will be enforceable to the fullest extent permitted by law.

*[Remainder of page intentionally left blank; signature pages follow.]*

IN WITNESS WHEREOF, the parties have duly executed and delivered this Amendment as of the date first written above.

**BUYER AND MANAGER**

BLUE CARE HOMES, LLC
a New Jersey limited liability company

By: _____
3F192FE2F1A04F9...

Name: Sam Haikins

Its: Managing Partner

**SELLER AND OPERATOR**

QHC FACILITIES, LLC

F7482FB2AA5D439...

Mark Hidlebaugh
By: _____

Its: Mark Hidlebaugh
_____

QHC MANAGEMENT, LLC

F7482FB2AA5D439...

Mark Hidlebaugh
By: _____

Its: Mark Hidlebaugh
_____

QHC MITCHELLVILLE, LLC

F7482FB2AA5D439...

Mark Hidlebaugh
By: _____

Its: Mark Hidlebaugh
_____

QHC WINTERSET NORTH, LLC

F7482FB2AA5D439...

Mark Hidlebaugh
By: _____

Its: Mark Hidlebaugh
_____

QHC MADISON SQUARE, LLC

*[Signature Page to Amendment]*

84572557.15

By: _____
Mark Hidlebaugh

Its: _____
Mark Hidlebaugh

QHC FORT DODGE VILLA, LLC

By: _____
Mark Hidlebaugh

Its: _____
Mark Hidlebaugh

QHC HUMBOLDT NORTH, LLC

By: _____
Mark Hidlebaugh

Its: _____
Mark Hidlebaugh

QHC HUMBOLDT SOUTH, LLC

By: _____
Mark Hidlebaugh

Its: _____
Mark Hidlebaugh

QHC VILLA COTTAGES, LLC

By: _____
Mark Hidlebaugh

Its: _____
Mark Hidlebaugh

CRESTRIDGE, INC.

By: _____
Mark Hidlebaugh

Its: `Mark Hidlebaugh`
_____

CRESTVIEW ACRES, INC.

DocuSigned by:

_____
F7482FB2AA5D439...

By: `Mark Hidlebaugh`
_____

Its: `Mark Hidlebaugh`
_____

## Schedule 1(d)(i)

| 1015 Wesley Drive | 2721 Tenth Avenue North | 1111 11th Avenue North | 411 East Lane Street | 925 Martin Luther King Drive | 209 W Jefferson |
|---|---|---|---|---|---|
| . | . | . | . | . | . |
| Maquoketa | Fort Dodge | Humboldt | Winterset | Fort Dodge | Winterset |
| Iowa | Iowa | Iowa | Iowa | Iowa | Iowa |
| 52060 | 50501 | 50548 | 50273 | 50501 | 50273 |
| Jackson | Webster | Humboldt | Madison | Webster | Madison |
| 75 | 85 | 75 | 65 | 20 | 80 |

**<u>Schedule 1(d)(ii)</u>**

- TDC Specialty Insurance Company; General and Professional Liability (PL/GL); Policy # LTP013172100
- Ironshore Indemnity Inc; Excess Liability (Umbrella); Policy # HC7SAB8JHV001
- Allied World Surplus Lines Ins Co; Directors & Officers (D&O); Policy # 0312-3976

### Schedule 1(n)

| Assignee | Assets |
|---|---|
| BLUE CARE OPCO FORT DODGE-NORTH, LLC | All Acquired Assets related to the Villa Cottages Facility (925 Martin Luther King Drive) other than Real Property |
| BLUE CARE OPCO FORT DODGE, LLC | All Acquired Assets related to the Fort Dodge Villa Care Center Facility (2721 10th Avenue N.) other than Real Property |
| BLUE CARE OPCO WINTERSET- WEST, LLC | All Acquired Assets related to the Madison Square Facility (209 W. Jefferson St.) other than Real Property |
| BLUE CARE  OPCO MAQUOKETA, LLC | All Acquired Assets related to the Crestridge Facility (1015 Wesley Drive) other than Real Property |
| BLUE CARE  OPCO WINTERSET-EAST, LLC | All Acquired Assets related to the Winterset Care Center North Facility (411 East Lane Street) other than Real Property |
| BLUE CARE OPCO HUMBOLDT- NORTH, LLC | All Acquired Assets related to the Humboldt North Facility (1111 11th Ave. N.) other than Real Property |
| BLUE CARE PROPCO FORT DODGE-NORTH, LLC | All Real Property related to the Villa Cottages Facility (925 Martin Luther King Drive) |
| BLUE CARE PROPCO FORT DODGE, LLC | All  Real Property related to the Fort Dodge Villa Care Center Facility (2721 10th Avenue N.) |
| BLUE CARE PROPCO WINTERSET- WEST, LLC | All Real Property related to the Madison Square Facility (209 W. Jefferson St.) |
| BLUE CARE  PROPCO MAQUOKETA, LLC | All Real Property related to the Crestridge Facility (1015 Wesley Drive) |
| BLUE CARE  PROPCO WINTERSET-EAST, LLC | All Real Property related to the Winterset Care Center North Facility (411 East Lane Street) |
| BLUE CARE PROPCO HUMBOLDT- NORTH, LLC | All Real Property related to the Humboldt North Facility (1111 11th Ave. N.) |

## SECOND AMENDMENT TO ASSET PURCHASE AGREEMENT AND MANAGEMENT AGREEMENTS

THIS SECOND AMENDMENT TO ASSET PURCHASE AGREEMENT AND MANAGEMENT AGREEMENTS (the "**Amendment**") is made and entered into as of October 7th, 2022 (the "**Effective Date**"), by and between Seller (as defined below) and Buyer (as defined below).  Reference is made to (i) that certain Asset Purchase Agreement (the "**Agreement**") dated as of March 25, 2022 (the "**Execution Date**"), by and between QHC Facilities, LLC, QHC Management, LLC, QHC Mitchellville, LLC, QHC Winterset North, LLC, QHC Madison Square, LLC, QHC Fort Dodge Villa, LLC, QHC Humboldt North, LLC, QHC Humboldt South, LLC, and QHC Villa Cottages, LLC, each an Iowa limited liability company, and Crestridge, Inc. and Crestview Acres, Inc., each an Iowa corporation, (individually and collectively, "**Seller**" or "**Operator**"), and Blue Care Homes, LLC, a New Jersey limited liability company ("**Buyer**" or "**Manager**"); (ii) that certain First Amendment to the Asset Purchase Agreement and Management Agreements (the "**First Amendment**") dated as of September 9, 2022 by and between Seller and Buyer; and (iii) those certain Management Agreements (the "**Management Agreements**") dated as of the Execution Date, by and between Operator and Manager.  Capitalized terms used but not defined in this Amendment shall have the meanings ascribed to such terms in the Agreement, First Amendment or Management Agreements.

1.  Subject to the terms of this Amendment and in consideration of the mutual covenants herein contained, Buyer and Seller do hereby agree that the Agreement and Management Agreements and First Amendment shall be amended as follows:

    a.  The Seller shall now assume and assign the Medicare provider agreement associated with QHC Winterset North, LLC dba Winterset Care Center North, along with the provider agreements for QHC Humboldt North, LLC dba Humboldt Care Center North, Crestridge, Inc. (Maquoketa) and QHC Fort Dodge Villa LLC dba Fort Dodge Villa Care Center (collectively, the "Assumed Medicare Contracts").

    b.  Under the First Amendment, the post-petition management term QAAF amount was an Assumed Liability to the Buyer. The parties now agree the post-petition management term QAAF amount owing will be paid to the Seller in cash at closing. The amount is estimated to be $580,000 as of October 31, 2022.

    c.  The Purchase price is being amended and increased as the Buyer is going to provide a two (2) million dollar note (the "Note") to the Seller or its assignees.
        i.   The Note is for a thirty (30) month period, unless paid off sooner, and will otherwise be paid monthly interest only at a rate of three (3) percent interest with balance due at end of the 30-month term.
        ii.  The Note shall be secured by a first mortgage upon all the Seller's properties purchased by the Buyer.
        iii. For any new loans Buyer obtains, there will be up to a $2.5 million subordination to Seller.
        iv.  For any new loans to Buyer between $2.5 million to $4.5 million, a total of up to a $375,000 payment to Seller that would be on a pro-rata basis.  For example, if $3.5 million subordination (half way between $2.5 million to $4.5 million), Seller would receive one-half of $375,000 or a $187,500 payment.  It would be pro-rata on the $375,000 amount so if a $4 million subordination, three-fourths of $375,000 or $281,250, and if a $4.5 million subordination, all of the $375,000.

      v.  For any new loans to Buyer between $4.5 million to $9.0 million, a total of an additional $525,000 payment (gets up to the total of $900,000 payment if $9.0 million subordination) to Seller that would be on a pro-rata basis.  For example, if $6.75 million subordination (half way between $4.5 million to $9.0 million), Seller would get the $375,000 payment for up to $4.5 million plus half of $525,000 or $262,500, for a total payment to Seller of $375,000 + $262,500 = $637,500.  It would be pro-rata on the $525,000 between $4.5 million to $9.0 million subordination.

      vi.  The Note shall be personally guaranteed by Schmuel Haikins.

2. <u>Representations</u>. In order to induce the other parties to execute and deliver this Amendment, each party hereby represents and warrants to the other parties that this Amendment is duly authorized, executed and delivered by it and assuming due authorization, execution and delivery by each other parties, constitutes the legally valid and binding obligation of it, enforceable against it in accordance with its terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting enforcement of creditors rights generally and equitable principles (whether considered in a proceeding at equity or at law).

3. <u>Counterparts</u>.  This Amendment may be executed in any number of counterparts, and by the different parties on different counterpart signature pages, all of which taken together shall constitute one and the same agreement.  Any of the parties hereto may execute this Amendment by signing any such counterpart and each of such counterparts shall for all purposes be deemed to be an original.  Delivery of a counterpart hereof by e-mail transmission of an Adobe portable document format file (also known as a *"PDF"* file) shall be effective as delivery of a manually executed counterpart hereof.

4. <u>Full Force and Effect</u>.

    a.  Unless specifically modified by this Amendment, all other terms and conditions of the Agreement will remain in full force and effect, and the same are hereby ratified and confirmed.  In the event of any conflict, inconsistency, or incongruity between the provisions of this Amendment and the Agreement the provisions of this Amendment will control.

    b.  Unless specifically modified by this Amendment, all other terms and conditions of the Management Agreements will remain in full force and effect, and the same are hereby ratified and confirmed.  In the event of any conflict, inconsistency, or incongruity between the provisions of this Amendment and the Management Agreements the provisions of this Amendment will control.

    c.  If the Closing has not occurred by the Outside Date, all obligations under the Agreement and the Management Agreements and all of the rights of the parties thereunder shall remain fully enforceable as originally set forth and approved by the Bankruptcy Court, and this Amendment shall terminate and have no further force or effect.

    d.  This Amendment and the obligations herein described are subject to and conditioned upon entry by the Bankruptcy Court of an order approving the Amendment.

5. <u>Governing Law</u>. This Amendment will be interpreted, construed, and enforced pursuant to the laws of the State of Iowa without giving effect to the choice of law rules thereof.

6. <u>Severability</u>.  If any provision of this Amendment is held invalid, illegal or unenforceable in any jurisdiction, the remainder of this Amendment, or application of that provision to any Persons or circumstances, or in any jurisdiction, other than those as to which it is held unenforceable, will not be affected by that unenforceability and will be enforceable to the fullest extent permitted by law.

*[Remainder of page intentionally left blank; signature pages follow.]*

IN WITNESS WHEREOF, the parties have duly executed and delivered this Amendment as of the date first written above.

**BUYER AND MANAGER**

BLUE CARE HOMES, LLC
a New Jersey limited liability company

By: _____

Name: Sam Hanksins

Its: Managing Partner

**SELLER AND OPERATOR**

QHC FACILITIES, LLC

By: Mark Hidlebaugh
_____

Its: Mark Hidlebaugh
_____

QHC MANAGEMENT, LLC

By: Mark Hidlebaugh
_____

Its: Mark Hidlebaugh
_____

QHC MITCHELLVILLE, LLC

By: Mark Hidlebaugh
_____

Its: Mark Hidlebaugh
_____

QHC WINTERSET NORTH, LLC

By: Mark Hidlebaugh
_____

Its: Mark Hidlebaugh
_____

QHC MADISON SQUARE, LLC

*[Signature Page to Amendment]*

84572557.15

DocuSigned by:

F7482FB2AA5D439...

By: Mark Hidlebaugh

Its: Mark Hidlebaugh

QHC FORT DODGE VILLA, LLC

DocuSigned by:

F7482FB2AA5D439...

By: Mark Hidlebaugh

Its: Mark Hidlebaugh

QHC HUMBOLDT NORTH, LLC

DocuSigned by:

F7482FB2AA5D439...

By: Mark Hidlebaugh

Its: Mark Hidlebaugh

QHC HUMBOLDT SOUTH, LLC

DocuSigned by:

F7482FB2AA5D439...

By: Mark Hidlebaugh

Its: Mark Hidlebaugh

QHC VILLA COTTAGES, LLC

DocuSigned by:

F7482FB2AA5D439...

By: Mark Hidlebaugh

Its: Mark Hidlebaugh

CRESTRIDGE, INC.

DocuSigned by:

F7482FB2AA5D439

By: Mark Hidlebaugh

Its: <u>Mark Hidlebaugh</u>

CRESTVIEW ACRES, INC.

By: <u>Mark Hidlebaugh</u>

Its: <u>Mark Hidlebaugh</u>

## THIRD AMENDMENT TO ASSET PURCHASE AGREEMENT AND MANAGEMENT AGREEMENTS

THIS THIRD AMENDMENT TO ASSET PURCHASE AGREEMENT AND MANAGEMENT AGREEMENTS (the "**Amendment**") is made and entered into as of October 31st, 2022 (the "**Effective Date**"), by and between Seller (as defined below) and Buyer (as defined below).  Reference is made to (i) that certain Asset Purchase Agreement (the "**Agreement**") dated as of March 25, 2022 (the "**Execution Date**"), by and between QHC Facilities, LLC, QHC Management, LLC, QHC Mitchellville, LLC, QHC Winterset North, LLC, QHC Madison Square, LLC, QHC Fort Dodge Villa, LLC, QHC Humboldt North, LLC, QHC Humboldt South, LLC, and QHC Villa Cottages, LLC, each an Iowa limited liability company, and Crestridge, Inc. and Crestview Acres, Inc., each an Iowa corporation, (individually and collectively, "**Seller**" or "**Operator**"), and Blue Care Homes, LLC, a New Jersey limited liability company ("**Buyer**" or "**Manager**"); (ii) that certain First Amendment to the Asset Purchase Agreement and Management Agreements (the "**First Amendment**") dated as of September 9, 2022 by and between Seller and Buyer; (iii) that certain Second Amendment to the Asset Purchase Agreement and Management Agreements (the "**Second Amendment**") dated as of October 7, 2022 by and between Seller and Buyer; and (iv) those certain Management Agreements (the "**Management Agreements**") dated as of the Execution Date, by and between Operator and Manager.  Capitalized terms used but not defined in this Amendment shall have the meanings ascribed to such terms in the Agreement, First Amendment, Second Amendment, or Management Agreements.

1. Subject to the terms of this Amendment and in consideration of the mutual covenants herein contained, Buyer and Seller do hereby agree that the Agreement, First Amendment, and Second Amendment shall be amended as follows:

    i. The Outside Date referenced in the Agreement, First Amendment, and Second Amendment shall be November 14, 2022.

2. Representations. In order to induce the other parties to execute and deliver this Amendment, each party hereby represents and warrants to the other parties that this Amendment is duly authorized, executed and delivered by it and assuming due authorization, execution and delivery by each other parties, constitutes the legally valid and binding obligation of it, enforceable against it in accordance with its terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting enforcement of creditors rights generally and equitable principles (whether considered in a proceeding at equity or at law).

3. Counterparts.  This Amendment may be executed in any number of counterparts, and by the different parties on different counterpart signature pages, all of which taken together shall constitute one and the same agreement.  Any of the parties hereto may execute this Amendment by signing any such counterpart and each of such counterparts shall for all purposes be deemed to be an original.  Delivery of a counterpart hereof by e-mail transmission of an Adobe portable document format file (also known as a *"PDF"* file) shall be effective as delivery of a manually executed counterpart hereof.

4. Full Force and Effect.

    a. Unless specifically modified by this Amendment, all other terms and conditions of the Agreement will remain in full force and effect, and the same are hereby ratified and confirmed.  In the event of any conflict, inconsistency, or incongruity between the

provisions of this Amendment and the Agreement the provisions of this Amendment will control.

b.   Unless specifically modified by this Amendment, all other terms and conditions of the Management Agreements will remain in full force and effect, and the same are hereby ratified and confirmed.  In the event of any conflict, inconsistency, or incongruity between the provisions of this Amendment and the Management Agreements the provisions of this Amendment will control.

c.   If the Closing has not occurred by the Outside Date, all obligations under the Agreement and the Management Agreements and all of the rights of the parties thereunder shall remain fully enforceable as originally set forth and approved by the Bankruptcy Court, and this Amendment shall terminate and have no further force or effect.

d.   This Amendment and the obligations herein described are subject to and conditioned upon entry by the Bankruptcy Court of an order approving the Amendment.

5.   <u>Governing Law</u>. This Amendment will be interpreted, construed, and enforced pursuant to the laws of the State of Iowa without giving effect to the choice of law rules thereof.

6.   <u>Severability</u>.  If any provision of this Amendment is held invalid, illegal or unenforceable in any jurisdiction, the remainder of this Amendment, or application of that provision to any Persons or circumstances, or in any jurisdiction, other than those as to which it is held unenforceable, will not be affected by that unenforceability and will be enforceable to the fullest extent permitted by law.

*[Remainder of page intentionally left blank; signature pages follow.]*

IN WITNESS WHEREOF, the parties have duly executed and delivered this Amendment as of the date first written above.

**BUYER AND MANAGER**

BLUE CARE HOMES, LLC
a New Jersey limited liability company

By:

Name: Samuel Haikins

Its:    Managing Partner

IN WITNESS WHEREOF, the parties have duly executed and delivered this Amendment as of the date first written above.

**BUYER AND MANAGER**

BLUE CARE HOMES, LLC
a New Jersey limited liability company

By:    _____
Name:
Its:

**SELLER AND OPERATOR**
QHC FACILITIES, LLC

By: Mark Hidlebaugh
Its: Managing member

QHC MANAGEMENT, LLC

By: Mark Hidlebaugh
Its: Managing Member

QHC MITCHELLVILLE, LLC

By: Mark Hidlebaugh
Its: Managing Member

QHC WINTERSET NORTH, LLC

By: Mark Hidlebaugh
Its: Managing Member

QHC MADISON SQUARE, LLC

*[Signature Page to Amendment]*

84572557.15

By: _Mark Hidlebaugh_

Its: _Managing Member_

QHC FORT DODGE VILLA, LLC

By: _Mark Hidlebaugh_

Its: _Managing Member_

QHC HUMBOLDT NORTH, LLC

By: _Mark Hidlebaugh_

Its: _Managing Member_

QHC HUMBOLDT SOUTH, LLC

By: _Mark Hidlebaugh_

Its: _Managing Member_

QHC VILLA COTTAGES, LLC

By: _Mark Hidlebaugh_

Its: _Managing Member_

CRESTRIDGE, INC.

By: _Mark Hidlebaugh_

Its: _Managing Member_

CRESTVIEW ACRES, INC.

By: _Mark E Hidlebaugh_

Its: _Managing member_

# EXHIBIT B

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| QHC Facilities, LLC, et al., | ) | Case No. 21-01643-als11 |
| | ) | Jointly Administered |
| Debtors.[1] | ) | |
| | ) | Hon. Anita L. Shodeen |
| | ) | |
| | ) | |

_____

### STIPULATION RESOLVING UNITED STATES' OBJECTION TO THE SALE
### MOTION AND THE ASSUMPTION AND ASSIGNMENT OF
### CERTAIN MEDICARE PROVIDER AGREEMENTS
### [Relates to ECF Nos. 180, 189, 366, 367, 434, 446, and 454]

This stipulation ("Settlement Agreement") is entered into by and among the Debtors, the

United States of America, acting on behalf of the U.S. Department of Health and Human Services

("HHS") and its component, the Centers for Medicare and Medicaid Services ("CMS") (HHS and

CMS, collectively, the "Government"); Blue Care Homes, LLC (the "Buyer"); Blue Care OpCo

Winterset - East LLC, Blue Care OpCo Maquoketa, LLC, Blue Care OpCo Fort Dodge - North

LLC, Blue Care OpCo Humboldt - North LLC  (each an "Assignee" and collectively, the

"Assignees") (the Debtors, the Government, the Buyer, and the Assignees, collectively, the

"Parties") with the consent of the Official Committee of Unsecured Creditors.

### RECITALS

A.    **WHEREAS**, on December 29, 2021, the Debtors filed voluntary petitions for relief

under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") commencing their

---

[1] The Jointly Administered Debtors (the "Debtors") in this proceeding are *In re QHC Management, LLC* (Case No. 21-01644-als11), *In re QHC Mitchellville, LLC* (Case No. 21-01645-als11), *In re QHC Winterset North, LLC* (Case No. 21-01646-als11), *In re QHC Madison Square, LLC* (Case No. 21-01647-als11), *In re QHC Fort Dodge Villa, LLC* (Case No. 21-01648-als11), *In re Crestridge, Inc.* (Case No. 21-01649-als11), *In re Crestview Acres, Inc.* (Case No. 21-01650- als11), *In re QHC Humboldt North, LLC* (Case No. 21-01651-als11), *In re QHC Humboldt South, LLC* (Case No. 21-01652-als11) and *In re QHC Villa Cottages, LLC* (Case No. 21-01653- als11).

Page 1 of 12

bankruptcy cases, jointly administered under Bankruptcy Case No. 21-01643-als11, in the United States Bankruptcy Court for the Southern District of Iowa (the "Court").

B.      **WHEREAS**, eight of the Debtors ("SNF Debtors") are subject to Medical Health Insurance Benefit Agreements, commonly referred to as Medicare provider agreements, with the Secretary of HHS;[2] through these agreements, SNF Debtors receive payments for services provided to Medicare beneficiaries and, in exchange, SNF Debtors must comply with Title XVIII of the Social Security Act, see 42 U.S.C. §§ 1395-1395lll and its implementing regulations (together, "Medicare Law"). CMS, as a component of HHS, administers the Medicare program.

C.      **WHEREAS**, on February 3, 2022, CMS timely filed proofs of claim in the SNF Debtors' cases for prepetition COVID-19 Accelerated and Advanced Payments ("CAAP") and civil monetary penalties ("CMPs") of at least $1,262,241.94, subject to CMS's audit rights on any potential Medicare overpayments and other claims and the United States' setoff and recoupment rights.

D.      **WHEREAS**, on February 18 and March 1, 2022, the Debtors on behalf of their estates filed cure notices (ECF Nos. 180 and 189) ("First and Second Cure Notices"), seeking to assume and assign the SNF Debtors' Medicare provider agreements under section 365 of the Bankruptcy Code and listing a total cure amount of $1,262,241.94 for these agreements.

E.      **WHEREAS**, on June 23, 2022, Debtors moved for authority to reject the Medicare provider agreements for Sunnycrest, Humboldt South, and Mitchellville (ECF No. 357) ("Rejection Motion") and to close those facilities (ECF No. 356).

---

[2] The SNF Debtors and Medicare provider agreement numbers are as follows: (1) Crestridge, Inc. ("Crestridge"): CCN 16-5516; (2) Crestview Acres, Inc. ("Crestview Acres"): CCN 16-5299; (3) Sunnycrest ("Sunnycrest"): CCN 16-5515; (4) QHC Fort Dodge Villa, LLC ("Fort Dodge"): CCN 16-5265; (5) QHC Humboldt North, LLC ("Humboldt North"): CCN 16-5533; (6) QHC Humboldt South, LLC ("Humboldt South"): CCN 16-5534; (7) QHC Mitchellville, LLC ("Mitchellville"): CCN 16-5264; and (8) QHC Winterset North, LLC ("Winterset North"): CCN 16-5497.

F.      **WHEREAS**, the Court granted the Rejection Motion, effective after all residents were safely relocated and the facilities were closed in accordance with counsel's representations on the record. The Court further ordered Debtors to comply with "any applicable regulations and rules governing the [facility closing] process."  ECF No. 362 ("Rejection Order").

G.      **WHEREAS**, on July 1, 2022, the United States filed its Objection to the First and Second Cure Notices (ECF No. 366) ("Cure Objection"); the Cure Objection listed SNF Debtors' total cure to assume and assign all their Medicare provider agreements as $2,108,910.52, which included prepetition CAAP amounts owed to CMS and prepetition and post-petition CMPs owed to CMS under the Debtors' Medicare provider agreements as of July 1, 2022.

H.      **WHEREAS**, on July 20, 2022, the Debtors filed a third cure notice (ECF No. 387) ("Third Cure Notice") (together with the First and Second Cure Notices, the "Cure Notices"), removing the Medicare provider agreements for Humboldt South and Sunnycrest from the list of agreements to be assumed and assigned under section 365 of the Bankruptcy Code.

I.      **WHEREAS**, on September 23, 2022, the Debtors filed a Motion for Order Approving the Sale Free and Clear Of Liens, Claims, Interests, & Encumbrances (ECF No. 434) ("Sale Motion") on September 23, 2022, and an amendment to the Sale Motion on October 10, 2022 (ECF No. 454) (collectively with the Sale Motion, "Sale Motion Amendment") seeking an order from the Court approving, *inter alia*:

(a)      the sale of substantially all Debtors' assets to the Buyer under section 363 of the Bankruptcy Code pursuant to a First Amendment to the Asset Purchase Agreement and Management Agreements (the "First Amendment"), dated September 9, 2022, between and among the Debtors and the Buyer;

(b)      the assumption of the Medicare provider agreements of Winterset North, Crestridge, Humboldt North, and Fort Dodge, (the "Assumed Provider Agreements") and the assignment of the Assumed Provider Agreements to the Assignees under section 365 of the Bankruptcy Code; and

(c)      the rejection of the Medicare provider agreements of Humboldt South, Sunnycrest, Mitchellville, and Crestview Acres (the "Rejected Provider Agreements") under section 365 of the Bankruptcy Code.

J.      **WHEREAS**, the United States filed an Amended Objection to the Sale Motion and Cure Amounts ("Amended Cure Objection") (ECF No. 446), objecting to the assumption and assignment of certain Assumed Provider Agreements and related proposed cure amounts.

K.      **WHEREAS**, the Parties engaged in good faith, arms' length negotiations to resolve the Cure Objection, the Cure Notices, and any potential objection by the Government to the Sale Motion Amendment, including the assumption and assignment or rejection of the Debtors' Medicare provider agreements.

**NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which is mutually acknowledged by the Parties hereto, intending to be legally bound, but subject to approval by the Bankruptcy Court, the Parties agree as follows:

## AGREEMENT

1.      **Cure Settlement.**  The Buyer shall pay CMS the greater of (a) the outstanding CAAP amounts owed under the Assumed Provider Agreements, totaling $32,182.17, plus forty percent (40%) of the CMP liabilities owed under the Assumed Provider Agreements through the closing date of the sale of the facilities ("Closing Date"), or (b) **$692,262.79** (the "Cure Settlement Amount").  The Cure Settlement Amount shall be paid upon the later of: (a) an entry of an order

by the Bankruptcy Court approving this Settlement Agreement; (b) the Closing Date; (c) the U.S. Department of Justice approving this Settlement Agreement; and (d) the fifth day after CMS provides the CMP liabilities, as of the Closing Date, owed under the Assumed Provider Agreements, to counsel for the Buyer and counsel for the Debtors. The U.S. Department of Justice will provide wiring instructions to counsel for the Buyer.

2. **Closed Facilities Settlement.** The Debtors shall pay CMS the greater of (x) fifteen percent (15%) of the CAAP and CMP liabilities owed under the Rejected Provider Agreements through the Closing Date, or (y) **$82,638.96** ("Closed Facilities Settlement Amount"). The Closed Facilities Settlement Amount shall be paid upon the later of: (a) an entry of an order by the Bankruptcy Court approving this Settlement Agreement; (b) the Closing Date; (c) the U.S. Department of Justice approving this Settlement Agreement; and (d) the fifth day after CMS provides the CMP liabilities, as of the Closing Date, owed under the Rejected Provider Agreements to counsel for the Debtors. The U.S. Department of Justice will provide wiring instructions to counsel for the Debtors.

3. **Assumption & Assignment.** The Debtors shall assume and assign to the Assignees and the Assignees shall accept assignment of the Assumed Provider Agreements pursuant to section 365 of the Bankruptcy Code on or before the Closing Date, subject to regulatory approval. In accordance with the Medicare Law, including 42 C.F.R. § 489.18, successor liability attaches to any claim arising under the Assumed Provider Agreements, and payments to the Assignees (or any future assignee under the provisions of Medicare Law) will be adjusted in accordance with 42 U.S.C. § 1395g(a) to account for prior overpayments and underpayments which may be determined in the future.

4. **Change of Ownership Process.** Prior to the Closing Date, the Buyer or Assignees

shall apply for CMS approval of a change of ownership (commonly referred to as the "CHOW") with respect to the facilities subject to the Assumed Provider Agreements by submitting Form CMS 855 for each Assignee to the Medicare Administrative Contractor ("MAC"). CMS shall direct the MAC to process the assignment of the Assumed Provider Agreements in the ordinary course immediately following the Closing Date. The Debtors and/or Buyer shall provide the undersigned attorneys for the United States Department of Justice with separate notice of the sale closing and Closing Date. As set forth in the CMS Program Integrity Manual at Chapter 15, Section 15.7.7.1.5, Medicare payments for all goods and services rendered both prior and subsequent to the Closing Date shall continue to be made to the Debtors, to the extent bills are submitted by the Debtors, until the assignment of the Assumed Provider Agreements and the Buyer's Form CMS 855s are processed and approved by the MAC.

5.      **Rejection Process.** The Government shall not object to Debtors' rejection of the Rejected Provider Agreements pursuant to section 365 of the Bankruptcy Code. *Notwithstanding* anything to the contrary in this Settlement Agreement, the Debtors and the Buyer shall comply with the Medicare Law governing the termination of the Rejected Provider Agreements and the closure of the facilities, including the safe transfer of any residents out of any SNF Debtor facilities prior to their closure. Rejection shall not become effective as to a Rejected Provider Agreement until all residents of the relevant SNF Debtor facility have been transferred out of the facility and the facility has closed.

6.      **The Debtors' Release.** Upon the United States' receipt of the Cure Settlement Amount and the Closed Facilities Settlement Amount, the Debtors shall be deemed to have released any claims against CMS arising under the Assumed Provider Agreements and the Rejected Provider Agreements prior to the Closing Date, including, without limitation, any appeals

of the CMPs assessed on any SNF Debtor, whether known or unknown, except as otherwise expressly provided in this Settlement Agreement.

7.      **The Buyer's Release.**    Upon the United States' receipt of the Cure Settlement Amount and the Closed Facilities Settlement Amount, the Buyer and the Assignees shall be deemed to have released any claims against CMS arising under the Assumed Provider Agreements and the Rejected Provider Agreements prior to the Closing Date, including any appeals of the CMPs assessed on any SNF Debtor, whether known or unknown, except as otherwise expressly provided in this Settlement Agreement.

8.      **The United States' Release**.    Upon the United States' receipt of the Cure Settlement Amount, except as provided in paragraphs 1, 3 and 10, CMS shall release the Debtors, the Buyer, and the Assignees from the following CAAP and CMP claims under the Assumed Provider Agreements, and any additional CMP liabilities that have accrued through the Closing Date under the Assumed Provider Agreements:

| Debtor | CAAP | Prepetition CMP | Post-petition CMP | TOTAL |
|---|---|---|---|---|
| Crestridge, Inc. | $32,182.17 | $0.00 | $0.00 | $32,182.17 |
| Fort Dodge Villa, LLC | $0.00 | $733,416.51 | $202,288.00 | $935,704.51 |
| Humboldt North, LLC | $0.00 | $17,500.00 | $57,600.00 | $75,100.00 |
| Winterset North, LLC | $0.00 | $405,458.06 | $233,938.97 | $639,397.03 |
| **TOTAL** | **$32,182.17** | **$1,156,374.57** | **$493,826.97** | **$1,682,383.71** |

Upon the United States' receipt of the Closed Facilities Settlement Amount, except as provided in paragraphs 2 and 10, CMS shall release the Debtors from the following CAAP and CMP claims under the Rejected Provider Agreements, and any additional CMP liabilities that have accrued through the Closing Date under the Rejected Provider Agreements:

| Debtor | CAAP | Prepetition CMP | Post-petition CMP | TOTAL |
|---|---|---|---|---|
| Crestview Acres, Inc. | $6,061.90 | $86,041.70 | $2,638.80 | $94,742.40 |
| Mitchellville, LLC | $178.71 | $280,625.73 | $104,903.96 | $385,708.40 |
| Sunnycrest | $0.00 | $3,250.00 | $0.00 | $3,250.00 |
| Humboldt South, LLC | $47,225.61 | $0.00 | $20,000.00 | $67,225.61 |
| **TOTAL** | **$53,466.22** | **$369,917.43** | **$127,542.76** | **$550,926.41** |

9.     **CMS Proofs of Claim.**  The proofs of claim filed by CMS are deemed allowed under section 502(a) of the Bankruptcy Code, and those claims shall be satisfied upon the United States' receipt of the Cure Settlement Amount and Closed Facilities Settlement Amount, except as otherwise expressly provided in this Settlement Agreement.

10.     **The United States' Claim Retention and Reservation of Rights**. Notwithstanding the language in paragraphs 7 and 8, this Settlement Agreement does not release or compromise any of the following claims or rights: (a) any claims arising under criminal law; (b) any criminal, civil, or administrative claims, rights or defenses arising under Title 26, United States Code (Internal Revenue Code); (c) any claims, rights, or defenses arising under the False Claims Act (31 U.S.C. §§ 3729 et seq.), the Program Frauds Civil Remedies Act (31 U.S.C. §§ 3801 et seq.), or the Civil Monetary Penalties Statute (42 U.S.C. §§ 1320-7a); (d) any common law cause of action for fraud; (e) any claims asserted by the Health Resources & Services Administration, a component of HHS; (f) any claims of any other agencies of the United States; and (g) the United States' right to audit the facilities subject to the Assumed Provider Agreements and the Rejected Provider Agreements and to recoup or setoff subsequently discovered overpayments or amounts due to the Medicare program under the Assumed Provider Agreements and the Rejected Provider Agreements, to the extent permitted by Medicare Law.

11.     **Sale Closing.**  The Debtors shall seek Court approval of this proposed Settlement Agreement; however, this proposed Settlement Agreement shall become void if the Court does not

enter an order approving both the Sale Motion Amendment and this proposed Settlement Agreement. Notwithstanding anything contained in the Settlement Agreement, the Settlement Agreement shall be of no force or effect and the Parties shall be returned to their pre-settlement positions if the Closing Date does not occur.

12.     **No Admissions.**  This Settlement Agreement is not and shall not in any way be construed as an admission by the Parties of any allegations made in connection with the Cure Objection, Amended Cure Objection, the Cure Notices, and the Sale Motion Amendment.

13.     **Expenses.**  The Parties shall bear their own costs, expenses, and attorneys' fees incurred to date, including but not limited to those incurred in connection with the Cure Objection and the Cure Notices.

14.     **Governing Law.**  This Settlement Agreement is governed by federal law.

15.     **Continuing Jurisdiction.**  Upon approval of this Settlement Agreement by the Court, the Court shall retain jurisdiction to resolve any disputes or controversies regarding the interpretation of this Settlement Agreement.

16.     **Miscellaneous.**

(a)     Each of the undersigned signatories represents and warrants that he or she is authorized to execute and deliver this Settlement Agreement on behalf of the Party or Parties that he or she represents.

(b)     For purposes of interpreting this Settlement Agreement, none of the Parties shall be deemed to have been the drafter of the Settlement Agreement, each Party having participated equally, and any rule of law providing that ambiguities shall be construed against the drafting party shall not be applicable to, or used in, resolving any dispute over the meaning or intent of this Settlement Agreement.

(c)     This Settlement Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof, and all prior agreements, negotiations, and understandings with respect to the subject matter hereof are canceled and superseded by this Settlement Agreement.

(d)     This Settlement Agreement may not be altered, amended, terminated, modified, or changed in any respect except by written instrument signed the Parties or by order of the Court.

(e)     This Settlement Agreement may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same agreement.  Signatures provided by electronic mail or facsimile shall constitute acceptable, binding signatures for purposes of this Settlement Agreement.

(f)     This Settlement Agreement shall be effective upon its execution by the Parties and the approval of the Settlement Agreement by the Court and shall be binding upon the Parties and any of their respective successors and assigns, except as otherwise provided in paragraph 11 of this Settlement Agreement.


Date Signed: October 27, 2022

                                        UNITED STATES OF AMERICA, on
                                        behalf of the United States Department of
                                        Health and Human Services


                                        /s/  _Tiffiney F. Carney__ _____
                                        RUTH A. HARVEY
                                        RODNEY A. MORRIS
                                        SETH B. SHAPIRO
                                        (D.C. Bar No. 433988)
                                        TIFFINEY F. CARNEY
                                        (D.C. Bar No. 1024568)
                                        United States Department of Justice
                                        P.O. BOX 875
                                        Ben Franklin Station

Washington, D.C. 20044-0875

*Attorneys for the United States on behalf of the U.S. Department of Health and Human Services*

Date Signed: October 27, 2022

QHC Facilities, LLC; QHC Management, LLC, QHC Mitchellville, LLC; QHC Winterset North, LLC; QHC Madison Square, LLC; QHC Fort Dodge Villa, LLC; Crestridge, Inc.; Crestview Acres, Inc.; QHC Humboldt North, LLC; QHC Humboldt South, LLC; QHC Villa Cottages, LLC

/s/   *Krystal R. Mikkilineni*
Krystal R. Mikkilineni, Esq., AT0011814
Dentons Davis Brown
The Davis Brown Tower
215 10th Street, Suite 1300
Des Moines, IA 50309
(515) 246-7943
krystal.mikkilineni@dentons.com

*General Reorganization Co-Counsel for Debtors and Debtors in Possession*

Date Signed: October 26, 2022

Blue Care Homes, LLC

/s/   *Richard Kanowitz*
Bradley R. Kruse, IS9999179
Dickinson, Mackaman, Tyler & Hagen, P.C.
699 Walnut St., Ste. 1600
Des Moines, IA 50309
Telephone: 515.246.4505
e-mail: bkruse@dickinsonlaw.com

and

Richard Kanowitz, Esq. (pro hac vice)
Gabriel Levinson (pro hac vice)

Haynes and Boone, LLP
30 Rockefeller Plaza, 26th Floor
New York, NY 10112
Telephone: 212.918.8971
e-mail: richard.kanowitz@haynesboone.com
e-mail: gabriel.levinson@haynesboone.com

Martha Wyrick (pro hac vice)
Haynes and Boone, LLP
2323 Victory Avenue, Suite 700
Dallas, TX 75219
Telephone: 713.547.2047
e-mail: martha.wyrick@haynesboone.com

*Counsel to the Blue Care Homes, LLC*

**CONSENTED TO BY**:
Date Signed: October 27, 2022

/s/  *Francis J. Lawall*
Francis J. Lawall, Esq. (admitted pro hac
vice)
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103-2799
Tel: (215) 981-44-81
Fax: (215) 689-4693
Francis.lawall@troutman.com

*Counsel for The Official Unsecured
Creditors' Committee*

DocuSign Envelope ID: EB468B73-C455-4432-9EC9-9F2DFE989F87

Blue Care OpCos (Assignees)


/s/ _____


_____
Shmuel Haikins

*Member of the Blue Care OpCos*
*(Assignees)*



_____

COURTESY REDLINE DRAFT

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF IOWA

| In re: | ) | Chapter 11 |
|---|---|---|
| | ) | |
| QHC Facilities, LLC, et al., | ) | Case No. 21-01643-als11 |
| | ) | Jointly Administered |
| Debtors.[1] | ) | |
| | ) | Hon. Anita L. Shodeen |
| | ) | |
| | ) | |

## STIPULATION RESOLVING UNITED STATES' OBJECTION TO THE SALE MOTION AND THE ASSUMPTION AND ASSIGNMENT OF CERTAIN MEDICARE PROVIDER AGREEMENTS
### [Relates to ECF Nos. 180, 189, 366, 367, 434, 446, and 454]

This stipulation ("Settlement Agreement") is entered into by and among the Debtors, the United States of America, acting on behalf of the U.S. Department of Health and Human Services ("HHS") and its component, the Centers for Medicare and Medicaid Services ("CMS") (HHS and CMS, collectively, the "Government"); Blue Care Homes, LLC (the "Buyer"); Blue Care OpCo Winterset - East LLC, Blue Care OpCo Maquoketa, LLC, Blue Care OpCo Fort Dodge - North LLC, Blue Care OpCo Humboldt - North LLC (each an "Assignee" and collectively, the "Assignees") (the Debtors, the Government, the Buyer, and the Assignees, collectively, the "Parties") with the consent of the Official Committee of Unsecured Creditors.

### RECITALS

A.    **WHEREAS**, on December 29, 2021, the Debtors filed voluntary petitions for relief under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") commencing their

---

[1] The Jointly Administered Debtors (the "Debtors") in this proceeding are *In re QHC Management, LLC* (Case No. 21-01644-als11), *In re QHC Mitchellville, LLC* (Case No. 21-01645-als11), *In re QHC Winterset North, LLC* (Case No. 21-01646-als11), *In re QHC Madison Square, LLC* (Case No. 21-01647-als11), *In re QHC Fort Dodge Villa, LLC* (Case No. 21-01648-als11), *In re Crestridge, Inc.* (Case No. 21-01649-als11), *In re Crestview Acres, Inc.* (Case No. 21-01650- als11), *In re QHC Humboldt North, LLC* (Case No. 21-01651-als11), *In re QHC Humboldt South, LLC* (Case No. 21-01652-als11) and *In re QHC Villa Cottages, LLC* (Case No. 21-01653- als11).

bankruptcy cases, jointly administered under Bankruptcy Case No. 21-01643-als11, in the United States Bankruptcy Court for the Southern District of Iowa (the "Court").

B.      **WHEREAS**, eight of the Debtors ("SNF Debtors") are subject to Medical Health Insurance Benefit Agreements, commonly referred to as Medicare provider agreements, with the Secretary of HHS;[2] through these agreements, SNF Debtors receive payments for services provided to Medicare beneficiaries and, in exchange, SNF Debtors must comply with Title XVIII of the Social Security Act, see 42 U.S.C. §§ 1395-1395lll and its implementing regulations (together, "Medicare Law"). CMS, as a component of HHS, administers the Medicare program.

C.      **WHEREAS**, on February 3, 2022, CMS timely filed proofs of claim in the SNF Debtors' cases for prepetition COVID-19 Accelerated and Advanced Payments ("CAAP") and civil monetary penalties ("CMPs") of at least $1,262,241.94, subject to CMS's audit rights on any potential Medicare overpayments and other claims and the United States' setoff and recoupment rights.

D.      **WHEREAS**, on February 18 and March 1, 2022, the Debtors on behalf of their estates filed cure notices (ECF Nos. 180 and 189) ("First and Second Cure Notices"), seeking to assume and assign the SNF Debtors' Medicare provider agreements under section 365 of the Bankruptcy Code and listing a total cure amount of $1,262,241.94 for these agreements.

E.      **WHEREAS**, on June 23, 2022, Debtors moved for authority to reject the Medicare provider agreements for Sunnycrest, Humboldt South, and Mitchellville (ECF No. 357) ("Rejection Motion") and to close those facilities (ECF No. 356).

---

[2] The SNF Debtors and Medicare provider agreement numbers are as follows: (1) Crestridge, Inc. ("Crestridge"): CCN 16-5516; (2) Crestview Acres, Inc. ("Crestview Acres"): CCN 16-5299; (3) Sunnycrest ("Sunnycrest"): CCN 16-5515; (4) QHC Fort Dodge Villa, LLC ("Fort Dodge"): CCN 16-5265; (5) QHC Humboldt North, LLC ("Humboldt North"): CCN 16-5533; (6) QHC Humboldt South, LLC ("Humboldt South"): CCN 16-5534; (7) QHC Mitchellville, LLC ("Mitchellville"): CCN 16-5264; and (8) QHC Winterset North, LLC ("Winterset North"): CCN 16-5497.

F.      **WHEREAS**, the Court granted the Rejection Motion, effective after all residents were safely relocated and the facilities were closed in accordance with counsel's representations on the record. The Court further ordered Debtors to comply with "any applicable regulations and rules governing the [facility closing] process."  ECF No. 362 ("Rejection Order").

G.      **WHEREAS**, on July 1, 2022, the United States filed its Objection to the First and Second Cure Notices (ECF No. 366) ("Cure Objection"); the Cure Objection listed SNF Debtors' total cure to assume and assign all their Medicare provider agreements as $2,108,910.52, which included prepetition CAAP amounts owed to CMS and prepetition and post-petition CMPs owed to CMS under the Debtors' Medicare provider agreements as of July 1, 2022.

H.      **WHEREAS**, on July 20, 2022, the Debtors filed a third cure notice (ECF No. 387) ("Third Cure Notice") (together with the First and Second Cure Notices, the "Cure Notices"), removing the Medicare provider agreements for Humboldt South and Sunnycrest from the list of agreements to be assumed and assigned under section 365 of the Bankruptcy Code.

I.      **WHEREAS**, on September 23, 2022, the Debtors filed a Motion for Order Approving the Sale Free and Clear Of Liens, Claims, Interests, & Encumbrances (ECF No. 434) ("Sale Motion") on September 23, 2022, and an amendment to the Sale Motion on October 10, 2022 (ECF No. 454) (collectively with the Sale Motion, "Sale Motion Amendment") seeking an order from the Court approving, *inter alia*:

(a)      the sale of substantially all Debtors' assets to the Buyer under section 363 of the Bankruptcy Code pursuant to a First Amendment to the Asset Purchase Agreement and Management Agreements (the "First Amendment"), dated September 9, 2022, between and among the Debtors and the Buyer;

(b)     the assumption of the Medicare provider agreements of Winterset North, Crestridge, Humboldt North, and Fort Dodge, (the "Assumed Provider Agreements") and the assignment of the Assumed Provider Agreements to the Assignees under section 365 of the Bankruptcy Code; and

(c)     the rejection of the Medicare provider agreements of Humboldt South, Sunnycrest, Mitchellville, and Crestview Acres (the "Rejected Provider Agreements") under section 365 of the Bankruptcy Code.

J.     **WHEREAS**, the United States filed an Amended Objection to the Sale Motion and Cure Amounts ("Amended Cure Objection") (ECF No. 446), objecting to the assumption and assignment of certain Assumed Provider Agreements and related proposed cure amounts.

K.     **WHEREAS**, the Parties engaged in good faith, arms' length negotiations to resolve the Cure Objection, the Cure Notices, and any potential objection by the Government to the Sale Motion Amendment, including the assumption and assignment or rejection of the Debtors' Medicare provider agreements.

**NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which is mutually acknowledged by the Parties hereto, intending to be legally bound, but subject to approval by the Bankruptcy Court, the Parties agree as follows:

## AGREEMENT

1.     **Cure Settlement.**  The Buyer shall pay CMS the greater of (a) the outstanding CAAP amounts owed under the Assumed Provider Agreements, totaling $32,182.17, plus forty percent (40%) of the CMP liabilities owed under the Assumed Provider Agreements through the closing date of the sale of the facilities ("Closing Date"), or (b) **$692,262.79** (the "Cure Settlement Amount").  The Cure Settlement Amount shall be paid upon the later of: (a) an entry of an order

by the Bankruptcy Court approving this Settlement Agreement; (b) the Closing Date; (c) the U.S. Department of Justice approving this Settlement Agreement; and (d) the fifth day after CMS provides the CMP liabilities, as of the Closing Date, owed under the Assumed Provider Agreements, to counsel for the Buyer and counsel for the Debtors. The U.S. Department of Justice will provide wiring instructions to counsel for the Buyer.

2. **Closed Facilities Settlement.** The Debtors shall pay CMS the greater of (x) fifteen percent (15%) of the CAAP and CMP liabilities owed under the Rejected Provider Agreements through the Closing Date, or (y) **$82,638.96** ("Closed Facilities Settlement Amount"). The Closed Facilities Settlement Amount shall be paid upon the later of: (a) an entry of an order by the Bankruptcy Court approving this Settlement Agreement; (b) the Closing Date; (c) the U.S. Department of Justice approving this Settlement Agreement; and (d) the fifth day after CMS provides the CMP liabilities, as of the Closing Date, owed under the Rejected Provider Agreements to counsel for the Debtors. The U.S. Department of Justice will provide wiring instructions to counsel for the Debtors.

3. **Assumption & Assignment.** The Debtors shall assume and assign to the Assignees and the Assignees shall accept assignment of the Assumed Provider Agreements pursuant to section 365 of the Bankruptcy Code on or before the Closing Date, subject to regulatory approval. In accordance with the Medicare Law, including 42 C.F.R. § 489.18, successor liability attaches to any claim arising under the Assumed Provider Agreements, and payments to the Assignees (or any future assignee under the provisions of Medicare Law) will be adjusted in accordance with 42 U.S.C. § 1395g(a) to account for prior overpayments and underpayments which may be determined in the future.

4. **Change of Ownership Process.** Prior to the Closing Date, the Buyer or Assignees

shall apply for CMS approval of a change of ownership (commonly referred to as the "CHOW")
with respect to the facilities subject to the Assumed Provider Agreements by submitting Form
CMS 855 for each Assignee to the Medicare Administrative Contractor ("MAC"). CMS shall
direct the MAC to process the assignment of the Assumed Provider Agreements in the ordinary
course immediately following the Closing Date. The Debtors and/or Buyer shall provide the
undersigned attorneys for the United States Department of Justice with separate notice of the sale
closing and Closing Date. As set forth in the CMS Program Integrity Manual at Chapter 15,
Section 15.7.7.1.5, Medicare payments for all goods and services rendered both prior and
subsequent to the Closing Date shall continue to be made to the Debtors, to the extent bills are
submitted by the Debtors, until the assignment of the Assumed Provider Agreements and the
Buyer's Form CMS 855s are processed and approved by the MAC.

5.    **Rejection Process.** The Government shall not object to Debtors' rejection of the
Rejected Provider Agreements pursuant to section 365 of the Bankruptcy Code. *Notwithstanding*
anything to the contrary in this Settlement Agreement, the Debtors and the Buyer shall comply
with the Medicare Law governing the termination of the Rejected Provider Agreements and the
closure of the facilities, including the safe transfer of any residents out of any SNF Debtor facilities
prior to their closure. Rejection shall not become effective as to a Rejected Provider Agreement
until all residents of the relevant SNF Debtor facility have been transferred out of the facility and
the facility has closed.

6.    **The Debtors' Release.** Upon the United States' receipt of the Cure Settlement
Amount and the Closed Facilities Settlement Amount, the Debtors shall be deemed to have
released any claims against CMS arising under the Assumed Provider Agreements and the
Rejected Provider Agreements prior to the Closing Date, including, without limitation, any appeals

of the CMPs assessed on any SNF Debtor, whether known or unknown, except as otherwise expressly provided in this Settlement Agreement.

7. **The Buyer's Release.** Upon the United States' receipt of the Cure Settlement Amount and the Closed Facilities Settlement Amount, the Buyer and the Assignees shall be deemed to have released any claims against CMS arising under the Assumed Provider Agreements and the Rejected Provider Agreements prior to the Closing Date, including any appeals of the CMPs assessed on any SNF Debtor, whether known or unknown, except as otherwise expressly provided in this Settlement Agreement.

8. **The United States' Release**. Upon the United States' receipt of the Cure Settlement Amount, except as provided in paragraphs 1, 3 and 10, CMS shall release the Debtors, the Buyer, and the Assignees from the following CAAP and CMP claims under the Assumed Provider Agreements, and any additional CMP liabilities that have accrued through the Closing Date under the Assumed Provider Agreements:

| Debtor | CAAP | Prepetition CMP | Post-petition CMP | TOTAL |
|---|---|---|---|---|
| Crestridge, Inc. | $32,182.17 | $0.00 | $0.00 | $32,182.17 |
| Fort Dodge Villa, LLC | $0.00 | $733,416.51 | $202,288.00 | $935,704.51 |
| Humboldt North, LLC | $0.00 | $17,500.00 | $57,600.00 | $75,100.00 |
| Winterset North, LLC | $0.00 | $405,458.06 | $233,938.97 | $639,397.03 |
| **TOTAL** | **$32,182.17** | **$1,156,374.57** | **$493,826.97** | **$1,682,383.71** |

Upon the United States' receipt of the Closed Facilities Settlement Amount, except as provided in paragraphs 2 and 10, CMS shall release the Debtors from the following CAAP and CMP claims under the Rejected Provider Agreements, and any additional CMP liabilities that have accrued through the Closing Date under the Rejected Provider Agreements:

| Debtor | CAAP | Prepetition CMP | Post-petition CMP | TOTAL |
|---|---|---|---|---|
| Crestview Acres, Inc. | $6,061.90 | $86,041.70 | $2,638.80 | $94,742.40 |
| Mitchellville, LLC | $178.71 | $280,625.73 | $104,903.96 | $385,708.40 |
| Sunnycrest | $0.00 | $3,250.00 | $0.00 | $3,250.00 |
| Humboldt South, LLC | $47,225.61 | $0.00 | $20,000.00 | $67,225.61 |
| **TOTAL** | **$53,466.22** | **$369,917.43** | **$127,542.76** | **$550,926.41** |

9.     **CMS Proofs of Claim.**  The proofs of claim filed by CMS are deemed allowed under section 502(a) of the Bankruptcy Code, and those claims shall be satisfied upon the United States' receipt of the Cure Settlement Amount and Closed Facilities Settlement Amount, except as otherwise expressly provided in this Settlement Agreement.

10.     **The United States' Claim Retention and Reservation of Rights**. Notwithstanding the language in paragraphs 7 and 8, this Settlement Agreement does not release or compromise any of the following claims or rights: (a) any claims arising under criminal law; (b) any criminal, civil, or administrative claims, rights or defenses arising under Title 26, United States Code (Internal Revenue Code); (c) any claims, rights, or defenses arising under the False Claims Act (31 U.S.C. §§ 3729 et seq.), the Program Frauds Civil Remedies Act (31 U.S.C. §§ 3801 et seq.), or the Civil Monetary Penalties Statute (42 U.S.C. §§ 1320-7a); (d) any common law cause of action for fraud; (e) any claims asserted by the Health Resources & Services Administration, a component of HHS; (f) any claims of any other agencies of the United States; and (g) the United States' right to audit the facilities subject to the Assumed Provider Agreements and the Rejected Provider Agreements and to recoup or setoff subsequently discovered overpayments or amounts due to the Medicare program under the Assumed Provider Agreements and the Rejected Provider Agreements, to the extent permitted by Medicare Law.

11.     **Sale Closing.**  The Debtors shall seek Court approval of this proposed Settlement Agreement; however, this proposed Settlement Agreement shall become void if the Court does not

enter an order approving both the Sale Motion Amendment and this proposed Settlement Agreement. Notwithstanding anything contained in the Settlement Agreement, the Settlement Agreement shall be of no force or effect and the Parties shall be returned to their pre-settlement positions if the Closing Date does not occur by October 31, 2022.

12.    **No Admissions.**  This Settlement Agreement is not and shall not in any way be construed as an admission by the Parties of any allegations made in connection with the Cure Objection, Amended Cure Objection, the Cure Notices, and the Sale Motion Amendment.

13.    **Expenses.**  The Parties shall bear their own costs, expenses, and attorneys' fees incurred to date, including but not limited to those incurred in connection with the Cure Objection and the Cure Notices.

14.    **Governing Law.**  This Settlement Agreement is governed by federal law.

15.    **Continuing Jurisdiction.**  Upon approval of this Settlement Agreement by the Court, the Court shall retain jurisdiction to resolve any disputes or controversies regarding the interpretation of this Settlement Agreement.

16.    **Miscellaneous.**

(a)    Each of the undersigned signatories represents and warrants that he or she is authorized to execute and deliver this Settlement Agreement on behalf of the Party or Parties that he or she represents.

(b)    For purposes of interpreting this Settlement Agreement, none of the Parties shall be deemed to have been the drafter of the Settlement Agreement, each Party having participated equally, and any rule of law providing that ambiguities shall be construed against the drafting party shall not be applicable to, or used in, resolving any dispute over the meaning or intent of this Settlement Agreement.

(c)     This Settlement Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof, and all prior agreements, negotiations, and understandings with respect to the subject matter hereof are canceled and superseded by this Settlement Agreement.

(d)     This Settlement Agreement may not be altered, amended, terminated, modified, or changed in any respect except by written instrument signed the Parties or by order of the Court.

(e)     This Settlement Agreement may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same agreement.  Signatures provided by electronic mail or facsimile shall constitute acceptable, binding signatures for purposes of this Settlement Agreement.

(f)     This Settlement Agreement shall be effective upon its execution by the Parties and the approval of the Settlement Agreement by the Court and shall be binding upon the Parties and any of their respective successors and assigns, except as otherwise provided in paragraph 11 of this Settlement Agreement.

Date Signed: October 27, 2022

> UNITED STATES OF AMERICA, on
> behalf of the United States Department of
> Health and Human Services
>
>
> /s/   *Tiffiney F. Carney*   _____
> RUTH A. HARVEY
> RODNEY A. MORRIS
> SETH B. SHAPIRO
> (D.C. Bar No. 433988)
> TIFFINEY F. CARNEY
> (D.C. Bar No. 1024568)
> United States Department of Justice
> P.O. BOX 875
> Ben Franklin Station

Washington, D.C. 20044-0875

*Attorneys for the United States on behalf of
the U.S. Department of Health and Human
Services*

Date Signed: October 27, 2022                    QHC Facilities, LLC; QHC Management,
                                                 LLC, QHC Mitchellville, LLC; QHC
                                                 Winterset North, LLC; QHC Madison
                                                 Square, LLC; QHC Fort Dodge Villa, LLC;
                                                 Crestridge, Inc.; Crestview Acres, Inc.;
                                                 QHC Humboldt North, LLC; QHC
                                                 Humboldt South, LLC; QHC Villa Cottages,
                                                 LLC

                                                 /s/   *Krystal R. Mikkilineni*
                                                 Krystal R. Mikkilineni, Esq., AT0011814
                                                 Dentons Davis Brown
                                                 The Davis Brown Tower
                                                 215 10th Street, Suite 1300
                                                 Des Moines, IA 50309
                                                 (515) 246-7943
                                                 krystal.mikkilineni@dentons.com

                                                 *General Reorganization Co-Counsel for
                                                 Debtors and Debtors in Possession*

Date Signed: October 26, 2022                    Blue Care Homes, LLC

                                                 /s/   *Richard Kanowitz*
                                                 Bradley R. Kruse, IS9999179
                                                 Dickinson, Mackaman, Tyler & Hagen, P.C.
                                                 699 Walnut St., Ste. 1600
                                                 Des Moines, IA 50309
                                                 Telephone: 515.246.4505
                                                 e-mail: bkruse@dickinsonlaw.com

                                                 and

                                                 Richard Kanowitz, Esq. (pro hac vice)
                                                 Gabriel Levinson (pro hac vice)

Haynes and Boone, LLP
30 Rockefeller Plaza, 26th Floor
New York, NY 10112
Telephone: 212.918.8971
e-mail: richard.kanowitz@haynesboone.com
e-mail: gabriel.levinson@haynesboone.com

Martha Wyrick (pro hac vice)
Haynes and Boone, LLP
2323 Victory Avenue, Suite 700
Dallas, TX 75219
Telephone: 713.547.2047
e-mail: martha.wyrick@haynesboone.com

*Counsel to the Blue Care Homes, LLC*

**CONSENTED TO BY**:
Date Signed: October 27, 2022

/s/  *Francis J. Lawall*_____
Francis J. Lawall, Esq. (admitted pro hac
vice)
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103-2799
Tel: (215) 981-44-81
Fax: (215) 689-4693
Francis.lawall@troutman.com

*Counsel for The Official Unsecured
Creditors' Committee*

Blue Care OpCos (Assignees)

/s/ _____



_____
Shmuel Haikins

*Member of the Blue Care OpCos (Assignees)*

_____