## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF IOWA

In re

**QHC Facilities, LLC et al.**[1]                                   **Case No.  21-01643-als11**

          Debtor(s)

## MEMORANDUM OF DECISION

## (date entered on docket:  January 26, 2023)

Before the Court are Motions for Summary Judgment and Objections thereto filed on behalf of Cedar Healthgroup, LLC and the Debtor, as well as pleadings filed on behalf of Lincoln Savings Bank and the Official Committee of Unsecured Creditors.  The Court has jurisdiction of this matter pursuant to 28 U.S.C. §§ 157(b)(1) and 1334.  For the reasons stated the Motion for Summary Judgment is granted in favor of Cedar Healthgroup, LLC for the return of its deposit.

## **BACKGROUND**

The following overview is derived from the pleadings and orders appearing on the docket to provide a context for the pending matters.

Bankruptcy petitions for QHC Facilities, LLC and nine of its related entities (hereinafter "Debtor")[2] were filed on December 29, 2021 and are being jointly administered.  Within a month of the petition date the Debtor filed two Motions related to its continued operations pending a sale of its assets.  A Motion to Obtain Secured Credit (ECF 120) was granted authorizing the Debtor to borrow $2M from its senior secured lender, Lincoln Savings Bank (LSB) to fund the business operations until a sale could be facilitated. (ECF 172).  The Debtor's second Motion requested approval of bidding and sale procedures (ECF 117) that required the successful bidder to enter into

---

[1] The Jointly Administered Debtors in this proceeding are *In re QHC Management, LLC* (Case No. 21-01644-als11), *In re QHC Mitchellville, LLC* (Case No. 21-01645-als11), *In re QHC Winterset North, LLC* (Case No. 21-01646-als11), *In re QHC Madison Square, LLC* (Case No. 21-01647-als11), *In re QHC Fort Dodge Villa, LLC* (Case No. 21-01648-als11), *In re Crestridge, Inc.* (Case No. 21-01649-als11), *In re Crestview Acres, Inc.* (Case No. 21-01650-als11), *In re QHC Humboldt North, LLC* (Case No. 21-01651-als11), *In re QHC Humboldt South, LLC* (Case No. 21-01652-als11) and *In re QHC Villa Cottages, LLC* (Case No. 21-01653-als11).

[2] The Debtors' assets were sold subject to the terms of the Asset Purchase Agreement executed by the parties.  The singular term "Debtor" is used here for ease of reference.

Management Agreements for each of the purchased facilities (collectively "MA") to undertake the transfer of operations and funding for the facilities prior to closing. This Motion was also granted. (ECF 164).

An auction was conducted with three potential buyers participating: the stalking horse, Cedar Healthgroup LLC (CH) and Blue Diamond (BD). (ECF 199). CH was the successful bidder offering a purchase price of $12.1 million, plus payment of some employee benefits. BD was designated as the back-up bidder at $12 million. After the auction, CH and the Debtor executed an Asset Purchase Agreement (APA). A final hearing was conducted and a final order approving the sale to CH was entered on March 17, 2022. (ECF 217).

CH did not timely perform the obligation to execute the MA and when negotiations to resolve that delay proved unsuccessful the Debtor filed an Ex Parte Application for Expedited Hearing on the Sale Motion. (ECF 221). It asked that the backup bidder, BD, be named the new prevailing bidder and that the deposit paid by CH under the APA be forfeited to the Debtor. Upon notice to the parties an expedited hearing was conducted, after which an Order was entered finding a breach under the terms of the APA had occurred and designating BD as the successful bidder and purchaser. The determination of the APA's termination was reserved, and the sale deposit was to be retained in escrow pending further Court order. (ECF 224).

CH seeks summary judgment and return of its $605,000 deposit paid to the Debtor. (ECF 322). Debtor filed a resistance and Cross-Motion for Summary Judgment contending the bankruptcy estate was entitled to retain CH's deposit. (ECF 364). The Committee filed a Joinder to the Debtor's Objection, as well as its own Cross-Motion for Summary Judgment (ECF 365). Like the Committee, LSB joined the Debtor's resistance and filed its own Cross-Motion. (ECF 367).[3] CH resisted and replied to these filings.

## LEGAL STANDARDS

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(a). Summary judgment is designed "to secure the just, speedy and inexpensive

---

[3] At the hearing on the pending Motions and Joinders LSB reported that pursuant to settlement terms accepted by the LSB, it does not have a current financial interest in the outcome of this dispute and its filing was made in support of the Debtor. In light of this statement, and because some of the information supplied in the pleading asserts facts outside of this record, LSB's pleading will not considered.

determination" of matters before the courts. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). "Summary judgment is appropriate if, viewing the evidence in the light most favorable to the nonmoving party, there is no material factual dispute." *Bremer Bank v. John Hancock Life Ins. Co.*, 601 F.3d 824, 829 (8th Cir. 2010); Fed. R. Civ. Pro. 56(c). The party opposing the motion must do more than raise doubts or bare assertions to meet its burden to establish a disputed fact. *Bedford v. Doe*, 880 F.3d 993, 997 (8th Cir. 2018). Substantive law guides the evaluation of whether genuine issues of material fact exist on an essential element of the case, which will affect the outcome. *Ries v. Wintz. Props., Inc. (In re Wintz Cos.)*, 230 B.R. 848, 858 (B.A.P. 8th Cir. 1999) (citations omitted). In making this determination "the court is required to review the record and draw all reasonable inferences in favor of the non-movant." *Page v. JP Morgan Chase Bank (In re Page)*, 592 B.R. 334, 337 (B.A.P. 8th Cir. 2018) (citing *Foster v. Johns-Manville Sales Corp.*, 787 F.2d 390, 391-92 (8th Cir. 1986)).

## <u>DISCUSSION</u>

Foremost among the arguments raised by CH is that it is entitled to summary judgment and return of its $605,000 deposit as a matter of law under the unambiguous language of the APA. According to CH, the Debtor failed to provide notice of default as required under the APA, and even if it had, CH timely cured the default by the Outside Date permitted by the APA. The Debtor does not identify any language in the contract related to the notice or termination provisions that are ambiguous.

The APA is subject to interpretation, construction and enforcement under Iowa law. CH Exhibit D, Article XIII, §13.03, page 30. "The cardinal rule of contract interpretation is to determine what the intent of the parties was at the time they entered into the contract." *Pillsbury Co. v. Wells Dairy, Inc.*, 752 N.W.2d 430, 436 (Iowa 2008), citing *Walsh v. Nelson*, 622 N.W.2d 499, 503 (Iowa 2001). The intentions of the parties do not change based upon events occurring after the execution of their agreement.

> Interpretation involves a two-step process. First, from the words chosen, a court must determine "what meanings are reasonably possible." In so doing, the court determines whether a disputed term is ambiguous. A term is not ambiguous merely because the parties disagree about its meaning. A term is ambiguous if, "after all pertinent rules of interpretation have been considered," "a genuine uncertainty exists concerning which of two reasonable interpretations is proper.

*Walsh v. Nelson*, 622 N.W.2d at 503 (internal citations omitted).  Crucial to determining whether an ambiguity exits are the words appearing in the contract.  *Id.*  The words used are given their "commonly accepted and ordinary meaning" and not read in isolation but within the context of the agreement.  *Hartig Drug Co. v. Hartig*, 602 N.W.2d 794, 797 (Iowa 1999).  "Once an ambiguity is identified, the court must then 'choose among possible meanings.'"  *Walsh,* 622 N.W.2d at 503, quoting Restatement (Second) of Contracts § 202 cmt. a, at 87.  "If the resolution of ambiguous language involves extrinsic evidence, a question of interpretation arises which is reserved for the trier of fact."  *Walsh,* 622 N.W.2d at 503, citing *Fausel v. JRJ Enters*., 603 N.W.2d 612, 618 (Iowa 1999).  Where no ambiguity exists interpretation of the contract is accomplished as a matter of law without reliance on extrinsic evidence.  *Hartig Drug Co.*, 602 N.W.2d at 797; *see* 17A Am. Jur. 2d Contracts § 339, at 346 (1991); see also *Pillsbury Co.*, 752 N.W.2d at 439.

> If the language used by the parties is plain, complete, clear and unambiguous, the intention of the parties must be gathered from that language, and from that language alone. Where an agreement is clear and unambiguous on its face, the parties' intent must be construed from the four corners of the agreement, and not from extrinsic evidence.

17A Am. Jur. 2d Contracts § 341.

Under the applicable law, the threshold issue is whether any genuine issues of material fact are generated because of ambiguities in the APA.  This evaluation is performed without reliance on any extrinsic evidence.  The parties have supplied to the Court a myriad of facts, supporting documents and arguments.  After considering all of it, the Court concludes that much of that information provided constitutes extrinsic evidence, or is not germane to the narrow issues presented:  1) Was the APA terminated?; and 2) If the APA was terminated which party is entitled to the deposit proceeds under the APA terms?

### A.    Undisputed Facts

The following facts are undisputed based upon the record before the Court:

- An auction was held for the sale of Debtor's assets on March 4, 2022.
- CH submitted the highest bid and was named the successful bidder.

4

- CH and Debtor(s) executed the APA.

- The APA required the MA to be signed within five "business days" of the March 17 Sale Order, or March 24, 2022.[4]

- CH had not signed the MA by March 22, 2022.

- Debtor's counsel emailed CH on March 23, 2022 notifying CH of breaches under the APA.

- No cure period was identified in that email communication.

- On March 24, 2022 the Court entered an order finding a breach under the APA related to the MA and named BD as the prevailing bidder at auction and the new purchaser.

- On April 1, 2022, CH signed the MA and sent to Debtor.

- On April 5, 2022 Debtor sent a formal cure notice to CH via FedEx delivery.  This notice detailed that pursuant to Sections 6.01(f), 6.02 and 6.03 the APA has been terminated for multiple reasons including CH's misrepresentations and breach of the APA.

- On May 16, 2022, CH delivered a Notice of Termination of the APA and demanded return of deposit.

### B.      Termination of the Contract

Article VI of the APA describes a variety of situations  that can trigger termination by either the Buyer or Seller.  Two specific provisions are applicable under the undisputed facts.

### 1.      Notice Provisions

The APA may be terminated as follows:

> By the Seller, at its sole election, in the event of a *material breach of this Agreement by the Buyer that has not been cured within ten (10) Business Days after written notice to the Buyer, or if any representation or warranty of the Buyer shall have become untrue in any material respect, in either case such that such breach or untruth is incapable of being cured, by the Outside Date.* Seller shall not have a right to terminate under this section if Seller is in material breach or any of its representations and/or warranties are untrue such that satisfaction of conditions to close under section 5.02 would be prevented.

---

[4] There was some confusion about whether the date was March 22 or March 24 by counting "business days" or "days" from the date of the Sale Order.

Article VI, §6.01(f) (emphasis added).   The approved bidding procedures, the circumstances leading up to the sale, the conduct of the auction and the Sale Order all referred to the MA, the transfer of operations and interim funding as critical to the Debtor's operation, making them material conditions of the sale.   It follows, then, that failure to perform these terms pursuant to the terms of the APA would be a material breach of the parties' agreement.   The communication sent by the Debtor confirms such an interpretation:

> The deadline to have signed, effective Management Agreements in place has passed and therefore, Cedar Healthgroup has failed to comply with the APA, Management Agreement, and Sale Order. Cedar Healthgroup is in further breach of the APA as it is now wanting to complete additional due diligence when in fact, under section 2.10[5] of the APA, it agreed that it had conducted sufficient due diligence to close the sale and purchase the Acquired Assets as is, where is.[6]

The requirement of written notice under §6.01(f) triggers application of the notice provisions set forth in the APA at Article XIII, which states:

> 13.04 Notice. All notices and other communication allowed or required under this Agreement will be in writing, and delivered by either hand delivery, overnight courier, or Regular First Class U.S. Mail, postage prepaid, and addressed as follows:
>
> [Specific names and mailing addresses are identified for notice to the Seller, Buyer and any necessary entities to be copied intentionally omitted here]
>
> All notices provided in accordance with this Section delivered by hand or by overnight courier will be deemed delivered and received on the delivery date. All notices delivered by First Class Mail will be deemed delivered and received four (4) Business Days after being placed for delivery with the U.S Postal Service.

CH contends that the Debtor failed to comply with the notice provisions under the APA to effectively terminate the contract under §6.01(f).   The Debtor takes the position that its communications with CH effectively terminated the contract.   CH had actual notice of the importance of the MA as a term of the sale, as well as knowledge of the expected time frames and

---

[5] "Inspection / Due Diligence Period. Buyer agrees that it has conducted sufficient due diligence to close the sale and purchase the Acquired Assets as is, where is, other than as otherwise agreed by Seller and Buyer."  Exhibit Cedar CH Exhibit D, Article II, §2.10.
[6] Debtor's Exhibit 10

the necessary financing requirements by way of the bidding procedures, sale order and discussions conducted related to the auction.  Debtor suggests, therefore, that CH was fully aware of the effect and consequences of its failure to satisfy the MA execution deadline.  While the Court can acknowledge that this may be true, none of those facts serve to amend or override the parties' intent, or excuse compliance, under the terms and conditions required under the executed APA.

The method and manner of notice is clearly stated and there is no ambiguity as to its application.  Nothing in the text of the APA expressly states or even contemplates an intent to use electronic notice for termination of the APA, regardless of any action that may have been taken after the initial email.  Because Debtor's March 23, 2022 communication was not made by "hand delivery, overnight courier, or Regular First Class U.S. Mail" it does not conform with the parties' agreed delivery options for "[a]ll notices . . . required under this Agreement."  Even if the noticing defect of the March 23, 2022 email could be overlooked, the APA would have allowed CH until at least April 5, 2022 to cure any breach.  The undisputed facts reflect that CH executed the MA on April 1, 2022.

### 2.    Acquisition Transaction

In addition to the parties' submissions a court "may consider other materials in the record." Fed. R. Civ. Pro. 56(c)(3); *Peoples Bank v. Wheeler (In re Wheeler)*, No. 18-01009-als7, 2018 Bankr. LEXIS 4167, at *2 (Bankr. S.D. Iowa Nov. 30, 2018).  While the parties do not specifically raise arguments related to termination pursuant to § 6.01(b) a review of the APA as unambiguous requires analysis under this section.  *Am. Econ. Ins. Co. v. Jackson*, 476 F.3d 620, 624 (8th Cir. 2007) (citing *Douglas v. Allied Am. Ins.*, 312 Ill. App. 3d 535, 727 N.E.2d 376, 380, 245 Ill. Dec. 123 (Ill. App. Ct. 2000) ("A court is not to read [contract] provisions in isolation but is required to read [them] in light of each other to determine whether an ambiguity exists."))

The APA states a termination event occurs:

> § 6.01(b) Automatically, upon the consummation of any Acquisition Transaction between the Seller and a party other than the Buyer.

Section §1.01 of the APA defines an Acquisition Transaction as:

> [A]ny sale, transfer or other disposition (not involving the Buyer or its Affiliates), in one transaction or a series of transactions, of all or any substantial portion of the Acquired Assets or the Business, whether proposed to be effected pursuant to a merger, consolidation, tender offer, exchange offer, share exchange, amalgamation, stock acquisition, asset acquisition, business combination, restructuring,

recapitalization, liquidation, dissolution, joint venture or similar transaction, whether or not proposed or advanced by the Seller.

The Debtor requested a hearing on an ex parte and expedited basis to report CH's failure to execute the MA and the delay resulting from additional time to complete due diligence. Naming the backup bidder to replace CH as the Buyer was the specific remedy the Debtor asked for. (ECF 221). The Court granted that relief by naming BD as the successful bidder and new purchaser. (ECF 224). This constitutes an Acquisition Transaction between the Debtor and BD which automatically resulted in termination of the APA with CH on March 24, 2022.

### C.    Payment or Retention of the Deposit

Section 6.02(c) of the APA governs the deposit in the event of termination.

> (i)    In the event of a *valid termination* of this Agreement *pursuant to Section 6.01(f) due to a breach by Buyer, Sellers shall be entitled to receive the Deposit.* In the event of such termination, the Parties shall direct the Escrow Agent to pay the Deposit to Sellers. The Sellers' receipt of the Deposit pursuant to this Section 6.02(c) is the only remedy available and will be liquidated damages.

> (b)[7]    In the event of *termination of this Agreement pursuant to Section 6.01 (except pursuant to Section 6.01(f)), the Parties shall direct the Escrow Agent to promptly return the Deposit to Buyer.*

Without giving the required notice of the breach under the APA or allowing an opportunity to cure the breach within the applicable cure deadline a valid termination did not occur pursuant to §6.01(f). The undisputed facts do not support a conclusion that a valid termination occurred which is a condition for the Debtor to retain the deposit proceeds.

A termination resulting from any other circumstances results in the deposit being returned to CH.

Based upon the foregoing the Court concludes that the language of the APA is unambiguous and judgment as a matter of law in favor of CH is warranted.

---

[7] Sic.

For the reasons stated, it is **ORDERED that**:

1.      The objections to Cedar Healthgroup, LLC's Motion for Summary Judgment are overruled.

2.      Summary Judgment is entered in favor of Cedar Healthgroup, LLC.

3.      The Debtor shall remit the deposit proceeds to Cedar Healthgroup, LLC within ten business days of the date this ruling is docketed.

4.      Debtor's Cross Motion for Summary Judgment is denied.

5.      The Joinder and Cross Motion for Summary Judgment filed on behalf of the Official Committee of Unsecured Creditors is denied.

6.      The Joinder and Cross Motion for Summary Judgment filed on behalf of Lincoln Savings Bank is deemed moot.


/s/ Anita L. Shodeen
Anita L. Shodeen
U.S. Bankruptcy Judge


Parties receiving this Memorandum of Decision from the Clerk of Court:
Electronic Filers in this Chapter Case