## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | Case No. 21-01643-als11 |
| **QHC FACILITIES LLC,** *et al,* | ) | |
| | ) | Hon. Anita L. Shodeen |
| Debtors and Debtors in Possession | ) | |
| | ) | **MEMORANDUM IN SUPPORT OF** |
| | ) | **CONFIRMATION OF THE JOINT** |
| | ) | **PLAN OF LIQUIDATION** |
| | ) | |
| | ) | Date: February 23, 2023 |
| | ) | Time: 10:00 am |
| _____ | ) | Courtroom: 1 |

### PRELIMINARY STATEMENT

1.      QHC Facilities LLC, et al ("Debtors" or "QHC") and the Official Committee of Unsecured Creditors ("Committee") (collectively, the "Plan Proponents") hereby submit this memorandum (the "Memorandum") in support of confirmation of their Joint Chapter 11 Plan of Liquidation (the "Plan") and response to objections thereto.  This Memorandum presents legal and other support for confirmation of the Plan.  At the confirmation hearing, the Debtors will present testimony and other evidence, as needed, supporting confirmation of the Plan.

### BACKGROUND

2.      On December 29, 2021 (the "Petition Date"), Debtors filed their respective petitions under Chapter 11 of title 11 of the United States Code. (Docket No. 1).

3.      On January 17, 2022, the Office of the United States Trustee filed a Notice of Appointment of Committee of Unsecured Creditors (Docket Nos. 55 & 76).

4.      On January 19, 2022, the Court entered an order (the "Joint Administration Order") granting the Debtors' Motion for Joint Administration of the Debtors' Bankruptcy Cases (Docket No. 66).

#3421757

5.      Information regarding the Debtors' history and business operations, capital structure and secured indebtedness, and the events leading up to the commencement of these Chapter 11 cases can be found in the Debtors' First Day Declaration, filed with the Court on December 31, 2021.

6.      On January 19, 2023, the Debtors and the Committee filed their Disclosure Statement and a Joint Plan of Liquidation dated January 19, 2023 (Docket Nos. 585 & 586).

7.      On January 24, 2023, the Court entered an Order and Notice of Deadlines and Hearing on the Disclosure Statement and Plan of Liquidation which conditionally approved the Disclosure Statement (Docket No. 589).

8.      The Order and Notice of Deadlines designated the time for filing objections to confirmation of the Plan as February 14, 2023; further established February 17, 2023 as the voting deadline; and set a hearing on confirmation of the Plan and Disclosure Statement for February 23, 2023 (the "Confirmation Hearing").

9.      Three parties have filed objections to plan confirmation: the United States Trustee (the "UST") (Docket No. 618), the United States of America on behalf of the U.S. Department of Health and Human Services ("HHS"), acting through its designated components, the Centers for Medicare and Medicaid Services ("CMS") and the Health Resources and Services Administration ("HRSA") (collectively, the "United States") (Docket No. 613), and Cedar Healthgroup, LLC ("Cedar") (Docket Nos. 611 & 615).

## BASIS FOR RELIEF

10.      To confirm the Plan, the Court must find that the Plan Proponents have satisfied the provisions of Bankruptcy Code section 1129 by a preponderance of the evidence. *See Heartland Fed. Savs. & Loan Ass'n v. Briscoe Enters., Ltd.,* II (*In re Briscoe Enters., Ltd., II*), 994 F.2d 1160 (5th Cir. 1993) (stating that "[t]he combination of legislative silence, Supreme Court

holdings, and the structure of the [Bankruptcy] Code leads this Court to conclude that preponderance of the evidence is the debtor's appropriate standard of proof both under § 1129(a) and in a cramdown"); *see also In re Armstrong World Indus., Inc.*, 348 B.R. 111, 120 (D. Del. 2006).

11.    Through the contents of the Plan, certain filings with the Bankruptcy Court and the proffers and/or testimonial evidence that may be presented and/or adduced at the Confirmation Hearing, the Plan Proponents will demonstrate, by a preponderance of the evidence, that all applicable subsections of Bankruptcy Code section 1129 have been satisfied with respect to the Plan.

**I.    The Plan Satisfies the Requirements for Confirmation under Bankruptcy Code Section 1129(a)**

12.    As addressed in detail below, the Plan satisfies all applicable requirements of Bankruptcy Code section 1129(a) of the Bankruptcy Code.

**A.    *Section 1129(a)(1):  The Plan Complies with Applicable Provisions of the Bankruptcy Code***

13.    Bankruptcy Code section 1129(a)(1) provides that a plan must "compl[y] with the applicable provisions of [the Bankruptcy Code]."  11 U.S.C. § 1129(a)(1) (2018).  The legislative history of Bankruptcy Code section 1129(a)(1) informs that this provision encompasses the requirements of Bankruptcy Code sections 1122 and 1123 governing classification of claims and contents of a plan, respectively.  H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 412 (1988); *see also In re Nutritional Sourcing Corp.*, 398 B.R. 816, 824 (Bankr. D. Del. 2008); *In re Johns-Manville Corp.*, 68 B.R. 618, 629–30 (Bankr. S.D.N.Y. 1986), aff'd in part, rev'd in part on other grounds, 78 B.R. 407 (S.D.N.Y. 1987), aff'd sub nom., *Kane v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*), 843 F.2d 236 (2d Cir. 1988); *In re Butler*, 42 B.R. 777, 780–81 (Bankr. E.D. Ark. 1984).

14.     As demonstrated below, the Plan fully complies with the requirements of Bankruptcy Code sections 1122 and 1123 and all other applicable provisions of the Bankruptcy Code.

### i.     Section 1122(a):  The Plan Complies with Bankruptcy Code Section 1122(a)

15.     Bankruptcy Code section 1122(a) provides in pertinent part as follows:

> Except as provided in subsection (b) of this section, a plan may place a claim or interest in a particular class only if such claim or interest is substantially similar to the  other claims or interests of such class.

11 U.S.C. § 1122(a).[1]  For a classification structure to satisfy Bankruptcy Code section 1122, it is not necessary that all substantially similar claims or interests be designated to the same class, but only that all claims or interests designated to a particular class be substantially similar.  *In re Armstrong World Indus., Inc.*, 348 B.R. 136, 159 (Bankr. D. Del. 2006).

16.     The Plan provides for the separate classification of Claims against the Debtors and classifies each separate Claim based upon differences in the legal nature and/or priority of such Claims.  The Plan designates the following classes of Claims:

| <u>Class</u> | <u>Status</u> | <u>Voting Rights</u> |
|---|---|---|
| Class 1 – Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 – Secured Tax Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3 – Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 4 – General Unsecured Claims | Impaired | Entitled to Vote |
| Class 5 – Subordinated Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

---

[1] Bankruptcy Code Section 1122(b) is not applicable to the instant case, as the Plan does not include a convenience class.

| Class | Status | Voting Rights |
|---|---|---|
| Class 6 – Intercompany Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 7 – Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

17.     Each of the Claims in each Class are substantially similar to the other Claims in such Class.  Accordingly, the Debtors' classification of Claims does not prejudice the rights of Holders of such Claims, is consistent with the requirements of the Bankruptcy Code, and thus, deemed appropriate.  *See John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 159 (3d Cir. 1993) (explaining that the determination of whether a classification scheme is reasonable "must be informed by the two purposes that classification serves under the Code: voting to determine whether a plan can be confirmed and treatment of claims under the plan") (internal citations omitted); *Olympia & York Fla. Equity Corp. v. Bank of N.Y.* (*In re Holywell Corp.*), 913 F. 2d 873, 880 (11th Cir. 1990) (plan proponent allowed considerable discretion to classify claims and interests according to facts and circumstances of case so long as classification scheme does not violate basic priority rights or manipulate voting).

### ii.     Section 1123(a):  The Plan Complies with All Requirements of Bankruptcy Code Section 1123(a)

18.     Bankruptcy Code section 1123(a) sets forth seven requirements with which every chapter 11 plan must comply.  *See* 11 U.S.C. § 1123(a) (2018).  As demonstrated herein, the Plan fully complies with each enumerated requirement.

### (a)     Section 1123(a)(1):  Designation of Classes and Equity Interests

19.     Bankruptcy Code section 1123(a)(1) requires that a plan must designate classes of claims and classes of equity interests subject to Bankruptcy Code section 1122. As discussed above, the Plan designates seven (7) Classes of Claims subject to section 1122.

Accordingly, the Plan satisfies the requirements of Bankruptcy Code section 1123(a)(1).

**(b)    Section 1123(a)(2):  Classes that are not Impaired by the Plan**

20.    Bankruptcy Code section 1123(a)(2) requires a plan to specify which classes of claims or interests are unimpaired by the plan.  Article 2 of the Plan specifies that Class 1 (Other Priority Claims), Class 2 (Secured Tax Claims), and Class 3 (Other Secured Claims) are Unimpaired[2].  Accordingly, the Plan satisfies the requirements of Bankruptcy Code section 1123(a)(2).

**(c)    Section 1123(a)(3):   Treatment of Classes that are Impaired by the Plan**

21.    Bankruptcy Code section 1123(a)(3) requires a plan to specify how classes of claims or interests that are impaired by the plan will be treated.  Article 4 of the Plan sets forth the treatment of Impaired Claims in Class 4 (General Unsecured Claims), Class 5 (Subordinated Claims), Class 6 (Intercompany Claims), and Class 7 (Equity Interests).  Accordingly, the Plan satisfies the requirements of Bankruptcy Code section 1123(a)(3).

**(d)    Section 1123(a)(4): Equal Treatment within Each Class**

22.    Bankruptcy Code section 1123(a)(4) requires that a plan provide the same treatment for each claim or interest within a particular class unless any claim or interest holder agrees to receive less favorable treatment than other class members.  Pursuant to the Plan, the treatment of each Claim against the Debtors, in each respective Class, is the same as the treatment of each other Claim in such Class, unless the Holder of such Claim has agreed to different treatment.  Accordingly, the Plan satisfies the requirements of Bankruptcy Code section 1123(a)(4).

---

[2] Terms not defined herein shall be defined in the Plan and/or Disclosure Statement.

        **(e)**       **Section 1123(a)(5Adequate Means for Implementation**

23.      Bankruptcy Code section 1123(a)(5) requires that a plan provide "adequate means for the plan's implementation."  Article 10 of the Plan provides adequate and proper means for the implementation of the Plan, including, without limitation:

- ➢ Substantive consolidation
- ➢ Corporate Action
- ➢ Dissolution of Debtors
- ➢ Dissolution of Creditor's Committee
- ➢ Establishment of the Liquidation Trust
- ➢ Rights, Powers, and Duties of the Liquidation Trustee
- ➢ Retention of Professionals
- ➢ Costs, Fees, and Expenses of the Liquidation Trust
- ➢ Appointment of Creditor Representatives
- ➢ Direction to Parties
- ➢ Winding Up Affairs and
- ➢ Books and Records.

24.      Further, the Plan sets forth the establishment of the Liquidation Trust. The Liquidation Trustee shall execute the Liquidation Trust Agreement, and all other necessary steps to establish the Liquidation Trust. The Liquidation Trustee will administer the Liquidation Trust, by satisfying expenses of the Liquidation Trust, making Distributions as provided in the Plan, pursuing Causes of Action, and generally winding up the Debtors. The Plan and this Memorandum set forth compensation and expenses of the Liquidation Trustee and the costs and expenses of the Liquidation Trust.

25.    The transactions contemplated by the Plan are designed to maximize the value of the Debtors' remaining assets. Accordingly, the Plan, together with the documents and agreements contemplated by the Plan, provide the means for implementation of the Plan as required by and in satisfaction of Bankruptcy Code section 1123(a)(5).

**(f)    Section 1123(a)(6):    Amendment of the Reorganized Debtor's Charters**

26.    Bankruptcy Code section 1123(a)(6) prohibits the issuance of non-voting equity securities and requires amendment of a debtor's charter to so provide. It also requires that a corporate charter provide an appropriate distribution of voting power among the classes of securities possessing voting power.  The Plan does not provide for the issuance of non-voting equity securities that would violate Bankruptcy Code section 1123(a)(6).

**(g)    Section 1123(a)(7): Provisions Regarding Directors and Officers**

27.    Bankruptcy Code section 1123(a)(7) requires that a plan "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan and any successor to such officer, director, or trustee." Article 10 of the Plan specifies that upon and as of the Effective Date, all the current officers and directors of the Debtors shall cease to serve immediately.  It further provides for Mr. Ronald Winters to be employed as the Liquidation Trustee. Therefore, the Plan is not in violation of Bankruptcy Code section 1123(a)(7).

**iii.    Section 1123(b):    The Plan Incorporates Certain Permissible Provisions**

28.    Bankruptcy Code section 1123(b) sets forth certain permissive provisions that may be incorporated into a chapter 11 plan. The contents of the Plan are consistent with

these provisions. The Plan employs various provisions in accordance with section 1123(b)'s discretionary authority.

### (a) Section 1123(b)(1): Impairment of Claims and Interests

29.     Bankruptcy Code section 1123(b)(1) provides that a plan may "impair or leave unimpaired any class of claims, secured or unsecured, or of interests." 11 U.S.C. § 1123(b)(1). The Plan is consistent with Bankruptcy Code section 1123(b)(1) as it does leave unimpaired certain Classes of Claims and impairs others. Claims in Classes 1, 2, and 3 are unimpaired, whereas Claims in Classes 4, 5, 6, and 7 are each impaired.

### (b) Section 1123(b)(2): Assumption or Rejection of Executory Contracts and Unexpired Leases

30.     Bankruptcy Code section 1123(b)(2) allows a plan to provide for assumption, assumption and assignment, or rejection of executory contracts and unexpired leases pursuant to Bankruptcy Code section 365.  Article 8 of the Plan provides, inter alia, that all executory contracts and unexpired leases that exist between the Debtors and any Person or Entity that have not been assumed or rejected pursuant to a Bankruptcy Court order entered prior to the Confirmation Date shall be deemed rejected by the Debtors on the Confirmation Date, effective as of the Confirmation Date.

### (c) Section 1123(b)(3)(A): Settlement of Claims Belonging to the Debtors or the Estates

31.     Bankruptcy Code section 1123(b)(3)(A) provides that a plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate." 11 U.S.C. § 1123(b)(3)(A).

32.     The Plan incorporates many settlements with claimants in various Classes.  In fact, the potential distribution in this case for the general unsecured creditors was made possible only

through settlement agreements reached with the secured lenders, federal government, and state government. These settlements essentially eliminated all secured claims (including any deficiency claims) and a significant portion of priority debt on an unallocated basis.

33.     Prior to bankruptcy, the Webb Trust and Lincoln Savings Bank asserted secured claims in excess of $25 million against all of the Debtors' assets.  As a result of a recent Court-approved settlement reached with both creditors, the Claims of each were fully resolved, thereby benefitting creditors across all of the Debtors' Estates. Other asserted secured claims have been withdrawn or otherwise resolved by the return of collateral.  There is only one other known secured claim, which was scheduled on the Debtors' bankruptcy schedules – that of Banleaco totaling approximately $300.

34.     The Debtors engaged in good faith negotiations with the State of Iowa regarding the Quality Assurance Assessment Fee. For purposes of the Plan, the Debtors and the State of Iowa agreed that all Priority Claims of the state of Iowa for Quality Assurance and Assessment Fees or similar charges ("QAAF") are being classified as a Priority Claim; but treated and paid as a Class 4 General Unsecured Claim.

35.     To facilitate the closing of the sale to Blue Care, and to resolve the objections filed by the United States, acting on behalf of HHS and CMS, the Debtors, Blue Care, and the United States entered into a stipulation (the "Stipulation") that was attached to the Sale Order. In the Stipulation, the parties came to an agreement regarding the cure amounts and CMPs associated with the Medicare Provider Agreements, the assumption and assignment of said agreements, and the change of ownership process.

36.     The Plan is truly a settlement and compromise by the claimants and Classes as envisioned by the Bankruptcy Code and, accordingly, the Plan meets the requirements of section

1123(b)(3)(A).

37.    The standard in determining whether to approve a settlement is "'whether the settlement is fair and equitable and in the best interests of the estate.'"  *In re Hildreth*, No. 09-00293, 2012 WL 4520635, at *6 (Bankr. N.D. Iowa Oct. 1, 2012) (*quoting In re Nutraquest, Inc.*, 434 F.3d 639, 644 (3d Cir. 2006); *see also In re Tri-State Fin., LLC v. Lovald*, 525 F.3d 649, 654 (8th Cir. 2008) (citing *In re Martin*, 212 B.R. 316, 319 (8th Cir. B.A.P. 1997).  "A settlement is not required to constitute 'the best result possible.'"  *Id.*  "'Rather, the court need only canvass the issues to determine that the settlement does not fall below the lowest point in the range of reasonableness.'"  *Id.*

38.    Courts generally examine four factors in determining whether to approve a settlement or compromise: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors."  *Id.*; *see also In re Tri-State Fin., LLC*, 525 F.3d at 654 (*citing In re Martin*, 212 B.R. 316, 319 (8th Cir. B.A.P. 1997); *In re World Health Alternatives, Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006).

39.    The settlements embodied in the Plan are in the best interests of creditors as they all allow the Plan to move forward and the general unsecured creditors to receive returns which they would clearly not otherwise receive. This is particularly true of the settlement between the Estates and the State of Iowa.

40.    The Plan Proponents submit that the settlements embodied by the Plan are reasonable settlements in the business judgement of the Plan Proponents and, to the extent not already approved by this Court, should be approved under the Plan to allow confirmation thereof.

**(d)** **Section 1123(b)(3)(B):  Retention of Claims or Interests by the Debtor**

41.     Bankruptcy Code section 1123(b)(3)(B) provides that a plan may provide for "the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose" any claim or interest. 11 U.S.C. 1123(b)(3)(B) (2018). Section 10.5.3 of the Plan provides that, all Causes of Action that the Debtors and their Estates may hold shall, on the Effective Date, automatically vest in the Liquidation Trust free and clear of liens, claims, encumbrances, and interests, except for the interests of the Liquidation Trust Beneficiaries or as otherwise expressly set forth in this Plan. The Liquidation Trustee, on behalf of the Liquidation Trust, shall have the exclusive right, authority, and discretion to institute, prosecute, abandon, settle, or compromise any and all such Causes of Action without the consent or approval of any third party and without further order of the Bankruptcy Court, except as otherwise provided in the Plan or in the Liquidation Trust Agreement. These provisions of the Plan are expressly permitted by Bankruptcy Code section 1123(b)(3) and, accordingly, are appropriate.

**(e)** **Section 1123(b)(6):  Provisions not Inconsistent with the Bankruptcy Code**

42.     Bankruptcy Code section 1123(b)(6) provides that a plan may "include any other appropriate provision not inconsistent with the applicable provisions of [the Bankruptcy Code]." The Plan employs various provisions in accordance with section 1123(b)'s discretionary authority. The Plan's discretionary provisions include certain releases, an exculpation provision, and an injunction provision. The United States, United States Trustee, and Cedar have objected to these provisions. The objections are described and discussed separately below in section IV of the Memorandum. The Plan Proponents submit that the additional provisions of the Plan are

12

consistent with the Bankruptcy Code. As such, all additional provisions are permitted by Bankruptcy Code section 1123(b)(6) and, accordingly, are appropriate in these Chapter 11 Cases.

> **B.** **Section 1129(a)(2): The Plan Proponents Have Complied with Applicable Provisions of the Bankruptcy Code**

43.     Bankruptcy Code section 1129(a)(2) requires that the plan proponent "compl[y] with the applicable provisions of [the Bankruptcy Code]." 11 U.S.C. § 1129(a)(2). The legislative history of section 1129(a)(2) reflects that this provision is intended to encompass the disclosure and solicitation requirements under Bankruptcy Code sections 1125 and 1126. *See* H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 412 (1977); S. Rep. No. 95-989, 95th Cong., 2d Sess. 126 (1978) ("Paragraph (2) [of § 1129(a)] requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure."); *see also In re Johns-Manville Corp.*, 68 B.R. at 630; *In re Butler*, 42 B.R. at 782. Bankruptcy Courts have "broad discretion" to determine whether a disclosure statement contains "adequate information" pursuant to section 1125(a)(1). *See Kirk v. Texaco, Inc.*, 82 B.R. 678, 685 (S.D.N.Y. 1988) (upholding adequacy of information determination pursuant to § 1125),

44.     The Plan Proponents have complied with Bankruptcy Code section 1129(a)(2) by distributing the Disclosure Statement and soliciting acceptances of the Plan.

45.     Bankruptcy Rules 3017 and 3018 require, in relevant part, that a debtor submit its plan and disclosure statement to all affected creditors and equity security holders, that it adopts effective procedures for the transmission of its plan and disclosure statement to beneficial owners of securities and that it affords creditors and equity security holders a reasonable time in which to accept or reject a proposed plan. Fed. R. Bank. P. 3017, 3018. The Debtors respectfully submit that they have met all such requirements.

46.    Based upon the foregoing, the Debtors have satisfied the requirements of Bankruptcy Code section 1129(a)(2). Further, no party in interest has objected to the Plan on the ground that the Plan Debtors failed to satisfy section 1129(a)(2).

### C.    Section 1129(a)(3):  The Plan has been Proposed in Good Faith and not by any Means Forbidden by Law

47.    Bankruptcy Code section 1129(a)(3) requires that a plan be "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3) (2018).  Courts consider the totality of the circumstances in determining whether a plan has been filed in good faith, including consideration of "the debtor's financial condition, motives, and the local financial realities."  *Id*. (*citing Little Creek Dev. Co. v. Commonwealth Mortg. Corp.* (*In re Little Creek Dev. Co.*), 779 F.2d 1068, 1072 (5th Cir. 1986)).  Although the term "good faith" is not defined in the Bankruptcy Code, courts have determined that "[f]or purposes of determining good faith under section 1129(a)(3) . . . the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives of the Bankruptcy Code." *In re PWS Holding Corp*., 228 F.3d at 242.

48.    The Plan Proponents have proposed the Plan in good faith and not by any means forbidden by law.  Consistent with the overriding purpose of Chapter 11 of the Bankruptcy Code, the Plan enables Holders of Allowed Claims to realize the highest possible recoveries in the shortest period of time under the circumstances of the case.

49.    Moreover, the Plan Proponents are not aware of any viable alternative that would allow the Debtors to emerge from Chapter 11 with the recoveries equal to or greater than those projected for creditors under the Plan in the timeframe proposed by the Plan.  Rather, all other alternatives would result in lower or possibly no recoveries for claimants receiving distributions under the Plan and claimants would not receive payments as quickly under any alternative.

14

Accordingly, under the circumstances of this case, the Plan is consistent with the objectives and purposes of the Bankruptcy Code and has been proposed in good faith. In light of the foregoing, the Plan complies with section 1129(a)(3) of the Bankruptcy Code.

**D.      Section 1129(a)(4):  The Payment for Certain Services or for Certain Costs and Expenses is Subject to Court Approval**

50.      Bankruptcy Code section 1129(a)(4) states that "[a]ny payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable." 11 U.S.C. § 1129(a)(4) (2018). This section of the Bankruptcy Code has been construed to require that all payments of professional fees that are made from estate assets be subject to review and approval of the Bankruptcy Court as to their reasonableness. *See In re Apex Oil Co.*, 118 B.R. 683, 704 (Bankr. E.D. Mo. 1990).

51.      The Plan specifically provides in Article 2.3 for Court approval of Professional Fees incurred through the Confirmation Date, pursuant to final fee applications which must be submitted to the Court no later than 60 days following the Effective Date of the Plan.

52.      The foregoing procedures in the Plan for the Court's review and ultimate determination of the fees and expenses to be paid by the Debtors' Estates satisfy the meaning and the objectives of Bankruptcy Code section 1129(a)(4).

**E.      Section 1129(a)(5):  Necessary Information Regarding Directors and Officers of the Debtors under the Plan**

53.      Bankruptcy Code section 1129(a)(5) requires that a plan proponent disclose the identity and affiliations of the proposed officers and directors of a reorganized debtor; that the appointment or continuance of such officers and directors be consistent with the interests of

15

creditors and equity security holders and with public policy, and that there be disclosure of the identity and compensation of any insiders to be retained or employed by the reorganized debtor. Article 10.2 of the Plan provides upon and as of the Effective Date, the current officers and directors of the Debtors shall cease to serve immediately. As such, Bankruptcy Code section 1129(a)(5) is satisfied.

### F.    Section 1129(a)(6):    The Plan does not Require Governmental Regulatory Approval

54.    Bankruptcy Code section 1129(a)(6) permits confirmation only if any regulatory commission that will have jurisdiction over the debtor after confirmation has approved any rate change provided for in the plan. 11 U.S.C. § 1129(a)(6) (2018). The foregoing provision is inapplicable, because after confirmation of the Plan, the Debtors businesses will not involve rates established or approved by, or otherwise subject to, any governmental regulatory commission.

### G.    Section 1129(a)(7): The Plan is in the Best Interests of Creditors and Equity Interest Holders

55.    Bankruptcy Code section 1129(a)(7) is often referred to as the "best interests test" or the "liquidation test," and provides, in relevant part:

> With respect to each impaired class of claims or interests --
>
> (A)    each holder of a claim or interest of such class --
>
> (i)    has accepted the plan; or
>
> (ii)    will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title . . . on such date…

11 U.S.C. § 1129(a)(7) (2018).

56.    The best interests test focuses on individual dissenting creditors rather than classes of claims. *See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526

U.S. 434, 441 (1999). Under the best interests test, a plan will be confirmed over the objection

of a holder of an impaired claim:

> only if the holder of the impaired claim or interest 'will receive or
> retain under the plan on account of such claim or interest property
> of the value, as of the effective date of the plan, that is not less than
> the amount that such holder would so receive or retain if the debtor
> were liquidated under chapter 7 of this title on such date.

*In re Affiliated Foods, Inc*., 249 B.R. 770, 787 (Bankr. W.D. Mo. 2000) (quoting 11 U.S.C. §

1129(a)(7)(A)(ii) (2018*)); see also Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St.*

*P'ship*, 526 U.S. at 441 n. 13. As Bankruptcy Code section 1129(a)(7) makes clear, the

liquidation analysis applies only to non-accepting impaired claims or equity interests.

57.    To assist the Court in making the findings required under Bankruptcy Code section

1129(a)(7), the Debtors prepared the liquidation analysis attached as Exhibit A to the Plan[3] (the

"Liquidation Analysis"). An updated version of the Liquidation Analysis is attached hereto as

**"Exhibit A."** As made clear by the Liquidation Analysis and as set forth in the Plan, the holders

of Impaired Claims in each Impaired Class under the Plan would receive significantly less under

a chapter 7 liquidation than under the Plan.

58.    The Liquidation Analysis demonstrates that in the event of liquidation as

described in such analysis, holders of Unsecured Claims are likely to receive a significantly lower

distribution, and perhaps no distribution, on their Claims. The Plan provides a significantly

greater recovery than under chapter 7 due to: (i) the value the Plan Proponents believe that the

Liquidation Trustee, working with current counsel to the Committee, will bring to the Estates in

reconciling overstated and invalid Claims and in assuring recoveries from Causes of Action; (ii)

by avoiding: the additional expenses associated with conversion to a chapter 7 case; the cost of

---

[3] Updated version submitted as Debtors' Exhibit 4 for the Confirmation Hearing.

employing and bringing up to speed a trustee and new counsel unfamiliar with the Debtors to reconcile the remaining assets and claims base; and the overall delay caused by such process and most importantly (iii)  conversion to chapter 7 will void previously negotiated plan treatment provisions which would result in no General Unsecured Creditor recovery.

59.     Further, the allowed claims would receive distribution under the Plan more quickly than they would under a hypothetical chapter 7.  Under a chapter 7 liquidation, most Classes of Claims would be forced to wait longer for payment as the Chapter 7 trustee would have to determine how to best administer the Debtors' assets. While a specific timeline cannot be determined at this time, the Plan Proponent believes that in a hypothetical Chapter 7 liquidation, holders of Claims would not receive any distribution on their Claims for several years.

60.     Although it is possible that a chapter 7 trustee will vigorously pursue objections to Claims and Causes of Action, the Plan Proponents submit that such a result is highly speculative because the pursuit of such litigation is not a precondition to the appointment of a chapter 7 trustee, and the chapter 7 trustee may ultimately choose not to challenge the Claims or to bring Causes of Action.

61.     Furthermore, the Plan Proponents submit that a significant distinction between the Plan and converting the Case to chapter 7 is the substantial chapter 7 administrative costs that will result from such conversion.  Under section 326 of the Bankruptcy Code, the statutory chapter 7 trustee fee (the "Chapter 7 Trustee Fee") shall not exceed 25% of the first $5,000 disbursed, 10% on any amount disbursed in excess of $5,000 but not in excess of $50,000, 5% on any amount disbursed in excess of $50,000 but not in excess of $1,000,000, and reasonable compensation not to exceed 3% on any amounts in excess of $1,000,000.  Any such Chapter 7 Trustee Fee will directly reduce any recovery for Creditors.

62.    A chapter 7 trustee would likely also retain new Professionals for purposes similar to those retained by the Liquidation Trustee.  The chapter 7 trustee and his or her Professionals, however, may be unfamiliar with the Debtors' operations and this Case.  Accordingly, the chapter 7 trustee and his or her Professionals would be required to devote considerable time reviewing the Debtors' books and records and the events of this Case occurring before the conversion to chapter 7.  Given this reality, the Plan Proponents estimate that the fees of a chapter 7 trustee's Professionals will exceed the fees of the Liquidation Trustee's Professionals. The rates of those Professionals retained by the chapter 7 trustee, on the one hand, and the Liquidation Trustee, on the other hand, may vary.  For instance, one group of Professionals may have higher rates than a group of other Professionals.  Assuming that both groups of Professionals are equally efficient in their approach and effectiveness in the results obtained, this factor may increase the cost of administration. [4]

63.    Another significant factor to be considered is the delay which would be caused by conversion of these cases to chapter 7.  Presently, the Debtors expect confirmation of the Plan to occur by the end of February 2023 (if not sooner).  The Committee, with the cooperation of the Debtors is currently working to fix the claims distribution matrix so that an expedited distribution to creditors can be made as soon after Plan confirmation as reasonably possible.  If these cases are converted to chapter 7, creditors can reasonably expect there to be significant delay caused by the selection of a trustee and retention of counsel, followed by a prolonged period necessary to allow these professionals to familiarize themselves with the Debtors to a point which would enable them to reconcile the claims matrix, only after which could a distribution to creditors occur.  In such event, there will be inefficiencies which will generate additional costs and result

---

[4]    Given that the Professional groups have not been – and, in fact, cannot be – identified at this time, it remains impossible to fully evaluate this issue for purposes of voting on the Plan.

in further diminution in the recovery for unsecured creditors.

64.     The Plan Proponents submit that the Plan provides a recovery that is greater than the amount each Creditor would receive under a chapter 7 liquidation.  The Liquidation Trust – which will be created if the Plan is confirmed helps ensure that the any fees charged by the Liquidation Trustee will be reasonable.   Moreover, the Liquidation Trustee will retain Professionals already very familiar with the facts of this case.   In contrast, it is reasonable to expect there will be added expense caused by the retention of the chapter 7 trustee's Professionals who will need to become familiar with the Debtors' Estates.   Therefore, the Plan Proponents submit that the fees of any Professionals of the Liquidation Trustee should be less than the professional fees of a chapter 7 trustee.

65.     Accordingly, the Plan satisfies the requirements of the best interest of creditors test set forth in Bankruptcy Code section 1129(a)(7).

### H.     Section 1129(a)(8):  Acceptance of Impaired Classes

66.     Bankruptcy Code section 1129(a)(8) requires that each class of claims or interests either accept the plan or be unimpaired under a plan. 11 U.S.C. § 1128(a)(8). Pursuant to Bankruptcy Code section 1126(c), a class of claims accepts a plan if holders of at least two thirds in dollar amount and more than one half in number of the claims in that class vote to accept the plan. 11 U.S.C. § 1126(c).

67.     Votes on the Plan were not solicited from holders of Allowed Administrative Expense Claims, Allowed Priority Tax Claims, and Allowed Claims in Classes 1, 2, and 3, all of which are unimpaired are deemed to have accepted the Plan. Votes on the Plan were also not solicited from holders of Claims in Classes 5, 6 and 7, all of which are deemed to have rejected the Plan.

68.    Under the terms of the Plan, the holders of Allowed Claims in Class 4 (General Unsecured Claims) are impaired and were entitled to vote to accept or reject the Plan. Class 4 has voted to accept the Plan under 1126(c).  Accordingly, the Plan Proponents have complied with section 1129(a)(8) of the Bankruptcy Code and no party in interest has alleged otherwise.

### I.    Section 1129(a)(9):    The Plan Provides for Payment of Allowed Administrative and Priority Claims as Agreed

69.    Section 1129(a)(9) of the Bankruptcy Code requires that entities holding claims entitled to priority under section 507(a) receive payment in full in cash, unless the holder of a particular claim agrees to a different treatment with respect to such claim. 11 U.S.C. § 1129(a)(9). As required by section 1129(a)(9), the Plan generally provides that the holder of each Allowed Administrative Expense Claim will receive payment in full in cash, unless the holder of a particular claim agrees to a different treatment with respect to such claim.

70.    Article 2 of the Plan discusses the treatment of Administrative Expense Claims and Priority Tax Claims. Under Article 2.2 of the Plan, each holder of an Allowed Administrative Expense Claim (save only Allowed Administrative Expense Claims for professional compensation and reimbursement of expenses, which are specifically addressed in Section 2.3 of the Plan) shall receive Cash in an amount equal to such Allowed Administrative Expense Claim on the later of the Effective Date and the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is practicable; provided, however, that (i) Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by a Debtor in Possession shall be paid in full and performed by the Debtors in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions[5]; and (ii) Allowed

---

[5] Pursuant to the Blue Care Sale Order, Blue Care assumed and became obligated to timely pay all obligations

Administrative Expense Claims arising from a personal injury arising after the Filing Date shall be satisfied solely from the Debtors' post-petition general liability insurance policies.

71.    Article 2.4 of the Plan provides that each holder of an Allowed Priority Tax Claim shall receive, in full and complete settlement, satisfaction and discharge of its Allowed Priority Tax Claim, at the option of the Plan Proponents or the Liquidation Trustee, (a) Cash in an amount equal to such Allowed Priority Tax Claim on the later of the Effective Date and the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon thereafter as is practicable, (b) in accordance with Bankruptcy Code section 1129(a)(9)(C), equal annual Cash payments commencing on the first anniversary of the Effective Date in an aggregate amount equal to such Allowed Priority Tax Claim, together with interest on any outstanding balance from the Effective Date at the applicable rate under non-bankruptcy law, over a period not exceeding five years after the Petition Date or (c) upon such other terms determined by the Bankruptcy Court to provide the holder of such Allowed Priority Tax Claim with deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Priority Tax Claim; provided, however, that the Debtors or Liquidation Trustee shall have the right to pay any Allowed Priority Tax Claim, or any remaining balance, in full, at any time on or after the Effective Date, without premium or penalty.

72.    Pursuant to Article 2.4.2 of the Plan, the Department of Treasury – Internal Revenue Service ("IRS") filed proofs of Claim in the following Estates: (1) QHC Villa Cottages, LLC (POC 5); (2) QHC Madison Square, LLC (POC 10); (3) QHC Management, LLC (POC 11 & 12); (4) Crestridge, Inc. (POC 17); (5) QHC Facilities, LLC (POC 19); (6) QHC Mitchellville, LLC (POC 20); (7) QHC Winterset North, LLC (POC 20); (8) Crestview

---

incurred by the Manager and required to be paid by the Manager under the Blue Care APA and Management Agreement, and the Debtors were released from such obligations.

Acres, Inc. (POC 22); (9) QHC Humboldt North, LLC (POC 22); (10) QHC Humboldt South, LLC (POC 22); and (11) QHC Fort Dodge Villa, LLC (POC 25).  The IRS' proofs of Claim total $1,089,436.30 (the "IRS Proofs of Claim").  The Debtors are currently owed refunds (the "Refunds") from the IRS for employee retention tax credits from the first and second quarters of 2021 that are in excess of the amounts set forth in the IRS Proofs of Claim. Therefore, as of the Effective Date, the Refunds will be deemed offset against the IRS' Proofs of Claim resulting in full satisfaction of any amounts owed by the Debtors to the IRS.  Any refunds owed to the Debtors in excess of the IRS Proofs of Claim will remain due and owing to the Debtors.

73.    Under Article 4.1 of the Plan, claims entitled to priority under the Bankruptcy Code, other than Administrative Expense Claims and Priority Claims (the "<u>Allowed Other Priority Claims</u>"), and except to the extent that a holder of an Allowed Other Priority Claim has been paid prior to the Effective Date or agrees to a different treatment, each such holder shall receive, in full and complete settlement, satisfaction and discharge of such Claim, Cash in an amount equal to such Claim, payable on the later of the Effective Date and the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, or as soon thereafter as is practicable.

74.    Article 4.2 of the Plan discusses the treatment of Secured Tax Claims. Except to the extent that a holder of an Allowed Secured Tax Claim has been paid prior to the Effective Date or agrees to a different treatment, each holder of an Allowed Secured Tax Claim shall receive, in full and complete settlement, satisfaction and discharge of its Allowed Secured Tax Claim, at the option of the Plan Proponents or the Liquidation Trustee, (i) Cash in an amount equal to such Allowed Secured Tax Claim, including any interest on such Allowed Secured Tax Claim required to be paid pursuant to Bankruptcy Code section 506(b), on the later of the

Effective Date and the date such Secured Tax Claim becomes an Allowed Secured Tax Claim, or as soon thereafter as is practicable, (ii) commencing on the first anniversary of the Effective Date and continuing on each anniversary thereafter over a period not exceeding five years after the Petition Date, equal annual Cash payments in an aggregate amount equal to such Allowed Secured Tax Claim, together with interest at the applicable rate under non-bankruptcy law, subject to the option of the Plan Proponents or the Liquidation Trustee to prepay the entire amount of the Allowed Secured Tax Claim or any remaining balance at any time, or (iii) upon such other terms determined by the Bankruptcy Court to provide the holder of such Allowed Secured Tax Claim with deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Secured Tax Claim.

75.    The treatment of Priority Claims under these Articles of the Plan satisfies the requirements of section 1129(a)(9) of the Bankruptcy Code.

**J.    Section 1129(a)(10):  The Plan has been Accepted by at Least One Impaired Class that is Entitled to Vote**

76.    Bankruptcy Code section 1129(a)(10) is an alternative requirement to Bankruptcy Code Section 1129(a)(8)'s requirement that each class of claims or interests must either accept the plan or be unimpaired under a plan.  Bankruptcy Code section 1129(a)(10) provides that, to the extent there is an impaired class of claims, at least one impaired class of claims must accept the plan, excluding acceptance by any insider. 11 U.S.C. § 1129(a)(10) (2018). Here, the Debtors have met this standard because the only impaired class, Class 4 (General Unsecured Claims) has voted, despite impairment of such Claims, to accept the Plan.    Therefore, the Plan satisfies the requirements of Bankruptcy Code section 1129(a)(10).

**K.    Section 1129(a)(11):  The Plan is Feasible**

77.    Bankruptcy Code section 1129(a)(11) requires that, as a condition to

confirmation, the Bankruptcy Court determine that a plan is feasible. Specifically, the Bankruptcy Court must determine that:

> Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

U.S.C. § 1129(a)(11).

78.     The statute requires the Bankruptcy Court to determine whether a plan is workable and has a reasonable likelihood of success. *See Danny Thomas Props. II Ltd. P'ship v. Beal Bank, S.S.B.* (*In re Danny Thomas Props. II Ltd. P'ship*), 241 F.3d 959, 962–63 (8th Cir. 2001); *Prudential Ins. Co. of America v. Monnier* (*In re Monnier Brothers*), 755 F. 2d 1336, 1341 (8th Cir. 1985) ("'[i]n determining whether [a plan] is feasible, the bankruptcy court has an obligation to scrutinize the plan carefully to determine whether it offers a reasonable prospect of success and is workable'") (*quoting United Props., Inc. v. Emporium Dept. Stores, Inc.*, 379 F.2d 55, 64 (8th Cir. 1967)). While the debtor bears the burden of proving plan feasibility, the applicable standard is by a preponderance of the evidence, which means presenting proof that a given fact is "more likely than not." *See In re Danny Thomas Props. II Ltd. P'ship*, 241 F.3d at 963; *CoreStates Bank, N.A. v. United Chem. Tech., Inc*., 202 B.R. 33, 45 (E.D. Pa. 1996).

79.     Further, a number of courts have held that this constitutes a "relatively low threshold of proof." *See In re Riverbend Leasing LLC*, 458 B.R. 520, 532 (Bankr. S.D. Iowa 2011) ("'only a relatively low threshold of proof is necessary to satisfy the feasibility requirement'") (quoting *In re Sagewood Manor Assocs. Ltd. P'ship*, 223 B.R. 756, 762 (Bankr. D. Nev. 1998)); *In re Mayer Pollack Steel Corp.*, 174 B.R. 414, 423 (Bankr. E.D. Pa. 1994) (stating that the debtors "have established that they meet the requisite low threshold of support for the [p]lan as a viable undertaking"); *see also Heartland Fed. Savs. & Loan Ass'n v. Briscoe*

*Enters., Ltd., II* (*In re Briscoe Enters., Ltd., II*), 994 F.2d 1160, 1166 (5th Cir. 1993) (upholding the bankruptcy court's ruling that reorganization that had only a "marginal prospect of success" was feasible because only "a reasonable assurance of commercial viability" was required).

80.    To demonstrate that a plan is feasible, it is not necessary for a debtor to guarantee success.  *In re Danny Thomas Props. II Ltd. P'ship*, 241 F.3d at 963; *United Props, Inc.*, 379 F.2d at 64; *see also In re U.S. Truck Co., Inc.,* 47 B.R. 932, 944 (E.D. Mich. 1985) ("'Feasibility' does not, nor can it, require the certainty that a reorganized company will succeed."). Rather, a debtor must provide only a reasonable assurance of success. *Clarkson v. Cooke Sales & Serv. Co.* (*In re Clarkson*), 767 F.2d 417, 420 (8th Cir. 1985) ("[T]he feasibility test contemplates 'the probability of actual performance of the provisions of the plan. . . .The test is whether the things which are to be done after confirmation can be done as a practical matter under the facts.'") (*quoting Chase Manhattan Mortg. & Realty Trust v. Bergman* (*In re Bergman*), 585 F.2d 1171, 1179 (2d Cir. 1978)); *In re Texaco, Inc*., 84 B.R. 893, 910 (Bankr. S.D.N.Y. 1988) ("All that is required is that there be a reasonable assurance of commercial viability.").

81.    Courts have also made clear that "the mere prospect of financial uncertainty cannot defeat confirmation of a Chapter 11 plan on feasibility grounds." *In re Union Fin. Servs. Group, Inc*., 303 B.R. 390, 427 (Bankr. E.D. Mo. 2003) (*citing In re Leslie Fay Cos., Inc.*, 207 B.R. 764, 789 (Bankr. S.D. N.Y. 1997)); *see also In re Adelphia Bus. Solutions, Inc.*, 341 B.R. 415, 421 (Bankr. S.D.N.Y. 2003) ("However, just as speculative prospects of success cannot sustain feasibility, speculative prospects of failure cannot defeat feasibility. The mere prospect of financial uncertainty cannot defeat confirmation on feasibility grounds").

82.    Applying the foregoing legal standards, the Plan satisfies the feasibility

requirement of Bankruptcy Code section 1129(a)(11). The Plan clearly complies with this requirement because all of the Debtors' remaining assets will be distributed to Creditors pursuant to the terms of the Plan and, provided the Plan is confirmed and consummated, the Estates will no longer exist to be subject to future reorganization or liquidation.

83.     While the Bankruptcy Court must independently determine the feasibility of the Plan, it should be noted that, the Plan Proponents have analyzed their ability to meet their obligations under the Plan, and as part of this analysis the Plan Proponents prepared a Plan Waterfall[6] that is attached hereto as "**Exhibit B**." As the Waterfall shows, the Plan Proponents submit there will be sufficient funds to fully satisfy Administrative and Priority Claims and make a distribution to general unsecured creditors pursuant to the treatment set forth in the Plan. Thus, the Plan is feasible and satisfies the requirements of Bankruptcy Code section 1129(a)(11).

### L.    *Section 1129(a)(12):  The Plan Provides for Full Payment of Statutory Fees*

84.     Bankruptcy Code section 1129(a)(12) requires the payment of "[a]ll fees payable under section 1930 [of title 28 of the United States Code], as determined by the court at the hearing on confirmation of the plan." 11 U.S.C. § 1129(a)(12) (2018). Bankruptcy Code section 507 provides that "any fees and charges assessed against the estate under [section 1930 of] chapter 123 of title 28" are afforded priority as administrative expenses. 11 U.S.C. § 507 (a)(1) (2018). In accordance with these provisions, Article 14.6 of the Plan provides that all fees payable pursuant to section 1930 of title 28 of the United States Code prior to the Effective Date shall be paid in accordance with the Plan. Based upon the foregoing, the Plan satisfies the requirements of Bankruptcy Code section 1129(a)(12).

---

[6] The Plan Waterfall was submitted as Debtors' Exhibit 5 for the Confirmation Hearing.

### M.   Section 1129(a)(13):  Retiree Benefits

85.    Bankruptcy Code section 1129(a)(13) requires a plan to provide for retiree benefits at levels established pursuant to Bankruptcy Code section 1114. 11 U.S.C. § 1129(a)(13) (2018).  The Debtors did not maintain retirement plans as contemplated by section 1114. Moreover, the Debtors have sold their assets and are no longer operating. Therefore, the Debtors have no further ongoing, current obligations to pension plans. Accordingly, the Plan Proponents submit that section 1129(a)(13) is not applicable.

### N.   Section 1129(a)(14):  Domestic Support Obligations

86.    Bankruptcy Code section 1129(a)(14) relates to the payment of domestic support obligations. The Debtors are not subject to any domestic support obligations, and, as such, this section of the Bankruptcy Code does not apply.

### O.   Section 1129(a)(15):  Objections by Allowed Unsecured Claims

87.    Bankruptcy Code section 1129(a)(15) does not apply in this Case as the Debtors are not individuals.

### P.   Section 1129(a)(16):  Transfers by a Corporation or Trust

88.    Bankruptcy Code section 1129(a)(16) provides that property transfers by a corporation or trust that is not a moneyed, business, or commercial corporation or trust be made in accordance with applicable provisions of non-bankruptcy law. The Plan Proponents submit that the Liquidation Trust and corresponding agreement comply with non-bankruptcy law including any applicable trust and tax law.

### Q.   Section 1129(b):  The Plan Satisfies the "Cram Down" Requirements of Section 1129(b)(1)

89.    Bankruptcy Code section 1129(b) provides a mechanism for confirmation of a plan in circumstances where the plan is not accepted by all impaired classes of claims and

equity interests. This mechanism is known colloquially as "cram down." Bankruptcy Code

section 1129(b) provides in pertinent part:

> [I]f all of the applicable requirements of [section 1129(a) of
> the Bankruptcy Code] other than [the requirement contained in
> section 1129(a)(8) that a plan must be accepted by all impaired
> classes] are met with respect to a plan, the court, on request of the
> proponent of the plan, shall confirm the plan notwithstanding
> the requirements of such paragraph if the plan does not
> discriminate unfairly, and is fair and equitable, with respect to
> each class of claims or interests that is impaired under, and has
> not accepted, the plan.

11 U.S.C. § 1129(b)(1)

90.     Thus, under Bankruptcy Code section 1129(b), the Bankruptcy Court may "cram

down" a plan over rejection by impaired classes of claims or equity interests as long as the plan

does not "discriminate unfairly" and is "fair and equitable" with respect to such classes. *See,

e.g., In re Am. Trailer & Storage, Inc.*, 419 B.R. 412, 433 (Bankr. W.D. Mo. 2009).

91.     While Class 4, the only class allowed to vote, has voted to accept the Plan, the

Holders of Claims in Classes 5, 6, and 7 are each impaired are deemed to reject the Plan. Those

Holders of Claims in Classes 5, 6, and 7 will receive no distributions under the Plan. Class 5 consists

of Claims that are subordinated pursuant to section 510(b) of the Bankruptcy Code. Classes 6 and

7 are Intercompany Claims and Equity Interest Claims that shall be extinguished under the Plan.

92.     The Bankruptcy Code does not provide a standard for determining when "unfair

discrimination exists." *See In re 203 N. LaSalle St. P'ship*, 190 B.R. 567, 585 (Bankr. N.D. Ill.

1995) (noting "the lack of any clear standard for determining the fairness of a discrimination in

the treatment of classes under a chapter 11 plan" and that "the limits of fairness in this context

have not been established"), rev'd on other grounds, 526 U.S. 434 (1999). Rather, courts typically

examine the facts and circumstances of the particular case to determine whether unfair

discrimination exists. Courts often hold that a plan unfairly discriminates only if it provides

materially different treatment for creditors and interest holders with similar legal rights without compelling justifications for doing so. *See In re Lernout & Hauspie Speech Prods., N.V.*, 301 B.R. 651, 661–62 (Bankr. D. Del. 2003).

93.     The Plan does not unfairly discriminate Classes 5, 6, or 7. There is no equally situated class that is receiving more favorable treatment than Classes 5, 6, or 7. Further, under the absolute priority rule, holders of interests are not entitled to receive any distribution on account of their interests absent payment in full of all classes ahead of them. Those Holders of Claims in Classes 5, 6, and 7 will receive no distributions under the Plan.

94.     A plan is "fair and equitable" with respect to an impaired class of claims or interests that rejects a plan (or is deemed to reject a plan) if it follows the "absolute priority" rule. *203 N. LaSalle St. P'ship,* 526 U.S. at 441–42. This requires that an impaired rejecting class of claims or interests either be paid in full or that a class junior to the impaired accepting class not receive any distribution under a plan on account of its junior claim or interest. *Id.*

95.     The treatment of Classes 5, 6, and 7 conforms to the absolute priority rule and is therefore fair and equitable within the meaning of section 1129(b). Further, there is no equally situated class receiving more favorable treatment. Accordingly, the Plan satisfies the cramdown requirements of section 1129(b) of the Bankruptcy Code and may be confirmed notwithstanding the deemed rejection of Classes 5, 6, and 7.

## II.    Substantive Consolidation of the Debtors

96.     Prior to bankruptcy, the Webb Trust and Lincoln Savings Bank asserted secured claims in excess of $25 million against all of the Debtors' assets.  As a result of a recent Court-approved settlement reached with both creditors, the Claims of each were fully resolved, thereby benefitting creditors across all of the Debtors' Estates.  Therefore, for purposes of the Plan, all

remaining assets and liabilities of the Debtors are deemed the assets and liabilities of a single consolidated entity. On the Effective Date, the assets and liabilities of the Debtors shall be substantively consolidated for all purposes under the Plan, including distributions from the Liquidation Trust.

97.     Substantive consolidation involves the pooling of the assets and liabilities of related debtor entities into a unitary debtor estate from which all claims are paid. *In re Huntco Inc.*, 302 B.R. 35 (Bankr. E.D. Mo. 2003). In substantive consolidation, "[t]he intercompany claims of the debtor companies are eliminated, the assets of all debtors are treated as common assets and claims of outside creditors as against any of the debtors are treated as against the common fund…" *Chemical Bank N.Y. Trust Co. v. Kheel*, 369 F.2d 845, 847 (2d Cir. 1966).

98.     Substantive consolidation is an extraordinary remedy, and no specific provision of the Bankruptcy Code expressly authorizes it. *See* Substantive Consolidation in Bankruptcy, Practical Law Practice Note 7-521-6812. Courts generally find authority for the remedy in the broad equitable powers conferred in section 105(a) of the Bankruptcy Code, which authorizes the court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code.

99.     Substantive consolidation rulings are determined on a case-by-case basis. *See In re Cooper*, 147 B.R. 678, 682 (Bankr. D.N.J. 1992); see also *In re Augie-Restivo Banking Co*., 860 F.2d at 518 (The sole purpose of substantive consolidation is to insure the equitable treatment of all creditors).; *FDIC v. Colonial Realty Co*., 966 F.2d 57, 59 (2d Cir. 1992) ("Courts have consistently found the authority for substantive consolidation in the bankruptcy court's general equitable powers as set forth in 11 U.S.C. § 105").

100.    While considering substantive consolidation, courts often analyze: (1) pre-

bankruptcy conduct between the entities sought to be consolidated; (2) balance of harms versus benefits of consolidation to creditors and parties in interest; and (3) the impact substantive consolidation would have on the estates. *See* Substantive Consolidation in Bankruptcy, Practical Law Practice Note 7-521-6812. See also *In re Affiliated Foods*, 249 B.R. 770 (Bankr.W.D.Mo.2000). The fact that some creditors will be disadvantaged is not grounds to deny substantive consolidation. *See In re Woodbridge Group of Companies, LLC,* 592 B.R. 761, 775 (Bankr. D. Del. 2018).

101.    The necessity of consolidation is largely premised on the interrelationship among the Debtors. Subfactors of this category to be considered in analyzing the interrelationship among the debtors include: (1) ownership, officers, directors, and the corporate structure; (2) operation of the entities' businesses; and (3) the financial dealings of the entities. In addressing subfactor one, courts look to whether the officers and directors of all entities were the same; whether the entities shared board meetings or held them separately; whether the annual corporation fees for the entities were paid from the same funds; and whether the state registration fees were paid by the same funds. Other factors courts have considered are:

> ➢ Assumption by a parent of contractual obligations of its subsidiaries.

> ➢ The sharing of overhead, management, accounting, and other related expenses among the affiliated entities.

> ➢ The existence of intercompany guarantees on loans.

> ➢ Failure to distinguish between property of each entity (for example, because the property is commingled).

> ➢ The shifting of funds from one affiliate to another without observing corporate formalities.

> ➢ A parent paying salaries of employees of subsidiaries.

> ➤ A subsidiary having grossly inadequate capital.

> ➤ The degree of difficulty in segregating and ascertaining the assets and liabilities of each affiliate.

> ➤ The affiliates having consolidated financial statements.

> ➤ A parent owning all or most the capital stock of a subsidiary.

> ➤ Common directors or officers among the affiliates.

> ➤ A parent or its affiliates financing a subsidiary.

> ➤ A parent shifting people on and off a subsidiary's board of directors.

> ➤ A subsidiary having substantially no business except that with a parent or its affiliates or no assets except those conveyed to it by a parent or an affiliate.

> ➤ A parent referring to a subsidiary as a department or division.

> ➤ The directors of a subsidiary not acting independently in the interest of the subsidiary, but taking direction from the parent.

> ➤ Affiliates acting from the same business location.

*See In re Drexel Burnham Lambert Grp., Inc*., 138 B.R. 723, 764 (Bankr. S.D.N.Y. 1992).

102.    The Eighth Circuit has further stated that bankruptcy courts should analyze the following three factors: (1) the necessity of consolidation due to the interrelationship among the debtors; (2) whether the benefits of consolidation outweigh the harm to creditors; and (3) prejudice resulting from not consolidating the debtors. *First Nat'l Bank v. Giller (In re Giller*), 962 F.2d 796, 799 (8th Cir.1992). The Eighth Circuit's use of the term "include" in identifying these three factors indicates that these factors are only illustrative of the type of fact specific analysis that the court must conduct. *In re Affiliated Foods*, 249 B.R. at 777.

103.    Substantive consolidation may be accomplished through a chapter 11 plan. *See* 11 U.S.C. § 1123(a)(5)(c). Section 1123(a)(5)(C) provides, in part, "a plan shall provide adequate means for the plan's implementation, such as merger or consolidation of the debtor with one or

more persons." *See e.g., In re Stone & Webster, Inc.*, 286 B.R. 532, 541 (Bankr. D. Del. 2002)

("Courts have held that [Section 1123(a)(5)(C)] indicates Congress' intent that a chapter 11 debtor

may merge or consolidate with other entities, including other debtors, as part of the reorganization

process. . . substantive consolidation is expressly authorized by . . . § 1123(a)(5)(C)"). Courts have

held that if the legal standard of substantive consolidation has been met, then it can be

accomplished through a plan. *See In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723; *see

also In re Apex Oil Co.*, 92 B.R. 847 (Bankr. E.D. Mo. 1988).

104.    In addition, the Bankruptcy Code and applicable case law make clear that Plan

Proponents do not have to provide non-consolidated financial information in a disclosure statement

relating to a substantive consolidation plan. *See In re Stone & Webster, Inc.*, 286 B.R. at 544–46;

*In re Affiliated Foods, Inc.*, 249 B.R. at 789. In fact, Debtors are not obligated to provide

information regarding any other possible or proposed plan of reorganization. *See* 11 U.S.C. §

1125(a)(1); *see also Kirk v. Texaco Inc.*, 82 B.R. 678, 684 (S.D.N.Y.1988); *In re Aspen Limousine

Service, Inc.*, 193 B.R. 325, 334 (D.Colo.1996).

105.    In Affiliated Foods, the Committee filed a consolidated Chapter 11 Plan of

Liquidation for Affiliated Foods and its two subsidiaries. *In re Affiliated Foods*, 249 B.R. at 777.

The Court addressed the aspect of substantive consolidation through the plan of liquidation

specifically in footnote 3 stating:

> There has been no complaint by any creditor or interested party to
> the provision for substantive consolidation being included in the
> Plan of Liquidation, rather than being brought before the Court in a
> separate motion, with separate notice and hearing. Though unusual,
> it is not inappropriate to propose substantive consolidation in a
> Chapter 11 plan. See In re Piece Goods Shops Co., L.P., 188 B.R.
> 778 (Bankr.M.D.N.C.1995). The Court finds that the creditors have
> been given appropriate notice of the proposal for substantive
> consolidation, in that the proposal was set out in a separate section
> prominently captioned, in bold face capital letters, "Substantive

34

Consolidation." The Court held an all-day hearing on confirmation of the Plan, at which time any party could have raised objections, but none did so. Therefore, all parties have been accorded procedural due process. Cf. In Re N.S. Garrott & Sons, 48 B.R. 13, 18 (Bankr.E.D.Ark.1984).

*Id.* at 775.

106.    When considering the burden of proof required for substantive consolidation, the

*Affiliated Foods* court stated that a preponderance of evidence standard would be sufficient. *Id.*

The moving party bears the burden of proof to demonstrate that substantive consolidation is

appropriate. *See In re Clark*, 548 B.R. 246, 254 (B.A.P. 9th Cir. 2016).

107.    Ultimately, the court in *Affiliated Foods* allowed the substantive consolidation

through the plan of liquidation. *Id.* at 777-78. The Court concluded: (1) that the entities were so

intertwined in their business and corporate relationships that they were difficult to separate; (2)

creditors substantially benefited from consolidation; and (3) creditors would be prejudiced by

non-consolidation in that greater expenses would be incurred through litigation of intercompany

claims and liabilities. *Id.* at 778.

108.    The interrelationship among the QHC entities/Debtors strongly supports the

necessity of substantive consolidation as demonstrated by the following facts.   The Debtors:

    a.  Historically shared and continued to share overhead, management, accounting, and substantially every other related business function;

    b.  Occupied a single management office in Clive, Iowa which was also the base of field operations direction and oversight;

    c.  Shared common welfare benefit plans;

    d.  Utilized the same employee handbook;

    e.  Made all policy and management decisions on behalf of all Debtors out of the Clive office rather than at each of the individual facilities;

    f.  Shared non-management and management staff across facilities;

    g.  Utilized a single accounting and payroll system for all Debtors' operations;

    h.  Were managed and controlled by common officers and directors;

     i.    Shared a single director and officer insurance policy, from which any recovery, if any, may be a significant asset to be distributed for the benefit of all of the Estates;

     j.    All of the Debtors' collections were consolidated into a single account from which all vendor and payroll disbursements were made;

     k.    Jointly pledged substantially all of their real estate and most of their personal property as collateral to the Webb Trust and Lincoln Savings Bank, with the face amount of such liens (greater than $25 million) substantially in excess of the value of the underlying collateral; and

     l.    In order to maintain the value of the Debtors' assets as a going concern, obtained a $2 million Debtor-in-possession loan for which all of the Debtors were jointly liable, and which was secured by all of the Debtors' assets.

109.    Further, the Debtors maintained a centralized cash management system which effectively resulted in the sharing of cash among each of the Entities on an as-needed basis resulting in intercompany debt. Substantive consolidation will eliminate such intercompany debt. The Debtors and Committee professionals believe there would be significant administrative cost to accurately verify the remaining Assets and liabilities of each of the Debtors individually with certainty. Moreover, such additional administrative cost would significantly diminish funds available to the general unsecured creditors.

110.    The benefits of substantive consolidation outweigh the harm to creditors. Substantive consolidation would have no adverse effect on LSB or the Webb Family Trust. Similarly, substantive consolidation would have no adverse effect on priority claims of the Entities. Thus, the only group of creditors that may be affected by the consolidation is the general unsecured creditors. The potential distribution in this case for the general unsecured creditors was made possible only through settlement agreements reached with the secured lenders, federal government, and state government. These settlements essentially eliminated all secured claims (including any deficiency claims) and a significant portion of priority debt on an unallocated basis. Through the LSB Settlement, approximately $25 million of secured debt was settled across all of the Estates.

111.    If substantive consolidation does not occur, these cases will almost certainly be converted to chapter 7.  If that occurs, it is highly likely one or more settlements would no longer be valid. For example, the federal and state governments have made it known that a distribution to general unsecured creditors was an important part of the deals struck.  Further, under chapter 7, the State of Iowa might not agree to the Plan treatment proposed, resulting in a multi-million-dollar priority claim which would likely eliminate any funds for general unsecured creditors.  In addition, it can be expected that the overall cost of concluding these bankruptcy cases will materially increase if consolidation does not occur resulting in Plan failure. Moreover, there would be delays in case administration and closing should that occur.

112.    Although there is a theoretical possibility that some unsecured creditors might receive a larger distribution without substantive consolidation of the Debtors, the Plan Proponents submit that the cost of trying to objectively identify and separate the assets and liabilities of each Debtor as well as the highly subjective nature of any allocation of the benefits achieved through the settlements with the secured creditors as well as the governmental entities, make such an outcome highly speculative and very likely unachievable.

113.    In light of the foregoing, many, if not all, of the factors courts analyze when considering substantive consolidation exist here as (1) these Debtors are so intertwined in their business and corporate relationships that it would be difficult, if not impossible, to separate; (2) creditors will substantially benefit from consolidation; and (3) creditors would be prejudiced by non-consolidation in that greater expenses would be incurred through delay and litigation over intercompany claims and liabilities.

**III.    Objections to Confirmation of the Plan**

114.    Three parties have filed objections to plan confirmation: the UST (the "UST

Limited Objection") (Docket No. 618), the United States of America (the "United States'
Objection") (Docket No. 613), and Cedar Healthgroup, LLC ("Cedar's Objections") (Docket Nos.
611 & 615). The Plan Proponents remain in discussions with the objecting parties to resolve any
outstanding issues in advance of the Confirmation Hearing. The Plan Proponents have provided
an affirmative response to the specific objections below. To the extent necessary, the Plan
Proponents will be prepared to address all remaining objections on the record at the Confirmation
Hearing.

### A. The United States Trustee's Limited Objection[7]

115.    In the UST Limited Objection, the UST discusses the selection of Ronald Winters
as the Liquidation Trustee. The UST is correct that the Debtors mailed a "final version" of the
Disclosure Statement and Plan, selecting Ronald Winters as the Liquidation Trustee, to all parties
listed on the filed certificate of service on or about January 25, 2023 (Docket No. 598). In its
Objection, the UST argues that the "disclosures surrounding Ronald Winters' appointment are
inadequate and not correct, and [that] more information should be provided to parties in interest."
*See* UST Objection p.3. The UST further argues that Mr. Winters is not a disinterested party, and
that a potential conflict of interest exists by virtue of his role as financial advisor to the Debtors.
*Id.* To resolve these potential conflict issues, the Plan Proponents propose that Ronald Winters, as
Liquidation Trustee, defer the right to bring objections to his final fee application (as financial
advisor to the Debtors) to the UST, who has actively reviewed fee applications of professionals
throughout this case.  Based upon conversations with the Office of the United States Trustee, the
Plan Proponents believe this will satisfy this aspect of the UST's objection.

116.    The UST also argues that the Plan did not adequately disclose Mr. Winters'

---

[7] Based upon conversations with the UST, the Plan Proponents believe the UST will have no further objections once feasibility is established on the record at the Confirmation Hearing.

compensation as Liquidation Trustee. Mr. Winters has proposed performing Liquidation Trustee services for $1,000 per month, _except_ for "Excepted Services" which include participating or preparation for depositions, testimony, and litigation support (including assisting counsel in deposition or cross-examination of others). Fees for Excepted Services shall be at Mr. Winters' hourly rate of $745.

117.    In order to execute the work efficiently, Mr. Winters plans to retain his firm, Gibbins Advisors, LLC, to perform work under his supervision and direction (no additional fees for such supervision beyond described in the fixed monthly fee component ($1,000 per month). Such work by Gibbins Advisors professionals will be at hourly rates provided below, however the blended average rate for such work will not exceed $500 per hour in any month.   Mr. Winters plans to have such work performed by Brad Williams and Tyler Brasher, each of whom have worked extensively on the QHC matter and are very knowledgeable of the cases.

| Gibbins Advisors 2023 Rates | |
| --- | --- |
| GA Professional[1] | Hourly Rates |
| Managing Director / Principal[2] | $650 – $775 |
| Director / Senior Director | $475 – $610 |
| Associate / Senior Associate | $350 – $450 |
| Data Analyst | $200 – $295 |

[1] And contractors so designated by GA.
[2] The hourly rate for GA Principals Ronald Winters and Clare Moylan is $745.

118.    The UST, United States, and Cedar also raise the issue of the Debtors' ability to pay claims. The Plan Proponents have analyzed their ability to meet their obligations under the Plan, and as part of this analysis the Plan Proponents prepared a Plan Waterfall. Moreover, at the Confirmation Hearing, the Debtors will further provide evidence which will demonstrate their financial ability to satisfy all Administrative and Priority Claims due upon the Effective Date or thereafter as approved by the Court and provide a return to Class 4 general unsecured creditors.

119. The UST, United States, and Cedar further argue that the Plan impermissibly imposes an injunction equivalent to a discharge injunction. To resolve this objection, the Plan Proponents propose to include in the Confirmation Order the following revised language that was recently approved by this Court and accepted by the UST:

**EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION, OR LIABILITIES THAT: (1) ARE SUBJECT TO COMPROMISE AND SETTLEMENT PURSUANT TO THE TERMS OF THE PLAN; (2) ARE SUBJECT TO EXCULPATION PURSUANT TO SECTION 14.4 HEREOF (BUT ONLY TO THE EXTENT OF THE EXCULPATION PROVIDED IN SECTION 14.4); OR (3) ARE OTHERWISE STAYED OR TERMINATED PURSUANT TO THE TERMS OF THE PLAN, ARE PERMANENTLY ENJOINED AND PRECLUDED, FROM AND AFTER THE EFFECTIVE DATE, FROM: (A) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND, INCLUDING ON ACCOUNT OF ANY CLAIMS, EQUITY INTERESTS, CAUSES OF ACTIONS, OR LIABILITIES THAT HAVE BEEN COMPROMISED OR SETTLED AGAINST THE DEBTORS, THE LIQUIDATING TRUST, OR ANY ENTITY SO EXCULPATED (OR THE PROPERTY OR ESTATE OF ANY ENTITY, DIRECTLY OR INDIRECTLY, SO EXCULPATED, INCLUDING THE LIQUIDATING TRUST AND THE LIQUIDATING TRUST ASSETS) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION, OR LIABILITIES; (B) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST THE DEBTORS, THE LIQUIDATING TRUST, OR ANY ENTITY SO EXCULPATED (OR THE PROPERTY OR ESTATES OF THE DEBTORS OR ANY ENTITY SO EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION, OR LIABILITIES; (C) CREATING, PERFECTING, OR ENFORCING ANY LIEN, CLAIM, OR ENCUMBRANCE OF ANY KIND AGAINST THE DEBTORS, THE LIQUIDATING TRUST, OR ANY ENTITY SO EXCULPATED (OR THE PROPERTY OR ESTATES OF THE DEBTORS OR ANY ENTITY SO EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION, OR LIABILITIES; (D) ASSERTING ANY RIGHT OF SETOFF (UNLESS PREVIOUSLY ASSERTED) OR SUBROGATION OF ANY KIND AGAINST ANY OBLIGATION DUE FROM THE DEBTORS, OR ANY ENTITY SO**

**EXCULPATED (OR THE PROPERTY OR ESTATES OF THE DEBTORS OR ANY ENTITY SO EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION, OR LIABILITIES UNLESS SUCH ENTITY HAS TIMELY ASSERTED SUCH SETOFF RIGHT PRIOR TO CONFIRMATION IN A DOCUMENT FILED WITH THE BANKRUPTCY COURT EXPLICITLY PRESERVING SUCH SETOFF OR SUBROGATION, AND NOTWITHSTANDING AN INDICATION OF A CLAIM OR INTEREST OR OTHERWISE THAT SUCH ENTITY ASSERTS, HAS, OR INTENDS TO PRESERVE ANY RIGHT OF SETOFF OR SUBROGATION PURSUANT TO APPLICABLE LAW OR OTHERWISE; AND (E) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND AGAINST THE DEBTORS, THE LIQUIDATING TRUST, OR ANY ENTITY SO EXCULPATED (OR THE PROPERTY OR ESTATES OF THE DEBTORS, THE LIQUIDATING TRUST, OR ANY ENTITY SO EXCULPATED) ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH SETTLED, COMPROMISED, OR EXCULPATED CLAIMS, EQUITY INTERESTS, CAUSES OF ACTION, OR LIABILITIES SETTLED, OR COMPROMISED PURSUANT TO THE PLAN; PROVIDED THAT NOTHING CONTAINED IN THE PLAN SHALL PRECLUDE AN ENTITY FROM OBTAINING BENEFITS DIRECTLY AND EXPRESSLY PROVIDED TO SUCH ENTITY PURSUANT TO THE TERMS OF THE PLAN; PROVIDED, FURTHER, THAT NOTHING CONTAINED IN THE PLAN SHALL BE CONSTRUED TO PREVENT ANY ENTITY FROM DEFENDING AGAINST CLAIMS OBJECTIONS OR COLLECTION ACTIONS WHETHER BY ASSERTING A RIGHT OF SETOFF OR OTHERWISE TO THE EXTENT PERMITTED BY LAW.**

*See In re Cycle Force Group*, *LLC*, No. 21-00571-als11 (Bankr. S.D.IA. April 22, 2021).

120.    Further, the Debtors will add a provision in the Confirmation Order stating that "**Notwithstanding anything to the contrary herein, the Debtors shall not receive a discharge under the Plan.**" This language also has been accepted by this Court and the UST. *See id.*

121.    This updated injunction provision is consistent with sections 105, 1122, 1123(b)(6), 1123(b)(3)(A), 1129 and 1142 of the Bankruptcy Code.

### B. The United States' Further Objections

122.    The United States and Plan Proponents have been in ongoing negotiations regarding

the HRSA claims and believe the U.S. Government's concerns have been resolved through the insertion of agreed language which will be contained within the Confirmation Order.

123.    The Plan Proponents also do not believe that the Plan affects the terms of the prior U.S. Settlement Agreement, and further state that these issues will be resolved through the insertion of agreed language within the Confirmation Order.

### C. Cedar's Objections

124.    The Plan Proponents and Cedar have engaged in ongoing settlement discussions regarding Cedar's Objections to the Plan and believe Cedar's objections have been resolved through settlement. The Plan Proponents believe a withdrawal of Cedar's Objections will be forthcoming.

125.    Therefore, based on the foregoing, the UST, United States and Cedar Objections should all be overruled.

### CONCLUSION

126.    For the foregoing reasons, the Plan Proponents submit that the Plan fully satisfies all applicable requirements of the Bankruptcy Code and respectfully requests that the Bankruptcy Court enter an order (i) confirming the Plan and (ii) granting such other and further relief as is just and proper.


Dated February 22, 2023.

Jeffrey D. Goetz, Esq., AT0002832
Bradshaw Fowler Proctor & Fairgrave, PC
801 Grand Avenue, Suite 3700
Des Moines, IA  50309-8004
515/246-5880
515/246-5808 FAX
goetz.jeffrey@bradshawlaw.com

General Reorganization Counsel for
Debtors and Debtors in Possession

/s/ *Krystal R. Mikkilineni*
Krystal R. Mikkilineni, AT0011814
Tirzah R. Roussell, AT0014113
Dentons Davis Brown, P.C.
The Davis Brown Tower
215 10th ST. Suite 1300
Des Moines, IA  50309
(515) 246-7943
krystal.mikkilineni@dentons.com
tirzah.roussell@dentons.com

General Reorganization Co-Counsel for
Debtors and Debtors in Possession

/s/ *Francis J. Lawall*
Francis J. Lawall (admitted pro hac vice)
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103-2799
Tel: (215) 981-4481
Fax: (215) 689-4693
lawallf@pepperlaw.com

Deborah Kovsky-Apap (admitted pro hac
vice)
Suite 1800
4000 Town Center
Southfield, MI 48075
Tel: (248) 359-7300
Fax: (248) 359-7700
kovskyd@pepperlaw.com

Robert C. Gainer
1307 50th St.
West Des Moines, IA 50266
Tel: (515) 223-6600
Fax:(515) 223-6787
rgainer@cutlerfirm.com

Counsel to the Official Committee
of Unsecured Creditors

## CERTIFICATE OF SERVICE

This document was served electronically on parties who receive electronic notice through CM/ECF as listed on CM/ECF's notice of electronic filing.

*/s/      Tirzah Roussell*

**EXHIBIT A**

**QHC Facilities, LLC, *et al.***
**Liquidation Analysis as of 2/17/2023**
*(Dollars in $000s)*

<span style="color:red">Amounts are Subject to Change</span>

| | | Chapter 11 | | | | Chapter 7 | |
|---|---|---|---|---|---|---|---|
| 1 | | **ASSETS (see General Note)** | | | | **ASSETS (see General Note)** | |
| 2 | | *Estimated cash & claims to cash* | $ | 4,828.7 | | *Estimated cash & claims to cash* | $ 4,828.7 |
| 3 | | **LIABILITIES** | | | | **LIABILITIES** | |
| 4 | | **Chapter 11 Post-Confirmation Expense** | | | | **Chapter 7 Expense** | |
| 5 | | Liquidating Trustee compensation (Note 1) | | (180.0) | | Chapter 7 Trustee commissions (Note 4) | (144.9) |
| 6 | | Liquidation Trust legal fees (Note 2) | | (150.0) | | Chapter 7 Trustee legal fees (Note 2) | (150.0) |
| 7 | | Contingency Fee Professionals (Note 3) | | - | | Support from Chapter 11 Professionals | (90.0) |
| 8 | | Total - Liquidating Trust expenses | | (330.0) | | Total - Chapter 7 expenses | (384.9) |
| 9 | **Class** | **Distributions** | | | | **Distributions** | |
| 10 | Unclassified | Administrative expense claims (Note 5) | | (2,095.7) | | Administrative expense claims (Note 5) + post-petition QAAF claims | (2,841.4) |
| 11 | Unclassified | Professional compensation and reimbursement claims (Note 5) | | (816.9) | | Professional compensation and reimbursement claims (Note 5) | (816.9) |
| 12 | Unclassified | Priority tax claims (Note 6) | | - | | Priority tax claims (Note 6) | - |
| 13 | Class 1 | Other priority claims | | (32.7) | | Other priority claims (including pre-petition QAAF) | (3,963.5) |
| 14 | Class 2 | Secured tax claims (Property tax) (Note 7) | | - | | Secured tax claims (Property tax) (Note 7) | - |
| 15 | Class 3 | Other secured claims | | (0.3) | | Other secured claims | (0.3) |
| 16 | | Subtotal - Secured, Administrative and Priority Distributions | | (2,945.6) | | Subtotal - Secured, Administrative and Priority Distributions | (7,622.1) |
| 17 | Class 4 | Available for GUC recovery (including QAAF claims) (Note 8) | $ | 1,553.1 | | Available for GUC recovery | $ (3,178.3) |

| | |
|---|---|
| General Note | "Assets" exclude any potential, but speculative litigation recoveries and "Liabilities" include items subject to final resolution that may impact final claim amounts (i.e., all amounts are estimates and are subject to change) |
| Note 1 | Estimated trustee fees of $7,500 per month for 24 months |
| Note 2 | Estimated non-litigation professional fees for 24 months |
| Note 3 | Assumes that estate litigation will be performed on a contingency basis |
| Note 4 | Statutory formula of 3% of remaining outflows that could be higher if any litigation recoveries increase available distributable assets |
| Note 5 | Estimated through March 31, 2023, includes Section 503(b)(9) claims of $0.010 and reserve for HRSA claims of $0.974 |
| Note 6 | Priority IRS Claims |
| Note 7 | Proofs of claim filed, but subject to objection; Debtors do not anticipate any outstanding claims as sale transactions for all real property have closed |
| Note 8 | Availability of funds for distribution to Class 4 may be enhanced by speculative litigation recoveries and/or reduced by final resolution of claims |

## EXHIBIT B

**QHC Facilities, LLC,** *et al.*

**Plan Waterfall**

<span style="color:red">Amounts are Subject to Change</span>

As of: **February 17, 2023**

*(Dollars in $000s)*

| | | | | | Notes |
|---|---|---|---|---|---|
| 1 | **Cash and Other Proceeds** | | | | |
| 2 | Cash | $ 4,828.7 | | | Includes Professional Fee Escrow account balance ($31.4K) |
| 3 | Receivable - Debtors' costs related to discontinued properties | TBD | | | Amount due from Lincoln Savings Bank per Stipulation with Debtors |
| 4 | ***Total Cash and Other Proceeds*** | $ 4,828.7 | | | |
| 5 | **Cash Disbursements** | | | | |
| 6 | Escrow - Lincoln Savings Bank | (500.3) | | | |
| 7 | Unreconciled Closing proceeds | (75.0) | | | |
| 8 | US Trustee Fees | (60.7) | | | Estimate of fees on 2023 Debtor disbursements |
| 9 | Home Office Costs | (55.0) | | | |
| 10 | Income Tax Return Prep 2021-2023 | (100.0) | | | Estimated fees, net of $20K retainer previously paid |
| 11 | 401(k) Audit 2021 | (20.0) | | | Estimated fees |
| 12 | Brighton Consulting Group Services | (50.0) | | | Estimated fees for financial reporting, cost reports, HRSA reporting, et al. |
| 13 | Resident Trust Account Audit | (88.0) | | | Estimated preliminary audit findings |
| 14 | Professional Fees and Expenses through Second Fee Applications | (31.4) | | | |
| 15 | Professional Fees and Expenses after Second Fee Applications | (785.5) | | | Preliminary estimate of fees and expenses from 11/1/22 thru 3/31/23 (POL Effective Date) |
| 16 | Secured Claims | (0.3) | | | Debtors' best estimate based upon analysis of claims register, subject to final claims analysis |
| 17 | Administrative Expense Claims | (162.3) | | | Debtors' best estimate based upon analysis of claims register, subject to final claims analysis |
| 18 | Administrative Expense Claims - HRSA Reserve | (974.2) | | | Reserve established per agreement with Federal government |
| 19 | Priority Claims | (32.7) | | | Debtors' best estimate based upon analysis of claims register, subject to final claims analysis |
| 20 | 503(b)(9) Claims | (10.3) | | | Debtors' best estimate based upon analysis of claims register, subject to final claims analysis |
| 21 | ***Total Cash Disbursements*** | | $ (2,945.6) | | |
| 22 | ***Cash Available for Distribution by GUC Trust*** | | | $ 1,883.1 | |
| 23 | **Post-Confirmation: Other Assets that may be Monetized** | | | | |
| 24 | Cedar Healthgroup Deposit | TBD | | | Subject to resolution of appeal |
| 25 | Cedar Healthgroup Damages | TBD | | | Subject to resolution of appeal |
| 26 | D&O Insurance Claims | TBD | | | |
| 27 | Chapter 5, Litigation Claims, etc. | TBD | | | |
| 28 | Miscellaneous unliquidated assets | TBD | | | |